**NIXON PEABODY LLP**
Barbara A. Lukeman
437 Madison Avenue
New York, NY 10022
Telephone:    (212) 940-3104
Facsimile:    (866) 581-5054
E-mail:        blukeman@nixonpeabody.com

**GLYNN & FINLEY, LLP**
Clement L. Glynn (*pro hac vice*)
James M. Hanlon, Jr. (*pro hac vice*)
100 Pringle Avenue, Suite 500
Walnut Creek, CA 94596
Telephone:    (925) 210-2800
Facsimile:    (925) 945-1975
E-mail        cglynn@glynnfinley.com
              jhanlon@glynnfinley.com

*Counsel for Defendant Barbara's Bakery, Inc.*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

------------------------------------------------------

| | | |
|---|---|---|
| ERIN SILBER, on behalf of herself and all others similarly situated, | : | No.: 12-cv-05511-WFK-RLM |
| | : | |
| Plaintiff, | : | **NOTICE OF CLASS ACTION** |
| | : | **SETTLEMENT, MOTION FOR** |
| v. | : | **PRELIMINARY APPROVAL OF CLASS** |
| | : | **ACTION SETTLEMENT AND MOTION** |
| BARBARA'S BAKERY, INC., | : | **TO ENJOIN THIS ACTION** |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

------------------------------------------------------

1

Defendant Barbara's Bakery, Inc. ("Barbara's") hereby notifies the Court and Plaintiff that Barbara's has entered into a national class action settlement in the case *Trammell v. Barbara's Bakery, Inc.*, Case No. C12-02664-CRB (N.D. Cal.), the plaintiff in *Trammell* has filed a motion for preliminary approval of the national class action settlement and Barbara's has filed in *Trammell* a motion to enjoin this and other litigation pursuant to the All Writs Act, 28 U.S.C. § 1651, the Anti-Injunction Act, 28 U.S.C. § 2283, and Federal Rules of Civil Procedure, Rule 23(d). If the settlement agreement is approved by the Northern District of California, it will moot the putative class claims sought in this action.

Barbara's attaches the following documents that have been filed in *Trammell*:

1.      "Settlement Agreement" and associated exhibits (Docket No. 37, filed April 25, 2013).

2.      "Plaintiff's Motion for Preliminary Approval of Class Action Settlement" and associated documents (Docket No. 36, filed April 25, 2013).

3.      "[Proposed] Order Preliminarily Certifying a Class For Settlement Purposes, Preliminarily Approving the Class Settlement, Appointing Class Counsel, Directing Issuance of Notice to the Class, Scheduling a Fairness Hearing, and Issuing Related Orders," (Docket No 38, filed April 25, 2013).

4.      "Defendant Barbara's Bakery, Inc.'s Motion for Preliminary Approval of Class

Action Settlement and Request for Preliminary Injunction," (Docket No. 39, filed April 26,

2013).

April 26, 2013

By: _Clement Glynn/one_____

Clement L. Glynn (*pro hac vice*)
James M. Hanlon, Jr. (*pro hac vice*)
GLYNN & FINLEY, LLP
One Walnut Creek Center
100 Pringle Avenue, Suite 500
Walnut Creek, California  94596
Telephone:      (925) 210-2800
Email:          cglynn@glynnfinley.com
                jhanlon@glynnfinley.com

Barbara A. Lukeman
437 Madison Avenue
New York, New York  10022
Telephone:      (212) 940-3104
Email:          blukeman@nixonpeabody.com

*Attorneys for Defendant Barbara's Bakery, Inc.*

# Attachment 1

TINA WOLFSON, SBN 174806
twolfson@ahdootwolfson.com
ROBERT AHDOOT, SBN 172098
rahdoot@ahdootwolfson.com
AHDOOT & WOLFSON, PC
10850 Wilshire Boulevard, Suite 370
Los Angeles, California 90024
Tel: 310-474-9111; Fax: 310-474-8585

*Counsel for Plaintiff, Richard W. Trammell*

CLEMENT L. GLYNN, SBN 57117
cglynn@glynnfinley.com
JONATHAN A. ELDREDGE, SBN 238559
jeldredge@glynnfinley.com
GLYNN & FINLEY, LLP
100 Pringle Avenue, Suite 500
Walnut Creek, California 94596
Tel: 925-210-2801; Fax: 925-945-1975

*Counsel for Defendant, Barbara's Bakery, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD W. TRAMMELL, | Case No. 3:12-cv-02664-CRB |
| Plaintiff, | |
| v. | **SETTLEMENT AGREEMENT** |
| BARBARA'S BAKERY, INC., *et al.*, | Honorable Charles R. Breyer, Presiding |
| Defendants. | Complaint Filed: May 23, 2012 |

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.      INTRODUCTION.............................................................................................1

II.     DEFINITIONS................................................................................................4

III.    CERTIFICATION OF THE SETTLEMENT CLASS…………………………….10

IV.     SETTLEMENT CONSIDERATION..............................................................11

V.      NOTICE TO THE CLASS..............................................................................19

VI.     REQUESTS FOR EXCLUSION.....................................................................27

VII.    OBJECTIONS TO SETTLEMENT AND APPEARANCE
        AT FAIRNESS HEARING .............................................................................27

VIII.   RELEASE AND WAIVER..............................................................................28

IX.     ATTORNEYS' FEES AND EXPENSES AND INDIVIDUAL
        PLAINTIFF AWARDS ……………………………………………………….31

X.      PRELIMINARY APPROVAL ORDER, FINAL ORDER, FINAL JUDGMENT AND
        RELATED ORDERS   ……………………………………………………...32

XI.     MODIFICATION OR TERMINATION OF THIS AGREEMENT...............................34

XII.    GENERAL MATTERS AND RESERVATIONS...........................................37

3:12-cv-02664-CRB: SETTLEMENT AGREEMENT

**<u>TABLE OF EXHIBITS</u>**

**<u>Document</u>**                                                                                    **<u>Exhibit Number</u>**

Claim Form ............................................................................................................ 1

Class Notice .......................................................................................................... 2

Final Order ........................................................................................................... 3

Final Judgment ..................................................................................................... 4

Preliminary Approval Order ................................................................................. 5

Summary Settlement Notice ................................................................................. 6

Settlement Claim Procedures and Claim Calculation Protocol ........................... 7

Notice Administrator Declaration ........................................................................ 8

Non-GMO Project Standards …………………………………………………..... 9

Stipulated Undertaking Re: Attorneys' Fees and Expenses   …..……………….…………………….. 10

**IT IS HEREBY STIPULATED AND AGREED**, by, between and among Plaintiff Richard Trammell ("Plaintiff") and Defendant Barbara's Bakery, Inc. ("Defendant" or "Barbara's Bakery"), with all terms as defined below, through their duly-authorized counsel, that the above-captioned action, *Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664 (N.D. Cal.), and the matters raised therein, are settled and judgment shall be entered on the terms and conditions set forth in this Settlement Agreement and the release set forth herein, subject to the approval of the Court.

## I.    <u>INTRODUCTION</u>

A.    Plaintiff's national class action complaint (including subsequent amendments thereto) in the instant case, entitled *Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664, and initially filed on May 23, 2012, in the United States District Court for the Northern District of California (the "Action"), alleges, *inter alia*, that Barbara's Bakery manufactured, marketed, and sold various food, cereals, and snack products (collectively, the "Eligible Products"). The Action alleges that through a nationwide advertising campaign, Barbara's Bakery sold its products by advertising that they were "All Natural." Plaintiff challenged these advertisements, asserting, *inter alia*, that Defendant's products are not "All Natural" in that they contain ingredients that are synthetic, and/or artificial, and/or ingredients containing and/or derived from Genetically Modified Organisms ("GMO"). Plaintiff alleged that Barbara's Bakery violated the California Unfair Competition Law, Bus. & Prof. Code §17200, *et seq.* ("UCL"), False Advertising Law, Bus & Prof. Code §17500, *et seq.* ("FAL"), Consumer Legal Remedies Act, Civil Code § 1750, *et seq.* ("CLRA") and constituted a breach of an express warranty.

B.    Plaintiff, as settlement class representative, believes that the claims settled herein have merit. However, Plaintiff and Class Counsel recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the claims through trial, appeal, and ancillary actions. They have also taken into account the uncertain outcome and the risk of any litigation, as well as the difficulties and delay inherent in such litigation. They believe that the settlement set forth in this Agreement confers substantial benefits upon the Class Members. Based upon their evaluation, they have determined that the settlement set forth in this Agreement is fair, reasonable and adequate and in the best interest of the settlement class.

C.     Defendant has denied and continues to deny all liability with respect to any and all of the claims alleged in the Action or the facts alleged in support thereof and has denied and continues to deny all charges of wrongdoing or liability against it arising out of or relating to any conduct, acts, or omissions alleged in the Action. Defendant's willingness to resolve the Action on the terms and conditions embodied in this Agreement is based on, *inter alia*: (i) the time and expense associated with litigating this Action through trial and any appeals; (ii) the benefits of resolving the Action, including limiting further expense, inconvenience, and distraction, disposing of burdensome litigation, and permitting Defendant to conduct its business unhampered by the distractions of continued litigation; and (iii) the uncertainty and risk inherent in any litigation.

D.     Before entering into this Agreement, Class Counsel conducted an extensive and thorough examination, investigation, and evaluation of the relevant law, facts and allegations to assess the merits of the claims and potential claims to determine the strength of both defenses and liability sought in the Action.

E.     Class Counsel obtained extensive class discovery, including voluminous documents and electronic information.  Plaintiff, through Class Counsel, thoroughly reviewed the documents obtained, the materials available electronically, and conducted detailed interviews of witnesses.  In particular, Plaintiff obtained discovery, regarding the Eligible Products in the following categories: (i) label design and product formulation; (ii) marketing, advertising, media, and public relations; and (iii) financial information.  In total, Plaintiff obtained over thirty (30) banker's boxes of documents and approximately seventy (70) Gigabytes (GB) of data through discovery.  In addition, Class Counsel conducted interviews of primary Barbara's Bakery's corporate witnesses who have been involved with the Eligible Products to address the following subjects: (i) sales and marketing; (ii) labeling; (iii) finance; (iv) document collection and retention; and (v) Barbara's Bakery's efforts to eliminate GMO ingredients from its products.

F.     This Agreement is the product of extensive, arms-length, and vigorously-contested settlement discussions.  After numerous settlement discussions between counsel, the Parties engaged in two (2) mediation sessions with the Honorable Eugene F. Lynch (Ret.) of JAMS, and continued lengthy and months long negotiations thereafter.  Before and during settlement discussions, the Parties

2

had an arm's length exchange of sufficient information to permit Plaintiff and Class Counsel to evaluate the claims and potential defenses and to meaningfully conduct informed settlement discussions.

     G.    Based upon their review, investigation, and evaluation of the facts and law relating to the matters alleged in the pleadings, Plaintiff and Class Counsel, on behalf of Plaintiff and the other members of the proposed Class, have agreed to settle the Action pursuant to the provisions of this Agreement, after considering, among other things: (1) the substantial benefits to the Class Members under the terms of this Agreement; (2) the risks, costs and uncertainty of protracted litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such litigation; and (3) the desirability of consummating this Agreement promptly in order to provide effective relief to the Class Members.

     H.    Barbara's Bakery has vigorously denied and continues to dispute all of the claims and contentions alleged in the Action. Barbara's Bakery expressly denies any and all wrongdoing alleged in the pleadings and does not admit or concede any actual or potential fault, wrongdoing, liability, or damage of any kind to Plaintiff and the putative class or in connection with any facts or claims that have been or could have been alleged against it in the Action. Barbara's Bakery further denies that it acted improperly or wrongfully in any way, and believes that the Action has no merit. Even though Barbara's Bakery expressly denies any wrongdoing, Barbara's Bakery considers it desirable for these cases to be settled and dismissed, because this Settlement will finally put Plaintiff's claims and the underlying matters to rest and will avoid the substantial expense, burden, and uncertainty associated with the continued litigation of these claims.

     I.    Barbara's Bakery has agreed to class action treatment of the claims alleged in the Action solely for the purpose of compromising and settling those claims on a class basis as set forth herein;

     J.    This Agreement, any negotiations, proceedings, or documents related to the Agreement, its implementation, or its judicial approval (as well as the fact of this Agreement and any acts or documents related to the Agreement or its implementation) cannot be asserted or used by any person to support a contention that class certification is proper or improper or that liability does or does not

exist, or for any other reason, in the above-captioned action or in any other proceedings; provided, however, that Class Members, Class Counsel, Defendant, other related persons, and any person who is a beneficiary or a release set forth herein, may reference and file this Agreement, and any resulting Order or Judgment, with the Court, or any other tribunal or proceeding, in connection with the implementation or enforcement of its terms (including but not limited to the releases granted therein, or any dispute related thereto). Nothing in this Agreement, nor in any court order approving this Agreement, shall be construed as a criticism or an endorsement of the Eligible Products.

NOW THEREFORE, it is hereby STIPULATED AND AGREED, by and between the Parties, through their respective counsel, that: (a) the Action be fully and finally compromised, settled and released upon final settlement approval by the Court after the hearings as provided for in this Agreement; and (b) upon such approval by the Court, a Final Order and Final Judgment, substantially in the form attached hereto as Exhibits "3" and "4," respectively, be entered dismissing the Action with prejudice upon the following terms and conditions of this Agreement.

## II.   **DEFINITIONS**

A.      As used in this Agreement and the attached exhibits (which are an integral part of this Agreement and are incorporated in their entirety by reference), the following terms have the following meanings, unless this Agreement specifically provides otherwise:

1.      "Action" means the lawsuit entitled *Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664 (N.D. Cal.).

2.      "Agreement" or "Settlement" means this Settlement Agreement and its exhibits, attached hereto or incorporated herein, including any subsequent amendments agreed to by the Parties and any exhibits to such amendments.

3.      "Attorneys' Fees and Expenses" means such funds as may be awarded by the Court to Class Counsel from Defendant to compensate Plaintiff's Counsel for their fees and expenses in connection with the Action and the Settlement, as described in Section IX of this Agreement.

4.      "Barbara's Bakery" means Defendant, Barbara's Bakery, Inc.

5.      "Barbara's Bakery's Counsel" or "Defendant's Counsel" means Glynn & Finley, LLP.

6. "Claim" means the claim of a Class Member or his or her representative submitted on a Claim Form as provided in this Agreement.

7. "Claimant" means a Class Member who has submitted a Claim.

8. "Claim Form" means the document, in substantially the same form attached as Exhibit 1 to this Agreement.

9. "Claim Period" means the time period in which Class Members may submit a Claim Form for review to the Settlement Administrator.  The Claim Period shall run for one hundred eighty (180) calendar days from the date of the first dissemination of the Summary Settlement Notice or Class Notice, whichever is earlier.

10. "Claim Process" means that process for submitting Claims described in this Agreement.

11. "Class" means all persons who, during the Class Period, purchased in the United States any of the Eligible Products.  Excluded from the Class are: (a) Barbara's Bakery's board members or executive-level officers, including its attorneys; (b) persons who purchased the Eligible Products primarily for the purpose of resale; (c) retailers or re-sellers of the Eligible Products; (d) governmental entities; (e) persons who timely and properly exclude themselves from the Class as provided in the Agreement; (f) persons who purchased the Eligible Products via the Internet or other remote means while not residing in the United States; and (g) the Court, the Court's immediate family, and Court staff.

12. "Class Member" means a member of the Class.

13. "Class Counsel" means:  Robert Ahdoot and Tina Wolfson of Ahdoot & Wolfson, PC.

14. "Class Notice" means a notice substantially in the form attached as Exhibit 2 to this Agreement.

15. "Class Period" means the period from May 23, 2008, up to and including the date of the first dissemination of the Summary Settlement Notice or Class Notice, whichever is earlier.

16. "Court" means the United States District Court for the Northern District of California.

5

17.     "Eligible Products" or "Eligible Product" means any of the following Barbara's Bakery products, of any size, purchased by Class Members during the Class Period:

         a.     **Cereals**:

               i.     BROWN RICE CRISPS (Fruit Juice Sweetened flavor);

               ii.     CORN FLAKES (Fruit Juice Sweetened flavor);

               iii.     HIGH FIBER (Cranberry, Flax & Granola, or Original flavors);

               iv.     HOLE 'N OATS (Fruit Juice Sweetened or Honey Nut flavors);

               v.     HONEST O's (Honey Nut, Multigrain, or Original flavors);

               vi.     ORGANIC APPLE CINNAMON O's;

               vii.     ORGANIC BREAKFAST O's;

               viii.     ORGANIC BROWN RICE;

               ix.     ORGANIC BROWN RICE CRISPS;

               x.     ORGANIC CORN FLAKES;

               xi.     ORGANIC CRISPY WHEATS;

               xii.     ORGANIC HONEY CRUNCH 'N OATS;

               xiii.     ORGANIC HONEY NUT O's;

               xiv.     ORGANIC SNACKIMALS CEREAL (Cinnamon Crunch or Vanilla Blast flavors);

               xv.     ORGANIC WILD PUFFS (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);

               xvi.     PUFFINS (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);

               xvii.     PUFFIN PUFFS (Crunchy Cocoa or Fruit Medley flavors);

               xviii.     SHREDDED OATS (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, or Vanilla Almond flavors);

               xix.     SHREDDED WHEAT;

               xx.     SHREDDED SPOONFULS (Multigrain or Vanilla Blast flavors);

               xxi.     SHREDDED MINIS (Blueberry Burst flavor);

6

xxii.   TOASTED OATMEAL FLAKES (Original flavor); and

xxiii.   ULTIMA ORGANIC (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors).

b.   **Cereal Bars**:

i.   MULTIGRAIN CEREAL BARS (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors);

ii.   FRUIT & YOGURT BARS (Apple Cinnamon, Blueberry Apple, Cherry Apple, Strawberry Apple, or Traditional flavors);

iii.   PUFFINS CEREAL AND MILK BARS (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors).

c.   **Cheese Puffs**:

i.   BAKED CHEESE PUFFS (Original or White Cheddar flavors); and

ii.   CHEESE PUFFS (Jalapeno or Original flavors).

d.   **Fig Bars:**

i.   FIG BARS (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free or Whole Wheat flavors).

e.   **Granola Bars**:

i.   CRUNCHY ORGANIC GRANOLA BARS (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors).

f.   **Snackimals Animal Cookies**:

i.   SNACKIMALS ANIMAL COOKIES (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors).

g.   **Organic Mini-Cookies**:

i.   ORGANIC MINI COOKIES (Chocolate, Ginger, or Oatmeal flavors).

h.   **Snack Mixes**:

i.   BRUSCHETTA SNACK MIX;

ii.   HONEY CINNAMON SNACK MIX;

7

             iii.      HONEY MUSTARD SNACK MIX; and

             iv.      SALSA SNACK MIX.

     i.     **Crackers**:

             i.      CRISP COOKIES (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread flavors);

             ii.      GO GO GRAHAMS (Chocolate, Cinnamon, Honey, or Lemon Ginger flavors);

             iii.      PIZZA AND CHEESE BITES;

             iv.      RITE LITE ROUNDS (Original, Poppy Seed, or Tamari Sesame flavors); and

             v.      WHEATINES (Cracked Pepper, Original or Sesame flavors).

18.    "Fairness Hearing" means the hearing at or after which the Court shall make a final decision whether to approve this Agreement as fair, reasonable, and adequate. The Parties shall request that the Court schedule the Fairness Hearing for a date that is in compliance with the provisions of 28 U.S.C. §1715(d), but no later than one hundred eighty-five (185) calendar days, after entry of Preliminary Approval Order.

19.    "Final Order and Final Judgment" means the Court's order approving the Settlement and this Agreement, as described in Section X of this Agreement, which is to be substantially in the forms attached as Exhibits 3 and 4, respectively, to this Agreement.

20.    "Final Settlement Date" means the date on which the Final Order and Final Judgment approving this Agreement becomes final.  For purposes of this Agreement:

    a.    if no appeal has been taken from the Final Order and Judgment, "Final Settlement Date" means the date on which the time to appeal therefrom has expired; or

    b.    if any appeal has been taken from the Final Order and Final Judgment, "Final Settlement Date" means the date on which all appeals therefrom, including petitions for rehearing or re-argument, petitions for rehearing en banc and petitions for certiorari or any other form of review, have been finally disposed of in a manner that affirms the Final Order and Judgment; or

    c.    if the Class Counsel and Defendant agree in writing, "Final Settlement

8

"Date" can occur on any other agreed date.

21. "Notice Administrator" means the Court-appointed third-party agent or administrator agreed to by the Parties and appointed by the Court. The Parties agree that Kinsella Media, LLC shall be retained to design, consult on, and implement the notice and related requirements of this Agreement.

22. "Parties" means Plaintiff and Barbara's Bakery, collectively, as each of those terms is defined in this Agreement.

23. "Plaintiff" means Richard W. Trammell.

24. "Plaintiff's Counsel" means counsel for the Plaintiff in the Action, who are: Ahdoot & Wolfson, PC.

25. "Preliminary Approval Order" means the order to be entered by the Court preliminarily approving the Settlement as outlined in Section X of this Agreement and should be substantially in the form attached as Exhibit 5 to this Agreement.

26. "Release" means the release and waiver set forth in Section VIII of this Agreement and in the Final Order and Final Judgment.

27. "Released Parties" means Barbara's Bakery, its past and present officers, directors, employees, stockholders, agents, attorneys, administrators, parent (The Weetabix Company, Inc. and Weetabix Limited), successors, subsidiaries, suppliers, distributors, assigns, affiliates, joint-ventures, partners, members, divisions, predecessors, authorized retailers, resellers, and wholesalers of Eligible Products for resale.

28. "Settlement Administrator" means the third-party agent or administrator agreed to by the Parties and appointed by the Court. The Parties agree that Rust Consulting, Inc. shall be retained to implement the mailed notice, the website, claim review and related requirements of this Agreement, subject to the Court's approval.

29. "Settlement Claim Procedures and Claim Calculation Protocol" means the protocol attached hereto as Exhibit 7.

30. "Settlement Fund" means the Four Million Dollars ($4,000,000.00) that Barbara's Bakery will pay or cause to be paid, pursuant to the terms of Section IV.A of this

9

Agreement.

31.    "Settlement Fund Balance" means the balance remaining in the Settlement Fund after payment of (i) all costs of notice and administration (including the Initial Deposit and Period Payments as defined in Section IV.A.1 herein), (ii) the Incentive Award (as defined in Section IX.F herein) to the representative Plaintiff, and (iii) the Attorneys' Fees and Expenses.

32.    "Summary Settlement Notice" means the Summary Class Notice to be disseminated by publication substantially in the form of Exhibit 6 attached to this Agreement.

33.    "Synthetic Ingredients" means an ingredient that is formulated or manufactured by a chemical (or biochemical) process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, including but not limited to the following: allegedly synthetic ingredients identified in Plaintiff's Second Amended Complaint, Annatto, Ascorbic Acid, Calcium Carbonate, Ferric Orthophosphate, Fructooligosaccarides, Nutra Flora, Retinyl Palmitate, Tocopherols, Vitamin D3 and "Dehydrated Cane Juice."

B.    Other capitalized terms used in this Agreement but not defined in this Section II shall have the meanings ascribed to them elsewhere in this Agreement.

C.    The terms "he or she" and "his or her" include "it" or "its" where applicable.

## III.    CERTIFICATION OF THE SETTLEMENT CLASS

Barbara's Bakery, while continuing to deny that the Action meets the requisites for class certification under Fed. R. Civ. P. 23 for any purpose other than settlement, consents, solely for purposes and in consideration of the Settlement, to the certification of the settlement Class, to the appointment of Class Counsel, and to the conditional approval of Plaintiff as a suitable representative of the Class.  The certification of the settlement Class, the appointment of Plaintiff as the class representative, and the appointment of Plaintiff's Counsel to act as Class Counsel, shall be binding only with respect to this Settlement and this Agreement.  If the Court fails to approve this Agreement and the Settlement proposed herein for any reason, or if this Agreement and the Settlement proposed herein is terminated, cancelled, or fails to become effective for any reason whatsoever, this class certification, to which the Parties have stipulated solely for the purposes and in consideration of the Settlement of this Action, this Agreement, and all the provisions of the Preliminary Approval Order,

10

shall be vacated by their own terms, and the litigation of the Action shall revert to its status with respect to class certification as it existed prior to the date of this Agreement. In that event, Barbara's Bakery shall retain all rights it had immediately preceding the execution of this Agreement to object to the maintenance of the Action as a class action, and in that event, nothing in this Agreement or other papers or proceedings related to the Settlement shall be used as evidence or argument by any party concerning whether the Action may properly be maintained as a class action under applicable law.

## IV.     SETTLEMENT CONSIDERATION

Settlement relief shall consist of three components: (1) refunds to Class Members who submit valid Claims; (2) Defendant's agreement to change its labeling and advertising to omit the terms "all natural," "no artificial additives," "no artificial preservatives," and "no artificial flavors;" and (3) certain conduct changes implemented by Barbara's Bakery relating to the use of ingredients that contain GMO in certain Barbara's Bakery's products.

A.     Settlement Fund:

1.     Barbara's Bakery agrees to pay or cause to be paid the sum of Four Million Dollars and No Cents ($4,000,000.00) as follows:

a.     Initial Deposit: Within five (5) calendar days after the entry of the Preliminary Approval Order, the sum of Two Hundred and Fifty Thousand Dollars and No Cents ($250,000.00) ("Initial Deposit") to the Settlement Administrator, for the initial notice and administration expenses that are likely to be incurred. This deadline may be extended by mutual consent of the Parties.

b.     Periodic Payment(s): Within ten (10) calendar days after the submission of any reasonable invoice submitted by the Settlement Administrator and / or Notice Administrator, and approved by Class Counsel and Defense Counsel, the sum of said approved invoice to the Settlement Administrator or Notice Administrator, as applicable. ("Periodic Payment(s)").

c.     First Fee Payment: Funding for the payment of the First Fee Payment (as this term is defined in Section IX.C) shall be made in accordance with Section IX of this Agreement. The deadline may be extended by mutual consent of the Parties.

d.    Settlement Fund Balance Payment: Within ten (10) calendar days after the Final Settlement Date, Defendant shall pay or cause to be paid to the Class Action Class Administrator an amount equal to the Settlement Fund Balance to be used for the payment of Class Member Claims.

e.    Final Fee Payment: Funding for the payment of the Final Fee Payment (as this term is defined in Section IX.E) shall be made in accordance with Section IX of this Agreement. The deadline may be extended by mutual consent of the Parties.

f.    Incentive Award Payment: Funding for the payment of the Incentive Award (as this term is defined in Section IX.F) shall be made in accordance with Section IX of this Agreement.  The deadline may be extended by mutual consent of the Parties.

2.    Settlement Fund proceeds shall be used for the payment of: (a) the costs and expenses that are associated with disseminating the notice to the Class, including, but not limited to, the Class Notice and the Summary Settlement Notice; (b) the costs and expenses associated with the administration of the Settlement; (c) timely, valid, and approved Claims submitted by Class Members pursuant to the Claim Process; (d) the Residual Funds, if any, pursuant to Section IV.D.3 of this Agreement; (e) payment of the Attorneys Fees and Expenses; and (f) payment of the Incentive Award to the Plaintiff.  Class Counsel must approve any payment of costs or expenses under subsections (a) and (b) of this paragraph.  Approval and payment of Claims under subsection (c) of this paragraph shall be in accordance with the terms and conditions of this Agreement and the Settlement Claim Procedures and Claim Calculation Protocol.  Payment of Attorneys Fees and Expenses under subsection (e) of this paragraph and the Incentive Award under subsection (f) of this paragraph shall be in accordance with Section IX of this Agreement and subject to Court approval.

3.    Barbara's Bakery shall not be liable for payment of any costs, expenses, or Claims authorized under this paragraph beyond its deposit or payment of the full amount of the Settlement Fund as provided in this Agreement. The Parties agree that the Settlement Fund and Barbara's Bakery payment of Four Million Dollars and No Cents ($4,000,000.00) is the full extent of Barbara's Bakery cash payment obligation under this Agreement.  This payment, pursuant to the terms and conditions of this Agreement, and any other non-monetary obligations of and considerations due

12

from Barbara's Bakery set forth in this Agreement, will be in full satisfaction of all individual and class claims asserted in the Action.

B.    Claim Form Submission, Review, and Administration of the Settlement:

1.    Class Members may submit a Claim through the Claim Process during the Claim Period and the Settlement Administrator shall review and process the Claim pursuant to this Agreement and the Settlement Claim Procedures and Claim Calculation Protocol, which is attached as Exhibit 7 to this agreement.  As part of the Claim Process, Class Members shall be eligible for the relief provided in this Agreement, provided Class Members complete and timely submit the Claim Form, which shall be included with the Class Notice, to the Settlement Administrator within the Claim Period, except as otherwise provided in this Agreement and the Settlement Claim Procedures and Claim Calculation Protocol.

2.    As further specified in the Settlement Claim Procedures and Claim Calculation Protocol, the Claim Form shall advise Class Members that the Settlement Administrator has the right to request verification of the purchase of Eligible Products, including, but not limited to, documentation demonstrating purchase of any and all of the Eligible Products during the Class Period. If the Class Member does not timely comply and/or is unable to produce documents to substantiate and/or verify the information on the Claim Form and the Claim is otherwise not approved, the Claim shall be disqualified.

3.    Each Class Member shall submit a Claim Form stating to the best of their knowledge the total amount of their purchases of the Eligible Products.  The Claim Form shall be signed under an affirmation, substantially in the following language: "I declare or affirm, under penalty of perjury, that the information in this claim form is true and correct to the best of my knowledge and that I purchased the amount of the Eligible Product(s) claimed above during the Claim Period. I understand that my claim form may be subject to audit, verification and Court review." Claim Forms will be:  (a) included on the Settlement website to be designed and administered by the Settlement Administrator; and (b) made readily available from the Settlement Administrator, as provided in the Preliminary Approval Order. In the event a Class Member submits an otherwise valid Claim Form, but fails to indicate the amount of his/her purchases of the Eligible Products during the

13

Class Period, as requested by the Claim Form, that Class Member will be entitled to the minimum payment amount available to eligible Class Member pursuant to Section IV.C.1.

4. The Settlement Administrator shall provide periodic updates to Class Counsel and to Barbara's Bakery regarding Claim Form submissions beginning within seven (7) business days after the commencement of the dissemination of the Class Notice or the Summary Settlement Notice and continuing on a monthly basis thereafter.

5. The Settlement Administrator shall begin to pay timely, valid, and approved Claims commencing no later than one hundred and twenty (120) calendar days after the close of the Claim Period so long as this period is after the Final Settlement Date, or sooner upon Barbara's Bakery and Plaintiff's Counsel's joint direction, but not before the issuance of the Court's Final Order and Final Judgment approving the Settlement. In the event the Final Settlement Date falls after the close of the Claim Period, then the Settlement Administrator shall begin to pay timely, valid, and approved Claims commencing no later than one hundred and twenty (120) calendar days after the Final Settlement Date. The Settlement Administrator shall have completed the payment to Class Members who have submitted timely, valid and approved Claims pursuant to the Claim Process no later than one hundred sixty (160) calendar days after either the Final Settlement Date or the close of the Claim Period, whichever is later.

C. Relief Available to Class Members

1. The relief to be provided to each eligible Class Member, who submits a Claim Form pursuant to the terms and conditions of this Agreement, shall be determined as follows:

a. Class Members whose total purchases of any of the Eligible Products during the Class Period amount to more than One Hundred Dollars ($100), are entitled to a payment of One Hundred Dollars ($100) subject to the adjustments set forth in Section IV.D.

b. Class Members whose total purchases of any of the Eligible Products during the Class Period amount to more than Seventy-Five Dollars ($75), up to and including One Hundred Dollars ($100), are entitled to a payment of Seventy-Five Dollars ($75) subject to the adjustments set forth in Section IV.D.

c. Class Members whose total purchases of any of the Eligible Products

14

during the Class Period amount to more than Fifty Dollars ($50), up to and including Seventy-Five Dollars ($75), are entitled to a payment of Fifty Dollars ($50) subject to the adjustments set forth in Section IV.D.

        d.    Class Members whose total purchases of any of the Eligible Products during the Class Period amount to more than Twenty-Five Dollars ($25), up to and including Fifty Dollars ($50), are entitled to a payment of Twenty-Five Dollars ($25) subject to the adjustments set forth in Section IV.D.

        e.    Class Members whose total purchases of any of the Eligible Products during the Class Period amount to more than Ten Dollars ($10), up to and including Twenty-Five Dollars ($25), are entitled to a payment of Ten Dollars ($10) subject to the adjustments set forth in Section IV.D.

        f.    Class Members whose total purchases of any of the Eligible Products during the Class Period amount to Ten Dollars ($10) or less (but more than zero ($0)), are entitled to a payment of Five Dollars ($5) subject to the adjustments set forth in Section IV.D.

    D.    <u>Adjustments and Remaining Funds</u>

    1.    If the total of the timely, valid and approved Claims submitted by Class Members exceeds the available relief, minus any fees, payments, and costs set forth in this Agreement, each eligible Class Member's Initial Claim Amount shall be reduced on a *pro rata* basis, such that the aggregate value of the cash payments does not exceed the Settlement Fund Balance. The Settlement Administrator shall determine each authorized Class Member's *pro rata* share based upon each Class Member's Claim Form and the total number of valid Claims. Accordingly, the actual amount recovered by each Class Member will not be determined until after the Claim Period has ended and all Claims Forms have been received, and may not be determined until after the Final Settlement Date.

    2.    In no event shall an individual Class Member's recovery amount exceed the individual recovery amounts specified in Section IV.C.

    3.    If there are any funds remaining in the Settlement Fund Balance from the claim program, including, but not limited to, any funds remaining in the Settlement Fund Balance after all Claims have been paid or un-cashed distributions made payable to eligible Class Members ("Residual

15

Funds"), the Settlement Administrator shall equally distribute the Residual Funds to the following non-profit organizations: Consumers Union (www.consumersunion.org) and Action for Healthy Kids (www.actionforhealthykids.org). The Residual Funds will not be returned to Defendant. Defendant represents and warrants that any payment of Residual Funds to any charities, non-profit organizations, or government entit(ies) shall not reduce any of its donations or contributions to any entity, charity, charitable foundation or trust, and / or non-profit organization. To be eligible to receive funds from the Residual Funds, each of the foregoing non-profit organizations must declare that they will not use the Residual Funds they receive (if any) for litigation or lobbying purposes.

E.   Agreement to Change Product Labeling

1.   In addition to the relief discussed above, as part of this Agreement and as a result of the Action and the efforts of Plaintiff and Plaintiff's Counsel, within three (3) months after the Final Settlement Date or by March 1, 2014, whichever is later, Barbara's Bakery shall (i) modify the labeling of the Eligible Products so that they no longer contain "all natural," "no artificial additives," "no artificial preservatives" or "no artificial flavors" statements on the product labeling; (ii) not refer to or represent any of its products that contain GMO, Synthetic Ingredients, artificial ingredients, or artificial flavors, including all of the Eligible Products, as "all natural," "no artificial additives," "no artificial preservatives" or "no artificial flavors" either on the given product's label or any media or advertising, including Barbara's Bakery's website; and (iii) Barbara's Bakery shall effect the relabeling of all Barbara's Bakery's products that contain GMO, Synthetic Ingredients, artificial ingredients, or artificial flavors, including all of the Eligible Products, to eliminate any "all natural," "no artificial additives," "no artificial preservatives" or "no artificial flavors" references and redesign the label to eliminate the use of the "All Natural" language on any Barbara's Bakery's product, including any of the Eligible Products. For the purposes of this Agreement, sales of Eligible Products already in inventory prior to the Final Settlement Date or March 1, 2014, whichever is later, shall not constitute a violation of this Agreement. Nothing in this provision shall be construed as preventing Barbara's Bakery from advertising and/or labeling its products that do not contain GMO, Synthetic Ingredients, artificial ingredients, and artificial flavors as "all natural," "no artificial additives," "no artificial preservatives" or "no artificial flavors," respectively. In addition, Barbara's Bakery shall

16

make no claims (on a product label or otherwise) to the effect that any Barbara's Bakery product does not contain GMO, except as allowed by the Non-GMO Project or substantially similar and independent non-GMO certifying organization, and only for any given product that has been approved and / or verified by the Non-GMO Project's verification program or substantially similar and independent certifying organization's Non-GMO verification program. Nothing contained herein shall prohibit Defendant from disclosing that any given product contains GMO ingredients either on a product label or otherwise, or require Defendant to disclose that a product contains GMO on product labels or advertisements.

2. Nothing in this Agreement shall prevent Defendant from implementing the changes referenced in this paragraph prior to the Final Settlement Date or prior to March 1, 2014.

3. Nothing in this Agreement shall prevent Defendant from making "natural flavor" claims in accordance with applicable U.S. Food and Drug Administration ("FDA") regulations.

4. The terms and requirements of the relief described in Section IV.E.1 shall expire on the earliest of the following dates: (i) three (3) years after the Final Settlement Date; or (ii) the date upon which there are changes to any applicable statute, regulation, or other law that Defendant reasonably believes would require a modification to any of the product labeling in order to comply with the applicable statute, regulation, or law; or (iii) the date upon which there are any changes to any applicable federal or state statutes or regulations that would allow Defendant to label products that contain GMO, Synthetic Ingredients, and /or artificial flavor and ingredients to be labeled "all natural," "no artificial additives," "no artificial preservatives" or "no artificial flavors," including, but not limited to, changes in FDA, Federal Trade Commission, U.S. Department of Agriculture and other applicable government agencies' regulations, guidances or pronouncements. Plaintiff and his counsel agree that this Agreement does not preclude Defendant from making further disclosures or any labeling changes that (i) Defendant reasonably believes is necessary to comply with any statute, regulation, or other law of any kind (including but not limited to the Federal Food, Drug, and Cosmetic Act, FDA regulations, and/or the California Sherman Food, Drug, and Cosmetic Law); or (ii) are necessitated by product changes and/or reformulations to ensure that Defendant provides accurate product descriptions.

17

F.     <u>Elimination of GMO Ingredients From Certain Eligible Products</u>

1.     In addition to the relief discussed above, Barbara's Bakery represents and warrants that it has eliminated the use of GMO ingredients, in accordance with the Non-GMO Project Standard (a copy of which is attached hereto as Exhibit 9 and available at http://www.nongmoproject.org/product-verification/non-gmo-project-standard/ (last visited April 15, 2013) (the "Non-GMO Project Standard"), in the following Eligible Products: BROWN RICE CRISPS Cereal (Fruit Juice Sweetened flavor), CORN FLAKES Cereal (Fruit Juice Sweetened), HONEST O'S Cereal (Honey Nut, Multigrain and Original flavors), PUFFINS Cereal (Multigrain), ORGANIC SNACKIMALS CEREAL (Cinnamon Crunch and Vanilla Blast flavors, SHREDDED OATS Cereal (Blueberry Burst, Cinnamon Crunch, Shredded Wheat, and Vanilla Almond flavors), and SNACKIMALS ANIMAL COOKIES (Chocolate Chip, Oatmeal, Peanut Butter, Snickerdoodle and Vanilla flavors) (collectively the "First Group of Non-GMO Products"). Barbara's Bakery represents and warrants that the First Group of Non-GMO Products were approved by the Non-GMO Project's (www.nongmoproject.com) Verification Program.

2.     In addition to the relief discussed above, Barbara's Bakery represents and warrants that it has and will make continuing reasonable efforts to eliminate the use of GMO ingredients, in accordance with the Non-GMO Project Standard, in the following Eligible Products: PUFFINS (Honey Rice flavor), TOASTED OATMEAL FLAKES (Original flavor), SNACKIMALS ANIMAL COOKIES (Double Chocolate flavor) (collectively, the "Second Group of Non-GMO Products"). Barbara's Bakery represents and warrants that it has submitted the Second Group of Non-GMO Products for approval to the Non-GMO Project's Product Verification Program. Barbara's Bakery anticipates that the Second Group of Non-GMO Products will be approved by the Non-GMO Project by August 2013.

3.     In addition to the relief discussed above, Barbara's Bakery represents and warrants that as of the date of this Agreement, Barbara's Bakery is in the process of eliminating GMO ingredients, in accordance with the Non-GMO Project Standard, from the following Eligible Products: HIGH FIBER Cereal (Cranberry, Flax & Granola, and Original flavors), PUFFINS Cereal (Cinnamon, Original, Peanut Butter, and Peanut Butter & Chocolate flavors), PUFFINS PUFFS Cereal (Cocoa

18

Crunch and Fruit Medley flavors), and FIG BARS (Multigrain, Raspberry and Whole Wheat flavors) (collectively, the "Third Group of Non-GMO Products"). Barbara's Bakery represents and warrants that it intends to submit the Third Group of Non-GMO Products for approval to the Non-GMO Project's Product Verification Program. Barbara's Bakery agrees to employ reasonable efforts to obtain the Non-GMO Project's approval for the Third Group Non-GMO Products by the Final Settlement Date or by March 1, 2014, whichever is later.

## V.      NOTICE TO THE CLASS

A.      Duties of the Settlement Administrator and the Notice Administrator

1.      The Parties shall jointly recommend and retain Rust Consulting, Inc. to be the Settlement Administrator and Kinsella Media, LLC to be the Notice Administrator to help implement the terms of this Agreement. Following the Court's preliminary approval of this Agreement and the Court's appointment of the proposed Settlement Administrator and the proposed Notice Administrator, the Notice Administrator shall disseminate notice to the Class as provided for in the Declaration of the Notice Administrator, substantially in the form attached as Exhibit 8 to this Agreement, as specified in the Preliminary Approval Order and in this Agreement, and in order to comply with all applicable laws, including, but not limited to, the Due Process Clause of the Constitution. The Settlement Administrator and Notice Administrator shall abide by the terms, conditions, and obligations of the Agreement, the Settlement Claim Procedures and Claim Calculation Protocol, and the Orders issued by the Court in this Action.

2.      The Notice Administrator shall be responsible for, without limitation, consulting on and designing the notice to the Class via various forms of media, including implementing the media purchases. In particular, the Notice Administrator shall be responsible for: (a) arranging for the publication of the Summary Settlement Notice; (b) designing and implementing notice to the Class by various electronic media, including social media and electronic publications; (c) press releases, as discussed in the Declaration of the Notice Administrator attached as Exhibit 8 to this Agreement; (d) responding to requests from Class Counsel and/or Barbara's Bakery's Counsel; and (e) otherwise implementing and/or assisting with the dissemination of the notice of the Settlement.

19

3. The Settlement Administrator shall be responsible for, without limitation, dissemination of Class Notice by E-mail and mail, as provided in this Agreement, and implementing the terms of the Claim Process and related administrative activities that include communications with Class Members concerning the Settlement, Claim Process, and their options thereunder. In particular, the Settlement Administrator shall be responsible for: (a) printing, mailing, or arranging for the mailing of the Class Notice; (b) handling returned mail not delivered to Class Members; (c) attempting to obtain updated address information for any Class Notice returned without a forwarding address; (d) making any additional mailings required under the terms of this Agreement; (e) establishing a website that contains the Claim Form that can be completed and submitted on-line; (f) establishing a toll-free voice response unit to which Class Members may refer for information about the Action and the Settlement; (g) receiving and maintaining on behalf of the Court any Class Member correspondence regarding requests for exclusion and objections to the Settlement; (h) forwarding inquiries from Class Members to Class Counsel or their designee for a response, if warranted; (i) establishing a post office box for the receipt of Claim Forms, exclusion requests, and any correspondence; (j) reviewing Claim Forms according to the review protocols set forth in this Agreement and in the Settlement Claim Procedures and Claim Calculation Protocol, attached hereto as Exhibit 7; and (k) otherwise implementing and/or assisting with the claim review process and payment of the claims, pursuant to the terms and conditions of this Agreement.

4. The Notice Administrator and the Settlement Administrator shall coordinate their activities to minimize costs in effectuating the terms of this Agreement.

5. Because the names of Class Members and other personal information about them will be provided to the Settlement Administrator and the Notice Administrator for purposes of providing cash benefits and processing opt out requests, the Settlement Administrator and the Notice Administrator will execute a confidentiality and non-disclosure agreement with Barbara's Bakery, Defense Counsel, and Class Counsel and will take all reasonable steps to ensure that any information provided to it by Class Members and/or the Parties will be used solely for the purpose of effecting this Settlement.

6.    The Settlement Administrator and Notice Administrator shall administer the Settlement in accordance with the terms of this Agreement (including but not limited to the Settlement Claim Procedures and Claim Calculation Protocol, attached hereto as Exhibit 7) and, without limiting the foregoing, shall:

a.    Treat any and all documents, communications, and other information and materials received in connection with the administration of the Settlement as confidential and shall not disclose any or all such documents, communications or other information to any person or entity except as provided for in this Agreement or by court order;

b.    Receive opt out and other requests from members of the Class to exclude themselves from the Settlement and provide to Class Counsel and Defense Counsel a copy thereof within seven (7) days of receipt.  If the Settlement Administrator and/or Notice Administrator receive any exclusion forms or other requests from Class Members to exclude themselves from the Settlement after the deadline for the submission of such forms and requests, the Settlement Administrator and/or Notice Administrator shall promptly provide Class Counsel and Defense Counsel with copies thereof.

c.    Receive and maintain on behalf of the Court all correspondence from any Class Member regarding the Settlement.

7.    If the Settlement Administrator and/or the Notice Administrator make a material or fraudulent misrepresentation to, or conceal requested material information from, Class Counsel, Barbara's Bakery, or Barbara's Bakery's Counsel, then the Party to whom the misrepresentation is made shall, in addition to any other appropriate relief, have the right to demand that the Settlement Administrator and/or the Notice Administrator, as applicable, immediately be replaced.  If the Settlement Administrator and/or the Notice Administrator fail to perform adequately on behalf of the Parties, the Parties may agree to remove the Settlement Administrator and/or the Notice Administrator. Neither Party shall unreasonably withhold consent to remove the Settlement Administrator and/or the Notice Administrator.  The Parties will attempt to resolve any disputes regarding the retention or dismissal of the Settlement Administrator and/or the Notice Administrator in good faith, and, if they are unable to do so, will refer the matter to the Court for resolution.

21

8.     The Settlement Administrator shall begin accepting Claim Forms as they are submitted by Class Members for processing.

9.     Not later than ten (10) calendar days before the date of the Fairness Hearing, the Settlement Administrator and Notice Administrator shall file with the Court: (a) a list of those persons who have opted out or excluded themselves from the Settlement; and (b) the details outlining the scope, methods and results of the notice program.

10.     The Settlement Administrator shall promptly provide copies of any requests for exclusion, objections, and/or related correspondence to Class Counsel and Barbara's Bakery's Counsel.

11.     No later than ten (10) calendar days after this Agreement is filed with the Court, Barbara's Bakery shall mail or cause the items specified in 28 U.S.C. §1715(b) to be mailed to each State and Federal official, as specified in 28 U.S.C. §1715(a).

12.     The Settlement Administrator shall administer the Settlement in accordance with the terms of this Agreement and in accordance with the Claim Procedure and Claim Calculation Protocol, attached hereto as Exhibit 7.

13.     Any Class Member who, in accordance with the terms and conditions of this Agreement, neither seeks exclusion from the Class nor files a Claim Form, will not be entitled to receive any cash pursuant to this Stipulation of Settlement, but will be bound together with all Class Members by all of the terms of this Agreement, including the terms of the Final Order and Judgment to be entered in the Action and the releases provided for herein, and will be barred from bringing any action in any forum (state or federal) against any of the Released Parties concerning the matters subject to the Release.

14.     Claim Forms that do not meet the requirements set forth in this Agreement and in the Claim Form instructions shall be rejected.  Where a good faith basis exists, the Settlement Administrator may reject a Class Member's Claim Form for, among other reasons, the following:

a.     The Class Member failed to provide adequate support of their claim pursuant to a request of the Settlement Administrator;

b.     The Class Member purchased products that are not covered by the terms

22

of this Stipulation of Settlement;

          c.     Failure to fully complete and/or sign the Claim Form;

          d.     Illegible Claim Form;

          e.     More than one Claim Form is submitted by persons who reside in the same household;

          f.     The Claim Form is fraudulent;

          g.     The Claim Form is duplicative of another Claim Form;

          h.     The person submitting the Claim Form is not a Class Member;

          i.     The person submitting the Claim Form is requesting that funds be paid to a person or entity that is not the Class Member for whom the Claim Form is submitted;

          j.     Failure to submit a Claim Form by the end of the Claim Period; and/or

          k.     The Claim Form otherwise does not meet the requirements of this Agreement.

     15.     The Settlement Administrator shall determine whether a Claim Form meets the requirements set forth in this Agreement. Each Claim Form shall be submitted to and reviewed by the Settlement Administrator, who shall determine in accordance with the terms and conditions of this Agreement the extent, if any, to which each claim shall be allowed. The Settlement Administrator shall have the authority to determine whether a claim by any Class Member is complete and timely. The Settlement Administrator shall use all reasonable efforts and means to identify and reject duplicate and/or fraudulent claims, including, without limitation, indexing all funds provided to Class Members.

     16.     Any Class Member who fails to submit a Claim Form by the end of the Claim Period shall be forever barred from receiving any benefit pursuant to this Agreement, but shall in all other respects be bound by all of the terms of this Agreement, the terms of the Final Order and Judgment to be entered in the Action, and the releases provided for herein, and will be barred from bringing any action in any forum (state or federal) against any of the Released Parties concerning any of the matters subject to the Release. The Claim Form will be deemed to have been submitted when the attestation form are posted, if received with a postmark or equivalent mark by a courier company

indicated on the envelope or mailer with the instructions set out in the Claim Form. In all other cases, the Claim Form shall be deemed to have been submitted when it is actually received by the Settlement Administrator.

17. Class Counsel and Defense Counsel shall have the right to inspect the Claim Forms and supporting documentation received by the Settlement Administrator at any time upon reasonable notice.

18. All notification duties imposed by 28 U.S.C. §1715, including the corresponding expenses, shall be separate and in addition to any other obligation imposed herein.

19. Barbara's Bakery and the Released Parties are not obligated to (and will not be obligated to) compute, estimate, or pay any taxes on behalf of Plaintiff (or his counsel), any Class Member, Plaintiff's Counsel, the Notice Administrator and/or the Settlement Administrator.

B. <u>Class Notice</u>:

1. <u>Dissemination of the Mailed Class Notice</u>

a. No later than five (5) calendar days after entry of the Preliminary Approval Order, Barbara's Bakery shall provide the Notice Administrator with the name, mailing address, and e-mail address of each reasonably identifiable Class Member that it possesses.

b. Beginning not later than ten (10) calendar days after entry of the Preliminary Approval Order and to be substantially completed not later than twenty-five (25) calendar days after entry of the Preliminary Approval Order, and subject to the requirements of the Preliminary Approval Order and the Settlement Agreement, the Notice Administrator shall send the Class Notice by Electronic Mail ("E-Mail") to: (i) each reasonably identifiable Class Member's last known E-Mail address; and (ii) each appropriate State and Federal official, as specified in 28 U.S.C. §1715, and shall otherwise comply with Fed. R. Civ. P. 23 and any other applicable statute, law, or rule, including but not limited to, the Due Process Clause of the United States Constitution.

c. No later than forty-five (45) calendar days after entry of the Preliminary Approval Order, the Notice Administrator shall send the Summary Settlement Notice by First Class U.S. Mail, proper postage prepaid, to each Class Member whose E-mail address returned a message as undeliverable, subject to the existence of such information as provided by Barbara's Bakery pursuant

24

to Section V.B.1.a of this Agreement.

        d.     The Notice Administrator shall: (i) re-mail any Summary Settlement Notices returned by the United States Postal Service with a forwarding address that are received by the Notice Administrator; and (ii) by itself or using one or more address research firms, as soon as practicable following receipt of any returned Summary Settlement Notices that do not include a forwarding address, research any such returned mail for better addresses and promptly mail copies of the Summary Settlement Notice to the better addresses so found.

        e.     Barbara's Bakery's Counsel shall provide to the Notice Administrator, within ten (10) business days of the entry of the Preliminary Approval Order, a list of all counsel for anyone who has litigation against Barbara's Bakery that involves the Eligible Products. The Notice Administrator shall mail copies of the Class Notice to all such legal counsel. Barbara's Bakery will promptly direct the Notice Administrator to serve the Class Notice on counsel for any Class Members who subsequently initiate litigation, arbitration, or other proceedings against Barbara's Bakery relating to claims alleging events occurring during the Class Period, the Eligible Products, and/or otherwise involving the Release.

        2.     <u>Contents of the Class Notice</u>: The Claim Form and the Class Notice shall be in a form substantially similar to the document attached to this Agreement as Exhibits 1 and 2, respectively, and shall advise Class Members of the following:

        a.     <u>General Terms</u>: The Class Notice shall contain a plain and concise description of the nature of the Action and the proposed Settlement, including information on the identity of Class Members, how the proposed Settlement would provide relief to the Class and Class Members, what claims are released under the proposed Settlement and other relevant terms and conditions.

        b.     <u>Opt-Out Rights</u>: The Class Notice shall inform Class Members that they have the right to opt out of the Settlement. The Class Notice shall provide the deadlines and procedures for exercising this right.

        c.     <u>Objection to Settlement</u>: The Class Notice shall inform Class Members of their right to object to the proposed Settlement and appear at the Fairness Hearing. The Class

Notice shall provide the deadlines and procedures for exercising these rights.

              d.    <u>Fees and Expenses</u>:  The Class Notice shall inform Class Members about the amounts being sought by Plaintiff's Counsel as Attorneys' Fees and Expenses and the individual awards to Plaintiff, and that such amounts will be paid out of the Settlement Fund.

              e.    <u>Consumer Information</u>:  The Class Notice shall inform the Class Members that any information they provide may be submitted to a federal or state agency in the administration of this relief.

              f.    <u>Claim Form</u>:  The Class Notice shall include the Claim Form, which shall inform the Class Member that he or she must fully complete and timely return the Claim Form within the Claim Period to be eligible to obtain relief pursuant to this Agreement.

      C.    <u>The Summary Settlement Notice</u>:  The Notice Administrator shall have the publication of the Summary Settlement Notice substantially completed no later than ninety (90) calendar days after entry of the Preliminary Approval Order as described in the Declaration of the Notice Administrator, attached as Exhibit 8, and in such additional newspapers, magazines, and/or other media outlets as shall be agreed upon by the Parties.  The form of Summary Settlement Notice agreed upon by the Parties is in the form substantially similar to the one attached to the Agreement as Exhibit 6.

      D.    <u>Internet Web site</u>:  Prior to the dissemination of the Class Notice pursuant to Section V.B.1 to Section V.C, the Notice Administrator shall establish an Internet website, www.BarbarasBakerySettlement.com, that will inform Class Members of the terms of this Agreement, their rights, dates and deadlines and related information.  The web site shall include, in .pdf format, materials agreed upon by the Parties and/or required by the Court. Banner ads on the Internet shall direct Class Members to the website.

      E.    <u>Toll-Free Telephone Number</u>:  Prior to the dissemination of the Class Notice pursuant to Section V.B.1 to Section V.C, the Notice Administrator shall establish a toll-free telephone number that will provide Settlement-related information to Class Members.

## VI.    **REQUESTS FOR EXCLUSION**

A.     Members of the Class may elect to opt out of the Class or the Settlement, relinquishing their rights to benefits hereunder. Members of the Class who opt out of the Settlement will not release their claims pursuant to this Agreement. Putative class members wishing to opt out of the Settlement must send to the Settlement Administrator by U.S. Mail a personally signed letter including their name and address, and providing a clear statement communicating that they elect to be excluded from the Class. Any request for exclusion or opt out must be postmarked on or before the opt out deadline date specified in the Preliminary Approval Order. The date of the postmark on the return-mailing envelope shall be the exclusive means used to determine whether a request for exclusion has been timely submitted. The Settlement Administrator shall forward copies of any written requests for exclusion to Class Counsel and Barbara's Bakery's Counsel. The Settlement Administrator shall file a list reflecting all requests for exclusion with the Court no later than ten (10) calendar days before the Fairness Hearing.

B.     Any potential Class Member who does not file a timely written request for exclusion as provided in the preceding Section VI.A shall be bound by all subsequent proceedings, orders, and judgments, including, but not limited to, the Release, in the Action, even if he or she has litigation pending or subsequently initiates litigation against Barbara's Bakery relating to the claims and transactions released in the Action.

## VII.    **OBJECTIONS TO SETTLEMENT AND APPEARANCE AT FAIRNESS HEARING**

A.     Any Class Member who has not filed a timely written request for exclusion and who wishes to object to the fairness, reasonableness, or adequacy of this Agreement or the proposed Settlement, or to the award of Attorneys' Fees and Expenses, or the individual awards to Plaintiff, must deliver to the Class Counsel identified in the Class Notice and to Barbara's Bakery's Counsel, and file with the Court (through the Court's Management / Electronic Case Files ("CM/ECF") or through any other method in which the Court will accept filings), no later than the objection deadline date specified in the Preliminary Approval Order, or as the Court otherwise may direct, a written statement of the objections, as well as the specific reason(s), if any, for each objection, including any legal support the Class Member wishes to bring to the Court's attention, any evidence or other

information the Class Member wishes to introduce in support of the objections, and a statement of whether the Class Member intends to appear and argue at the Fairness Hearing.  Class Members may do so either on their own or through an attorney retained at their own expense. The Parties shall request that the Court allow any interested party to file a reply to any objection, as described in this Section VII.A, no later than seven (7) calendar days before the Fairness Hearing.

B.      Any Class Member, including one who files and serves a written objection, as described in the preceding Section VII.A, may appear at the Fairness Hearing, either in person or through personal counsel hired at the Class Member's expense, to object to or comment on the fairness, reasonableness, or adequacy of this Agreement or the proposed Settlement, or to the award of Attorneys' Fees and Expenses or any award to the individual Plaintiff.  Class Members or their attorneys who intend to make an appearance at the Fairness Hearing must deliver a notice of intention to appear to one of the Class Counsel identified in the Class Notice and to Barbara's Bakery's Counsel, and file said notice with the Court (through CM/ECF or through any other method in which the Court will accept filings), no later than the date specified in the Preliminary Approval Order, or as the Court may otherwise direct.

C.      Any Class Member who fails to comply with the provisions of Section VII.A above shall waive and forfeit any and all rights he or she may have to object, and shall be bound by all the terms of this Agreement and by all proceedings, orders and judgments, including, but not limited to, the Release, in the Action.

D.      Any Class Member who objects to the Settlement shall be entitled to all of the benefits of the Settlement if this Agreement and the terms contained therein are approved, as long as the objecting Class Member complies with all requirements of this Agreement applicable to Class Members, including the timely submission of Claim Forms and other requirements contained in this Agreement.

## VIII.   RELEASE AND WAIVER

A.      The Parties agree to the following release and waiver, which shall take effect upon entry of the Final Order and Final Judgment.

B.       In consideration for the Settlement benefits described in this Agreement, Plaintiff and

28

the other members of the Class, on behalf of themselves, their heirs, guardians, assigns, executors, administrators, predecessors, and/or successors, will fully, finally and forever release, relinquish, acquit, and discharge the Released Parties from, and shall not now or hereafter institute, maintain, or assert on their own behalf, on behalf of the Class, any and all manner of claims, actions, causes of action, suits, rights, debts, sums of money, payments, obligations, reckonings, contracts, agreements, executions, promises, damages, liens, judgments, and demands of whatever kind, type or nature whatsoever, both at law and in equity, whether past, present, or future, mature or not yet mature, known or unknown, suspected or unsuspected, contingent or non-contingent, that arose during the Class Period, whether based on federal, state, or local law, statute, ordinance, regulation, code, contract, common law, or any other source, or any claim that Plaintiff or Class Members ever had, now have, may have, or hereafter can, shall, or may ever have against the Released Parties that were or reasonably could have been alleged in the Action or in any other court, tribunal, arbitration panel, commission, agency, or before any governmental and/or administrative body, or any other adjudicatory body, on the basis of, connected with, arising from, or in any way whatsoever relating to claims that were or reasonably could have been alleged in the Action, including, but without in any way limiting the generality of the foregoing, arising from, directly or indirectly, or in any way whatsoever pertaining or relating to (1) the claims alleged in the Action, (2) any communications, disclosures, nondisclosures, representations, statements, claims, omissions, warnings, messaging, marketing, advertising, promotion, packaging, displays, brochures, sale, and/or resale by the Released Parties of the Eligible Products arising from or in any way whatsoever relating to claims that were or reasonably could have been alleged in the Action; (3) any claims for rescission, restitution, or unjust enrichment for all damages of any kind related to the purchase, sale, or marketing of the Eligible Products arising from or in any way whatsoever relating to claims that were or reasonably could have been alleged in the Action; (4) violations of any state's deceptive, unlawful and/or unfair business and/or trade practices, false, misleading or fraudulent advertising, consumer fraud and/or consumer protection statutes related to the purchase, sale, or marketing of the Eligible Products arising from or in any way whatsoever relating to claims that were or reasonably could have been alleged in the Action; (5) any violation of the Uniform Commercial Code, any breaches of express, implied, and/or

29

any other warranties, any similar federal, state, or local statutes, codes related to the purchase, sale, or marketing of the Eligible Products arising from or in any way whatsoever relating to claims that were or reasonably could have been alleged in the Action; or (6) damages, costs, expenses, extra-contractual damages, compensatory damages, exemplary damages, special damages, penalties, punitive damages and/or damage multipliers, disgorgement, declaratory relief, expenses, interest, and/or attorneys' fees and costs related to the purchase, sale, or marketing of the Eligible Products arising from or in any way whatsoever relating to claims that were or reasonably could have been alleged in the Action.

C.    Notwithstanding the language in this section and/or this Agreement, the Plaintiff and the other members of the Class are not releasing (1) any claims of or relating to personal injury; and (2) any of Defendant's obligations pursuant to this Agreement.

D.    Plaintiff represents and warrants that he is the sole and exclusive owner of all claims that he is personally releasing under this Agreement.  Plaintiff further acknowledges that he has not assigned, pledged, or in any manner whatsoever, sold, transferred, assigned or encumbered any right, title, interest or claim arising out of or in any way whatsoever pertaining to the Action, including without limitation, any claim for benefits, proceeds or value under the Action.

E.    Without in any way limiting its scope, and, except to the extent otherwise specified in the Agreement, this Release covers by example and without limitation, any and all claims for attorneys' fees, costs, expert fees, or consultant fees, interest, or litigation fees, costs or any other fees, costs, and/or disbursements incurred by Plaintiff's Counsel, or by Plaintiff or the Class Members.

F.    Plaintiff expressly understands and acknowledges, and all Class Members will be deemed by the Final Order and Final Judgment to acknowledge, that certain principles of law, including, but not limited to, **Section 1542 of the Civil Code of the State of California, provide that "a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**  To the extent that anyone might argue that these principles of law are applicable, Plaintiff hereby agrees that the provisions of all such principles of law or similar federal or state laws, rights, rules, or legal principles, to the extent they are found to be applicable herein, are hereby knowingly and voluntarily waived, relinquished and released

by Plaintiff and all Class Members.

G.     Nothing in this Release shall preclude any action to enforce the terms of the Agreement, including participation in any of the processes detailed in the Agreement.

H.     Plaintiff and Defendant hereby agree and acknowledge that the provisions of this Release together constitute an essential and material term of the Agreement and shall be included in any Final Order and Final Judgment entered by the Court.

## IX.     ATTORNEYS' FEES AND EXPENSES AND INDIVIDUAL PLAINTIFF AWARD

A.     Class Counsel agrees to make and Barbara's Bakery agrees not to oppose, an application for an award of Attorneys' Fees and Expenses in the Action that will not exceed an amount equal to twenty-five percent (25%) of the Settlement Fund (One Million Dollars ($1,000,000), which shall be the sole aggregate compensation paid by Barbara's Bakery for Class Counsel representing the Class.  The ultimate award of Attorneys' Fees and Expenses will be determined by the Court.

B.     The denial, downward modification, or failure to grant the request for Attorneys' Fees and Expenses shall not constitute grounds for modification or termination of this Agreement or the proposed Settlement.  The Parties negotiated the amount of the Attorneys' Fees and Expenses to be sought by Class Counsel only after reaching an agreement upon the relief provided to the Class.

C.     Barbara's Bakery agrees to pay, and shall pay or cause to be paid, an initial payment to Class Counsel of seven-tenths (7/10) of the amount of Attorneys' Fees and Expenses awarded by the Court ("First Fee Payment"), within ten (10) calendar days after entry of the Court's order so awarding Attorneys' Fees and Expenses, notwithstanding any appeal, and upon service of a fully executed Stipulated Undertaking and Order by Class Counsel, substantively in the form attached hereto as Exhibit 10, to Barbara's Bakery's Counsel.  The Stipulated Undertaking and Order shall provide that Class Counsel are jointly and severally liable to Barbara's Bakery for the repayment of the First Fee Payment, without interest, should the Final Order be reversed or the fee order reversed or reduced on appeal. In addition, no interest will accrue on such amounts at any time.

D.     If the Final Order and Final Judgment (or the order awarding Attorneys' Fees and Expenses) is reversed, vacated, modified, and/or remanded for further proceedings or otherwise disposed of in any manner other than one resulting in an affirmance, then Plaintiff's Counsel (or, as

31

applicable, any and all successor(s) or assigns of their respective firms) shall, within ten (10) calendar days of such event, (i) repay to Barbara's Bakery, as applicable, the full amount of the First Fee Payment paid to them, or (ii) repay to Barbara's Bakery the amount by which the award of Attorneys' Fees and Expenses has been reduced. Counsel Counsel (or, as applicable, any and all successor(s) or assigns of their firm) shall be jointly and severally liable for repayment to Barbara's Bakery of the First Fee Payment, without interest, and each such entity shall execute a guarantee of repayment concurrently with this Agreement.

E.      Barbara's Bakery agrees to pay and shall pay or cause to be paid a final payment of the remaining three-tenths (3/10) of the Attorneys' Fees and Expenses awarded by the Court ("Final Fee Payment"), to Class Counsel within ten (10) calendar days after the Final Settlement Date.

F.      Class Counsel may petition the Court for an incentive award of up to Two Thousand Five Hundred Dollars ($2,500.00) for Plaintiff. The purpose of such an award shall be to compensate Plaintiff for efforts and risks taken by him on behalf of the Class. Barbara's Bakery agrees to pay and shall pay or cause to be paid an incentive award made and approved by the Court ("Incentive Award") within ten (10) calendar days after the occurrence of the Final Settlement Date in accordance with the instructions provided by Class Counsel.

G.      Barbara's Bakery shall not be liable for or obligated to pay any fees, expenses, costs, or disbursements to, or incur any expense on behalf of, any person or entity, either directly or indirectly, in connection with the Action or this Settlement Agreement, other than the amount or amounts expressly provided for in this Settlement Agreement.

## X.      PRELIMINARY APPROVAL ORDER, FINAL ORDER, FINAL JUDGMENT AND RELATED ORDERS

A.      The Parties shall seek from the Court, within fifteen (15) business days after the execution of this Agreement, a Preliminary Approval Order in a form substantially similar to Exhibit 5. The Preliminary Approval Order shall, among other things:

1.      Certify a nationwide settlement-only class, approve Plaintiff Richard W. Trammell as class representative and appoint Tina Wolfson and Robert Ahdoot of Ahdoot & Wolfson, PC as counsel for the class, pursuant to Fed. R. Civ. P. 23;

2.     Preliminarily approve the Settlement;

3.     Require the dissemination of the Notice and the taking of all necessary and appropriate steps to accomplish this task;

4.     Determine that the notice complies with all legal requirements, including, but not limited to, the Due Process Clause of the United States Constitution;

5.     Schedule a date and time for a Fairness Hearing to determine whether the Preliminary Approval Order should be finally approved by the Court;

6.     Require Class Members who wish to exclude themselves to submit an appropriate and timely written request for exclusion as directed in the Agreement and Class Notice and that a failure to do so shall bind those Class Members who remain in the Class;

7.     Require Class Members who wish to object to the Agreement to submit an appropriate and timely written statement as directed in the Agreement and Class Notice;

8.     Require Class Members who wish to appear to object to the Agreement to submit an appropriate and timely written statement as directed in the Agreement and Class Notice;

9.     Require attorneys representing individual Class Members, at their own expense, to file a notice of appearance as directed in the Agreement and Class Notice;

10.    Issue a preliminary injunction pursuant to the Agreement;

11.    Appoint the Settlement Administrator and/or the Notice Administrator;

12.    Authorize Barbara's Bakery to take all necessary and appropriate steps to establish the means necessary to implement the Agreement;

13.    Issue other related orders to effectuate the preliminary approval of the Agreement.

B.     After the Fairness Hearing, the Parties shall seek to obtain from the Court a Final Order and Final Judgment in the forms substantially similar to Exhibits 3 and 4, respectively.  The Final Order and Final Judgment shall, among other things:

1.     Find that the Court has personal jurisdiction over all Class Members, the Court has subject matter jurisdiction over the claims asserted in the Action, and that venue is proper.

2.     Finally approve the Agreement and Settlement, pursuant to Fed. R. Civ. P. 23;

33

3. Finally certify the Class for settlement purposes only;

4. Find that the notice and the notice dissemination methodology complied with all laws, including, but not limited to, the Due Process Clause of the United States Constitution;

5. Dismiss the Action with prejudice;

6. Incorporate the Release set forth in the Agreement and make the Release effective as of the date of the Final Order and Final Judgment;

7. Issue a permanent injunction pursuant to the Agreement;

8. Authorize the Parties to implement the terms of the Agreement;

9. Retain jurisdiction relating to the administration, consummation, enforcement, and interpretation of the Agreement, the Final Order and Final Judgment, and for any other necessary purpose; and

10. Issue related Orders to effectuate the final approval of the Agreement and its implementation.

## XI. MODIFICATION OR TERMINATION OF THIS AGREEMENT

A. The terms and provisions of this Agreement may be amended, modified, or expanded by written agreement of the Parties and approval of the Court; provided, however that, after entry of the Final Order and Final Judgment, the Parties may by written agreement effect such amendments, modifications, or expansions of this Agreement and its implementing documents (including all exhibits hereto) without further notice to the Class or approval by the Court if such changes are consistent with the Court's Final Order and Final Judgment and do not limit the rights of Class Members under this Agreement.

B. This Agreement shall terminate at the discretion of either Barbara's Bakery or Plaintiff, through Class Counsel, if: (1) the Court, or any appellate court(s), rejects, modifies, or denies approval of any portion of this Agreement that the terminating party reasonably determines is material, including, without limitation, the terms of relief, the findings, or conclusions of the Court, the provisions relating to notice, the definition of the Class, and/or the terms of the Release; or (2) the Court, or any appellate court(s), does not enter or completely affirm, or alters or expands, any portion of the Final Order and Judgment, or any of the Court's findings of fact or conclusions of law, that the

34

terminating party in his or her sole judgment and discretion reasonably determines is material. The terminating party must exercise the option to withdraw from and terminate this Agreement, as provided in this Section XI, by a signed writing served on the other Parties no later than twenty (20) calendar days after receiving notice of the event prompting the termination. In the event that a terminating party exercises his or her option to withdraw from and terminate this Agreement, this Agreement and the Settlement proposed herein shall become null and void and the Parties will be returned to their respective positions existing immediately before the execution of this Agreement.

C.     If an option to withdraw from and terminate this Agreement arises under Section IX.B above, neither Barbara's Bakery nor Plaintiff is required for any reason or under any circumstance to exercise that option and any exercise of that option shall be in good faith.

D.     If this Agreement is terminated pursuant to Section IX.B, above, then:

1.     This Agreement shall be null and void and shall have no force or effect, and no Party to this Agreement shall be bound by any of its terms, except for the terms of this Section XI.D of this Agreement;

2.     The Parties will petition to have any stay orders entered pursuant to this Agreement lifted;

3.     All of its provisions, and all negotiations, statements, and proceedings relating to it shall be without prejudice to the rights of Barbara's Bakery, Plaintiff or any Class Member, all of whom shall be restored to their respective positions existing immediately before the execution of this Agreement, except that the Parties shall cooperate in requesting that the Court set a new scheduling order such that neither party's substantive or procedural rights is prejudiced by the attempted Settlement;

4.     Released Parties expressly and affirmatively reserve all defenses, arguments, and motions as to all claims that have been or might later be asserted in the Action, including, without limitation, the argument that the Action may not be litigated as a class action;

5.     Plaintiffs and all other Class Members, on behalf of themselves and their heirs, assigns, executors, administrators, predecessors, and successors, expressly and affirmatively reserve and do not waive all motions as to, and arguments in support of, all claims, causes of actions or

35

remedies that have been or might later be asserted in the Action including, without limitation, any argument concerning class certification, consumer fraud, and treble or other damages;

6. Neither this Agreement, the fact of its having been made, nor the negotiations leading to it, nor any discovery or action taken by a Party or Class Member pursuant to this Agreement, or any documents or communications pertaining to this Agreement shall be admissible or entered into evidence for any purpose whatsoever in the Action or in any proceeding, other than to enforce the terms of this Agreement;

7. The Parties stipulate that any Settlement-related order(s) or judgment(s) entered in this Action after the date of execution of this Agreement shall be deemed vacated and shall be without any force or effect;

8. All costs incurred in connection with the Settlement, including, but not limited to, notice, publication, and customer communications (excluding the Attorneys' Fees and Expenses) will be paid from the Settlement Fund, and any remaining amounts from the Initial Deposit or the Settlement Fund will be returned to Barbara's Bakery with an accounting of amounts spent within ten (10) calendar days. Neither the Class, Plaintiff nor Class Counsel shall be responsible for any of these costs or other Settlement-related costs; and

9. Notwithstanding the terms of this paragraph, if Settlement is not consummated, Plaintiff's Counsel may include any time spent in Settlement efforts as part of any statutory fee petition filed at the conclusion of the case, and Barbara's Bakery reserves the right to object to the reasonableness of such requested fees.

E. Notwithstanding any provision herein, the amount of any award by the Court, if any, for the Incentive Award or the Attorneys' Fees and Expenses shall not operate to terminate or cancel this Agreement. The Parties negotiated the amount of the Attorneys' Fees and Expenses and the Incentive Award to be sought by Class Counsel and Plaintiff, respectively, only after reaching an agreement upon the relief provided to the Class.

## XII.    GENERAL MATTERS AND RESERVATIONS

A.    The obligation of the Parties to conclude the proposed Settlement is and shall be contingent upon entry by the Court of the Final Order and Final Judgment approving the Settlement, from which the time to appeal has expired or which has remained unmodified after any appeal(s).

B.    This Agreement reflects, among other things, the compromise and settlement of disputed claims among the Parties hereto, and neither this Agreement nor the releases provided in it, nor any consideration for the Agreement, nor any actions taken to carry out this Agreement are intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or the validity of any claim, or defense, or of any point of fact or law (including but not limited to matters respecting class certification) on the part of any party. Barbara's Bakery expressly denies the allegations of Plaintiff's complaints. Neither this Agreement, nor the fact of settlement, nor the settlement proceedings, nor settlement negotiations, nor any related document, shall be used as an admission of any fault or omission by Barbara's Bakery, or be offered or received in evidence as an admission, concession, presumption, or inference of any wrongdoing by Barbara's Bakery in any proceeding, other than such proceedings as may be necessary to consummate, interpret, or enforce this Agreement.

C.    The Parties and their counsel agree to keep the existence and contents of this Agreement confidential until the date on which the Agreement is filed with the Court, provided, however, that this section shall not prevent Barbara's Bakery from disclosing such information, prior to the date on which the Agreement is filed, to state and federal agencies, independent accountants, actuaries, advisors, financial analysts, insurers, or attorneys, nor shall it prevent the Parties and their counsel from disclosing such information to persons or entities (such as experts, courts, co-counsel, and/or administrators) to whom the Parties agree disclosure must be made in order to effectuate the terms and conditions of this Agreement; provided further, that Barbara's Bakery may disclose publicly the terms of the Agreement that it deems necessary to meet its regulatory obligations or fiduciary duties.

D.    Plaintiff and Plaintiff's Counsel agree that the confidential information made available to them solely through the settlement process was made available, as agreed to, on the condition that

37

neither Plaintiff nor his counsel may disclose it to third parties (other than experts or consultants retained by Plaintiff in connection with this case); that it not be the subject of public comment; that it not be used by Plaintiff or Plaintiff's Counsel in any way in this litigation should the Settlement not be achieved, and that it is to be returned if the Settlement is not concluded; provided, however, that nothing contained in this Agreement shall prohibit Plaintiff from seeking such information through formal discovery or from referring to the existence of such information in connection with the Settlement of this litigation.

E. Within one hundred and eighty (180) calendar days after the Final Settlement Date (unless the time is extended by agreement of the Parties), Plaintiff's Counsel, and any expert or other consultant employed by them in such capacity or any other individual with access to documents provided by Barbara's Bakery to Plaintiff's Counsel, shall either: (i) return to Barbara's Bakery's Counsel, all such documents and materials (and all copies of which documents in whatever form made or maintained) produced by Barbara's Bakery in the Action and any and all handwritten notes summarizing, describing, or referring to such documents; or (ii) certify to Barbara's Bakery's Counsel that all such documents and materials (and all copies of such documents in whatever form made or maintained) produced by Barbara's Bakery in the Action any and all handwritten notes summarizing, describing, or referring to such documents have been destroyed, provided, however, that this section shall not apply to any documents made part of the record in connection with a Claim, nor to any documents made part of a Court filing, nor to Plaintiff's Counsel's work product.  Barbara's Bakery's Counsel agrees to hold all documents returned by Plaintiff's Counsel, and any expert or other consultant or any other individual employed by Plaintiff's Counsel in such capacity with access to documents provided by Barbara's Bakery until one year after the distribution of the Settlement Fund Balance to Class Members who submitted valid Claim Forms.

F. Two (2) years after the distribution of the Settlement Fund Balance to Class Members who submitted acceptable Claim Forms, the Settlement Administrator and Notice Administrator shall destroy any and all documents and materials related to the Action or this Settlement, including any Claim Forms, information related to Class Members, and  any and all information and/or documentation submitted by or relating to Class Members.

G. Barbara's Bakery's execution of this Agreement shall not be construed to release — and Barbara's Bakery expressly does not intend to release — any claim Barbara's Bakery may have or make against any insurer for any cost or expense incurred in connection with this Settlement, including, without limitation, for attorneys' fees and costs.

H. Class Counsel represent that: (1) they are authorized by Plaintiff to enter into this Agreement on behalf of Plaintiff; and (2) they are seeking to protect the interests of the Class. Class Counsel shall take all necessary actions to accomplish approval of the Settlement, the Class Notice, and dismissal of the Action, pursuant to the terms and conditions of this Agreement.

I. Plaintiff represents and certifies that: (1) he has agreed to serve as a representative of the Class; (2) he is willing, able, and ready to perform all of the duties and obligations of a representative of the Class; (3) he has read the operative complaint, or has had the contents of such pleadings described to him; (4) he is familiar with the results of the fact-finding undertaken by Class Counsel; (5) he has read this Agreement or has received a detailed description of it from Class Counsel and he has agreed to its terms; (6) he has consulted with Class Counsel about the Action and this Agreement and the obligations imposed on a representative of the Class; (7) he has authorized Class Counsel to execute this Agreement on his behalf; and (8) he shall remain and serve as a representative of the Class until the terms of the Agreement are effectuated, this Agreement is terminated in accordance with its terms, or the Court at any time determines that Plaintiff cannot represent the Class.

J. Barbara's Bakery represents and warrants that the individual(s) executing this Agreement is/are authorized to enter into this Agreement on behalf of Barbara's Bakery.

K. The Parties (including their counsel, successors, and assigns) agree to cooperate fully and in good faith with one another and to use their best efforts to effectuate the Settlement, including without limitation in seeking preliminary and final Court approval of this Agreement and the Settlement embodied herein, carrying out the terms of this Agreement, and promptly agreeing upon and executing all such other documentation as may be reasonably required to obtain final approval by the Court of the Settlement. In the event that the Court fails to approve the Settlement or fails to issue the Final Order and Final Judgment, the Parties agree to use all reasonable efforts, consistent with this Agreement and subject to Section XI.B herein, to cure any defect identified by the Court. Each party

39

will cooperate with the other party in connection with effectuating the Settlement or the administration of claims thereunder. Any requests for cooperation shall be narrowly tailored and reasonably necessary for the requesting party to recommend the Settlement to the Court, and to carry out its terms.

L.     This Agreement, complete with its exhibits, sets forth the sole and entire agreement among the Parties with respect to its subject matter, and it may not be altered, amended, or modified except by written instrument executed by Class Counsel and Barbara's Bakery's Counsel. The Parties expressly acknowledge that no other agreements, arrangements, or understandings not expressed in this Agreement exist among or between them and that in deciding to enter into this Agreement, they rely solely upon their judgment and knowledge. This Agreement supersedes any prior agreements, understandings, or undertakings (written or oral) by and between the Parties regarding the subject matter of this Agreement.

M.     This Agreement and any amendments thereto shall be governed by and interpreted according to the laws of the State of California, notwithstanding its conflict of laws provisions.

N.     Any disagreement and/or action to enforce this Agreement shall be commenced and maintained only in the Court in which this Action is pending.

O.     Whenever this Agreement requires or contemplates that one of the Parties shall or may give notice to the other, notice shall be provided by e-mail and/or next-day (excluding Saturdays, Sundays and Legal Holidays) express delivery service as follows:

1.     If to Barbara's Bakery, then to:

Clement L. Glynn
GLYNN & FINLEY, LLP
100 Pringle Avenue, Suite 500
Walnut Creek, California  94596
Telephone:  925-210-2801
Facsimile:  925-945-1975
E-mail: cglynn@glynnfinley.com

40

2.    If to Plaintiff, then to:

Tina Wolfson
Robert Ahdoot
AHDOOT & WOLFSON, PC
10850 Wilshire Blvd., Suite 370
Los Angeles, California 90024
Telephone: 310-474-9111
Facsimile: 310-474-8585
E-mail: twolfson@ahdootwolfson.com
       rahdoot@ahdootwolfson.com

P.    All time periods set forth herein shall be computed in calendar days unless otherwise expressly provided. In computing any period of time prescribed or allowed by this Agreement or by order of the Court, the day of the act, event, or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a Legal Holiday (as defined in Fed. R. Civ. P. 6(a)(6)), or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the office of the clerk of the court inaccessible, in which event the period shall run until the end of the next day that is not one of the aforementioned days.

Q.    The Parties reserve the right, subject to the Court's approval, to agree to any reasonable extensions of time that might be necessary to carry out any of the provisions of this Agreement.

R.    The Class, Plaintiff, Class Counsel, Barbara's Bakery, or Barbara's Bakery's Counsel shall not be deemed to be the drafter of this Agreement or of any particular provision, nor shall they argue that any particular provision should be construed against its drafter or otherwise resort to the *contra proferentem* canon of construction.  All Parties agree that the Parties' counsel drafted this Agreement during and as a result of extensive arm's length negotiations.  No parol or other evidence may be offered to explain, construe, contradict, or clarify its terms, the intent of the Parties or their counsel, or the circumstances under which this Agreement was made or executed.

S.    The headings in this Agreement are inserted merely for the purpose of convenience and shall not affect the meaning or interpretation of this document.

T.    The Parties expressly acknowledge and agree that this Agreement and its exhibits, along with all related drafts, motions, pleadings, conversations, negotiations, and correspondence,

41

constitute an offer of compromise and a compromise within the meaning of Federal Rule of Evidence 408 and any equivalent rule of evidence in any state. In no event shall this Agreement, any of its provisions or any negotiations, statements, or court proceedings relating to its provisions in any way be construed as, offered as, received as, used as, or deemed to be evidence of any kind in the Action, any other action, or in any judicial, administrative, regulatory, or other proceeding, except in a proceeding to enforce this Agreement or the rights of the Parties or their counsel. Without limiting the foregoing, neither this Agreement nor any related negotiations, statements, or court proceedings shall be construed as, offered as, received as, used as or deemed to be evidence or an admission or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including, but not limited to, the Released Parties, Plaintiff, or the Class, or as a waiver by the Released Parties, Plaintiff, or the Class of any applicable privileges, claims, or defenses.

U.     Plaintiff expressly affirms that the allegations contained in the complaints filed in the Action were made in good faith and have a basis in fact, but considers it desirable for the Action to be settled and dismissed because of the substantial benefits that the proposed Settlement will provide to Class Members.

V.     The Parties, their successors and assigns, and their counsel undertake to implement the terms of this Agreement in good faith, and to use good faith in resolving any disputes that may arise in the implementation of the terms of this Agreement.

W.     The waiver by one party of any breach of this Agreement by another party shall not be deemed a waiver of any prior or subsequent breach of this Agreement.

X.     If one party to this Agreement considers another party to be in breach of its obligations under this Agreement, that party must provide the breaching party with written notice of the alleged breach and provide a reasonable opportunity to cure the breach before taking any action to enforce any rights under this Agreement.

Y.     The Parties, their successors and assigns, and their counsel agree to cooperate fully with one another in seeking Court approval of this Agreement and to use their best efforts to effect the prompt consummation of this Agreement and the proposed Settlement.

Z.      This Agreement may be signed with a facsimile signature and in counterparts, each of
which shall constitute a duplicate original.

     Agreed to on the date indicated below.

APPROVED AND AGREED TO BY THE PLAINTIFF


BY_____        DATE_____
     RICHARD W. TRAMMELL

APPROVED AND AGREED TO BY CLASS COUNSEL


BY_____        DATE_____
     Tina Wolfson
     AHDOOT & WOLFSON, PC


APPROVED AND AGREED TO BY AND ON BEHALF OF
BARBARA'S BAKERY, INC.

BY_____        DATE April 25, 2013
NAME:   STEPHEN VAN TASSEL
TITLE:    CEO

APPROVED AND AGREED TO BY BARBARA'S BAKERY'S COUNSEL


BY_____        DATE 4. 25. 13
     Clement L. Glynn
     GLYNN & FINLEY, LLP

43

Z.    This Agreement may be signed with a facsimile signature and in counterparts, each of which shall constitute a duplicate original.

Agreed to on the date indicated below.

APPROVED AND AGREED TO BY THE PLAINTIFF

BY _____       DATE 24 Apr. 13
    RICHARD W. TRAMMELL

APPROVED AND AGREED TO BY CLASS COUNSEL

BY _____       DATE _____
    Tina Wolfson
    AHDOOT & WOLFSON, PC

APPROVED AND AGREED TO BY AND ON BEHALF OF
BARBARA'S BAKERY, INC.

BY _____       DATE _____
NAME:
TITLE:

APPROVED AND AGREED TO BY BARBARA'S BAKERY'S COUNSEL

BY _____       DATE _____
    Clement L. Glynn
    GLYNN & FINLEY, LLP

Z.     This Agreement may be signed with a facsimile signature and in counterparts, each of which shall constitute a duplicate original.

Agreed to on the date indicated below.

APPROVED AND AGREED TO BY THE PLAINTIFF

BY_____          DATE_____
    RICHARD W. TRAMMELL

APPROVED AND AGREED TO BY CLASS COUNSEL

BY _____          DATE_____4/25/13_____
    Tina Wolfson
    AHDOOT & WOLFSON, PC

APPROVED AND AGREED TO BY AND ON BEHALF OF
BARBARA'S BAKERY, INC.

BY_____          DATE_____
NAME:
TITLE:

APPROVED AND AGREED TO BY BARBARA'S BAKERY'S COUNSEL

BY_____          DATE_____
    Clement L. Glynn
    GLYNN & FINLEY, LLP

Case 3:12-cv-02664-CRB Document 37-1 Filed 04/25/12 Page 55 of 3 PageID #: 284

# EXHIBIT 1

3:12-cv-02664-CRB – EXHIBIT TO SETTLEMENT AGREEMENT

<table>
<tr><td>Must Be Postmarked<br>No Later Than<br>**Month XX, 2013**</td><td>UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA</td><td>For Official Use Only<br>01</td></tr>
</table>

## BARBARA'S BAKERY SETTLEMENT CLAIM FORM

To receive a payment, you must accurately complete this Claim Form and submit it by **Month 00, 2013**. Failure to do so will result in a reduction or the denial of your Claim. You will not be given an opportunity to cure or fix any deficiencies in this claim form. Claim Forms may be submitted online at www.BarbarasBakerySettlement.com or by mail to: *Barbara's Bakery Settlement,* P.O. Box XXXX, Faribault, MN 55021-xxxx.

### A. CLASS MEMBER INFORMATION

First Name                              Last Name

Street Address

City                                    State    Zip Code

E-mail Address (optional)

### B. PURCHASE INFORMATION

What is the total amount of your household's purchases of Eligible Products from May 23, 2008 to Month XX, 2013 (see page 2 for the list of Eligible Products)? *Please check the appropriate box:*

☐ More than $100

☐ Between $75.01 and $100

☐ Between $50.01 and $75

☐ Between $25.01 and $50

☐ Between $10.01 and $25

☐ Less than $10

### C. SIGN AND DATE YOUR CLAIM FORM

I declare, under penalty of perjury, that the information in this claim form is true and correct to the best of my knowledge and that I purchased the amount of the Eligible Product(s) claimed above from May 23, 2008 to Month XX, 2013. I understand that my claim form may be subject to audit, verification, and Court review.

| | | |
|---|---|---|
| Signature | Type/Print Name | Date |

**Eligible Products**

| Cereals: | Cereals: |
|---|---|
| • Brown Rice Crisps (Fruit Juice Sweetened flavor);<br>• Corn Flakes (Fruit Juice Sweetened flavor);<br>• High Fiber (Cranberry, Flax & Granola, and Original flavors);<br>• Hole 'n Oats (Fruit Juice Sweetened or Honey Nut flavors);<br>• Honest O's (Honey Nut, Multigrain, or Original flavors);<br>• Organic Apple Cinnamon O's;<br>• Organic Breakfast O's;<br>• Organic Brown Rice;<br>• Organic Brown Rice Crisps;<br>• Organic Corn Flakes;<br>• Organic Crispy Wheats;<br>• Organic Honey Crunch 'N Oats;<br>• Organic Honey Nut O's;<br>• Organic Snackimals Cereal (Cinnamon Crunch or Vanilla Blast flavors); | • Organic Wild Puffs (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);<br>• Puffins (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);<br>• Puffin Puffs (Crunchy Cocoa, or Fruit Medley flavors);<br>• Shredded Oats (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, Vanilla Almond flavors);<br>• Shredded Wheat;<br>• Shredded Spoonfuls (Multigrain or Vanilla Blast flavors);<br>• Shredded Minis (Blueberry Burst flavor);<br>• Toasted Oatmeal Flakes (Original flavor); and<br>• Ultima Organic (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors). |
| **Cereal Bars:**<br>• Multigrain Cereal Bars (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors);<br>• Fruit & Yogurt Bars (Apple Cinnamon, Blueberry Apple, Cherry Apple, or Strawberry Apple or Traditional flavors); and<br>• Puffins Cereal and Milk Bars (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors). | **Cheese Puffs:**<br>• Baked Cheese Puffs (Original or White Cheddar flavors); and<br>• Cheese Puffs (Jalapeno or Original flavors). |
| **Fig Bars:**<br>• Fig Bars (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free or Whole Wheat flavors). | **Granola Bars:**<br>• Crunchy Organic Granola Bars (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors). |
| **Snackimals Animal Cookies:**<br>• Snackimals Animal Cookies (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors). | **Organic Mini Cookies:**<br>• Organic Mini Cookies (Chocolate, Ginger, or Oatmeal flavors). |
| **Snack Mixes:**<br>• Bruschetta Snack Mix;<br>• Honey Cinnamon Snack Mix;<br>• Honey Mustard Snack Mix; and<br>• Salsa Snack Mix | **Crackers:**<br>• Crisp Cookies (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread flavors);<br>• Go Go Grahams (Chocolate, Cinnamon, Honey, Lemon Ginger flavors);<br>• Pizza and Cheese Bites;<br>Rite Lite Rounds (Original, Poppy Seed, or Tamari Sesame flavors); and<br>• Wheatines (Cracked Pepper, Original or Sesame flavors). |

Case 1:12-cv-02664-CRB Document 37-2 Filed 04/25/13 Page 56 of 552 PageID #: 287

# EXHIBIT 2

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

# If You Bought a Barbara's Bakery Product Any Time From May 23, 2008 to Month 00, 0000

### *You Could Get Up to $100 From a Class Action Settlement*

**Included Products:** Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies

*A federal court authorized this notice.  This is not a solicitation from a lawyer.*

- There is a Settlement in a class action lawsuit that claims Barbara's Bakery violated state laws regarding the marketing and sale of its products (*see* Question 2).  Barbara's Bakery denies it did anything wrong.

- Anyone who bought an eligible Barbara's Bakery product, referred to as the "Eligible Products" and listed below under Question 7, from May 23, 2008 to Month 00, 0000 is included in the Settlement. You may be entitled to a refund of up to $100.

- The Settlement will provide $4,000,000 to pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) a special service payment to the Class Representative, and (4) attorneys' fees and costs.  Barbara's Bakery has also agreed to change some of its business practices.

- Your legal rights are affected whether you act or not.

- **Read this notice carefully because it explains decisions you must make and actions you must take <u>now</u>.**

| SUMMARY OF YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **DO NOTHING** | Get no payment.  Give up your rights. |
| **SUBMIT A CLAIM FORM** | Submit a Claim Form by **Month 00, 0000** to get a payment (*see* Question 14). |
| **EXCLUDE YOURSELF** | Exclude yourself by **Month 00, 0000** and get no payment from the Settlement. This is the only choice that allows you to ever be part of any other lawsuit against Barbara's Bakery about the claims in this case (*see* Question 17). |
| **OBJECT** | Write to the Court by **Month 00, 0000** about why you don't like the Settlement (*see* Question 22). |
| **GO TO A HEARING** | Ask to speak in Court by **Month 00, 0000** about the fairness of the Settlement (*see* Question 26). |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the Settlement.  If it does, and any appeals are resolved, payments will be distributed to those who qualify.  Please be patient.

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION**……………………………………………………………**3**
    1.    Why was this notice issued?
    2.    What is this lawsuit about?
    3.    Why is this a class action?
    4.    Why is there a Settlement?

**WHO IS PART OF THE SETTLEMENT?**………………………………………………**3**
    5.    Who is included in the Settlement?
    6.    Are there exceptions to being included?
    7.    Which products are included?
    8.    What if I'm still not sure if I'm included?

**THE SETTLEMENT BENEFITS – WHAT YOU CAN GET**……………………………**6**
    9.    What does the Settlement provide?
    10.    What can I get from the Settlement?
    11.    What happens if there are any funds remaining?
    12.    What am I giving up if I stay in the Class?
    13.    When will I get my payment, if any?

**HOW TO RECEIVE A PAYMENT**……………………………………………………**7**
    14.    How can I get a payment?
    15.    What is the claim process?
    16.    What if I do nothing?

**EXCLUDING YOURSELF FROM THE SETTLEMENT**…………………………………**8**
    17.    How can I get out of the Settlement?
    18.    If I exclude myself, can I still get a payment?
    19.    If I don't exclude myself, can I sue Barbara's Bakery for the same thing later?

**THE LAWYERS REPRESENTING THE CLASS**………………………………………**9**
    20.    Do I have a lawyer in this case?
    21.    How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT**…………………………………………………**9**
    22.    How can I tell the Court if I do not like the Settlement?
    23.    What is the difference between objecting and asking to be excluded?

**THE COURT'S FAIRNESS HEARING**………………………………………………**10**
    24.    When and where will the Court decide whether to approve the Settlement?
    25.    Do I have to come to the hearing?
    26.    May I speak at the fairness hearing?

**GETTING MORE INFORMATION**……………………………………………………**11**
    27.    How can I get more information?

# BASIC INFORMATION

| 1. Why was this notice issued? |
| --- |

The Court authorized this notice because you have a right to know about a proposed Settlement, and about your rights and options, before the Court decides whether to approve the Settlement. You will be informed of the progress of this Settlement and may receive a payment if you are a Class Member and submit a completed and timely Claim Form. This notice explains the lawsuit, the Settlement, and your legal rights. Judge Charles R. Breyer of the United States District Court for the Northern District of California is overseeing this case. The lawsuit is known as *Trammell v. Barbara's Bakery, Inc.,* Case Number 3:12-cv-02664-CRB. The person who sued is called the "Plaintiff." Barbara's Bakery is the "Defendant."

| 2. What is this lawsuit about? |
| --- |

The lawsuit claims that Barbara's Bakery violated certain state laws and consumer protection statutes regarding the marketing and sale of certain products. For example, Plaintiff claims that Barbara's Bakery misrepresented the nature of certain products to consumers by labeling them as "All Natural." Plaintiff claims that these products contain ingredients that are not "All Natural." Barbara's Bakery denies any and all claims of wrongdoing and does not admit any fault, wrongdoing or liability.

Information about the Settlement is summarized in this notice. More detail is provided in the Settlement Agreement, available at www.BarbarasBakerySettlement.com.

| 3. Why is this a class action? |
| --- |

In a class action, one or more people called "Class Representatives" (in this case, Plaintiff, Richard Trammell), sue on behalf of themselves and other people who have similar claims. Together, all of these people are "Class Members." One Court resolves the issues for all Class Members in a Class Action, except for those who exclude themselves from the Class (*see* Question 17).

| 4. Why is there a Settlement? |
| --- |

The Court has not decided in favor of the Plaintiff or Barbara's Bakery. Instead, both sides have agreed to the Settlement. By agreeing to the Settlement, they avoid the costs and uncertainty of a trial, and Class Members receive the benefits described in this notice. The proposed Settlement does not mean that any law was broken or that Barbara's Bakery did anything wrong. The parties believe that the Settlement is fair, reasonable, and adequate and will provide substantial benefit to the Class.

# WHO IS PART OF THE SETTLEMENT?

| 5. Who is included in the Settlement? |
| --- |

The Class includes all persons or entities that bought the Eligible Products (listed below under Question 7) from Barbara's Bakery U.S. Retailers, Barbara's Bakery, www.barbarasbakery.com, or other third-party retailers from May 23, 2008 through **Month 00, 0000**.

| 6. Are there exceptions to being included? |
| --- |

The Settlement does not include:
- Barbara Bakery's board members or executive-level officers, including its attorneys;
- Persons or entities who purchased the Eligible Products primarily for purposes of resale;
- Any claims for personal injury relating to the use of the Eligible Products;
- Distributors or re-sellers of the Eligible Products;
- The judge and magistrate judge and their immediate families presiding over the class action and the Court staff;
- Governmental entities;
- Any person who excludes him or herself from the Class (*see* Question 17); and
- Anyone who purchased the Eligible Products via the Internet or other remote means while not residing in the United States.

| 7. Which products are included? |
| --- |

The following Barbara's Bakery products are the Eligible Products:

---

**CEREALS:**
- **BROWN RICE CRISPS** (Fruit Juice Sweetened flavor);
- **CORN FLAKES** (Fruit Juice Sweetened flavor);
- **HIGH FIBER** (Cranberry, Flax & Granola, and Original flavors);
- **HOLE 'N OATS** (Fruit Juice Sweetened or Honey Nut flavors);
- **HONEST O'S** (Honey Nut, Multigrain, or Original flavors);
- **ORGANIC APPLE CINNAMON O'S**;
- **ORGANIC BREAKFAST O'S**;
- **ORGANIC BROWN RICE**;
- **ORGANIC BROWN RICE CRISPS**;
- **ORGANIC CORN FLAKES**;
- **ORGANIC CRISPY WHEATS**;
- **ORGANIC HONEY CRUNCH 'N OATS**;
- **ORGANIC HONEY NUT O'S**;
- **ORGANIC SNACKIMALS CEREAL** (Cinnamon Crunch or Vanilla Blast flavors);
- **ORGANIC WILD PUFFS** (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);
- **PUFFINS** (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);
- **PUFFIN PUFFS** (Crunchy Cocoa or Fruit Medley flavors);
- **SHREDDED OATS** (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, or Vanilla Almond flavors);
- **SHREDDED WHEAT**;
- **SHREDDED SPOONFULS** (Multigrain or Vanilla Blast flavors);
- **SHREDDED MINIS** (Blueberry Burst flavor);
- **TOASTED OATMEAL FLAKES** (Original flavor); and
- **ULTIMA ORGANIC** (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors).

---

| | |
|---|---|
| **CEREAL BARS:**<br>• **MULTIGRAIN CEREAL BARS** (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors);<br>• **FRUIT & YOGURT BARS** (Apple Cinnamon, Blueberry Apple, Cherry Apple, Strawberry Apple, or Traditional flavors); and<br>• **PUFFINS CEREAL AND MILK BARS** (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors). | **CHEESE PUFFS:**<br>• **BAKED CHEESE PUFFS** (Original or White Cheddar flavors); and<br>• **CHEESE PUFFS** (Jalapeno or Original flavors). |
| **FIG BARS:**<br>• **FIG BARS** (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free or Whole Wheat flavors). | **GRANOLA BARS:**<br>• **CRUNCHY ORGANIC GRANOLA BARS** (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors). |
| **SNACKIMALS ANIMAL COOKIES:**<br>• **SNACKIMALS ANIMAL COOKIES** (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors). | **ORGANIC MINI COOKIES:**<br>• **ORGANIC MINI COOKIES** (Chocolate, Ginger, or Oatmeal flavors). |
| **SNACK MIXES:**<br>• **BRUSCHETTA SNACK MIX**;<br>• **HONEY CINNAMON SNACK MIX**;<br>• **HONEY MUSTARD SNACK MIX**; and<br>• **SALSA SNACK MIX**. | **CRACKERS:**<br>• **CRISP COOKIES** (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread flavors);<br>• **GO GO GRAHAMS** (Chocolate, Cinnamon, Honey, or Lemon Ginger flavors);<br>• **PIZZA AND CHEESE BITES**;<br>• **RITE LITE ROUNDS** (Original, Poppy Seed, or Tamari Sesame flavors); and<br>• **WHEATINES** (Cracked Pepper, Original, or Sesame flavors). |

---

### 8. What if I'm still not sure if I'm included?

If you are not sure whether you are a Class Member, or have any other questions about the Settlement, visit the website, www.BarbarasBakerySettlement.com, or call the toll free number, 1-800-000-0000. You may also send questions to the Settlement Administrator at Barbara's Bakery Settlement, P.O. Box 0000, City, ST 00000.

## THE SETTLEMENT BENEFITS – WHAT YOU CAN GET

| 9. What does the Settlement provide? |
| --- |

If the Settlement is approved and becomes final, it will provide benefits to Class Members. Barbara's Bakery will pay $4,000,000 to a Settlement Fund to make payments to Class Members who file valid claims (*see* Question 14), as well as to pay for costs associated with the notice and administration of the Settlement, attorneys' fees and costs (*see* Question 21), and a special service payment to the Class Representative (*see* Question 21). The costs of notice and administration are estimated to be $790,000.

In addition, Barbara's Bakery has agreed to change their labeling and advertising of the Eligible Products so as not to make certain claims. For example, Barbara's Bakery will not say that the Eligible Products are "All Natural," have "no artificial additives," have "no artificial flavors," and have "no artificial preservatives." The Settlement Agreement, available at www.BarbarasBakerySettlement.com, has more information.

| 10. What can I get from the Settlement? |
| --- |

You can get up to $100 if you submit a valid Claim Form. The amount of your payment will depend on the total amount of money you spent on the Eligible Products at any time from May 23, 2008 until **Month 00, 0000** as follows:

| IF YOU SPENT: | YOU COULD RECEIVE A MAXIMUM OF: |
| --- | --- |
| More than $100.00 | $100.00 |
| $75.01 to $100.00 | $75.00 |
| $50.01 to $75.00 | $50.00 |
| $25.01 to $50.00 | $25.00 |
| $10.01 to $25.00 | $10.00 |
| $10.00 or less | $5.00 |

Payment amounts may be adjusted to ensure that all eligible Class Members receive a payment, as follows: If the total value of all approved claims is greater than the amount of money available to pay claims (after costs and fees have been deducted), eligible Class Members' payments will be reduced proportionally.

The actual amount available for each eligible Class Member will not be determined until after **Month 00, 0000** and all Claims Forms have been received, and may not be determined until after the Settlement is final.

### 11. What happens if there are any funds remaining?

If there are any funds remaining after all claims are processed, those funds will be distributed to the following non-profit organizations: Consumers Union (www.consumersunion.org) and Action for Healthy Kids (www.actionforhealthykids.org). No remaining funds will be returned to Barbara's Bakery.

### 12. What am I giving up if I stay in the Class?

Unless you exclude yourself from the Settlement, you can't sue Barbara's Bakery or be part of any other lawsuit against Barbara's Bakery about the issues in this case. Unless you exclude yourself, all of the decisions by the Court will bind you. The Settlement Agreement is available at www.BarbarasBakerySettlement.com and describes the claims that you give up if you remain in the Settlement.

### 13. When will I get my payment, if any?

Class Members who submit valid claims will receive their payments only after the Court grants final approval to the Settlement and after any appeals are resolved (*see* "The Court's Fairness Hearing" below). If there are appeals, resolving them can take time. Please be patient.

## HOW TO RECEIVE A PAYMENT

### 14. How can I get a payment?

To get a payment under the Settlement, you must send in a Claim Form. You may access a Claim Form and other relevant documents at www.BarbarasBakerySettlement.com. A Claim Form also is attached to this Notice. Please read the instructions carefully, and fill out the form completely and accurately. Claim Forms can be submitted two ways: electronically or by mail. Your Claim Form must be submitted electronically no later than **Month 00, 0000** or by mail postmarked no later than **Month 00, 0000** and addressed to:

<div align="center">

Barbara's Bakery Settlement
P.O. Box 0000
City, ST 00000

</div>

### 15. What is the claim process?

The Settlement Administrator will review each Claim Form. Proofs of purchase are not initially required. However, in some cases you may be asked to verify your purchase(s) of any of the Eligible Products, by providing receipt(s) or other documentation. If you do not respond to these requests, it may result in the denial of your claim. You will have 35 days from the date of the Settlement Administrator's request to provide your documentation.

### 16. What if I do nothing?

If you are a Class Member and you do nothing, you will <u>not</u> get any payment from the Settlement and you will be bound by the Court's decisions, including the Settlement's release and waiver of claims you may have against Barbara's Bakery that related to the claims made in the lawsuit. To receive a payment, you must complete and submit a Claim Form (*see* Question 14).

# EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from this Settlement, but you want to keep the right to sue or continue to sue Barbara's Bakery on your own about the legal issues in this case, then you must take steps to get out of the Class. This is called excluding yourself – or it is sometimes referred to as "opting out" of the Class.

## 17. How can I get out of the Settlement?

To exclude yourself from the Class, you must mail a letter or written request to the Settlement Administrator. Your request must include:

1. Your name, address, and telephone number;
2. A statement that you wish to be excluded from the Class in *Trammell v. Barbara's Bakery, Inc.*, Case Number 3:12-cv-02664; and
3. Your signature (you must personally sign the letter).

Please write "exclusion request" on the lower left-hand corner of the front of the envelope.

Your exclusion request must be postmarked no later than **Month 00, 0000**. Send your request to:

Barbara's Bakery Settlement
P.O. Box 0000
City, ST 00000

## 18. If I exclude myself, can I still get a payment?

No. You will not get a payment if you exclude yourself from the Settlement. If you request exclusion from the Class, then for each of the excluded Eligible Products:

- You will not be eligible for payment under the proposed Settlement;
- You will not be allowed to object to the terms of the proposed Settlement, and
- You will not be bound by any subsequent rulings entered in this case if the proposed Settlement is finally approved.

## 19. If I don't exclude myself, can I sue Barbara's Bakery for the same thing later?

No. If the Court approves the proposed Settlement and you do not exclude yourself from the Class, you give up (or "release") all claims that have been or could have been made in this lawsuit relating to the Eligible Products.

As part of this Settlement, the Court has preliminary stopped all Class Members and/or their representatives (who do not timely exclude themselves from the Class) from filing, participating in, or continuing litigation against Barbara's Bakery (or against any of its related parties or affiliates), and/or from receiving any benefits from any other lawsuit relating to the claims being resolved in this case.

Upon final approval of the Settlement, Plaintiffs and Barbara's Bakery will ask the Court to enter a permanent ruling forbidding all Class Members and/or their representatives and/or personnel from engaging in the activities described above. All Class Members will be bound by this order.

# THE LAWYERS REPRESENTING THE CLASS

## 20. Do I have a lawyer in this case?

The Court has appointed attorneys at the law firm of Ahdoot & Wolfson, P.C. to represent you and the other Class Members in this lawsuit. The lawyers representing you and the Class Members are called "Class Counsel." You will not be charged for the services of these lawyers.

You may contact Class Counsel as follows:

<div align="center">

Robert Ahdoot / Tina Wolfson
Ahdoot & Wolfson, PC
2355 Westwood Boulevard, #337
Los Angeles, CA 90064-2109
classactioncounsel@gmail.com
Telephone: 888-333-8996

</div>

You have the right to retain your own lawyer to represent you in this case, but you are not obligated to do so. If you do hire your own lawyer, you will have to pay his or her fees and expenses. You also have the right to represent yourself before the Court without a lawyer.

## 21. How will the lawyers be paid?

Class Counsel have not been paid anything to date for their work on this case. Class Counsel will request attorneys' fees and expenses of up to $1,000,000 to be paid out of the $4,000,000 Settlement Fund. The attorneys' motion(s) for fees, costs, and expenses and Class Representative payment will be filed on or before **Month 00, 0000**. The motion(s) will be posted on the website at www.BarbarasBakerySettlement.com.

Class Counsel will also ask the Court for a special service payment of up to $2,500 for the Class Representative, Richard W. Trammell, for his work on behalf of the Class. Any special service payment will also be paid out of the $4,000,000 Settlement Fund.

# OBJECTING TO THE SETTLEMENT

You have the right to tell the Court that you do not agree with the Settlement or any or all of its terms.

## 22. How can I tell the Court if I do not like the Settlement?

If you choose to remain a Class Member, you have a right to object to any part of the proposed Settlement. The Court will consider your views.

To object, you must send a letter stating that you object to *Richard W. Trammell v. Barbara's Bakery, Inc.,* Case Number 3:12-cv-02664. Your written objection must also include:

1. Your name, address, and telephone number;
2. A written statement of your objection(s), including any legal support and/or any supporting evidence you wish to introduce;
3. A statement of whether you intend to appear and speak at the Fairness Hearing; and
4. Your signature.

**QUESTIONS? VISIT WWW.BARBARASBAKERYSETTLEMENT.COM OR CALL, TOLL-FREE, 1-000-000-0000**

If you choose to object, in order to be considered by the Court, your written objections must be filed with the Court by **Month 00, 0000** and mailed to each of the following three addresses, postmarked by **Month 00, 0000**:

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of the Court<br>United States District Court<br>Northern District of California<br>Phillip Burton Federal Building<br>& United States Courthouse<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 | Robert Ahdoot<br>Tina Wolfson<br>Ahdoot & Wolfson, P.C.<br>2355 Westwood Boulevard, #337<br>Los Angeles, CA 90064-2109 | Clement L. Glynn<br>Glynn & Finley LLP<br>100 Pringle Avenue<br>Suite 500<br>Walnut Creek, CA 94596 |

### 23. What is the difference between objecting and asking to be excluded?

Objecting is simply a way of telling the Court that you don't like something about the Settlement. You can only object if you stay in the Class. You will also be bound by any subsequent rulings in this case and you will not be able to file or participate in any other lawsuit based upon or relating to the claims of this lawsuit. If you object to the Settlement, you still remain a Class Member and you will still be eligible to submit a Claim Form. Excluding yourself is telling the Court that you don't want to be a part of the Class. If you exclude yourself, you have no basis to object to the Settlement and appear at the Fairness Hearing because it no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a final hearing (called a Fairness Hearing) to decide whether to finally approve the Settlement. You may attend and ask to speak, but you don't have to.

### 24. When and where will the Court decide whether to approve the Settlement?

On **Month 00, 0000 at 00:00 x.m.** the Court will hold a Fairness Hearing at the United States District Court for the Northern District of California, before the Honorable Charles R. Breyer, Senior District Judge, in Courtroom 6, Phillip Burton Federal Building & United States Courthouse, 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102.

The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.BarbarasBakerySettlement.com for updates. At this hearing the Court will consider whether the Settlement is fair, reasonable, and adequate. The Court will also decide whether to award attorneys' fees and costs, as well as a special payment to the Class Representative. If there are objections, the Court will consider them at that time. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

### 25. Do I have to come to the hearing?

No. Class Counsel will answer questions the Court may have at the Fairness Hearing. But you are welcome to come at your own expense. Please note that the Court has the right to change the date and/or time of the Fairness Hearing without further notice. If you are planning to attend the hearing, you should confirm the date and time before going to the Court.

**26. May I speak at the fairness hearing?**

Yes, you may ask the Court for permission to speak at the hearing. To do so, you must file a document called a "Notice of Intention to Appear." If you or your attorney wants to appear and speak at the Fairness Hearing, you (or your attorney) must mail a Notice of Intention to Appear at the Fairness Hearing to the addresses listed above in Question 22. Your Notice of Intention to Appear at the Fairness Hearing must be filed and received by the Court, Barbara's Bakery's Counsel, and Class Counsel no later than **Month 00, 0000**.

## GETTING ADDITIONAL INFORMATION

**27. How can I get more information?**

This notice summarizes the proposed Settlement. More details are in the Settlement Agreement. For a complete, definitive statement of the Settlement terms, refer to the Settlement Agreement at www.BarbarasBakerySettlement.com. You also may write with questions to the Settlement Administrator at Barbara's Bakery Settlement, P.O. Box 0000, City, ST 00000 or call the toll-free number, 1-800-000-0000.

### PLEASE DO NOT CALL THE COURT

Dated: **Month 00, 0000**              Clerk of the Court for the United States
                                        District Court for the Northern District of California

Case 1:12-cv-02664-CRB Document 37-3 Filed 04/25/13 Page 1 of 10 PageID #: 299

# EXHIBIT 3

1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

11
12

13  RICHARD W. TRAMMELL,

14          Plaintiff,

15      v.

16  BARBARA'S BAKERY, INC., *et al.*,

17          Defendants.

18

Case No. 3:12-cv-02664-CRB

**FINAL ORDER APPROVING CLASS ACTION**
**SETTLEMENT**

Honorable Charles R. Breyer, Presiding

19
20
21
22
23
24
25
26
27
28

This motion for final approval, having been brought before the Court jointly by the Parties, the Parties having entered into a Settlement Agreement, with its attached exhibits, (collectively, the "Settlement Agreement"), signed and filed with this Court on _____, 2013, to settle *Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664-CRB (the "Action"); and

The Court having entered an Order dated [DATE_____] (the "Preliminary Approval Order"), preliminarily certifying the putative class in this action for settlement purposes only under Fed. R. Civ. P. 23(a) and (b)(3), ordering individual and publication notice to potential Class Members, scheduling a Fairness Hearing for [DATE_____], providing potential Class Members with an opportunity either to exclude themselves from the Settlement Class or to object to the proposed settlement and issuing related Orders; and the Court having held a Fairness Hearing on [DATE_____] to determine whether to grant final approval of the proposed settlement and issue related relief; and

The Court having considered the papers submitted by the Parties and by all other persons who timely submitted papers in accordance with the Preliminary Approval Order, and having heard oral presentations by the Parties and all persons who complied with the Preliminary Approval Order, and based on all of the foregoing, together with this Court's familiarity with the Action, it is hereby **ORDERED, ADJUDGED, AND DECREED** as follows:

1. **Incorporation of Other Documents**. This Final Order Approving Class Action Settlement incorporates and makes a part hereof: (a) the Settlement Agreement, including all amendments and exhibits thereto, and definitions included therein, which was signed and filed with this Court on _____, 2013; (b) the briefs, affidavits, declarations, and other materials filed in support of the settlement and Class Counsel's request for an award of attorneys' fees and reimbursement of expenses; (c) the record at the Fairness Hearing; (d) the documents listed on the docket sheet or otherwise submitted to the Court; and (e) all prior proceedings in the Action.

2. **Jurisdiction**. Because due, adequate, and the best practicable notice has been disseminated and all potential Class Members have been given the opportunity to exclude themselves from or object to this class action settlement, the Court has personal jurisdiction over all Class Members (as defined below). The Court has subject-matter jurisdiction over the claims asserted in the

complaint and/or the Action pursuant to 28 U.S.C. §§ 1332 and 1367, including, without limitation, jurisdiction to approve the proposed settlement and the Settlement Agreement and all exhibits attached thereto, grant final certification to the Class, dismiss the Action on the merits and with prejudice, and issue related orders. The Court finds that venue is proper in this district pursuant to 28 U.S.C. § 1391.

3. **Final Class Certification**. The Class preliminarily certified by this Court is hereby finally certified for settlement purposes only under Fed. R. Civ. P. 23(a), (b)(3), and (c)(2), the Court finding that the Class fully satisfies all the applicable requirements of Fed. R. Civ. P. 23 and due process. The Class shall consist of all persons who, during the Class Period, May 23, 2008 to [DATE_____], purchased in the United States any Eligible Products (as this term is defined in the Settlement Agreement). Excluded from the Class are: (a) Barbara's Bakery board members or executive-level officers, including its attorneys; (b) persons who purchased the Eligible Products primarily for the purpose of resale; (c) retailers or re-sellers of the Eligible Products; (d) governmental entities; (e) persons who timely and properly exclude themselves from the Class as provided in the Agreement; (f) persons who purchased the Eligible Products via the Internet or other remote means while not residing in the United States; and (g) the Court, the Court's immediate family, and Court staff.

4. **Requests for Exclusion**. The Court finds that only those persons and entities listed in Exhibit __ to the Declaration of [_____ of the Settlement Administrator] and filed with the Court have submitted timely and valid requests for exclusion from the Class and are therefore not bound by this Final Order and accompanying Final Judgment. Attached hereto as Exhibit A is the list of persons or entities who submitted timely and valid requests for exclusion from the Class. Class Counsel and Barbara's Bakery's Counsel may mutually agree to allow additional Class Members to exclude themselves or to withdraw their exclusion requests by filing an appropriate notice with the Court.

5. **Adequacy of Representation**. Class Plaintiff Richard W. Trammell has adequately represented the Settlement Class for purposes of entering into and implementing the Settlement. Tina Wolfson and Robert Ahdoot, of Ahdoot & Wolfson, PC, are experienced and adequate Class Counsel. Class Plaintiff and Class Counsel have satisfied the requirements of Fed. R. Civ. P. 23(a)(4) and 23(g).

6. **Class Notice**. The Court finds that the dissemination of the Class Notice, the publication of the Summary Settlement Notice, the establishment of a website containing settlement-related materials, the establishment of a toll-free telephone number, and all other notice methods set forth in the Settlement Agreement and the Notice Administrator's Declaration and the notice dissemination methodology implemented pursuant to the Settlement Agreement and this Court's Preliminary Approval Order, as described in the Notice Administrator's Declaration, a copy of which is incorporated herein and made a part hereof:

a. constituted the best practicable notice to Class Members under the circumstances of the Action;

b. constituted notice that was reasonably calculated, under the circumstances, to apprise Class Members of (i) the pendency of this action; (ii) the terms of the proposed settlement; (iii) their rights under the proposed settlement; (iv) their right to exclude themselves from the Class and the proposed settlement; (v) their right to object to any aspect of the proposed settlement (including, but not limited to, final certification of the Settlement Class, the fairness, reasonableness, or adequacy of the proposed settlement, the adequacy of the Class's representation by Plaintiff or Class Counsel, and/or the award of attorneys' fees); (vi) their right to appear at the Fairness Hearing – either on their own or through counsel hired at their own expense – if they did not exclude themselves from the Class; and (vii) the binding effect of the Orders and Judgment in this action, whether favorable or unfavorable, on all persons who did not request exclusion from the Class;

c. constituted notice that was reasonable, due, adequate, and sufficient notice to all persons and entities entitled to be provided with notice; and

d. constituted notice that met all applicable requirements of the Federal Rules of Civil Procedure, 28 U.S.C. §1715, the Due Process Clause of the United States Constitution, and any other applicable law, as well as complied with the Federal Judicial Center's illustrative class action notices.

7. **Final Settlement Approval**. The terms and provisions of the proposed settlement and Settlement Agreement, including all exhibits, have been entered into in good faith and are hereby fully and finally approved as fair, reasonable, and adequate as to, and in the best interests of, each of the

Parties and the Class Members, and in full compliance with all applicable requirements of the Federal Rules of Civil Procedure, the Class Action Fairness Act (P.L. 109-2), the United States Constitution (including the Due Process Clause), and any other applicable law. The settlement is approved and all objections to the settlement are overruled as without merit. The Parties and Class Members are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions. Class Counsel shall take all steps necessary and appropriate to provide Class Members with the benefits to which they are entitled under the terms of the Settlement Agreement.

8. **Early Implementation**. Barbara's Bakery and Class Counsel are hereby authorized, and without requiring further approval of this Court, to implement the settlement before the Final Settlement Date (as defined in the Settlement Agreement), in which case all provisions of the Settlement Agreement specifying actions to be taken on or after the Final Settlement Date shall, to the extent necessary, be deemed to provide that those actions shall be taken on or after the date the Parties elect to implement the settlement.

9. **Binding Effect**. The terms of the Settlement Agreement and of this Final Order and the accompanying Final Judgment shall be forever binding on Plaintiff, Barbara's Bakery, and all Class Members, as well as their heirs, executors and administrators, predecessors, successors and assigns, and those terms shall have *res judicata* and other preclusive effect in all pending and future claims, lawsuits, or other proceedings maintained by or on behalf of any such persons, to the extent those claims, lawsuits, or other proceedings involve matters that were or could have been raised in the Action or are otherwise encompassed by the Release.

10. **Release**. The Release, which is set forth in Section VIII of the Settlement Agreement, is expressly incorporated herein in all respects, including all defined terms used therein, is effective as of the date of this Final Order and the accompanying Final Judgment, and forever discharges the Released Parties from any claims or liabilities arising from or related to the Release.

11. **Permanent Injunction**. All Class Members and/or their representatives who have not been timely excluded from the Class are hereby permanently barred and enjoined from bringing, filing, commencing, prosecuting, maintaining, intervening in, participating in, continuing, or receiving any benefits from, as class members or otherwise, any lawsuit (including putative class actions),

4

arbitration, administrative, regulatory, or other proceeding in any jurisdiction that is covered by the Release. All Class Members and all persons in active concert or participation with Class Members are permanently barred and enjoined from organizing or soliciting the participation of any Class Members who did not timely exclude themselves from the Class into a separate class or group for purposes of pursuing a putative class action, any claim, or lawsuit in any jurisdiction that is covered by the Release. Pursuant to 28 U.S.C. §§1651(a) and 2283, the Court finds that issuance of this permanent injunction is necessary and appropriate in aid of the Court's continuing jurisdiction and authority over the Action.

12. **Enforcement of Settlement**. Nothing in this Final Order or in the accompanying Final Judgment shall preclude any action to enforce the terms of the Settlement Agreement; nor shall anything in this Final Order or in the accompanying Final Judgment preclude Plaintiff or other Class Members from participating in the Claim Process described in the Settlement Agreement if they are entitled to do so under the terms of the Settlement Agreement.

13. **Attorneys' Fees and Expenses**. Class Counsel are hereby awarded attorneys' fees and reimbursement of their disbursements and expenses in the amount of $_____, which amount is approved as fair and reasonable, pursuant to Fed. R. Civ. P. 23(h) and is in accordance with the terms of the Settlement Agreement. The Court finds that the above stated award of attorneys' fees is fair and reasonable in consideration of, among other things, the efforts of Class Counsel and the settlement they achieved for the Class, and that the amount of expenses is reasonable and were reasonably incurred in the course of the litigation. Class Counsel, in their discretion, shall allocate and distribute this award of attorneys' fees and expenses among Plaintiff's Counsel. All objections to Class Counsel's request for an award of attorneys' fees and reimbursement of expenses are hereby overruled.

14. **Incentive Award**. The Court hereby awards $_____ to Plaintiff Richard W. Trammell as an incentive award in his capacity as a representative Plaintiff in the Action.

15. **No Other Payments**. The preceding two paragraphs of this Final Order cover, without limitation, any and all claims against the Released Parties for attorneys' fees and expenses, costs, or disbursements incurred by Class Counsel or any other counsel representing Plaintiff or Class

5

Members, or incurred by Plaintiff or the Class Members, or any of them, in connection with or related in any manner to the Action, the settlement of the Action, the administration of such settlement, and/or the Release, except to the extent otherwise specified in this Final Order and accompanying Final Judgment and the Settlement Agreement. Plaintiff is not precluded from seeking attorneys' fees, expenses, costs, or disbursements from an objecting Class Member or his or her counsel (and not Barbara's Bakery or its counsel) in connection with an appeal filed by an objecting Class Member.

16. **Modification of Settlement Agreement**. The Parties are hereby authorized, without needing further approval from the Court, to agree to and adopt such amendments to, and modifications and expansions of, the Settlement Agreement, and all exhibits attached, as are consistent with this Final Order and the accompanying Final Judgment and do not limit the rights of Class Members under the Settlement Agreement.

17. **Retention of Jurisdiction**. The Court has jurisdiction to enter this Final Order and the accompanying Final Judgment. Without in any way affecting the finality of this Final Order and/or the accompanying Final Judgment, this Court expressly retains jurisdiction as to all matters relating to the administration, consummation, enforcement, and interpretation of the Settlement Agreement and of this Final Order and the accompanying Final Judgment, and for any other necessary purpose, including, without limitation:

a. enforcing the terms and conditions of the Settlement Agreement and resolving any disputes, claims, or causes of action that, in whole or in part, are related to or arise out of the Settlement Agreement, this Final Order, or the accompanying Final Judgment (including, without limitation, whether a person or entity is or is not a Class Member and whether claims or causes of action allegedly related to this case are or are not barred by this Final Order and the accompanying Final Judgment);

b. entering such additional Orders as may be necessary or appropriate to protect or effectuate this Final Order and the accompanying Final Judgment, dismissing all claims on the merits and with prejudice, and permanently enjoining Class Members from initiating or pursuing related proceedings, or to ensure the fair and orderly administration of this settlement; and

6

c.    entering any other necessary or appropriate Orders to protect and effectuate this Court's retention of continuing jurisdiction; provided, however, that nothing in this paragraph is intended to restrict the ability of the Parties to exercise their rights under paragraphs 8 and 16 or as otherwise provided in the Settlement Agreement.

18.   **No Admissions**.  Neither this Final Order, the accompanying Final Judgment, nor the Settlement Agreement (nor any other document referred to herein, nor any action taken to carry out this Final Order or the accompanying Final Judgment) is, may be construed as, or may be used as an admission or concession by or against Barbara's Bakery or the Released Parties of the validity of any claim or defense or any actual or potential fault, wrongdoing, or liability whatsoever Barbara's Bakery continues to deny that the Action meets the requisites for class certification under Fed. R. Civ. P. 23 for any purpose other than settlement.  Entering into or carrying out the Settlement Agreement, and any negotiations or proceedings related to it, shall not in any event be construed as, or deemed evidence of, an admission or concession as to Barbara's Bakery's denials or defenses and shall not be offered or received in evidence in any action or proceeding against any Party hereto in any court, administrative agency, or other tribunal for any purpose whatsoever, except as evidence of the settlement or to enforce the provisions of this Final Order, the accompanying Final Judgment, and the Settlement Agreement; provided, however, that this Final Order, the accompanying Final Judgment, and the Settlement Agreement may be filed in any action against or by Barbara's Bakery or the Released Parties to support a defense of *res judicata*, collateral estoppel, release, waiver, good-faith settlement, judgment bar or reduction, full faith and credit, or any other theory of claim preclusion, issue preclusion, similar defense, or counterclaim.

19.   **Dismissal of Action**.  The Action (including all individual and Class claims presented therein) are hereby dismissed on the merits and with prejudice, without fees or costs to any Party except as otherwise provided in this Order and the accompanying Final Judgment and the Settlement Agreement.

_____
Honorable Charles R. Breyer
UNITED STATES DISTRICT JUDGE

7

Exhibit A – List of persons who Requested Exclusion

Case 1:12-cv-02664-CRB Document 37-4 Filed 04/25/12 Page 78 of 552 PageID #: 309

# EXHIBIT 4

3:12-cv-02664-CRB – EXHIBIT TO SETTLEMENT AGREEMENT

1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

11

12

13 | RICHARD W. TRAMMELL,

Case No. 3:12-cv-02664-CRB

14 |      Plaintiff,

**FINAL JUDGMENT**

15 |   v.

16 | BARBARA'S BAKERY, INC., *et al.*,

Honorable Charles R. Breyer, Presiding

17 |      Defendants.

18
19
20
21
22
23
24
25
26
27
28

IT IS on this _____ day of _____, 2013, HEREBY ADJUDGED AND DECREED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 58 THAT:

1.      The settlement of this class action on the terms set forth in the Parties' Settlement Agreement, with exhibits (collectively, the "Settlement Agreement"), and definitions included therein, signed and filed with this Court on _____, 2013, is finally approved, and the following class is granted final certification for settlement purposes only under Fed. R. Civ. P. 23(a) and (b)(3): all persons who, during the Class Period, May 23, 2008 to [DATE_____], purchased in the United States any Eligible Products.  "Eligible Products" means any of the following Barbara's Bakery, Inc.'s ("Barbara's Bakery") products:

**A.**    **Cereals**:

i.      BROWN RICE CRISPS (Fruit Juice Sweetened flavor);

ii.     CORN FLAKES (Fruit Juice Sweetened flavor);

iii.    HIGH FIBER (Cranberry, Flax & Granola, or Original flavors);

iv.     HOLE 'N OATS (Fruit Juice Sweetened or Honey Nut flavors);

v.      HONEST O'S (Honey Nut, Multigrain, or Original flavors);

vi.     ORGANIC APPLE CINNAMON O'S;

vii.    ORGANIC BREAKFAST O'S;

viii.   ORGANIC BROWN RICE;

ix.     ORGANIC BROWN RICE CRISPS;

x.      ORGANIC CORN FLAKES;

xi.     ORGANIC CRISPY WHEATS;

xii.    ORGANIC HONEY CRUNCH 'N OATS;

xiii.   ORGANIC HONEY NUT O'S;

xiv.    ORGANIC SNACKIMALS CEREAL (Cinnamon Crunch or Vanilla Blast flavors);

xv.     ORGANIC WILD PUFFS (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);

xvi.    PUFFINS (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);

1

xvii. PUFFIN PUFFS (Crunchy Cocoa or Fruit Medley flavors);

xviii. SHREDDED OATS (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, or Vanilla Almond flavors);

xix. SHREDDED WHEAT;

xx. SHREDDED SPOONFULS (Multigrain or Vanilla Blast flavors);

xxi. SHREDDED MINIS (Blueberry Burst flavor);

xxii. TOASTED OATMEAL FLAKES (Original flavor); and

xxiii. ULTIMA ORGANIC (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors).

B. **Cereal Bars**:

i. MULTIGRAIN CEREAL BARS (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors);

ii. FRUIT & YOGURT BARS (Apple Cinnamon, Blueberry Apple, Cherry Apple, Strawberry Apple, or Traditional flavors); and

iii. PUFFINS CEREAL AND MILK BARS (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors).

C. **Cheese Puffs**:

i. BAKED CHEESE PUFFS (Original or White Cheddar flavors); and

ii. CHEESE PUFFS (Jalapeno or Original flavors).

D. **Fig Bars:**

i. FIG BARS (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free, or Whole Wheat flavors).

E. **Granola Bars**:

i. CRUNCHY ORGANIC GRANOLA BARS (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors).

F. **Snackimals Animal Cookies**:

i. SNACKIMALS ANIMAL COOKIES (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors).

2

G. **Organic Mini-Cookies**:

    i.    ORGANIC MINI COOKIES (Chocolate, Ginger, or Oatmeal flavors).

H. **Snack Mixes**:

    i.    BRUSCHETTA SNACK MIX;

    ii.    HONEY CINNAMON SNACK MIX;

    iii.    HONEY MUSTARD SNACK MIX; and

    iv.    SALSA SNACK MIX.

I. **Crackers**:

    i.    CRISP COOKIES (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread flavors);

    ii.    GO GO GRAHAMS (Chocolate, Cinnamon, Honey, or Lemon Ginger flavors);

    iii.    PIZZA AND CHEESE BITES;

    iv.    RITE LITE ROUNDS (Original, Poppy Seed, or Tamari Sesame flavors); and

    v.    WHEATINES (Cracked Pepper, Original, or Sesame flavors).

2.    The Court finds that only those persons and entities listed in Exhibit ___ to the Declaration of _____ and filed with the Court, a copy of which is attached hereto as Exhibit A, have submitted timely and valid requests for exclusion from the Class and are therefore not bound by this Final Judgment and accompanying Final Order. Class Counsel and Barbara's Bakery's Counsel may mutually agree to allow additional Class Members to exclude themselves or to withdraw their exclusion requests by filing an appropriate notice with the Court.

3.    The Class Notice, the Summary Settlement Notice, the website, the toll-free telephone number, all other notices in the Settlement Agreement, the Declaration of the Notice Administrator, and the notice methodology implemented pursuant to the Settlement Agreement: (a) constituted the best practicable notice under the circumstances; (b) constituted notice that was reasonably calculated to apprise Class Members of the pendency of the Action, the terms of the settlement, and their rights under the settlement, including, but not limited to, their right to object to or exclude themselves from the proposed settlement and to appear at the Fairness Hearing; (c) were reasonable and constituted due, adequate, and sufficient notice to all persons entitled to receive notice; and (d) met all applicable

3

requirements of law, including, but not limited to, the Federal Rules of Civil Procedure, 28 U.S.C. §1715, and the Due Process Clause(s) of the United States Constitution, as well as complied with the Federal Judicial Center's illustrative class action notices.

4. The claims in *Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664-CRB (the "Action") are dismissed on the merits and with prejudice according to the terms (including the Release) set forth in the Parties' Settlement Agreement and in the Court's Final Order Approving Class Action Settlement, (the "Final Approval Order"), without costs to any party except as provided in the Final Approval Order.

5. All Class Members and/or their representatives who have not been timely excluded from the Class are permanently barred and enjoined from bringing, filing, commencing, prosecuting, maintaining, intervening in, participating (as class members or otherwise) in, or receiving any benefits from any other lawsuit (including putative class action lawsuits), arbitration, administrative, regulatory, or other proceeding, order, or cause of action in law or equity in any jurisdiction that is covered by the Release. In addition, all Class Members and all persons in active concert or participation with Class Members are permanently barred and enjoined from organizing Class Members who have not been excluded from the Class into a separate class for purposes of pursuing, as a purported class action, any lawsuit (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action) that is covered by the Release. Pursuant to 28 U.S.C. §§1651(a) and 2283, the Court finds that issuance of this permanent injunction is necessary and appropriate in aid of the Court's continuing jurisdiction and authority over the Action.

6. Class Counsel shall take all steps necessary and appropriate to provide Class Members with the benefits to which they are entitled under the terms of the Settlement Agreement and pursuant to the Orders of the Court.

7. Class Counsel shall be awarded $_____ in attorneys' fees and expenses, which amount is approved as fair and reasonable, in accordance with the terms of the Settlement Agreement.

8. Plaintiff Richard W. Trammell shall be awarded $_____ as an incentive award in his capacity as a representative Plaintiff in the Action.

9. The Court will retain continuing jurisdiction over the Action for the reasons and purposes set forth in this Court's Final Approval Order.

_____
Honorable Charles R. Breyer
UNITED STATES DISTRICT JUDGE

Exhibit A – List of persons who Requested Exclusion

Case 3:12-cv-02664-CRB Document 31-5 Filed 04/25/13 Page 551 of 552

# EXHIBIT 5

1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RICHARD W. TRAMMELL,<br><br>       Plaintiff,<br><br>   v.<br><br>BARBARA'S BAKERY, INC., *et al.*,<br><br>       Defendants. | Case No. 3:12-cv-02664-CRB<br><br>**[PROPOSED] ORDER PRELIMINARILY CERTIFYING A CLASS FOR SETTLEMENT PURPOSES, PRELIMINARILY APPROVING THE CLASS SETTLEMENT, APPOINTING CLASS COUNSEL, DIRECTING ISSUANCE OF NOTICE TO THE CLASS, SCHEDULING A FAIRNESS HEARING, AND ISSUING RELATED ORDERS**<br><br>Honorable Charles R. Breyer, Presiding |

WHEREAS:

This motion was brought before the Court by Plaintiff Richard W. Trammell ("Plaintiff");

*Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664-CRB, originally was filed on May 23, 2012 in the United States District Court for the Northern District of California (the "Action");

The Action alleges, on behalf of a nationwide class of consumers, that Barbara's Bakery violated California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §17200, *et seq.*, False Advertising Law ("FAL"), Bus. & Prof. Code §17500, *et seq.*, Consumers Legal Remedies Act ("CLRA"), Civ. Code §1770, *et seq.*, and breached an express warranty;

A first amended complaint was filed on June 28, 2012, and a second amended complaint was filed on January 30, 2013. The amended complaints allege causes of action identical to the original complaint, and re-alleged Barbara's Bakery's, Inc.'s ("Barbara's Bakery") violations of California's consumer protection laws;

Barbara's Bakery filed an answer to the first amended complaint on July 19, 2012, in which it expressly denied any and all wrongdoing alleged in the action, and neither admitted nor conceded any actual or potential fault, wrongdoing, or liability in connection with any facts or claims that have been or could have been alleged against it in this action. Barbara's Bakery filed an answer to the second amended complaint on February 5, 2013, which was substantively identical to the original answer;

Class Counsel has conducted a thorough examination, investigation, and evaluation of the relevant law, facts, and allegations to assess the merits of the claims and potential claims to determine the strength of both defenses and liability sought in the Action;

Class Counsel, on behalf of Plaintiff and the other members of the Class, engaged in extensive discovery. In particular, Barbara's Bakery has produced the following documentation regarding the Eligible Products: (i) label design and product formulation; (ii) marketing, advertising, media, and public relations; and (iii) financial information. In total, Plaintiff's Counsel was given access to over thirty (30) banker's boxes of documents and approximately seventy (70) Gigabytes (GB) of data. Class Counsel also conducted interviews of primary Barbara's Bakery's corporate witnesses who have been involved with the Eligible Products to address the following subjects: (i) sales and marketing; (ii) labeling; (iii) finance; (iv) document collection and retention; and (v) Barbara's Bakery's efforts to

2

eliminate GMO ingredients from its products. Before entering into this Settlement Agreement, Class Counsel conducted a thorough examination and evaluation of the relevant law, facts, and allegations to assess the merits of the claims and could reasonably assess the strength of Plaintiff's claims and Barbara's Bakery's liability, including its defenses; and

The Parties having entered into a Settlement Agreement in which the Parties have agreed to settle the Action, pursuant to the terms of the Settlement Agreement, subject to the approval and determination of the Court as to the fairness, reasonableness, and adequacy of the Settlement which, if approved, will result in dismissal of the Action with prejudice; and The Court having reviewed the Settlement Agreement, including the exhibits attached thereto (together, the "Settlement Agreement"), and all prior proceedings herein, and good cause appearing based on the record;

THEREFORE, IT IS **ORDERED, ADJUDGED, AND DECREED** as follows (all capitalized terms being defined as they are defined in the Settlement Agreement unless otherwise specified or defined herein):

1. **Stay of the Action**. All non-settlement-related proceedings in the Action are hereby stayed and suspended until further order of this Court.

2. **Preliminary Class Certification for Settlement Purposes Only**. The Action is preliminarily certified as a class action for settlement purposes only, pursuant to Fed. R. Civ. P. 23(a) and (b)(3). The Court preliminarily finds for settlement purposes that: (a) the Class certified herein is numerous, and that joinder of all such persons would be impracticable, (b) there are issues of law and fact that are typical and common to the Class, and that those issues predominate over individual questions; (c) a class action on behalf of the certified Class is superior to other available means of adjudicating this dispute; and (d) as set forth in paragraph 4, below, Plaintiff and Class Counsel are adequate representatives of the Class. Barbara's Bakery retains all rights to assert that this action may not be certified as a class action, other than for settlement purposes.

3. **Class Definition**. The Class shall consist of all persons who, during the Class Period, purchased in the United States any Eligible Products. Excluded from the Class are: (a) Barbara's Bakery's board members or executive-level officers, including its attorneys; (b) persons who purchased the Eligible Products primarily for the purpose of resale; (c) retailers or re-sellers of the

Eligible Products; (d) governmental entities; (e) persons who timely and properly exclude themselves from the Class as provided in the Agreement; (f) persons who purchased the Eligible Products via the Internet or other remote means while not residing in the United States; and (g) the Court, the Court's immediate family, and Court staff.

"Class Period" means the period from May 23, 2008, up to and including the date of the first dissemination of the Summary Settlement Notice or Class Notice, whichever is earlier

"Eligible Products" means any of the following Barbara's Bakery products purchased by Class Members during the Class Period:

**A.    Cereals**:

    i.     BROWN RICE CRISPS (Fruit Juice Sweetened flavor);

    ii.    CORN FLAKES (Fruit Juice Sweetened flavor);

    iii.   HIGH FIBER (Cranberry, Flax & Granola, or Original flavors);

    iv.    HOLE 'N OATS (Fruit Juice Sweetened or Honey Nut flavors);

    v.     HONEST O'S (Honey Nut, Multigrain, or Original flavors);

    vi.    ORGANIC APPLE CINNAMON O'S;

    vii.   ORGANIC BREAKFAST O'S;

    viii.  ORGANIC BROWN RICE;

    ix.    ORGANIC BROWN RICE CRISPS;

    x.     ORGANIC CORN FLAKES;

    xi.    ORGANIC CRISPY WHEATS;

    xii.   ORGANIC HONEY CRUNCH 'N OATS;

    xiii.  ORGANIC HONEY NUT O'S;

    xiv.   ORGANIC SNACKIMALS CEREAL (Cinnamon Crunch or Vanilla Blast flavors);

    xv.    ORGANIC WILD PUFFS (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);

    xvi.   PUFFINS (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);

    xvii.  PUFFIN PUFFS (Crunchy Cocoa or Fruit Medley flavors);

4

      xviii.    Sʜʀᴇᴅᴅᴇᴅ Oᴀᴛs (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, or Vanilla Almond flavors);

      xix.    Sʜʀᴇᴅᴅᴇᴅ Wʜᴇᴀᴛ;

      xx.    Sʜʀᴇᴅᴅᴇᴅ Sᴘᴏᴏɴꜰᴜʟs (Multigrain or Vanilla Blast flavors);

      xxi.    Sʜʀᴇᴅᴅᴇᴅ Mɪɴɪs (Blueberry Burst flavor);

      xxii.    Tᴏᴀsᴛᴇᴅ Oᴀᴛᴍᴇᴀʟ Fʟᴀᴋᴇs (Original flavor); and

      xxiii.    Uʟᴛɪᴍᴀ Oʀɢᴀɴɪᴄ (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors).

**B.**    **Cereal Bars**:

      i.    Mᴜʟᴛɪɢʀᴀɪɴ Cᴇʀᴇᴀʟ Bᴀʀs (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors);

      ii.    Fʀᴜɪᴛ & Yᴏɢᴜʀᴛ Bᴀʀs (Apple Cinnamon, Blueberry Apple, Cherry Apple, Strawberry Apple, or Traditional flavors); and

      iii.    Pᴜꜰꜰɪɴs Cᴇʀᴇᴀʟ ᴀɴᴅ Mɪʟᴋ Bᴀʀs (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors).

**C.**    **Cheese Puffs**:

      i.    Bᴀᴋᴇᴅ Cʜᴇᴇsᴇ Pᴜꜰꜰs (Original or White Cheddar flavors); and

      ii.    Cʜᴇᴇsᴇ Pᴜꜰꜰs (Jalapeno or Original flavors).

**D.**    **Fig Bars:**

      i.    Fɪɢ Bᴀʀs (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free, or Whole Wheat flavors).

**E.**    **Granola Bars**:

      i.    Cʀᴜɴᴄʜʏ Oʀɢᴀɴɪᴄ Gʀᴀɴᴏʟᴀ Bᴀʀs (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors).

**F.**    **Snackimals Animal Cookies**:

      i.    Sɴᴀᴄᴋɪᴍᴀʟs Aɴɪᴍᴀʟ Cᴏᴏᴋɪᴇs (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors).

G. **Organic Mini-Cookies**:

    i.    ORGANIC MINI COOKIES (Chocolate, Ginger, or Oatmeal flavors).

H. **Snack Mixes**:

    i.    BRUSCHETTA SNACK MIX;

    ii.    HONEY CINNAMON SNACK MIX;

    iii.    HONEY MUSTARD SNACK MIX; and

    iv.    SALSA SNACK MIX.

I. **Crackers**:

    i.    CRISP COOKIES (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread);

    ii.    GO GO GRAHAMS (Chocolate, Cinnamon, Honey, or Lemon Ginger);

    iii.    PIZZA AND CHEESE BITES;

    iv.    RITE LITE ROUNDS (Original, Poppy Seed, or Tamari Sesame flavors); and

    v.    WHEATINES (Cracked Pepper, Original, or Sesame flavors).

4. **Class Representatives and Class Counsel**. Plaintiff, Richard W. Trammell, is designated as the representative of the conditionally certified Class. The Court preliminarily finds that he is similarly situated to absent Class Members and therefore typical of the Class, and that he will be an adequate Class Representative. Tina Wolfson and Robert Ahdoot of Ahdoot & Wolfson, PC, whom the Court finds are experienced and adequate counsel, are hereby designated as Class Counsel.

5. **Preliminary Settlement Approval**. Upon preliminary review, the Court finds that the Settlement Agreement, and the Settlement it incorporates, appears fair, reasonable, and adequate. Fed. R. Civ. P. 23(e); Manual for Complex Litigation (Fourth) § 21.632 (2004). Accordingly, the Settlement Agreement is preliminarily approved and is sufficient to warrant sending notice to the Class.

6. **Jurisdiction**. The Court has subject-matter jurisdiction over the Action pursuant to 28 U.S.C. §§ 1332 and 1367, and personal jurisdiction over the Parties before it. Additionally, venue is proper in this District pursuant to 28 U.S.C. § 1391.

7. **Fairness Hearing**. A Fairness Hearing shall be held on _____ at _____ at the United States District Court for the Northern District of California, 450 Golden Gate Avenue, 17th Floor, Courtroom 6, San Francisco, California, 94102, to determine, among other things: (a) whether the Action should be finally certified as a class action for settlement purposes pursuant to Fed. R. Civ. P. 23(a) and (b)(3); (b) whether the settlement of the Action should be approved as fair, reasonable and adequate, and finally approved pursuant to Fed. R. Civ. P. 23(e); (c) whether the Action should be dismissed with prejudice pursuant to the terms of the Settlement Agreement; (d) whether Class Members should be bound by the release set forth in the Settlement Agreement; (e) whether Class Members and related persons should be subject to a permanent injunction; (f) whether the application of Class Counsel for an award of Attorneys' Fees and Expenses should be approved pursuant to Fed. R. Civ. P. 23(h); and (g) whether the application of the named Plaintiff for an incentive award should be approved. The submissions of the Parties in support of the settlement, including Plaintiff's Counsel's application for Attorneys' Fees and Expenses and incentive awards, shall be filed with the Court no later than fourteen (14) days prior to the deadline for the submission of objections and may be supplemented up to seven (7) days prior to the Fairness Hearing.

8. **Administration**. In consultation with and with the approval of Barbara's Bakery, Class Counsel is hereby authorized to establish the means necessary to administer the proposed settlement and implement the Claim Process, in accordance with the terms of the Agreement.

9. **Class Notice**. The proposed Class Notice, Summary Settlement Notice, the notice methodology described in the Settlement Agreement, and the Declaration of the Media Notice Administrator are hereby approved.

a. Pursuant to the Settlement Agreement, the Court appoints Kinsella Media, LLC to be the Notice Administrator and Rust Consulting, Inc. to be the Settlement Administrator to help implement the terms of the Settlement Agreement.

b. Beginning not later than ten (10) calendar days after entry of the Preliminary Approval Order and to be substantially completed not later than twenty-five (25) calendar days after entry of the Preliminary Approval Order and subject to the requirements of the Preliminary Approval Order, the Settlement Agreement, and the Declaration of the Notice Administrator, the Notice

7

Administrator shall commence sending the Class Notice by Electronic Mail ("E-mail") to: (i) each reasonably identifiable Class Member's last known E-mail address, reasonably obtainable from Barbara's Bakery, which addresses shall be provided to the Notice Administrator by Barbara's Bakery, no later than one (1) business day after the day of entry of the Preliminary Approval Order, subject to the existence of such information; and (ii) each appropriate State and Federal official, as specified in 28 U.S.C. §1715, and shall otherwise comply with Fed. R. Civ. P. 23 and any other applicable statute, law, or rule, including but not limited to the Due Process Clause of the United States Constitution.

c.   The Notice Administrator shall have the publication of the Summary Settlement Notice substantially completed no later than ninety (90) calendar days after entry of this Preliminary Approval Order.  The Notice Administrator shall publish the Summary Settlement Notice as described in the Declaration of the Notice Administrator and in such additional newspapers, magazines, and/or other media outlets as shall be agreed upon by the Parties.

d.   No later than forty-five (45) calendar days after entry of the Preliminary Approval Order, the Notice Administrator shall send the Summary Settlement Notice by First Class U.S. Mail, proper postage prepaid, to each Class Member whose E-mail address returned a message as undeliverable, subject to the existence of such information as provided by Barbara's Bakery pursuant to Section IV.B.1.a of this Agreement.  The Notice Administrator shall: (a) re-mail any Summary Settlement Notices returned by the United States Postal Service with a forwarding address that are received by the Notice Administrator no later than sixty (60) calendar days after entry of the Preliminary Approval Order; and (b) by itself or using one or more address research firms, as soon as practicable following receipt of any returned Summary Settlement Notices that do not include a forwarding address, research any such returned mail for better addresses and promptly mail copies of the Summary Settlement Notices to the better addresses so found.

e.   Prior to the dissemination of the Class Notice as set forth above in paragraphs 9(a) to 9(d), the Notice Administrator shall establish an Internet website, www.BarbarasBakerySettlement.com, that will inform Class Members of the terms of this Agreement, their rights, dates and deadlines, and related information.  The web site shall include, in .pdf format, materials agreed upon by the Parties and as further ordered by this Court.

8

f.  Prior to the dissemination of the Class Notice as set forth above in paragraphs 9(a) to 9(d), the Notice Administrator shall establish a toll-free telephone number that will provide Settlement-related information to Class Members.

g.  The Notice Administrator shall timely disseminate any remaining notice, as stated in the Settlement Agreement and/or the Declaration of the Notice Administrator.

h.  Not later than ten (10) calendar days before the date of the Fairness Hearing, the Notice Administrator and/or Settlement Administrator shall file with the Court: (a) a list of those persons who have opted out or excluded themselves from the Settlement; and (b) the details outlining the scope, methods, and results of the notice program.

10.  **Findings Concerning Notice**.  The Court finds that the form, content, and method of giving notice to the Class as described in Paragraph 9 of this order: (a) will constitute the best practicable notice; (b) are reasonably calculated, under the circumstances, to apprise the Class Members of the pendency of the Action, the terms of the proposed settlement, and their rights under the proposed settlement, including but not limited to their rights to object to or exclude themselves from the proposed settlement and other rights under the terms of the Settlement Agreement; (c) are reasonable and constitute due, adequate, and sufficient notice to all Class Members and other persons entitled to receive notice; and (d) meet all applicable requirements of law, including but not limited to 28 U.S.C. § 1715, Fed. R. Civ. P. 23(c) and (e), and the Due Process Clause(s) of the United States Constitution.  The Court further finds that all of the notices are written in simple terminology, are readily understandable by Class Members, and comply with the Federal Judicial Center's illustrative class action notices.

11.  **Exclusion from Class**.  Any Class Member who wishes to be excluded from the Class must mail a personally signed, written request for exclusion to the Settlement Administrator at the addressed provided in the Class Notice, postmarked no later than October 14, 2013, or as the Court otherwise may direct, to the Notice Administrator, in care of the address provided in the Class Notice. Any person or entity requesting exclusion is requested to include in the signed written request the information set forth under Question 17 of the Class Notice.  So-called "mass" or "class" opt-outs shall not be allowed.  The Settlement Administrator shall forward copies of any written requests for

exclusion to Class Counsel and Barbara's Bakery's Counsel. The Settlement Administrator shall file a list reflecting all timely requests for exclusion with the Court no later than ten (10) calendar days before the Fairness Hearing. If the proposed settlement is finally approved, any potential Class Member who has not submitted a timely written request for exclusion from the Class shall be bound by all subsequent proceedings, orders, and judgments in the Action, including but not limited to the Release, even if the potential Class Member previously initiated or subsequently initiates any litigation against any or all of the Released Parties relating to the claims and transaction released in the Action. Persons who properly exclude themselves from the Class shall not be entitled to participate in the benefits of the Settlement Agreement. Barbara's Bakery's Counsel shall provide to the Settlement Administrator, within ten (10) business days of the entry of this Preliminary Approval Order, a list of all counsel for anyone who has litigation against Barbara's Bakery that involves Eligible Products. The Settlement Administrator shall mail copies of the Class Notice to all such legal counsel. Barbara's Bakery will promptly direct the Settlement Administrator to serve the Class Notice on counsel for any Class Members who subsequently initiate litigation, arbitration, or other proceedings against Barbara's Bakery relating to claims alleging events occurring during the Class Period, the Eligible Products, and/or otherwise involving the Release.

12. **Objections and Appearances**. Any Class Member or counsel hired at any Class Member's own expense who complies with the requirements of this paragraph may object to any aspect of the proposed settlement.

a. Any Class Member who has not filed a timely written request for exclusion and who wishes to object to the fairness, reasonableness, or adequacy of the Settlement Agreement, the proposed Settlement, the award of Attorneys' Fees and Expenses, or the individual award to Plaintiff, must deliver to the Class Counsel identified in the Class Notice and to Barbara's Bakery's Counsel, and file with the Court, no later than October 14, 2013, or as the Court otherwise may direct: (a) a written statement of objections, as well as the specific reason(s), if any, for each objection, including any legal and factual support the Class Member wishes to bring to the Court's attention; (b) any evidence or other information the Class Member wishes to introduce in support of the objections; (c) a statement of whether the Class Member intends to appear and argue at the Fairness Hearing; and (d) a

list of all the Class Member's purchase(s) of Eligible Products. Class Members may do so either on their own or through an attorney retained at their own expense. Any Class Member filing an objection may be required to sit for deposition regarding matters concerning the objection. Any Class Member who fails to comply with the provisions in this section shall waive and forfeit any and all rights he or she may have to object, and shall be bound by all the terms of the Settlement Agreement, this Order, and by all proceedings, orders, and judgments, including, but not limited to, the Release in the Settlement Agreement in the Action.

b. Any Class Member, including a Class Members who files and serves a written objection, as described above, may appear at the Fairness Hearing, either in person or through personal counsel hired at the Class Member's expense, to object to or comment on the fairness, reasonableness, or adequacy of the Settlement Agreement or the proposed Settlement, or to the award of Attorneys' Fees and Expenses or the individual award to Plaintiff. Class Members or their attorneys who intend to make an appearance at the Fairness Hearing must deliver a notice of intention to appear to one of the Class Counsel identified in the Class Notice and to Barbara's Bakery's Counsel, and file said notice with the Court, no later than October 14, 2013, or as the Court may otherwise direct.

c. Any interested party may file a reply to any written objection, as described in Section 12(a) herein. A reply to an objection must be served and filed no later than seven (7) calendar days before the Fairness Hearing.

13. **Preliminary Injunction**. All Class Members and/or their representatives who do not timely exclude themselves from the Class are hereby preliminarily barred and enjoined from filing, commencing, prosecuting, maintaining, intervening in, participating in, conducting, or continuing litigation as class members, putative class members, or otherwise against Barbara's Bakery (or against any of its related parties or affiliates), and/or from receiving any benefits from, any lawsuit, administrative, or regulatory proceeding or order in any jurisdiction, based on or relating to the claims or causes of actions or the facts, and circumstances relating thereto, relating to the Eligible Products, the Action, and/or the Release. In addition, all such persons are hereby preliminarily barred and enjoined from filing, commencing, or prosecuting a lawsuit against Barbara's Bakery (or against any of its related parties or affiliates) as a class action, a separate class, or group for purposes of pursuing a

putative class action (including by seeking to amend a pending complaint to include class allegations or by seeking class certification in a pending action in any jurisdiction) on behalf of Class Members who do not timely exclude themselves from the Class, arising out of, based on, or relating to the claims, causes of action, facts, and/or circumstances relating thereto, relating to the Eligible Products, the Action, and/or the Release. Pursuant to 28 U.S.C. §§ 1651(a) and 2283, the Court finds that issuance of this preliminary injunction is necessary and appropriate in aid of the Court's continuing jurisdiction and authority over this Action.

14. **Post-Office Box(es)**. The Settlement Administrator or their designated agent(s) shall rent one or more post-office boxes in the name of the Clerk of the Court, to be used for receiving requests for exclusion from the Class and any other communications. Other than the Court or the Clerk of Court and the Notice Administrator, only Barbara's Bakery, Barbara's Bakery's Counsel, Class Counsel, and their designated agents shall have access to these post-office box(es).

15. **Disclosure of Objections**. The Settlement Administrator, Barbara's Bakery's Counsel, and Class Counsel shall promptly furnish to each other copies of any and all objections or written requests for exclusion that might come into their possession.

16. **Termination of Settlement**. This Order shall become null and void and shall be without prejudice to the rights of the parties, all of whom shall be restored to their respective positions existing immediately before this Court entered this Order, if: (a) the settlement is not finally approved by the Court, or does not become final, pursuant to the terms of the Settlement Agreement; (b) the settlement is terminated in accordance with the Settlement Agreement; or (c) the settlement does not become effective as required by the terms of the Settlement Agreement for any other reason. In such event, the settlement and Settlement Agreement shall become null and void and be of no further force and effect, and neither the Settlement Agreement nor the Court's orders, including this Order, relating to the settlement shall be used or referred to for any purpose whatsoever.

17. **Use of Order**. This Order shall be of no force or effect if the settlement does not become final and shall not be construed or used as an admission, concession, or declaration by or against Barbara's Bakery of any fault, wrongdoing, breach, or liability. Nor shall this Order be construed or used as an admission, concession, or declaration by or against Plaintiff or the other Class

Members that their claims lack merit or that the relief requested is inappropriate, improper, unavailable, or as a waiver by any party of any defenses or claims he, she, or it may have in this Action or in any other lawsuit.

18.     **Retaining Jurisdiction**.  This Court shall maintain continuing jurisdiction over these settlement proceedings to assure the effectuation thereof for the benefit of the Class.

19.     **Continuance of Hearing**.  The Court reserves the right to adjourn or continue the Fairness Hearing without further written notice.


_____
Honorable Charles R. Breyer
UNITED STATES DISTRICT JUDGE

Case 3:12-cv-02664-CRB Document 30-6 Filed 04/25/13 Page 1 of 3 PageID #: 331

# EXHIBIT 6

3:12-cv-02664-CRB – EXHIBIT TO SETTLEMENT AGREEMENT

# If You Bought a
# Barbara's Bakery Product

### *You Could Get Up to $100*
### *From a Settlement*

**Includes:** Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies

There is a class action Settlement involving Barbara's Bakery Products. The lawsuit claims that Barbara's Bakery violated state laws regarding the marketing and sale of certain products. Barbara's Bakery denies it did anything wrong.

### Who is included in the Settlement?

Anyone who bought an eligible Barbara's Bakery product from May 23, 2008 to Month 00, 0000 is included in the Settlement. A full list of products is available at the website located at www.BarbarasBakerySettlement.com or by calling 1-800-000-0000.

### What does the Settlement provide?

A Settlement Fund of $4 million will pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) attorneys' fees and costs, and (4) a special service payment to the Class Representative. Barbara's Bakery has also agreed to change some of its business practices, including modifying its product labels and advertising. Any money remaining in the Settlement Fund after all claims are paid will be donated to charities and non-profit organizations. Additional details are in the Settlement Agreement available on the website.

### How can I get a payment?

Submit a Claim Form online at www.BarbarasBakerySettlement.com or by mail by **Month 00, 2013**. The payment amount you receive will be based in part on the amount of products you purchased and the total number of claims made.

### What are my rights?

Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue Barbara's Bakery yourself, you must exclude yourself from the Settlement by **Month 00, 2013**. If you stay in the Settlement, you may object to it by **Month 00, 2013**.

The Court will hold a hearing on **Month 00, 2013** to consider whether to approve the Settlement, a request for attorneys' fees and costs up to $1 million, and a special service payment of $2,500 from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

### For More Information: 1-800-000-0000
### **www.BarbarasBakerySettlement.com**

# If You Bought a Barbara's Bakery Product

## *You Could Get Up to $100 From a Settlement*

---

### Includes: Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies

---

There is a class action Settlement involving Barbara's Bakery Products. The lawsuit claims that Barbara's Bakery violated state laws regarding the marketing and sale of certain products. Barbara's Bakery denies it did anything wrong.

### Who is included in the Settlement?

Anyone who bought an eligible Barbara's Bakery product from May 23, 2008 to Month 00, 0000 is included in the Settlement. A full list of products is available at the website located at www.BarbarasBakerySettlement.com or by calling 1-800-000-0000.

### What does the Settlement provide?

A Settlement Fund of $4 million will pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) attorneys' fees and costs and (4) a special service payment to the Class Representative. Barbara's Bakery has also agreed to change some of its business practices including modifying its product lables and advertising. Any money remaining in the Settlement Fund afer all claims are paid will be donated to charities and non-profit organizations. Additional details are in the Settlement Agreement available on the website.

### How can I get a payment?

Submit a Claim Form online or by mail by **Month 00, 2013**. The payment amount you receive will be based in part on the amount of products you purchased and the total number of claims made.

### What are my rights?

Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue Barbara's Bakery yourself, you must exclude yourself from the Settlement by **Month 00, 2013**. If you stay in the Settlement, you may object to it by **Month 00, 2013**.

The Court will hold a hearing on **Month 00, 2013** to consider whether to approve the Settlement, a request for attorneys' fees up to $1 million, and a special service payment of $2,500 from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

---

### For More Information: 1-800-000-0000 www.BarbarasBakerySettlement.com

Case 3:12-cv-02664-CRB Document 187-7 Filed 04/25/13 Page 15 of 6

# EXHIBIT 7

3:12-cv-02664-CRB – EXHIBIT TO SETTLEMENT AGREEMENT

## <u>Settlement Claim Procedures and Claim Calculation Protocol</u>

This Settlement Claim Procedures and Claim Calculation Protocol (collectively, the "Protocol") are part of the Settlement Agreement ("Agreement") and shall be used by the Settlement Administrator to review, address, implement, and process those Claims submitted pursuant to the Agreement and otherwise implement the terms of the Claim Process in the Agreement. All capitalized terms used in this Protocol shall have the same meaning given them in the Agreement.

1. **<u>Settlement Administrator's Role and Duties</u>**

   (a)   The Settlement Administrator shall be selected by the agreement of the Parties and recommended to and approved by the Court.

   (b)   The Settlement Administrator must consent, in writing, to serve and shall abide by the obligations of the Agreement, this Protocol, and the Orders issued by the Court.

   (c)   The Settlement Administrator warrants that it knows of no reason why it cannot fairly and impartially administer the Claim Process set forth in the Agreement. The Settlement Administrator shall not process the Claim of any Class Member if the Settlement Administrator, Barbara's Bakery, or Class Counsel determines that there is a conflict of interest. In the event that the Settlement Administrator, Barbara's Bakery, or Class Counsel learns of a conflict of interest as to a Claim, that party shall give written notice to the other parties, who shall resolve any such circumstances by further written agreement. Any unresolved dispute over such conflict of interest shall be submitted to the Court for resolution.

   (d)   The Settlement Administrator shall keep a clear and careful record of all communications with Claimants, all claims decisions, all expenses, and all tasks performed in administering the Claim Process.

   (e)   The costs of the Settlement Administrator shall be paid by Barbara's Bakery pursuant to the Settlement Agreement.

   (f)   The Settlement Administrator shall take all reasonable efforts to administer the Claims efficiently and to avoid unnecessary fees and expenses. As soon as work commences, the Settlement Administrator shall provide a detailed written accounting of all fees and expenses on a regular basis to Class Counsel and Barbara's Bakery's Counsel, and shall respond promptly to inquiries by Class Counsel and Barbara's Bakery's Counsel concerning fees and expenses.

   (g)   The Parties are entitled to observe and monitor the performance of the Settlement Administrator to assure compliance with the Agreement and this Protocol. The Settlement Administrator shall promptly respond to all inquiries and requests for information made by Barbara's Bakery, its counsel, or Class Counsel.

2.      **Locating, Obtaining, and Submitting Claim Forms**

(a)     The Claim Form, which is substantially similar to the form attached as Exhibit 1 to the Agreement, shall be available as part of the Class Notice, on the Internet website at www.BarbarasBakerySettlement.com, and by contacting by telephone or by mail or other similar service the Settlement Administrator and/or Notice Administrator. The Claim Form on the Internet website and the hard copy Claim Form shall be consistent in content.

(b)     The Claim Form shall advise Class Members that, upon request, the Settlement Administrator has the right to request information and/or documentation necessary to verify the purchase of the Eligible Products, including, but not limited to, receipt(s) or other documentation demonstrating purchase of any and all of the Eligible Products during the Class Period. If the Class Member does not timely comply and/or is unable to produce documents to substantiate and/or verify the information on the Claim Form and the Claim is otherwise not approved, the Claim may be reduced or denied.

(c)     Class Members may submit a Claim to the Settlement Administrator during the Claim Period. As part of the Claim Process, Class Members shall be eligible for the relief provided in the Agreement, provided Class Members complete and timely submit the Claim Form to the Settlement Administrator within the Claim Period, subject to the terms herein and in the Agreement.

(d)     Claims may be submitted by completing the Claim Forms in hard copy by mail or other similar delivery service or on-line through a web-based Claim Form at the Internet website, www.BarbarasBakerySettlement.com.

(e)     The Settlement Administrator and/or Notice Administrator shall establish and maintain an Internet website, www.BarbarasBakerySettlement.com, that shall be easily accessible through commonly used Internet Service Providers for the submission of claims. The Internet website shall be designed to permit Class Members to readily and easily submit Claims and obtain information about the Class Members' rights and options under the Agreement. The Internet website shall be maintained continuously until the end of the Claim Period. The Settlement Administrator shall be solely responsible for receiving and processing requests for Claim Forms and for promptly delivering Claim Forms to the Class Members who request them.

(f)     The Settlement Administrator also shall establish a toll-free telephone number that will have recorded information answering frequently asked questions about certain terms of the Settlement, including, but not limited to, the Claim Process and instructions about how to request a Claim Form and/or Class Notice.

3.      **Claim Form Review and Processing**

(a)     The Settlement Administrator shall begin the Claim Process so that it is completed within the time period specified in the Agreement. Except as provided

in Paragraph 3(b)(iii) (below), Class Members must submit their Claims so that they are postmarked or submitted online no later than the end of the Claim Period.

(b)      The Settlement Administrator shall gather, review, prepare, and address the Claim Forms received pursuant to the Claim Process and the Agreement.

     (i)      Claims that have been properly submitted shall be designated as Approved Claims. The Settlement Administrator shall examine the Claim Form before designating the Claim as an Approved Claim, to determine that the information on the Claim Form is reasonably complete and contains sufficient information to enable the mailing of the settlement payment to the Claimant.

     (ii)      No Claimant may submit more than one Claim Form. The Settlement Administrator shall identify any Claim Forms that appear to seek relief on behalf of the same Claimant ("Duplicative Claim Forms"). The Settlement Administrator shall determine whether there is any duplication of Claims, if necessary by contacting the Claimant(s) or their counsel. The Settlement Administrator shall designate any such Duplicative Claims as rejected Claims to the extent they allege the same damages or allege damages on behalf of the same Claimant.

     (iii)      The Settlement Administrator shall exercise, in its discretion, all usual and customary steps to prevent fraud and abuse and take any reasonable steps to prevent fraud and abuse in the Claim Process. The Settlement Administrator may, in its discretion, deny in whole or in part any Claim to prevent actual or possible fraud or abuse.

     (iv)      By agreement of the Parties, the Parties can instruct the Settlement Administrator to take whatever steps they deem appropriate to preserve the Settlement Fund to further the purposes of the Agreement if the Settlement Administrator identifies actual or possible fraud or abuse relating to the submission of Claims, including, but not limited to, denying in whole or in part any Claim to prevent actual or possible fraud or abuse.

(c)      The Class Action Settlement Administrator shall provide periodic reports to Class Counsel and Barbara's Bakery's Counsel regarding the implementation of the Agreement and this Protocol.

     (i)      The Settlement Administrator may review timely submitted Claim Forms and approve or contest any of the Claims, including, but not limited to, requesting that the Class Member submit documentation demonstrating purchase of the Eligible Products during the Class Period.

     (ii)      If a Claim Form is not contested, that Claim shall be processed for payment by the Settlement Administrator. If a Claim Form is contested,

the Settlement Administrator shall promptly notify the Parties and mail a letter that advises the Claimant of the reason(s) why the Claim Form was contested and request, if applicable, any and all additional information and/or documentation, to validate the Claim and have it submitted for payment. The additional information and/or documentation can include, for example, receipts evidencing purchase of the Eligible Products and/or the payment amount. The Claimant shall have thirty-five (35) days from the date of the postmarked letter sent by the Settlement Administrator to respond to the request from the Settlement Administrator and the Claimant shall be so advised.

(A) In the event the Claimant timely provides the requested information and/or documentation, the Claim shall be deemed validated and shall be processed by the Settlement Administrator for payment.

(B) In the event the Claimant does not timely and completely provide the requested information and/or documentation, the Settlement Administrator shall reduce or deny the Claim unless Barbara's Bakery and Class Counsel otherwise agree.

(d) The Settlement Administrator's reduction or denial of a Claim pursuant to paragraph 3(c)(iii) above is final and may not be appealed by the Claimant, Class Counsel, Barbara's Bakery, or Barbara's Bakery's Counsel. However, if a Claimant's Claim is reduced or denied because the Settlement Administrator determined that the documentation submitted to support Claimant's Claim was not sufficient to prove up the Claim, the Settlement Administrator shall provide a report to Class Counsel and Barbara's Bakery's Counsel who shall meet and confer in an attempt to resolve these deficient Claims. If Class Counsel reasonably recommends payment of the Claim or payment of a reduced claim amount and Barbara's Bakery agrees (and Barbara's Bakery's agreement shall not be unreasonably withheld), then Class Counsel shall instruct the Settlement Administrator to pay those Claims. Class Counsel may petition the Court in the event Barbara's Bakery's agreement is unreasonably withheld.

(e) The Settlement Administrator shall provide all information gathered in investigating Claims, including, but not limited to, copies of all correspondence and email and all notes of the Settlement Administrator, the decision reached, and all reasons supporting the decision, if requested by Class Counsel or Barbara's Bakery.

4. **Claim Calculation and Payment of Valid Claims**

(a) As specified in the Agreement, the Settlement Administrator shall select the timely, valid, and approved Claims submitted pursuant to the Claim Process to be paid from the Settlement Fund Balance subject to any *pro rata* adjustments pursuant to the terms and conditions of the Agreement.

(b)     The Settlement Administrator shall begin to pay timely, valid, and approved
Claims within one hundred and twenty (120) days after the close of the Claim
Period, so long as this period is after the Final Settlement Date, or sooner upon
Barbara's Bakery and Class Counsel's joint discretion, but not before the issuance
of the Court's Final Order and Final Judgment approving the Settlement.  In the
event the Final Settlement Date falls after the close of the Claim Period, then the
Settlement Administrator shall begin to pay timely, valid, and approved Claims
commencing one hundred and twenty (120) days after the Final Settlement Date.
Not later than one hundred sixty (160) days after either the occurrence of the Final
Settlement Date or the close of the Claim Period, whichever is later, the
Settlement Administrator shall have completed the payment to Class Members
who have submitted timely, valid and approved Claims pursuant to the Claim
Process, provided, further however, that Barbara's Bakery and Class Counsel
may, at their joint discretion, commence this payment period after final approval
of the settlement by the Court, but before the attainment of the Final Settlement
Date.

(c)     The relief to be provided to eligible Class Members shall be as set forth in the
Agreement.

# EXHIBIT 8

1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

11

12

RICHARD W. TRAMMELL,

Case No. 3:12-cv-02664-CRB

13

Plaintiff,

**DECLARATION OF SHANNON R.**
**WHEATMAN, PH.D.**

14

v.

**ON ADEQUACY OF NOTICE PLAN**

15

BARBARA'S BAKERY, INC., *et al.*,

16

Defendants.

17
18
19
20
21
22
23
24
25
26
27
28

**3:12-cv-02664-CRB: DECLARATION OF SHANNON R. WHEATMAN**
**ON ADEQUACY OF NOTICE PLAN**

I, Shannon R. Wheatman, being duly sworn, hereby declare as follows:

1.  I am a Senior Vice President of Kinsella Media, LLC ("KM"), an advertising and notification firm in Washington, D.C. specializing in the design and implementation of class action and bankruptcy notification programs.  My business address is 2120 L Street, NW, Suite 860, Washington, D.C. 20037.  My telephone number is (202) 686-4111.

2.  This report will describe my experiences in designing and implementing notices and notice plans, my credentials to opine on the overall adequacy of the notice effort, as well as describe the notices (the "Notice" or "Notices") proposed here for *Trammell v. Barbara's Bakery, Inc.*, including how they were developed and why I believe they will be effective. Attached as **Exhibit 1** is the proposed Notice Plan.

### RELEVANT EXPERIENCE

3.  I have served as a qualified class action notice expert in many major class actions. State and federal courts have accepted my analyses and expert testimony on whether information is effectively communicated to people.   My curriculum vitae is attached as **Exhibit 2**.

4.  I have testified in court as an expert in *Spillman v. RPM Pizza, Inc.*, No. 10-349 (M.D. La.); *PRC Holdings LLC v. East Resources, Inc.*, No. 06-C-81 (Cir. Ct. W. Va.); *Guidry v. American Public Life Ins. Co*., No. 2008-3465 (14th Jud. Dist. Ct., Calcasieu Parish); *Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark); and *Beasley v. The Reliable Life Insurance Co*., No. CV-2005-58-1 (Cir. Ct. Ark).  I have been deposed as an expert in *Thomas v. A. Wilbert Sons, LLC*, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish).

5.  I have been involved in some of the largest and most complex national notification programs in the country, including: *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827 (N.D. Cal.) (involving tens of millions of consumers); *In re: Oil Spill by the Oil Rig*

"*Deepwater Horizon*" in the Gulf of Mexico on April 20, 2010, MDL No. 2179 (E.D. La.); *Kramer v. B2Mobile, LLC* (text messaging case involving 40 million consumers), No. 10-cv-02722 (N.D. Cal.); *In Re: Enfamil LIPIL Mkt'g & Sales Pract. Litig.* (consumer fraud settlement involving millions of infant formula purchasers), No. 11-MD-02222 (S.D. Fla.); *Fogel v. Farmers Group, Inc* ($455 million settlement involving tens insureds), No. BC300142 (Cal. Super. Ct., LA County); *In re Katrina Canal Breaches Consolidated Litig.* (settlement obtained for Hurricane Katrina and Rita survivors), No. 05-4182 (E.D. La.); *Lockwood v. Certegy Check Services, Inc.* (data theft settlement involving over 37 million consumers), No. 8:07CV-1434 (M.D. Fla.); *Grays Harbor Adventist Christian School v. Carrier Corp.* (defective product settlement involving high efficiency furnaces), No. 05-05437 (W.D. Wash.); and many others.

6. Courts have admitted my expert testimony on quantitative and qualitative evaluations of the effectiveness of notice programs and several courts have commented favorably, on the record, regarding the effectiveness of notice plans I have done. Selected judicial comments are included in the attached curriculum vitae.

7. My qualifications include expertise in the form and content of notice. For example, while serving with the Federal Judicial Center ("FJC"), I played an integral part in the development of the illustrative, "model" forms of notice, designed to satisfy the plain language requirements of Federal Rule of Civil Procedure 23(c)(2). This research formed the basis for my doctoral dissertation, *The Effects of Plain Language Drafting on Layperson's Comprehension of Class Action Notices* (2001) (Ph.D. dissertation, University of Georgia). To assist judges and attorneys, in state as well as federal courts, the FJC has posted the notices at www.fjc.gov.

8. I have authored and co-authored articles on notice and due process. I believe notice and due process depend upon clear communication with the people affected. *See, e.g.,*

Shannon R. Wheatman & Terri R. LeClercq, *Majority of Class Action Publication Notices Fail to Satisfy Rule 23 Requirements*, 30 REV. LITIG. 53 (2011); Katherine Kinsella & Shannon R. Wheatman, *Class Notice and Claims Administration*, in The International Private Enforcement of Competition Law 264–274 (Albert A. Foer & Jonathan W. Cuneo eds., 2010); Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do you really want me to know my rights? The ethics behind due process in class action notice is more than just plain language: A desire to actually inform*, GEO J. LEGAL ETHICS, 18 (4), 1359-1382 (2005); Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 TULANE LAW REV. 1771 (2006).

9. KM was retained to design and implement the Notice Program in this litigation. I submit this declaration to describe the elements of the Notice Program.

## Overview

10. The proposed Notice Program was designed to reach the greatest practicable number of Class Members ensuring that they will be exposed to the Notice, to see, review, and understand it.

11. I have been involved in drafting the various forms of Notice described below. All forms of Notice are noticeable, clear, concise, and in plain, easily understood language.

12. In developing the Notice Program, it was determined that the most practicable way to reach Class Members is through the use of direct notice, paid media, earned media, and an informational website.

13. As detailed below, in my opinion, the Notice Program represents the best notice practicable.

## NOTICE PLAN SUMMARY

14. Although each case is unique, the methods and tools used in developing the Notice Program for this Settlement have been employed in many other court-approved notice plans.

### *Direct Notice*

15. Notice will be sent via email or mail to known Class Members who purchased Barbara's Bakery products online of their rights and how they may participate in the Settlement.

16. It is my understanding that Rust Consulting Inc. will make three delivery attempts to any email that bounces back. Rust will also take measures to ensure the maximum deliverability of the emails, including among other things, utilizing a vendor that has contacts with Internet Service Providers ("ISPs") to ensure that the ISPs understand that the emails are non-soliciting.

17. After the Court grants approval to the Notice Plan and Notices, potential Class Members will be sent a Summary Notice in the form of a Postcard Notice or Email Notice.

### *Publication Notice*

18. To effectively reach Class Members, KM recommends a paid media program.

19. To design the paid media segment of the notice program, KM analyzed syndicated data available from the 2012 Doublebase Survey[1] from GfK MediaMark Research, Inc. ("GfK

---

[1] GfK MRI produces an annual Doublebase, a study of 50,000+ adults consisting of two full years of data. The MediaMark sample consists of 26,000+ respondents. Fieldwork is done in two waves per year, each lasting six months and consisting of 13,000 interviews. At the end of the interview, the fieldworker presents a self-administered questionnaire that measures approximately 500 product/service categories, 6,000 brands, and various lifestyle activities. Resulting data is weighted to reflect the probabilities of selection inherent in the sample design

MRI"). GfK MRI is a nationally accredited media and marketing research firm that provides syndicated data on audience size, composition, and other relevant factors pertaining to major media including broadcast, magazines, newspapers, and outdoor advertising. MRI provides a single-source measurement of major media, products, services, and in-depth consumer demographic and lifestyle/psychographic characteristics.

20. Using GfK MRI, KM selected demographics that encompass the characteristics of Class Members. Media vehicles were then analyzed and selected for their strength and efficiency in reaching these demographic targets.

21. KM chose adults 18 years of age or older that bought food labeled as natural or organic ("Healthy Food Purchasers") as the primary target audience. GfK MRI provides specific data on this target audience.

22. To effectively reach this Class, KM recommends a broad-based notice program that utilizes national consumer magazines, a newspaper supplement, and Internet ad networks in order to meet due process standards and provide the best notice practicable under the circumstances.

23. KM chose the specific consumer magazines listed below because they provide good coverage of Healthy Food Purchasers. The Publication Notice will appear in the following consumer magazines:

   a. A half-page ad (3.5" x 10") once in *Parents* with an estimated circulation of 2,200,000.

   b. A half-page ad (3.375" x 10") once in *People* with an estimated circulation of 3,475,000.

---

and then balanced so that major study demographics match the most recent independent estimates.

c. A half-page ad (3.5" x 10") once in *Southern Living* with an estimated circulation of 2,800,000.

24. The Publication Notice will appear in the following newspaper supplement:

d. A two-fifths-page ad once in *Relish* with an estimated circulation of 15,000,000.

25. Internet advertising will include the following placements:

a. Banner advertisements measuring 728 x 90, 300 x 250, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the 24/7 Real Media Network. 24/7 Real Media is a network that represents over 5,000 websites.

b. A banner advertisement measuring 100 x 100 pixels will appear, on a rotating basis, on Facebook.com, which is a free, global social networking website that helps people communicate with friends, family, and coworkers.

c. Banner advertisements measuring 728 x 90, 300 x 250, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the Microsoft Media Network, which is a premium ad network of top-ranked commercial sites.

d. Banner advertisements measuring 728 x 90, 300 x 250, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the Specific Media Network. Specific Media is an online media company that enables advertisers to target audiences through advanced proprietary technologies across a premium network.

e. Banner advertisements measuring 728 x 90, 300 x 250, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the Yahoo! Network. Yahoo is a leading Internet brand and global online network of integrated services providing users with entertainment and other quality content.

26. For the purpose of evaluating the strength and efficiency of the media, the national consumer magazines, newspaper supplement, and Internet[2] were measured against the target audience to establish the estimated *reach*[3] of the media program and the estimated *frequency*[4] of exposure to the media vehicles.

      e.  An estimated 80.1% Healthy Food Purchasers will be reached with an average frequency of 2.3 times.

27. All print advertising will carry a toll-free number and website address for potential Class Members to request or access the Long Form Notice.

### *Earned Media*

28. An earned media program will be implemented in order to amplify the paid media program and provide additional notice to Class Members.  The earned media program will feature:

      f.  A press release distributed on PR Newswire's Full National Circuit, reaching approximately 5,000 media outlets and 5,400 websites.  The press release will highlight the toll-free telephone number and Settlement website address so that Class Members can obtain complete information.

### *Online Media*

29. A website will be established at www.BarbarasBakerySettlement.com to enable

---

[2] MRI does not measure the U.S. territories and possessions newspapers or the trade publications.  Therefore, their contribution to the overall reach of the media is not calculated.

[3] Reach is the estimated number of different people exposed to a specific vehicle or combination of vehicles.  It can be expressed as whole number or percentage of the total population.

[4] Frequency is the estimated average number of opportunities an audience member has to see the notice.

potential Class Members to get information on the Settlement.

### *Other*

30. A toll-free phone number will be established allowing Class Members to call and request that a Notice be mailed to them or listen to frequently asked questions.

31. A post office box will be established allowing Class Members to contact Class Counsel by mail with any specific requests or questions.

### THE FORM AND CONTENT OF THE NOTICES

32. Attached as **Exhibits C**, **D**, and **E** to the Notice Plan are copies of the Email Notice, Postcard Notice, Long Form Notice, and Publication Notice.

33. The Notices effectively communicate information about the Settlement.

34. Rule 23(c)(2) of the Federal Rules of Civil Procedure requires class action notices to be written in "plain, easily understood language." KM applies the plain language requirement in drafting notices in federal and state class actions. The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its experience and expertise to draft notices that effectively convey the necessary information to Class Members.

35. The Summary Notices (Email, Postcard, and Publication Notices) are designed to capture the Class Member's attention with clear, concise, plain language. They direct readers to the case website for more information. The plain language text provides important information regarding the subject of the litigation, the Class definition, and the legal rights available to Class Members. No important or required information is missing or omitted. In fact, these Notices state all required information, without omitting significant facts that Class Members need to understand their rights. The Summary Notices refer readers to the Long Form Notice which is available to those who call or visit the website.

36. The Long Form Notice will be available at the website or by calling the toll-free number. The Long Form Notice provides substantial information, including all specific instructions Class Members need to follow to properly exercise their rights, and background on the issues in the case. It is designed to encourage readership and understanding, in a well-organized and reader-friendly format.

37. In preparing the Notices in this Settlement, I have employed communications methods that are well-established in my field. I have embraced the high standards embodied in the Advisory Committee's notes accompanying the 2003 changes to Rule 23(c)(2):

> *The direction that the class-certification notice be couched in plain easily understood language is added as a reminder of the need to work unremittingly at the difficult task of communicating with class members.*

### Conclusion

38. It is my opinion that the reach of the target audience and the number of exposure opportunities to the notice information is adequate and reasonable under the circumstances, and it is consistent with the standards employed by KM in notification programs designed to reach members of settlement groups or classes. The Notice Program as designed is fully compliant with Rule 23 of the Federal Rules of Civil Procedure, and in my opinion, it is the best notice practicable.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Washington, D.C. this 24th day of April 2013.

Shannon R. Wheatman

Case 1:12-cv-03264-CRB Document 87-3 Filed 04/25/13 Page 120 of 552 PageID #: 351

# EXHIBIT 1



# NOTICE PROGRAM

## *Trammell v. Barbara's Bakery, Inc.*

### *Case* No. 12-CV-02664-CRB

United States District Court

Northern District of California

© 2013 KINSELLA MEDIA, LLC

# TABLE OF CONTENTS

|  | PAGE |
|---|---|
| **FIRM OVERVIEW** | 4 |
| **CASE BACKGROUND** | |
| Situation Analysis | 6 |
| Class Definition | 7 |
| **NOTICE PROGRAM OVERVIEW** | |
| Program Components | 10 |
| Direct Notice | 11 |
| Paid Media Program | 12 |
| Paid Media Placements Summary | 13 |
| **PAID MEDIA METHODOLOGY** | 15 |
| **TARGET AUDIENCE** | |
| Selection Methodology | 17 |
| Demographics | 18 |
| Media Usage | 20 |
| **PAID MEDIA PLACEMENTS** | |
| Newspaper Supplement | 23 |
| Consumer Magazines | 24 |
| Target Audience's Print Readership | 25 |
| Internet Advertising | 26 |
| **NATIONAL MEDIA DELIVERY** | 28 |
| **NOTICE DESIGN** | |
| Direct Notice | 30 |
| Detailed Notice | 31 |
| Publication Notice | 32 |
| Website and Internet Ads | 33 |

**EARNED MEDIA PROGRAM** 34

**TOLL-FREE TELEPHONE SUPPORT** 35

**EXHIBITS**

Exhibit A – KM Case Experience

Exhibit B – Relish Newspaper Supplement

Exhibit C – Direct Notice

Exhibit D – Detailed Notice

Exhibit E – Publication Notice

© 2013 KINSELLA MEDIA, LLC

# FIRM OVERVIEW

Kinsella Media, LLC ("KM") is a nationally recognized legal notification firm in Washington, D.C. specializing in the design and implementation of notification programs to reach unidentified putative class members primarily in consumer and antitrust class actions and claimants in bankruptcy and mass tort litigation.

KM has developed and directed some of the largest and most complex national notification programs, primarily in antitrust, bankruptcy, consumer fraud, mass tort, and product liability litigation. Specific cases have spanned a broad spectrum of issues, including asbestos, breast implants, home siding and roofing products, infant formula, pharmaceuticals, polybutylene plumbing, tobacco, and Holocaust claims. The firm has developed or consulted on over 700 notification programs and has placed over $300 million in paid media notice. A selection of KM's case experience is attached as Exhibit A.

KM develops advertisements, press materials, websites, and other notice materials that bridge the gap between litigation complexities and the need for a clear and simple explanation of legal rights. The firm employs industry-recognized tools of media measurement to quantify the adequacy of the notice for the court, and ensures all notice materials are in "plain language" and are fully compliant with Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") and comparable state guidelines.

Case 1:12-cv-03644-CRB Document 87-3 Filed 04/25/13 Page 125 of 552 PageID #: 356

*Trammell v. Barbara's Bakery, Inc.*

# CASE BACKGROUND

# CASE BACKGROUND:
## SITUATION ANALYSIS

This Notice Program is submitted by Kinsella Media, LLC ("KM") in connection with *Trammell v. Barbara's Bakery, Inc.* in the U.S. District Court for the Northern District of California. This document outlines the efforts that will be made to provide notice of the Settlement to reach consumers.

The lawsuit claims, *inter alia*, that Barbara's Bakery, Inc. manufactured, marketed, and sold various food, cereals, and snack products ("Eligible Products") as "all natural" when the Eligible Products are made with unnatural ingredients. Plaintiff alleges that, as a result, consumers purchased and consumed a product on the false premise that the product is "all natural." The lawsuit claims this conduct violated California's Unfair Competition Law, False Advertising Law, Consumer Legal Remedies Act, and constituted breach of an express warranty.

The goal of the Notice Program is to inform as many Class Members as possible about the Settlement and how it will affect their rights. The Notice Program recommends a paid media approach.

# CASE BACKGROUND:
# CLASS DEFINITION

The Class is defined as:

> All persons who, during the Class Period, purchased in the United States any of the Eligible Products. "Eligible Products" means any of the following Barbara's Bakery products, of any size, purchased by Class Members during the Class Period:

- **Cereals**:
  - BROWN RICE CRISPS
  - CORN FLAKES
  - HIGH FIBER
  - HOLE 'N OATS
  - HONEST O'S
  - ORGANIC APPLE CINNAMON O'S
  - ORGANIC BREAKFAST O'S
  - ORGANIC BROWN RICE
  - ORGANIC BROWN RICE CRISPS
  - ORGANIC CORN FLAKES
  - ORGANIC CRISPY WHEATS
  - ORGANIC HONEY CRUNCH 'N OATS
  - ORGANIC HONEY NUT O'S
  - ORGANIC SNACKIMALS CEREAL
  - ORGANIC WILD PUFFS
  - PUFFINS
  - PUFFIN PUFFS
  - SHREDDED OATS
  - SHREDDED WHEAT
  - SHREDDED SPOONFULS
  - SHREDDED MINIS
  - TOASTED OATMEAL FLAKES
  - ULTIMA ORGANIC
- **Cereal Bars**:
  - MULTIGRAIN CEREAL BARS
  - FRUIT & YOGURT BARS
  - PUFFINS CEREAL AND MILK BARS
- **Cheese Puffs**:
  - BAKED CHEESE PUFFS
  - CHEESE PUFFS
- **FIG BARS**
- **CRUNCHY ORGANIC GRANOLA BARS**
- **SNACKIMALS ANIMAL COOKIES**
- **ORGANIC MINI COOKIES**
- **Snack Mixes**:
  - BRUSCHETTA SNACK MIX
  - HONEY CINNAMON SNACK MIX
  - HONEY MUSTARD SNACK MIX
  - SALSA SNACK MIX
- **Crackers**:
  - CRISP COOKIES
  - GO GO GRAHAMS
  - PIZZA AND CHEESE BITES
  - RITE LITE ROUNDS
  - WHEATINES

"Class Period" means the period from May 23, 2008, up to and including the date of the first dissemination of the Summary Settlement Notice or Class Notice, whichever is earlier. Excluded from the Class are: (a) Barbara's Bakery's board members or executive-level officers, including its attorneys; (b) persons who purchased the Eligible Products primarily for the purpose of resale; (c) retailers or re-sellers of the Eligible Products; (d) governmental entities;

(e) persons who timely and properly exclude themselves from the Class as provided in the Agreement; (f) persons who purchased the Eligible Products via the Internet or other remote means while not residing in the United States; and (g) the Court, the Court's immediate family, and Court staff.

# PAID PROGRAM OVERVIEW

NOTICE PROGRAM OVERVIEW:
# PROGRAM COMPONENTS

This Notice Program outlines procedures to provide notice of the settlement of *Trammell v. Barbara's Bakery, Inc.* as a class action, consistent with the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure.

Based on information provided by Plaintiffs' Counsel, the results of research on Class Members and their response to media and the media habits of the target audience, KM recommends the following two-part notice program.

- ➢ **DIRECT NOTICE:** Direct Notice to potential Class Members will consist of:

    - ➢ A summary of the Settlement will be emailed to a list of known Class Members who purchased Barbara's Bakery products online.

    - ➢ A Postcard Notice will be sent via first-class mail to a list of known Class Members who do not receive an email notice.

- ➢ **PAID MEDIA-BASED NOTICE:** After careful research of the demographics of Class Members, KM recommends broad paid media notice comprised of print and Internet vehicles that will reach those Class Members, including:

    - ➢ Consumer magazines and a newspaper supplement, and

    - ➢ Internet banner ads on multiple networks and hundreds of targeted websites.

- ➢ **EARNED MEDIA:** KM recommends amplifying paid media notice efforts with earned media outreach through a press release sent to major media outlets.

To complement the Notice Program and to ensure Class Members' easy access to updated information, KM recommends a dedicated informational website.

NOTICE PROGRAM OVERVIEW:
# DIRECT NOTICE

Direct Notice will consist of emailing a summary of the Settlement to identifiable Class Members, informing them of their legal rights and how they may participate in or opt-out of the Classes. The Notice will be sent to known Class Members who purchased Barbara's Bakery products online. Any email notices that are returned as non-deliverable after three attempts, will be re-mailed in the form of a Postcard Notice to any known address of Class Member who purchased Barbara's Bakery products online.

## NOTICE PROGRAM OVERVIEW:
## PAID MEDIA PROGRAM

Direct Notice will be provided to all identifiable Class Members. To reach Class Members, KM recommends the use of measurable paid media. Paid media advertising is guaranteed to appear, allowing for control of the content, timing, and positioning of the message. Newspapers, consumer magazines, television, radio, and the Internet, among other sources, offer paid media opportunities.

In considering which media to use for this case, KM evaluated the media consumption habits of the following target audience: Adults 18 years of age and older that bought food labeled as natural or organic ("Healthy Food Purchasers").

Based on data regarding the target audience's media consumption, KM researched the most appropriate media vehicles that would be best for this case. KM reviewed available consumer magazines, newspaper supplements, and Internet channels for reach of the target audiences as well as compatibility of the editorial.

# NOTICE PROGRAM OVERVIEW:
## PAID MEDIA PLACEMENTS SUMMARY

The following list provides a brief summary of KM's recommended media placements in this case. More detailed information about each publication and its applicability to the target audience in this case appears in the Paid Media Placements section of this plan.

## PRINT PUBLICATIONS

### Newspaper Supplement
- *Relish*

### Consumer Magazines
- *Parents*
- *People*
- *Southern Living*

## ONLINE MEDIA

### Internet Banner Ads
- 24/7 Network
- Facebook.com
- Microsoft Media Network
- Specific Media Network
- Yahoo! Network

# PAID MEDIA METHODOLOGY

# PAID MEDIA METHODOLOGY

KM notice programs directed to unidentified class members: (1) identify the demographics of class members and establish a target audience, (2) outline the methodology for selecting the media and other program elements and how they relate to product usage or exposure, and (3) provide results that quantify for the court the adequacy of the notice based upon recognized tools of media measurement.

In the wake of the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the reliability of a notice expert's testimony should be tested against the standards developed within the media industry for determining to what degree and at what frequency a target audience has been reached. In assessing the expert's reliability, the court must determine whether the testifying expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. That showing would likely require evidence that the expert's data and methodology are similar to that used by professionals in the relevant field.

In keeping with the *Daubert* and *Kumho* rulings, KM employs methodology and measurement tools used in the media planning and advertising industry for designing and measuring the adequacy of a paid media program to reach a particular audience.

Choosing a target audience that encompasses the characteristics of class members is the first step in designing the paid media program. KM chooses media vehicles based on their ability to provide effective and cost-efficient penetration of the target audience. Then it measures selected vehicles against the target audience to quantify the reach of the media program and the frequency of exposure to the media vehicles. Reach and frequency estimates are two of the primary measurements used to quantify the media penetration of a target audience.

> ➢ *Reach* is the estimated number of different people exposed to a specific vehicle or combination of vehicles. It can be expressed as whole number or percentage of the total population.

> ➢ *Frequency* is the estimated average number of opportunities an audience member has to see the notice.

*Trammell v. Barbara's Bakery, Inc.*

# TARGET AUDIENCE

<div align="center">

Target Audience:
# Selection Methodology

</div>

To develop a profile of the demographics and media habits of potential Class Members, KM analyzed syndicated data available from GfK MRI's *2012 Doublebase Study*[1].

GfK MRI is the leading U.S. supplier of multimedia audience research. As a nationally accredited research firm, it provides information concerning magazines, television, radio, Internet and other media to leading national advertisers and over 450 advertising agencies – including 90 of the top 100 in the U.S. GfK MRI's nationally syndicated data are widely used by these companies as the basis for the majority of the media and marketing plans written for advertised brands in the U.S.

Specifically, GfK MRI presents a single-source measurement of major media, products, services, and in-depth consumer demographic and lifestyle characteristics. GfK MRI provides data on media usage, audience composition, and other relevant factors pertaining to all major media types as well as the readership of print vehicles.

Therefore, to adequately reach the Class, KM will purchase and measure media against the following primary target:

➢ Adults 18 years of age and older that bought food labeled as natural or organic ("Healthy Food Purchasers")

---

[1] Since 1979, GfK MRI's *Survey of the American Consumer* has conducted detailed polling of a large sample of U.S. adults about the media they see and hear and about the products they use. Participants in the survey are identified by age, occupation, income, education and by where they live, among other things. They are asked what magazines and newspapers they read, what TV shows and cable channels they watch, and are asked questions about Internet access and radio formats. Survey data indicate the brands and products they use from among 500 categories and 6000 consumer brands. The data from this survey is used by media practitioners industry-wide to characterize media and product users by demographics and to account for and compare the size and make-up of media audiences. The *Doublebase Study* consists of two years of *Survey of the American Consumer* data. (GfK MRI was known until mid-2010 as Mediamark Research & Intelligence, or MRI.)

TARGET AUDIENCE:
**DEMOGRAPHICS**

Based on GfK MRI data, the graph below outlines the demographics of Healthy Food Purchasers and the demographics of adults 18 years and older ("Adults 18+") for comparison purposes:

| DEMOGRAPHICS | ADULTS 18+ | HEALTHY FOOD PURCHASERS |
|---|---|---|
| **Gender** | | |
| Male | 48.4% | 31.6% |
| Female | 51.6% | 68.4% |
| **Age** | | |
| 18-24 | 12.8% | 11.3% |
| 25-34 | 17.9% | 17.8% |
| 35-44 | 17.7% | 19.0% |
| 45-54 | 19.3% | 21.0% |
| 55-64 | 15.5% | 18.0% |
| 65+ | 16.8% | 13.0% |
| **Education** | | |
| Graduated/Attended College | 55.4% | 69.7% |
| Graduated High School | 30.8% | 22.7% |
| **Household Income[2]** | | |
| Under $20,000 | 13.9% | 8.9% |
| $20,000 - $39,999 | 19.7% | 14.5% |
| $40,000 - $59,999 | 17.0% | 15.9% |
| $60,000 - $74,999 | 10.9% | 10.3% |
| $75,000+ | 38.6% | 50.4% |
| $100,000+ | 25.1% | 33.9% |
| **Ethnicity[3]** | | |
| Caucasian | 76.1% | 79.6% |
| African-American | 11.7% | 9.4% |
| Hispanic | 14.0% | 11.2% |
| Asian | 3.2% | 4.1% |
| Other | 9.5% | 7.4% |

---

[2] The total percentages listed do not equal exactly 100% percent because GfK MRI rounds up all percentages to the nearest tenth of a decimal.

[3] The GfK MRI *Doublebase Study* allows for multi-classification of an individual's ethnicity. Therefore, the sum of all ethnicities may be greater than 100%.

*Trammell v. Barbara's Bakery, Inc.*

| Location[4] | ADULTS 18+ | HEALTHY FOOD PURCHASERS |
|---|---|---|
| A & B "Urban" Counties | 71.7% | 79.6% |
| C & D "Rural" Counties | 28.3% | 20.4% |

Based on these data, Healthy Food Purchasers are more likely than the average adult to be/have:

➢ Women

➢ 25-64 years of age

➢ Educated

➢ A household income over $75,000

➢ Living in urban counties

---

[4] "A" Counties, as defined by A.C. Nielsen Company ("Nielsen"), are all counties belonging to the 25 largest metropolitan areas. These metro areas correspond to the Metropolitan Statistical Area and include the largest cities and consolidated areas in the United States. "B" Counties, as defined by Nielsen, are all counties not included under A that have either a population greater than 150,000 or are in a metro area with a population greater than 150,000 according to the latest census. "C" Counties, as defined by Nielsen, are all counties not included under A or B that either have a population greater than 40,000 or are in a metro area with a population greater than 40,000 according to the latest census. "D" Counties are, essentially, rural counties.

© 2013 KINSELLA MEDIA, LLC

<div align="center">

TARGET AUDIENCE:
## MEDIA USAGE

</div>

Individuals spend varying amounts of time with different media. Certain demographic groups may be heavy consumers, light consumers, or non-users of a particular medium. For example, GfK MRI data shows that individuals who are less educated are likely to be heavy television viewers and light newspaper readers. Conversely, highly educated individuals are more likely to be heavy newspaper readers and light television viewers.

KM notice plans focus on the media types used most often by the target audiences. To examine the media habits of the target audience, KM compares the target audience's media usage to that of the average adult 18 years of age and older ("Adult 18+") in usage quintiles reported by GfK MRI. The study ranks respondents based on their amount of exposure to a medium and divides them into five equal-sized groups ("quintiles") from heaviest usage (1) to lightest usage (5).

The media usage of the target audience in each quintile is expressed as an index. An index of 100 is the average adult's usage of a particular medium. Therefore, an index above 100 indicates a heavier usage of the medium than the average adult, and an index below 100 indicates a lighter usage of the medium than the average adult.

The target audience's top two quintiles (heaviest and next heaviest usage) for each type of media are:

| MEDIA | ADULTS 18+ | HEALTHY FOOD PURCHASERS |
|---|---|---|
| **Magazine** | | |
| Quintile 1 | 100.0 | 113.0 |
| Quintile 2 | 100.0 | 113.0 |
| **Newspaper** | | |
| Quintile 1 | 100.0 | 100.0 |
| Quintile 2 | 100.0 | 97.0 |
| **Radio** | | |
| Quintile 1 | 100.0 | 96.0 |
| Quintile 2 | 100.0 | 108.0 |
| **Television** | | |
| Quintile 1 | 100.0 | 67.0 |
| Quintile 2 | 100.0 | 84.0 |
| **Internet** | | |
| Quintile 1 | 100.0 | 125.0 |
| Quintile 2 | 100.0 | 114.0 |

These data indicate the following regarding the target audience's media consumption habits:

© 2013 KINSELLA MEDIA, LLC

*Trammell v. Barbara's Bakery, Inc.*

       ➢ Heavy consumers of Internet and magazines

       ➢ Average consumers of newspapers and radio

       ➢ Light television viewers

# Paid Media Placements

*Trammell v. Barbara's Bakery, Inc.*

PAID MEDIA PLACEMENTS:
## NEWSPAPER SUPPLEMENTS

*Relish* is a publication known as a newspaper supplement that is inserted into weekend or Sunday editions newspapers nationwide. These magazines, printed on newsprint, contain articles written for broad, general appeal and encourage readership through brevity. Issues are typically fewer than 30 pages. For this Notice Program, KM recommends this newspaper supplement because of its cost-effective reach capability.

*Relish* appears in 1,008 papers. A list of the newspapers into which the selected supplement is inserted is attached as Exhibit B.

KM recommends the following newspaper supplement placement:

## relish

➢ A two-fifths-page ad (4.75" x 6.625") once in *Relish* with an estimated circulation of 15,000,000.[5]

➢ *Relish* is published monthly and is a food-focused newspaper supplement. The magazine brings readers useful cooking tips, recipes, and new products for the kitchen.

➢ 37.8% of Healthy Food Purchasers read an average issue of *Relish*.

---

[5] The GfK MRI readership estimate for *Relish* is reflective of the broader readership measurement of the newspaper carrier groups into which these supplements are inserted. A custom study, conducted in 2003, by GfK MRI indicates that the actual readership of the supplements is less than that of the carrier papers. While this study provided directional insight into the audience, the data provided is highly variable and insufficient for use in specific computation of reach and frequency. Therefore, the use of carrier paper readership for the newspaper supplements remains an accredited methodology

*Trammell v. Barbara's Bakery, Inc.*

<div align="center">

Paid Media Placements:
## Consumer Magazines

</div>

Most adults read one or more magazines during an average month and nearly three out of five adults read or look at a magazine daily. Heavy readers read 16 or more magazines per month. Weekly magazines quickly accumulate readership and provide timely and efficient notice to readers. KM chose the specific consumer magazines listed below because they are among the highest ranking in coverage of the target audience.

KM recommends the following consumer magazine placements:

**Parents.**

- ➢ A half-page ad (3.5" x 10") once in *Parents* with an estimated circulation of 2,200,000.

- ➢ *Parents* is published monthly and provides information and advice in raising healthy children.

- ➢ 6.6% of Healthy Food Purchasers read an average issue of *Parents*.



- ➢ A half-page ad (3.375" x 10") once in *People* with an estimated circulation of 3,475,000.

- ➢ *People* is a weekly publication covering contemporary personalities in entertainment, politics, business, and other current events.

- ➢ 21.8% of Healthy Food Purchasers read an average issue of *People*.

**Southern Living**

- ➢ A half-page ad (3.5" x 10") once in *Southern Living* with an estimated circulation of 2,800,000.

- ➢ *Southern Living* is a monthly publication covering food, travel, homes, and gardens between the South's traditional and cosmopolitan attitudes.

- ➢ Healthy Food Purchasers are 24% more likely than the average adult to be *Southern Living* readers.

*Trammell v. Barbara's Bakery, Inc.*

PAID MEDIA PLACEMENTS:
# TARGET AUDIENCE'S PRINT READERSHIP

Readership includes both primary readers and pass-along readers. Primary readers purchase a publication or are members of a household where the publication was purchased. Pass-along readers are those who read the publication outside the home, in places such as a doctor's office. The table below indicates the estimated number of readers in the target audience of an average issue of the magazine or newspaper supplement:

| PUBLICATION | INSERTIONS | HEALTHY FOOD PURCHASERS |
|---|---|---|
| *Parents* | 1 | 1,374,000 |
| *People* | 1 | 4,543,000 |
| *Southern Living* | 1 | 1,670,000 |
| *Relish* | 1 | 7,866,000 |

© 2013 KINSELLA MEDIA, LLC

*Trammell v. Barbara's Bakery, Inc.*

# INTERNET ADVERTISING

GfK MRI provides data on Internet usage by asking survey respondents about their online usage during the 30 days prior to the survey. According to GfK MRI, 88.2% of Healthy Food Purchasers used the Internet during the last 30 days.

Accordingly, KM recommends incorporating Internet advertising into the Notice Program in order to provide potential Class Members with additional national notice opportunities beyond the broad-reaching print program. Internet advertising delivers an immediate message and allows the viewer of an advertisement to instantly click through to a website for further information.

## WEBSITE ADVERTISING

KM recommends placing ads on a wide range of websites, enabling maximum exposure opportunities to reach the broad audience of Healthy Food Purchasers. In addition, websites with audiences that are highly comprised of the specific target audiences were also selected. KM also recommends using advanced targeting to reach Healthy Food Purchasers and to optimize based on performance during the campaign. After optimization additional Internet sites may be used to increase exposure to the message. (Delivery of Internet impressions to specific sites and categories within sites are subject to availability at the time KM purchases the media.)

KM recommends 247,000,000+ impressions in the following Web placements:



> ➤ 24/7 Real Media is a network that represents over 5,000 websites.

> ➤ Banner advertisements measuring 728 x 90 pixels, 300 x 250 pixels, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the 24/7 Real Media Network.

**facebook**

> ➤ Facebook.com is a free, global social networking website that helps people communicate with friends, family and coworkers.

> ➤ A banner advertisement measuring 100 x 100 pixels will appear, on a rotating basis, on Facebook.com.

*Trammell v. Barbara's Bakery, Inc.*



➤ Microsoft Media Network is a premium ad network of top-ranked commercial sites.

➤ Banner advertisements measuring 728 x 90 pixels, 300 x 250 pixels, and 160 x 600 pixels will appear, on a rotating basis, on the Microsoft Media Network.

**specificmedia**

➤ Specific Media is an online media company that enables advertisers to target audiences through advanced proprietary technologies across a premium network.

➤ Banner advertisements measuring 728 x 90 pixels, 300 x 250 pixels, and 160 x 600 pixels will appear, on a rotating basis, on the Specific Media Network.

**YAHOO!**

➤ Yahoo! is a leading Internet brand and a global online network of integrated services providing users with entertainment and other quality content.

➤ Banner advertisements measuring 728 x 90 pixels, 300 x 250, and 120 x 600 pixels will appear, on a rotating basis, on various Yahoo! Web pages.

# NATIONAL MEDIA DELIVERY

The paid media program outlined in this plan provides Class Members with multiple exposure opportunities to media vehicles carrying the Notice and delivers the following estimated reach and frequency measurements to the target audience defined by the 2012 ComScore/GfK MRI Media+ Fusion (12-12/S12) Study[6] from GfK MRI and comScore:

> ➢ An estimated 80.1% of Healthy Food Purchasers will be reached with an average estimated frequency of 2.3 times, delivering at least 38,000,000 gross impressions.[7]

---

[6] GfK MRI Net+ Fusion combines GfK MRI's *Survey of the American Consumer* and Nielsen Online's NetView, providing a single-source dataset of off-line and online media usage by American consumers. Nielsen uses a patented metering technology and representative panels of Internet users to collect and report consumer Internet usage. The GfK MRI survey provides data on magazine and newspaper reading, television viewing, radio listening, product consumption, psychographic characteristics, computer and Internet access configurations, and geo-demographic characteristics. Combining the two datasets provides unduplicated audience estimates across print and online media.

[7] Gross Impressions are the duplicated sum of audiences to the media vehicles containing the notice.

# NOTICE DESIGN

NOTICE DESIGN:
# DIRECT NOTICE

The plain language Email and Postcard Notices (Exhibit C) are designed to alert Class Members to the litigation by using an informative headline. This headline will enable Class Members to quickly determine if they may be affected by the litigation. Plain language text provides important information regarding the subject of the litigation, the Class definition, and the legal rights available to Class Members. The Email and Postcard Notices include all of the substantive information required by Rule 23.


Each notice will prominently feature a toll-free number and website address for Class Members to obtain the Detailed Notice and other information.

*Trammell v. Barbara's Bakery, Inc.*

NOTICE DESIGN:
# DETAILED NOTICE

The Detailed Notice (Exhibit D) will be compliant with Rule 23 and consistent with the Federal Judicial Center's "illustrative" class action notices. Specifically, the Detailed Notice will clearly and concisely state in plain, easily understood language:

➢ The nature of the action;

➢ The definition of the class certified;

➢ The class claims, issues, or defenses;

➢ That a class member may enter an appearance through an attorney if the member so desires;

➢ That the Court will exclude from the class any member who requests exclusion;

➢ The time and manner for requesting exclusion; and

➢ The binding effect of a class judgment on members under Rule 23 (c)(3).

The Detailed Notice will prominently feature a toll-free number and website address for Class Members to obtain more information and file a claim.

NOTICE DESIGN:
# PUBLICATION NOTICE

Rule 23(c)(2) of the Federal Rules of Civil Procedure requires notices in 23(b)(3) class actions to be written in "plain, easily understood language." KM applies the plain language requirement in drafting all notices in federal and state class actions. The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its experience and expertise to draft notices that effectively convey the necessary information to Class Members.

The plain language Publication Notice (Exhibit E), is designed to alert Class Members to the litigation by using a bold headline. This headline will enable Class Members to quickly determine if they are potentially affected by the litigation. Plain language text provides important information regarding the subject of the litigation, the Class definition and the legal rights available to Class Members. The Publication Notice will include all the substantive information required by Rule 23.

Each advertisement will prominently feature a toll-free number and website address to obtain the Detailed Notice and other information.

# Notice Design:
## Website and Internet Ads

An informational interactive website is a critical component of the Notice Program. A website is a constant information source instantly accessible to millions. In this case, the site will capitalize on the Internet's ability to distribution information and provide access to customer service.

## Website Design

Combining clean site design, consistent site navigation cues and search engine optimization, the website will provide Class Members with easy access to the details of the litigation.

> **Clean Design:** The site will be designed for ease of navigation and comprehension, with user-friendly words and icons. Clearly labeled content will include the Detailed Notice, court documents, and answers to frequently asked questions. A "Contact Us" page will provide a toll-free number for individuals seeking additional information and the address or email of Class Counsel.

> **Online Registration/Claim Filing:** In an effort to make it even easier for Class Members to receive information/make claims, the website will allow users to request hard copies of materials, and/or make a claim online.

## Internet Banner Ad Design

KM will design Internet banner advertisements to alert Class Members to the litigation by using a bold headline. The headline will enable Class Members to quickly determine if they may be affected by the litigation. When users click on the banner advertisement, they will be connected to the informational website that contains complete information about their legal rights.

# EARNED MEDIA PROGRAM

Earned media provides additional notice to Class Members, amplifying the paid media program. Earned media, as opposed to paid media, occurs by disseminating a message about the Settlement to the media without a guarantee that it will appear. KM will distribute the message to media outlets (newspapers, websites, television, and radio stations) hoping to spark press interest and generate coverage.

The earned media outreach for this program will focus primarily on key daily newspapers, websites, wire services, national newspaper bureaus, and major television and radio outlets.

## TRADITIONAL PRESS RELEASE

KM will distribute a press release on PR Newswire's US1 national wire, reaching more than 5,500 print and broadcast outlets and more than 5,400 websites and online databases. The press release will highlight the toll-free telephone number and Settlement website address so that Class Members can obtain complete information.

## TOLL-FREE TELEPHONE SUPPORT

A toll-free interactive voice response system (IVR) will be established to service Class Members calling as a result of seeing the paid media notice. Callers requesting the Detailed Notice will be prompted to input the telephone number of the residence where they would like to receive the Notice.

The system uses an address look-up database to locate the corresponding address of the resident. A portion of the address will be read back to the caller for address verification. For successful look-ups, the caller will be asked to speak the Class Member's full name and to spell the last name. If the look-up fails, is incorrect, or the call is placed from a rotary dial telephone, callers will be prompted to state their name, address, and telephone number.

# EXHIBIT A

Case 1:12-cv-02664-CRB Document 87-8 Filed 04/25/13 Page 157 of 552 PageID #: 388



# Kinsella Media, LLC

## Relevant Case Experience

### Antitrust

*Big Valley Milling, Inc. v. Archer Daniels Midland Co.,* No. 65-C2-96-000215 (Minn. Dist. Ct. Renville County) (lysine).

*Carlson v. Abbott Laboratories*, No. 94-CV-002608 (Wis. Cir. Ct. Milwaukee County) (infant formula).

*Comes v. Microsoft Corp.,* No. CL8231 (Iowa Dist. Ct. Polk County

*Connecticut v. Mylan Laboratories, Inc.,* No. 99-276, MDL No. 1290 (D.D.C.) (pharmaceutical).

*Conroy v. 3M Corp.*, No. C-00-2810 CW (N.D. Cal.) (invisible tape).

*Copper Antitrust Litigation,* MDL 1303 (W.D. Wis.) (physical copper).

*Cox v. Microsoft Corp.,* No. 105193/00 (N.Y. Sup. Ct. N.Y. County) (software).

*D.C. 37 Health & Security Plan v. Medi-Span*, No. 07-cv-10988 (D.Mass.); *New England Carpenters Health Benefits Fund v. First DataBank, Inc.,* No. 1:05-CV-11148 (D. Mass.) (pharmaceutical).

*Giral v. Hoffman-LaRoche Ltd.*, C.A. No. 98 CA 7467 (W. Va. Cir. Ct., Kanawha County) (vitamins).

*In re Buspirone Antitrust Litigation*, MDL No. 1413 (S.D.N.Y.) (pharmaceutical).

*In re Cardizem Antitrust Litigation*, 200 F.R.D. 326 (E.D. Mich.) (pharmaceutical).

*In re Compact Disc Minimum Price Antitrust Litigation*, MDL No. 1361 (D. Me.) (compact discs).

*In re Insurance Brokerage Antitrust Litig.*, MDL No. 1663 Civil No. 04-5184 (FSH) (D.N.J.) (insurance).

*In re International Air Transportation Surcharge Antitrust Litigation*, No. M 06-1793, MDL No. 1793 (N.D. Cal.) (airline fuel surcharges).

*In re Monosodium Glutamate Antitrust Litig.,* D-0202-CV-0200306168, D-202-CV-200306168 (N.M. Dist. Ct., Bernalillo County) (MSG).

*In re Motorsports Merchandise Antitrust Litigation,* No. 1:97-CV-2314-TWT (N.D. Ga.) (merchandise).

*In re Nasdaq Market-Makers Antitrust Litigation*, MDL No. 1023 (S.D.N.Y.) (securities).

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, No. CA:01-CV-12257, MDL No. 1456 (D. Mass.) (pharmaceutical).

*In re Toys "R" Us Antitrust Litigation*, No. CV-97-5750, MDL No. 1211, (E.D.N.Y.) (toys and other products).

*In re Western States Wholesale Natural Gas Antitrust Litigation*, No. CV-03-1431, MDL No. 1566, (D. Nev) (natural gas).

*Kelley Supply, Inc. v. Eastman Chemical Co*., No. 99CV001528 (Wis. Cir. Ct., Dane County) (Sorbates).

*Ohio vs. Bristol-Myers Squibb, Co*., No. 1:02-cv-01080 (D.D.C.) (pharmaceutical).

*Raz v. Archer Daniels Midland Co.,* Inc., No. 96-CV-009729 (Wis. Cir. Ct. Milwaukee County) (citric acid).

## Consumer and Product Liability

*Azizian v. Federated Department Stores, Inc.,* No. 4:03 CV-03359 (N.D. Cal.) (cosmetics).

*Baird v. Thomson Consumer Elecs.,* No. 00-L-000761 (Ill. Cir. Ct., Madison County) (television).

*Bonilla v. Trebol Motors Corp.,* No. 92-1795 (D.P.R.) (automobiles).

*Burch v. American Home Products Corp.,* No. 97-C-204 (1-11) (W. Va. Cir. Ct., Brooke County) (Fen Phen).

*Cosby v. Masonite Corp., No.* CV-97-3408 (Ala. Cir. Ct. Mobile County) (siding product); *Quin v. Masonite Corp.,* No. CV-97-3313 (Ala. Cir. Ct. Mobile County) (roofing product).

*Cox v. Shell Oil Co.,* No. 18,844 (Tenn. Ch. Ct. Obion County) (polybutylene pipe).

*Daniel v. AON Corp.,* No. 99 CH 11893 (Ill. Cir. Ct. Cook County) (insurance).

*Fettke v. McDonald's Corp.,* No. 044109 (Cal. Super Ct. Marin County) (trans fatty acids).



*Florida v. Nine West Group, Inc.,* No. 00 CIV 1707 (S.D.N.Y.) (shoes).

*Foothill/De Anza Community College Dist. v. Northwest Pipe Co.,* No. 00-20749-JF(N.D. Cal.) (fire sprinklers).

*Galanti v. The Goodyear Tire & Rubber Company,* No. 03-209 (D.N.J.) (radiant heating) (2002).

*Garza v. Sporting Goods Properties, Inc.,* No. SA 93-CA-1082 (W.D. Tex.) (gun ammunition).

*Hoorman v. GlaxoSmithKline,* No. 04-L-715 (Ill. Cir. Ct., Madison Cty.) (Paxil pharmaceutical*).*

*In re Louisiana Pacific Corp. Inner Seal OSB Trade Practices Litigation,* MDL No. 1114 (N.D. Cal.) (oriented strand board).

*In re Tri-State Crematory Litig,* MDL 1467 (N.D. Ga.) (improper burial).

*Lebrilla v. Farmers Group Inc.,* No. 00-CC-07185 (Cal. Super. Ct., Orange County) (auto insurance).

*Lovelis v. Titflex,* No. 04-211 (Ak. Cir. Ct., Clark County) (gas transmission pipe).

*Naef v. Masonite Corp.,* No. CV-94-4033 (Ala. Cir. Ct. Mobile County) (hardboard siding product).

*Peterson v. BASF Corp.,* No. C2-97-295 (D. Minn.) (herbicide).

*Posey v. Dryvit Sys., Inc.* No. 17,715-IV (Tenn. Cir. Ct., Jefferson County) (EIFS stucco).

*Reiff v. Epson America, Inc. and Latham v. Epson Am., Inc.,* J.C.C.P. No. 4347 (Cal. Super. Ct., L.A. County) (ink jet printers).

*Richison v. Weyerhaeuser Company Limited,* No. 05532 (Cal. Super. Ct. San Joaquin County) (roofing product).

*Ruff v. Parex, Inc.,* No. 96-CvS 0059 (N.C. Super. Ct. Hanover County) (synthetic stucco product).

*Shah v. Re-Con Building Products, Inc.,* No. C99-02919 (Cal. Super. Ct. Contra Costa County) (roofing product).

*Shields vs. Bridgestone/Firestone, Inc., Bridgestone Corp.,* No. E-167.637 (D. Tex.) (tires).

*Smith v. Behr Process Corp.,* No. 98-2-00635 (Wash. Super. Ct., Gray Harbor County) (stain product).



*Weiner v. Cal-Shake, Inc., J.*C.C.P. No. 4208 (Cal. Super. Ct., Contra Costa County) (roofing product).

*Wholesale Elec. Antitrust Cases I & II,* J.C.C.P. Nos. 4204 & 4205 (Cal. Super. Ct., San Diego County) (energy).

*Woosley v. State of California,* No. CA 000499 (Cal. Super. Ct., Los Angeles County) (automobiles).

## Mass Tort

*Ahearn v. Fibreboard Corp.,* No. 6:93cv526 (E.D. Tex); *Continental Casualty Co. v. Rudd*, No. 6:94cv458 (E.D. Tex) (asbestos injury).

*Backstrom v. The Methodist Hospital,* No. H.-94-1877 (S.D. Tex.) (TMJ injury).

*Engle v. RJ Reynolds Tobacco Co.,* No. 94-08273 (Fla. Cir. Ct. Dade County) (tobacco injury).

*Georgine v. Amchem, Inc.,* No. 93-CV-0215 (E.D. Pa.) (asbestos injury).

## Bankruptcies

*In re Armstrong World Industries, Inc.,* No. 00-4471 (Bankr. D. Del.).

*In re Dow Corning,* No. 95-20512 (Bankr. E.D. Mich.) (breast implants).

*In re Johns-Manville Corp.,* 68 B.R. 618, 626 (Bankr. S.D.N.Y.) (asbestos).

*In re Kaiser Aluminum Corp.,* No. 02-10429 (JFK) (D. Del).

*In re Owens Corning,* No. 00-03837 (Bankr. D. Del.).

*In re Raytech Corp.,* No. 5-89-00293 (Bankr. D. Conn.) (asbestos).

*In re The Celotex Corp.,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (asbestos).

*In re U.S. Brass Corp.,* No.94-40823S (Bankr. E.D. Tex.) (polybutylene).

*In re USG Corp.,* Nos. 01-2094 - 01-2104 (Bankr. D. Del.).

*In re W.R. Grace & Co.,* No. 01-01139 (Bankr. D. Del.).



## Insurance

*McNeil v. American General Life and Accident Insurance Co.,* No. 8-99-1157 (M.D. Tenn.) (insurance).

*Nealy v. Woodmen of the World Life Insurance Co.,* No. 3:93 CV-536 (S.D. Miss.) (insurance).

## Holocaust Victims Reparations

*In re Holocaust Victim Assets Litigation,* Nos. CV 96-4849, CV-5161 and CV 97-461 (E.D.N.Y.) (Holocaust).

The International Commission on Holocaust Era Insurance Claims Outreach

## Pension Benefits

*Collins v. Pension Benefit Guarantee Corp.,* No. 88-3406 (D.D.C.); Page v. Pension Benefit Guarantee Corp., No. 89-2997 (D.D.C.).

*Forbush v. J. C. Penney Co., Inc.,* Nos. 3:90-2719 and 3:92-0109 (N.D. Tex.).

## International

*Ahearn v. Fiberboard Corporation,* No. 6:93cv526 (E.D. Tex) and *Continental Casualty Co. v. Rudd,* No. 6:94cv458 (E.D. Tex.) (asbestos injury) (1993).

*Galanti v. The Goodyear Tire & Rubber Company,* No. 03-209 (D.N.J.) (radiant heating) (2002).

*In re Holocaust Victims Assets Litigation,* No. CV 96-4849 (ERK) (MDG) (Consolidated with CV-5161 and CV 97461) (E.D.N.Y.) (2003).

*In re Owens Corning, Chapter 11,* No. 00-03837 (MFW) (Bankr. D. Del.) (2006).

*In re The Celotex Corporation, Chapter 11,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (1996).

*In re USG Corporation, Chapter 11,* Nos. 01-2094 (RJN) through 01-2104(RJN) (Bankr. D. Del.) (2006).

*In re Western Union Money Transfer Litigation,* No. 01 0335 (CPS) (VVP) (E.D.N.Y.) (wire transactions) (2004).

*In re W.R. Grace & Co., Chapter 11,* No. 01-01139 (Bankr. D. Del.) (bankruptcy) (2001).



International Committee on Holocaust Era Insurance Claims (1999).

## Product Recall

Central Sprinkler Voluntary Omega Sprinkler Replacement Program

*Hart v. Central Sprinkler Corp.,* No. BC17627 (Cal. Super. Ct. Los Angeles County) & *County of Santa Clara v. Central Sprinkler Corp., No.* CV 17710119 (Cal. Super. Ct. Santa Clara County)

## Telecom

*Bidner, et al. v. LCI International Telecom Corp d/b/a Qwest Communications.*

*Community Health Association v. Lucent Technologies, Inc.,* No. 99-C-237, (W.Va. Cir. Ct., Kanawha County).

*Cundiff et al. v. Verizon California, Inc.,* No. 237806 (Cal. Super Ct., Los Angeles County).

*Kushner v. AT&T Corporation,* No. GIC 795315 (Cal. Super. Ct., San Diego County).

*Rish Enterprise v. Verizon New Jersey,* No. MID-L-8946-02 (N.J. Super. Ct.).

*Sonnier, et. al. v. Radiofone, Inc.,* No. 44-844, (L.A. Jud. Dist. Ct., Plaquemines Parish County).

*State of Louisiana v. Sprint Communications Company L.P.,* No. 26,334 (Jud. Dis. Ct., Parish of West Baton Rouge) and *State of Louisiana v. WilTel, Inc.,* No. 26,304 (Jud. Dis. Ct., Parish of West Baton Rouge).



Case 1:12-cv-03264-CRB Document 60-1 Filed 04/25/13 Page 552 of PageID #: 394

# EXHIBIT B

Case 1:12-cv-32264-CRB Document 1-1 Filed 05/22/12 Page 56 of 103 PageID #: 395

**Relish Carrier Newspaper List**

| Publication | City | State | County | Circulation | DMA |
|---|---|---|---|---|---|
| The Sand Mountain Reporter | Albertville | AL | Marshall | 10,100 | HUNTSVILLE-DECATUR (FLOR) |
| The Outlook | Alexander City | AL | Tallapoosa | 3,900 | MONTGOMERY (SELMA) |
| The Andalusia Star-News | Andalusia | AL | Covington | 4,450 | MONTGOMERY (SELMA) |
| The Anniston Star | Anniston | AL | Calhoun | 22,000 | BIRMINGHAM (ANN AND TUSC) |
| Daily Home | Anniston | AL | Calhoun | 9,500 | BIRMINGHAM (ANN AND TUSC) |
| Coosa Valley Advantage | Anniston | AL | Calhoun | 17,500 | BIRMINGHAM (ANN AND TUSC) |
| The News Courier | Athens | AL | Limestone | 7,226 | HUNTSVILLE-DECATUR (FLOR) |
| The Atmore Advance | Atmore | AL | Escambia | 3,200 | MOBILE-PENSACOLA (FT WALT) |
| The Brewton Standard | Brewton | AL | Escambia | 3,000 | MOBILE-PENSACOLA (FT WALT) |
| The Cullman Times | Cullman | AL | Cullman | 12,125 | BIRMINGHAM (ANN AND TUSC) |
| The Demopolis Times | Demopolis | AL | Marengo | 3,000 | MONTGOMERY (SELMA) |
| The Dothan Eagle | Dothan | AL | Houston | 31,700 | DOTHAN |
| The Eufaula Tribune | Eufaula | AL | Barbour | 5,580 | COLUMBUS GA |
| The Times-Journal | Fort Payne | AL | DeKalb | 6,500 | HUNTSVILLE-DECATUR (FLOR) |
| North Jefferson News | Gardendale | AL | Jefferson | 4,454 | BIRMINGHAM (ANN AND TUSC) |
| Daily Mountain Eagle | Jasper | AL | Walker | 11,044 | BIRMINGHAM (ANN AND TUSC) |
| The Monroe Journal | Monroeville | AL | Monroe | 7,000 | MOBILE-PENSACOLA (FT WALT) |
| The Opelika-Auburn News | Opelika | AL | Lee | 14,800 | COLUMBUS GA |
| St. Clair News-Aegis | Pell City | AL | St. Clair | 3,200 | BIRMINGHAM (ANN AND TUSC) |
| The Randolph Leader | Roanoke | AL | Randolph | 7,200 | ATLANTA |
| The Daily Sentinel | Scottsboro | AL | Jackson | 5,100 | HUNTSVILLE-DECATUR (FLOR) |
| The Tallassee Tribune | Tallassee | AL | Elmore | 4,000 | MONTGOMERY (SELMA) |
| The Messenger | Troy | AL | Pike | 3,333 | MONTGOMERY (SELMA) |
| The Eclectic Observer | Wetumpka | AL | Elmore | 1,600 | MONTGOMERY (SELMA) |
| The Wetumpka Herald | Wetumpka | AL | Elmore | 4,000 | MONTGOMERY (SELMA) |
| Blytheville Courier News | Blytheville | AR | Mississippi | 4,949 | MEMPHIS |
| Camden News | Camden | AR | Ouachita | 3,959 | LITTLE ROCK-PINE BLUFF |
| The Villager Journal | Cherokee Village | AR | Sharp | 2,200 | JONESBORO |
| El Dorado News-Times | El Dorado | AR | Union | 9,382 | MONROE-EL DORADO |
| Northwest Arkansas Times | Fayetteville | AR | Washington | 64,000 | FT. SMITH-FAY-SPRNGDL-RGRS |
| Cleburne County Sun-Times | Heber Springs | AR | Cleburne | 5,025 | LITTLE ROCK-PINE BLUFF |
| Helena-West Helena Daily World | Helena | AR | Phillips | 4,090 | MEMPHIS |
| Hope Star | Hope | AR | Hempstead | 3,075 | SHREVEPORT |
| The Daily Siftings Herald | Hope | AR | Hempstead | 3,075 | SHREVEPORT |
| The Sentinel-Record | Hot Spring | AR | Garland | 22,370 | LITTLE ROCK-PINE BLUFF |
| The Jonesboro Sun | Jonesboro | AR | Craighead | 20,000 | JONESBORO |
| Arkansas Democrat Gazette Inc | Little Rock | AR | Pulaski | 120,000 | LITTLE ROCK-PINE BLUFF |
| Banner-News | Magnolia | AR | Columbia | 4,157 | SHREVEPORT |
| Northeast Arkansas Town Crier | Manila | AR | Mississippi | 2,000 | MEMPHIS |
| Newport Independent | Newport | AR | Jackson | 2,261 | LITTLE ROCK-PINE BLUFF |
| Paragould Daily Press | Paragould | AR | Greene | 4,800 | JONESBORO |
| Clay County Times Democrat | Rector | AR | Clay | 2,600 | JONESBORO |
| The Courier | Russellville | AR | Pope | 8,500 | LITTLE ROCK-PINE BLUFF |
| The News | Salem | AR | Fulton | 2,550 | SPRINGFIELD MO |
| The Daily Citizen | Searcy | AR | White | 5,208 | LITTLE ROCK-PINE BLUFF |
| Daily Leader | Stuttgart | AR | Arkansas | 3,015 | LITTLE ROCK-PINE BLUFF |
| Poinsett County Democrat Tribune | Trumann | AR | Poinsett | 1,500 | MEMPHIS |
| The White Hall Journal | White Hall | AR | Jefferson | 2,350 | LITTLE ROCK-PINE BLUFF |
| San Pedro Valley News - Sun | Benzon | AZ | Cochise | 3,030 | TUCSON (SIERRA VISTA) |
| The Bugle | Cottonwood | AZ | Yavapai | 2,450 | PHOENIX (PRESCOTT) |
| The Verde Independent | Cottonwood | AZ | Yavapai | 2,499 | PHOENIX (PRESCOTT) |
| The Daily Dispatch | Douglas | AZ | Cochise | 4,040 | TUCSON (SIERRA VISTA) |
| Arizona Daily Sun | Flagstaff | AZ | Coconino | 11,383 | PHOENIX (PRESCOTT) |
| The Kingman Daily Miner | Kingman | AZ | Mohave | 8,314 | PHOENIX (PRESCOTT) |
| Today's News Herald | Lake Havasu City | AZ | Mohave | 11,500 | PHOENIX (PRESCOTT) |
| Parker Pioneer | Parker | AZ | Mohave | 4,660 | PHOENIX (PRESCOTT) |
| Payson Roundup | Payson | AZ | Gila | 6,000 | PHOENIX (PRESCOTT) |
| Ahwatukee Foothills News | Phoenix | AZ | Maricopa | 28,280 | PHOENIX (PRESCOTT) |
| The Daily Courier | Prescott | AZ | Yavapai | 16,500 | PHOENIX (PRESCOTT) |
| Eastern Arizona Courier | Safford | AZ | Graham | 6,666 | PHOENIX (PRESCOTT) |
| Sedona Red Rock News | Sedona | AZ | Coconino | 5,500 | PHOENIX (PRESCOTT) |
| White Mountain Independent | Show Low | AZ | Navajo | 9,000 | PHOENIX (PRESCOTT) |
| Sierra Vista Herald | Sierra Vista | AZ | Cochise | 10,605 | TUCSON (SIERRA VISTA) |
| Glendale/Peoria Today | Sun City | AZ | Maricopa | 30,000 | PHOENIX (PRESCOTT) |

## Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| Surprise Today | Sun City | AZ | Maricopa | 40,000 | PHOENIX (PRESCOTT) |
| Chandler Tribune/East Valley Tribune | Tempe | AZ | Maricopa | 98,000 | PHOENIX (PRESCOTT) |
| Arizona Range News | Willcox | AZ | Cochise | 3,131 | PHOENIX (PRESCOTT) |
| Williams-Grand Canyon News | Williams | AZ | Coconion | 4,000 | PHOENIX (PRESCOTT) |
| The Sun | Yuma | AZ | Yuma | 24,450 | YUMA-EL CENTRO |
| Palo Verde Valley Times(/Quartszite Times) | Blythe | CA | Riverside | 4,140 | LOS ANGELES |
| Chester Progressive | Chester | CA | Lassen | 2,440 | SACRAMNTO-STKTON-MODESTO |
| Chico-Oroville Enterprise Record | Chico | CA | Butte | 28,000 | CHICO-REDDING |
| The Davis Enterprise | Davis | CA | Yolo | 10,393 | SACRAMNTO-STKTON-MODESTO |
| Imperial Valley Press | El Centro | CA | Imperial | 11,500 | YUMA-EL CENTRO |
| Escalon Times | Escalon | CA | Stanislaus | 1,700 | SACRAMNTO-STKTON-MODESTO |
| Escalon Times | Escalon | CA | Stanislaus | 1,800 | SACRAMNTO-STKTON-MODESTO |
| Eureka Times Standard | Eureka | CA | Humboldt | 30,684 | EUREKA |
| Daily Republic | Fairfield | CA | Solano | 19,301 | SACRAMNTO-STKTON-MODESTO |
| Fort Bragg Advocate News | Fort Bragg | CA | Mendocino | 5,048 | SAN FRANCISCO-OAK-SAN JOSE |
| Fremont Argus | Fremont | CA | Alameda | 22,068 | SAN FRANCISCO-OAK-SAN JOSE |
| The Union | Grass Valley | CA | Nevada | 15,000 | SACRAMNTO-STKTON-MODESTO |
| Indian Valley Record | Greenville | CA | Plumas | 1,498 | SACRAMNTO-STKTON-MODESTO |
| The Gridley Herald | Gridley | CA | Butte | 2,500 | CHICO-REDDING |
| The Hanford Sentinel | Hanford | CA | Kings | 15,913 | FRESNO-VISALIA |
| Hayward Daily Review | Hayward | CA | Alameda | 24,275 | SAN FRANCISCO-OAK-SAN JOSE |
| Lake County Record Bee | Lakeport | CA | Lake | 9,086 | SAN FRANCISCO-OAK-SAN JOSE |
| Lompoc Record | Lompoc | CA | Santa Barbara | 6,900 | SANTABARBRA-SANMAR-SANLUOB |
| Press Telegram | Long Beach | CA | Los Angeles | 60,773 | LOS ANGELES |
| The Manteca Bulletin | Manteca | CA | San Joaquin | 5,800 | SACRAMNTO-STKTON-MODESTO |
| Appeal-Democrat | Marysville | CA | Yuba | 27,000 | SACRAMNTO-STKTON-MODESTO |
| Merced Sun-Star | Merced | CA | Merced | 18,500 | FRESNO-VISALIA |
| The Modesto Bee | Modesto | CA | Stanislaus | 59,500 | SACRAMNTO-STKTON-MODESTO |
| The Monterey County Herald | Monterey | CA | Monterey | 25,863 | MONTEREY-SALINAS |
| Salinas Valley Weekly | Monterey | CA | Monterey | 35,000 | MONTEREY-SALINAS |
| Mount Shasta Herald | Mount Shasta | CA | Siskiyou | 4,920 | MEDFORD-KLAMATH FALLS |
| The Napa Valley Register | Napa | CA | Napa | 14,300 | SAN FRANCISCO-OAK-SAN JOSE |
| The Napa Valley Register | Napa | CA | Napa | 14,300 | SAN FRANCISCO-OAK-SAN JOSE |
| Marin Indpendent Journal | Novato | CA | Marin | 30,483 | SAN FRANCISCO-OAK-SAN JOSE |
| Oakdale Leader | Oakdale | CA | Stanislaus | 3,600 | SACRAMNTO-STKTON-MODESTO |
| Alameda Times Star | Oakland | CA | Alameda | 4,540 | SAN FRANCISCO-OAK-SAN JOSE |
| The Oakland Tribune | Oakland | CA | San Mateo | 35,157 | SAN FRANCISCO-OAK-SAN JOSE |
| Inland Valley Daily Bulletin | Ontario | CA | San Bernardino | 42,899 | LOS ANGELES |
| Antelope Valley Press | Palmdale | CA | Los Angeles | 19,500 | LOS ANGELES |
| Paradise Post | Paradise | CA | Butte | 8,084 | CHICO-REDDING |
| Star News | Pasadena | CA | Los Angeles | 21,623 | LOS ANGELES |
| Mountain Democrat | Placerville | CA | Placer | 14,783 | SACRAMNTO-STKTON-MODESTO |
| Tri-Valley Herald | Pleasanton | CA | Alameda | 23,820 | SAN FRANCISCO-OAK-SAN JOSE |
| The Porterville Recorder | Porterville | CA | Tulare | 8,791 | FRESNO-VISALIA |
| Portola Reporter | Portola | CA | Plumas | 2,475 | SACRAMNTO-STKTON-MODESTO |
| Feather River Bulletin | Quincy | CA | Plumas | 3,742 | SACRAMNTO-STKTON-MODESTO |
| Red Bluff Daily News | Red Bluff | CA | Tehama | 7,918 | CHICO-REDDING |
| Redlands Daily Fact | Redlands | CA | San Bernardino | 7,324 | LOS ANGELES |
| The Daily Indpendent | Ridgecrest | CA | Kern | 8,200 | LOS ANGELES |
| The Sacramento Bee | Sacramento | CA | Sacramento | 176,000 | SACRAMNTO-STKTON-MODESTO |
| The Sun | San Bernardino | CA | San Bernardino | 43,019 | LOS ANGELES |
| The San Diego Union-Tribune | San Diego | CA | San Diego | 257,000 | SAN DIEGO |
| San Jose Mercury News | San Jose | CA | Santa Clara | 173,504 | SAN FRANCISCO-OAK-SAN JOSE |
| San Mateo County Times | San Mateo | CA | Alameda | 20,486 | SAN FRANCISCO-OAK-SAN JOSE |
| The Signal | Santa Clarita | CA | Los Angeles | 10,046 | LOS ANGELES |
| Santa Cruz Sentinel | Santa Cruz | CA | Santa Cruz | 25,531 | MONTEREY-SALINAS |
| The Santa Maria Times | Santa Maria | CA | Santa Barbara | 20,418 | SANTABARBRA-SANMAR-SANLUOB |
| Tahoe Daily Tribune | South Lake Tahoe | CA | El Dorado | 7,600 | RENO |
| The Record | Stockton | CA | San Joaquin | 30,700 | SACRAMNTO-STKTON-MODESTO |
| Lassen County Times | Susanville | CA | Lassen | 8,600 | RENO |
| Westwood Pinepress | Susanville | CA | Lassen | 1,245 | RENO |
| Daily Midway Driller | Taft | CA | Kern | 3,075 | LOS ANGELES |
| Daily Breeze | Torrance | CA | Los Angeles | 58,621 | LOS ANGELES |
| Sierra Sun | Truckee | CA | Nevada | 5,700 | SACRAMNTO-STKTON-MODESTO |
| Turlock Journal | Turlock | CA | Stanislaus | 3,600 | SACRAMNTO-STKTON-MODESTO |

Case 1:12-cv-32644-CRB Document 87-81 Filed 04/25/13 Page 58 of 103 PageID #: 397

# Relish Carrier Newspaper List

| Newspaper | City | State | County | Circ. | Market |
|---|---|---|---|---|---|
| Ukiah Daily Journal | Ukiah | CA | Mendocino | 7,774 | SAN FRANCISCO-OAK-SAN JOSE |
| Vacaville Reporter | Vacaville | CA | Solano | 17,187 | SACRAMNTO-STKTON-MODESTO |
| Vallejo Times Herald | Vallejo | CA | Solano | 17,311 | SAN FRANCISCO-OAK-SAN JOSE |
| Press-Dispatch | Victorville | CA | San Bernardino | 39,972 | LOS ANGELES |
| Visalia Times Delta/Tulare Advance Register | Visalia | CA | Tulare | 20,500 | FRESNO-VISALIA |
| Contra Costa Times | Walnut Creek | CA | Contra Costa | 146,500 | SAN FRANCISCO-OAK-SAN JOSE |
| San Gabriel Valley Tribune | West Covina | CA | Los Angeles | 30,385 | LOS ANGELES |
| The Daily News | Whittier | CA | Los Angeles | 11,431 | LOS ANGELES |
| The Willits News | Willits | CA | Mendocino | 3,030 | SAN FRANCISCO-OAK-SAN JOSE |
| Woodland Daily Democrat | Woodland | CA | Yolo | 10,096 | SACRAMNTO-STKTON-MODESTO |
| Los Angeles Daily News | Woodland Hills | CA | Los Angeles | 78,208 | LOS ANGELES |
| Siskiyou Daily News | Yreka | CA | Siskiyou | 5,945 | MEDFORD-KLAMATH FALLS |
| Daily Camera | Boulder | CO | Boulder | 27,000 | DENVER |
| The Burlington Record | Burlington | CO | Kit Carson | 3,370 | DENVER |
| Daily Record | Canon City | CO | Fremont | 5,300 | COLORADO SPRINGS-PUEBLO |
| Craig Daily Press | Craig | CO | Moffat | 3,535 | DENVER |
| The Denver Post | Denver | CO | Denver | 215,452 | DENVER |
| Fort Morgan Times | Fort Morgan | CO | Morgan | 2,800 | DENVER |
| The Greeley Tribune | Greeley | CO | Weld | 21,000 | DENVER |
| Lafayette News | Lafayette | CO | Boulder | 2,020 | DENVER |
| Daily Times - Call | Longmont | CO | Boulder | 21,715 | DENVER |
| Louisville Times | Louisville | CO | Boulder | 2,020 | DENVER |
| (Loveland) Daily Reporter - Herald | Loveland | CO | Larimer | 18,685 | DENVER |
| Steamboat Pilot | Steamboat Springs | CO | Routt | 5,355 | DENVER |
| Steamboat Today | Steamboat Springs | CO | Routt | 5,250 | DENVER |
| Journal Advocate | Sterling | CO | Logan | 2,900 | DENVER |
| The Chronicle News | Trinidad | CO | Las Animas | 4,080 | COLORADO SPRINGS-PUEBLO |
| The News-Times | Danbury | CT | Fairfield | 30,500 | NEW YORK |
| Journal Inquirer | Manchester | CT | Hartford | 45,450 | HARTFORD & NEW HAVEN |
| The Hour | Norwalk | CT | Fairfield | 9,000 | NEW YORK |
| Norwich Bulletin | Norwich | CT | New London | 25,149 | HARTFORD & NEW HAVEN |
| The Chronicle | Willimantic | CT | Windham | 7,000 | HARTFORD & NEW HAVEN |
| The Washington Examiner | Washington | DC | DC | 200,000 | WASHINGTON DC (HAGRSTWN) |
| Desoto Sun | Arcadia | FL | Desoto | 5,000 | FT. MYERS-NAPLES |
| The Polk County Democrat | Bartow | FL | Polk | 4,500 | TAMPA-ST. PETE (SARASOTA) |
| Charlotte Sun Herald | Charlotte Harbor | FL | Charlotte | 2,500 | FT. MYERS-NAPLES |
| Chiefland Citizen | Chiefland | FL | Levy | 3,500 | GAINESVILLE |
| Holmes County Advertisers | Chipley | FL | Holmes | 3,131 | PANAMA CITY |
| Washington County News | Chipley | FL | Washington | 3,131 | PANAMA CITY |
| The South Lake Press | Clermont | FL | Lake | 15,000 | ORLANDO-DAYTONA BCH-MELBRN |
| The Destin Log/The Walton Log | Destin | FL | Okaloosa | 6,452 | MOBILE-PENSACOLA (FT WALT) |
| Englewood Sun | Englewood | FL | Sarasota | 6,000 | TAMPA-ST. PETE (SARASOTA) |
| The Fort Meade Leader | Fort Meade | FL | Polk | 6,250 | TAMPA-ST. PETE (SARASOTA) |
| Frostproof News | Frostproof | FL | Polk | 4,500 | TAMPA-ST. PETE (SARASOTA) |
| The Florida Times-Union | Jacksonville | FL | Duval | 160,743 | JACKSONVILLE |
| Osceola News-Gazette | Kissimmee | FL | Osceola | 40,400 | ORLANDO-DAYTONA BCH-MELBRN |
| Lake Placid Journal | Lake Placid | FL | Highlands | 7,000 | TAMPA-ST. PETE (SARASOTA) |
| Lake Wales News | Lake Wales | FL | Polk | 4,750 | TAMPA-ST. PETE (SARASOTA) |
| The Daily Commercial | Leesburg | FL | Lake | 22,000 | ORLANDO-DAYTONA BCH-MELBRN |
| Suwannee Democrat | Live Oak | FL | Suwannee | 6,350 | TALLAHASSEE-THOMASVILLE |
| Jackson County Floridan | Marianna | FL | Jackson | 7,272 | PANAMA CITY |
| Santa Rosa Press-Gazette | Milton | FL | Santa Rosa | 7,070 | MOBILE-PENSACOLA (FT WALT) |
| North Port Sun | North Port | FL | Sarasota | 5,000 | TAMPA-ST. PETE (SARASOTA) |
| Palatka Daily News | Palatka | FL | Putnam | 7,300 | JACKSONVILLE |
| Walton Sun | Santa Rosa Beach | FL | Walton | 12,240 | PANAMA CITY |
| The News-Sun | Sebring | FL | Highlands | 8,000 | TAMPA-ST. PETE (SARASOTA) |
| St. Augustine Record | St. Augustine | FL | St. Johns | 21,776 | JACKSONVILLE |
| Treasure Coast News | Stuart | FL | Martin | 79,000 | WEST PALM BEACH-FT. PIERCE |
| Hardee Sun | Venice | FL | Sarasota | 6,000 | TAMPA-ST. PETE (SARASOTA) |
| Venice Gondolier Sun | Venice | FL | Sarasota | 10,000 | TAMPA-ST. PETE (SARASOTA) |
| The Herald Advocate | Wauchula | FL | Hardee | 4,000 | TAMPA-ST. PETE (SARASOTA) |
| News Chief | Winter Haven | FL | Polk | 8,413 | TAMPA-ST. PETE (SARASOTA) |
| Americus Times-Recorder | Americus | GA | Sumter | 4,400 | COLUMBUS GA |
| Athens Banner Herald | Athens | GA | Clarke | 22,000 | ATLANTA |
| The Augusta Chronicle | Augusta | GA | Richmond | 45,000 | AUGUSTA |

## Relish Carrier Newspaper List

| | | | | | |
|---|---|---|---|---|---|
| The Post Searchlight | Bainbridge | GA | Decatur | 7,575 | ATLANTA |
| The Brunswick News | Brunswick | GA | Glynn | 16,200 | JACKSONVILLE |
| The Daily Tribune News | Cartersville | GA | Bartow | 6,600 | ATLANTA |
| Columbus Ledger-Enquirer | Columbus | GA | Muscogee | 43,430 | COLUMBUS GA |
| The Rockdale News | Conyers | GA | Rockdale | 7,500 | ATLANTA |
| The Cordele Dispatch | Cordele | GA | Crisp | 4,058 | ALBANY GA |
| The Covington News | Covington | GA | Newton | 6,000 | ATLANTA |
| The Daily Citizen | Dalton | GA | Whitfield | 13,956 | CHATTANOOGA |
| The Courier Herald | Dublin | GA | Laurens | 10,000 | MACON |
| The Times | Gainesville | GA | Hall | 22,000 | ATLANTA |
| Griffin Daily News | Griffin | GA | Spalding | 8,500 | ATLANTA |
| Jackson Progress Argus | Jackson | GA | Butts | 3,998 | ATLANTA |
| The Press-Sentinel | Jesup | GA | Wayne | 6,565 | SAVANNAH |
| Clayton News-Daily | Jonesboro | GA | Clayton | 2,800 | ATLANTA |
| The News & Farmer | Louisville | GA | Jefferson | 4,000 | AUGUSTA |
| The Macon Telegraph | Macon | GA | Bibb | 36,000 | MACON |
| Daily Herald | McDonough | GA | Henry | 3,100 | ATLANTA |
| The Metter Advertiser | Metter | GA | Candler | 2,700 | SAVANNAH |
| The Union Recorder | Milledgeville | GA | Baldwin | 8,413 | MACON |
| The Observer | Moultrie | GA | Colquitt | 6,929 | ALBANY GA |
| Rome News Tribune | Rome | GA | Floyd | 17,271 | ATLANTA |
| Savannah Morning News | Savannah | GA | Chatham | 50,000 | SAVANNAH |
| The Statesboro Herald | Statesboro | GA | Bulloch | 8,000 | SAVANNAH |
| The Sylvania Telephone | Sylvania | GA | Scravem | 4,375 | SAVANNAH |
| Thomasville Times Enterprise | Thomasville | GA | Thomas | 9,898 | TALLAHASSEE-THOMASVILLE |
| Valdosta Daily Times | Valdosta | GA | Lowndes | 19,796 | TALLAHASSEE-THOMASVILLE |
| Dallas County News | Adel | IA | Adel | 1,500 | DES MOINES-AMES |
| NE Dallas County Record | Adel | IA | Adel | 1,500 | DES MOINES-AMES |
| The Algona Upper Des Moines | Algona | IA | Kossuth | 3,250 | DES MOINES-AMES |
| Butler County Tribune Journal | Allison | IA | Butler | 1,300 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| The Tribune | Ames | IA | Story | 11,378 | DES MOINES-AMES |
| The Britt News Tribune | Britt | IA | Hancock | 1,100 | ROCHESTR-MASON CITY-AUSTIN |
| Buffalo Center Tribune | Buffalo Center | IA | Winebago | 1,200 | ROCHESTR-MASON CITY-AUSTIN |
| The Hawk Eye | Burlington | IA | Des Moines | 21,634 | DAVENPORT-R.ISLAND-MOLINE |
| Daily Times Herald | Carroll | IA | Carroll | 6,161 | DES MOINES-AMES |
| Daily Iowegian | Centerville | IA | Appanoose | 2,771 | DES MOINES-AMES |
| Chronicle Times | Cherokee | IA | Cherokee | 2,552 | SIOUX CITY |
| Clarinda Herald-Journal | Clarinda | IA | Page | 1,212 | OMAHA |
| Clarksville Star | Clarksville | IA | Butler | 1,100 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Clinton Herald | Clinton | IA | Clinton | 11,900 | DAVENPORT-R.ISLAND-MOLINE |
| CWL Times | Corwith | IA | Hancock | 320 | ROCHESTR-MASON CITY-AUSTIN |
| The Daily Nonpareil | Council Bluffs | IA | Pottawattamie | 17,170 | OMAHA |
| Creston News Advertiser | Creston | IA | Union | 4,949 | DES MOINES-AMES |
| Wright County Monitor | Dows | IA | Wright | 600 | DES MOINES-AMES |
| Eagle Grove Eagle | Eagle Grove | IA | Wright | 1,600 | DES MOINES-AMES |
| The Fairfield Daily Ledger | Fairfield | IA | Jefferson | 3,359 | OTTUMWA-KIRKSVILLE |
| Forest City Summit | Forest City | IA | Winnebago | 1,750 | ROCHESTR-MASON CITY-AUSTIN |
| Village Vine | Freemont | IA | Mahaska | 1,450 | DES MOINES-AMES |
| Garner Leader & Signal | Garner | IA | Mahaska | 1,400 | ROCHESTR-MASON CITY-AUSTIN |
| The Grundy Register | Grundy Grove | IA | Grundy | 2,200 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Hamburg Reporter | Hamburg | IA | Fremont | 1,256 | OMAHA |
| Calhoun County Advocate | Hampton | IA | Calhoun | 550 | DES MOINES-AMES |
| Hampton Chonicle | Hampton | IA | Franklin | 3,330 | DES MOINES-AMES |
| Pioneer Enterprise | Hampton | IA | Franklin | 450 | DES MOINES-AMES |
| Kanawha Reporter | Kanawha | IA | Hancock | 550 | ROCHESTR-MASON CITY-AUSTIN |
| Keota Eagle | Keota | IA | Keokuk | 700 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Journal Express | Knoxville | IA | Marion | 1,644 | DES MOINES-AMES |
| Lake City Graphic | Lake City | IA | Calhoun | 1,000 | DES MOINES-AMES |
| LeMars Daily Sentinel | LeMars | IA | Plymouth | 2,694 | SIOUX CITY |
| Globe Gazette | Mason City | IA | Cerro Cordo | 15,400 | ROCHESTR-MASON CITY-AUSTIN |
| Mt. Pleasant News | Mount Pleasant | IA | Henry | 3,054 | DAVENPORT-R.ISLAND-MOLINE |
| New Sharon Sun | New Sharon | IA | Mahaska | 650 | DES MOINES-AMES |
| Newton Daily News | Newton | IA | Jasper | 5,202 | DES MOINES-AMES |
| Mitchell County Press News | Osage | IA | Mitchell | 2,550 | ROCHESTR-MASON CITY-AUSTIN |
| Osceola Sentinel-Tribune | Osceola | IA | Clarke | 3,636 | DES MOINES-AMES |

Case 1:12-cv-03264-CRB Document 87-1 Filed 04/25/13 Page 605 of 552 PageID #: 399

## Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| Oskaloosa Herald | Oskaloosa | IA | Marion | 3,200 | DES MOINES-AMES |
| The Ottumwa Courier | Ottumwa | IA | Wapello | 12,500 | OTTUMWA-KIRKSVILLE |
| The Chronicle | Pella | IA | Marion | 2,810 | DES MOINES-AMES |
| Sheffield Press | Sheffield | IA | Franklin | 800 | DES MOINES-AMES |
| Valley News Today | Shenandoah | IA | Page | 2,020 | OMAHA |
| Sigourney News Review | Sigourney | IA | Keokuk | 1,800 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Sioux City Journal | Sioux City | IA | Woodbury | 37,000 | SIOUX CITY |
| The Daily Reporter | Spencer | IA | Clay | 2,500 | SIOUX CITY |
| Pilot Tribune | Storm Lake | IA | Buena Vista | 2,000 | SIOUX CITY |
| The Washington Evening Journal | Washington | IA | Washington | 3,888 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Coeur d'Alene Press | Coeur d'Alene | ID | Kootenai | 21,423 | SPOKANE |
| Shoshone News-Press | Kellogg | ID | Shoshone | 4,200 | SPOKANE |
| Idaho Press Tribune | Nampa | ID | Canyon | 23,600 | BOISE |
| Idaho State Journal | Pacatello | ID | Bannock | 18,685 | IDAHO FALLS-POCATELLO |
| Priest River Times | Priest River | ID | Bonner | 2,800 | SPOKANE |
| Standard Journal | Rexburg | ID | Madison | 5,555 | IDAHO FALLS-POCATELLO |
| Bonner County Daily Bee | Sandpoint | ID | Bonner | 5,200 | SPOKANE |
| Bonners Ferry Herald | Sandpoint | ID | Boundary | 3,000 | SPOKANE |
| Times News | Twin Falls | ID | Twin Falls | 24,745 | TWIN FALLS |
| The Times Record | Aledo | IL | Mercer | 3,485 | DAVENPORT-R.ISLAND-MOLINE |
| The Telegraph | Alton | IL | Madison | 22,200 | ST. LOUIS |
| The Evening News | Benton | IL | Franklin | 2,500 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Daily Ledger | Canton | IL | Fulton | 5,641 | PEORIA-BLOOMINGTON |
| The Southern Illinoisan | Carbondale | IL | Jackson | 29,724 | PADUCAH-C.GIRD-HARBG-MT VN |
| Randolph County Herald-Tribune | Chester | IL | Randolph | 2,512 | ST. LOUIS |
| The Progress | Christopher | IL | Franklin | 1,000 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Northwest Herald | Crystal Lake | IL | McHenry | 28,200 | CHICAGO |
| Lake County Journals | Crystal Lake | IL | McHenry | 8,150 | CHICAGO |
| The Daily Chronicle | Dekalb | IL | DeKalb | 7,200 | CHICAGO |
| Suburban Life Publications | Downers Grove | IL | Cook | 101,000 | CHICAGO |
| Du Quoin Evening Call | Du Quoin | IL | Perry | 3,896 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Blade | Fairbury | IL | Livingston | 2,160 | PEORIA-BLOOMINGTON |
| The Clay County Advocate-Press | Flora | IL | Clay | 2,160 | TERRE HAUTE |
| The Journal-Standard | Freeport | IL | Stephenson | 9,500 | ROCKFORD |
| Register-Mail | Galesburg | IL | Knox | 12,000 | DAVENPORT-R.ISLAND-MOLINE |
| Geneseo Republic | Geneseo | IL | Henry | 5,979 | DAVENPORT-R.ISLAND-MOLINE |
| Kane County Chronicle | Geneva | IL | Kane | 7,100 | CHICAGO |
| The Daily Register | Harrisburg | IL | Saline | 6,253 | PADUCAH-C.GIRD-HARBG-MT VN |
| Jacksonville Journal Courier | Jacksonville | IL | Morgan | 14,836 | CHAMPAIGN&SPRNGFLD-DECATUR |
| The Daily Journal | Kankakee | IL | Kankakee | 23,300 | CHICAGO |
| Star-Courier | Kewanee | IL | Henry | 6,048 | DAVENPORT-R.ISLAND-MOLINE |
| The Courier | Lincoln | IL | Logan | 7,073 | CHAMPAIGN&SPRNGFLD-DECATUR |
| Rock Valley Publishing | Loves Park | IL | Boone | 1,600 | ROCKFORD |
| Elmhurst Independent | Machesney Park | IL | DuPage | 6,400 | ROCKFORD |
| Macomb Journal | Macomb | IL | McDonough | 4,220 | QUINCY-HANNIBAL-KEOKUK |
| Marion Daily Republican | Marion | IL | Williamson | 3,075 | PADUCAH-C.GIRD-HARBG-MT VN |
| Daily Review Atlas | Monmouth | IL | Warren | 1,537 | DAVENPORT-R.ISLAND-MOLINE |
| Morris Daily Herald | Morris | IL | Grundy | 7,720 | CHICAGO |
| Register-News | Mount Vernon | IL | Jefferson | 8,908 | PADUCAH-C.GIRD-HARBG-MT VN |
| Murphysboro American | Murphysboro | IL | Jackson | 1,859 | PADUCAH-C.GIRD-HARBG-MT VN |
| Newton Press-Mentor | Newton | IL | Jasper | 2,261 | TERRE HAUTE |
| Olney Daily Mail | Olney | IL | Richland | 3,675 | TERRE HAUTE |
| Oquawka Current | Oquawka | IL | Henderson | 1,025 | DAVENPORT-R.ISLAND-MOLINE |
| (Pekin) Daily Times | Pekin | IL | Tazewell | 7,500 | PEORIA-BLOOMINGTON |
| Chillicothe Times-Bulletin | Peoria | IL | Peoria | 3,215 | PEORIA-BLOOMINGTON |
| East Peoria Times-Courier | Peoria | IL | Tazewell | 5,000 | PEORIA-BLOOMINGTON |
| Morton Times-News | Peoria | IL | Tazewell | 5,000 | PEORIA-BLOOMINGTON |
| Washington Times-Reporter | Peoria | IL | Tazewell | 7,666 | PEORIA-BLOOMINGTON |
| Woodford Times | Peoria | IL | Woodford | 3,365 | PEORIA-BLOOMINGTON |
| Journal Star | Peoria | IL | Peoria | 55,000 | PEORIA-BLOOMINGTON |
| Daily Leader | Pontiac | IL | Livingston | 4,511 | PEORIA-BLOOMINGTON |
| Rockford Register Star | Rockford | IL | Winnegago | 39,500 | ROCKFORD |
| The Gallatin Democrat | Shawneetown | IL | Gallatin | 2,261 | PADUCAH-C.GIRD-HARBG-MT VN |
| Shelbyville Daily Union | Shelbyville | IL | Shelby | 2,300 | CHAMPAIGN&SPRNGFLD-DECATUR |
| State Journal Register | Springfield | IL | Sangamom | 39,490 | CHAMPAIGN&SPRNGFLD-DECATUR |

## Relish Carrier Newspaper List

| | | | | | |
|---|---|---|---|---|---|
| Sauk Valley Newspaper | Sterling | IL | Whiteside | 21,947 | DAVENPORT-R.ISLAND-MOLINE |
| The Daily American | West Frankfort | IL | Franklin | 3,075 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Herald Tribune | Batesville | IN | Ripley | 3,150 | CINCINNATI |
| The News-Banner | Bluffton | IN | Wells | 5,252 | FT. WAYNE |
| Brazil Times | Brazil | IN | Clay | 4,157 | TERRE HAUTE |
| Connersville News Examiner | Conenrsville | IN | Fayette | 5,600 | INDIANAPOLIS |
| Banner - Graphic | Greencastle | IN | Putnam | 5,543 | INDIANAPOLIS |
| Greensburg Daily News | Greensburg | IN | Decatur | 5,200 | INDIANAPOLIS |
| Kokomo Tribune | Kokomo | IN | Howard | 20,000 | INDIANAPOLIS |
| The Daily World | Linton | IN | Greene | 5,444 | TERRE HAUTE |
| Logansport Pharos-Tribune | Logansport | IN | Cass | 9,000 | INDIANAPOLIS |
| The Courier Times | New Castle | IN | Henry | 6,300 | INDIANAPOLIS |
| The Paoli News | Paoli | IN | Orange | 2,800 | LOUISVILLE |
| The Rochester Sentinel | Rochester | IN | Fulton | 3,900 | SOUTH BEND-ELKHART |
| The Rushville Republican | Rushville | IN | Rush | 3,050 | INDIANAPOLIS |
| The Tribune | Seymour | IN | Jackson | 8,448 | LOUISVILLE |
| The Shelbyville News | Shelbyville | IN | Shelby | 6,200 | INDIANAPOLIS |
| Vincennes Sun-Commercial | Vincennes | IN | Knox | 7,000 | TERRE HAUTE |
| Zionsville Times Sentinel | Zionsville | IN | Boone | 4,120 | INDIANAPOLIS |
| Atchison Daily Globe | Atchison | KS | Atchison | 3,800 | KANSAS CITY |
| Rawlins County Square Deal | Atwood | KS | Rawlins | 1,000 | WICHITA-HUTCHINSON PLUS |
| Augusta Daily Gazette | Augusta | KS | Butler | 2,525 | WICHITA-HUTCHINSON PLUS |
| Dodge City Daily Globe | Dodge City | KS | Ford | 6,929 | WICHITA-HUTCHINSON PLUS |
| The El Dorado Times | El Dorado | KS | Butler | 3,517 | WICHITA-HUTCHINSON PLUS |
| Anderson County Advocate | Garnett | KS | Anderson | 1,200 | KANSAS CITY |
| The Goodland Daily News | Goodland | KS | Sherman | 1,950 | WICHITA-HUTCHINSON PLUS |
| The Hays Daily News | Hays | KS | Ellis | 10,400 | WICHITA-HUTCHINSON PLUS |
| Hiawatha World | Hiawatha | KS | Brown | 2,500 | TOPEKA |
| The Daily Union | Junction City | KS | Geary | 4,400 | TOPEKA |
| The Kiowa County Signal | Kiowa | KS | Kiowa | 800 | WICHITA-HUTCHINSON PLUS |
| Journal-World | Lawrence | KS | Douglas | 21,210 | KANSAS CITY |
| Louisburg Herald | Louisburg | KS | Miami | 1,700 | KANSAS CITY |
| McPherson Sentinel | McPherson | KS | McPherson | 4,040 | WICHITA-HUTCHINSON PLUS |
| The Newton Kansan | Newton | KS | Harvey | 7,918 | WICHITA-HUTCHINSON PLUS |
| The Norton Telegram | Norton | KS | Norton | 1,900 | WICHITA-HUTCHINSON PLUS |
| Bird City Times | Oberlin | KS | Cheyenne | 551 | WICHITA-HUTCHINSON PLUS |
| Colby Free Press | Oberlin | KS | Thomas | 1,950 | WICHITA-HUTCHINSON PLUS |
| The Oberlin Herald | Oberlin | KS | Decatur | 1,850 | WICHITA-HUTCHINSON PLUS |
| The St. Francis Herald | Oberlin | KS | Cheyenne | 1,250 | WICHITA-HUTCHINSON PLUS |
| Osawatomie Graphic | Osawatomie | KS | Miami | 1,975 | KANSAS CITY |
| Johnson County Sun | Overland Park | KS | Johnson | 27,000 | KANSAS CITY |
| Wednesday Sun | Overland Park | KS | Johnson | 20,000 | KANSAS CITY |
| The Miami County Republic | Paola | KS | Miami | 3,550 | KANSAS CITY |
| Pittsburg Morning Sun | Pittsburgh | KS | Crawford | 8,512 | JOPLIN-PITTSBURG |
| Linn County News | Pleasanton | KS | Linn | 2,300 | KANSAS CITY |
| The Pratt Tribune | Pratt | KS | Pratt | 1,700 | WICHITA-HUTCHINSON PLUS |
| The St. John News | St. John | KS | Stafford | 800 | WICHITA-HUTCHINSON PLUS |
| Topeka Capital Journal | Topeka | KS | Shawnee | 37,000 | TOPEKA |
| Wellington Daily News | Wellington | KS | Sumner | 2,626 | WICHITA-HUTCHINSON PLUS |
| The Daily Independent | Ashland | KY | Boyd | 16,208 | CHARLESTON-HUNTINGTON |
| Kentucky Standard | Bardstown | KY | Nelson | 9,700 | LOUISVILLE |
| The Tribune Courier | Benton | KY | Marshall | 4,500 | PADUCAH-C.GIRD-HARBG-MT VN |
| Daily News | Bowling Green | KY | Warren | 30,000 | BOWLING GREEN |
| McLean County News | Calhoun | KY | McLean | 1,800 | EVANSVILLE |
| The Advocate Messenger | Danville | KY | Boyle | 9,000 | LEXINGTON |
| The News-Enterprise | Elizabethtown | KY | Hardin | 17,124 | LOUISVILLE |
| The State Journal | Frankfort | KY | Franklin | 10,000 | LEXINGTON |
| Franklin Favorite | Franklin | KY | Simpson | 2,000 | NASHVILLE |
| Glasgow Daily Times | Glasgow | KY | Barren | 8,198 | BOWLING GREEN |
| Greenup County News-Times | Greenup | KY | Greenup | 3,547 | CHARLESTON-HUNTINGTON |
| Kentucky New Era | Hopkinsville | KY | Christian | 9,000 | NASHVILLE |
| Fort Campbell Courier | Hopkinsville | KY | Christian | 18,000 | NASHVILLE |
| The Record | Leitchfield | KY | Grayson | 5,939 | LOUISVILLE |
| The Sentinel-Echo | London | KY | Laurel | 7,918 | LEXINGTON |
| The Messenger | Madisonville | KY | Hopkins | 7,000 | EVANSVILLE |

Case 1:12-cv-08315-WCC Document 171 Filed 04/25/13 Page 170 of 552 PageID #: 401

# Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| The Ledger Independent | Maysville | KY | Mason | 6,500 | CINCINNATI |
| The Jessamine Journal | Nicholasville | KY | Jessamine | 7,437 | LEXINGTON |
| The Eagle Post | Oak Grove | KY | Christian | 4,500 | NASHVILLE |
| Messenger - Inquirer | Owensboro | KY | McLean | 25,000 | EVANSVILLE |
| The Times - Leader | Princeton | KY | Caldwell | 4,500 | PADUCAH-C.GIRD-HARBG-MT VN |
| Sentinel-News | Shelbyville | KY | Shelby | 8,512 | LOUISVILLE |
| The Pioneer News | Shepherdsville | KY | Bullitt | 7,000 | LOUISVILLE |
| The Commonwealth-Journal | Somerset | KY | Pulaski | 9,403 | LEXINGTON |
| The McCreary County Record | Whitley City | KY | McCreary | 3,682 | KNOXVILLE |
| The Winchester Sun | Winchester | KY | Clark | 5,858 | LEXINGTON |
| Bastrop Daily Enterprise | Bastrop | LA | Morehouse | 4,613 | MONROE-EL DORADO |
| Denham Springs-Livingston Parish News | Denham Springs | LA | Livingston | 12,400 | BATON ROUGE |
| Beauregard Daily News | DeRidder | LA | Beauregard | 3,500 | LAKE CHARLES |
| Ascension Citizen | Gonzales | LA | Ascension | 7,236 | BATON ROUGE |
| The Daily Star | Hammond | LA | Tangipahoa | 10,059 | NEW ORLEANS |
| American Press | Lake Charles | LA | Calcasieu | 35,000 | LAKE CHARLES |
| Leesville News Leader | Leesville | LA | Vernon | 3,500 | ALEXANDRIA LA |
| Southwest Daily News | Sulphur | LA | Calcasieu | 4,000 | LAKE CHARLES |
| The Sun Chronicle | Attleboro | MA | Bristol | 20,290 | PROVIDENCE-NEW BEDFORD |
| The Salem News | Beverly | MA | Essex | 22,500 | BOSTON (MANCHESTER) |
| Patriot Ledger | Dorchester | MA | Norfolk | 45,000 | BOSTON (MANCHESTER) |
| The Enterpirse | Dorchester | MA | Plymouth | 28,000 | BOSTON (MANCHESTER) |
| Fall River Herald News | Fall River | MA | Bristol | 21,643 | PROVIDENCE-NEW BEDFORD |
| Sentinel & Enterprise | Fitchburg | MA | Worcester | 16,900 | BOSTON (MANCHESTER) |
| Milford Daily News | Framingham | MA | Worcester | 8,940 | BOSTON (MANCHESTER) |
| Metro West Daily News | Framingham | MA | Middlesex | 26,216 | BOSTON (MANCHESTER) |
| Gloucester Daily Times | Gloucester | MA | Essex | 8,200 | BOSTON (MANCHESTER) |
| The Recorder | Greenfield | MA | Franklin | 14,352 | SPRINGFIELD-HOLYOKE |
| The Sun | Lowell | MA | Middlesex | 40,569 | BOSTON (MANCHESTER) |
| Inquirer and Mirror | Nantucket | MA | Nantucket | 10,500 | BOSTON (MANCHESTER) |
| Daily News Tribune | Needham Heights | MA | Middlesex | 4,920 | BOSTON (MANCHESTER) |
| The Standard Times | New Bedford | MA | Bristol | 24,500 | PROVIDENCE-NEW BEDFORD |
| The Daily News of Newburyport | Newburyport | MA | Essex | 10,300 | BOSTON (MANCHESTER) |
| North Adams Transcript | North Adams | MA | Berkshire | 6,767 | ALBANY-SCHENECTADY-TROY |
| Eagle Tribune | North Andover | MA | Essex | 38,250 | BOSTON (MANCHESTER) |
| Berkshire Eagle | Pittsfield | MA | Bershire | 30,300 | ALBANY-SCHENECTADY-TROY |
| Taunton Daily Gazette | Taunton | MA | Bristol | 9,927 | PROVIDENCE-NEW BEDFORD |
| The Enfield Press | Westfield | MA | Hampden | 2,850 | SPRINGFIELD-HOLYOKE |
| The Longmeadow News | Westfield | MA | Hampden | 1,550 | SPRINGFIELD-HOLYOKE |
| The Westfield News | Westfield | MA | Hampden | 4,400 | SPRINGFIELD-HOLYOKE |
| Telegram & Gazette | Worcester | MA | Worcester | 70,000 | BOSTON (MANCHESTER) |
| The Capital | Annapolis | MD | Anne Arundel | 47,312 | BALTIMORE |
| Cumberland Times - News | Cumberland | MD | Cumberland | 27,775 | WASHINGTON DC (HAGRSTWN) |
| The Star Democrat | Easton | MD | Talbot | 19,301 | BALTIMORE |
| Cecil Whig | Elkton | MD | Cecil | 15,000 | BALTIMORE |
| The Frederick News-Post | Frederick | MD | Frederick | 37,000 | WASHINGTON DC (HAGRSTWN) |
| Carroll County Times | Westminster | MD | Carroll | 26,131 | BALTIMORE |
| Kennebec Journal & Morning Sentinel | Augusta | ME | Kennebec | 25,000 | PORTLAND-AUBURN |
| Bangor Daily News | Bangor | ME | Penobscot | 56,000 | BANGOR |
| Aaroostook Republican | Caribou | ME | Aaroostook | 4,200 | PRESQUE ISLE |
| Piscataquis Observer | Dover-Foxcroft | ME | Piscataquis | 3,500 | BANGOR |
| Houlton Pioneer Times | Houlton | ME | Aaroostook | 5,450 | PRESQUE ISLE |
| Sun Journal | Lewiston | ME | Androscoggin | 36,865 | PORTLAND-AUBURN |
| Portland Press Herald | Portland | ME | Cumberland | 54,000 | PORTLAND-AUBURN |
| The Star Herald | Presque Isle | ME | Aaroostook | 6,300 | PRESQUE ISLE |
| Cheboygan Daily Tribune | Cheboygan | MI | Cheboygan | 4,408 | TRAVERSE CITY-CADILLAC |
| The Daily Reporter | Coldwater | MI | Branch | 5,996 | GRAND RAPIDS-KALMZOO-B.CRK |
| Gaylord Herald Times | Gaylord | MI | Otsego | 5,700 | TRAVERSE CITY-CADILLAC |
| Grand Haven Tribune | Grand Haven | MI | Ottawa | 8,800 | GRAND RAPIDS-KALMZOO-B.CRK |
| Oceana's Herald Journal | Hart | MI | Oceana | 6,200 | GRAND RAPIDS-KALMZOO-B.CRK |
| The Hillsdale Daily News | Hillsdale | MI | Hillsdale | 6,500 | LANSING |
| The Holland Sentinel | Holland | MI | Ottawa | 14,500 | GRAND RAPIDS-KALMZOO-B.CRK |
| Sentinel-Standard | Ionia | MI | Ionia | 3,178 | GRAND RAPIDS-KALMZOO-B.CRK |
| (The Ironwood) Daily Globe | Ironwood | MI | Gogebic | 6,300 | DULUTH-SUPERIOR |
| Ludington Daily News | Ludington | MI | Mason | 8,500 | GRAND RAPIDS-KALMZOO-B.CRK |

Case 1:12-cv-03264-CRB Document 87-1 Filed 05/29/13 Page 63 of 103 PageID #: 402

## Relish Carrier Newspaper List

| | | | | | |
|---|---|---|---|---|---|
| Monroe Evening News | Monroe | MI | Monroe | 19,500 | DETROIT |
| Petoskey News-Review | Petoskey | MI | Emmet | 10,000 | TRAVERSE CITY-CADILLAC |
| The Evening News | Sault Ste. Marie | MI | Chippewa | 7,688 | TRAVERSE CITY-CADILLAC |
| Sturgis Journal | Sturgis | MI | Saint Joseph | 6,868 | GRAND RAPIDS-KALMZOO-B.CRK |
| Traverse City Record Eagle | Traverse City | MI | Grand Traverse | 28,704 | TRAVERSE CITY-CADILLAC |
| White Lake Beacon | Whitehall | MI | Muskegon | 4,000 | GRAND RAPIDS-KALMZOO-B.CRK |
| Austin Daily Herald | Austin | MN | Mower | 5,444 | ROCHESTR-MASON CITY-AUSTIN |
| The Bemidji Pioneer | Bemidji | MN | Beltrami | 7,300 | MINNEAPOLIS-ST. PAUL |
| Brainerd Daily Dispatch | Brainerd | MN | Crowwing | 13,000 | MINNEAPOLIS-ST. PAUL |
| Tri-County News | Cottonwood | MN | Lyon | 1,356 | MINNEAPOLIS-ST. PAUL |
| Crookston Daily Times | Crookston | MN | Polk | 2,060 | FARGO-VALLEY CITY |
| Duluth News Tribune | Duluth | MN | St. Louis | 30,000 | MINNEAPOLIS-ST. PAUL |
| Faribault Daily News | Faribault | MN | Rice | 5,259 | MINNEAPOLIS-ST. PAUL |
| The Daily Journal | Fergus Falls | MN | Otter Tail | 7,000 | FARGO-VALLEY CITY |
| Herald Review | Grand Rapids | MN | Itasca | 6,929 | DULUTH-SUPERIOR |
| Granite Falls Advocate-Tribune | Granite Falls | MN | Yellow Medicine | 2,716 | MINNEAPOLIS-ST. PAUL |
| The Daily Tribune | Hibbing | MN | St. Louis | 4,603 | DULUTH-SUPERIOR |
| Hutchinson Leader | Hutchinson | MN | McLeod | 16,766 | MINNEAPOLIS-ST. PAUL |
| The Daily Journal | International Falls | MN | Koochiching | 3,300 | DULUTH-SUPERIOR |
| The Le Center Leader | Le Center | MN | Le Sueur | 1,024 | MINNEAPOLIS-ST. PAUL |
| Le Sueur News Herald | Le Sueur | MN | Le Sueur | 1,336 | MINNEAPOLIS-ST. PAUL |
| Litchfield Independent Review | Litchfield | MN | Meeker | 11,009 | MINNEAPOLIS-ST. PAUL |
| The Free Press | Mankato | MN | Blue Earth | 22,220 | MANKATO |
| Montevideo American News | Montevideo | MN | Chippewa | 3,691 | MINNEAPOLIS-ST. PAUL |
| Northfield News | Northfield | MN | Rice | 4,300 | MINNEAPOLIS-ST. PAUL |
| Owatonna People's Press | Owatonna | MN | Steele | 6,102 | MINNEAPOLIS-ST. PAUL |
| The Redwood Falls Gazette | Redwood Falls | MN | Redwood | 3,998 | MINNEAPOLIS-ST. PAUL |
| Post-Bulletin | Rochester | MN | Olmsted | 41,645 | ROCHESTR-MASON CITY-AUSTIN |
| Sleepy Eye Herald - Dispatch | Sleepy Eye | MN | Brown | 2,000 | MANKATO |
| St. James Plaindealer | St. James | MN | Watonwan | 2,361 | MANKATO |
| St. Peter Herald | St. Peter | MN | Nicollet | 1,980 | MINNEAPOLIS-ST. PAUL |
| Thief River Falls Times | Thief River Falls | MN | Pennington | 4,545 | FARGO-VALLEY CITY |
| The Mesabi Daily News | Virginia | MN | St. Louis | 9,403 | DULUTH-SUPERIOR |
| Waseca County News | Waseca | MN | Waseca | 2,848 | MINNEAPOLIS-ST. PAUL |
| West Central Tribune | Willmar | MN | Kandiyohi | 15,000 | MINNEAPOLIS-ST. PAUL |
| Winona Daily News | Winona | MN | Winona | 9,000 | LA CROSSE-EAU CLAIRE |
| Daily Globe | Worthington | MN | Nobles | 9,700 | SIOUX FALLS(MITCHELL) |
| Aurora Advertiser | Aurora | MO | Lawrence | 3,075 | SPRINGFIELD MO |
| Bolivar Herald -Free Press | Bolivar | MO | Polk | 5,500 | SPRINGFIELD MO |
| Boonville Daily News | Boonville | MO | Cooper | 2,222 | COLUMBIA-JEFFERSON CITY |
| Buffalo Reflex | Buffalo | MO | Dallas | 5,950 | SPRINGFIELD MO |
| Lake Sun Leader | Camdenton | MO | Camden | 5,025 | SPRINGFIELD MO |
| Southeast Missourian | Cape Girardeau | MO | Cape Girrandeau | 13,775 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Carthage Press | Carthage | MO | Jasper | 2,400 | JOPLIN-PITTSBURG |
| The Daily Statesman | Dexter | MO | Stoddard | 2,900 | PADUCAH-C.GIRD-HARBG-MT VN |
| Liberty Tribune | Gladstone | MO | Clay | 10,500 | KANSAS CITY |
| Hannibal Courier-Post | Hannibal | MO | Marion | 8,413 | QUINCY-HANNIBAL-KEOKUK |
| The Advertiser-Courier | Hermann | MO | Gasconade | 3,700 | ST. LOUIS |
| New Haven Leader | Hermann | MO | Franklin | 1,500 | ST. LOUIS |
| The Examiner | Independence | MO | Jackson | 9,200 | KANSAS CITY |
| Cash-Book Journal | Jackson | MO | Cape Girrandeau | 4,405 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Kearney Courier | Kearney | MO | Clay | 3,000 | KANSAS CITY |
| The Daily Dunklin Democrat | Kennett | MO | Dunklin | 3,200 | PADUCAH-C.GIRD-HARBG-MT VN |
| Kirksville Daily Express | Kirksville | MO | Adair | 6,432 | OTTUMWA-KIRKSVILLE |
| The Lebanon Daily Record | Lebanon | MO | Laclede | 4,949 | SPRINGFIELD MO |
| The Louisiana Press Journal | Louisiana | MO | Pike | 3,131 | ST. LOUIS |
| The Banner Press | Marble Hill | MO | Bollinger | 3,200 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Marshall Democrat News | Marshall | MO | Saline | 2,600 | KANSAS CITY |
| Maryville Daily Forum | Maryville | MO | Nodaway | 2,626 | ST. JOSEPH |
| Mexico Ledger | Mexico | MO | Audrain | 5,500 | COLUMBIA-JEFFERSON CITY |
| Evening Democrat | Moberly | MO | Randolph | 3,429 | COLUMBIA-JEFFERSON CITY |
| Moberly Monitor - Index | Moberly | MO | Randolph | 3,500 | COLUMBIA-JEFFERSON CITY |
| Neosho Daily News | Neosho | MO | Newton | 4,511 | JOPLIN-PITTSBURG |
| Sunday Herald-Tribune | Nevada | MO | Vernon | 4,000 | JOPLIN-PITTSBURG |
| Missourian-News | Portageville | MO | New Madrid | 1,200 | PADUCAH-C.GIRD-HARBG-MT VN |

Case 1:12-Case:112-W-3264CBBcDocumentE87e81 0F1/e0042571age P3ge6452103geID #: 403

# Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| Rolla Daily News | Rolla | MO | Phelps | 7,045 | SPRINGFIELD MO |
| The Sedalia Democrat | Sedalia | MO | Pettis | 18,410 | KANSAS CITY |
| The Smithville Lake Herald | Smithville | MO | Clay | 2,350 | KANSAS CITY |
| St. Joseph News-Press | St. Joseph | MO | Buchanan | 30,000 | ST. JOSEPH |
| South Missourian-News | Thayer | MO | Oregon | 1,600 | SPRINGFIELD MO |
| The Daily Star-Journal | Warrensburg | MO | Johnson | 5,304 | KANSAS CITY |
| Warren County Record | Warrenton | MO | Warren | 3,775 | ST. LOUIS |
| Washington Missourian | Washington | MO | Franklin | 16,525 | ST. LOUIS |
| West Plains Daily Quill | West Plains | MO | Howell | 7,600 | SPRINGFIELD MO |
| The Monroe County Journal | Aberdeen | MS | Monroe | 6,000 | COLUMBUS-TUPELO-WEST POINT |
| The Daily Leader | Brookhaven | MS | Lincoln | 6,200 | JACKSON MS |
| Bolivar Commerical | Cleveland | MS | Boliver | 6,000 | GREENWOOD-GREENVILLE |
| The Daily Corinthian | Corinth | MS | Alcorn | 7,272 | MEMPHIS |
| The Itawamba County Times | Fulton | MS | Itawamba | 3,300 | COLUMBUS-TUPELO-WEST POINT |
| The Daily Star | Grenada | MS | Grenada | 5,670 | GREENWOOD-GREENVILLE |
| The Sun Herald | Gulfport | MS | Harrison | 41,500 | BILOXI-GULFPORT |
| The Lamar Times | Hattiesburg | MS | Lamar | 8,000 | HATTIESBURG-LAUREL |
| The South Reporter | Holly Springs | MS | Marshall | 5,200 | MEMPHIS |
| Chickasaw Journal/Times Post | Houston | MS | Chickasaw | 1,300 | COLUMBUS-TUPELO-WEST POINT |
| The Star-Herald | Kosciusko | MS | Attala | 4,949 | JACKSON MS |
| The Chronicle | Laurel | MS | Jones | 7,000 | HATTIESBURG-LAUREL |
| The Meridian Star | Meridan | MS | Lauderdale | 11,300 | MERIDIAN |
| New Albany Gazette | New Albany | MS | New Albany | 4,200 | COLUMBUS-TUPELO-WEST POINT |
| The Oxford Eagle | Oxford | MS | LaFayette | 6,060 | MEMPHIS |
| Picayune Item | Picayune | MS | Pearl River | 4,949 | NEW ORLEANS |
| The Pontotoc Progress | Pontotoc | MS | Pontotoc | 5,200 | COLUMBUS-TUPELO-WEST POINT |
| The Democrat | Senatobia | MS | Tate | 4,500 | MEMPHIS |
| Starkville Daily News | Starkville | MS | Oktibbeha | 6,060 | COLUMBUS-TUPELO-WEST POINT |
| Northeast Mississippi Daily Journal | Tupelo | MS | Lee | 39,000 | COLUMBUS-TUPELO-WEST POINT |
| The Tylertown Times | Tylertown | MS | Walthall | 2,250 | JACKSON MS |
| Vicksburg Post | Vicksburg | MS | Warren | 14,645 | JACKSON MS |
| Daily Times Leader | West Point | MS | Clay | 3,990 | COLUMBUS-TUPELO-WEST POINT |
| Belgrade News | Belgrade | MT | Gallatin | 4,500 | BUTTE-BOZEMAN |
| Lone Peak Lookout | Big Sky | MT | Gallatin | 3,000 | BUTTE-BOZEMAN |
| Billings Gazette | Billings | MT | Yellowstone | 39,000 | BILLINGS |
| Cut Bank Pioneer | Cut Bank | MT | Glacier | 1,500 | GREAT FALLS |
| Great Falls Tribune | Great Falls | MT | Cascade | 27,000 | GREAT FALLS |
| Ravalli Republic | Hamilton | MT | Ravalli | 5,858 | MISSOULA |
| The Indpendent Record Editorial | Helena | MT | Lewis & Clark | 13,500 | HELENA |
| The Western News | Libby | MT | Lincoln | 3,232 | SPOKANE |
| Shelby Promoter | Shelby | MT | Toole | 1,550 | GREAT FALLS |
| The Valierian | Valier | MT | Pondera | 250 | GREAT FALLS |
| West Yellowstone News | West Yellowstone | MT | Gallatin | 1,500 | BUTTE-BOZEMAN |
| Roanoke-Chowan News Herald | Ahoskie | NC | Hertford | 10,302 | NORFOLK-PORTSMTH-NEWPT NWS |
| The Stanly News & Press | Albemarle | NC | Stanly | 7,800 | CHARLOTTE |
| The Randolph Guide | Asheboro | NC | Randolph | 2,500 | GREENSBORO-H.POINT-W.SALEM |
| Watauga Democrat | Boone | NC | Watauga | 3,150 | CHARLOTTE |
| Avery Journal Times | Boone | NC | Avery | 4,020 | CHARLOTTE |
| Times-News | Burlington | NC | Alamance | 25,464 | GREENSBORO-H.POINT-W.SALEM |
| The Clayton News-Star | Clayton | NC | Johnston | 15,500 | RALEIGH-DURHAM (FAYETVLLE) |
| The Clemmons Courier | Clemmons | NC | Forsyth | 3,500 | GREENSBORO-H.POINT-W.SALEM |
| The Daily Record | Dunn | NC | Harnett | 9,000 | RALEIGH-DURHAM (FAYETVLLE) |
| The Herald Sun | Durham | NC | Durham | 30,000 | RALEIGH-DURHAM (FAYETVLLE) |
| The Daily Courier | Forest City | NC | Rutherford | 8,000 | GREENVLL-SPART-ASHEVLL-AND |
| The Gaston Gazette | Gastonia | NC | Gaston | 23,500 | CHARLOTTE |
| The Daily Dispatch | Henderson | NC | Vance | 8,000 | RALEIGH-DURHAM (FAYETVLLE) |
| Hickory Daily Record | Hickory | NC | Catawba | 20,400 | CHARLOTTE |
| The High Point Enterprise | High Point | NC | Guilford | 21,800 | GREENSBORO-H.POINT-W.SALEM |
| Denver Weekly | Huntersville | NC | Mecklenburg | 8,000 | CHARLOTTE |
| The Herald Weekly | Huntersville | NC | Mecklenburg | 25,000 | CHARLOTTE |
| Mountain Island Monitor | Huntersville | NC | Mecklenburg | 10,000 | CHARLOTTE |
| The Daily News | Jacksonville | NC | Onslow | 19,984 | GREENVILLE-N.BERN-WASHNGTN |
| Independent Tribune | Kannapolis | NC | Cabarrus | 12,000 | CHARLOTTE |
| Kinston Free Press | Kinston | NC | Lenior | 10,843 | GREENVILLE-N.BERN-WASHNGTN |
| News-Topic | Lenoir | NC | Caldwell | 8,800 | CHARLOTTE |

# Relish Carrier Newspaper List

| | | | | | |
|---|---|---|---|---|---|
| The McDowell New | Marion | NC | McDowell | 5,600 | GREENVLL-SPART-ASHEVLL-AND |
| Davie County Enterprise-Record | Mocksville | NC | Davie | 7,000 | GREENSBORO-H.POINT-W.SALEM |
| The Enquirer-Journal | Monroe | NC | Union | 6,300 | CHARLOTTE |
| The News Herald | Morganton | NC | Burke | 9,200 | CHARLOTTE |
| The Sun Journal | New Bern | NC | Craven | 14,613 | GREENVILLE-N.BERN-WASHNGTN |
| The News & Observer | Raleigh | NC | Wake | 130,500 | RALEIGH-DURHAM (FAYETVLLE) |
| The Salisbury Post | Salisbury | NC | Rowan | 18,500 | CHARLOTTE |
| The Sanford Herald | Sanford | NC | Lee | 9,000 | RALEIGH-DURHAM (FAYETVLLE) |
| Shelby Star | Shelby | NC | Cleveland | 10,800 | CHARLOTTE |
| The Pilot | Southern Pines | NC | Moore | 15,000 | RALEIGH-DURHAM (FAYETVLLE) |
| Statesville Record & Landmark | Statesville | NC | Iredell | 10,500 | CHARLOTTE |
| The Daily Southerner | Tarboro | NC | Edgecombe | 4,850 | RALEIGH-DURHAM (FAYETVLLE) |
| The Bismarck Tribune | Bismarck | ND | Burleigh | 29,290 | MINOT-BISMARCK-DICKINSON |
| Devils Lake Journal | Devils Lake | ND | Ramsey | 3,400 | FARGO-VALLEY CITY |
| The Dickinson Press | Dickinson | ND | Stark | 6,565 | MINOT-BISMARCK-DICKINSON |
| The Forum | Fargo | ND | Cass | 52,459 | FARGO-VALLEY CITY |
| Grand Forks Herald | Grand Forks | ND | Grand Forks | 32,663 | FARGO-VALLEY CITY |
| The Jamestown Sun | Jamestown | ND | Stutsman | 6,928 | FARGO-VALLEY CITY |
| BHG Inc. Newspapers | Minot | ND | Various | 5,555 | MINOT-BISMARCK-DICKINSON |
| Northern Sentry | Minot | ND | Mercer | 5,555 | MINOT-BISMARCK-DICKINSON |
| Ashland Gazette | Ashland | NE | Saunders | 2,000 | OMAHA |
| Beatrice Daily Sun | Breatrice | NE | Gage | 5,200 | LINCOLN & HASTINGS-KRNY |
| Columbus Telegram | Columbus | NE | Platte | 8,900 | OMAHA |
| Fremont Tribune | Fremont | NE | Dodge | 7,200 | OMAHA |
| Grand Island Independent | Grand Island | NE | Hall | 20,200 | LINCOLN & HASTINGS-KRNY |
| Journal  - Register | Hebron | NE | Thayer | 1,700 | LINCOLN & HASTINGS-KRNY |
| Kearney Hub | Kearney | NE | Buffalo | 13,130 | LINCOLN & HASTINGS-KRNY |
| McCook Daily Gazette | McCook | NE | Red Willow | 5,050 | LINCOLN & HASTINGS-KRNY |
| The Minden Courier | Minden | NE | Kearny | 2,239 | LINCOLN & HASTINGS-KRNY |
| Nebraska City News-Press | Nebraska City | NE | Otoe | 2,208 | OMAHA |
| Norfolk Daily News | Norfolk | NE | Madison | 15,500 | SIOUX CITY |
| North Platte Telegraph | North Platte | NE | Lincoln | 12,867 | NORTH PLATTE |
| The Omaha World-Herald | Omaha | NE | Douglas | 166,260 | OMAHA |
| Star Herald | Scottsbluff | NE | Scotts Bluff | 15,150 | CHEYENNE-SCOTTSBLUF |
| Syracuse Journal-Democrat | Syracuse | NE | Otoe | 2,200 | OMAHA |
| Wahoo Newspaper | Wahoo | NE | Saunders | 2,000 | OMAHA |
| Waverly News | Waverly | NE | Saunders | 2,200 | LINCOLN & HASTINGS-KRNY |
| News-Time | York | NE | York | 4,545 | LINCOLN & HASTINGS-KRNY |
| Eagle Times | Claremont | NH | Sullivan | 7,900 | BURLINGTON-PLATTSBURGH |
| Concord Monitor | Concord | NH | Merrimack | 17,000 | BOSTON (MANCHESTER) |
| The Telegraph | Hudson | NH | Hillsborough | 20,000 | BOSTON (MANCHESTER) |
| Keene Sentinel | Keene | NH | Cheshire | 12,112 | BOSTON (MANCHESTER) |
| Laconia Citizen | Laconia | NH | Belknap | 7,500 | BOSTON (MANCHESTER) |
| New Jersey Herald | Newton | NJ | Sussex | 12,150 | NEW YORK |
| The Record | Woodland Park | NJ | Bergen | 166,040 | NEW YORK |
| Alamogordo Daily News | Alamogordo | NM | Otero | 6,500 | ALBUQUERQUE-SANTA FE |
| The Albuquerque Journal | Albuquerque | NM | Bernalillo | 104,000 | ALBUQUERQUE-SANTA FE |
| Carlsbad Current-Argus | Carlsbad | NM | Eddy | 6,600 | ALBUQUERQUE-SANTA FE |
| Deming Headlight | Deming | NM | Luna | 3,000 | ALBUQUERQUE-SANTA FE |
| The Daily Times | Farmington | NM | San Jaun | 19,000 | ALBUQUERQUE-SANTA FE |
| The Gallup Independent | Gallup | NM | McKinley | 22,000 | ALBUQUERQUE-SANTA FE |
| Hobbs News Sun | Hobbs | NM | Lea | 10,393 | ALBUQUERQUE-SANTA FE |
| Los Alamos Monitor | Las Alamos | NM | Los Alamos | 5,444 | ALBUQUERQUE-SANTA FE |
| Las Cruces Sun-News | Las Cruces | NM | Dona Ana | 21,500 | EL PASO |
| Las Vegas Optic | Las Vegas | NM | San Miguel | 4,949 | ALBUQUERQUE-SANTA FE |
| Roswell Daily Record | Roswell | NM | Chaves | 10,940 | ALBUQUERQUE-SANTA FE |
| The Ruidoso News | Ruidoso | NM | Lincoln | 6,300 | ALBUQUERQUE-SANTA FE |
| The Santa Fe New Mexican | Santa Fe | NM | Santa Fe | 21,250 | ALBUQUERQUE-SANTA FE |
| Nevada Appeal | Carson City | NV | Washoe | 10,050 | RENO |
| Lincoln County Record | Ely | NV | Lincoln | 2,000 | SALT LAKE CITY |
| Lahontan Valley News | Fallon | NV | Churchhill | 3,150 | RENO |
| The Record Courier | Gardnerville | NV | Douglas | 5,000 | RENO |
| Mineral County Independent News | Hawthorne | NV | Mineral | 1,500 | RENO |
| North Lake Tahoe Bonanza | Incline Village | NV | Washoe | 3,900 | RENO |
| The Humboldt Sun | Winnemucca | NV | Humboldt | 4,040 | RENO |

## Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| The Daily News | Batavia | NY | Genesee | 13,000 | BUFFALO |
| Messenger Post Newspapers | Canandaigua | NY | Ontario | 11,000 | ROCHESTER NY |
| Catskill Daily Mail | Catskill | NY | Greene | 3,500 | ALBANY-SCHENECTADY-TROY |
| Chatham Courier | Chatham | NY | Columbia | 1,800 | ALBANY-SCHENECTADY-TROY |
| Genesee Country Express | Dansville | NY | Livingston | 2,562 | ROCHESTER NY |
| Finger Lakes Times | Geneva | NY | Ontario | 14,500 | ROCHESTER NY |
| The Post Star | Glens Falls | NY | Warren | 25,500 | ALBANY-SCHENECTADY-TROY |
| The Evening Telegram | Herkimer | NY | Herkimer | 3,300 | UTICA |
| Hudson Register-Star | Hudson | NY | Columbia | 5,000 | ALBANY-SCHENECTADY-TROY |
| The Evening Times | Little Falls | NY | Herkimer | 2,000 | UTICA |
| Times Herald-Record | Middletown | NY | Orange | 59,000 | NEW YORK |
| New York Daily News | New York | NY | New York | 800,000 | NEW YORK |
| The Daily Star | Oneonta | NY | Chenango | 13,500 | UTICA |
| Cooperstown Crier | Oneonta | NY | Otsego | 1,811 | UTICA |
| The Palladium Times | Oswego | NY | Oswego | 6,322 | SYRACUSE |
| The Chronicle-Express | Penn Yan | NY | Yates | 3,838 | ROCHESTER NY |
| Press-Republican | Plattsburgh | NY | Clinton | 20,000 | BURLINGTON-PLATTSBURGH |
| The Daily Gazette | Schenectady | NY | Albany | 50,500 | ALBANY-SCHENECTADY-TROY |
| Mountain Eagle | Stamford | NY | Greene | 2,200 | BINGHAMTON |
| Watertown Daily Times | Watertown | NY | Jefferson | 26,000 | WATERTOWN |
| Windham Journal | Windham | NY | Columbia | 1,520 | ALBANY-SCHENECTADY-TROY |
| Ulster Townsman | Woodstock | NY | Ulster | 2,500 | NEW YORK |
| The Suburbanite | Akron | OH | Stark | 34,138 | CLEVELAND-AKRON (CANTON) |
| The Akron Beacon Journal | Akron | OH | Summit | 112,000 | CLEVELAND-AKRON (CANTON) |
| Review | Alliance | OH | Stark | 12,000 | CLEVELAND-AKRON (CANTON) |
| Ashland Times-Gazette | Ashland | OH | Ashland | 14,000 | CLEVELAND-AKRON (CANTON) |
| Star Beacon | Ashtabula | OH | Ashtabula | 13,750 | CLEVELAND-AKRON (CANTON) |
| The Athens Messenger | Athens | OH | Athens | 8,275 | CHARLESTON-HUNTINGTON |
| Vinton County Courier | Athens | OH | Vinton | 2,200 | CHARLESTON-HUNTINGTON |
| Gazette Publishing Company | Bellevue | OH | Huron | 3,350 | CLEVELAND-AKRON (CANTON) |
| The Bryan Times | Bryan | OH | Williams | 10,313 | TOLEDO |
| The Repository | Canton | OH | Stark | 66,000 | CLEVELAND-AKRON (CANTON) |
| The Herald | Circleville | OH | Pickaway | 6,600 | COLUMBUS OH |
| Cresent-News | Defiance | OH | Defiance | 16,200 | TOLEDO |
| The Delaware Gazette | Delaware | OH | Delaware | 8,119 | COLUMBUS OH |
| The Chronicle Telegram | Elyria | OH | Lorain | 25,755 | CLEVELAND-AKRON (CANTON) |
| Georgetown News Democrat | Georgetown | OH | Brown | 3,460 | CINCINNATI |
| Hillsboro Times Gazette | Hillsboro | OH | Highland | 3,637 | CINCINNATI |
| The Jackson County Times-Journal | Jackson | OH | Jackson | 5,500 | CHARLESTON-HUNTINGTON |
| Record Courier | Kent | OH | Portage | 18,000 | CLEVELAND-AKRON (CANTON) |
| Sugarcreek-Bellbrook Times | Kettering | OH | Greene | 1,100 | DAYTON |
| Times Community Newspapers - North | Kettering | OH | Fulton | 14,677 | DAYTON |
| Times Community Newspapers - South | Kettering | OH | Fulton | 11,300 | DAYTON |
| Logan Daily News | Logan | OH | Hocking | 3,900 | COLUMBUS OH |
| Madison Press | London | OH | Madison | 4,545 | COLUMBUS OH |
| Marysville Journal -Tribune | Marysville | OH | Union | 6,000 | COLUMBUS OH |
| Richwood Gazette | Marysville | OH | Union | 2,000 | COLUMBUS OH |
| The Independent | Massillon | OH | Stark | 13,837 | CLEVELAND-AKRON (CANTON) |
| Northwest Signal | Napoleon | OH | Henry | 4,242 | TOLEDO |
| Perry County Tribune | New Lexington | OH | Perry | 4,000 | COLUMBUS OH |
| The Times Reporter | New Philadelphia | OH | Stark | 24,240 | CLEVELAND-AKRON (CANTON) |
| Norwalk Reflector | Norwalk | OH | Huron | 9,000 | CLEVELAND-AKRON (CANTON) |
| The Register-Herald | Piqua | OH | Preble | 13,681 | DAYTON |
| Sandusky Register | Sandusky | OH | Erie | 24,400 | CLEVELAND-AKRON (CANTON) |
| The Sidney Daily News | Sidney | OH | Shelby | 12,924 | DAYTON |
| Troy Daily News | Troy | OH | Miami | 10,710 | DAYTON |
| Putnam County Sentinel | Van Wert | OH | Van Wert | 5,500 | FT. WAYNE |
| Times-Bulletin | Van Wert | OH | Van Wert | 5,000 | FT. WAYNE |
| Record Herald | Washington Court House | OH | Fayette | 5,068 | COLUMBUS OH |
| Fulton County Expositor | Wauseon | OH | Fulton | 4,848 | TOLEDO |
| The News Watchman | Waverly | OH | Pike | 3,629 | COLUMBUS OH |
| People's Defender | West Union | OH | Adams | 6,800 | CINCINNATI |
| Wilmington News Journal | Wilmington | OH | Clinton | 6,400 | CINCINNATI |
| Daily Record | Wooster | OH | Wayne | 22,664 | CLEVELAND-AKRON (CANTON) |
| Beavercreek News Current | Xenia | OH | Greene | 2,785 | DAYTON |

# Relish Carrier Newspaper List

| Fairborn Daily Herald | Xenia | OH | Greene | 1,450 | DAYTON |
|---|---|---|---|---|---|
| The Xenia Daily Gazette | Xenia | OH | Greene | 4,150 | DAYTON |
| The Daily Ardmoreite | Ardmore | OK | Carter | 8,900 | SHERMAN-ADA |
| Express-Star | Chickasha | OK | Grady | 4,949 | OKLAHOMA CITY |
| Daily Progress | Claremore | OK | Rogers | 5,938 | TULSA |
| The Duncan Banner | Duncan | OK | Stephens | 6,500 | WICHITA FALLS & LAWTON |
| The Edmond Sun | Edmond | OK | Oklahoma | 4,200 | OKLAHOMA CITY |
| The American | Fairland | OK | Ottawa | 1,700 | JOPLIN-PITTSBURG |
| The Grove Sun | Grove | OK | Delaware | 2,800 | TULSA |
| McAlester News-Capital | McAlester | OK | Pittsburg | 9,403 | TULSA |
| Miami News-Record | Miami | OK | Ottawa | 3,500 | JOPLIN-PITTSBURG |
| Mustang Times | Mustang | OK | Canadian | 5,500 | OKLAHOMA CITY |
| The Nowata Star | Nowata | OK | Nowata | 2,500 | TULSA |
| The Daily Times | Pryor | OK | Mayes | 3,200 | TULSA |
| Sapulpa Daily Herald | Sapulpa | OK | Creek | 3,500 | TULSA |
| Shawnee News-Star | Shawnee | OK | Pottawatomie | 9,106 | OKLAHOMA CITY |
| News Press | Stillwater | OK | Adair | 7,800 | OKLAHOMA CITY |
| Tahlequah Daily Press | Tahlequah | OK | Cherokee | 3,959 | TULSA |
| Vinita Daily Journal | Vinita | OK | Craig | 3,000 | TULSA |
| Woodward News | Woodward | OK | Woodward | 4,751 | OKLAHOMA CITY |
| Albany-Democrat-Herald | Albany | OR | Linn | 16,100 | PORTLAND OR |
| The World | Coos Bay | OR | Coos | 9,000 | EUGENE |
| Corvallis Gazette Times | Corvallis | OR | Benton | 10,400 | EUGENE |
| Wallowa County Chieftain | Enterprise | OR | Wallowa | 3,030 | SPOKANE |
| The Register-Guard | Eugene | OR | Lane | 54,000 | EUGENE |
| The Hermiston Herald | Hermiston | OR | Umatilla | 3,838 | YAKIMA-PASCO-RCHLND-KNNWCK |
| Blue Mountain Eagle | John Day | OR | Grant | 3,030 | BOISE |
| Herald & News | Klamath Falls | OR | Klamath | 17,321 | MEDFORD-KLAMATH FALLS |
| Mail Tribune | Medford | OR | Jackson | 24,650 | MEDFORD-KLAMATH FALLS |
| East Oregonian | Pendleton | OR | Grant | 9,090 | YAKIMA-PASCO-RCHLND-KNNWCK |
| The News Review | Roseburg | OR | Douglas | 19,190 | EUGENE |
| East Penn Press | Allentown | PA | Lehigh | 8,000 | PHILADELPHIA |
| Northwestern Press | Allentown | PA | Lehigh | 3,000 | PHILADELPHIA |
| Parkland Press | Allentown | PA | Lehigh | 5,000 | PHILADELPHIA |
| Whitehall-Coplay Press | Allentown | PA | Lehigh | 7,000 | PHILADELPHIA |
| Bedford Gazette | Bedford | PA | Bedford | 9,421 | JOHNSTOWN-ALTOONA |
| Press Enterprise | Bloomsburg | PA | Columbia | 23,735 | WILKES BARRE-SCRANTON |
| The Sentinel | Carlisle | PA | Cumberland | 16,766 | HARRISBURG-LNCSTR-LEB-YORK |
| The Progress | Clearfield | PA | Clearfield | 11,200 | JOHNSTOWN-ALTOONA |
| The Express-Times | Easton | PA | Northampton | 51,439 | PHILADELPHIA |
| The Echo-Pilot | Greencastle | PA | Franklin | 2,562 | WASHINGTON DC (HAGRSTWN) |
| Hazleton Standard-Speaker | Hazleton | PA | Luzerne | 19,000 | WILKES BARRE-SCRANTON |
| The Wayne Independent | Honesdale | PA | Wayne | 4,100 | WILKES BARRE-SCRANTON |
| The Daily News | Huntingdon | PA | Huntingdon | 10,000 | JOHNSTOWN-ALTOONA |
| The Tribune-Democrat | Johnstown | PA | Cambria | 37,000 | JOHNSTOWN-ALTOONA |
| The Latrobe Bulletin | Latrobe | PA | West Moreland | 7,500 | PITTSBURGH |
| Salisbury Press | Lehighton | PA | Carbon | 3,000 | WILKES BARRE-SCRANTON |
| Times News | Lehighton | PA | Carbon | 16,420 | WILKES BARRE-SCRANTON |
| The Meadville Tribune | Meadville | PA | Crawford | 13,528 | ERIE |
| Lewisburg Daily Journal | Milton | PA | Northumberland | 1,020 | WILKES BARRE-SCRANTON |
| The Standard Journal | Milton | PA | Northumberland | 2,652 | WILKES BARRE-SCRANTON |
| New Castle News | New Castle | PA | Lawrence | 17,816 | PITTSBURGH |
| Trib Total Media | Pittsburgh | PA | Allegheny | 228,765 | PITTSBURGH |
| Republican-Herald/The News Item | Pottsville | PA | Schuylkill | 32,700 | WILKES BARRE-SCRANTON |
| Morning Times | Sayre | PA | Bradford | 6,222 | WILKES BARRE-SCRANTON |
| The Scranton Times | Scranton | PA | Lackawanna | 47,000 | WILKES BARRE-SCRANTON |
| The Pocono Record | Stroudsburg | PA | Monroe | 20,290 | WILKES BARRE-SCRANTON |
| The Daily Item | Sunbury | PA | Northumberland | 23,000 | WILKES BARRE-SCRANTON |
| The Daily Review | Towanda | PA | Bradford | 9,292 | WILKES BARRE-SCRANTON |
| The Daily Herald | Tyrone | PA | Huntingdon | 2,000 | JOHNSTOWN-ALTOONA |
| Observer-Reporter | Washington | PA | Washington | 36,000 | PITTSBURGH |
| The Record Herald | Waynesboro | PA | Franklin | 9,000 | WASHINGTON DC (HAGRSTWN) |
| The Citizens' Voice | Wilkes-Barre | PA | Luzerne | 29,000 | WILKES BARRE-SCRANTON |
| The Newport Daily News | Newport | RI | Newport | 11,000 | PROVIDENCE-NEW BEDFORD |
| The Westerly Sun | Westerly | RI | Washington | 10,670 | PROVIDENCE-NEW BEDFORD |

## Relish Carrier Newspaper List

| | | | | | |
|---|---|---|---|---|---|
| The People-Sentinel | Barnwell | SC | Barnwell | 6,000 | AUGUSTA |
| Bluffton Today | Bluffton | SC | Beaufort | 12,500 | SAVANNAH |
| Morning News | Florence | SC | Florence | 24,200 | FLORENCE-MYRTLE BEACH |
| Hampton County Guardian | Hampton | SC | Hampton | 1,020 | SAVANNAH |
| The Messenger | Hartsville | SC | Darlington | 3,550 | FLORENCE-MYRTLE BEACH |
| The Weekly Observer | Henmingway | SC | Williamsburg | 2,040 | CHARLESTON SC |
| Lake City News & Post | Lake City | SC | Florence | 1,371 | FLORENCE-MYRTLE BEACH |
| Marion Star & Mullins Enterprise | Lake City | SC | Marion | 2,550 | FLORENCE-MYRTLE BEACH |
| The Sun News | Myrtle Beach | SC | Horry | 45,000 | FLORENCE-MYRTLE BEACH |
| Jasper County Sun Times | Ridgeland | SC | Jasper | 1,337 | SAVANNAH |
| The Daily Journal | Seneca | SC | Oconee | 8,000 | GREENVLL-SPART-ASHEVLL-AND |
| The Daily Messenger | Seneca | SC | Oconee | 1,000 | GREENVLL-SPART-ASHEVLL-AND |
| The Item | Sumter | SC | Sumter | 15,000 | COLUMBIA SC |
| The Daily Republic | Mitchell | SD | Davison | 12,327 | SIOUX FALLS(MITCHELL) |
| Capital Journal | Pierre | SD | Hughes | 4,400 | SIOUX FALLS(MITCHELL) |
| Rapid City Journal | Rapid City | SD | Pennington | 30,684 | RAPID CITY |
| Public Opinion | Watertown | SD | Codington | 12,726 | SIOUX FALLS(MITCHELL) |
| Daily Press and Dakotan | Yankton | SD | Yankton | 8,686 | SIOUX FALLS(MITCHELL) |
| The Daily Post-Athenian | Athens | TN | McMinn | 9,700 | CHATTANOOGA |
| Chattanooga Times Free Press | Chattanooga | TN | Hamilton | 78,788 | CHATTANOOGA |
| Cleveland Daily Banner | Cleveland | TN | Bradley | 16,000 | CHATTANOOGA |
| Herald -Citizen | Cookeville | TN | Putman | 11,878 | NASHVILLE |
| The Leader | Covington | TN | Tipton | 5,543 | MEMPHIS |
| Crossville Chronicle | Crossville | TN | Cumberland | 7,062 | KNOXVILLE |
| The State Gazette | Dyersburg | TN | Dyer | 5,939 | MEMPHIS |
| Elizabethton Star | Elizabethton | TN | Carter | 9,000 | TRI-CITIES TN-VA |
| The Greeneville Sun | Greeneville | TN | Greene | 14,000 | TRI-CITIES TN-VA |
| Johnson City Press | Johnson City | TN | Washington | 31,300 | TRI-CITIES TN-VA |
| Herald & Tribune | Jonesborough | TN | Washington | 4,400 | TRI-CITIES TN-VA |
| Kingsport Times-News | Kingsport | TN | Hawkins | 42,000 | TRI-CITIES TN-VA |
| The Mt. Juliet News | Lebanon | TN | Wilson | 2,500 | NASHVILLE |
| The Hartsville Vidette | Lebanon | TN | Trousdale | 2,500 | NASHVILLE |
| The Lebanon Democrat | Lebanon | TN | Wilson | 8,000 | NASHVILLE |
| The News-Herald | Lenoir City | TN | Loudon | 5,836 | KNOXVILLE |
| The Daily Times | Maryville | TN | Blount | 18,300 | KNOXVILLE |
| Southern Standard | McMinnville | TN | Warren | 8,908 | NASHVILLE |
| Citizen Tribune | Morristown | TN | Hamblen | 19,004 | KNOXVILLE |
| Murfreesboro Post | Murfreesboro | TN | Rutherford | 21,000 | NASHVILLE |
| The Oak Ridger | Oak Ridge | TN | Anderson | 7,622 | KNOXVILLE |
| The News Leader | Parsons | TN | Decatur | 3,535 | JACKSON TN |
| Portland Leader | Portland | TN | Sumner | 2,000 | NASHVILLE |
| The Mountain Press | Sevierville | TN | Sevier | 9,300 | KNOXVILLE |
| Shelbyville Times Gazette | Shelbyville | TN | Bedford | 10,888 | NASHVILLE |
| Smithville Review | Smithville | TN | DeKalb | 3,535 | NASHVILLE |
| Manchester Times | Tullahoma | TN | Coffee | 9,595 | NASHVILLE |
| Manchester Times | Tullahoma | TN | Coffee | 9,595 | NASHVILLE |
| Cannon Courier | Woodbury | TN | Cannon | 3,500 | NASHVILLE |
| Abilene Reporter News | Abilene | TX | Taylor | 29,000 | ABILENE-SWEETWATER |
| Alvin Sun | Alvin | TX | Brazoria | 1,000 | HOUSTON |
| Amarillo Globe-News | Amarillo | TX | Potter | 30,000 | AMARILLO |
| Athens Daily Review | Athens | TX | Henderson | 5,252 | DALLAS-FT. WORTH |
| Lake Travis View | Austin | TX | Travis | 5,050 | AUSTIN |
| Westlake Picayune | Austin | TX | Travis | 4,400 | AUSTIN |
| Bastrop Advertiser | Bastrop | TX | Bastrop | 6,700 | AUSTIN |
| Lewisville Leader | Bastrop | TX | Denton | 10,500 | AUSTIN |
| The Bay City Tribune | Bay City | TX | Matagorda | 4,000 | HOUSTON |
| Baytown Sun | Baytown | TX | Harris | 7,000 | HOUSTON |
| The Bowie News | Bowie | TX | Montaque | 3,500 | WICHITA FALLS & LAWTON |
| Breckenridge American | Breckenridge | TX | Stephens | 1,783 | ABILENE-SWEETWATER |
| The Banner - Press | Brenham | TX | Washington | 6,434 | WACO-TEMPLE-BRYAN |
| The Brownsville Herald | Brownsville | TX | Cameron | 25,061 | HARLINGEN-WSLCO-BRNSVL-MCA |
| Brownwood Bulletin | Brownwood | TX | Brown | 5,500 | ABILENE-SWEETWATER |
| Bryan-College Station Eagle | Bryan | TX | Brazos | 24,745 | WACO-TEMPLE-BRYAN |
| Alvarado Star | Burleson | TX | Johnson | 375 | DALLAS-FT. WORTH |
| Burleson Star | Burleson | TX | Johnson | 3,300 | DALLAS-FT. WORTH |

## Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| Crowley Star | Burelson | TX | Tarrant | 745 | DALLAS-FT. WORTH |
| Everman Star | Burelson | TX | Tarrant | 289 | DALLAS-FT. WORTH |
| Joshua Star | Burelson | TX | Johnson | 687 | DALLAS-FT. WORTH |
| Kenne Star | Burelson | TX | Johnson | 554 | DALLAS-FT. WORTH |
| Canton Herald | Canton | TX | Van Zandt | 4,000 | DALLAS-FT. WORTH |
| Cleburne Times-Review | Cleburne | TX | Johnson | 3,000 | DALLAS-FT. WORTH |
| Corpus Christi Caller Times | Corpus Christi | TX | Nueces | 49,100 | CORPUS CHRISTI |
| Corsicana Daily Sun | Corsicana | TX | Navarro | 7,028 | DALLAS-FT. WORTH |
| El Paso Times | El Paso | TX | El Paso | 75,000 | EL PASO |
| Fort Worth Star-Telegram | Fort Worth | TX | Tarrant | 142,000 | DALLAS-FT. WORTH |
| Fredericksburg Standard-Radio Post | Fredericksburg | TX | Gillespie | 9,600 | AUSTIN |
| Gainesville Daily Register | Gainesville | TX | Cooke | 5,740 | DALLAS-FT. WORTH |
| Galveston County Daily News | Galveston | TX | Galveston | 24,500 | HOUSTON |
| The Gilmer Mirror | Gilmer | TX | Upshur | 4,545 | TYLER-LONGVIEW(LFKN&NCGD) |
| Glen Rose Reporter | Glen Rose | TX | Somervell | 2,000 | DALLAS-FT. WORTH |
| Lake County Sun | Graford | TX | Palo Pinto | 1,150 | DALLAS-FT. WORTH |
| The Graham Leader | Graham | TX | Young | 3,088 | WICHITA FALLS & LAWTON |
| Greenville Herald-Banner | Greenville | TX | Hunt | 8,000 | DALLAS-FT. WORTH |
| Henderson Daily News | Henderson | TX | Rusk | 6,060 | TYLER-LONGVIEW(LFKN&NCGD) |
| The Huntsville Item | Huntsville | TX | Walker | 5,939 | HOUSTON |
| West Kerr Current | Ingram | TX | Kerr | 1,500 | SAN ANTONIO |
| Jack County Herald | Jacksboro | TX | Jack | 1,266 | DALLAS-FT. WORTH |
| Cedar Park Citizen | Jonestown | TX | Williamson | 14,350 | AUSTIN |
| Leander Ledger | Jonestown | TX | Williamson | 9,700 | AUSTIN |
| Coppell Gazette | Jonestown | TX | Denton | 7,600 | AUSTIN |
| Flower Mound Leader | Jonestown | TX | Denton | 6,000 | AUSTIN |
| The Junction Eagle | Junction | TX | Kimble | 1,800 | SAN ANGELO |
| The Katy Times | Katy | TX | Harris | 6,000 | HOUSTON |
| Kaufman Herald | Kaufman | TX | Kaufman | 4,256 | DALLAS-FT. WORTH |
| Kerrville Daily Times | Kerrville | TX | Kerr | 9,000 | SAN ANTONIO |
| Longview News Journal | Longview | TX | Gregg | 29,795 | TYLER-LONGVIEW(LFKN&NCGD) |
| Lubbock Avalanche-Journal | Lubbock | TX | Lubbock | 30,850 | LUBBOCK |
| The Lufkin Daily News | Lufkin | TX | Angelina | 14,039 | TYLER-LONGVIEW(LFKN&NCGD) |
| The Monitor | Mabank | TX | Kaufman | 4,949 | DALLAS-FT. WORTH |
| Marshall News Messenger | Marshall | TX | Harrison | 7,575 | SHREVEPORT |
| The Mexia Daily News | Mexia | TX | Limestone | 2,771 | WACO-TEMPLE-BRYAN |
| Midland Reporter-Telegram | Midland | TX | Midland | 15,000 | ODESSA-MIDLAND |
| Mineral Wells Index | Mineral Wells | TX | Palo Pinto | 3,000 | DALLAS-FT. WORTH |
| The Daily Sentinel | Nochgodoches | TX | Nacogdoches | 8,989 | TYLER-LONGVIEW(LFKN&NCGD) |
| The Olney Enterprise | Olney | TX | Young | 1,000 | WICHITA FALLS & LAWTON |
| The Orange Leader | Orange | TX | Orange | 5,000 | BEAUMONT-PORT ARTHUR |
| Palestine Herald - Press | Palestine | TX | Anderson | 7,070 | DALLAS-FT. WORTH |
| Plainview Daily Herald | Plainview | TX | Hale | 6,632 | LUBBOCK |
| Port Arthur News | Port Arthur | TX | Jefferson | 13,500 | BEAUMONT-PORT ARTHUR |
| The Port Lavaca Wave | Port Lavaca | TX | Calhoun | 3,959 | HOUSTON |
| Rockport Pilot | Rockport | TX | Aransas | 4,949 | CORPUS CHRISTI |
| The Fort Bend Herald | Rosenburg | TX | Fort Bend | 8,413 | HOUSTON |
| Pflugerville Pflag | Round Rock | TX | Travis | 8,200 | AUSTIN |
| Round Rock Leader | Round Rock | TX | Williamson | 8,500 | AUSTIN |
| Carrollton Leader | Round Rock | TX | Denton | 3,100 | AUSTIN |
| Plano Star Courier | Round Rock | TX | Collin | 41,000 | AUSTIN |
| San Angelo Standard Times | San Angelo | TX | Tom Green | 18,300 | SAN ANGELO |
| San Marcos Daily Record | San Marcos | TX | Hays | 3,400 | AUSTIN |
| Seguin Gazette-Enterprise | Seguin | TX | Guadalupe | 6,060 | SAN ANTONIO |
| Herald Democrat | Sherman | TX | Grayson | 22,765 | SHERMAN-ADA |
| Smithville Times | Smithvilel | TX | Bastrop | 4,100 | AUSTIN |
| McKinney Courier Gazette | Smithvilel | TX | Collin | 4,000 | AUSTIN |
| Stephenville Empire-Tribune | Stephenville | TX | Erath | 4,800 | DALLAS-FT. WORTH |
| Temple Daily Telegram | Temple | TX | Bell | 18,500 | WACO-TEMPLE-BRYAN |
| Terrell Tribune | Terrell | TX | Kaufman | 2,969 | DALLAS-FT. WORTH |
| Texarkana Gazette | Texarkana | TX | Bowie | 34,000 | SHREVEPORT |
| Victoria Advocate | Victoria | TX | Victoria | 49,000 | VICTORIA |
| Waco Tribune - Herald | Waco | TX | McLennan | 37,370 | WACO-TEMPLE-BRYAN |
| Waxahachie Daily Light | Waxahachie | TX | Ellis | 5,000 | DALLAS-FT. WORTH |
| The Weatherford Democrat | Weatherford | TX | Parker | 6,000 | DALLAS-FT. WORTH |

Case 1:12-cv-03264-CRB Document 87-1 Filed 04/25/13 Page 178 of 552 PageID #: 409

# Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| Mid Valley Town Crier | Weslaco | TX | Hidalgo | 23,230 | HARLINGEN-WSLCO-BRNSVL-MCA |
| Wichita Falls Times Records News | Wichita Falls | TX | Wichita | 25,000 | WICHITA FALLS & LAWTON |
| Van Banner | Wills Point | TX | Van Zandt | 1,000 | DALLAS-FT. WORTH |
| Davis County Clipper | Bountiful | UT | Davis | 10,000 | SALT LAKE CITY |
| The Herald Journal | Logan | UT | Cache | 17,170 | SALT LAKE CITY |
| Standard-Examiner | Ogden | UT | Weber | 60,000 | SALT LAKE CITY |
| The Daily Herald | Provo | UT | Utah | 27,000 | SALT LAKE CITY |
| The Salt Lake Tribune/Deseret News | Salt Lake City | UT | Salt Lake | 125,000 | SALT LAKE CITY |
| Tooele Transcript Bulletin | Tooele | UT | Tooele | 7,500 | SALT LAKE CITY |
| Bristol Herald Courier | Bristol | VA | Sullivan | 30,000 | TRI-CITIES TN-VA |
| The Floyd Press | Floyd | VA | Floyd | 5,000 | ROANOKE-LYNCHBURG |
| Smyth County News & Messenger | Marion | VA | Smyth | 4,632 | TRI-CITIES TN-VA |
| The Virginian-Pilot | Norfolk | VA | Norfolk | 164,000 | NORFOLK-PORTSMTH-NEWPT NWS |
| Hampton Roads Saving Weekly | Norfolk | VA | Norfolk | 34,000 | NORFOLK-PORTSMTH-NEWPT NWS |
| Progress-Index | Petersburg | VA | Prince George | 15,150 | RICHMOND-PETERSBURG |
| Clinch Valley News | Richlands | VA | Tazewell | 2,400 | BLUEFIELD-BECKLEY-OAK HILL |
| Richlands News-Press | Richlands | VA | Tazewell | 3,798 | BLUEFIELD-BECKLEY-OAK HILL |
| Richmond Times-Dispatch | Richmond | VA | Richmond City | 121,000 | RICHMOND-PETERSBURG |
| Northern Virginia Daily | Strasburg | VA | Shenandoah | 14,000 | WASHINGTON DC (HAGRSTWN) |
| The Bland Messenger | Wytheville | VA | Bland | 2,500 | ROANOKE-LYNCHBURG |
| Wytheville Enterprise | Wytheville | VA | Wythe | 5,415 | ROANOKE-LYNCHBURG |
| Bennington Banner | Bennington | VT | Bennington | 7,575 | ALBANY-SCHENECTADY-TROY |
| Brattleboro Reformer | Brattleboro | VT | Windham | 10,100 | BOSTON (MANCHESTER) |
| St. Albans Messenger | St. Albans | VT | Franklin | 6,060 | BURLINGTON-PLATTSBURGH |
| The Bellingham Herald | Bellingham | WA | Whatcom | 19,000 | SEATTLE-TACOMA |
| The Chronicle | Centralia | WA | Lewis | 12,800 | SEATTLE-TACOMA |
| Daily Record | Ellensburg | WA | Kittitas | 5,741 | YAKIMA-PASCO-RCHLND-KNNWCK |
| The Herald | Everett | WA | Snohomish | 54,439 | SEATTLE-TACOMA |
| Columbia Basin Herald | Moses Lake | WA | Grant | 9,090 | SPOKANE |
| Skagit Valley Herald | Mount Vernon | WA | Skagit | 15,000 | SEATTLE-TACOMA |
| Peninsula Daily News | Port Angeles | WA | Clallam | 18,000 | SEATTLE-TACOMA |
| Seattle Times | Seattle | WA | King | 218,000 | SEATTLE-TACOMA |
| The Columbian | Vancouver | WA | Clark | 32,000 | PORTLAND OR |
| Walla Walla Union Bulletin | Walla Walla | WA | Walla Walla | 12,500 | YAKIMA-PASCO-RCHLND-KNNWCK |
| The Wenatchee World | Wenatchee | WA | Chelan | 20,500 | SEATTLE-TACOMA |
| Yakima Herald-Republic | Yakima | WA | Yakima | 34,200 | YAKIMA-PASCO-RCHLND-KNNWCK |
| Waupaca Buyers Guide | Antigo | WI | Langlade | 11,276 | WAUSAU-RHINELANDER |
| The Daily Press | Ashland | WI | Ashland | 6,000 | DULUTH-SUPERIOR |
| Baraboo News Republic | Baraboo | WI | Sauk | 4,242 | MADISON |
| Daily Citizen | Beaver Dam | WI | Dodge | 10,492 | MILWAUKEE |
| Rural Post | Bowler | WI | Shawano | 9,000 | GREEN BAY-APPLETON |
| Burlington Standard Press | Burlington | WI | Racine | 3,000 | MILWAUKEE |
| Cambridge News | Cambridge | WI | Dane | 2,647 | MADISON |
| Ozaukee County News Graphic | Cedarburg | WI | Ozaukee | 8,080 | MILWAUKEE |
| Clintonville Tribune Gazette | Clintonville | WI | Waupaca | 2,500 | GREEN BAY-APPLETON |
| Clintonville Buyers Guide | Clintonville | WI | Waupaca | 14,000 | MISSOULA |
| Herald-Independent | Cottage Grove | WI | Dane | 1,981 | MADISON |
| DeForest Times | DeForest | WI | Dane | 2,550 | MADISON |
| The Delavan Enterprise | Delavan | WI | Walworth | 2,000 | MILWAUKEE |
| The East Troy News | East Troy | WI | Walworth | 500 | MILWAUKEE |
| The Leader-Telegram | Eau Claire | WI | Eau Claire | 24,707 | MADISON |
| The Elkhorn Independent | Elkhorn | WI | Walworth | 1,000 | MILWAUKEE |
| Mukwonago Chief | Hartland | WI | Waukesha | 5,126 | MILWAUKEE |
| Reporter Focus | Hartland | WI | Waukesha | 9,282 | MILWAUKEE |
| Sawyer County Record | Hayward | WI | Sawyer | 6,000 | DULUTH-SUPERIOR |
| Manawa Advocate | Iola | WI | Waupaca | 500 | GREEN BAY-APPLETON |
| The Iola Herald | Iola | WI | Waupaca | 1,000 | GREEN BAY-APPLETON |
| The Janesville Gazette | Janesville | WI | Rock | 22,220 | WAUSAU-RHINELANDER |
| Kenosha News | Kenosha | WI | Kenosha | 26,310 | MILWAUKEE |
| La Crosse Tribune | La Crosse | WI | La Crosse | 27,000 | MILWAUKEE |
| Lake Geneva Times | Lake Geneva | WI | Walworth | 2,000 | MILWAUKEE |
| Lake Mills Leader | Lake Mills | WI | Jefferson | 2,907 | MILWAUKEE |
| Lodi Enteprise | Lodi | WI | Columbia | 2,540 | MADISON |
| Eagle Herald | Marinette | WI | Marinette | 9,000 | GREEN BAY-APPLETON |
| Marshfield Buyers Guide | Marshfield | WI | Clark | 21,513 | WAUSAU-RHINELANDER |

Case 1:12-cv-03264-CRB Document 87-81 Filed 04/25/13 Page 179 of 552 PageID #: 410

## Relish Carrier Newspaper List

| | | | | | |
|---|---|---|---|---|---|
| McFarland Thistle | McFarland | WI | Dane | 1,785 | MADISON |
| Foto News | Merrill | WI | Lincoln | 16,400 | WAUSAU-RHINELANDER |
| Milton Courier | Milton | WI | Rock | 3,519 | MADISON |
| The Monroe Times | Monroe | WI | Green | 5,050 | MADISON |
| New London Buyers Guide | New London | WI | Waupaca | 15,151 | GREEN BAY-APPLETON |
| Berlin/Ripon Ad Pack | Oshkosh | WI | Winneago | 12,700 | GREEN BAY-APPLETON |
| Oshkosh Buyers Guide | Oshkosh | WI | Winneago | 25,000 | GREEN BAY-APPLETON |
| The Park Falls Herald | Park Falls | WI | Price | 2,969 | MADISON |
| Daily Register | Portage | WI | Portage | 5,555 | MADISON |
| Poynette Press | Poynette | WI | Dane | 1,530 | MADISON |
| The Journal Times | Racine | WI | Racine | 26,000 | MILWAUKEE |
| Star Journal | Rhinelander | WI | Oneida | 16,000 | WAUSAU-RHINELANDER |
| Spooner Advocate | Spooner | WI | Washburn | 3,953 | MINNEAPOLIS-ST. PAUL |
| Stevens Point Buyers Guide | Stevens Point | WI | Portage | 21,097 | WAUSAU-RHINELANDER |
| The Star | Sun Prairie | WI | Dane | 5,396 | MADISON |
| The Daily Telegram | Superior | WI | Douglas | 5,000 | MILWAUKEE |
| Westosha Report | Twin Lakes | Wi | Walworth | 500 | MILWAUKEE |
| Westine Report | Union Grove | WI | Racine | 500 | MILWAUKEE |
| The Times Walworth | Walworth | WI | Walworth | 500 | MILWAUKEE |
| Waterford Post | Waterford | WI | Racine | 1,000 | MILWAUKEE |
| The Courier | Waterloo | WI | Jefferson | 2,309 | MILWAUKEE |
| Times Publishing Company | Watertown | WI | Jefferson | 8,050 | MILWAUKEE |
| Waukesha Freeman | Waukesha | WI | Waulkesha | 11,200 | MILWAUKEE |
| Waunakee Tribune | Waunakee | WI | Dane | 3,749 | MADISON |
| Waupaca County Post | Waupaca | WI | Waupaca | 7,300 | GREEN BAY-APPLETON |
| Marathon Buyers Guide | Wausau | WI | Marathon | 33,800 | WAUSAU-RHINELANDER |
| The Waushara Argus | Wautoma | WI | Waushara | 5,500 | GREEN BAY-APPLETON |
| West Bend Daily News | West Bend | WI | Washington | 9,343 | MILWAUKEE |
| The Chronicle | Weyauwega | WI | Waupaca | 2,500 | GREEN BAY-APPLETON |
| Whitewater Register | Whitewater | WI | Walworth | 1,000 | MILWAUKEE |
| Wisconsin Rapids Buyers Guide | Wisconsin Rapids | WI | Wood | 22,040 | GREEN BAY-APPLETON |
| The Register Herald | Beckley | WV | Raliegh | 22,904 | BLUEFIELD-BECKLEY-OAK HILL |
| Mineral Daily News Tribune | Keyser | WV | Mineral | 4,242 | WASHINGTON DC (HAGRSTWN) |
| Casper Star-Tribune | Casper | WY | Natrona | 24,500 | CASPER-RIVERTON |
| | | | | **15,061,439** | |

Case 1:12-cv-03864-CBB Document 87-3 Filed 04/25/13 Page 180 of 552 PageID #: 411

# EXHIBIT C

To:
From:      Barbara's Bakery Settlement Administrator
Subject:   Barbara's Bakery Settlement

### If You Bought a Barbara's Bakery Product
### You Could Get Up to $100 from a Settlement

*Includes: Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies*

Records show that you may have previously purchased a Barbara's Bakery product and that you may be eligible for a payment of up to $100 from a class action Settlement. The lawsuit claims that Barbara's Bakery violated state laws regarding the marketing and sale of certain products. Barbara's Bakery denies it did anything wrong. Please go to www.BarbarasBakerySettlement.com for a list of included products and / or to file a claim.

**What Does the Settlement Provide?**
A Settlement Fund of $4 million will pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) attorneys' fees and costs, and (4) a special service payment to the Class Representative. Barbara's Bakery has also agreed to change some of its business practices, including modifying its product labels and advertising. Any money remaining in the Settlement Fund after all claims are paid will be donated to charities and non-profit organizations. Additional details are in the Settlement Agreement available on the website.

**How Can I Get a Payment?** Submit a Claim Form online at www.BarbarasBakerySettlement.com or by mail by **Month 00, 2013**. The payment amount you receive will be based in part on the amount of products you purchased and the total number of claims made.

**What Are My Rights?** Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue Barbara's Bakery yourself, you must exclude yourself from the Settlement by **Month 00, 2013**. If you stay in the Settlement, you may object to it by **Month 00, 2013**.

The Court will hold a hearing on **Month 00, 2013** to consider whether to approve the Settlement and a request for attorneys' fees and costs up to $1 million and a special service payment of $2,500 from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

The detailed notice, available at www.BarbarasBakerySettlement.com or by calling 1-800-000-0000, further explains how to exclude yourself or object.

**For More Information: 1-800-000-0000       www.BarbarasBakerySettlement.com**

# If You Bought a Barbara's Bakery Product, You Could Get Up to $100 from a Settlement

*Includes: Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies*

Records show that you may have previously purchased a Barbara's Bakery product and that you may be eligible for a payment of up to $100 from a class action Settlement. The lawsuit claims that Barbara's Bakery violated state laws regarding the marketing and sale of certain products. Barbara's Bakery denies it did anything wrong. Please go to www.BarbarasBakerySettlement.com for a list of included products and / or to file a claim.

**What Does the Settlement Provide?** A Settlement Fund of $4 million will pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) attorneys' fees and costs, and (4) a special service payment to the Class Representative. Barbara's Bakery also has agreed to change some of its business practices, including modifying its product labels and advertising. Any money remaining in the Settlement Fund after all claims are paid will be donated to charities and non-profit organizations. Additional details are in the Settlement Agreement available on the website.

**How Can I Get a Payment?** Submit a Claim Form online at www.BarbarasBakerySettlement.com or by mail by **Month 00, 2013**. The payment amount you receive will be based in part on the amount of products you purchased and the total number of claims made.

**What Are My Rights?** Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue Barbara's Bakery yourself, you must exclude yourself from the Settlement by **Month 00, 2013**. If you stay in the Settlement, you may object to it by **Month 00, 2013**.

The Court will hold a hearing on **Month 00, 2013** to consider whether to approve the Settlement, a request for attorneys' fees and costs up to $1 million, and a special service payment of $2,500 from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

The detailed notice, available at www.BarbarasBakerySettlement.com or by calling 1-800-000-0000, further explains how to exclude yourself or object.

**For More Information: 1-800-000-0000     www.BarbarasBakerySettlement.com**

CLAIMS ADMINISTRATOR
PO BOX 0000
MINNEAPOLIS, MN 00000-0000

PRESOR ED
RS -CLASS MA L
U S POS AGE
PA D
Rust Consulting, nc

**Important Notice About Barbara's Bakery Product Settlement**

NAME
ADDRESS
CITY STATE ZIP CODE

# EXHIBIT D

Case 1:12-ca65311-WF-B2664-CRBcuDoeum6ent87e8l O41e60405251/age 1Bg5e7552103geID #: 416

<u>UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA</u>

# If You Bought a Barbara's Bakery Product Any Time From May 23, 2008 to Month 00, 0000

### *You Could Get Up to $100 From a Class Action Settlement*

---

**Included Products:** Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies

---

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

- There is a Settlement in a class action lawsuit that claims Barbara's Bakery violated state laws regarding the marketing and sale of its products (*see* Question 2). Barbara's Bakery denies it did anything wrong.

- Anyone who bought an eligible Barbara's Bakery product, referred to as the "Eligible Products" and listed below under Question 7, from May 23, 2008 to Month 00, 0000 is included in the Settlement. You may be entitled to a refund of up to $100.

- The Settlement will provide $4,000,000 to pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) a special service payment to the Class Representative, and (4) attorneys' fees and costs. Barbara's Bakery has also agreed to change some of its business practices.

- Your legal rights are affected whether you act or not.

- **Read this notice carefully because it explains decisions you must make and actions you must take <u>now</u>.**

| SUMMARY OF YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **DO NOTHING** | Get no payment. Give up your rights. |
| **SUBMIT A CLAIM FORM** | Submit a Claim Form by **Month 00, 0000** to get a payment (*see* Question 14). |
| **EXCLUDE YOURSELF** | Exclude yourself by **Month 00, 0000** and get no payment from the Settlement. This is the only choice that allows you to ever be part of any other lawsuit against Barbara's Bakery about the claims in this case (*see* Question 17). |
| **OBJECT** | Write to the Court by **Month 00, 0000** about why you don't like the Settlement (*see* Question 22). |
| **GO TO A HEARING** | Ask to speak in Court by **Month 00, 0000** about the fairness of the Settlement (*see* Question 26). |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the Settlement. If it does, and any appeals are resolved, payments will be distributed to those who qualify. Please be patient.

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION**.................................................................................................**3**
    1.    Why was this notice issued?
    2.    What is this lawsuit about?
    3.    Why is this a class action?
    4.    Why is there a Settlement?

**WHO IS PART OF THE SETTLEMENT?**.......................................................................**3**
    5.    Who is included in the Settlement?
    6.    Are there exceptions to being included?
    7.    Which products are included?
    8.    What if I'm still not sure if I'm included?

**THE SETTLEMENT BENEFITS – WHAT YOU CAN GET**.............................................**6**
    9.    What does the Settlement provide?
    10.   What can I get from the Settlement?
    11.   What happens if there are any funds remaining?
    12.   What am I giving up if I stay in the Class?
    13.   When will I get my payment, if any?

**HOW TO RECEIVE A PAYMENT**................................................................................**7**
    14.   How can I get a payment?
    15.   What is the claim process?
    16.   What if I do nothing?

**EXCLUDING YOURSELF FROM THE SETTLEMENT**....................................................**8**
    17.   How can I get out of the Settlement?
    18.   If I exclude myself, can I still get a payment?
    19.   If I don't exclude myself, can I sue Barbara's Bakery for the same thing later?

**THE LAWYERS REPRESENTING THE CLASS**..............................................................**9**
    20.   Do I have a lawyer in this case?
    21.   How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT**............................................................................**9**
    22.   How can I tell the Court if I do not like the Settlement?
    23.   What is the difference between objecting and asking to be excluded?

**THE COURT'S FAIRNESS HEARING**.........................................................................**10**
    24.   When and where will the Court decide whether to approve the Settlement?
    25.   Do I have to come to the hearing?
    26.   May I speak at the fairness hearing?

**GETTING MORE INFORMATION**...............................................................................**11**
    27.   How can I get more information?

# BASIC INFORMATION

| 1. Why was this notice issued? |
| --- |

The Court authorized this notice because you have a right to know about a proposed Settlement, and about your rights and options, before the Court decides whether to approve the Settlement. You will be informed of the progress of this Settlement and may receive a payment if you are a Class Member and submit a completed and timely Claim Form. This notice explains the lawsuit, the Settlement, and your legal rights. Judge Charles R. Breyer of the United States District Court for the Northern District of California is overseeing this case. The lawsuit is known as *Trammell v. Barbara's Bakery, Inc.,* Case Number 3:12-cv-02664-CRB. The person who sued is called the "Plaintiff." Barbara's Bakery is the "Defendant."

| 2. What is this lawsuit about? |
| --- |

The lawsuit claims that Barbara's Bakery violated certain state laws and consumer protection statutes regarding the marketing and sale of certain products. For example, Plaintiff claims that Barbara's Bakery misrepresented the nature of certain products to consumers by labeling them as "All Natural." Plaintiff claims that these products contain ingredients that are not "All Natural." Barbara's Bakery denies any and all claims of wrongdoing and does not admit any fault, wrongdoing or liability.

Information about the Settlement is summarized in this notice. More detail is provided in the Settlement Agreement, available at www.BarbarasBakerySettlement.com.

| 3. Why is this a class action? |
| --- |

In a class action, one or more people called "Class Representatives" (in this case, Plaintiff, Richard Trammell), sue on behalf of themselves and other people who have similar claims. Together, all of these people are "Class Members." One Court resolves the issues for all Class Members in a Class Action, except for those who exclude themselves from the Class (*see* Question 17).

| 4. Why is there a Settlement? |
| --- |

The Court has not decided in favor of the Plaintiff or Barbara's Bakery. Instead, both sides have agreed to the Settlement. By agreeing to the Settlement, they avoid the costs and uncertainty of a trial, and Class Members receive the benefits described in this notice. The proposed Settlement does not mean that any law was broken or that Barbara's Bakery did anything wrong. The parties believe that the Settlement is fair, reasonable, and adequate and will provide substantial benefit to the Class.

# WHO IS PART OF THE SETTLEMENT?

| 5. Who is included in the Settlement? |
| --- |

The Class includes all persons or entities that bought the Eligible Products (listed below under Question 7) from Barbara's Bakery U.S. Retailers, Barbara's Bakery, www.barbarasbakery.com, or other third-party retailers from May 23, 2008 through **Month 00, 0000**.

## 6. Are there exceptions to being included?

The Settlement does not include:
- Barbara Bakery's board members or executive-level officers, including its attorneys;
- Persons or entities who purchased the Eligible Products primarily for purposes of resale;
- Any claims for personal injury relating to the use of the Eligible Products;
- Distributors or re-sellers of the Eligible Products;
- The judge and magistrate judge and their immediate families presiding over the class action and the Court staff;
- Governmental entities;
- Any person who excludes him or herself from the Class (*see* Question 17); and
- Anyone who purchased the Eligible Products via the Internet or other remote means while not residing in the United States.

## 7. Which products are included?

The following Barbara's Bakery products are the Eligible Products:

<div style="border:1px solid black; padding:8px;">

**CEREALS:**
- **BROWN RICE CRISPS** (Fruit Juice Sweetened flavor);
- **CORN FLAKES** (Fruit Juice Sweetened flavor);
- **HIGH FIBER** (Cranberry, Flax & Granola, and Original flavors);
- **HOLE 'N OATS** (Fruit Juice Sweetened or Honey Nut flavors);
- **HONEST O'S** (Honey Nut, Multigrain, or Original flavors);
- **ORGANIC APPLE CINNAMON O'S**;
- **ORGANIC BREAKFAST O'S**;
- **ORGANIC BROWN RICE**;
- **ORGANIC BROWN RICE CRISPS**;
- **ORGANIC CORN FLAKES**;
- **ORGANIC CRISPY WHEATS**;
- **ORGANIC HONEY CRUNCH 'N OATS**;
- **ORGANIC HONEY NUT O'S**;
- **ORGANIC SNACKIMALS CEREAL** (Cinnamon Crunch or Vanilla Blast flavors);
- **ORGANIC WILD PUFFS** (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);
- **PUFFINS** (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);
- **PUFFIN PUFFS** (Crunchy Cocoa or Fruit Medley flavors);
- **SHREDDED OATS** (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, or Vanilla Almond flavors);
- **SHREDDED WHEAT**;
- **SHREDDED SPOONFULS** (Multigrain or Vanilla Blast flavors);
- **SHREDDED MINIS** (Blueberry Burst flavor);
- **TOASTED OATMEAL FLAKES** (Original flavor); and
- **ULTIMA ORGANIC** (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors).

</div>

| **CEREAL BARS:** | **CHEESE PUFFS:** |
|---|---|
| • **MULTIGRAIN CEREAL BARS** (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors); <br> • **FRUIT & YOGURT BARS** (Apple Cinnamon, Blueberry Apple, Cherry Apple, Strawberry Apple, or Traditional flavors); and <br> • **PUFFINS CEREAL AND MILK BARS** (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors). | • **BAKED CHEESE PUFFS** (Original or White Cheddar flavors); and <br> • **CHEESE PUFFS** (Jalapeno or Original flavors). |
| **FIG BARS:** | **GRANOLA BARS:** |
| • **FIG BARS** (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free or Whole Wheat flavors). | • **CRUNCHY ORGANIC GRANOLA BARS** (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors). |
| **SNACKIMALS ANIMAL COOKIES:** | **ORGANIC MINI COOKIES:** |
| • **SNACKIMALS ANIMAL COOKIES** (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors). | • **ORGANIC MINI COOKIES** (Chocolate, Ginger, or Oatmeal flavors). |
| **SNACK MIXES:** | **CRACKERS:** |
| • **BRUSCHETTA SNACK MIX;** <br> • **HONEY CINNAMON SNACK MIX;** <br> • **HONEY MUSTARD SNACK MIX;** and <br> • **SALSA SNACK MIX.** | • **CRISP COOKIES** (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread flavors); <br> • **GO GO GRAHAMS** (Chocolate, Cinnamon, Honey, or Lemon Ginger flavors); <br> • **PIZZA AND CHEESE BITES;** <br> • **RITE LITE ROUNDS** (Original, Poppy Seed, or Tamari Sesame flavors); and <br> • **WHEATINES** (Cracked Pepper, Original, or Sesame flavors). |

## 8. What if I'm still not sure if I'm included?

If you are not sure whether you are a Class Member, or have any other questions about the Settlement, visit the website, www.BarbarasBakerySettlement.com, or call the toll free number, 1-800-000-0000. You may also send questions to the Settlement Administrator at Barbara's Bakery Settlement, P.O. Box 0000, City, ST 00000.

## THE SETTLEMENT BENEFITS – WHAT YOU CAN GET

### 9. What does the Settlement provide?

If the Settlement is approved and becomes final, it will provide benefits to Class Members. Barbara's Bakery will pay $4,000,000 to a Settlement Fund to make payments to Class Members who file valid claims (*see* Question 14), as well as to pay for costs associated with the notice and administration of the Settlement, attorneys' fees and costs (*see* Question 21), and a special service payment to the Class Representative (*see* Question 21). The costs of notice and administration are estimated to be $790,000.

In addition, Barbara's Bakery has agreed to change their labeling and advertising of the Eligible Products so as not to make certain claims. For example, Barbara's Bakery will not say that the Eligible Products are "All Natural," have "no artificial additives," have "no artificial flavors," and have "no artificial preservatives." The Settlement Agreement, available at www. BarbarasBakerySettlement.com, has more information.

### 10. What can I get from the Settlement?

You can get up to $100 if you submit a valid Claim Form. The amount of your payment will depend on the total amount of money you spent on the Eligible Products at any time from May 23, 2008 until **Month 00, 0000** as follows:

| IF YOU SPENT: | YOU COULD RECEIVE A MAXIMUM OF: |
|---|---|
| More than $100.00 | $100.00 |
| $75.01 to $100.00 | $75.00 |
| $50.01 to $75.00 | $50.00 |
| $25.01 to $50.00 | $25.00 |
| $10.01 to $25.00 | $10.00 |
| $10.00 or less | $5.00 |

Payment amounts may be adjusted to ensure that all eligible Class Members receive a payment, as follows: If the total value of all approved claims is greater than the amount of money available to pay claims (after costs and fees have been deducted), eligible Class Members' payments will be reduced proportionally.

The actual amount available for each eligible Class Member will not be determined until after **Month 00, 0000** and all Claims Forms have been received, and may not be determined until after the Settlement is final.

### 11. What happens if there are any funds remaining?

If there are any funds remaining after all claims are processed, those funds will be distributed to the following non-profit organizations: Consumers Union (www.consumersunion.org) and Action for Healthy Kids (www.actionforhealthykids.org). No remaining funds will be returned to Barbara's Bakery.

### 12. What am I giving up if I stay in the Class?

Unless you exclude yourself from the Settlement, you can't sue Barbara's Bakery or be part of any other lawsuit against Barbara's Bakery about the issues in this case. Unless you exclude yourself, all of the decisions by the Court will bind you. The Settlement Agreement is available at www.BarbarasBakerySettlement.com and describes the claims that you give up if you remain in the Settlement.

### 13. When will I get my payment, if any?

Class Members who submit valid claims will receive their payments only after the Court grants final approval to the Settlement and after any appeals are resolved (*see* "The Court's Fairness Hearing" below). If there are appeals, resolving them can take time. Please be patient.

## HOW TO RECEIVE A PAYMENT

### 14. How can I get a payment?

To get a payment under the Settlement, you must send in a Claim Form. You may access a Claim Form and other relevant documents at www.BarbarasBakerySettlement.com. A Claim Form also is attached to this Notice. Please read the instructions carefully, and fill out the form completely and accurately. Claim Forms can be submitted two ways: electronically or by mail. Your Claim Form must be submitted electronically no later than **Month 00, 0000** or by mail postmarked no later than **Month 00, 0000** and addressed to:

<div align="center">
Barbara's Bakery Settlement<br>
P.O. Box 0000<br>
City, ST 00000
</div>

### 15. What is the claim process?

The Settlement Administrator will review each Claim Form. Proofs of purchase are not initially required. However, in some cases you may be asked to verify your purchase(s) of any of the Eligible Products, by providing receipt(s) or other documentation. If you do not respond to these requests, it may result in the denial of your claim. You will have 35 days from the date of the Settlement Administrator's request to provide your documentation.

### 16. What if I do nothing?

If you are a Class Member and you do nothing, you will <u>not</u> get any payment from the Settlement and you will be bound by the Court's decisions, including the Settlement's release and waiver of claims you may have against Barbara's Bakery that related to the claims made in the lawsuit. To receive a payment, you must complete and submit a Claim Form (*see* Question 14).

# EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from this Settlement, but you want to keep the right to sue or continue to sue Barbara's Bakery on your own about the legal issues in this case, then you must take steps to get out of the Class. This is called excluding yourself – or it is sometimes referred to as "opting out" of the Class.

### 17. How can I get out of the Settlement?

To exclude yourself from the Class, you must mail a letter or written request to the Settlement Administrator. Your request must include:

1. Your name, address, and telephone number;
2. A statement that you wish to be excluded from the Class in *Trammell v. Barbara's Bakery, Inc.*, Case Number 3:12-cv-02664; and
3. Your signature (you must personally sign the letter).

Please write "exclusion request" on the lower left-hand corner of the front of the envelope.

Your exclusion request must be postmarked no later than **Month 00, 0000**. Send your request to:

<div align="center">

Barbara's Bakery Settlement
P.O. Box 0000
City, ST 00000

</div>

### 18. If I exclude myself, can I still get a payment?

No. You will not get a payment if you exclude yourself from the Settlement. If you request exclusion from the Class, then for each of the excluded Eligible Products:

- You will not be eligible for payment under the proposed Settlement;
- You will not be allowed to object to the terms of the proposed Settlement, and
- You will not be bound by any subsequent rulings entered in this case if the proposed Settlement is finally approved.

### 19. If I don't exclude myself, can I sue Barbara's Bakery for the same thing later?

No. If the Court approves the proposed Settlement and you do not exclude yourself from the Class, you give up (or "release") all claims that have been or could have been made in this lawsuit relating to the Eligible Products.

As part of this Settlement, the Court has preliminary stopped all Class Members and/or their representatives (who do not timely exclude themselves from the Class) from filing, participating in, or continuing litigation against Barbara's Bakery (or against any of its related parties or affiliates), and/or from receiving any benefits from any other lawsuit relating to the claims being resolved in this case.

Upon final approval of the Settlement, Plaintiffs and Barbara's Bakery will ask the Court to enter a permanent ruling forbidding all Class Members and/or their representatives and/or personnel from engaging in the activities described above. All Class Members will be bound by this order.

## THE LAWYERS REPRESENTING THE CLASS

### 20. Do I have a lawyer in this case?

The Court has appointed attorneys at the law firm of Ahdoot & Wolfson, P.C. to represent you and the other Class Members in this lawsuit. The lawyers representing you and the Class Members are called "Class Counsel." You will not be charged for the services of these lawyers.

You may contact Class Counsel as follows:

Robert Ahdoot / Tina Wolfson
Ahdoot & Wolfson, PC
2355 Westwood Boulevard, #337
Los Angeles, CA 90064-2109
classactioncounsel@gmail.com
Telephone: 888-333-8996

You have the right to retain your own lawyer to represent you in this case, but you are not obligated to do so. If you do hire your own lawyer, you will have to pay his or her fees and expenses. You also have the right to represent yourself before the Court without a lawyer.

### 21. How will the lawyers be paid?

Class Counsel have not been paid anything to date for their work on this case. Class Counsel will request attorneys' fees and expenses of up to $1,000,000 to be paid out of the $4,000,000 Settlement Fund. The attorneys' motion(s) for fees, costs, and expenses and Class Representative payment will be filed on or before **Month 00, 0000**. The motion(s) will be posted on the website at www.BarbarasBakerySettlement.com.

Class Counsel will also ask the Court for a special service payment of up to $2,500 for the Class Representative, Richard W. Trammell, for his work on behalf of the Class. Any special service payment will also be paid out of the $4,000,000 Settlement Fund.

## OBJECTING TO THE SETTLEMENT

You have the right to tell the Court that you do not agree with the Settlement or any or all of its terms.

### 22. How can I tell the Court if I do not like the Settlement?

If you choose to remain a Class Member, you have a right to object to any part of the proposed Settlement. The Court will consider your views.

To object, you must send a letter stating that you object to *Richard W. Trammell v. Barbara's Bakery, Inc.,* Case Number 3:12-cv-02664. Your written objection must also include:

1. Your name, address, and telephone number;
2. A written statement of your objection(s), including any legal support and/or any supporting evidence you wish to introduce;
3. A statement of whether you intend to appear and speak at the Fairness Hearing; and
4. Your signature.

**QUESTIONS? VISIT WWW.BARBARASBAKERYSETTLEMENT.COM OR CALL, TOLL-FREE, 1-000-000-0000**

If you choose to object, in order to be considered by the Court, your written objections must be filed with the Court by **Month 00, 0000** and mailed to <u>each</u> of the following three addresses, postmarked by **Month 00, 0000**:

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of the Court<br>United States District Court<br>Northern District of California<br>Phillip Burton Federal Building<br>& United States Courthouse<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 | Robert Ahdoot<br>Tina Wolfson<br>Ahdoot & Wolfson, P.C.<br>2355 Westwood Boulevard, #337<br>Los Angeles, CA 90064-2109 | Clement L. Glynn<br>Glynn & Finley LLP<br>100 Pringle Avenue<br>Suite 500<br>Walnut Creek, CA 94596 |

### 23. What is the difference between objecting and asking to be excluded?

Objecting is simply a way of telling the Court that you don't like something about the Settlement. You can only object if you stay in the Class. You will also be bound by any subsequent rulings in this case and you will not be able to file or participate in any other lawsuit based upon or relating to the claims of this lawsuit. If you object to the Settlement, you still remain a Class Member and you will still be eligible to submit a Claim Form. Excluding yourself is telling the Court that you don't want to be a part of the Class. If you exclude yourself, you have no basis to object to the Settlement and appear at the Fairness Hearing because it no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a final hearing (called a Fairness Hearing) to decide whether to finally approve the Settlement. You may attend and ask to speak, but you don't have to.

### 24. When and where will the Court decide whether to approve the Settlement?

On **Month 00, 0000 at 00:00 x.m.** the Court will hold a Fairness Hearing at the United States District Court for the Northern District of California, before the Honorable Charles R. Breyer, Senior District Judge, in Courtroom 6, Phillip Burton Federal Building & United States Courthouse, 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102.

The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.BarbarasBakerySettlement.com for updates. At this hearing the Court will consider whether the Settlement is fair, reasonable, and adequate. The Court will also decide whether to award attorneys' fees and costs, as well as a special payment to the Class Representative. If there are objections, the Court will consider them at that time. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

### 25. Do I have to come to the hearing?

No. Class Counsel will answer questions the Court may have at the Fairness Hearing. But you are welcome to come at your own expense. Please note that the Court has the right to change the date and/or time of the Fairness Hearing without further notice. If you are planning to attend the hearing, you should confirm the date and time before going to the Court.

**QUESTIONS? VISIT WWW.BARBARASBAKERYSETTLEMENT.COM OR CALL, TOLL-FREE, 1-000-000-0000**

## 26. May I speak at the fairness hearing?

Yes, you may ask the Court for permission to speak at the hearing. To do so, you must file a document called a "Notice of Intention to Appear." If you or your attorney wants to appear and speak at the Fairness Hearing, you (or your attorney) must mail a Notice of Intention to Appear at the Fairness Hearing to the addresses listed above in Question 22. Your Notice of Intention to Appear at the Fairness Hearing must be filed and received by the Court, Barbara's Bakery's Counsel, and Class Counsel no later than **Month 00, 0000**.

# GETTING ADDITIONAL INFORMATION

## 27. How can I get more information?

This notice summarizes the proposed Settlement. More details are in the Settlement Agreement. For a complete, definitive statement of the Settlement terms, refer to the Settlement Agreement at www.BarbarasBakerySettlement.com. You also may write with questions to the Settlement Administrator at Barbara's Bakery Settlement, P.O. Box 0000, City, ST 00000 or call the toll-free number, 1-800-000-0000.

### PLEASE DO NOT CALL THE COURT

Dated: **Month 00, 0000**               Clerk of the Court for the United States
                                        District Court for the Northern District of California

# EXHIBIT E

2:06-4-CRB Documen80nt87e8 04/260425-P13e P

# If You Bought a Barbara's Bakery Product

## *You Could Get Up to $100 From a Settlement*

---

### Includes: Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies

---

There is a class action Settlement involving Barbara's Bakery Products. The lawsuit claims that Barbara's Bakery violated state laws regarding the marketing and sale of certain products. Barbara's Bakery denies it did anything wrong.

### Who is included in the Settlement?

Anyone who bought an eligible Barbara's Bakery product from May 23, 2008 to Month 00, 0000 is included in the Settlement. A full list of products is available at the website located at www.BarbarasBakerySettlement.com or by calling 1-800-000-0000.

### What does the Settlement provide?

A Settlement Fund of $4 million will pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) attorneys' fees and costs and (4) a special service payment to the Class Representative. Barbara's Bakery has also agreed to change some of its business practices including modifying its product lables and advertising. Any money remaining in the Settlement Fund afer all claims are paid will be donated to charities and non-profit organizations. Additional details are in the Settlement Agreement available on the website.

### How can I get a payment?

Submit a Claim Form online or by mail by **Month 00, 2013**. The payment amount you receive will be based in part on the amount of products you purchased and the total number of claims made.

### What are my rights?

Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue Barbara's Bakery yourself, you must exclude yourself from the Settlement by **Month 00, 2013**. If you stay in the Settlement, you may object to it by **Month 00, 2013**.

The Court will hold a hearing on **Month 00, 2013** to consider whether to approve the Settlement, a request for attorneys' fees up to $1 million, and a special service payment of $2,500 from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

---

### For More Information: 1-800-000-0000 www.BarbarasBakerySettlement.com

Case 1:12-cv-03644-CRB Document 87-3 Filed 04/25/13 Page 90 of 103 PageID #: 429

# EXHIBIT 2



# Shannon R. Wheatman, Ph.D.

Senior Vice President
Kinsella Media, LLC
2120 L Street NW, Suite 860
Washington, DC 20037
2010 – Present

Dr. Wheatman specializes in designing, developing, analyzing, and implementing large-scale legal notification plans. She is a court-recognized expert who provides testimony on the best notice practicable. Dr. Wheatman began her class action career in 2000 at the Federal Judicial Center where she was instrumental in the development of model notices to satisfy the plain language amendment to Rule 23. Her plain language expertise was advanced by her education, including her doctoral dissertation on plain language drafting of class action notice and her master's thesis on comprehension of jury instructions. Dr. Wheatman has been involved in over 200 class actions. Her selected case experience includes:

## Antitrust

*Blessing v. Sirius XM Radio Inc.*, No 09-CV-10035 HB (S.D.N.Y.).

*Brookshire Bros. v. Chiquita*, No. 05-CIV-21962 (S.D. Fla.).

*In re: Dynamic Random Memory (DRAM) Antitrust Litig.,* MDL No. 1486 (N.D. Cal.).

*In re Flonase Antitrust Litigation*, No. 08-CV-3301 (E.D. Pa.).

*In re: Metoprolol Succinate End-Payor Antitrust Litig.,* No. 06-cv-71 (D. De.).

*In re: Online DVD Rental Antitrust Litig.*, MDL No. 2029 (N.D. Cal.).

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827 (N.D. Cal.).

*Allen v. Dairy Farmers of America, Inc.*, No. 5:09-CV-00230-CR (D. Vt.).

*Sweetwater Valley Farm, Inc. v. Dean Foods*, No. 2:07-CV-208 (E.D. Tenn.).

## Consumer and Product Liability

*Beringer v. Certegy Check Servs., Inc.*, No. 8:07-cv-1434-T-23TGW (M.D. Fla.) (data breach).

*CSS Inc. v. FiberNet, L.L.C.*, No. 07-C-401 (Cir. Ct. W. Va.) (telecommunications).

*Donovan v. Philip Morris USA, Inc.,* No. 06-12234 NG (D. Mass.) (medical monitoring).

*FIA Card Services, N.A. v. Camastro*, No. 09-C-233 (Cir. Ct. W. Va.) (credit card arbitration).

*Glazer v. Whirlpool Corp.*, No. 1:08-WP-65001 (N.D. Ohio)(defective product).

*Grays Harbor v. Carrier Corp.*, No. 05-CIV-21962 (W.D. Wash.) (defective product).

*In Re: Checking Account Overdraft Litig.*, MDL No. 2036 (S.D. Fla.) (JP Morgan, U.S. Bank, BOA settlements; overdraft fees).

*In Re: Enfamil LIPIL Mktg. & Sales Practs. Litig.*, No. 11-MD-02222 (S.D. Fla.) (false advertising).

*In re: M3Power Razor System Marketing & Sales Practs. Litig.*, MDL 1704 (D. Mass.) (false advertising).

*In re Netflix Privacy Litig.*, No. 5:11-cv-00379 (N.D. Cal.) (privacy).

*In re: Pharmaceutical Industry Average Wholesale Price Litig.*, MDL No. 1456 (D. Mass.) (pharmaceutical).

*In re: SCBA Liquidation, Inc., f/k/a Second Chance Body Armor, Inc.,* No. 04-12515 (Bankr. W.D. Mich.) (defective product).

*In re: Toyota Motor Corp. Unintended Acceleration Mktg, Sales Practs, & Prods Litig.,* No. 8:10ML2151 (C.D. Cal.) (unintended acceleration).

*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Mktg & Sales Practs. Litig.*, No. M:09-CV-2015 (N.D. Cal.) (negative amortization).

*Keilholtz v. Lennox Hearth Prods.*, No. 08-CV-00836 (N.D. Cal.) (defective product).

*Kramer v. B2Mobile, LLC*, No. 10-cv-02722 (N.D. Cal.) (text messaging).

*Lee v. Carter Reed Co., L.L.C.*, No. UNN-L-39690-04 (N.J. Super. Ct.) (false advertising).

*Palace v. DaimlerChrysler*, No. 01-CH-13168 (Cir. Ct. Ill.) (defective product).

*Rowe v. UniCare Life & Health Ins. Co.*, No. 09-cv-02286 (N.D. Ill.) (data breach).

*Spillman v. Domino's Pizza*, No. 10-349 (M.D. La.) (robo-call).

*Wolph v. Acer*, No. 09-cv-01314 (N.D. Cal.) (false advertising).


### Environmental/Property

*Allen v. Monsanto Co.*, No. 041465 and *Carter v. Monsanto Co.*, No. 00-C-300 (Cir. Ct. W. Va.) (dioxin release).

*Angel v. U.S. Tire Recovery*, No. 06-C-855 (Cir. Ct. W.Va.) (tire fire).

*Ed Broome Inc. v. XTO Energy, Inc.,* No. 1:09-CV-147 (N.D. W. Va.) (oil & gas rights).

*Cather v. Seneca-Upshur Petroleum Inc.*, No. 1:09-cv-00139 (N.D. W. Va.) (oil & gas rights).



*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010,* MDL No. 2179 (E.D. La.) (BP oil spill).

*In Re Katrina Canal Breaches Litig.*, No. 05-4182 (E.D. La.) (Hurricanes Katrina and Rita).

*Jones v. Dominion Transmission Inc.*, No. 2.06-cv-00671 (S.D. W. Va.) (oil & gas rights).

*Thomas v. A. Wilbert Sons, LLC*, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish) (vinyl chloride water contamination).

### Government

Countrywide Mortgage Settlement, Department of Justice.

Iovate Settlement, Federal Trade Commission.

*Cobell v. Salazar*, No. 1:96cv01285 (D. D.C.), Depts. of Interior and Treasury.

National Mortgage Settlement, Attorneys General.

Walgreens Settlement, Federal Trade Commission.

### Insurance

*Beasley v. Hartford Ins. Co. of the Midwest*, No. CV-2005-58-1 (Cir. Ct. Ark.) (homeowners insurance).

*Bond v. Am. Family Ins. Co.*, No. CV06-01249 (D. Ariz) (property insurance).

*Burgess v. Farmers Ins. Co.*, No. 2001-292 (Dist. Ct. Okla.) (homeowners insurance).

*Campbell v. First Am. Title Ins. Co.*, No. 2:08-cv-311-GZS (D. Me.) (title insurance).

*DesPortes v. ERJ Ins. Co.,* No. SU2004CV-3564 (Ga. Super. Ct.) (credit premium insurance).

*Fogel v. Farmers Group, Inc.*, No. BC300142 (Super. Ct. Cal.)(management exchange fees).

*Guidry v. Am. Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct.) (cancer insurance).

*Gunderson v. F.A. Richard & Associates, Inc.*, No. 2004-2417-D. (14th Jud. D. Ct. La.) (PPO).

*Johnson v. Progressive Casualty Ins., Co.*, No. CV-2003-513 (Cir. Ct. Ark.) (automobile insurance).

*McFadden v. Progressive Preferred*, No. 09CV002886 (Ct. C.P. Ohio) (UM/UIM).

*Orrill v. Louisiana Citizens Fair Plan*, No. 05-11720 (Civ. Dist. Ct., Orleans Parish) (Hurricane Katrina property insurance).

*Purdy v. MGA Ins. Co.*, No. D412-CV-2012-298 (4th Jud. Ct. N. Mex.) (UM/UIM).

*Press v. Louisiana Citizens Fair Plan Prop. Ins. Co.*, No. 06-5530 (Civ. Dist. Ct., Orleans Parish) (Hurricane Katrina property insurance).

*Shaffer v. Continental Casualty Co.*, No. 06-2235 (C.D. Cal.) (long term care insurance).

*Sherrill v. Progressive Northwestern Ins. Co.*, No. DV-03-220 (18th D. Ct. Mont.) (automotive



premises).

*Soto v. Progressive Mountain Ins. Co.*, No. 2002CV47 (Dist. Ct. Mont.) (personal injury insurance).

*Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark) (bodily injury claims).

### Securities

*In re Municipal Derivatives Antitrust Litig.*, MDL No. 1950 (S.D.N.Y.).

*In re Mutual Funds Investment Litig.,* MDL No. 1586 (Allianz Sub-Track, D. Md.).

### Canada

*Donnelly v. United Technologies Corp.,* No. 06-CV-320045 CP (Ont. S.C.J.) (defective product).

*Wener v. United Technologies Corp.*, 2008 QCCS 6605 (Québec) (defective product).

*Dolmage v. Ontario*, No. CV-09-376927CP00 (Ont. S.C.J.) (personal injury).

*Hall v. Gillette Canada Co.*, No. 47521CP (Ont. S.C.J.) (false advertising).

## Articles and Presentations

Shannon R. Wheatman, Speaker, *Class Action Developments and Settlements*, 18th Annual Consumer Financial Services Institute, New York, New York (Apr. 2013).

Shannon R. Wheatman, *Ensuring Procedural Fairness Through Effective Notice, in* NATIONAL CONFERENCE ON CLASS ACTIONS:  RECENT DEVELOPMENTS IN QUÉBEC, IN CANADA AND IN THE UNITED STATES 83-99 (Yvon Blais ed., 2013).

Shannon R. Wheatman, Speaker, *Recent Trends in Class Actions in the United States*, National Conference on Class Actions:  Recent Developments in Québec, in Canada and in the United States, Montreal, Canada (Mar. 2013).

Joshua P. Davis & Shannon R. Wheatman, Speaker, *Report on Model Jury Instructions in Civil Antitrust Cases, Presentation*, American Antitrust Institute's 6th Annual Private Antitrust Enforcement Conference, Washington, DC (Dec. 2012).

Shannon R. Wheatman & Katherine M. Kinsella, *International Class Action Notice, in* WORLD CLASS ACTION: A GUIDE TO GROUP AND REPRESENTATIVE ACTIONS AROUND THE GLOBE 673-686 (Paul Karlsgodt ed., 2012).



Katherine Kinsella & Shannon Wheatman, *Class Notice and Claims Administration*, *in* PRIVATE ENFORCEMENT OF ANTITRUST LAW IN THE UNITED STATES: A HANDBOOK 338–348 (Albert A. Foer & Randy M. Stutz eds., 2012).

Shannon R. Wheatman, Webinar Speaker, *Class Action Notice Requirements: Challenges for Plaintiffs and Defendants*, Strafford Publications (July 2012).

Shannon R. Wheatman, Webinar Speaker, *How to Craft Plain Language Privacy Notices*, Int'l Assoc. of Privacy Professionals (Oct. 2011).

Shannon R. Wheatman, Speaker, *Improving Take-Up Rates in Class Actions*, The Canadian Institute's 12th Annual National Forum on Class Actions, Ontario, Canada (Sept. 2011).

Shannon R. Wheatman & Terri R. LeClercq, *Majority of Publication Class Action Notices Fail to Satisfy Rule 23 Requirements*, 30 REV. LITIG. 53 (2011).

Katherine Kinsella & Shannon Wheatman, *Class Notice and Claims Administration*, *in* THE INTERNATIONAL PRIVATE ENFORCEMENT OF COMPETITION LAW 264–274 (Albert A. Foer & Jonathan W. Cuneo eds., 2010).

Shannon R. Wheatman, Speaker, *Majority of Publication Class Action Notices Fail to Satisfy Plain Language Requirements*, Clarity International Conference, Lisbon, Portugal (Oct. 2010).

Shannon R. Wheatman, Webinar Speaker, *Class Action Notification With Electronic Media: Emerging Legal Issues*, Stratford Publications (Sept. 2010).

Shannon R. Wheatman & Thomas E. Willging, *Does Attorney Choice of Forum in Class Action Litigation Really Make a Difference?* 17 CLASS ACTIONS & DERIVATIVES SUITS 1 (2007).

Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 TULANE LAW REV. 1771 (2006).

Thomas E. Willging & Shannon R. Wheatman, *Attorney Choice of Forum in Class Action Litigation: What Difference Does it Make?* NOTRE DAME L. REV., 81 (2), 101, 161 (2006).

Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do you really want me to know my rights? The ethics behind due process in class action notice is more than just plain language: A desire to actually inform*. GEO. J. LEGAL ETHICS, 18 (4), 1359-1382 (2005).



Thomas E. Willging & Shannon R. Wheatman, *An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation*. FEDERAL JUDICIAL CENTER (2005).

Elizabeth C. Wiggins & Shannon R. Wheatman, *So what's a concerned psychologist to do? Translating the research on interrogations, confessions, and entrapment into policy*, in INTERROGATIONS, CONFESSIONS AND ENTRAPMENT 265–280 (G. Daniel Lassiter ed., 2004).

Thomas E. Willging & Shannon R. Wheatman, *Attorneys' Experiences and Perceptions of Class Action Litigation in Federal and State Courts. A Report to the Advisory Committee on Civil Rules Regarding a Case Based Survey*. FEDERAL JUDICIAL CENTER (2003).

Shannon R. Wheatman, *Survey of Bankruptcy Judges on Effectiveness of Case-Weights*. FEDERAL JUDICIAL CENTER (2003).

Elizabeth C. Wiggins & Shannon R. Wheatman, *Judicial Evaluation of Bankruptcy Judges*. FEDERAL JUDICIAL CENTER (2003).

Robert Niemic, Thomas Willging, & Shannon Wheatman, *Effects of Amchem/Ortiz on Filing of Federal Class Actions: Report to the Advisory Committee on Civil Rules*. FEDERAL JUDICIAL CENTER (2002).

Shannon Wheatman, Robert Niemic & Thomas Willging, *Report to the Advisory Committee on Civil Rules: Class Action Notices*. FEDERAL JUDICIAL CENTER (2002).

Elizabeth C. Wiggins & Shannon R. Wheatman, *Implementation of Selected Amendments to Federal Rule of Civil Procedure 26 by United States Bankruptcy Courts*. FEDERAL JUDICIAL CENTER (2001).

Shannon R. Wheatman & David R. Shaffer, *On finding for defendants who plead insanity: The crucial impact of dispositional instructions and opportunity to deliberate*. LAW & HUM. BEH., 25(2), 165, 181(2001).

Shannon R. Wheatman, *Distance Learning in the Courts*. FEDERAL JUDICIAL CENTER (2000).

David R. Shaffer & Shannon R. Wheatman, *Does personality influence the effectiveness of judicial instructions?* PSYCHOL. PUB. POL'Y & L., 6, 655, 676 (2000).

## Court Testimony

*Spillman v. Domino's Pizza*, No. 10-349 (M.D. La.)



*PRC Holdings LLC v. East Resources, Inc.*, No. 06-C-81 (Cir. Ct. W. Va.).

*Guidry v. American Public Life Ins. Co*., No. 2008-3465 (14th Jud. Dist. Ct., Calcasieu Parish).

*Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark).

*Beasley v. The Reliable Life Insurance Co*., No. CV-2005-58-1 (Cir. Ct. Ark).

## Depositions

*Thomas v. A. Wilbert Sons, LLC*, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish).

## Judicial Comments

*PRC Holdings, LLC v. East Resources, Inc.,* No. 06-C-81(E) (W.Va. Cir. Ct., Roane County).

"Notice was uniquely effective in this action because East's records of their leases allowed the Claims Administrator to provide individual notice by mail to most Class Members." - Hon. Thomas C. Evans, III (2012).

*Kramer v. B2Mobile, LLC*, No. 10-cv-02722 (N.D. Cal.).
"The Court approved Notice Plan to the Settlement Classes . . . was the best notice practicable under the circumstances, including comprehensive nationwide newspaper and magazine publication, website publication, and extensive online advertising. The Notice Plan has been successfully implemented and satisfies the requirements of Federal Rule of Civil Procedure 23 and Due Process." - Hon. Claudia A. Wilken (2012).

*Cather v. Seneca-Upshur Petroleum, Inc.,* No. 1:09-CV-00139 (N.D. W. Va.).
 "The Court finds that Class Members have been accorded the best notice as is practical under the circumstances, and have had the opportunity to receive and/or access information relating to this Settlement by reading the comprehensive written notice mailed to them . . . or by reading the published Notice in the local newspapers . . . The Court further finds that the Notice provided to the members of the Settlement Class had been effective and has afforded such class members a reasonable opportunity to be heard at the Final Fairness Hearing and to opt-out of the subject settlement should anyone so desire." – Hon. Irene M. Keeley (2012).

*In re: Checking Account Overdraft Fee Litigation*, No. 1:09-md-2036-JLK (S.D. Fla.)  (JP Morgan Settlement)
"The Court finds that the Settlement Class Members were provided with the best practicable notice; the notice was "reasonably calculated, under [the] circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Shutts*, 472 U.S. at 812 (quoting *Mullane*, 339 U.S. at 314-15). This Settlement with Chase was widely publicized, and any



Settlement Class Member who wished to express comments or objections had ample opportunity and means to do so." - Hon. James Lawrence King (2012).

*In re Netflix Privacy Litigation*, No. 5:11-cv-00379 (N.D. Cal.)
"The Notice Plan and the intent of the forms of Notice to the Settlement Class as set forth in the Settlement Agreement and Exhibits B through E to the Wheatman Declaration are approved pursuant to subsections (c)(2)(B) and (ed) of Federal Rule of Civil Procedure 23. - Hon. Edward J. Davila (2012)

*Purdy v. MGA Ins. Co.,* No. D412-CV-2012-298 (N.M. 4th Jud. Dist. Ct.)
"Notice of the Settlement Class was constitutionally adequate, both in terms of it substance and the manner in which it was disseminated. The Notice contained the essential elements necessary to satisfy due process . . . [T]he Notice also contained a clear and concise Claim Form, and a described a clear deadline and procedure for filing of Claims. Notice was directly mailed to all Class Members whose current whereabouts could be identified by reasonable effort. Notice reached a large majority of the Class Members. The Court finds that such notice constitutes the best notice practicable." – Hon. Eugenio Mathis (2012).

*Blessing v. Sirius XM Radio Inc.,* No 09-CV-10035 HB (S.D.N.Y.).
 "The Court finds that the distribution of the Notice and the publication of the Publication Notice . . . constituted the best notice reasonably practicable under the circumstances . . . was reasonably calculated . . . constituted due, adequate, and sufficient notice to all Class members who could be identified with reasonable efforts; and . . . satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, R 23.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, and all other applicable law and rules." - Honorable Harold Baer, Jr. (2011).

*Fogel v. Farmers Group, Inc.*, No. BC300142 (Super. Ct. Cal.).
"The Court further finds and confirms that the Individual Notice (including the Proof of Claim), the Summary Notice, the reminder postcard, and the notice methodology: (a) constituted the best practicable notice . . . ; (b) constituted noticed that was reasonably calculated under the circumstances to apprise potential Class Members . . .; (c) were reasonable and constituted due, adequate, and sufficient notice to all persons or entities entitled to receive notice, and (d) met all applicable requirements of California law . . . ." - Hon. Laura Evans (2011).

*In Re: Enfamil LIPIL Mktg. & Sales Practs. Litig.*, No. 11-MD-02222 (S.D. Fla.)
"The Court finds that the Class Notice provided to Class Members, in the form and manner of distribution described above, constitutes the best notice practicable under the circumstances, and fully



satisfies the requirements of Federal Rules of Civil Procedure, Rule 23, the requirements of due process, and any other applicable law. The declarations filed with the Court demonstrate that the Parties have fully complied with the Court's Preliminary Approval Order (as amended by Order dated April 1, 201 1) and that the best notice practicable under the circumstances was in fact given to Class Members." - Hon. James I. Cohn (2011).

*Keilholtz v. Lennox Hearth Prods.*, No. 08-CV-00836 (N.D. Cal.)
"Notice has been provided to the Settlement Class of the pendency of the Actions, the conditional certification of the Settlement Class for purposes of this Settlement, and the preliminary approval of the Settlement Agreement and the Settlement contemplated thereby. The Court finds that said notice and the related Notice Plan provided for the best notice practicable under the circumstances to all Persons entitled to such notice and fully satisfied the requirements of Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure and the requirements of due process." - Hon. Claudia Wilken (2011).

*Rowe v. UniCare Life and Health Insurance Company*, No. 09-CV-02286 (N.D.Ill.)
"The form, content, and method of dissemination of the notice given to the Settlement Class were adequate and reasonable, and constituted the best notice practicable under the circumstances. The notice, as given, provided valid, due, and sufficient notice of the proposed settlement, the terms and conditions set forth in the Settlement Agreement, and these proceedings to all Persons entitled such notice, and said notice fully satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process." – Hon. William J. Hibbler (2011).

*Thomas v. A. Wilbert & Sons, LLC*, 55,127 (La. 18th Jud. Dist. Ct., Iberville Parish).
"[N]otices complied with all requirements of the federal and state constitutions, including the due process clauses, and applicable articles of the Louisiana Code of Civil Procedure, and constituted the best notice practicable under the circumstances and constituted due and sufficient notice to all potential members of the Thomas Subclass." – Hon. Jerome M. Winsberg (2011).

*In re: M3Power Razor System Marketing & Sales Pract. Litig.*, MDL 1704 (D. Mass).
"The form, content, and method of dissemination of the notice given to the Settlement Class was adequate and reasonable, and constituted the best notice practicable under the circumstances. The notice, as given, provided valid, due, and sufficient notice of the proposed settlement, the terms and conditions set forth in the Amended Settlement Agreement, and these proceedings to all Persons entitled to such notice, and said notice fully satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process." - Hon. Douglas P. Woodlock (2011).

*Soto v. Progressive Mountain Ins. Co*., No. 2002CV47 (Dist. Ct. Colo.).
"Notice of the Settlement Class was constitutionally adequate, both in terms of its substance and the manner in which it was disseminated. The Notice contained the essential elements necessary to satisfy



due process . . . Finally, the Notice also contained a clear and concise Claim Form, and described a clear deadline and procedure for filing of claims. . . . Notice reached a large majority of the Class Members. The Court finds that such notice constitutes the best notice practicable." - Hon. J. Steven Patrick (2010).

*Press v. Louisiana Citizens Fair Plan Prop. Ins. Co.*, No. 06-5530 (Civ. Dist. Ct., Orleans Parish).
"This notice methodology . . . constitutes reasonable and best practicable notice . . . constitutes due, adequate and sufficient notice to all persons entitled to receive notice; and . . . meets the requirements of the United States Constitution, Louisiana law, the Federal Rules of Civil Procedure and any other applicable rules of the Court . . ." - Hon. Sidney H. Cates, IV (2010).

*In Re Katrina Canal Breaches*, No. 05-4182 (E.D. La.).
"The notice here was crafted by Shannon Wheatman, Ph.D., whose affidavit was received as evidence . . . . The entire notice was drafted in plain, comprehensible language . . . The Court finds this notice adequately reached the potential class. "- Hon. Stanwood R. DuVal, Jr. (2009).

*Jones v. Dominion Transmission Inc.*, No. 2.06-cv-00671 (S.D. W. Va.)
"The Parties' notice expert Shannon R. Wheatman, Ph.D. . . testified that in this case . . . that the mailed notices reached approximately 95.4 percent of the potential class . . . I HOLD that personal jurisdiction exists over the Class Members because notice was reasonable and afforded the Settlement Class an opportunity to be heard and to opt out." - Hon. Joseph R. Goodwin (2009).

*Guidry v. American Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct.).
"The facts show that the notice plan . . . as adequate to design and implementation . . . Dr. Shannon R. Wheatman, a notice expert, also testified at the fairness hearing as to the sufficiency of the notice plan. Dr. Wheatman testified that the notice form, content, and dissemination was adequate and reasonable, and was the best notice practicable." - Hon. G. Michael Canaday (2008).

*Webb v. Liberty Mutual Ins. Co.*, (March 3, 2008) No. CV-2007-418-3 (Cir. Ct. Ark).
"Ms. Wheatman's presentation today was very concise and straight to the point . . . that's the way the notices were . . . So, I appreciate that . . . Having admitted and reviewed the Affidavit of Shannon Wheatman and her testimony concerning the success of the notice campaign, including the fact that written notice reached 92.5% of the potential Class members, the Court finds that it is unnecessary to afford a new opportunity to request exclusion to individual Class members who had an earlier opportunity to request exclusion but failed to do so . . . The Court finds that there was minimal opposition to the settlement. After undertaking an extensive notice campaign to Class members of approximately 10,707 persons, mailed notice reached 92.5% of potential Class members." - Hon. Kirk D. Johnson (2008).



*Sherrill v. Progressive Northwestern Ins. Co*., No. DV-03-220 (18th D. Ct. Mont.).
"Dr. Wheatman's affidavit was very informative, and very educational, and very complete and thorough about the process that was undertaken here. . .  So I have reviewed all of these documents and the affidavit of Dr. Wheatman and based upon the information that is provided . . . and the significant number of persons who are contacted here, 90 percent, the Court will issue the order." - Hon. Mike Salvagni (2008).

*Shaffer v. Continental Casualty Co*., No. 06-2235 (C.D. Cal.).
"The Class Notice and the notice methodology implemented pursuant to the Settlement Agreement, as described in part in the Declarations of . . . Shannon Wheatman . . . constituted the best practicable notice. . . was reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and met all applicable requirements of the Federal Rules of Civil Procedure, the Class Action Fairness Act, the United States Constitution (including the Due Process Clauses), the Rules of the Court, and any other applicable law." - Hon. Philip S. Gutierrez (2008).

*Gray's Harbor v. Carrier Corp*., No. 05-05437(W.D. Wash.).
"The Court finds that this notice was the best notice practicable under the circumstances, that it provided due and adequate notice of the proceedings and of the matters set forth therein, and that it fully satisfied all applicable requirements of law and due process." - Hon. Ronald B. Leighton (2008).

*Beringer v. Certegy Check Servs., Inc*., No. 8.07-cv-1434-T-23TGW (M.D. Fla.).
"The proposed form of notice and plan for publishing are reasonable and designed to advise members of the Settlement class of their rights . . . A nationally recognized notice specialist, Hilsoft Notifications, has developed the comprehensive Notice Plan. Here, Notice is reasonably calculated to reach the maximum number of potential Settlement Class Members and, thus, qualifies as the best notice practicable. The Notice Plan here is designed to reach the maximum number of Class Members, and it is Plaintiffs' goal to reach at least 80% of the Class—an extraordinary result in consumer class action litigation." - Hon. Steven D. Merryday (2008).

*Palace v. DaimlerChrysler Corp*., No. 01-CH-13168 (Cir. Ct. Ill.).
"The form, content, and method of dissemination of the notice given to the Illinois class and to the Illinois Settlement Class were adequate and reasonable, and constituted the best notice practicable under the circumstances. The notice, as given, provided valid, due, and sufficient notice of the proposed Settlement, the terms and conditions set forth in the Settlement Agreement, and these proceedings, to all Persons entitled to such notice, and said notice fully satisfied the requirements of due process . . ." – Hon. Mary Anne Mason (2008).

*Johnson v. Progressive Casualty Ins., Co*., No. CV-2003-513 (Cir. Ct. Ark.).
"Notice of the Settlement Class was constitutionally adequate, both in terms of its substance and the



manner in which it was disseminated . . . Notice was direct mailed to all Class members whose current whereabouts could be identified by reasonable effort. Notice reached a large majority of the Class members. The Court finds that such notice constitutes the best notice practicable . . . The forms of Notice and Notice Plan satisfy all of the requirements of Arkansas law and due process." - Hon. Carol Crafton Anthony (2007).

*Beasley v. The Reliable Life Insurance Co.*, No. CV-2005-58-1 (Cir. Ct. Ark).

"[T]he Court has, pursuant to the testimony regarding the notification requirements, that were specified and adopted by this Court, has been satisfied and that they meet the requirements of due process. They are fair, reasonable, and adequate. I think the method of notification certainly meets the requirements of due process . . . So the Court finds that the notification that was used for making the potential class members aware of this litigation and the method of filing their claims, if they chose to do so, all those are clear and concise and meet the plain language requirements and those are completely satisfied as far as this Court is concerned in this matter." - Hon. Joe Griffin (2007).

## Education and Experience

### Education

Ph.D., Social Psychology, 2001; The University of Georgia, Athens, GA
Dissertation Title: *The effects of plain language drafting on layperson's comprehension of class action notices.*

M.S., Social Psychology, 1999; The University of Georgia, Athens, GA
Thesis Title: *Effects of verdict choice, dispositional instructions, opportunity to deliberate, and locus of control on juror decisions in an insanity case.*

M.L.S., Legal Studies, 1996; The University of Nebraska-Lincoln, Lincoln, NE

B.A., Psychology, 1993; Millersville University of Pennsylvania, Millersville, PA
Honor's Thesis Title: *The effects of inadmissible evidence and judicial admonishment in individual versus group decisions in a mock jury simulation.*

### Related Experience

Hilsoft Notifications
Souderton, PA
2004-2009



Dr. Wheatman was the Vice President (2006-2009) and Notice Director (2004-2009) at Hilsoft Notifications, a legal notification firm.

Federal Judicial Center
Washington, DC
2000-2004

Dr. Wheatman was a Research Associate at the Federal Judicial Center. The Federal Judicial Center is the education and research agency for the Federal Courts. The Research Division performs empirical and explanatory research on federal judicial processes and court management. Dr. Wheatman worked with the Civil Rules Advisory Committee on a number of class action studies and with the Bankruptcy Administration Committee on judicial evaluations.

## *Supplementary Background*

Dr. Wheatman has a strong statistical background, having completed nine graduate level courses as well as teaching undergraduate statistics at the University of Georgia. She is also a member of several plain language organizations, including the Center for Plain Language, Clarity, and Scribes.



Case 1:12-cv-02664-CRB Document 37-9 Filed 04/25/13 Page 552 PageID #: 443

# EXHIBIT 9

Case 1:12-cv-05531-VEK-02664-CRB Document 37-904 Filed 04/25/13 Page 55 of 237 PageID #: 444

# Non-GMO Project Standard



October 2012

Case 1:12-cv-00484-RBW Document 37-9 Filed 04/25/13 Page 35 of 37 PageID #: 445

# Non-GMO Project Standard

This version of the Non-GMO Project Standard includes revisions based on the Fall 2011 and Summer 2012 Public Comment Periods.

The next round of public comment on the Working Standard in its entirety will be from March 10th through April 10th 2013. Comments may be submitted online at http://www.nongmoproject.org/non-gmo-project-standard/comment-on-the-standard/ or may be sent to standard@nongmoproject.org

# Non-GMO Project Standard

TABLE OF CONTENTS

1. INTRODUCTION……………………………………………4
1.1. Purpose ……………………………………………4
1.2. Scope ……………………………………………4
    1.2.1. Products ……………………………………………4
    1.2.2.Activities ……………………………………… 5
    1.2.3. Program Elements ……………………………… 6

2. CORE REQUIREMENTS …………………………………9
2.1. Traceability …....................................................9
2.2. Cleanout and Segregation …………………………9
2.3. Specifications for Inputs and Products ………………10
2.4. Input Categories …………………………………11
2.5. Reclassification of Specific High-and Low-Risk
    Materials Based on Experience in the Field ……………....14
2.6. Action Thresholds ………………………………15

3. QUALITY ASSURANCE AND QUALITY CONTROL …...21

4. TRANSITION PERIOD AND CONTINUOUS
    IMPROVEMENT …………………………………………25

APPENDIX A: Current Variances to the Standard …………….27

APPENDIX B: List of Crops, Processed/Processing Inputs,
Production Inputs and other Organisms with GMO Risk …........34

APPENDIX C: Monitored Crops ………………………………36

## Non-GMO Project Standard

| 1. INTRODUCTION |
|---|

**Explanation of layout of this Standard:**
*This Standard is published in two columns. The left-hand column contains clauses of the Standard itself. The corresponding right-hand column contains Guidance notes that are included to help interpret and explain the intent of the given standard clause, offer additional relevant details, and/or place the clause into the context of current realities. Guidance notes should be read along with the Standard's clauses and must be followed accordingly. Where no Guidance is offered, the Standard alone suffices.*

| STANDARD | GUIDANCE |
|---|---|
|  |  |
| **1.1. Purpose:** The Non-GMO Project's Product Verification Program (the "Program" or "PVP") aims to verify: | See Section 1.3, "Additional Terms and Definitions," for meaning of "product" and definitions of other terms. |
| **1.1.1.** That the systems and procedures of the participant company or organization (the "Participant") are capable of delivering products that comply with the Non-GMO Project's Standard (the "Standard"). | Each Participant company or organization has the freedom to design its own systems to reflect its particular operational needs and practicalities, so long as the objectives of the Standard are met. |
| **1.1.2.** That the Participant consistently operates their systems according to those procedures. | Annual third-party verification of conformity to this Standard, via evaluation of Participant documentation and on-site inspection, is part of the Program. |
| **1.1.3.** That the resultant products are compliant with the Standard. | The Non-GMO Project's Product Verification Program ("PVP") is a practice/process-oriented standard that uses testing as a key strategic tool to confirm that practices/processes are meeting expectations. |
|  |  |
| **1.2. Scope:** The scope of the Program encompasses the following products, activities, and aspects: | Refer also to Section 4 and Appendix A regarding specific variances to this Standard and its scope. |
| **1.2.1. Products** | |
| **1.2.1.1.** Agricultural inputs, such as seeds, fertilizers, pesticides, and herbicides.<br><br>The scope of this Standard includes an exclusion for composted materials and animal manures. These may be used from any source, *except* manure from animals that have been genetically engineered to produce a novel material. | Examples of non-compliant fertilizers are oilcake/oilseed meal from genetically engineered soybeans, canola, or cotton, un-composted GMO cornstalks, etc.<br><br>An example of a non-compliant pesticide is genetically altered *Bacillus thuringiensis (Bt)*.<br><br>An example of a non-compliant herbicide is corn gluten from genetically engineered corn.<br><br>An example of an animal engineered to produce a novel material would be a goat that is genetically engineered to have antibiotics or |

Case 1:12-cv-00664-CRB   Document 37-6   Filed 04/25/13   Page 65 of 237   PageID #: 448

## Non-GMO Project Standard

| | hormones secreted in its milk. |
|---|---|
| **1.2.1.2.** Unprocessed agricultural products, such as vegetables, grains, fruit, greens, herbs, and other fresh foods, fibers, etc. | |
| **1.2.1.3.** Livestock feed components, such as grains, vitamins, enzymes, minerals, etc. | |
| **1.2.1.4** Microbial starters, media, and products. | Includes those used for animal feed (e.g., silage or hay inoculants, fermentation solids or similar products) or human food. |
| **1.2.1.5.** Manufacturing and processing inputs ("inputs"), including ingredients, flavorings, seasonings, colorings, additives, and all other substances present in final, manufactured products. Processing aids used by the Participant and present in the final product are also included in the scope of this Standard. | |
| **1.2.1.6.** Animal products, including dairy, meat, eggs, bee products, wool and hides. | |
| **1.2.1.7.** Veterinary inputs such as vaccines, hormones, semen and medicines. | For the purposes of the Standard, cloned animals and their progeny are not allowed. |
| **1.2.1.8.** Processed agricultural products or ingredients and manufactured food products. | |
| **1.2.1.9** Dietary supplements, vitamins and herbal preparations. | |
| **1.2.1.10.** Health-care products. | |
| **1.2.1.11.** Personal care products and cosmetics. | Includes lotions, soaps, balms, makeup, etc. |
| **1.2.1.12.** Cleaning products. | |
| **1.2.1.13.** Packaging, textiles and other agriculturally derived mercantile products. | |
| **1.2.2. Activities:** The scope of the Program encompasses the following types of activities and sectors of food and related production systems: | A core goal of the Project is to identify, create, and/or maintain sources and practices that effectively minimize GMO risk to the supply chain. High-Risk Inputs (see below) will ultimately be able to be downgraded to low-risk status as a result of such efforts. |
| **1.2.2.1.** Agricultural production—seeds and crops | Includes farm production, harvest, and post-harvest handling and storage on farm or farm-related facilities. |

# Non-GMO Project Standard

| | Reduction of background contamination levels in seed supplies is of primary importance toward reduction of GMO content of consumer goods. |
|---|---|
| **1.2.2.2.** Handling | Includes any form of post-harvest movement, storage, transformation, or labeling of goods along the entire chain of custody from seed to consumer, except for products enclosed in final retail packaging. |
| **1.2.2.3.** Storage | Includes all links in the chain of custody from seed to finished product. |
| **1.2.2.4.** Distribution | This may or may not involve physical handling of goods. |
| **1.2.2.5.** Processing | Includes all movements, storage, transformations, combinations, or labeling of goods within any given production facility. |
| **1.2.2.6.** Manufacturing | Involves the combination of inputs to make the final product sold by the operation in question. |
| **1.2.2.7.** Packaging and labeling | Includes any and all events where the package or labeling of goods is altered. |
| **1.2.3. Program Elements:** The scope of the Program encompasses all aspects of the production process relevant to producing Non-GMO Project verified products, including the following: | |
| **1.2.3.1.** Traceability | Special attention needs to be paid to inputs and products that are verified as Non-GMO Project Standard compliant, versus like inputs or products that are not explicitly verified or included in the Program as such. This applies even if the presumed chance that non-verified goods have GMO content is low. |
| **1.2.3.2.** Segregation | Additional segregation measures for Non-GMO Project Standard compliant materials may be necessary, especially when any high-risk inputs are handled. Appendix B of this Standard lists high-risk crops and their derivatives. Segregation is also necessary between distinct lots of goods that are Non-GMO Project verified, versus inputs or products that are not explicitly verified or included in the program as such. |
| **1.2.3.3.** Specifications for Inputs and Products | Refers to GMO action thresholds, etc. This Standard specifies relevant quantitative limits. |
| **1.2.3.4.** Operating Procedures | |
| **1.2.3.5.** Quality System | |

Case 1:12-cv-05331-VEK-02664-CRB Document 37-9 04/16/04/25/13 Page 85237 PageID #: 450

# Non-GMO Project Standard

| | |
|---|---|
| **1.2.3.6.** Quality Assurance and Quality Control | Specific procedures and practices relevant to traceability, segregation, sampling and testing of lots for GMO content—with associated ingredient procurement SOPs and training of personnel—are a necessary inclusion in any operation's routine activities when assuring adherence to this Standard. Existing procedures and documents can be amended or new ones created, as deemed most appropriate by the operation in question. |
| **1.2.3.7.** Training | |
| **1.2.3.8.** Document Control | |
| **1.2.3.9.** Maintenance of Records and Data | |
| **1.3. Additional Terms and Definitions** | In addition to explanations of terms provided by other Guidance notes, the terms in this section are explicitly defined. |
| **1.3.1.** Compost | Decayed organic material used as a fertility amendment in agricultural production, produced by a combination of actions over time by microbes, invertebrates, temperature, and other elemental factors (e.g., moisture content, aeration). Composted material shows practically no macroscopic indication as to the original substrate(s) from which it was made. |
| **1.3.2.** Farming operation | Any operation involved with production, handling, storage, or management of crops until legal ownership or physical transformation of crops or livestock products occurs. |
| **1.3.3.** GM | Genetically Modified or Genetic Modification—A term referring to products or processes employing gene splicing, gene modification, recombinant DNA technology, or transgenic technology, and referring to products of the gene-splicing process, either as inputs or as process elements. |
| **1.3.4.** GMO or Genetically Modified Organism | A plant, animal, microorganism, or other organism whose genetic makeup has been modified using recombinant DNA methods, also called gene splicing, gene modification, or transgenic technology. Cloned animals and their progeny are also considered GMOs under this Standard. |
| **1.3.5.** Input | The term "input" includes any material or substance that becomes a part of the final product, or a component of which becomes a |

Case 1:12-cv-00694-CRB Document 37-16 Filed 04/25/13 Page 55 of 237 PageID #: 451

# Non-GMO Project Standard

|  | part of the product, or is used otherwise in the production of a product. These include the following:<br>• Agricultural inputs, such as seeds, fertilizers, and pesticides.<br>• Unprocessed agricultural products, such as vegetables, grains, fruit, greens, herbs, and other fresh foods etc.<br>• Feed components, such as grains, forage plants, vitamins, enzymes and minerals.<br>• Livestock production inputs such as vaccines, hormones, and other veterinary materials.<br>• Manufacturing and processing inputs, including ingredients, flavorings, seasonings, colorings, additives, enzymes, cultures, and all other substances present in final manufactured products.<br><br>The PVP distinguishes between inputs as being "mono" (composed of only one component) or "compound" (composed of more than one component). |
|---|---|
| 1.3.6. Medicine (Veterinary) | (i) Any synthetic material other than vitamins, minerals, or amino acids given to livestock at any time; or (ii) Any non-synthetic material given to an animal on a non-routine basis for the purposes of maintaining or restoring health. |
| **1.3.7.** Non-GMO or Non-GM | A plant, animal, or other organism or derivative of such an organism whose genetic structure has not been altered by gene splicing. A process or product that does not employ GM processes or inputs. Cloned animals and their progeny are considered GM. |
| **1.3.8.** Participant | A company or other entity independent of the Non-GMO Project that enrolls in the Program. |
| **1.3.9.** Product | The term "product" refers to a distinct product name that the Participant offers to the marketplace, at whatever stage of the production chain (i.e., final consumer product, ingredient for further manufacturing, raw agricultural crop or commodity, etc., as applicable). "Product" refers to products that are involved in the Non-GMO Project Product Verification Program. |
| **1.3.10.** Shall or Must | A mandatory requirement under the Standard. |

Case 1:12-cv-02164-CRC Document 37-9 Filed 04/25/13 Page 105 of 87 PageID #: 452

# Non-GMO Project Standard

| | |
|---|---|
| **1.3.11.** Should or May | A non-mandatory recommendation or recommended practice. |
| **1.3.12.** Standard | The "Standard" herein refers to the Standard for The Non-GMO Project Product Verification Program, which is this document. |
| **1.3.13.** Supplier | Any party from whom an input is obtained. |
| **1.3.14.** Technical Administrator | The organization responsible for conducting the Program on behalf of the Non-GMO Project. |
| **1.3.15.** Unintentional Contamination | A contamination incident (event) will be deemed unintentional if available information confirms that:<br>i. The operator did not knowingly use GMOs or GMO-derived inputs.<br>ii. The operator used all due diligence to exclude GMO contamination. |

| | |
|---|---|
| **2. CORE REQUIREMENTS** | |
| **2.1. Traceability** | |
| **2.1.1.** Each lot of Non-GMO Project-verified product or input must be traceable back to specific lots of the inputs used in its production. | If the operation is dedicated strictly to Non-GMO Project Standard compliant production then it is sufficient to have a record-keeping system that records the lot numbers for all lots of inputs used to make a specific lot of product.<br><br>Systematic procedures shall be in place for tracking lot numbers and/or marking and labeling of packaging, containers, and storage facilities to assure traceability of inputs, work-in-progress, and final products at all points in the production process. |
| **2.1.2.** Traceability records shall explicitly trace and track the Non-GMO Project Standard compliant status of both inputs and the final product. | If lots of a given input are co-mingled in storage before use in production of a certain lot of product, the lot numbers related to all lots commingled shall be linked to that particular lot of product. |
| **2.1.3.** The producer/manufacturer must be prepared to provide the Technical Administrator of the Program with traceability information. | |
| **2.2. Cleanout and Segregation** | The aim of cleanout and segregation procedures is to prevent GMO contamination of inputs, work-in-progress, and final products. |
| **2.2.1.** Cleanout: | |
| **2.2.1.1.** Receiving, production, processing, | |

# Non-GMO Project Standard

| | |
|---|---|
| manufacturing, transfer, and storage facilities, as well as shipping and transportation conveyances, shall be inspected and cleaned/purged as needed to remove sources of GMO contamination, and all relevant cleaning, purging, and inspections shall be documented. | |
| **2.2.1.2.** Procedures shall be appropriate to the operation and may likely differ significantly between agricultural producer, manufacturer, etc. | |
| **2.2.2.** Segregation | If the operation is dedicated strictly to Non-GMO Project Standard compliant production, then segregation measures within the production operation are unnecessary, since only Non-GMO Project verified inputs will enter the operation.<br><br>Segregation measures are also required for instances where any required testing occurs after the input in question has entered the facility. For example, when a Participant, rather than an ingredient supplier, is taking responsibility for testing. |
| **2.2.2.1.** If the operation is not dedicated to Non-GMO Project verified production, systematic procedures shall be in place during production to keep Program verified inputs, work-in-progress, and finished products separate from all materials that are not compliant with the Non-GMO Project Standard. | |
| **2.2.2.2.** Tracking of lot numbers and labeling/marking on packaging and containers shall be used as necessary to identify and segregate Non-GMO Project Standard compliant materials from non-compliant materials. | |
| **2.3. Specifications for Inputs and Products** | The intent of the program is for the Participant to design production processes and input specifications that exclude GMOs from the Participant's products. This not only requires that one use inputs that are compliant with the Non-GMO Project Standard, but also that one employ practices that control unintentional contamination with GM material. |
| **2.3.1.** For products enrolled in the PVP, | |

Case 1:12-cv-02604-CRB Document 37-9 Filed 03/25/13 Page 125 of 87 PageID #: 454

# Non-GMO Project Standard

| | |
|---|---|
| Participants shall not knowingly plant, purchase, or use inputs that are not compliant with the Non-GMO Project Standard. | |
| **2.3.2.** Preventive measures, as defined below, must be undertaken by Participants to prevent or reduce unintentional GMO contamination in excess of the action thresholds set by this Standard. | This requirement is necessitated because risk of unintentional contamination of inputs and products with GMOs is increasing due to the growing use of GMOs in non-organic agriculture. |
| **2.3.3.** The written specifications for all inputs and products shall include requirements regarding Non-GMO Project Standard compliance, and shall be updated when the Participant changes suppliers or inputs. | |
| **2.3.4.** Purchase and use of inputs shall be contingent on inputs being compliant with requirements of the Non-GMO Project Standard, including traceability, segregation and GMO content. | Methodology for determining this is given in sections 2.4., 2.5., and 2.6. of this Standard. Spot purchasing from unverified suppliers should be avoided. Participants must seek out Non-GMO Project Verified inputs and if they are available, and a spot purchase is used instead, the Participant must justify to the Technical Administrator why the verified input was not used. Spot purchases are allowed on the following basis:<br>(i) Any input that is spot purchased must be tested in accordance to the requirements of this Standard, and must be below the relevant Action Threshold.<br>(ii) The Participant must provide the Technical Administrator with documentation of the purchase, including sampling information and test results on a periodic basis determined between the Technical Administrator and the Participant, with a minimum frequency of annual reporting.<br>(iii) Constraints on spot purchasing may be enforced at the discretion of the Technical Administrator. For example, repeated spot purchases from the same supplier could be grounds for this allowance to be revoked or restricted. |
| **2.3.5.** Release of products to the marketplace | Participants shall have a written methodology |

# Non-GMO Project Standard

| | |
|---|---|
| shall be contingent on products meeting requirements regarding Non-GMO Project Standard compliance, including traceability, segregation and GMO content. | and rationale for determining this. Success must be documented, with adjustments made and documented as necessary to meet this Standard.<br><br>Methodology for determining this as described in sections 2.4., 2.5., and 2.6. of this Standard may be applied. |
| **2.4. Input Categories** | Appropriate preventive measures depend on the category of the input, and are elaborated below. |
| **2.4.1. Non-Risk Inputs**: Materials that are not derived from biological organisms and are not, therefore, susceptible to genetic modification. | Examples: lime, water and fossil-based products. |
| **2.4.1.1.** Preventive measures for Non-Risk Inputs consist of examining the specification sheet for compound ingredients to confirm the absence of components with GMO-risk. | Specification sheets must fully disclose all components of the input in question. |
| **2.4.2. Low-Risk Inputs**: Species for which genetically modified versions have not yet been commercialized. | Although biotechnologists are engaged in laboratory experimentation with most species, the crops, ingredients, and production inputs derived from such species (for example, cherries, wheat, and green peppers) have extremely low risk of being contaminated. |
| **2.4.2.1.** Preventive measures for Low-Risk Inputs consist of: | |
| **2.4.2.1.1.** Examining the specification sheet for compound ingredients to verify absence of high-risk ingredients. | Specification sheets must fully disclose all components of the input in question. |
| **2.4.2.1.2.** Verifying that the input was produced under conditions designed to avoid cross-contamination with GM materials. | a. If the facility does not use any High-Risk Inputs, then demonstration of this fact is sufficient to fulfill this requirement.<br><br>b. If the facility does use High-Risk Inputs, fulfillment of this requirement will involve demonstrating that procedures and systems are in place that effectively segregate the Low-Risk Input under consideration from potential sources of high-risk contamination within the facility. |
| **2.4.2.2.** Monitoring of Low-Risk Inputs with suspected contamination. Monitored crops are listed in Appendix C. | Certain crops for which genetically modified versions have not yet been commercialized may be subject to higher contamination risk. Such crops are subject to monitor testing by the technical administrator, and will be reclassified as High-Risk Inputs by the |

**Non-GMO Project Standard**

| | Standard Committee and Board of Directors if results indicate persistent contamination in accordance to section 2.5.1. Crops may be added to Appendix C for either of the following reasons:<br><br>• Suspected or known incident of contamination at any point in the production chain. Examples include flax, for which known contamination by an unapproved variety has occurred.<br>• Genetically modified relatives are in commercial production with which cross-pollination is possible. Examples include table beets, which have a risk of cross-pollination with genetically modified sugar beets. |
|---|---|
| **2.4.3. High-Risk Inputs:** Crops and their derivatives that carry high risk of being genetically modified are listed in Appendix B. | Genetically modified varieties of the crops listed in Appendix B include genetically modified crops that are grown on a large scale in North America and certain other parts of the world.<br><br>There is greater risk that any lot of these crops, whether conventional, natural or certified organic, could become contaminated, either via cross-pollination or admixture during storage, shipping, handling or processing.<br><br>Animal products are included in the list of High-Risk Inputs because animal feed commonly contains High-Risk Inputs. In addition, injections of recombinant bovine growth hormone are sometimes used to increase milk production, and other High-Risk Inputs may be used to treat problems encountered in livestock production.<br><br>There are other GM crops and biological materials, in addition to those in Appendix B, that have been commercialized (for example, tomatoes). However, because these are not in wide or common use in the food production system at this time, this Standard does not classify them as high-risk. |
| **2.4.4.** Participants shall undertake preventative | |

# Non-GMO Project Standard

| | |
|---|---|
| measures to assure the Non-GMO Project Standard compliance of High-Risk Inputs, and shall consist of at least the following: | |
| **2.4.4.1.** Examining the specification sheet of the input to identify all high-risk ingredients. | A specification sheet or similar description must be on file with Participants for each unique input received from each supplier, which discloses all components contained in that input. |
| **2.4.4.2.** Verifying that the input was produced under conditions designed to avoid cross-contamination with GM materials (traceability and segregation). | Participants must be able to show their methodology and due diligence in this. |
| **2.4.4.3.** Monitoring for GMO contamination against an Action Threshold, which, if exceeded, triggers the Participant to investigate the cause of the contamination and to correct that cause when identified. | Monitoring and associated testing regimens may be conducted by the supplier and/or the user of any given input.  The validity of the testing regimen shall be evaluated. |
| **2.4.4.5.** Compliance of animal products with the Standard is not necessarily verified by testing of the animal product, but by showing that inputs (feed, supplements, etc.) are compliant with the Standard, and that adequate traceability, cleanout, and segregation measures have been used in handling the inputs and the resulting animal products. | A similar approach is applicable to other inputs where GMO content or origin is not readily determined by analysis, e.g. refined vegetable oil derived from GM canola. |
| **2.5. Reclassification of Specific High- and Low-Risk Materials Based on Experience in the Field** | |
| **2.5.1.** A Low-Risk Input that is found through verified, random testing to contain GM material at levels above the Action Threshold (defined below) at a frequency of greater than 1 sample per 50 samples tested, or that is projected to contain such GM material at a frequency greater than 1 in 50 samples based on existing test results, shall be classified as a High-Risk Input, the verification of which shall be carried out according to the requirements for High-Risk Inputs. | Such risks will be evaluated on a Project-wide basis, i.e., from compiled experience with Product Verification Program Participants using any given Low-Risk Input.<br><br>In addition to the examples given in the guidance to section 2.4.2.2., another example of a Low-Risk Input that might be classified as High-Risk according to this criterion would be wheat flour. GM wheat itself has not been commercialized. However, due to rotation with soy, cross-contamination frequently takes place in the fields, and, due to accidental admixture, cross-contamination of wheat flour with soy or corn often takes place in the flour mill or during other post-harvest activities. This also applies to most other flours, many of which |

**Non-GMO Project Standard**

| | may be made in the same mill. |
|---|---|
| **2.5.2.** On a case-by-case basis, certain High-Risk inputs may be downgraded to Low-Risk status based on source, documentation, protocols for contamination prevention/avoidance, and laboratory results (in accordance with this standard) demonstrating consistently low risk of GMO contamination. | An example would be cornstarch produced in a country where GMOs are prohibited, Non-GMO Project Standard compliant seed was verified as having been used, and documented IP procedures are in place for the manufacturing and transport of the product.<br><br>Another example would be honey produced by bees whose forage area is free of commercial agriculture involving GM risk crops within a 4 mile radius of hives, provided no other feed is used unless it is compliant with the Non-GMO Project Standard. |
| **2.6. Action Thresholds** for High-Risk Inputs: The Non-GMO Project has established the following long-term Action Thresholds for High-Risk Inputs and Products based on input from a broad range of stakeholders:<br><br>• Seed and Other Propagation Materials (see sections 2.7 and Appendix B): 0.1%.<br>• Human Food, Ingredients, Supplements, Personal Care Products, and other products that are either ingested or used directly on skin: 0.5%<br>• Animal Feed and Supplements: 0.9%<br>• Packaging, Cleaning Products, Textiles and other products that are not ingested or used directly on skin: 0.9%<br><br>For species not listed in Appendix B, there is no allowable presence. | Absence of all GMOs is the target for all Non-GMO Project Standard compliant products. Continuous improvement practices toward achieving this goal must be part of the Participant's quality management systems.<br><br>A key requirement of such quality management systems is to establish an Action Threshold, which, if exceeded, triggers the Participant to investigate the cause of the contamination, and to correct that cause when identified. Inputs contaminated above the action thresholds may not be intentionally used, except for livestock feed verified under section 2.7.2 of this standard.<br><br>When tested lots are mixed after testing has been conducted, the Participant must:<br><br>a. Demonstrate reasonable efforts to achieve homogeny prior to testing.<br>b. Investigate and document the cause of any individual lot's contamination over the relevant action threshold<br>c. Implement and document practical continuous improvement practices to reduce, and ultimately eliminate, the need for any future blending of lots. An example of one such practice would be to help growers secure Non-GMO Project Standard |

# Non-GMO Project Standard

| | |
|---|---|
| | compliant planting seed.<br>d. In all cases, the finished lot must be below the relevant Action Threshold. |
| **2.6.1.** Compliance with Action Thresholds shall be verified on the basis of test results or affidavits from suppliers, as is consistent with the technical requirements applicable at each point in the production/storage/handling chain. The following methods shall be used where appropriate: | |
| **2.6.1.1.** Genetics-based testing using the Real-Time PCR method.<br><br>Where genetic testing is most appropriate, the following applies: | Genetics based testing is required before a finished product can be verified, except for livestock products verified under section 2.7 of this standard. The frequency and location of Real Time PCR testing can be tailored to accommodate an applicant's supply chain. |
| **2.6.1.1.1.** A statistically valid sampling and testing plan shall be designed on the basis of risk assessment of the production/handling system, and shall reflect the level of monitoring appropriate for the risks inherent in the production/handling system, as well as industry standards. | Risk assessment and monitoring must be done by the Participant, and the sampling and testing plan shall be approved as part of the Product Verification Program.<br><br>Compliant sampling and testing must occur at least once post harvest, depending on contamination risks, except for livestock products verified under section 2.7 of this standard. Sampling plans must be designed to achieve 90% confidence in quantification of GMO at the action threshold set by this Standard. When achieving this level of confidence through crop sampling is impractical (e.g. for large crops such as zucchini and papaya), the testing program may be shifted to the seed level. |
| **2.6.1.1.2.** Statistical calculations can also be used to design compositing strategies through which portions of multiple samples can be combined and tested together for the purpose of reducing the number of tests required and therefore the costs for testing. | Compositing must be done in a manner that assures that any single sample in excess of the relevant action threshold produces a positive result for the composite sample as a whole. If a positive result is obtained for the composite, it will be necessary to retest all samples individually. |
| **2.6.1.1.3.** Testing shall be carried out by a laboratory that is accredited to ISO17025 and uses methods that are included within the scope of their ISO17025 accreditation, for the | A list of approved labs that have provided this criteria, along with instructions to laboratories regarding being added to this list, is available on the Non-GMO Project website, |

**Non-GMO Project Standard**

| crops/inputs in question. | www.nongmoproject.org. |
|---|---|
| **2.6.1.1.4.** Appropriate laboratory controls must indicate that the DNA of the input is sufficiently intact to allow valid quantitative analysis by PCR. | Inputs that do not meet this criterion and are, therefore not "testable" in this manner, must be verified by lot-specific traceability back to precursors for the input that are testable. |
| **2.6.1.1.5**. Laboratory testing must target all commercialized GM events relevant to the product and the production system.<br>Where Quantitative results are required, the Real-Time PCR test must employ primers sufficient to accurately quantify the % GMO for that event.<br><br>Qualitative analysis using Real-Time PCR is sufficient if 1) the PCR limit of detection is 0.01%; and 2) GMOs are not detected; and 3) appropriate laboratory controls indicate that the DNA of the input is sufficiently intact to allow for valid quantitative analysis by PCR. | See guidelines for recommended primers for each crop (see Non-GMO Project Real Time PCR Primer Table for GMO Detection).<br><br>Examples of sample types for which the DNA is sufficiently intact to allow for valid quantitative analysis by Real-Time PCR: raw agricultural products such as seed, grain, legumes; raw milled products; flour. |
| **2.6.1.2.** Immunologically-based testing using strip tests.<br><br>In cases where lateral flow strip tests are suitable, they must cover all commercialized GM events for the crop in question. | These methods shall be used when rapid, qualitative in-field testing is needed and when accuracy, sensitivity, and ramifications of false negative results are not large concerns. An example includes use of strip tests for the purpose of spot testing input samples. Compositing can be used for subsequent confirmatory Real-Time PCR testing. Frequency of Real-Time PCR testing and method of compositing to be determined such that there is 90% confidence in quantification of GMO at the action threshold set by the Standard. |

# Non-GMO Project Standard

| | |
|---|---|
| **2.6.1.2.1.** A statistically valid sampling and testing plan shall be designed on the basis of risk assessment of the production/handling system and shall reflect the level of monitoring appropriate for the risks inherent in the production/handling system, as well as industry standards. | See guidance to 2.6.1.1.1. |
| **2.6.1.2.2.** Analysts must be trained and their performance verified to assure they use the tests reliably. | Participants shall document the in-house evaluation of performance. |
| **2.6.1.3.** Supplier Affidavits. In cases where a non-GMO affidavit is appropriate, the following applies: | This option is available in cases where an input that is normally classified as High Risk is shown to be produced under conditions where the risk does not exist, for example, a crop grown in a country where no GMO production has been allowed, or a class of enzyme for which no GMO form has been developed. |
| **2.6.1.3.1.** The affidavit must attest that the origin of the input as well as its chain of custody merits the classification of the input as Low Risk as described in section 2.4.2 of this Standard. | |
| **2.6.1.3.2.** The affidavit must be signed by the manufacturer of the input. | |
| **2.7. Verification of livestock products** based on testing of seed and feed. | Livestock product inputs are qualitatively different from any other type of major input verified under this Standard in that there is no point in the production chain at which it is possible to identify GMO contamination using current testing methodologies. It is therefore necessary to control contamination based on testing of feed, and/or of the seed used to grow the feed. |
| **2.7.1. Seed** used to grow crops for livestock feed | From the point of enrollment, Participants have a five-year transition period to bring all seed into compliance with the requirements below. |
| **2.7.1.1. Commercially purchased seed** planted for on-farm feed production must be compliant with the requirements outlined in section 2.6 of this standard. | Commercially purchased seed must be tested using PCR and test below the action threshold outlined in section 2.6. |
| **2.7.1.2. Farmer-saved seed** and seed purchased from any neighboring farmer who does not have a retail seed operation must be | Frequency of testing should increase if there are any changes that would significantly increase the likelihood of contamination (e.g. |

# Non-GMO Project Standard

| | |
|---|---|
| strip tested annually. | new neighbor planting GMOs). If the strip test results are positive, samples must be submitted to a lab for quantitative PCR testing. If the seed is over the action threshold the seed may not be planted. |
| **2.7.2 Feed** | Must be monitored for compliance with Action Thresholds according to a sampling plan reviewed by the Technical Administrator. |
| **2.7.2.1. Feed for Certified Organic Operations in which products are pooled before final processing (e.g. dairy, ground meat, egg mixtures)** | The sampling plan for certified organic operations shall be based on testing of a composite sample of the high-risk feedstuffs from a representative selection of farms, with an intention of identifying and addressing any contamination occurring in the Participant's operation. The farms chosen for such testing shall be representative of the Participant's operations in a region (defined as a geographic area with relatively homogenous farm operations and sources of livestock feed, typically encompassing one or more states, in which farms ship unprocessed livestock products to one or a few processors).

Testing Methodology:
Testing method must yield valid quantitative results. When feedstuffs can be isolated into their raw material components, strip testing may be used. When feedstuffs are tested as a blend form, PCR testing must be used.

Quarterly Sampling Density
• Fewer than 10 farms per region: Minimum of 1 farm tested per region per quarter
• 10-20 farms per region: Minimum of 2 farms tested per region
• 21-50 farms per region: 10% of farms tested per region
• 51-100 farms per region: 5% of farms tested per region
• Over 100 farms per region: Minimum of 6 farms tested per region
The sampling plan within each region shall include a random selection of farms each quarter. Annual sampling plans shall be reviewed with the technical administrator and may be adjusted over time to provide the most |

Case 1:12-cv-02104-CRB Document 37-9 Filed 04/25/13 Page 255 of 37 PageID #: 463

| | |
|---|---|
| | technically sound basis for continuous improvement. Adjustments shall be mutually agreed upon and might include increased/decreased sampling frequency or density in regions with unusually high/low percentages of samples over the action threshold. |
| | Composite samples shall be tested on a quarterly basis. When more than one test is needed, results shall be averaged. Quarterly results or averages in excess of the Action Threshold shall trigger an assessment of the cause of contamination and appropriate steps to eliminate identified sources of contamination. |
| | Participant shall provide a report upon renewal on any significant changes in the frequency of GMO presence in livestock feed, the percent of samples exceeding the action threshold, and steps taken to secure feed below the action threshold. |
| **2.7.2.2. Feed for Non-Organic Operations and all operations in which products are NOT pooled before final processing (e.g. shell eggs, cut meat)** | The sampling plan for non-organic operations must include quarterly composite testing of feed samples for each shipment of feed purchased by each farmer in the Participant's operations. If more than 20% of the Participant's farmers fail to supply samples, it will be considered a major nonconformity, subject to section 3.5.1 of this Standard. |
| | At time of annual evaluation, the average for all quarterly composite tests for the prior year must be below the Action Threshold. |
| **2.7.3. Onsite Inspections** | Inspections may be completed via a group certification model. In order to be considered compliant, the Participants' Internal Control System (ICS) must conduct a documented assessment visit to each farm at least once every year. |
| | In addition to the ICS, third party inspections must be conducted on 10% of all farms every year. Results of the third party audit will be compared with results of the ICS assessment of |

# Non-GMO Project Standard

| | the farms to verify effectiveness of the ICS process.<br><br>For certified organic operations, additional inspections (beyond those required for organic certification) are not required. |
|---|---|
| | |
| **3. Quality Assurance and Quality Control** | |
| **3.1.** The Participant's quality assurance and quality control program shall be revised as needed to assure compliance with the Non-GMO Project Standard. | These modifications will, in most cases, involve additions or revisions to existing procedures, but where necessary, may include new procedures specific to processes, procedures, and record keeping critical to compliance with the Non-GMO Project Standard. |
| **3.1.1.** Compliance with applicable requirements of the Non-GMO Project Standard shall be identified as a key quality indicator of the Participant's products, and standard operating procedures shall be revised, or added where necessary, to incorporate measures that assure such compliance of products with the Non-GMO Project Standard. | |
| **3.1.1.1.** Where needed, additional training shall be provided to staff to assure that they are capable of fulfilling their duties in a manner that supports compliance of the operation, and the products produced, with the Non-GMO Project Standard. | |
| **3.1.1.2.** Documents and forms shall be revised, as necessary, to include compliance with the requirements of the Non-GMO Project Standard as a key quality indicator, and to assure that the Participant organization operates in a manner that fulfils the requirements of the Non-GMO Project Standard. | |
| **3.1.1.3.** All documents, forms, reference materials, and specifications needed by personnel to fulfill the requirements of the Non-GMO Project Standard shall be readily available to relevant personnel. | |
| **3.1.1.4.** Records shall be retained for 3 years. | |

## Non-GMO Project Standard

| | |
|---|---|
| **3.2.** Monitoring and control of key parameters relevant to compliance with the Non-GMO Project Standard shall be incorporated into the quality assurance and quality control program of the Participant organization. Key parameters are: | The Participant shall create or revise documentation accordingly to show compliance with each aspect identified below. |
| **3.2.1.** Traceability | |
| **3.2.2.** Segregation | |
| **3.2.3.** Compliance with Action Thresholds | Periodic monitoring of compliance with Action Thresholds is typically done via additional analytical testing at strategic times and points in the system to corroborate and support the regular sampling and testing program that the operation has implemented. |
| **3.2.4.** Labeling | Labeling claims must be accurate and truthful, and must not mislead the consumer about the GMO content of the product. Any reference to the Non-GMO Project or use of the seal must be approved by a written agreement with the Non-GMO Project.<br><br>Examples of claims that are not acceptable are "contains zero GMOs," "GMO-free" and GE-free.<br><br>The Technical Administrator will review labels to assess compliance with these claim guidelines. |
| **3.3.** The Participant organization shall monitor and verify the Non-GMO Project Standard compliance of inputs purchased, in line with section 2.3. of this Standard, and this shall be documented. | Record-keeping procedures shall be revised as necessary to assure that records include relevant information regarding the Non-GMO Project Standard compliance of each specific lot of input. |
| **3.4.** The Participant organization shall monitor and verify the Non-GMO Project Standard compliance of final products sold, in line with section 2.4. of this Standard, and this shall be documented. | Record-keeping procedures shall be revised as necessary to assure that records include relevant information regarding the Non-GMO Project Standard compliance of each specific lot of product. |
| **3.5.** Corrective actions. Non-conformities in processes, procedures, inputs, or products, which could impact compliance with the Non-GMO Project Standard, shall trigger corrective actions. | Nonconformities discovered during the program application or renewal process must be satisfied in order to achieve or maintain compliance with the Non-GMO Project Standard.<br><br>Mid-term nonconformities discovered through internal quality-assurance processes, |

# Non-GMO Project Standard

| | complaints from customers, or third party surveillance, require corrective action as described below. |
|---|---|
| **3.5.1.** Major nonconformities shall be reviewed at the time of occurrence, documented, and reported to the Product Verification Program's Technical Administrator. | A major nonconformity is a deviation that directly affects the compliance of the product with the Non-GMO Project Standard, such as accidental contamination of the product with GM material.<br><br>Any major non-conformities that go unreported and/or uncorrected according to the requirements below may be cause for product or the company to be removed from the Non-GMO Project Product Verification Program. Prior to removing company or product from the program, the Technical Administrator will notify company via email of this intended action. Company will have 5 days from date of said notice to provide all required documentary evidence in order to avoid withdrawal from the program.<br><br>The Technical Administrator will notify the Non-GMO Project of any withdrawal from the program. Additionally, if the company/products withdrawal impacts other Non-GMO Project Verified companies (such as the withdrawal of an ingredient supplier), the Technical Administrator will notify the other companies and require that a substitute supplier be found. Please see guidance in 3.6 for requirements for bringing in new suppliers. Any notice of product/company withdrawal from the program issued by the Technical Administrator will be devoid of any company confidential information. |
| **3.5.1.2.** Timely root-cause analysis. | Discovery of any major nonconformity must be immediately reported in writing to the Technical Administrator. "Timely" is considered to be typically within 7 days, and rarely longer than 30 days. Longer delays must be justified in writing. Accompanying the notice must be an explanation of the action steps being taken, and the expected completion date of the root-cause analysis. |

# Non-GMO Project Standard

| | Findings of the root-cause analysis must be reported in writing to the Technical Administrator, together with expected corrective actions to be undertaken. |
|---|---|
| **3.5.1.3.** Corrective actions designed to improve the system and products to achieve compliance with the Non-GMO Project Standard. | Corrective actions must be completed within 15 days of completing the root-cause analysis. The Technical Administer will review and approve the planned corrective actions.<br><br>Corrective action plans shall include identification of persons responsible for their execution, defined timelines for actions, and realization of the desired results of the corrective action plan. Documentary evidence must be submitted to the Technical Administrator within 5 days of completing corrective actions. Such evidence might include new/modified quality assurance SOPs such as updates to training and record keeping or changes to sampling and testing plans, and, where possible, evidence that these updated SOPs are achieving compliance with the Standard. The Technical Administer will review and approve all corrective evidence. Repeated non-conformance with the action threshold may require company mid-term re-evaluation of the facility and possibly including an onsite inspection and/or input supplier enrollment the Non-GMO Project's product verification program.<br><br>Any delays in the timeline from reporting to completion of corrective actions must be justified in writing and approved by the Technical Administrator. |
| **3.5.1.4.** Identification of nonconformities, corrective actions, root-cause analysis, and successful remediation of the non-compliance shall all be documented. | This documentation shall be available to the Technical Administrator and its inspectors. |
| **3.5.3.2.** Minor non-conformities shall be reviewed at the time of the annual inspection. | A minor non-conformity is a deviation in procedures, recordkeeping, documentation, or other part of the program that does not cause any of the relevant ingredients used throughout the operation to exceed action thresholds.<br><br>Renewal of verified status shall be contingent |

# Non-GMO Project Standard

| | upon appropriate resolution of any such non-conformities. |
|---|---|
| **3.6.** In addition to Participants, suppliers and contractors shall also participate in the Non-GMO Project Product Verification Program to verify compliance with the Standard. | In some cases, inputs certified by other non-GMO certification programs may be approved as equivalent for use in Non-GMO Project compliant products. A program would be acceptable as long as that program is fully equivalent to or exceeds the requirements of the Non-GMO Project Product Verification Program. The decision on equivalency will be made by the Board of Directors based on evaluation of said program by the Technical Administrator via a procedure duly approved by the Board. In such cases, certificates of compliance from such a program may be accepted as equivalent to verification by the Non-GMO Project.<br><br>Such suppliers and contractors must still, in all cases, input their product, ingredient and facilities data into the Non-GMO Project Product Verification Program database. |
| **3.6.1.** A Product Verification Program update shall be required at least annually. | The Technical Administrator may require a Participant to submit updates more frequently, if history shows cases of major non-conformities occurring as a result of unannounced changes to the operation.<br><br>Such changes could include the following: changes in product composition that involve High-Risk Inputs, changes in suppliers of High-Risk Inputs, changes in processes or procedures that alter segregation or traceability of products, or changes in specifications of a high-risk ingredient or of a final product that contains High-Risk Inputs. |
| | |
| **4. Transition Period and Continuous Improvement**<br>It is expected that with systematic efforts within each sector of the industry, it should eventually be possible for the industry to be successfully operating uniformly and consistently with all aspects of this Standard. Until that time, compliance will be assessed according to program-wide variances set in Appendix A. All variances are meant to be temporary, and will be reviewed on at least an annual basis by the Standard Revision Committee. Each variance shall be removed from this Standard as quickly as is practically feasible on an industry-wide level. | |
| **4.1.** During this transition period Participants will develop systems, procedures, and source | |

Case 1:12-cv-02164-CRC Document 37-9 Filed 04/25/13 Page 25 of 37 PageID #: 469

# Non-GMO Project Standard

| | |
|---|---|
| materials required to enable their companies and the industry to operate effectively and sustainably to the Action Thresholds. | |
| **4.2.** During this transition period, while the industry is working cooperatively and dynamically to achieve the ability to consistently operate to these target Action Thresholds, temporary variances will be set on a sector-by-sector basis. Participants are required to operate to the most stringent conditions practical at this time, while also working with others in their sector to develop sources that are progressively closer to the Action Thresholds described above. | A primary goal of the Project is that sufficient experience (systems) and data will be generated to downgrade some sources of high-risk materials to low-risk status. |
| **4.3.** Variances can, in principle, be applied to any aspect of the Standard or the verification process, including the Action Thresholds, the risk classification of a given crop or input, or the criteria required to verify compliance with other aspects of the Non-GMO Project Standard. Variances are applied on an industry-wide basis, and apply uniformly to all companies. | Recommended changes to variances will be made by the Standard Revision Committee (which includes members of the Technical Advisory Board), and will be based on input received from stakeholders. These recommendations will be approved and finalized by the Board of Directors. |
| **4.4.** Individual Participants may choose to either operate to long-term action thresholds or avail themselves of current variances. Use of a variance is contingent upon participation in industry-wide continuous improvement efforts aimed at eliminating the need for that variance. | Variances have been set in acknowledgement of current industry-wide limitations, but the goal is to eventually overcome those limitations through collaborative efforts. |
| **4.5.** For manufactured food and feed products, distinct variances may be established for each of the following categories of High Risk Inputs (see Appendix A for currently applicable variances): | All percentages noted below are weight percentages of the product, not counting the weight of salt or added water in the finished product.<br><br>For livestock feed, the categories below are calculated based on the weight of the input as a percentage of the ration fed to the animal. |
| **4.5.1.** Major Ingredients, each of which represents 5% or more of the product or is a defining ingredient. | A defining ingredient is one whose name appears in the name of the product. |
| **4.5.2.** Minor Ingredients, each of which represents at least 0.5% but less than 5% of the product, and is not a defining ingredient. | |
| **4.5.3.** Micro Ingredients, each of which represents less than 0.5% of the product and is not a defining ingredient. | |

# Non-GMO Project Standard

| APPENDIX A: Current Variances to the Standard | |
|---|---|
| **Variance #1—Elevated Action Thresholds**<br><br>*Relates primarily to Section 2.6.* | Current variances for the Action Threshold are as follows:<br><br>• Planting Seed and Other Propagation Materials that are listed in Appendix B: 0.25%. For all other species, below the limit of detection.<br>• Human Food, Products, Ingredients, Supplements, and Personal Care Products and other products that are either ingested or used directly on skin: 0.9%<br>• Animal Feed and Supplements: 1.5%<br>• Packaging, Cleaning Products, Textiles and other products that are not ingested or used directly on skin: 1.5%<br><br>Absence of all GMOs is the target for all Non-GMO Project Standard compliant products. However, current risk of contamination makes it necessary to establish quality management systems to assure that GMO contamination stays within the applicable Standard.<br><br>A key requirement of such quality management systems is to establish an Action Threshold, which, if exceeded, triggers the Participant to investigate the cause of the contamination, and to correct that cause when identified. Participants must demonstrate compliance with the Action Threshold in one of two ways (please note that option 2 is NOT available for planting seed and other propagation material):<br><br>1. By ensuring that each batch of high-risk input used has tested below 0.9% prior to its use in verified product. In this case, test results are submitted to the technical administrator for review at the time of annual renewal.<br><br>OR |

Case 1:12-cv-02164-CRB Document 37-9 Filed 04/25/13 Page 295 of 37 PageID #: 471

**Non-GMO Project Standard**

<table>
<tr>
<td></td>
<td>2. By ensuring that test results for all batches of high-risk input used during each 6 month period average at or below the relevant Action Threshold, with no single batch of input ever exceeding the relevant Action Threshold by more than a factor of 2. In this case, all test results are submitted to the technical administrator for review at least annually, and the Participant is responsible for ongoing monitoring of test results to ensure compliance for each period. A Participant may not use this option for a period in excess of three years from initial verification.<br><br>Allowed use of this variance is contingent upon the Participant demonstrating their role in sustained, active efforts to develop sources of the relevant input that are below the Action Thresholds specified in section 2.6. The focus of such efforts should be enrollment of the entire supply chain, with an ultimate goal of supporting farmers in planting seed that has tested below the relevant Action Threshold.</td>
</tr>
<tr>
<td>**Variance #2—Including on the list of crops with high risk of GMO contamination only those crops species for which genetic modification is widely and commonly used.**<br><br>*Relates primarily to Appendix B*</td>
<td>Appendix B is a list of the GMO crops and inputs considered "High-Risk" by the Non-GMO Project—this is the Project's Operational list of High-Risk Inputs. It does not include all GMO crops that have been commercialized. Some of GMO crops that were commercialized at one time are not in commercial use today. For instance, potatoes and tomatoes were once produced commercially but today are not in North America. Another example is rice, where accidental contamination occurred in both in the US and China before any varieties being commercialized. In all of these cases, the GM crop is present today in only low, residual amounts in the food system.<br><br>These and other low-incidence GMOs have been excluded from the Project's operational list of High-Risk Inputs (see Appendix B for list). This substantially reduces the number of</td>
</tr>
</table>

Case 1:12-cv-02604-CRB Document 37-9 Filed 04/25/13 Page 305 of 37 PageID #: 472

# Non-GMO Project Standard

| | products and ingredients that are classified as High-Risk and thereby reduces the number of inputs that require in-depth review.<br><br>Allowed use of this variance is contingent on the Participant demonstrating their role in sustained, active efforts to develop non-GMO sources of High-Risk Inputs. |
|---|---|
| **Variance #3—Exemptions from production facility review**<br><br>*Relates primarily to Section 2.4.2.1.2. and 2.5.* | Production facility reviews are not required for:<br>a. Low-Risk inputs<br>b. Products in which the only Low-Risk and/or High-Risk Inputs are approved under variances 4 or 5<br>c. Products produced in a facility where the only high-risk ingredients are already Non-GMO Project Verified prior to entering the facility parallel processing of same ingredients.<br><br>Use of this variance is contingent on the Participant demonstrating sustained, active efforts to work with suppliers of the Low-Risk Input to enable them to comply with Section 2.4.2.1.2. of the Standard. |
| **Variance #4—Temporary exclusion of all Micro Ingredients**<br><br>*Relates primarily to Section 4.5.3.* | All Micro Ingredients used in livestock feed formulations or products manufactured for human consumption may be excluded from the Verification Process at this time, with the exception of:<br><br>a. Viable microbes and their functional components, which replicate their action. Examples include yeasts and dairy cultures.<br>b. Microbial products that have no viable microbes, or functional enzymes, but which are not isolates. Examples include cheese, bread, wine, beer and fruit puree.<br>c. Enzymes. Examples include Chymosin.<br>d. Recombinant bovine growth hormone (rBGH, rBST).<br><br>Any given product formulation included in the Program must not contain more than 10 unique non-verified High-Risk Micro Ingredients. |

Case 1:12-cv-02164-CRB Document 37-9 Filed 04/25/13 Page 85 of 87 PageID #: 473

# Non-GMO Project Standard

| | Formulations exceeding 10 unique High-Risk Micro Ingredients must either be reformulated or enough of the micro inputs verified as Non-GMO Project Standard compliant in line with section 2.6. of this Standard, to reduce the amount of non-verified inputs to 10 or less.<br><br>Allowed use of this variance is contingent on the Participant demonstrating their role in sustained, active efforts to develop Non-GMO Project compliant sources of the exempted Micro Ingredients. |
|---|---|
| **Variance #5—Verification of Non-GMO Project compliance of Minor and Micro Ingredients using supplier affidavits**<br><br>*Relates primarily to Section 2.6.* | In cases where GMO analytical certificates or traceability linked to analytical certificates of precursors is not available, Non-GMO Project compliant status of Minor and Micro Ingredients may be verified based on affidavits from suppliers, as long as these ingredients are the product of a system that has been designed to avoid GMOs. Examples of such systems are organic certification and other identity preservation systems. Suitability of these other identity preservation systems are subject to review by the Technical Administrator. Suppliers shall agree to provide further information or demonstration in support of affidavit when requested by the Technical Administrator.<br><br>Allowed use of this variance is contingent on the Participant demonstrating their role in sustained, active efforts to develop Non-GMO Project compliant sources of that Ingredient. |
| **Variance #6—Eliminated Spring 2010** | This variance has been combined with Variance #5 |
| **Variance #7—Verification of inputs based on testing alone at any stage of the production chain.**<br><br>*Relates primarily to Section 1.2., 2.6.1.1.1. and 2.6.1.1.3.* | The intention of the Standard is that compliance be verified at all levels of the production chain regarding the use (intentional or accidental) of all production inputs.<br><br>A. This variance allows for high-risk inputs to be verified as compliant with the Non-GMO Project Standard if:<br>(i) A copy of the original result for the PCR test shows that the GMO content of the input in question is |

**Non-GMO Project Standard**

|  | below the relevant action threshold; and |
|  | (ii) The testing must have been conducted by a laboratory in compliance with sections 2.6.1.1.1 and 2.6.1.1.3 of this Standard and must reference by lot number the specific lot of product used by the Participant; and |
|  | (iii) Appropriate laboratory controls indicate that the DNA of the input is sufficiently intact to allow valid quantitative analysis by PCR.  (Inputs that do not meet this criterion and are, therefore not "testable" in this manner, must be verified by lot-specific traceability back to precursors for the input that are testable.) |
|  | B.  This variance also allows for high-risk inputs to be verified as compliant with the Non-GMO Project Standard if: |
|  | (i) The precursor(s) to the input used by the Participant are tested by PCR; and |
|  | (ii) For each precursor to an input used by the Participant, a copy of the original result for the PCR test of the specific lot of the precursor in question must show that the GMO content is below the relevant action threshold: and |
|  | (iii) The testing must have been conducted by a laboratory in compliance with sections 2.6.1.1.1 and 2.6.1.1.3 of this Standard and must reference by lot number the specific lot(s) of the precursor used for lot of product used by the Participant; and |
|  | (iv) Appropriate laboratory controls indicate that the DNA of the tested precursor is sufficiently intact to allow valid quantitative analysis by |

Case 1:12-cv-02164-CRB Document 37-9 Filed 04/25/13 Page 35 of 37 PageID #: 475

# Non-GMO Project Standard

| | |
|---|---|
| | PCR; and |
| | (v) From the point of the PCR testing forward, an identity preservation system is in place to ensure the given lot of the input in question has not been exposed to any other high-risk GMO material. All such systems are subject to review and must be approved by the Technical Administrator. |
| | Allowed use of this variance is contingent on the Participant demonstrating sustained, active efforts to obtain Non-GMO Project compliant sources of the ingredient in compliance with the fully applicable scope of this Standard as described in section 1.2. |
| **Variance #8 – Temporary Exclusion of vaccines and medicines used in livestock production as well as all fertilizers, pesticides, and herbicides.** | All vaccines and medicines used in livestock production, except for rBGH, as well as all fertilizers, pesticides, and herbicides may be excluded from the Verification Process at this time. |
| | Allowed use of this variance is contingent on the Participant demonstrating their role in sustained, active efforts to develop Non-GMO Project compliant sources of these inputs. |
| **Variance #9 – Approval of a Participant's Co-Processed Products Based on a Process Certification Combined with Analytical Testing.** | The Non-GMO Project Standard's Product Verification Program follows a process-based approach that is supported by testing at strategic points in the supply chain, as applicable and taking into consideration the other variances of this Standard.  The Non-GMO Project acknowledges that pre-existing contractual agreements between certain Participants (e.g., brand owners) and their contracted processors, may pose barriers to enrollment in the early stages of the Program. This variance enables Participants who manufacture their products in contracted facilities (also known as co-packers or co-processors) to more quickly enter the Program while still adhering to the Program's process-based approach. |
| | Under this variance, any manufactured product |

Case 1:12-cv-02604-CRB Document 37-9 Filed 04/25/13 Page 345 of 37 PageID #: 476

# Non-GMO Project Standard

| | that is made by an operation contracted by the Participant may be evaluated and approved under the PVP as long as it is a product of a system that has been designed to avoid GMOs. Examples of such systems are organic certification and other identity preservation systems. All such systems are subject to review by the Technical Administrator, especially in cases where parallel processing occurs within the certified system. For example, processing certified organic soybeans in both Non-GMO Project verified and non-verified forms. In such cases lot by lot identity preservation will likely be necessary. |
| --- | --- |
| | The Participant and/or the contracted operation provides evidence of testing as described in Variance #7 of the Non-GMO Project Standard. |
| | Allowed use of this variance is contingent on the Participant having a defined plan for bringing contracted operations into full enrollment in the PVP within a defined time frame, not to exceed three years, to be reviewed and approved by the Technical Administrator with oversight by the Standards Committee. |
| **Variance #10—"Made with" claims for certain products containing livestock and bee product inputs**<br><br>*Relates primarily to Section 2.6. and section 4.5.1* | Under this variance, certain products made with livestock and bee product inputs may use a "Made with" claim in accordance with the following guidelines:<br><br>(i)    Livestock/bee product inputs may not collectively constitute more than 25% of the product, and may not be a defining ingredient (appearing in the product name).<br><br>(ii)    The product must contain approved major, high-risk inputs other than those from the livestock/bee products (e.g. corn meal, soy flour, etc. constituting more than 5% of the product).<br><br>(iii)    The "made with" claim may only be made in relation to approved |

# Non-GMO Project Standard

<table>
<tr>
<td></td>
<td colspan="2">major, high-risk inputs. For example, a corn chip with a seasoning blend containing more than 5% of an unverified dairy ingredient could claim "Made with Non-GMO Project Verified Corn."</td>
</tr>
<tr>
<td></td>
<td>(iv)</td>
<td>The "made with" claim is a text only claim. The Non-GMO Project Verification Mark may not be used on products approved under this variance. For more details, see the Non-GMO Project Licensing Agreement.</td>
</tr>
<tr>
<td></td>
<td>(v)</td>
<td>If the product contains dairy inputs, supplier affidavits must show that no recombinant bovine growth hormone (rBGH, rBST) was used.</td>
</tr>
<tr>
<td></td>
<td colspan="2">Allowed use of this variance is contingent on the Participant demonstrating their role in sustained, active efforts to develop Non-GMO Project compliant sources of livestock and bee products.</td>
</tr>
</table>

<table>
<tr>
<td colspan="2" align="center"><b>APPENDIX B</b>: List of Crops, Processed/Processing Inputs, Production Inputs, and other Organisms with GMO Risk</td>
</tr>
<tr>
<td><b>Crops -</b> The following crops carry risk of being genetically engineered, because engineered varieties of these crops are grown large scale in North America and certain other parts of the world:</td>
<td>These crops may not be used in Non-GMO Project approved products unless verified as compliant with the Non-GMO Project Standard.</td>
</tr>
<tr>
<td>Alfalfa</td>
<td></td>
</tr>
<tr>
<td>Canola</td>
<td></td>
</tr>
<tr>
<td>Corn</td>
<td>Except popcorn</td>
</tr>
<tr>
<td>Cotton</td>
<td></td>
</tr>
<tr>
<td>Papaya</td>
<td></td>
</tr>
<tr>
<td>Soy</td>
<td></td>
</tr>
<tr>
<td>Sugar beets</td>
<td></td>
</tr>
<tr>
<td>Zucchini and yellow summer squash</td>
<td></td>
</tr>
<tr>
<td colspan="2"></td>
</tr>
<tr>
<td><b>Animal Derivatives -</b> These include products derived from cattle, sheep, pigs, chickens, and other common livestock, fowl, and fish, and include the following:</td>
<td>Most animal-derived products have GMO risk because soy, corn, cottonseed, and canola are commonly used in feed. Micro Inputs for feed such as vitamins may also carry risk of not being compliant with the Non-GMO Project Standard (see below).</td>
</tr>
</table>

# Non-GMO Project Standard

|  |  |
|---|---|
|  | These animal derivatives may not be used in Non-GMO Project approved products unless verified as compliant with the Non-GMO Project Standard. |
| Milk |  |
| Meat | Hides and skins are also included in this category. |
| Eggs |  |
| Honey and other bee products | Due to potential for contamination with GMO crop pollen. |
|  |  |
| **Livestock Production Inputs** | The following inputs may not be used unless verified as compliant with the Non-GMO Project Standard. |
| rBGH, rBST (recombinant Bovine Growth Hormone or recombinant Bovine Somatotropin) |  |
| Semen | See Guidance at 1.2.1.6. |
| Vaccines |  |
| Veterinary Medicines |  |
|  |  |
| **Microbes and microbial products** |  |
| Enzymes, including chymosin |  |
| Microbial cultures and starters | Including yeast. |
|  |  |
| **Processed/processing inputs and ingredients, and related derivatives, derived from crops, livestock, or microorganisms:** | The following is a non-exhaustive list of derivatives with high GMO risk that are commonly used in food production. It is meant to provide examples of materials that will be considered high-risk in the Non-GMO Project Product Verification Program. The following inputs may not be used unless verified as compliant with the Non-GMO Project Standard. |
| Amino Acids |  |
| Aspartame |  |
| Ascorbic Acid, Sodium Ascorbate, Vitamin C |  |
| Citric Acid, Sodium Citrate | Derived from glucose syrup. |
| Ethanol | Derived from corn or GMO sugar beets. |
| Flavorings, "natural" and "artificial" | Also the carrier may have GMO risk. |
| High-Fructose Corn Syrup |  |
| Hydrolyzed Vegetable Protein |  |
| Lactic acid |  |
| Maltodextrins |  |

Case 1:12-cv-02164-CRB Document 37-9 Filed 04/25/13 Page 35 of 37 PageID #: 479

## Non-GMO Project Standard

| Microbial growth media | |
|---|---|
| Molasses | Derived from sugar beets, beginning 2008 crop. |
| Monosodium Glutamate | |
| Sucrose | Derived from sugar beets, beginning 2008 crop. |
| Textured vegetable protein | Including soy protein, |
| Xanthan Gum | |
| Vitamins | Vitamin A (various forms), Vitamin B6 (pyridoxine hydrochloride), Vitamin B12 (cyanocobalamin), Vitamin C (ascorbic acid), and Vitamin E (various forms) are known to have GMO risk.  Vitamins in general are often formulated with dispersants and related ingredients that also have GMO risk (e.g., corn oil). |
| Yeast products | |

| APPENDIX C: List of Monitored Crops | |
|---|---|
| **Crops -** The following crops carry potential risk of being contaminated with GMOs: | Monitored crops include those for which suspected or known incidents of contamination have occurred, and those crops which have genetically modified relatives in commercial production with which cross-pollination is possible. |
| *Beta vulgaris,*(e.g., chard, table beets) | Cross pollination risk from GM sugar beets |
| *Brassica napa* (e.g., rutabaga, Siberian kale) | Cross pollination risk from GM canola |
| *Brassica rapa* (e.g., bok choy, mizuna, Chinese cabbage, turnip, rapini, tatsoi) | Cross pollination risk from GM canola |
| *Curcubita* (acorn squash, delicata squash, patty pan squash, pumpkin, and spaghetti squash) | Cross-pollination risk from GM squash |
| Flax | |
| Rice | |

Case 1:12-cv-02664-CRB Document 37-10 Filed 04/25/13 Page 1 of 5 PageID #: 480
Case 3:12-cv-02664-CRB Document 37-10 Filed 04/25/13 Page 249 of 552 PageID #: 480

# EXHIBIT 10

TINA WOLFSON, SBN 174806
twolfson@ahdootwolfson.com
ROBERT AHDOOT, SBN 172098
rahdoot@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10850 Wilshire Boulevard, Suite 370
Los Angeles, California 90024
Tel: 310-474-9111; Fax: 310-474-8585

*Counsel for Plaintiff, Richard W. Trammell*

Clement L. Glynn
cglynn@glynnfinley.com
GLYNN & FINLEY, LLP
100 Pringle Avenue, Suite 500
Walnut Creek, California 94596
Tel: 925-210-2801; Fax: 925-945-1975

*Counsel for Defendant, Barbara's Bakery, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD W. TRAMMELL,<br><br>Plaintiff,<br><br>v.<br><br>BARBARA'S BAKERY, INC., *et al.*,<br><br>Defendants. | Case No. 3:12-cv-02664-CRB<br><br>**STIPULATED UNDERTAKING RE: ATTORNEYS' FEES AND EXPENSES IN CONNECTION WITH PROPOSED CLASS ACTION SETTLEMENT AND [PROPOSED] ORDER**<br><br>Honorable Charles R. Breyer, Presiding |

Plaintiff Richard Trammell ("Plaintiff") and Defendant Barbara's Bakery, Inc., ("Defendant" or "Barbara's Bakery") by and through their undersigned counsel, stipulate and agree as follows:

WHEREAS, Plaintiff and Defendant have entered into a Settlement Agreement ("Stipulation of Settlement") in the above captioned action to which this Stipulated Undertaking and Proposed Order is an exhibit;

WHEREAS, all capitalized terms used herein, without definition, shall have the same meaning, force and effect given to them Stipulation of Settlement;

WHEREAS, Class Counsel and their respective law firms desire to give an undertaking for the possible repayment of their award of the Attorneys' Fees and Expenses, as may be required by Section IX.D. of the Stipulation of Settlement.

NOW, THEREFORE, each of the undersigned Class Counsel, on behalf of themselves as individuals and as officers of their law firm, hereby submit themselves and their law firm to the jurisdiction of the Court for the purpose of enforcing the provisions of this Undertaking.

In the event that the Final Order in the Action is reversed or modified on appeal, in whole or in part, Class Counsel shall, within ten (10) business days after the order vacating or modifying the Final Order becomes final, repay to Defendant or any of its successors or assigns, a portion or all of the Attorneys' Fees and Expenses paid to Class Counsel in the amount vacated or modified.

In the event the Final Order is not reversed on appeal, in whole or in part, but the Attorneys' Fees and Expenses awarded by the Court are vacated or modified on appeal, Class Counsel shall, within ten (10) business days after the order vacating or modifying the award of Attorneys' Fees and Expenses becomes final, repay to the Fund, a portion or all of the Attorneys' Fees and Expenses paid from the Fund to Class Counsel in the amount vacated or modified.

Any action that may be required thereafter may be addressed to this Court on shortened notice, but not less than five (5) court days.

This Undertaking and all obligations set forth herein shall expire upon finality of all appeals of the Final Order, or upon the Final Settlement Date, whichever is earlier.

In the event Class Counsel fails to repay to the Fund, Defendant, or any of its successors or

1

assigns any of the Attorneys' Fees and Expenses that are owed pursuant to this Undertaking, the Court shall, upon application of such entity and notice to Class Counsel, summarily issue orders, including but not limited to judgments and attachment orders against Class Counsel, and each of them, and may make appropriate findings for sanctions for contempt of court.

The undersigned stipulate, warrant, and represent that they are equity partners in their law firm and have both actual and apparent authority to enter into this stipulation, agreement, and undertaking on behalf of their respective law firms.

This Undertaking may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Signatures by facsimile shall be as effective as original signatures.

The undersigned declare under penalty of perjury under the laws of the State of California and the United States that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED THROUGH COUNSEL OF RECORD:


AGREED TO BY CLASS COUNSEL


TINA WOLFSON
AHDOOT & WOLFSON, PC


By:_____          Date: _____
TINA WOLFSON
For herself and on behalf AHDOOT & WOLFON, PC


ROBERT AHDOOT
AHDOOT & WOLFSON, PC


By:_____          Date: _____
Robert Ahdoot
For himself and on behalf of AHDOOT & WOLFSON, PC.

2

ACKNOWLEDGED BY COUNSEL FOR DEFENDANT


By: _____          Date: _____
   Clement L. Glynn
   GLYNN & FINLEY, LLP


### [PROPOSED] ORDER


     IT IS SO ORDERED this ____ day of _____, 20___.


                              _____
                              THE HONORABLE CHARLES R. BREYER
                              SENIOR DISTRICT JUDGE
                              UNITED STATES DISTRICT COURT

3:12-cv-02664-CRB: STIPULATED UNDERTAKING AND [PROPOSED] ORDER

Attachment 2

1  TINA WOLFSON, SBN 174806
   twolfson@ahdootwolfson.com
2  ROBERT AHDOOT, SBN 172098
   rahdoot@ahdootwolfson.com
3  THEODORE W. MAYA, SBN 223242
   tmaya@ahdootwolfson.com
4
   **AHDOOT & WOLFSON, P.C.**
5  10850 Wilshire Boulevard, Suite 370
   Los Angeles, California 90024
6  Tel: 310-474-9111; Fax: 310-474-8585
7
   Counsel for Plaintiff
8  RICHARD W. TRAMMELL
9
10              **UNITED STATES DISTRICT COURT**
11             **NORTHERN DISTRICT OF CALIFORNIA**
12
13
14  RICHARD W. TRAMMELL, individually and on    Case No. 12-CV-02664-CRB
    behalf of all others similarly situated,
15                                               **PLAINTIFF'S MOTION FOR**
                                                 **PRELIMINARY APPROVAL OF CLASS**
16                     Plaintiffs,               **ACTION SETTLEMENT**
17                        v.                     Date:  June 14, 2013
                                                 Time: 10:00 A.M.
18  BARBARA'S BAKERY, INC. a California          Place: Courtroom 6 (17th Floor)
    corporation; and DOES 1-50,
19                                               The Honorable Charles R. Breyer, Presiding
                       Defendants
20
21
22
23
24
25
26
27
28

─────────────────────────────────────────────────────
12-CV-02664-CRB: MOT. FOR PRELIM. APPROVAL OF CLASS ACTION SETTLEMENT

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on June 14, 2013, at 10:00 AM, or at such other date and time as the Court may provide, in Courtroom 6 of the above-entitled Court, the Honorable Charles R. Breyer, Presiding, Plaintiff Richard W. Trammell ("Plaintiff") will and hereby does move the Court for an Order:

Preliminarily approving a class action settlement of this matter, pursuant to the terms and conditions of the Settlement Agreement filed concurrently herewith.

This Motion is made pursuant to Federal Rule of Civil Procedure 23, and is based upon: this Notice; the attached Memorandum of Points and Authorities; the concurrently filed Declarations of Tina Wolfson ("Wolfson Decl."), Elisa Odabashian ("Odabashian Decl."), Mary Haley ("Haley Decl."), David K. Rey (Rey Decl."), and Shannon R. Wheatman ("Wheatman Decl."); the proposed Settlement Agreement and the exhibits thereto; and such evidence and argument as the Court may consider appropriate or as may be presented at or before any hearing on this motion.

Dated: April 24, 2013                    **AHDOOT & WOLFSON, PC**

/s/ Tina Wolfson
Tina Wolfson, Esq.
10850 Wilshire Blvd., Suite 370
Los Angeles, California 90024
Tel: 310-474-9111; Fax: 310-474-8585

Attorneys for Plaintiff,
Richard W. Trammell

---

# TABLE OF CONTENTS

I.   Introduction and Summary of Argument.................................................................................1

II.  The Proposed Settlement......................................................................................................3

     A.  Settlement Benefits........................................................................................................3

         1.  The Settlement Fund and Payments to Class Members.........................................3

         2.  Any Residual Funds Would Be Distributed to Charitable Organizations
             Whose Work Is Related to Plaintiff's Claims and Benefits the Class....................5

         3.  Agreement to Modify Product Labeling and Advertising.......................................5

         4.  Agreement to Eliminate GMO Ingredients from Certain Eligible Products..........6

         5.  Attorneys' Fees and Expenses................................................................................6

     B.  The Class Notice Program.............................................................................................6

III. History of the Litigation.....................................................................................................7

IV.  The Court Should Preliminarily Approve the Proposed Settlement..................................9

     A.  The Proposed Settlement Meets The Standards for Preliminary Approval..................9

     B.  The Proposed Settlement Resulted from Intensive Arm's Length Negotiations
         Between Well-Informed and Experienced Counsel Based on Adequate Discovery..................9

     C.  The Settlement Is Fair.................................................................................................10

         1.  Class Members Receive Substantial Monetary Benefits.....................................10

         2.  Any Residual *Cy Pres* Award Also Would Benefit the Class and Be Related
             to the Claims at Issue...........................................................................................11

         3.  Defendant Will Modify Its Labeling, Advertising, and Manufacturing to
             Address Plaintiff's Claims...................................................................................12

         4.  The Risks of Litigation Support Approval...........................................................13

         5.  The Attorney Fees Are Fair.................................................................................14

V.   The Class Should Be Certified for Settlement Purposes..................................................14

     A.  The Settlement Class Satisfies the Requirements of Fed. R. Civ. P. 23(a)................15

         1.  Numerosity..........................................................................................................15

2. Commonality..........................................................................................................15

3. Typicality.............................................................................................................16

4. Adequacy of Representation.................................................................................16

B. The Settlement Class Satisfies the Requirements of Fed. R. Civ. P. 23(b)(3)..........................17

1. Common Issues Predominate................................................................................17

2. A Class Action Is the Superior Method to Settle This Controversy....................................18

VI. The Proposed Schedule.............................................................................................18

VII.    Conclusion........................................................................................................19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

3    **Cases**

4    *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513 (C.D. Cal. 2011) .................................................. 15

5    *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................... 14, 17

6    *Arnold v. UA Theatre Circuit, Inc.*, 158 F.R.D. 439 (N.D. Cal. 1994) ............................... 15

7    *Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524 (N.D. Cal. 2004) ..................................... 16

8    *Churchill Village, LLC v. GE*, 361 F.3d 566 (9th Cir. 2004) ................................... 9, 10, 13

9    *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ....................................... 9

10   *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995) .............................. 15

11   *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) ................................................... 11, 12

12   *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468 (C.D. Cal. 2012) .......................................... 16

13   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ....................................... 15, 16, 17

14   *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909 (9th Cir. 1964) ........................ 15

15   *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628 (C.D. Cal. 2009) .................................. 15

16   *In re First Alliance Mortgage Co.*, 471 F.3d 977 (9th Cir. 2006) ....................................... 16

17   *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, , 55 F.3d 768 (3d Cir. 1995) ..... 14

     *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200 (S.D.N.Y. 1995) ................. 14

18   *In re Sumitomo Copper Litig.*, 189 F.R.D. 274 (S.D.N.Y. 1999) ....................................... 10

19   *In re Syncor ERISA Litig.*, 516 F.3d 1095 (9th Cir. 2008) ............................................... 3, 9

20   *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007) ................ 2, 9, 11

21   *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) .......................................... 10

22   *Rolland v. Cellucci*, 191 F.R.D. 3 (D. Mass. 2000) ........................................................... 10

23   *Satchell v. Fed. Express Corp.*, C03 2659 SI, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ............... 9

24   *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) ............ 11, 14

25   *Valentino v. Carter Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) ........................................ 18

26   *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976) ........................................... 9

27   *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) .................................................. 15

28   *Young v. Polo Retail, LLC*, No. C-02-4546 (VRW), 2006 WL 3050861 (N.D. Cal. 2006) .................. 9

*Zeisel v. Diamond Foods, Inc.*, No. C 10-01192, 2011 WL 2221113 (N.D. Cal. June 7, 2011)..... 15, 16

**Other Authorities**

H. Newberg & A. Conte, Newberg on Class Actions (4th ed. 2008)........................................... 10

Manual for Complex Litigation, Fourth (2004) .......................................................................... 9

**Rules**

Fed. R. Civ. P. 23.............................................................................................. 15, 16, 17

## **MEMORANDUM OF POINTS AND AUTHORITIES**

Pursuant to the terms and conditions of the proposed Settlement Agreement filed concurrently herewith ("Settlement Agreement"), the parties to this consumer class action respectfully seek preliminary approval of a proposed nationwide settlement (the "Settlement") between Plaintiff and Defendant, Barbara's Bakery, Inc. ("Defendant" and, together with Plaintiff, the "Parties").

Plaintiff's claims are premised, *inter alia*, on Defendant's advertising and sale of food products labeled "All Natural," which, Plaintiff alleges, were made with ingredients derived, in whole or in part, from genetically modified organisms ("GMOs") and other synthetic and artificial ingredients. (These products are referred to herein and in the accompanying Settlement Agreement as the "Eligible Products.")

## **I.     Introduction and Summary of Argument**

The proposed Settlement, which was reached after extensive discovery, arms-length negotiations, and two rounds of mediation with retired Northern District Judge Eugene F. Lynch, provides real and significant benefits to the proposed Class. The Settlement provides for cash payments of up to $100 to Class Members who purchased Eligible Products and submit claims, mandates changes to Defendant's labels that fully address the allegations of Plaintiff's complaint, and includes a change to Defendant's manufacturing processes to eliminate GMOs from many of the Eligible Products and to comply with a third-party verification program known as The Non-GMO Project, which is the premier program of its kind in the country. Defendant already has submitted more than a dozen of the Eligible Products to the Non-GMO Project and had those products non-GMO verified. The Settlement is fair and merits preliminary approval.

Under the proposed Settlement, a $4 million non-revertible fund will be created to refund money paid for Eligible Products to Class Members. Class Members who submit properly completed claim forms will be refunded up to $100 for purchases of Eligible Products, based on the total retail amount they paid during the Class Period. The amount received by Class Members who submit claims is significant and should meet or exceed amounts they could hope to receive were the case to proceed to trial.

---

The parties have designed a thorough notice program that should reach many Class Members, and the size of the recovery available to those Class Members under the proposed Settlement is likely to motivate many of them to submit claims. However, in the event any residual funds remain, they will be distributed to two proposed *cy pres* recipients who were selected because their charitable work is related to Plaintiff's claims in this action and because they provide benefits to members of the proposed settlement class.

Additionally, Defendant will alter its advertising in ways designed to address the wrongdoing alleged in Plaintiff's complaint. Defendant will be precluded from labeling any Eligible Products, or any other products containing GMOs or synthetic and artificial ingredients, as "all natural," "no artificial additives," "no artificial preservatives," or "no artificial flavors." (Settlement Agmt. § IV.E.1.)

Defendant also agrees to use reasonable efforts to continue to change its manufacturing processes to remove GMOs from many of the Eligible Products and have its products verified non-GMO by the Non-GMO Project. Consumers who choose to avoid foods containing GMO will now have the option of purchasing Eligible Products that meet the Non-GMO Project's strict standards. This relief is particularly valuable to Class Members in light of the fact that the vast majority of corn grown in the U.S. is GMO. *See* <http://www.nongmoproject.org/learn-more/what-is-gmo/> ("approx. 88% of U.S. crop in 2011").

The non-monetary components of the Settlement, including the changes to Defendant's labeling practices, manufacturing processes, and its participation in the Non-GMO Project, provide real value to the Class beyond the non-revertible $4 million Fund and will cost Defendant approximately $1.1 million to implement. These efforts also are predicted to cost Defendant approximately $1.2 million per year going forward. No part of these costs, however, will be paid out of the $4 million Settlement Fund. All of these monetary and non-monetary benefits are achieved without the substantial risks and costs that the Class would incur should the litigation continue.

The proposed Settlement is well "within the range of possible approval" and thus justifies preliminary approval. *E.g.*, *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007). Accordingly, Plaintiff requests the Court issue the accompanying Proposed Order that would,

---

12-CV-02664-CRB: MOT. FOR PRELIM. APPROVAL OF CLASS ACTION SETTLEMENT

among other things, (1) preliminarily approve the Settlement, (2) conditionally certify the proposed settlement-only Class, (3) appoint Plaintiff as Class representative and Plaintiff's counsel as Class counsel, (4) direct notice dissemination, and (5) set a date for a hearing on Final approval after notice has been disseminated to the Class. *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1097 (9th Cir. 2008) (holding district court should schedule fairness hearing when presented with proposed class action settlement).

## II.    The Proposed Settlement

Under the Settlement, the Class is:

> all persons who, during the Class Period, purchased in the United States any of the Eligible Products. Excluded from the Class are: (a) Barbara's Bakery's board members or executive-level officers, including its attorneys; (b) persons who purchased the Eligible Products primarily for the purpose of resale; (c) retailers or re-sellers of the Eligible Products; (d) governmental entities; (e) persons who timely and properly exclude themselves from the Class as provided in the Agreement; (f) persons who purchased the Eligible Products via the Internet or other remote means while not residing in the United States; and (g) the Court, the Court's immediate family, and Court staff.

(Settlement Agmt. § II.A.11.)

"Eligible Products" include a wide array of Defendant's Cereals, Cereal Bars, Granola Bars, Cheese Puffs, Baked Cheese Puffs, Snackimals Animal Cookies, Organic Mini-Cookies, Snack Mixes, and Crackers.  (*Id.* § II.A.18.)  The "Class Period" is the period from May 23, 2008, up to and including the date of the first dissemination of the Summary Settlement Notice or Class Notice, whichever is earlier.  (*Id.* § II.A.11.)

A.    **Settlement Benefits**

1.    **The Settlement Fund and Payments to Class Members**

Under the Settlement, Defendant will create a $4 million non-revertible fund (the "Settlement Fund") for the benefit of the Class.  (Settlement Agmt. §§ II.A.30, IV.)  The proceeds in the Settlement Fund will be distributed to Class Members and will be used to pay Plaintiff's reasonable attorneys' fees and costs, which will be determined by the Court after a hearing but will not exceed 25% of the Settlement Fund; a reasonable incentive award to Plaintiff, which will be determined by the Court after a hearing but will not exceed $2,500; and the costs of notice and administration of the

the Settlement, which are estimated at $786,350 and will not exceed $875,000.  (Wolfson Dec. ¶ 10; Settlement Agmt. §§ IV.A, IV.C.)

Class Members are eligible to receive an amount of up to $100, depending on the amount a particular Class Member spent on Eligible Products, and depending on the number of Class Members who submit Claims.  Specifically, Class Members are entitled to the following maximum amounts: $100 if their total purchases of Eligible Products amount to more than $100; $75 if their total purchases of Eligible Products amount to more than $75, up to and including $100; $50 if their total purchases amount to more than $50, up to and including $75; $25 if their total purchases amount to more than $25, up to and including $50; $10 if their total purchases amount to more than $10, up to and including $25; or $5 if their total purchases amount to $10 or less.  (*Id.* § IV.C.)  Thus:

| CLASS MEMBERS WHO SPENT: | COULD RECEIVE A MAXIMUM OF: |
|---|---|
| More than $100.00 | $100.00 |
| $75.01 to $100.00 | $75.00 |
| $50.01 to $75.00 | $50.00 |
| $25.01 to $50.00 | $25.00 |
| $10.01 to $25.00 | $10.00 |
| $10.00 or less | $5.00 |

If the total amount of eligible and approved claims exceeds the total amount available for distribution, then each claim will be proportionately reduced.  (*Id.* § IV.D.1.)

Class Members may recover these amounts by timely submitting a simplified Claim Form (attached as Ex. 1 to the Settlement Agreement) either online at a website specifically set up for the Settlement (www. BarbarasBakerySettlement.com) or by U.S. Mail.  The amounts paid to individual Class Members are designed to provide a substantial recovery that is based on the full retail price of the Eligible Products that Class Members purchased, thereby providing generous compensation to claimants as measured by any theory of damages, whether based on a theory of restitution of the full amounts Class Members paid or based on any other theory that would compensate Class Members for a lesser portion of their purchase price.

**2.** **Any Residual Funds Would Be Distributed to Charitable Organizations Whose Work Is Related to Plaintiff's Claims and Benefits the Class**

While the Settlement is designed to maximize claims, any money that remains after distribution to the Class and payment of fees and specified expenses will be donated to non-profit organizations that support projects that will benefit the Class, and whose objectives are related to Plaintiff's causes of action. (Settlement Agmt. § IV.D.2.) None of the $4 million fund will revert to Defendant. (*Id.*)

Specifically, the parties agree that, subject to Court approval, the following non-profit organizations would be appropriate recipients of any funds remaining in the Settlement Fund after all Claims and other specified expenses are paid: Consumers Union of the United States, Inc., and Action for Healthy Kids. Under the Settlement these organizations would split any residual funds equally.

Consumers Union is the non-profit policy and advocacy arm of Consumer Reports and has a long history of fighting for accurate labeling and working to educate and protect consumers in the marketplace. (Odabashian Decl. ¶ 2.) The nonprofit organization will use any Settlement funds to support its mission of protecting consumers from false advertising, as well as meeting the national demand by universities, academic societies and the media for fact-based research, surveys, expert testimony, talks, and panel participation on genetically engineered food. (*Id.* ¶ 9.)

Action for Healthy Kids is a non-profit organization that promotes education of children and parents regarding proper nutrition, healthy living, healthy food ingredients, and understanding food labeling in order to fight childhood obesity, undernourishment and physical inactivity. (Haley Decl. ¶ 2.) Action for Healthy Kids will use any Settlement funds toward its educational efforts in support of its mission of fostering sound nutrition in children and its vision of helping children develop the lifelong habits necessary to promote health. (*Id.* ¶ 12.)

**3.** **Agreement to Modify Product Labeling and Advertising**

The Settlement requires Defendant to modify the labeling and all advertising of the Eligible Products to exclude claims that the Eligible Products are "all natural" and that they include "no artificial additives," "no artificial preservatives," or "no artificial flavors." (Settlement Agmt.

---

§ IV.E.1.)  The Settlement Agreement also prohibits Defendant from including similar representations on any other products that it may produce containing GMOs or artificial or synthetic ingredients. Finally, Defendant will not be permitted to represent that any of its products are free of GMO ingredients, but will be able to include the Non-GMO Project Seal on particular product labels, if and when Defendant complies with the Non-GMO Project's Product Verification Program with respect to those products.  (*Id.*)

### 4. Agreement to Eliminate GMO Ingredients from Certain Eligible Products

The Settlement Agreement includes additional relief under which Defendant agrees to use reasonable efforts to eliminate the use of GMO ingredients in most of the currently sold Eligible Products and, furthermore, to participate in the Non-GMO Project's Product Verification Program with respect to these products.  (Settlement Agmt. § IV.F.)  This will require Defendant to comply with a process-based program designed to assess compliance with the Non-GMO Project Standard, which is incorporated into the Settlement Agreement as Exhibit No. 10.  (*Id.*)

The non-monetary components of the Settlement, including the changes to Defendant's labeling practices, manufacturing processes, and its participation in the Non-GMO Project, will cost Defendant approximately $1.1 million to implement and are predicted to cost Defendant approximately $1.2 million per year going forward.  No part of these costs, however, will be paid out of the Settlement Fund.  (Rey Decl. ¶ 3.)

### 5. Attorneys' Fees and Expenses

Defendant agrees not to oppose Plaintiffs' Counsel's application for reasonable attorneys' fees and expenses not to exceed 25% of the Settlement Fund ($1 million), to be paid out of the Settlement Fund.  (Settlement Agmt. § IX.) Defendant also agrees not to oppose a Court-awarded class representative incentive award to Plaintiff up to $2,500, also to be paid out of the Settlement Fund. (*Id*. at § IX.E.)

### B. The Class Notice Program

The Parties have developed a comprehensive notice program with input from Rust Consulting, Inc. ("Rust"), and Kinsella Media, LLC ("Kinsella"), companies that specialize in developing and implementing class action notice plans, whom the Parties engaged as the Settlement Administrator and

as Notice Administrator, respectively.  (Settlement Agmt. at § V.A.1.).  The details of the notice program, including the methodology underlying its design, are further explained in the concurrently filed Declaration of Shannon R. Wheatman (attached hereto and as Exhibit 8 to the Settlement Agreement), Senior Vice President of Kinsella.  Ms. Wheatman is an expert in the dissemination of class action notices and has been involved in some of the largest and most complex national notification programs in the country.  (Wheatman Decl. ¶ 5.)

As detailed in Ms. Wheatman's declaration and in the Notice Plan attached to it as Exhibit 1, a broad-based notice program will utilize national consumer magazines, a newspaper supplement, and Internet ad networks in order to meet due process standards and provide the best notice practicable.  (*Id.* ¶¶ 19 *et seq.*)  Class members will be able to call a toll-free number to request that a Notice be mailed to them or listen to frequently asked questions, and will be able to view documents and submit claims online through a website at <www.BarbarasBakerySettlement.com>.  A summary of the Settlement will be emailed directly to Class Members who purchased Eligible Products online, whose email addresses are known to Defendant, with follow up mailing of the Summary Settlement Notice to those Class Members whose emails "bounce" as undeliverable.  (*Id.* ¶ 15.)

Ms. Wheatman estimates that 80.1% of the target demographic of Healthy Food Purchasers, which includes the proposed Class, will be reached with an average frequency of 2.3 times.  (*Id.* ¶ 24.)

### III.    History of the Litigation

Plaintiffs' Counsel began investigating the facts underlying this matter months before filing this action.  Plaintiffs' Counsel reviewed and analyzed Defendant's advertising and labeling, retained a consulting expert who assisted in understanding the scientific issues and in evaluating the veracity of Defendant's advertising claims, and conducted an independent investigation of the scientific and factual basis for the advertising of Defendant's products.  (Wolfson Decl. at ¶¶ 2-3.)

Plaintiff filed this Action on May 23, 2012, and seeks to certify a class of all consumers in the United States who, during the Class Period, purchased Barbara's Bakery's products. (Second Amended Compl. ¶ 37.)  Plaintiff alleges violations of California's Unfair Competition Law, Cal. Bus. & Profs. Code § 17200 *et seq.* ("UCL"); California's False Advertising Law, Cal. Bus. & Profs. Code § 17500 *et seq.* ("FAL"); California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*

("CLRA"); and breach of express warranty. Plaintiff seeks restitution, disgorgement of revenues, injunctive relief, damages, reasonable attorneys' fees and costs, statutory pre-judgment interest, and any other relief the court deems just and proper.[1]

Plaintiff's Counsel began conducting extensive discovery early in the litigation. In total, Plaintiff obtained over thirty (30) banker's boxes of documents and approximately seventy (70) Gigabytes (GB) of data through discovery, which concerned: (i) label design and product formulation; (ii) marketing, advertising, media, and public relations; and (iii) financial information. (Wolfson Decl. ¶ 4.)

In addition, Plaintiff's Counsel conducted interviews of primary Barbara's Bakery's corporate witnesses who have been involved with the Eligible Products to address the following subjects: (i) sales and marketing; (ii) labeling; (iii) finance; (iv) document collection and retention; and (v) Barbara's Bakery's efforts to eliminate GMO ingredients from its products. (*Id.* ¶ 5.)

The Parties began discussing potential settlement early in the litigation, in an effort to resolve the action as efficiently as possible. Counsel engaged in numerous settlement discussions as discovery proceeded. (*Id.* ¶ 7.) The Parties then engaged in two rounds of mediation, on November 28, 2012, and again on January 11, 2013, with the assistance of retired Northern District Judge Eugene F. Lynch of JAMS, a respected and experienced mediator widely recognized as one of the best available. *See* <http://www.jamsadr.com/lynch/>. The essential terms of the Settlement were agreed upon at the second of these mediation sessions. (*Id.* ¶ 8.)

Subsequently, the Parties engaged in additional extensive negotiations to finalize and memorialize all aspects of the Settlement Agreement, including each of the 10 exhibits. During this process, the Parties engaged Rust and Kinsella to advise as to the mechanics and specifics of a notice program. The notice program and each document comprising the notice were negotiated and

---

[1] As discussed in Defendant's Memorandum in Support of Preliminary Approval, after Plaintiff filed this action, several other plaintiffs filed similar actions: *Silber v. Barbara's Bakery, Inc.*, Case No. 1:12-cv-05511-WFK-RLM (E.D.N.Y) was filed on November 5, 2012; *Rojas v. Barbara's Bakery, Inc.*, Case No. CGC-12-525911 (San Francisco Superior Court), was filed on November 7, 2012; and *Moro v. Barbara's Bakery, Inc.*, Case No. 1:12-cv-06087-WFK-RLM (E.D.N.Y.), was filed on December 11, 2012. Defendant's Memorandum addresses the request for injunctive relief concerning these cases that is included in the Proposed Preliminary Approval Order.

exhaustively refined to make them easy to read and understand and to maximize the likelihood of broad Class Member participation in the claims process.  (*Id.* ¶¶ 9-11.)

### IV.    The Court Should Preliminarily Approve the Proposed Settlement

Public policy strongly favors settlement as a means of resolving disputes, and particularly class actions.  *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976).

### A.    The Proposed Settlement Meets The Standards for Preliminary Approval

"[I]f the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls ***within the range of possible approval***, then the court should direct that the notice be given to the class members of a formal fairness hearing."  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (emphasis added) (citations omitted); *see also Young v. Polo Retail, LLC*, No. C-02-4546 (VRW), 2006 WL 3050861 at *5 (N.D. Cal. 2006) (same); *Satchell v. Fed. Express Corp.*, C03 2659 SI, 2007 WL 1114010 at *4 (N.D. Cal. Apr. 13, 2007) (applying same standard).

While the Court must undertake a more rigorous analysis at the final fairness hearing,[2] to grant preliminary approval, the Court need only find that  "that the settlement proposal contains some merit, is within the range of reasonableness required for a settlement offer, or is presumptively valid.'"  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079-80 (citation omitted); MANUAL FOR COMPLEX LITIGATION, FOURTH, § 21.632 at 321 (2004) (hereinafter, "MANUAL").

### B.    The Proposed Settlement Resulted from Intensive Arm's Length Negotiations Between Well-Informed and Experienced Counsel Based on Adequate Discovery.

The Settlement is the result of arm's length negotiations between fully informed, experienced counsel and is, therefore, entitled to "a strong initial presumption that the compromise is fair and

---

[2] *See, e.g.*, *Churchill Village, LLC v. GE*, 361 F.3d 566, 575 & n.7 (9th Cir. 2004) (describing non-exclusive factors to consider at final approval stage and affirming class action settlement and notice).

reasonable." *Rolland v. Cellucci*, 191 F.R.D. 3, 6 (D. Mass. 2000); *see also Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009), *vacated on other grounds* 688 F.3d 645 ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution."); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280-81 (S.D.N.Y. 1999) ("a 'presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery.'") (quoting MANUAL, Third § 30.42) ; 5 H. NEWBERG & A. CONTE, NEWBERG ON CLASS ACTIONS § 11.41 at 90 (4th ed. 2008).

Plaintiff's counsel have extensive experience in class action litigation, have been designated class counsel in numerous class actions, and have successfully litigated false advertising and consumer protection class actions in various jurisdictions. (Wolfson Decl. at ¶¶ 12-26.)  Similarly, Defense counsel are highly skilled and sophisticated lawyers with extensive class action experience and defended the case vigorously.  Courts recognize that the "the experience and views of counsel" should be considered when approving a settlement. *Churchill Village, LLC v. GE*, 361 F.3d 566, 575 & n.7 (9th Cir. 2004).

As explained above, Plaintiffs' Counsel conducted extensive pre-filing investigation as well as post-filing discovery.  Plaintiff's counsel thus were well-informed of the facts in order to negotiate a fair settlement.  Plaintiff's Counsel also thoroughly analyzed the legal issues in this case, including possible defenses, in order to reach a fair settlement.  The extensive Settlement negotiations occurred at arm's length and were assisted by Judge Lynch, a respected mediator at JAMS.

**C.**   **The Settlement Is Fair.**

    **1.**   **Class Members Receive Substantial Monetary Benefits.**

Under the proposed Settlement, Class members will receive significant payments, up to $100, that are based on the total purchase price they paid for Eligible Products, which mostly range in price from less than a dollar to approximately nine dollars each.  The range of payments to Class Members under the Settlement would provide a substantial benefit to those Class Members submitting claims. The non-revertible Settlement Fund of $4 million (excluding the value of the non-monetary relief) will permit all Class Members who submit valid claims after a robust notice program to receive monetary relief as good as, if not better than, they could reasonably hope to receive after trial, applying any

potential measure of damages. None of this money will revert to Defendant under any circumstances should the Court approve the Settlement.

The notice program described above and detailed further in the Settlement Agreement and in the Declaration of Shannon Wheatman is comprehensive and likely to reach many Class Members. Far from containing "obvious deficiencies" that might cut against preliminary approval, the Settlement is entirely fair and adequate, and well "within the range of reasonableness required for a settlement offer." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079-80. Accordingly, preliminary approval is appropriate.

**2.** **Any Residual *Cy Pres* Award Also Would Benefit the Class and Be Related to the Claims at Issue.**

The potential money Class Members stand to receive by submitting claims is likely to motivate them to do so and payouts to Class Members may completely dispose of the Settlement Fund. Nevertheless, any residual funds would be distributed equally to two non-profit organizations selected because their work provides a benefit to the Class and bears a strong relationship to the claims that Plaintiff asserts in this action. *See Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012) ("A *cy pres* award must be 'guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members,' . . . and must not benefit a group 'too remote from the plaintiff class.'") (quoting *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 1990)).

The Class is comprised of U.S. consumers who are interested in purchasing "natural" foods and eating and feeding their families healthier and more nutritious foods. Based on the advertising, the Eligible Products are targeted toward such health-conscious consumers, particularly children and parents purchasing for their children as most of the Eligible Products are cereals and snack foods. The general purpose of the underlying statutes is to stop false advertising. Specifically, this action focuses on labeling food products in a manner that allows Class Members to be informed about what is in the food they are purchasing and consuming so that they can make informed decisions about their nutrition. The proposed charities are a perfect fit for this case both in terms of the Class demographic and the underlying claims.

The work of Consumers Union, fighting for accurate labeling and to educate and protect consumers in the marketplace, is directly related to the objectives of the statutes invoked by Plaintiff in this action and anticipated to directly benefit the proposed Class.  (Odabashian Decl. ¶ 2.)  The nonprofit organization will use any Settlement funds to support its mission of protecting consumers from false advertising, as well as meeting the national demand by universities, academic societies and the media for fact-based research, surveys, expert testimony, talks, and panel participation on genetically engineered food.  (*Id.* ¶ 9.)

The work of Action for Healthy Kids to educate school leaders, public health officials, parents, and students about nutrition, food labeling, and healthy eating habits is directly related to the objectives of the statutes Plaintiff invokes in this action and benefits the proposed Class.  Plaintiff alleges that because of Defendant's alleged false advertising concerning the ingredients in the Eligible Products, Plaintiff and the putative class were unable to make informed decisions about the food they were purchasing and consuming.  Action for Healthy Kids is a national charity that focuses on educating people, including children and their parents, about nutrition and food labeling so that they can make informed decisions about what food to purchase and consume.  Because the primary consumers and purchasers of the Eligible Products, which are mostly cereals and snack foods, are children and their parents, charities dedicated to educating children and their parents about nutrition are especially important to the proposed Class.  The education work conducted by Action for Healthy Kids will prevent parents and children falling prey to false advertising in the food industry.  (Haley Decl. ¶¶ 2-12.)  Additionally, both organizations' work to effectuate nationwide results, which geographically matches the scope of the nationwide proposed Class.  *Dennis*, 697 F.3d at 865-66.

### 3.  Defendant Will Modify Its Labeling, Advertising, and Manufacturing to Address Plaintiff's Claims.

Defendant's agreement to alter its labeling, advertising, and manufacturing processes provides further, real benefit to the Class, the value of which is not included in the $4 million figure described above.  Indeed, this non-monetary relief will cost Defendant $1.1 million to implement, and is predicted to cost approximately $1.2 million more per year going forward.  (Rey Decl. ¶ 3.)  Defendant agrees to change its labeling and advertising practices so as not to claim the Eligible

Products are "all natural" and to eliminate "no artificial additives," "no artificial preservatives," and "no artificial flavors" representations. This relief directly addresses Plaintiff's false advertising allegations.

The Settlement also includes additional relief in the form of Defendant's agreement to make reasonable efforts to modify its manufacturing processes to eliminate GMO ingredients and to participate in the Non-GMO Project's Product Verification Program. This is a substantial benefit to the Class. Consumers who choose to avoid foods containing GMO and were allegedly deceived by Defendant's "all natural" labeling into thinking that the Eligible Products did not contain GMOs will now have the option of purchasing Eligible Products that meet the Non-GMO Project's strict standards.

### 4.   The Risks of Litigation Support Approval.

The Settlement provides all of these significant benefits without the risks, costs, and delays inherent in continued litigation, trial, and appeal of Plaintiff's claims. The expense, complexity, and duration of litigation are important factors considered in evaluating the reasonableness of a settlement. *Churchill*, 361 F.3d at 577. Litigating this class action through trial would be time-consuming and expensive. As with most class actions, the claims at issue are complex and risky.

Class certification always poses a risk and, in false advertising cases, often involves an expensive and prolonged battle of the experts. If Plaintiff were unable to certify a class, the case would effectively be over, and the Class would gain nothing from continued litigation. Assuming Plaintiff prevailed at class certification, proving liability on the merits would require further risky litigation and additional expert work. Even if Plaintiff successfully passed the certification and liability hurdles, a battle would ensue concerning whether Plaintiff and other Class Members have sustained damages and, if so, the proper measure of those damages, requiring yet more expert testimony and entailing further risks to Plaintiff's and the Class's chances of recovery. Although Plaintiff was confident in his case and was prepared to litigate it through trial, the risks were numerous and real. Accordingly, a settlement that provides significant monetary relief to the Class and overhauls Defendant's advertising and manufacturing practices is fair.

---

12-CV-02664-CRB: MOT. FOR PRELIM. APPROVAL OF CLASS ACTION SETTLEMENT

**5.**     **The Attorney Fees Are Fair.**

The Ninth Circuit has ruled that attorney fees amounting to 25 percent of the total Settlement Fund are a "standard award," and "well within the range for recoveries of this size." *Six Mexican Workers*, 904 F.2d at 1311. Accordingly, the provision in the Settlement Agreement regarding a request for attorney fees and costs not to exceed 25% of the Settlement Fund is presumed fair, and the Court will have the discretion to make an award within this range after revising Class Counsel's motion for an award of attorney fees and costs. (Settlement Agmt. § IX.) Significantly, the attorney fees are based on the Settlement Fund only, and not the total value of the Settlement, which includes the additional costs Defendant will incur to implement the advertising and manufacturing changes ($1.1 million to implement, $1.2 million more per year going forward).

## V. The Class Should Be Certified for Settlement Purposes

"The settlement class device has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims," where the claims are small. *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y. 1995); *see also In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("[C]ourts should favor the use of devices that tend to foster negotiated solutions to these actions. Prima facie, this would include settlement classes."). In fact, a settlement class in complex litigation "actually enhances absent class members' opt-out rights because the right to exclusion is provided simultaneously with the opportunity to accept or reject the terms of a proposed settlement." *In re Prudential*, 163 F.R.D. at 205.

Where a court is passing on the certification question in the context of a proposed settlement class, questions regarding the manageability of the case for trial purposes are not considered. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Nonetheless, the remaining requirements under Rule 23 must still be met in settlement-only certification situations. *Id.* As demonstrated below, this case readily satisfies Rule 23 and should be certified as a class action for settlement purposes.

**A.**     **The Settlement Class Satisfies the Requirements of Fed. R. Civ. P. 23(a).**

Rule 23(a) enumerates four prerequisites for class certification, each of which is met here: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.  Fed. R. Civ. P. 23(a); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

**1.**     **Numerosity**

It is not necessary for Plaintiffs to allege that joining all class members would be impossible.  *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964).  Nor must a plaintiff establish the precise number or identity of class members.  *Arnold v. UA Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994).

Numerosity is presumed where the class is comprised of 40 or more members.  *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).  Defendant has sold millions of the Eligible Products, nationwide, during the Class Period.  (Wolfson Decl. ¶ 6.)  The numerosity requirement is met.

**2.**     **Commonality**

Rule 23(a)(2)'s commonality requirement is construed liberally and "permissively."  *Hanlon*, 150 F.3d at 1019.  The requirement is met if class members' grievances share a single common question of law or fact that is capable of class-wide resolution.  *Id*. at 1022; *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

The commonality element is easily satisfied here because Defendant has engaged in standardized conduct, including making identical statements to each member of the Class on its product packaging, marketing materials and website.  *Zeisel v. Diamond Foods, Inc.*, No. C 10-01192, 2011 WL 2221113, at *1 (N.D. Cal. June 7, 2011) (certifying nationwide class of consumers who purchased walnuts that were falsely advertised as having health benefits).

Commonality is met if a common contention exists that is capable of class wide resolution; in other words, commonality exists where, in one stroke, the determination of a contention's truth or falsity will resolve an issue that is central to the validity of each claim.  *Dukes*, 131 S. Ct. at 2551.  "[I]t is the plaintiff's theory that matters at the class certification stage, not whether the theory will ultimately succeed on the merits."  *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 519 (C.D. Cal. 2011).

---

12-CV-02664-CRB: MOT. FOR PRELIM. APPROVAL OF CLASS ACTION SETTLEMENT

The commonality element is easily satisfied here because Defendant has engaged in the same conduct on a class-wide basis, including making identical statements to each member of the Class on its product packaging, marketing materials and website. *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 476-77 (C.D. Cal. 2012) (finding commonality requirement met in false advertising action where defendant's product "was packaged and sold uniformly across the nation"); *Zeisel*, 2011 WL 2221113 at *1 (certifying nationwide class of consumers who purchased walnuts that were falsely advertised as having health benefits).

Here, Class Members' claims involve common questions of law and fact. Plaintiffs' allegations focus on advertising claims related to the Eligible Products during the Class Period. The questions of law and fact common to the Class include whether the Eligible Products were, as represented, "all natural," whether they contained GMOs, and whether they contained synthetic or artificial ingredients. Accordingly, the commonality requirement is satisfied.

### 3. <u>Typicality</u>

Rule 23(a)(2) requires that the named plaintiff's claims and defenses be typical of the claims and defenses of the class. "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members." *Hanlon*, 150 F.3d at 1020.

"'[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement, irrespective of the varying fact patterns underlying the individual claims.'" *Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524, 526 (N.D. Cal. 2004) (citation omitted); *see also In re First Alliance Mortgage Co.*, 471 F.3d 977, 991 (9th Cir. 2006) (reasoning that where a "centrally-orchestrated scheme to mislead" is alleged, it is the scheme and not the precise details of any individual's experience that forms the nucleus of the class claims).

Plaintiff's claims are typical because they are based on the same theories as the claims of each of the many class members and because they arise out of Defendant's common labeling, to which there are no unique defenses specific to any one Class Member.

### 4. <u>Adequacy of Representation</u>

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In the Ninth Circuit, adequacy is a two-part test:

"(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

Plaintiff's interests are fully aligned with those of the class since they bring the same claims for similar remedies under the same legal theories. There are no actual or potential conflicts of interest between Plaintiff and the class members. Moreover, Plaintiff and his counsel have vigorously prosecuted the case and will continue to do so. Plaintiffs' counsel have the requisite expertise and are adequate class counsel. (Wolfson Decl. at ¶¶ 12-26.)

**B.** **The Settlement Class Satisfies the Requirements of Fed. R. Civ. P. 23(b)(3)**

Rule 23(b)(3) provides that a class may be certified when:

> [T]he court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3). Both criteria are met here: common issues predominate and a class action is superior to other methods for adjudicating the claims of the Class.

**1.** **Common Issues Predominate.**

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (quoting *Amchem Prods.*, 521 U.S. at 623). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *Hanlon*, 150 F.3d at 1022 (internal quotation marks omitted).

In this matter, common issues of law and fact readily predominate. The gravamen of Plaintiff's action, Defendant's alleged false advertising and labeling, hinges on uniform theories of liability and arises from a common and uniform set of facts. Resolution of Defendant's liability to one Class Member will provide resolution for all.

## 2.    A Class Action Is the Superior Method to Settle This Controversy

In a case where there are many class members each with relatively small claims, "no realistic alternative" to a class action exists, and such an action is the preferred method for resolving the dispute. *Valentino v. Carter Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996).  Under the circumstances presented here, where each Class Member most likely incurred damages that are too small to litigate on an individual basis, a class action is clearly superior to any other mechanism for adjudicating the case.

## VI.    The Proposed Schedule

The key settlement-related dates (such as the time to complete publication of the Summary Settlement Notice or to opt-out or object) are triggered by the preliminary approval of the settlement and the Fairness Hearing date.  The significant settlement-related dates calculated in accordance with the provisions of the Settlement Agreement are as follows (assuming the Court enters the Preliminary Order on June 14, 2013) and Plaintiff requests that the Court set future dates as follows:

| EVENT | DATE |
|---|---|
| Notice dissemination to the Class begins | **June 14, 2013** (10 calendar days after entry of the Preliminary Approval Order) |
| Notice dissemination completed | **September 12, 2013** (no later than 90 calendar days after entry of the Preliminary Approval Order) |
| Parties to file Motion(s) in Support of Final Approval and Plaintiffs to file applications for Attorneys' Fees and Expenses and for Incentive Awards | **October 1, 2013** (no later than 14 calendar days before the Objection / Exclusion Deadlines) |
| Objection / Exclusion Deadlines | **October 14, 2013** (115 days after entry of the Preliminary Approval Order) |
| Parties to file reply briefs in support of final approval and response to objections | **November 1, 2013** (7 calendar days prior to Fairness Hearing) |
| Fairness Hearing | **Friday, November 8, 2013, 10:00 AM** (Settlement Agreement provides that Fairness Hearing take place not before 90 days after compliance with 28 USC §1715(d) and  no later than 185 days after entry of the Preliminary Approval Order) |

Accordingly, the Parties request that the Court schedule the Fairness Hearing 130 days after it enters an order granting preliminary approval, or as soon thereafter as the Court's schedule permits.

### VII.    Conclusion

If the Settlement is approved, the Parties will avoid protracted litigation and will establish a means for the prompt resolution of Plaintiff's claims against Defendant, on a Class-wide bases, providing real and substantial relief to Class Members.  Under any circumstances, and particularly when compared to the alternative of long, complex, and uncertain litigation, the proposed Settlement is highly beneficial to the Class and fair.  Accordingly, Plaintiffs respectfully request that the Court grant preliminary approval of the proposed Settlement, approve the proposed notice program, and set a date for the Fairness Hearing, as set forth in the concurrently filed Proposed Order.


Respectfully submitted,

Dated:  April 25, 2013                    **AHDOOT & WOLFSON, PC**


                                          /s/
                                          _____
                                          Tina Wolfson
                                          10850 Wilshire Blvd., Suite 370
                                          Los Angeles, California 90024
                                          Tel: 310-474-9111
                                          Facsimile: 310-474-8585

                                          Counsel for Plaintiff
                                          Richard W. Trammell

TINA WOLFSON, SBN 174806
twolfson@ahdootwolfson.com
ROBERT AHDOOT, SBN 172098
rahdoot@ahdootwolfson.com
**AHDOOT & WOLFSON, P.C.**
10850 Wilshire Boulevard, Suite 370
Los Angeles, California 90024
Tel: 310-474-9111; Fax: 310-474-8585

Counsel for Plaintiff
RICHARD W. TRAMMELL

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD W. TRAMMELL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BARBARA'S BAKERY, INC. a California corporation; and DOES 1-50,<br><br>Defendants | Case No. 12-CV-02664-CRB<br><br>**DECLARATION OF TINA WOLFSON IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: June 14, 2013<br>Time: 10:00 A.M.<br>Place: 6 (17th Floor)<br><br>The Honorable Charles R. Breyer, Presiding |

I, Tina Wolfson, declare as follows:

1.     I am an attorney licensed to practice in all courts in the State of California, and a founding member of the law firm of Ahdoot & Wolfson, PC ("AW").  I submit this declaration in support of my firm's motion for preliminary approval of the proposed Class Action Settlement in the above-captioned case.  The matters stated herein are true of my own knowledge or, where indicated, I am informed and believe that they are true.  If called upon as a witness, I could and would competently testify to these facts.

2.     Plaintiffs' counsel began investigating the facts underlying this matter months before this action was filed.   Plaintiffs' counsel (i) reviewed and analyzed Defendant's advertising and labeling, (ii) gathered any available substantiation and research relating to the claims made in the subject advertising, and (iii) conducted an independent investigation of the scientific and factual basis for the claims in the advertising of Defendant's products.

3.     These efforts included retaining a consulting expert, who assisted in understanding the scientific issues involved in evaluating the veracity of Defendant's advertising claims.

4.     The parties engaged in extensive discovery in this matter.  Plaintiff obtained discovery regarding the Eligible Products in the following categories: (i) label design and product formulation; (ii) marketing, advertising, media, and public relations; and (iii) financial information.  In total, Plaintiff obtained over thirty (30) banker's boxes of documents and approximately seventy (70) Gigabytes (GB) of data through discovery.

5.     In addition, Class Counsel conducted interviews of primary Barbara's Bakery's corporate witnesses who have been involved with the Eligible Products to address the following subjects: (i) sales and marketing; (ii) labeling; (iii) finance; (iv) document collection and retention; and (v) Barbara's Bakery's efforts to eliminate GMO ingredients from its products.

6.     Among other things, discovery revealed that Defendant has sold millions of the Eligible Products nationwide.

7.     The Parties began discussing potential settlement early in the litigation, and counsel engaged in numerous settlement discussions as discovery proceeded.

8. The Parties then engaged in two rounds of mediation, on November 28, 2012, and again on January 11, 2013, with the assistance of retired Northern District Judge Eugene F. Lynch of JAMS, a respected and experienced mediator widely recognized as one of the best available. *See* <http://www.jamsadr.com/lynch/>. The essential terms of the Settlement were agreed upon at the second of these mediation sessions.

9. Subsequently, the Parties engaged in additional extensive negotiations to finalize and memorialize all aspects of the Settlement Agreement, including each of the 10 exhibits. During this process, the Parties engaged Rust Consulting, Inc. ("Rust"), and Kinsella Media, LLC ("Kinsella") as Settlement Administrator and Notice Administrator, respectively, to advise as to the mechanics and specifics of a notice program.

10. Rust and Kinsella have estimated the total cost of the nationwide notice program and administration of the Settlement to be $786,350, and have agreed to a maximum charge of $875,000.

11. The notice program and each document comprising the notice were negotiated and exhaustively refined to make them easy to read and understand and to maximize the likelihood of broad Class Member participation in the claims process.

12. AW has extensive experience in class action litigation, and has successfully litigated false advertising and consumer protection class actions in various jurisdictions.

13. I graduated Harvard Law School cum laude in 1994 and began my civil litigation career at the Los Angeles office of Morrison & Foerster, LLP, where I defended major corporations in complex actions and represented indigent individuals in immigration and deportation trials as part of the firm's pro bono practice. I then gained further invaluable litigation and trial experience at the firm of Schonbrun & DeSimone, which specialized in representing plaintiffs on contingency basis in civil rights and employee rights cases.

14. My partner Robert Ahdoot graduated from Pepperdine Law School cum laude in 1994 where he served as Literary Editor of the *Pepperdine Law Review*. Mr. Ahdoot clerked for the Honorable Paul Flynn at the California Court of Appeals, and then began his career as a civil litigator at the Los Angeles office of Mendes & Mount, LLP, where he defended large corporations and

syndicates such as Lloyds of London in complex environmental and construction-related litigation as well as a variety of other matters.

15.     Theodore Maya is an attorney at AW working on this matter. He graduated from UCLA Law School in 2002 after serving as Editor-in-Chief of the *UCLA Law Review*.  From July 2003 to August 2004, Mr. Maya served as Law Clerk to the Honorable Gary Allen Feess in the United States District Court for the Central District of California.  Mr. Maya was also a litigation associate in the Los Angeles offices of Kaye Scholer LLP for approximately eight years where he worked on a large variety of complex commercial litigations from inception through trial.  Mr. Maya was named "Advocate of the Year" for 2007 by the Consumer Law Project of Public Counsel for successful pro bono representation of a victim of a large-scale equity fraud ring.

16.     Bradley King is an attorney at AW working on this matter.  He graduated from Pepperdine University School of Law, where he served as Associate Editor of the *Pepperdine Law Review*.  He worked as a law clerk for the California Office of the Attorney General, Correctional Law Section in Los Angeles and was a certified law clerk for the Ventura County District Attorney's Office.  Mr. King began his legal career at a boutique civil rights law firm, gaining litigation experience in a wide variety of practice areas, including employment law, police misconduct, municipal contract, criminal defense, and premises liability cases.  At AW, Mr. King focuses on consumer and employment class actions.

17.     In March 1998, Robert Ahdoot and I founded AW.  AW is a top tier law firm specializing in advocating consumer and employee rights.  We vigorously litigate against large corporations to vindicate the rights of millions of consumers or employees in protracted, complex litigation, to successful results.

18.     AW has been appointed class counsel in numerous class actions, and, as founding members, Mr. Ahdoot and I have obtained extensive experience in prosecuting complex class action and representative lawsuits.  We have served as plaintiffs' counsel / co-counsel or class counsel and litigated numerous class actions or representative actions against large corporate defendants involving varied consumer rights claims.  The following examples of such actions have all been

successfully resolved, and have or will confer millions of dollars worth of benefits to the class or the general public and/or charity beneficiaries, as well as injunctive relief:

- *Cassidy v. Reebok*, United States District Court ("USDC"), California Central District, Case No. 2:10-cv-09966-AHM.
- *Carey v. New Balance*, Mass. Dist. Case No. 1:11-cv-10632-LTS & Case No. 1:11-cv-10001-LTS.
- *Zadeh v. Chase Manhattan Bank, et al.*, San Francisco Superior Court ("SFSC") Case No. 323715.
- *Steinhaus v. American Express Travel Related Services Co., et al.*, SFSC Case No. 416248.
- *Bernard v. MBNA America Bank, et al.*, SFSC Case No. 408700.
- *Shakib v. Discover Bank, et al.*, SFSC Case No. 416194.
- *Baumsteiger v. FleetBoston, et al.*, SFSC Case No. 408698.
- *Lanchester v. Washington Mutual Bank, et al.*, SFSC Case No. 429754.
- *Mirto v. AIG/Granite State Insurance Co. et al.*, Alameda County Superior Court Case No. HG 04180408.
- *Axen v. Ginco International, et al.*, SFSC Case No. 427033.
- *Citizens for Responsible Business v. Rite Aid Corp., et al.*, SFSC Case No. 414831.

19.     In addition, AW and Tina Wolfson were named as interim co-lead class counsel in a contested Motion for Interim Lead Class Counsel in a pending false advertising proposed class action entitled *In Re Naked Juice Cases*, C.D. Cal. Case No. 2:11-cv-8276-JAK-PLA, pending before Judge Kronstadt.  In *Naked Juice*, Plaintiffs averred factual allegations and causes of action similar to this case, against Naked Juice Co. of Glendora, Inc. (a Pepsico subsidiary).  The Parties have announced a settlement in the *Naked Juice* case, and currently are finalizing paperwork related to that settlement.

20.     In *Citizens for Responsible Business v. Rite Aid Corporation, et al.*, SFSC Case No. 414831, AW prosecuted claims of false and illegal labeling in the herbal supplement industry against 107 retailers and manufacturers, including the Rite Aid Corporation, Wal-Mart Stores, Safeway, The

Vons Companies, General Nutrition Corporation, Trader Joe's Company, Wild Oats Markets, Ralphs Grocery Company, The Kroger Company, Sav-On Drugs Stores, Albertson's, Walgreen Company, Stater Bros. Markets, Longs Drug Stores,  Bally's Total Fitness Corporation, Whole Foods Market, and Target Corporation, who were gleaning millions of dollars from this nationwide practice.  AW was successful in completely eradicating the alleged illegal practice in the United States.

21.     In prosecuting the above actions, AW litigated against some of the largest corporate defendants in the nation, represented by renowned law firms, such as Gibson Dunn, Goodwin Procter, Reed Smith, Stroock & Stroock, Kirkland & Ellis, Morrison & Foerester, Bingham McCutchen, Latham & Watkins, O'Melveny & Myers, Sidley Austin, and so on.

22.     Further, AW was named a member of the Executive Committee in the consolidated actions entitled *Whitaker v. Health Net*, Case No. 2:11-cv-00910-KJM, pending in the Eastern District of California, in which plaintiffs allege violations of California law, including the Unfair Competition Law, with regard to a data breach involving Health Net and IBM.  AW also was named a member of the Executive Committee in the *Sutter Medical Information Cases*, Case No. JCCP 4698 (California Superior Court, County of Sacramento).

23.     In addition, A&W has filed and is prosecuting the following consumer class actions, which are currently pending:

- *Pfeiffer vs. General Mills, Inc.*, D.N.J. Case No. 2:12-cv-03567-FSH-PS.
- *Parker v. J.M. Smucker Co.*, N.D. Cal. Case No. 13-cv-00690-SC
- *Hill v. Robert's American Gourmet Food, LLC*, N.D. Cal. Case No. 13-cv-00696-DMR
- *Weiss v. City of Los Angeles*, LASC Case No. BS141354

24.     As founding members of AW, Robert Ahdoot and I have also prosecuted actions for violations of wage and hour laws and other employee rights, in the form of class actions and/or representative lawsuits on behalf of wronged employees and/or the general public.  Among them are the following actions:

- *Nazlou v. Answer Financial, Inc.*, LASC Case No. BC323752

- *Inganni v. Artists Group*, LASC Case No. BC328470
- *Jones v. California Pizza Kitchen (Morris)*, LASC Case No. BC195527
- *Citizens for Responsible Business v. Ming International, Inc.*, LASC Case No. BC275555
- *Gitterman v. Def Jam Records*, LASC Case No. BC 222816
- *Atwood v. Richardson Inc.*, U.S. Dist. Court Case No. CV 00-01778 GHK (Mcx)
- *Bertoli v. Katy Castings, Inc.*, LASC Case No. BC 214324

All of the above actions also were successfully resolved.

25.  This summary firm resume establishes that AW has the required experience and expertise in class actions and other complex litigation in general, and in consumer rights class actions and complex litigation in particular.

26.  In addition to AW's extensive experience and impressive track record in the area of consumer class action litigation, AW's work on this case shows that AW has the requisite expertise and necessary resources to be appointed class counsel.  As described above, in the course of one year, AW conducted extensive investigation, discovery, and vigorously negotiated an excellent settlement for the Class that provides Class Members significant monetary relief, based on the full purchase price they paid for Eligible Products, as well as non-monetary relief that fully addresses the claims in this case.

I declare under the penalty of perjury on the 25th day of April, 2013, that the foregoing is true and correct.

/s/ Tina Wolfson
Tina Wolfson

1  TINA WOLFSON, SBN 174806
   twolfson@ahdootwolfson.com
2  ROBERT AHDOOT, SBN 172098
   rahdoot@ahdootwolfson.com
3  **AHDOOT & WOLFSON, P.C.**
4  10850 Wilshire Boulevard, Suite 370
   Los Angeles, California 90024
5  Tel: 310-474-9111; Fax: 310-474-8585

6  Counsel for Plaintiff
   RICHARD W. TRAMMELL
7

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11

12
   RICHARD W. TRAMMELL, individually and on     Case No. 12-CV-02664-CRB
13 behalf of all others similarly situated,
                                                 **DECLARATION OF SHANNON R.**
14                                               **WHEATMAN, PH.D. ON ADEQUACY OF**
                                                 **NOTICE PLAN IN SUPPORT OF**
15                  Plaintiffs,                  **PLAINTIFF'S MOTION FOR**
                                                 **PRELIMINARY APPROVAL OF CLASS**
16                  v.                           **ACTION SETTLEMENT**

17 BARBARA'S BAKERY, INC. a California           Date: June 14, 2013
   corporation; and DOES 1-50,                   Time: 10:00 A.M.
18                                               Place: Courtroom 6 (17th Floor)
19                  Defendants
                                                 The Honorable Charles R. Breyer, Presiding
20

21

22

23

24

25

26

27

28

---

12-CV-02664-CRB: DECL. OF S. R. WHEATMAN ISO MOT. FOR PRELIM. APPROVAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD W. TRAMMELL, | Case No. 3:12-cv-02664-CRB |
| Plaintiff, | **DECLARATION OF SHANNON R. WHEATMAN, PH.D. ON ADEQUACY OF NOTICE PLAN** |
| v. | |
| BARBARA'S BAKERY, INC., *et al.*, | |
| Defendants. | |

I, Shannon R. Wheatman, being duly sworn, hereby declare as follows:

1.  I am a Senior Vice President of Kinsella Media, LLC ("KM"), an advertising and notification firm in Washington, D.C. specializing in the design and implementation of class action and bankruptcy notification programs.  My business address is 2120 L Street, NW, Suite 860, Washington, D.C. 20037.  My telephone number is (202) 686-4111.

2.  This report will describe my experiences in designing and implementing notices and notice plans, my credentials to opine on the overall adequacy of the notice effort, as well as describe the notices (the "Notice" or "Notices") proposed here for *Trammell v. Barbara's Bakery, Inc.*, including how they were developed and why I believe they will be effective. Attached as **Exhibit 1** is the proposed Notice Plan.

## RELEVANT EXPERIENCE

3.  I have served as a qualified class action notice expert in many major class actions. State and federal courts have accepted my analyses and expert testimony on whether information is effectively communicated to people.   My curriculum vitae is attached as **Exhibit 2**.

4.  I have testified in court as an expert in *Spillman v. RPM Pizza, Inc.*, No. 10-349 (M.D. La.); *PRC Holdings LLC v. East Resources, Inc.*, No. 06-C-81 (Cir. Ct. W. Va.); *Guidry v. American Public Life Ins. Co*., No. 2008-3465 (14th Jud. Dist. Ct., Calcasieu Parish); *Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark); and *Beasley v. The Reliable Life Insurance Co*., No. CV-2005-58-1 (Cir. Ct. Ark).  I have been deposed as an expert in *Thomas v. A. Wilbert Sons, LLC*, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish).

5.  I have been involved in some of the largest and most complex national notification programs in the country, including: *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827 (N.D. Cal.) (involving tens of millions of consumers); *In re: Oil Spill by the Oil Rig*

*"Deepwater Horizon" in the Gulf of Mexico on April 20, 2010,* MDL No. 2179 (E.D. La.); *Kramer v. B2Mobile, LLC* (text messaging case involving 40 million consumers), No. 10-cv-02722 (N.D. Cal.); *In Re: Enfamil LIPIL Mkt'g & Sales Pract. Litig.* (consumer fraud settlement involving millions of infant formula purchasers), No. 11-MD-02222 (S.D. Fla.); *Fogel v. Farmers Group, Inc* ($455 million settlement involving tens insureds), No. BC300142 (Cal. Super. Ct., LA County); *In re Katrina Canal Breaches Consolidated Litig.* (settlement obtained for Hurricane Katrina and Rita survivors), No. 05-4182 (E.D. La.); *Lockwood v. Certegy Check Services, Inc.* (data theft settlement involving over 37 million consumers), No. 8:07CV-1434 (M.D. Fla.); *Grays Harbor Adventist Christian School v. Carrier Corp.* (defective product settlement involving high efficiency furnaces), No. 05-05437 (W.D. Wash.); and many others.

6. Courts have admitted my expert testimony on quantitative and qualitative evaluations of the effectiveness of notice programs and several courts have commented favorably, on the record, regarding the effectiveness of notice plans I have done. Selected judicial comments are included in the attached curriculum vitae.

7. My qualifications include expertise in the form and content of notice. For example, while serving with the Federal Judicial Center ("FJC"), I played an integral part in the development of the illustrative, "model" forms of notice, designed to satisfy the plain language requirements of Federal Rule of Civil Procedure 23(c)(2). This research formed the basis for my doctoral dissertation, *The Effects of Plain Language Drafting on Layperson's Comprehension of Class Action Notices* (2001) (Ph.D. dissertation, University of Georgia). To assist judges and attorneys, in state as well as federal courts, the FJC has posted the notices at www.fjc.gov.

8. I have authored and co-authored articles on notice and due process. I believe notice and due process depend upon clear communication with the people affected. *See, e.g.,*

Shannon R. Wheatman & Terri R. LeClercq, *Majority of Class Action Publication Notices Fail to Satisfy Rule 23 Requirements*, 30 REV. LITIG. 53 (2011); Katherine Kinsella & Shannon R. Wheatman, *Class Notice and Claims Administration*, in The International Private Enforcement of Competition Law 264–274 (Albert A. Foer & Jonathan W. Cuneo eds., 2010); Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do you really want me to know my rights? The ethics behind due process in class action notice is more than just plain language: A desire to actually inform*, GEO J. LEGAL ETHICS, 18 (4), 1359-1382 (2005); Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 TULANE LAW REV. 1771 (2006).

9.  KM was retained to design and implement the Notice Program in this litigation. I submit this declaration to describe the elements of the Notice Program.

## Overview

10. The proposed Notice Program was designed to reach the greatest practicable number of Class Members ensuring that they will be exposed to the Notice, to see, review, and understand it.

11. I have been involved in drafting the various forms of Notice described below. All forms of Notice are noticeable, clear, concise, and in plain, easily understood language.

12. In developing the Notice Program, it was determined that the most practicable way to reach Class Members is through the use of direct notice, paid media, earned media, and an informational website.

13. As detailed below, in my opinion, the Notice Program represents the best notice practicable.

## NOTICE PLAN SUMMARY

14. Although each case is unique, the methods and tools used in developing the Notice Program for this Settlement have been employed in many other court-approved notice plans.

### *Direct Notice*

15. Notice will be sent via email or mail to known Class Members who purchased Barbara's Bakery products online of their rights and how they may participate in the Settlement.

16. It is my understanding that Rust Consulting Inc. will make three delivery attempts to any email that bounces back.  Rust will also take measures to ensure the maximum deliverability of the emails, including among other things, utilizing a vendor that has contacts with Internet Service Providers ("ISPs") to ensure that the ISPs understand that the emails are non-soliciting.

17. After the Court grants approval to the Notice Plan and Notices, potential Class Members will be sent a Summary Notice in the form of a Postcard Notice or Email Notice.

### *Publication Notice*

18. To effectively reach Class Members, KM recommends a paid media program.

19. To design the paid media segment of the notice program, KM analyzed syndicated data available from the 2012 Doublebase Survey[1] from GfK MediaMark Research, Inc. ("GfK

---

[1] GfK MRI produces an annual Doublebase, a study of 50,000+ adults consisting of two full years of data.  The MediaMark sample consists of 26,000+ respondents.  Fieldwork is done in two waves per year, each lasting six months and consisting of 13,000 interviews.  At the end of the interview, the fieldworker presents a self-administered questionnaire that measures approximately 500 product/service categories, 6,000 brands, and various lifestyle activities. Resulting data is weighted to reflect the probabilities of selection inherent in the sample design

MRI"). GfK MRI is a nationally accredited media and marketing research firm that provides syndicated data on audience size, composition, and other relevant factors pertaining to major media including broadcast, magazines, newspapers, and outdoor advertising. MRI provides a single-source measurement of major media, products, services, and in-depth consumer demographic and lifestyle/psychographic characteristics.

20. Using GfK MRI, KM selected demographics that encompass the characteristics of Class Members. Media vehicles were then analyzed and selected for their strength and efficiency in reaching these demographic targets.

21. KM chose adults 18 years of age or older that bought food labeled as natural or organic ("Healthy Food Purchasers") as the primary target audience. GfK MRI provides specific data on this target audience.

22. To effectively reach this Class, KM recommends a broad-based notice program that utilizes national consumer magazines, a newspaper supplement, and Internet ad networks in order to meet due process standards and provide the best notice practicable under the circumstances.

23. KM chose the specific consumer magazines listed below because they provide good coverage of Healthy Food Purchasers. The Publication Notice will appear in the following consumer magazines:

    a. A half-page ad (3.5" x 10") once in *Parents* with an estimated circulation of 2,200,000.

    b. A half-page ad (3.375" x 10") once in *People* with an estimated circulation of 3,475,000.

and then balanced so that major study demographics match the most recent independent estimates.

c. A half-page ad (3.5" x 10") once in *Southern Living* with an estimated circulation of 2,800,000.

24. The Publication Notice will appear in the following newspaper supplement:

d. A two-fifths-page ad once in *Relish* with an estimated circulation of 15,000,000.

25. Internet advertising will include the following placements:

a. Banner advertisements measuring 728 x 90, 300 x 250, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the 24/7 Real Media Network. 24/7 Real Media is a network that represents over 5,000 websites.

b. A banner advertisement measuring 100 x 100 pixels will appear, on a rotating basis, on Facebook.com, which is a free, global social networking website that helps people communicate with friends, family, and coworkers.

c. Banner advertisements measuring 728 x 90, 300 x 250, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the Microsoft Media Network, which is a premium ad network of top-ranked commercial sites.

d. Banner advertisements measuring 728 x 90, 300 x 250, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the Specific Media Network. Specific Media is an online media company that enables advertisers to target audiences through advanced proprietary technologies across a premium network.

e. Banner advertisements measuring 728 x 90, 300 x 250, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the Yahoo! Network. Yahoo is a leading Internet brand and global online network of integrated services providing users with entertainment and other quality content.

26. For the purpose of evaluating the strength and efficiency of the media, the national consumer magazines, newspaper supplement, and Internet[2] were measured against the target audience to establish the estimated *reach*[3] of the media program and the estimated *frequency*[4] of exposure to the media vehicles.

    e. An estimated 80.1% Healthy Food Purchasers will be reached with an average frequency of 2.3 times.

27. All print advertising will carry a toll-free number and website address for potential Class Members to request or access the Long Form Notice.

### *Earned Media*

28. An earned media program will be implemented in order to amplify the paid media program and provide additional notice to Class Members. The earned media program will feature:

    f. A press release distributed on PR Newswire's Full National Circuit, reaching approximately 5,000 media outlets and 5,400 websites. The press release will highlight the toll-free telephone number and Settlement website address so that Class Members can obtain complete information.

### *Online Media*

29. A website will be established at www.BarbarasBakerySettlement.com to enable

---

[2] MRI does not measure the U.S. territories and possessions newspapers or the trade publications. Therefore, their contribution to the overall reach of the media is not calculated.

[3] Reach is the estimated number of different people exposed to a specific vehicle or combination of vehicles. It can be expressed as whole number or percentage of the total population.

[4] Frequency is the estimated average number of opportunities an audience member has to see the notice.

potential Class Members to get information on the Settlement.

### *Other*

30. A toll-free phone number will be established allowing Class Members to call and request that a Notice be mailed to them or listen to frequently asked questions.

31. A post office box will be established allowing Class Members to contact Class Counsel by mail with any specific requests or questions.

### THE FORM AND CONTENT OF THE NOTICES

32. Attached as **Exhibits C**, **D**, and **E** to the Notice Plan are copies of the Email Notice, Postcard Notice, Long Form Notice, and Publication Notice.

33. The Notices effectively communicate information about the Settlement.

34. Rule 23(c)(2) of the Federal Rules of Civil Procedure requires class action notices to be written in "plain, easily understood language." KM applies the plain language requirement in drafting notices in federal and state class actions. The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its experience and expertise to draft notices that effectively convey the necessary information to Class Members.

35. The Summary Notices (Email, Postcard, and Publication Notices) are designed to capture the Class Member's attention with clear, concise, plain language. They direct readers to the case website for more information. The plain language text provides important information regarding the subject of the litigation, the Class definition, and the legal rights available to Class Members. No important or required information is missing or omitted. In fact, these Notices state all required information, without omitting significant facts that Class Members need to understand their rights. The Summary Notices refer readers to the Long Form Notice which is available to those who call or visit the website.

36. The Long Form Notice will be available at the website or by calling the toll-free number. The Long Form Notice provides substantial information, including all specific instructions Class Members need to follow to properly exercise their rights, and background on the issues in the case. It is designed to encourage readership and understanding, in a well-organized and reader-friendly format.

37. In preparing the Notices in this Settlement, I have employed communications methods that are well-established in my field. I have embraced the high standards embodied in the Advisory Committee's notes accompanying the 2003 changes to Rule 23(c)(2):

> *The direction that the class-certification notice be couched in plain easily understood language is added as a reminder of the need to work unremittingly at the difficult task of communicating with class members.*

### Conclusion

38. It is my opinion that the reach of the target audience and the number of exposure opportunities to the notice information is adequate and reasonable under the circumstances, and it is consistent with the standards employed by KM in notification programs designed to reach members of settlement groups or classes. The Notice Program as designed is fully compliant with Rule 23 of the Federal Rules of Civil Procedure, and in my opinion, it is the best notice practicable.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Washington, D.C. this 24th day of April 2013.

Shannon R. Wheatman

Case 1:12-cv-03664-CRB Document 60-2 Filed 05/09/13 Page 255 of 703

# EXHIBIT 1



# NOTICE PROGRAM

*Trammell v. Barbara's Bakery, Inc.*

*Case* No. 12-CV-02664-CRB

United States District Court
Northern District of California

© 2013 Kinsella Media, LLC

# TABLE OF CONTENTS

| | PAGE |
|---|---|
| **FIRM OVERVIEW** | 4 |
| **CASE BACKGROUND** | |
| Situation Analysis | 6 |
| Class Definition | 7 |
| **NOTICE PROGRAM OVERVIEW** | |
| Program Components | 10 |
| Direct Notice | 11 |
| Paid Media Program | 12 |
| Paid Media Placements Summary | 13 |
| **PAID MEDIA METHODOLOGY** | 15 |
| **TARGET AUDIENCE** | |
| Selection Methodology | 17 |
| Demographics | 18 |
| Media Usage | 20 |
| **PAID MEDIA PLACEMENTS** | |
| Newspaper Supplement | 23 |
| Consumer Magazines | 24 |
| Target Audience's Print Readership | 25 |
| Internet Advertising | 26 |
| **NATIONAL MEDIA DELIVERY** | 28 |
| **NOTICE DESIGN** | |
| Direct Notice | 30 |
| Detailed Notice | 31 |
| Publication Notice | 32 |
| Website and Internet Ads | 33 |

© 2013 KINSELLA MEDIA, LLC

**EARNED MEDIA PROGRAM** 34

**TOLL-FREE TELEPHONE SUPPORT** 35

**EXHIBITS**

    Exhibit A – KM Case Experience

    Exhibit B – Relish Newspaper Supplement

    Exhibit C – Direct Notice

    Exhibit D – Detailed Notice

    Exhibit E – Publication Notice

© 2013 KINSELLA MEDIA, LLC

# FIRM OVERVIEW

Kinsella Media, LLC ("KM") is a nationally recognized legal notification firm in Washington, D.C. specializing in the design and implementation of notification programs to reach unidentified putative class members primarily in consumer and antitrust class actions and claimants in bankruptcy and mass tort litigation.

KM has developed and directed some of the largest and most complex national notification programs, primarily in antitrust, bankruptcy, consumer fraud, mass tort, and product liability litigation. Specific cases have spanned a broad spectrum of issues, including asbestos, breast implants, home siding and roofing products, infant formula, pharmaceuticals, polybutylene plumbing, tobacco, and Holocaust claims. The firm has developed or consulted on over 700 notification programs and has placed over $300 million in paid media notice. A selection of KM's case experience is attached as Exhibit A.

KM develops advertisements, press materials, websites, and other notice materials that bridge the gap between litigation complexities and the need for a clear and simple explanation of legal rights. The firm employs industry-recognized tools of media measurement to quantify the adequacy of the notice for the court, and ensures all notice materials are in "plain language" and are fully compliant with Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") and comparable state guidelines.

# CASE BACKGROUND

# CASE BACKGROUND:
## SITUATION ANALYSIS

This Notice Program is submitted by Kinsella Media, LLC ("KM") in connection with *Trammell v. Barbara's Bakery, Inc.* in the U.S. District Court for the Northern District of California. This document outlines the efforts that will be made to provide notice of the Settlement to reach consumers.

The lawsuit claims, *inter alia*, that Barbara's Bakery, Inc. manufactured, marketed, and sold various food, cereals, and snack products ("Eligible Products") as "all natural" when the Eligible Products are made with unnatural ingredients. Plaintiff alleges that, as a result, consumers purchased and consumed a product on the false premise that the product is "all natural." The lawsuit claims this conduct violated California's Unfair Competition Law, False Advertising Law, Consumer Legal Remedies Act, and constituted breach of an express warranty.

The goal of the Notice Program is to inform as many Class Members as possible about the Settlement and how it will affect their rights. The Notice Program recommends a paid media approach.

Case 1:12-cv-00864-WF-326-4-CBC Document 86-21 Filed 04/25/13 Page 305 of 552 PageID #: 536

# CASE BACKGROUND:
# CLASS DEFINITION

The Class is defined as:

All persons who, during the Class Period, purchased in the United States any of the Eligible Products. "Eligible Products" means any of the following Barbara's Bakery products, of any size, purchased by Class Members during the Class Period:

- **Cereals**:
  BROWN RICE CRISPS
  CORN FLAKES
  HIGH FIBER
  HOLE 'N OATS
  HONEST O'S
  ORGANIC APPLE CINNAMON O'S
  ORGANIC BREAKFAST O'S
  ORGANIC BROWN RICE
  ORGANIC BROWN RICE CRISPS
  ORGANIC CORN FLAKES
  ORGANIC CRISPY WHEATS
  ORGANIC HONEY CRUNCH 'N
      OATS
  ORGANIC HONEY NUT O'S
  ORGANIC SNACKIMALS CEREAL
  ORGANIC WILD PUFFS
  PUFFINS
  PUFFIN PUFFS
  SHREDDED OATS
  SHREDDED WHEAT
  SHREDDED SPOONFULS
  SHREDDED MINIS
  TOASTED OATMEAL FLAKES

  ULTIMA ORGANIC
- **Cereal Bars**:
  MULTIGRAIN CEREAL BARS
  FRUIT & YOGURT BARS
  PUFFINS CEREAL AND MILK BARS
- **Cheese Puffs**:
  BAKED CHEESE PUFFS
  CHEESE PUFFS
- **FIG BARS**
- **CRUNCHY ORGANIC GRANOLA BARS**
- **SNACKIMALS ANIMAL COOKIES**
- **ORGANIC MINI COOKIES**
- **Snack Mixes**:
  BRUSCHETTA SNACK MIX
  HONEY CINNAMON SNACK MIX
  HONEY MUSTARD SNACK MIX
  SALSA SNACK MIX
- **Crackers**:
  CRISP COOKIES
  GO GO GRAHAMS
  PIZZA AND CHEESE BITES
  RITE LITE ROUNDS
  WHEATINES

"Class Period" means the period from May 23, 2008, up to and including the date of the first dissemination of the Summary Settlement Notice or Class Notice, whichever is earlier. Excluded from the Class are: (a) Barbara's Bakery's board members or executive-level officers, including its attorneys; (b) persons who purchased the Eligible Products primarily for the purpose of resale; (c) retailers or re-sellers of the Eligible Products; (d) governmental entities;

(e) persons who timely and properly exclude themselves from the Class as provided in the Agreement; (f) persons who purchased the Eligible Products via the Internet or other remote means while not residing in the United States; and (g) the Court, the Court's immediate family, and Court staff.

# PAID PROGRAM OVERVIEW

NOTICE PROGRAM OVERVIEW:
# PROGRAM COMPONENTS

This Notice Program outlines procedures to provide notice of the settlement of *Trammell v. Barbara's Bakery, Inc.* as a class action, consistent with the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure.

Based on information provided by Plaintiffs' Counsel, the results of research on Class Members and their response to media and the media habits of the target audience, KM recommends the following two-part notice program.

> ➤ **DIRECT NOTICE:** Direct Notice to potential Class Members will consist of:
>
> > ➤ A summary of the Settlement will be emailed to a list of known Class Members who purchased Barbara's Bakery products online.
> >
> > ➤ A Postcard Notice will be sent via first-class mail to a list of known Class Members who do not receive an email notice.

> ➤ **PAID MEDIA-BASED NOTICE:** After careful research of the demographics of Class Members, KM recommends broad paid media notice comprised of print and Internet vehicles that will reach those Class Members, including:
>
> > ➤ Consumer magazines and a newspaper supplement, and
> >
> > ➤ Internet banner ads on multiple networks and hundreds of targeted websites.

> ➤ **EARNED MEDIA:** KM recommends amplifying paid media notice efforts with earned media outreach through a press release sent to major media outlets.

To complement the Notice Program and to ensure Class Members' easy access to updated information, KM recommends a dedicated informational website.

Notice Program Overview:
# DIRECT NOTICE

Direct Notice will consist of emailing a summary of the Settlement to identifiable Class Members, informing them of their legal rights and how they may participate in or opt-out of the Classes. The Notice will be sent to known Class Members who purchased Barbara's Bakery products online. Any email notices that are returned as non-deliverable after three attempts, will be re-mailed in the form of a Postcard Notice to any known address of Class Member who purchased Barbara's Bakery products online.

## NOTICE PROGRAM OVERVIEW:
## PAID MEDIA PROGRAM

Direct Notice will be provided to all identifiable Class Members. To reach Class Members, KM recommends the use of measurable paid media. Paid media advertising is guaranteed to appear, allowing for control of the content, timing, and positioning of the message. Newspapers, consumer magazines, television, radio, and the Internet, among other sources, offer paid media opportunities.

In considering which media to use for this case, KM evaluated the media consumption habits of the following target audience: Adults 18 years of age and older that bought food labeled as natural or organic ("Healthy Food Purchasers").

Based on data regarding the target audience's media consumption, KM researched the most appropriate media vehicles that would be best for this case. KM reviewed available consumer magazines, newspaper supplements, and Internet channels for reach of the target audiences as well as compatibility of the editorial.

# NOTICE PROGRAM OVERVIEW:
## PAID MEDIA PLACEMENTS SUMMARY

The following list provides a brief summary of KM's recommended media placements in this case. More detailed information about each publication and its applicability to the target audience in this case appears in the Paid Media Placements section of this plan.

### PRINT PUBLICATIONS
#### Newspaper Supplement
- *Relish*

#### Consumer Magazines
- *Parents*
- *People*
- *Southern Living*

### ONLINE MEDIA
#### Internet Banner Ads
- 24/7 Network
- Facebook.com
- Microsoft Media Network
- Specific Media Network
- Yahoo! Network

Case 1:12-cv-03864-CRB Document 60-1 Filed 04/25/13 Page 76 of 103

*Trammell v. Barbara's Bakery, Inc.*

# PAID MEDIA METHODOLOGY

© 2013 KINSELLA MEDIA, LLC

# PAID MEDIA METHODOLOGY

KM notice programs directed to unidentified class members: (1) identify the demographics of class members and establish a target audience, (2) outline the methodology for selecting the media and other program elements and how they relate to product usage or exposure, and (3) provide results that quantify for the court the adequacy of the notice based upon recognized tools of media measurement.

In the wake of the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the reliability of a notice expert's testimony should be tested against the standards developed within the media industry for determining to what degree and at what frequency a target audience has been reached. In assessing the expert's reliability, the court must determine whether the testifying expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. That showing would likely require evidence that the expert's data and methodology are similar to that used by professionals in the relevant field.

In keeping with the *Daubert* and *Kumho* rulings, KM employs methodology and measurement tools used in the media planning and advertising industry for designing and measuring the adequacy of a paid media program to reach a particular audience.

Choosing a target audience that encompasses the characteristics of class members is the first step in designing the paid media program. KM chooses media vehicles based on their ability to provide effective and cost-efficient penetration of the target audience. Then it measures selected vehicles against the target audience to quantify the reach of the media program and the frequency of exposure to the media vehicles. Reach and frequency estimates are two of the primary measurements used to quantify the media penetration of a target audience.

➤ *Reach* is the estimated number of different people exposed to a specific vehicle or combination of vehicles. It can be expressed as whole number or percentage of the total population.

➤ *Frequency* is the estimated average number of opportunities an audience member has to see the notice.

# TARGET AUDIENCE

<div align="center">

TARGET AUDIENCE:
# SELECTION METHODOLOGY

</div>

To develop a profile of the demographics and media habits of potential Class Members, KM analyzed syndicated data available from GfK MRI's *2012 Doublebase Study*[1].

GfK MRI is the leading U.S. supplier of multimedia audience research. As a nationally accredited research firm, it provides information concerning magazines, television, radio, Internet and other media to leading national advertisers and over 450 advertising agencies – including 90 of the top 100 in the U.S. GfK MRI's nationally syndicated data are widely used by these companies as the basis for the majority of the media and marketing plans written for advertised brands in the U.S.

Specifically, GfK MRI presents a single-source measurement of major media, products, services, and in-depth consumer demographic and lifestyle characteristics. GfK MRI provides data on media usage, audience composition, and other relevant factors pertaining to all major media types as well as the readership of print vehicles.

Therefore, to adequately reach the Class, KM will purchase and measure media against the following primary target:

➢ Adults 18 years of age and older that bought food labeled as natural or organic ("Healthy Food Purchasers")

---

[1] Since 1979, GfK MRI's *Survey of the American Consumer* has conducted detailed polling of a large sample of U.S. adults about the media they see and hear and about the products they use. Participants in the survey are identified by age, occupation, income, education and by where they live, among other things. They are asked what magazines and newspapers they read, what TV shows and cable channels they watch, and are asked questions about Internet access and radio formats. Survey data indicate the brands and products they use from among 500 categories and 6000 consumer brands. The data from this survey is used by media practitioners industry-wide to characterize media and product users by demographics and to account for and compare the size and make-up of media audiences. The *Doublebase Study* consists of two years of *Survey of the American Consumer* data. (GfK MRI was known until mid-2010 as Mediamark Research & Intelligence, or MRI.)

<div align="center">

TARGET AUDIENCE:
**DEMOGRAPHICS**

</div>

Based on GfK MRI data, the graph below outlines the demographics of Healthy Food Purchasers and the demographics of adults 18 years and older ("Adults 18+") for comparison purposes:

| DEMOGRAPHICS | ADULTS 18+ | HEALTHY FOOD PURCHASERS |
|---|---|---|
| **Gender** | | |
| Male | 48.4% | 31.6% |
| Female | 51.6% | 68.4% |
| **Age** | | |
| 18-24 | 12.8% | 11.3% |
| 25-34 | 17.9% | 17.8% |
| 35-44 | 17.7% | 19.0% |
| 45-54 | 19.3% | 21.0% |
| 55-64 | 15.5% | 18.0% |
| 65+ | 16.8% | 13.0% |
| **Education** | | |
| Graduated/Attended College | 55.4% | 69.7% |
| Graduated High School | 30.8% | 22.7% |
| **Household Income[2]** | | |
| Under $20,000 | 13.9% | 8.9% |
| $20,000 - $39,999 | 19.7% | 14.5% |
| $40,000 - $59,999 | 17.0% | 15.9% |
| $60,000 - $74,999 | 10.9% | 10.3% |
| $75,000+ | 38.6% | 50.4% |
| $100,000+ | 25.1% | 33.9% |
| **Ethnicity[3]** | | |
| Caucasian | 76.1% | 79.6% |
| African-American | 11.7% | 9.4% |
| Hispanic | 14.0% | 11.2% |
| Asian | 3.2% | 4.1% |
| Other | 9.5% | 7.4% |

[2] The total percentages listed do not equal exactly 100% percent because GfK MRI rounds up all percentages to the nearest tenth of a decimal.

[3] The GfK MRI *Doublebase Study* allows for multi-classification of an individual's ethnicity. Therefore, the sum of all ethnicities may be greater than 100%.

*Trammell v. Barbara's Bakery, Inc.*

| Location[4] | ADULTS 18+ | HEALTHY FOOD PURCHASERS |
|---|---|---|
| A & B "Urban" Counties | 71.7% | 79.6% |
| C & D "Rural" Counties | 28.3% | 20.4% |

Based on these data, Healthy Food Purchasers are more likely than the average adult to be/have:

➢ Women

➢ 25-64 years of age

➢ Educated

➢ A household income over $75,000

➢ Living in urban counties

---

[4] "A" Counties, as defined by A.C. Nielsen Company ("Nielsen"), are all counties belonging to the 25 largest metropolitan areas. These metro areas correspond to the Metropolitan Statistical Area and include the largest cities and consolidated areas in the United States. "B" Counties, as defined by Nielsen, are all counties not included under A that have either a population greater than 150,000 or are in a metro area with a population greater than 150,000 according to the latest census. "C" Counties, as defined by Nielsen, are all counties not included under A or B that either have a population greater than 40,000 or are in a metro area with a population greater than 40,000 according to the latest census. "D" Counties are, essentially, rural counties.

© 2013 KINSELLA MEDIA, LLC

# TARGET AUDIENCE:
## MEDIA USAGE

Individuals spend varying amounts of time with different media. Certain demographic groups may be heavy consumers, light consumers, or non-users of a particular medium. For example, GfK MRI data shows that individuals who are less educated are likely to be heavy television viewers and light newspaper readers. Conversely, highly educated individuals are more likely to be heavy newspaper readers and light television viewers.

KM notice plans focus on the media types used most often by the target audiences. To examine the media habits of the target audience, KM compares the target audience's media usage to that of the average adult 18 years of age and older ("Adult 18+") in usage quintiles reported by GfK MRI. The study ranks respondents based on their amount of exposure to a medium and divides them into five equal-sized groups ("quintiles") from heaviest usage (1) to lightest usage (5).

The media usage of the target audience in each quintile is expressed as an index. An index of 100 is the average adult's usage of a particular medium. Therefore, an index above 100 indicates a heavier usage of the medium than the average adult, and an index below 100 indicates a lighter usage of the medium than the average adult.

The target audience's top two quintiles (heaviest and next heaviest usage) for each type of media are:

| MEDIA | ADULTS 18+ | HEALTHY FOOD PURCHASERS |
|---|---|---|
| **Magazine** | | |
| Quintile 1 | 100.0 | 113.0 |
| Quintile 2 | 100.0 | 113.0 |
| **Newspaper** | | |
| Quintile 1 | 100.0 | 100.0 |
| Quintile 2 | 100.0 | 97.0 |
| **Radio** | | |
| Quintile 1 | 100.0 | 96.0 |
| Quintile 2 | 100.0 | 108.0 |
| **Television** | | |
| Quintile 1 | 100.0 | 67.0 |
| Quintile 2 | 100.0 | 84.0 |
| **Internet** | | |
| Quintile 1 | 100.0 | 125.0 |
| Quintile 2 | 100.0 | 114.0 |

These data indicate the following regarding the target audience's media consumption habits:

*Trammell v. Barbara's Bakery, Inc.*

➢ Heavy consumers of Internet and magazines

➢ Average consumers of newspapers and radio

➢ Light television viewers

# PAID MEDIA PLACEMENTS

*Trammell v. Barbara's Bakery, Inc.*

PAID MEDIA PLACEMENTS:
## NEWSPAPER SUPPLEMENTS

*Relish* is a publication known as a newspaper supplement that is inserted into weekend or Sunday editions newspapers nationwide. These magazines, printed on newsprint, contain articles written for broad, general appeal and encourage readership through brevity. Issues are typically fewer than 30 pages. For this Notice Program, KM recommends this newspaper supplement because of its cost-effective reach capability.

*Relish* appears in 1,008 papers. A list of the newspapers into which the selected supplement is inserted is attached as Exhibit B.

KM recommends the following newspaper supplement placement:

# relish

➢ A two-fifths-page ad (4.75" x 6.625") once in *Relish* with an estimated circulation of 15,000,000.[5]

➢ *Relish* is published monthly and is a food-focused newspaper supplement. The magazine brings readers useful cooking tips, recipes, and new products for the kitchen.

➢ 37.8% of Healthy Food Purchasers read an average issue of *Relish*.

---

[5] The GfK MRI readership estimate for *Relish* is reflective of the broader readership measurement of the newspaper carrier groups into which these supplements are inserted. A custom study, conducted in 2003, by GfK MRI indicates that the actual readership of the supplements is less than that of the carrier papers. While this study provided directional insight into the audience, the data provided is highly variable and insufficient for use in specific computation of reach and frequency. Therefore, the use of carrier paper readership for the newspaper supplements remains an accredited methodology

<div align="center">

P AID M EDIA P LACEMENTS:
## CONSUMER MAGAZINES

</div>

Most adults read one or more magazines during an average month and nearly three out of five adults read or look at a magazine daily. Heavy readers read 16 or more magazines per month. Weekly magazines quickly accumulate readership and provide timely and efficient notice to readers. KM chose the specific consumer magazines listed below because they are among the highest ranking in coverage of the target audience.

KM recommends the following consumer magazine placements:



- ➢ A half-page ad (3.5" x 10") once in *Parents* with an estimated circulation of 2,200,000.

- ➢ *Parents* is published monthly and provides information and advice in raising healthy children.

- ➢ 6.6% of Healthy Food Purchasers read an average issue of *Parents*.

- ➢ A half-page ad (3.375" x 10") once in *People* with an estimated circulation of 3,475,000.

- ➢ *People* is a weekly publication covering contemporary personalities in entertainment, politics, business, and other current events.

- ➢ 21.8% of Healthy Food Purchasers read an average issue of *People*.

- ➢ A half-page ad (3.5" x 10") once in *Southern Living* with an estimated circulation of 2,800,000.

- ➢ *Southern Living* is a monthly publication covering food, travel, homes, and gardens between the South's traditional and cosmopolitan attitudes.

- ➢ Healthy Food Purchasers are 24% more likely than the average adult to be *Southern Living* readers.

*Trammell v. Barbara's Bakery, Inc.*

## TARGET AUDIENCE'S PRINT READERSHIP

Readership includes both primary readers and pass-along readers. Primary readers purchase a publication or are members of a household where the publication was purchased. Pass-along readers are those who read the publication outside the home, in places such as a doctor's office. The table below indicates the estimated number of readers in the target audience of an average issue of the magazine or newspaper supplement:

| PUBLICATION | INSERTIONS | HEALTHY FOOD PURCHASERS |
|---|---|---|
| *Parents* | 1 | 1,374,000 |
| *People* | 1 | 4,543,000 |
| *Southern Living* | 1 | 1,670,000 |
| *Relish* | 1 | 7,866,000 |

*Trammell v. Barbara's Bakery, Inc.*

PAID MEDIA PLACEMENTS:
## INTERNET ADVERTISING

GfK MRI provides data on Internet usage by asking survey respondents about their online usage during the 30 days prior to the survey. According to GfK MRI, 88.2% of Healthy Food Purchasers used the Internet during the last 30 days.

Accordingly, KM recommends incorporating Internet advertising into the Notice Program in order to provide potential Class Members with additional national notice opportunities beyond the broad-reaching print program. Internet advertising delivers an immediate message and allows the viewer of an advertisement to instantly click through to a website for further information.

### WEBSITE ADVERTISING

KM recommends placing ads on a wide range of websites, enabling maximum exposure opportunities to reach the broad audience of Healthy Food Purchasers. In addition, websites with audiences that are highly comprised of the specific target audiences were also selected. KM also recommends using advanced targeting to reach Healthy Food Purchasers and to optimize based on performance during the campaign. After optimization additional Internet sites may be used to increase exposure to the message. (Delivery of Internet impressions to specific sites and categories within sites are subject to availability at the time KM purchases the media.)

KM recommends 247,000,000+ impressions in the following Web placements:



- ➢ 24/7 Real Media is a network that represents over 5,000 websites.

- ➢ Banner advertisements measuring 728 x 90 pixels, 300 x 250 pixels, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the 24/7 Real Media Network.

**facebook**

- ➢ Facebook.com is a free, global social networking website that helps people communicate with friends, family and coworkers.

- ➢ A banner advertisement measuring 100 x 100 pixels will appear, on a rotating basis, on Facebook.com.

*Trammell v. Barbara's Bakery, Inc.*



➢ Microsoft Media Network is a premium ad network of top-ranked commercial sites.

➢ Banner advertisements measuring 728 x 90 pixels, 300 x 250 pixels, and 160 x 600 pixels will appear, on a rotating basis, on the Microsoft Media Network.

➢ Specific Media is an online media company that enables advertisers to target audiences through advanced proprietary technologies across a premium network.

➢ Banner advertisements measuring 728 x 90 pixels, 300 x 250 pixels, and 160 x 600 pixels will appear, on a rotating basis, on the Specific Media Network.

➢ Yahoo! is a leading Internet brand and a global online network of integrated services providing users with entertainment and other quality content.

➢ Banner advertisements measuring 728 x 90 pixels, 300 x 250, and 120 x 600 pixels will appear, on a rotating basis, on various Yahoo! Web pages.

*Trammell v. Barbara's Bakery, Inc.*

# NATIONAL MEDIA DELIVERY

The paid media program outlined in this plan provides Class Members with multiple exposure opportunities to media vehicles carrying the Notice and delivers the following estimated reach and frequency measurements to the target audience defined by the 2012 ComScore/GfK MRI Media+ Fusion (12-12/S12) Study[6] from GfK MRI and comScore:

> ➢ An estimated 80.1% of Healthy Food Purchasers will be reached with an average estimated frequency of 2.3 times, delivering at least 38,000,000 gross impressions.[7]

---

[6] GfK MRI Net+ Fusion combines GfK MRI's *Survey of the American Consumer* and Nielsen Online's NetView, providing a single-source dataset of off-line and online media usage by American consumers. Nielsen uses a patented metering technology and representative panels of Internet users to collect and report consumer Internet usage. The GfK MRI survey provides data on magazine and newspaper reading, television viewing, radio listening, product consumption, psychographic characteristics, computer and Internet access configurations, and geo-demographic characteristics. Combining the two datasets provides unduplicated audience estimates across print and online media.

[7] Gross Impressions are the duplicated sum of audiences to the media vehicles containing the notice.

# NOTICE DESIGN

NOTICE DESIGN:
# DIRECT NOTICE

The plain language Email and Postcard Notices (Exhibit C) are designed to alert Class Members to the litigation by using an informative headline. This headline will enable Class Members to quickly determine if they may be affected by the litigation. Plain language text provides important information regarding the subject of the litigation, the Class definition, and the legal rights available to Class Members. The Email and Postcard Notices include all of the substantive information required by Rule 23.

Each notice will prominently feature a toll-free number and website address for Class Members to obtain the Detailed Notice and other information.

NOTICE DESIGN:
# DETAILED NOTICE

The Detailed Notice (Exhibit D) will be compliant with Rule 23 and consistent with the Federal Judicial Center's "illustrative" class action notices. Specifically, the Detailed Notice will clearly and concisely state in plain, easily understood language:

> ➢ The nature of the action;
>
> ➢ The definition of the class certified;
>
> ➢ The class claims, issues, or defenses;
>
> ➢ That a class member may enter an appearance through an attorney if the member so desires;
>
> ➢ That the Court will exclude from the class any member who requests exclusion;
>
> ➢ The time and manner for requesting exclusion; and
>
> ➢ The binding effect of a class judgment on members under Rule 23 (c)(3).

The Detailed Notice will prominently feature a toll-free number and website address for Class Members to obtain more information and file a claim.

NOTICE DESIGN:
## PUBLICATION NOTICE

Rule 23(c)(2) of the Federal Rules of Civil Procedure requires notices in 23(b)(3) class actions to be written in "plain, easily understood language." KM applies the plain language requirement in drafting all notices in federal and state class actions. The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its experience and expertise to draft notices that effectively convey the necessary information to Class Members.

The plain language Publication Notice (Exhibit E), is designed to alert Class Members to the litigation by using a bold headline. This headline will enable Class Members to quickly determine if they are potentially affected by the litigation. Plain language text provides important information regarding the subject of the litigation, the Class definition and the legal rights available to Class Members. The Publication Notice will include all the substantive information required by Rule 23.

Each advertisement will prominently feature a toll-free number and website address to obtain the Detailed Notice and other information.

Notice Design:
# WEBSITE AND INTERNET ADS

An informational interactive website is a critical component of the Notice Program. A website is a constant information source instantly accessible to millions. In this case, the site will capitalize on the Internet's ability to distribution information and provide access to customer service.

## WEBSITE DESIGN

Combining clean site design, consistent site navigation cues and search engine optimization, the website will provide Class Members with easy access to the details of the litigation.

➤ **CLEAN DESIGN:** The site will be designed for ease of navigation and comprehension, with user-friendly words and icons. Clearly labeled content will include the Detailed Notice, court documents, and answers to frequently asked questions. A "Contact Us" page will provide a toll-free number for individuals seeking additional information and the address or email of Class Counsel.

➤ **ONLINE REGISTRATION/CLAIM FILING:** In an effort to make it even easier for Class Members to receive information/make claims, the website will allow users to request hard copies of materials, and/or make a claim online.

## INTERNET BANNER AD DESIGN

KM will design Internet banner advertisements to alert Class Members to the litigation by using a bold headline. The headline will enable Class Members to quickly determine if they may be affected by the litigation. When users click on the banner advertisement, they will be connected to the informational website that contains complete information about their legal rights.

# EARNED MEDIA PROGRAM

Earned media provides additional notice to Class Members, amplifying the paid media program. Earned media, as opposed to paid media, occurs by disseminating a message about the Settlement to the media without a guarantee that it will appear. KM will distribute the message to media outlets (newspapers, websites, television, and radio stations) hoping to spark press interest and generate coverage.

The earned media outreach for this program will focus primarily on key daily newspapers, websites, wire services, national newspaper bureaus, and major television and radio outlets.

## TRADITIONAL PRESS RELEASE

KM will distribute a press release on PR Newswire's US1 national wire, reaching more than 5,500 print and broadcast outlets and more than 5,400 websites and online databases. The press release will highlight the toll-free telephone number and Settlement website address so that Class Members can obtain complete information.

## TOLL-FREE TELEPHONE SUPPORT

A toll-free interactive voice response system (IVR) will be established to service Class Members calling as a result of seeing the paid media notice. Callers requesting the Detailed Notice will be prompted to input the telephone number of the residence where they would like to receive the Notice.

The system uses an address look-up database to locate the corresponding address of the resident. A portion of the address will be read back to the caller for address verification. For successful look-ups, the caller will be asked to speak the Class Member's full name and to spell the last name. If the look-up fails, is incorrect, or the call is placed from a rotary dial telephone, callers will be prompted to state their name, address, and telephone number.

Case 1:12-cv-03264-CRB Document 86-21 Filed 04/25/13 Page 334 of 552 PageID #: 565

# EXHIBIT A

Case 1:12-cv-03824-CBB Document 86-21 Filed 04/25/13 Page 335 of 552 PageID #: 566



# Kinsella Media, LLC

## Relevant Case Experience

**Antitrust**

*Big Valley Milling, Inc. v. Archer Daniels Midland Co.,* No. 65-C2-96-000215 (Minn. Dist. Ct. Renville County) (lysine).

*Carlson v. Abbott Laboratories*, No. 94-CV-002608 (Wis. Cir. Ct. Milwaukee County) (infant formula).

*Comes v. Microsoft Corp.,* No. CL8231 (Iowa Dist. Ct. Polk County

*Connecticut v. Mylan Laboratories, Inc.,* No. 99-276, MDL No. 1290 (D.D.C.) (pharmaceutical).

*Conroy v. 3M Corp.*, No. C-00-2810 CW (N.D. Cal.) (invisible tape).

*Copper Antitrust Litigation,* MDL 1303 (W.D. Wis.) (physical copper).

*Cox v. Microsoft Corp.,* No. 105193/00 (N.Y. Sup. Ct. N.Y. County) (software).

*D.C. 37 Health & Security Plan v. Medi-Span*, No. 07-cv-10988 (D.Mass.); *New England Carpenters Health Benefits Fund v. First DataBank, Inc.,* No. 1:05-CV-11148 (D. Mass.) (pharmaceutical).

*Giral v. Hoffman-LaRoche Ltd.*, C.A. No. 98 CA 7467 (W. Va. Cir. Ct., Kanawha County) (vitamins).

*In re Buspirone Antitrust Litigation*, MDL No. 1413 (S.D.N.Y.) (pharmaceutical).

*In re Cardizem Antitrust Litigation*, 200 F.R.D. 326 (E.D. Mich.) (pharmaceutical).

*In re Compact Disc Minimum Price Antitrust Litigation*, MDL No. 1361 (D. Me.) (compact discs).

*In re Insurance Brokerage Antitrust Litig.*, MDL No. 1663 Civil No. 04-5184 (FSH) (D.N.J.) (insurance).

*In re International Air Transportation Surcharge Antitrust Litigation*, No. M 06-1793, MDL No. 1793 (N.D. Cal.) (airline fuel surcharges).

*In re Monosodium Glutamate Antitrust Litig.,* D-0202-CV-0200306168, D-202-CV-200306168 (N.M. Dist. Ct., Bernalillo County) (MSG).

*In re Motorsports Merchandise Antitrust Litigation,* No. 1:97-CV-2314-TWT (N.D. Ga.) (merchandise).

*In re Nasdaq Market-Makers Antitrust Litigation*, MDL No. 1023 (S.D.N.Y.) (securities).

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, No. CA:01-CV-12257, MDL No. 1456 (D. Mass.) (pharmaceutical).

*In re Toys "R" Us Antitrust Litigation*, No. CV-97-5750, MDL No. 1211, (E.D.N.Y.) (toys and other products).

*In re Western States Wholesale Natural Gas Antitrust Litigation*, No. CV-03-1431, MDL No. 1566, (D. Nev) (natural gas).

*Kelley Supply, Inc. v. Eastman Chemical Co*., No. 99CV001528 (Wis. Cir. Ct., Dane County) (Sorbates).

*Ohio vs. Bristol-Myers Squibb, Co*., No. 1:02-cv-01080 (D.D.C.) (pharmaceutical).

*Raz v. Archer Daniels Midland Co.,* Inc., No. 96-CV-009729 (Wis. Cir. Ct. Milwaukee County) (citric acid).

## Consumer and Product Liability

*Azizian v. Federated Department Stores, Inc.,* No. 4:03 CV-03359 (N.D. Cal.) (cosmetics).

*Baird v. Thomson Consumer Elecs.,* No. 00-L-000761 (Ill. Cir. Ct., Madison County) (television).

*Bonilla v. Trebol Motors Corp.,* No. 92-1795 (D.P.R.) (automobiles).

*Burch v. American Home Products Corp.,* No. 97-C-204 (1-11) (W. Va. Cir. Ct., Brooke County) (Fen Phen).

*Cosby v. Masonite Corp., No.* CV-97-3408 (Ala. Cir. Ct. Mobile County) (siding product); *Quin v. Masonite Corp.,* No. CV-97-3313 (Ala. Cir. Ct. Mobile County) (roofing product).

*Cox v. Shell Oil Co.,* No. 18,844 (Tenn. Ch. Ct. Obion County) (polybutylene pipe).

*Daniel v. AON Corp.,* No. 99 CH 11893 (Ill. Cir. Ct. Cook County) (insurance).

*Fettke v. McDonald's Corp.,* No. 044109 (Cal. Super Ct. Marin County) (trans fatty acids).



*Florida v. Nine West Group, Inc.,* No. 00 CIV 1707 (S.D.N.Y.) (shoes).

*Foothill/De Anza Community College Dist. v. Northwest Pipe Co.,* No. 00-20749-JF(N.D. Cal.) (fire sprinklers).

*Galanti v. The Goodyear Tire & Rubber Company,* No. 03-209 (D.N.J.) (radiant heating) (2002).

*Garza v. Sporting Goods Properties, Inc.,* No. SA 93-CA-1082 (W.D. Tex.) (gun ammunition).

*Hoorman v. GlaxoSmithKline,* No. 04-L-715 (Ill. Cir. Ct., Madison Cty.) (Paxil pharmaceutical*).*

*In re Louisiana Pacific Corp. Inner Seal OSB Trade Practices Litigation,* MDL No. 1114 (N.D. Cal.) (oriented strand board).

*In re Tri-State Crematory Litig,* MDL 1467 (N.D. Ga.) (improper burial).

*Lebrilla v. Farmers Group Inc.,* No. 00-CC-07185 (Cal. Super. Ct., Orange County) (auto insurance).

*Lovelis v. Titflex,* No. 04-211 (Ak. Cir. Ct., Clark County) (gas transmission pipe).

*Naef v. Masonite Corp.,* No. CV-94-4033 (Ala. Cir. Ct. Mobile County) (hardboard siding product).

*Peterson v. BASF Corp.,* No. C2-97-295 (D. Minn.) (herbicide).

*Posey v. Dryvit Sys., Inc.* No. 17,715-IV (Tenn. Cir. Ct., Jefferson County) (EIFS stucco).

*Reiff v. Epson America, Inc. and Latham v. Epson Am., Inc.,* J.C.C.P. No. 4347 (Cal. Super. Ct., L.A. County) (ink jet printers).

*Richison v. Weyerhaeuser Company Limited,* No. 05532 (Cal. Super. Ct. San Joaquin County) (roofing product).

*Ruff v. Parex, Inc.,* No. 96-CvS 0059 (N.C. Super. Ct. Hanover County) (synthetic stucco product).

*Shah v. Re-Con Building Products, Inc.,* No. C99-02919 (Cal. Super. Ct. Contra Costa County) (roofing product).

*Shields vs. Bridgestone/Firestone, Inc., Bridgestone Corp.,* No. E-167.637 (D. Tex.) (tires).

*Smith v. Behr Process Corp.,* No. 98-2-00635 (Wash. Super. Ct., Gray Harbor County) (stain product).



*Weiner v. Cal-Shake, Inc., J.*C.C.P. No. 4208 (Cal. Super. Ct., Contra Costa County) (roofing product).

*Wholesale Elec. Antitrust Cases I & II,* J.C.C.P. Nos. 4204 & 4205 (Cal. Super. Ct., San Diego County) (energy).

*Woosley v. State of California,* No. CA 000499 (Cal. Super. Ct., Los Angeles County) (automobiles).

## Mass Tort

*Ahearn v. Fibreboard Corp.,* No. 6:93cv526 (E.D. Tex); *Continental Casualty Co. v. Rudd*, No. 6:94cv458 (E.D. Tex) (asbestos injury).

*Backstrom v. The Methodist Hospital,* No. H.-94-1877 (S.D. Tex.) (TMJ injury).

*Engle v. RJ Reynolds Tobacco Co.,* No. 94-08273 (Fla. Cir. Ct. Dade County) (tobacco injury).

*Georgine v. Amchem, Inc.,* No. 93-CV-0215 (E.D. Pa.) (asbestos injury).

## Bankruptcies

*In re Armstrong World Industries, Inc.,* No. 00-4471 (Bankr. D. Del.).

*In re Dow Corning,* No. 95-20512 (Bankr. E.D. Mich.) (breast implants).

*In re Johns-Manville Corp.,* 68 B.R. 618, 626 (Bankr. S.D.N.Y.) (asbestos).

*In re Kaiser Aluminum Corp.,* No. 02-10429 (JFK) (D. Del).

*In re Owens Corning,* No. 00-03837 (Bankr. D. Del.).

*In re Raytech Corp.,* No. 5-89-00293 (Bankr. D. Conn.) (asbestos).

*In re The Celotex Corp.,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (asbestos).

*In re U.S. Brass Corp.,* No.94-40823S (Bankr. E.D. Tex.) (polybutylene).

*In re USG Corp.,* Nos. 01-2094 - 01-2104 (Bankr. D. Del.).

*In re W.R. Grace & Co.,* No. 01-01139 (Bankr. D. Del.).



## Insurance

*McNeil v. American General Life and Accident Insurance Co.,* No. 8-99-1157 (M.D. Tenn.) (insurance).

*Nealy v. Woodmen of the World Life Insurance Co.,* No. 3:93 CV-536 (S.D. Miss.) (insurance).

## Holocaust Victims Reparations

*In re Holocaust Victim Assets Litigation,* Nos. CV 96-4849, CV-5161 and CV 97-461 (E.D.N.Y.) (Holocaust).

The International Commission on Holocaust Era Insurance Claims Outreach

## Pension Benefits

*Collins v. Pension Benefit Guarantee Corp.,* No. 88-3406 (D.D.C.); Page v. Pension Benefit Guarantee Corp., No. 89-2997 (D.D.C.).

*Forbush v. J. C. Penney Co., Inc.,* Nos. 3:90-2719 and 3:92-0109 (N.D. Tex.).

## International

*Ahearn v. Fiberboard Corporation,* No. 6:93cv526 (E.D. Tex) and *Continental Casualty Co. v. Rudd,* No. 6:94cv458 (E.D. Tex.) (asbestos injury) (1993).

*Galanti v. The Goodyear Tire & Rubber Company,* No. 03-209 (D.N.J.) (radiant heating) (2002).

*In re Holocaust Victims Assets Litigation,* No. CV 96-4849 (ERK) (MDG) (Consolidated with CV-5161 and CV 97461) (E.D.N.Y.) (2003).

*In re Owens Corning, Chapter 11,* No. 00-03837 (MFW) (Bankr. D. Del.) (2006).

*In re The Celotex Corporation, Chapter 11,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (1996).

*In re USG Corporation, Chapter 11,* Nos. 01-2094 (RJN) through 01-2104(RJN) (Bankr. D. Del.) (2006).

*In re Western Union Money Transfer Litigation,* No. 01 0335 (CPS) (VVP) (E.D.N.Y.) (wire transactions) (2004).

*In re W.R. Grace & Co., Chapter 11,* No. 01-01139 (Bankr. D. Del.) (bankruptcy) (2001).



International Committee on Holocaust Era Insurance Claims (1999).

## Product Recall

Central Sprinkler Voluntary Omega Sprinkler Replacement Program

*Hart v. Central Sprinkler Corp.,* No. BC17627 (Cal. Super. Ct. Los Angeles County) & *County of Santa Clara v. Central Sprinkler Corp., No.* CV 17710119 (Cal. Super. Ct. Santa Clara County)

## Telecom

*Bidner, et al. v. LCI International Telecom Corp d/b/a Qwest Communications.*

*Community Health Association v. Lucent Technologies, Inc.,* No. 99-C-237, (W.Va. Cir. Ct., Kanawha County).

*Cundiff et al. v. Verizon California, Inc.,* No. 237806 (Cal. Super Ct., Los Angeles County).

*Kushner v. AT&T Corporation,* No. GIC 795315 (Cal. Super. Ct., San Diego County).

*Rish Enterprise v. Verizon New Jersey,* No. MID-L-8946-02 (N.J. Super. Ct.).

*Sonnier, et. al. v. Radiofone, Inc.,* No. 44-844, (L.A. Jud. Dist. Ct., Plaquemines Parish County).

*State of Louisiana v. Sprint Communications Company L.P.,* No. 26,334 (Jud. Dis. Ct., Parish of West Baton Rouge) and *State of Louisiana v. WilTel, Inc.,* No. 26,304 (Jud. Dis. Ct., Parish of West Baton Rouge).



# EXHIBIT B

Case 1:12-cv-03261-WBH Document 6-21 Filed 04/25/13 Page 565 of 103 PageID #: 573

## Relish Carrier Newspaper List

| Publication | City | State | County | Circulation | DMA |
|---|---|---|---|---|---|
| The Sand Mountain Reporter | Albertville | AL | Marshall | 10,100 | HUNTSVILLE-DECATUR (FLOR) |
| The Outlook | Alexander City | AL | Tallapoosa | 3,900 | MONTGOMERY (SELMA) |
| The Andalusia Star-News | Andalusia | AL | Covington | 4,450 | MONTGOMERY (SELMA) |
| The Anniston Star | Anniston | AL | Calhoun | 22,000 | BIRMINGHAM (ANN AND TUSC) |
| Daily Home | Anniston | AL | Calhoun | 9,500 | BIRMINGHAM (ANN AND TUSC) |
| Coosa Valley Advantage | Anniston | AL | Calhoun | 17,500 | BIRMINGHAM (ANN AND TUSC) |
| The News Courier | Athens | AL | Limestone | 7,226 | HUNTSVILLE-DECATUR (FLOR) |
| The Atmore Advance | Atmore | AL | Escambia | 3,200 | MOBILE-PENSACOLA (FT WALT) |
| The Brewton Standard | Brewton | AL | Escambia | 3,000 | MOBILE-PENSACOLA (FT WALT) |
| The Cullman Times | Cullman | AL | Cullman | 12,125 | BIRMINGHAM (ANN AND TUSC) |
| The Demopolis Times | Demopolis | AL | Marengo | 3,000 | MONTGOMERY (SELMA) |
| The Dothan Eagle | Dothan | AL | Houston | 31,700 | DOTHAN |
| The Eufaula Tribune | Eufaula | AL | Barbour | 5,580 | COLUMBUS GA |
| The Times-Journal | Fort Payne | AL | DeKalb | 6,500 | HUNTSVILLE-DECATUR (FLOR) |
| North Jefferson News | Gardendale | AL | Jefferson | 4,454 | BIRMINGHAM (ANN AND TUSC) |
| Daily Mountain Eagle | Jasper | AL | Walker | 11,044 | BIRMINGHAM (ANN AND TUSC) |
| The Monroe Journal | Monroeville | AL | Monroe | 7,000 | MOBILE-PENSACOLA (FT WALT) |
| The Opelika-Auburn News | Opelika | AL | Lee | 14,800 | COLUMBUS GA |
| St. Clair News-Aegis | Pell City | AL | St. Clair | 3,200 | BIRMINGHAM (ANN AND TUSC) |
| The Randolph Leader | Roanoke | AL | Randolph | 7,200 | ATLANTA |
| The Daily Sentinel | Scottsboro | AL | Jackson | 5,100 | HUNTSVILLE-DECATUR (FLOR) |
| The Tallassee Tribune | Tallassee | AL | Elmore | 4,000 | MONTGOMERY (SELMA) |
| The Messenger | Troy | AL | Pike | 3,333 | MONTGOMERY (SELMA) |
| The Eclectic Observer | Wetumpka | AL | Elmore | 1,600 | MONTGOMERY (SELMA) |
| The Wetumpka Herald | Wetumpka | AL | Elmore | 4,000 | MONTGOMERY (SELMA) |
| Blytheville Courier News | Blytheville | AR | Mississippi | 4,949 | MEMPHIS |
| Camden News | Camden | AR | Ouachita | 3,959 | LITTLE ROCK-PINE BLUFF |
| The Villager Journal | Cherokee Village | AR | Sharp | 2,200 | JONESBORO |
| El Dorado News-Times | El Dorado | AR | Union | 9,382 | MONROE-EL DORADO |
| Northwest Arkansas Times | Fayetteville | AR | Washington | 64,000 | FT. SMITH-FAY-SPRNGDL-RGRS |
| Cleburne County Sun-Times | Heber Springs | AR | Cleburne | 5,025 | LITTLE ROCK-PINE BLUFF |
| Helena-West Helena Daily World | Helena | AR | Phillips | 4,090 | MEMPHIS |
| Hope Star | Hope | AR | Hempstead | 3,075 | SHREVEPORT |
| The Daily Siftings Herald | Hope | AR | Hempstead | 3,075 | SHREVEPORT |
| The Sentinel-Record | Hot Spring | AR | Garland | 22,370 | LITTLE ROCK-PINE BLUFF |
| The Jonesboro Sun | Jonesboro | AR | Craighead | 20,000 | JONESBORO |
| Arkansas Democrat Gazette Inc | Little Rock | AR | Pulaski | 120,000 | LITTLE ROCK-PINE BLUFF |
| Banner-News | Magnolia | AR | Columbia | 4,157 | SHREVEPORT |
| Northeast Arkansas Town Crier | Manila | AR | Mississippi | 2,000 | MEMPHIS |
| Newport Independent | Newport | AR | Jackson | 2,261 | LITTLE ROCK-PINE BLUFF |
| Paragould Daily Press | Paragould | AR | Greene | 4,800 | JONESBORO |
| Clay County Times Democrat | Rector | AR | Clay | 2,600 | JONESBORO |
| The Courier | Russellville | AR | Pope | 8,500 | LITTLE ROCK-PINE BLUFF |
| The News | Salem | AR | Fulton | 2,550 | SPRINGFIELD MO |
| The Daily Citizen | Searcy | AR | White | 5,208 | LITTLE ROCK-PINE BLUFF |
| Daily Leader | Stuttgart | AR | Arkansas | 3,015 | LITTLE ROCK-PINE BLUFF |
| Poinsett County Democrat Tribune | Trumann | AR | Poinsett | 1,500 | MEMPHIS |
| The White Hall Journal | White Hall | AR | Jefferson | 2,350 | LITTLE ROCK-PINE BLUFF |
| San Pedro Valley News - Sun | Benzon | AZ | Cochise | 3,030 | TUCSON (SIERRA VISTA) |
| The Bugle | Cottonwood | AZ | Yavapai | 2,450 | PHOENIX (PRESCOTT) |
| The Verde Independent | Cottonwood | AZ | Yavapai | 2,499 | PHOENIX (PRESCOTT) |
| The Daily Dispatch | Douglas | AZ | Cochise | 4,040 | TUCSON (SIERRA VISTA) |
| Arizona Daily Sun | Flagstaff | AZ | Coconino | 11,383 | PHOENIX (PRESCOTT) |
| The Kingman Daily Miner | Kingman | AZ | Mohave | 8,314 | PHOENIX (PRESCOTT) |
| Today's News Herald | Lake Havasu City | AZ | Mohave | 11,500 | PHOENIX (PRESCOTT) |
| Parker Pioneer | Parker | AZ | Mohave | 4,660 | PHOENIX (PRESCOTT) |
| Payson Roundup | Payson | AZ | Gila | 6,000 | PHOENIX (PRESCOTT) |
| Ahwatukee Foothills News | Phoenix | AZ | Maricopa | 28,280 | PHOENIX (PRESCOTT) |
| The Daily Courier | Prescott | AZ | Yavapai | 16,500 | PHOENIX (PRESCOTT) |
| Eastern Arizona Courier | Safford | AZ | Graham | 6,666 | PHOENIX (PRESCOTT) |
| Sedona Red Rock News | Sedona | AZ | Coconino | 5,500 | PHOENIX (PRESCOTT) |
| White Mountain Independent | Show Low | AZ | Navajo | 9,000 | PHOENIX (PRESCOTT) |
| Sierra Vista Herald | Sierra Vista | AZ | Cochise | 10,605 | TUCSON (SIERRA VISTA) |
| Glendale/Peoria Today | Sun City | AZ | Maricopa | 30,000 | PHOENIX (PRESCOTT) |

Case 1:12-cv-03264-CRB Document 86-1 Filed 04/25/13 Page 575 of 103 PageID #: 574

# Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation / DMA |
|---|---|---|---|---|
| Surprise Today | Sun City | AZ | Maricopa | 40,000 PHOENIX (PRESCOTT) |
| Chandler Tribune/East Valley Tribune | Tempe | AZ | Maricopa | 98,000 PHOENIX (PRESCOTT) |
| Arizona Range News | Willcox | AZ | Cochise | 3,131 PHOENIX (PRESCOTT) |
| Williams-Grand Canyon News | Williams | AZ | Coconion | 4,000 PHOENIX (PRESCOTT) |
| The Sun | Yuma | AZ | Yuma | 24,450 YUMA-EL CENTRO |
| Palo Verde Valley Times(/Quartszite Times) | Blythe | CA | Riverside | 4,140 LOS ANGELES |
| Chester Progressive | Chester | CA | Lassen | 2,440 SACRAMNTO-STKTON-MODESTO |
| Chico-Oroville Enterprise Record | Chico | CA | Butte | 28,000 CHICO-REDDING |
| The Davis Enterprise | Davis | CA | Yolo | 10,393 SACRAMNTO-STKTON-MODESTO |
| Imperial Valley Press | El Centro | CA | Imperial | 11,500 YUMA-EL CENTRO |
| Escalon Times | Escalon | CA | Stanislaus | 1,700 SACRAMNTO-STKTON-MODESTO |
| Escalon Times | Escalon | CA | Stanislaus | 1,800 SACRAMNTO-STKTON-MODESTO |
| Eureka Times Standard | Eureka | CA | Humboldt | 30,684 EUREKA |
| Daily Republic | Fairfield | CA | Solano | 19,301 SACRAMNTO-STKTON-MODESTO |
| Fort Bragg Advocate News | Fort Bragg | CA | Mendocino | 5,048 SAN FRANCISCO-OAK-SAN JOSE |
| Fremont Argus | Fremont | CA | Alameda | 22,068 SAN FRANCISCO-OAK-SAN JOSE |
| The Union | Grass Valley | CA | Nevada | 15,000 SACRAMNTO-STKTON-MODESTO |
| Indian Valley Record | Greenville | CA | Plumas | 1,498 SACRAMNTO-STKTON-MODESTO |
| The Gridley Herald | Gridley | CA | Butte | 2,500 CHICO-REDDING |
| The Hanford Sentinel | Hanford | CA | Kings | 15,913 FRESNO-VISALIA |
| Hayward Daily Review | Hayward | CA | Alameda | 24,275 SAN FRANCISCO-OAK-SAN JOSE |
| Lake County Record Bee | Lakeport | CA | Lake | 9,086 SAN FRANCISCO-OAK-SAN JOSE |
| Lompoc Record | Lompoc | CA | Santa Barbara | 6,900 SANTABARBRA-SANMAR-SANLUOB |
| Press Telegram | Long Beach | CA | Los Angeles | 60,773 LOS ANGELES |
| The Manteca Bulletin | Manteca | CA | San Joaquin | 5,800 SACRAMNTO-STKTON-MODESTO |
| Appeal-Democrat | Marysville | CA | Yuba | 27,000 SACRAMNTO-STKTON-MODESTO |
| Merced Sun-Star | Merced | CA | Merced | 18,500 FRESNO-VISALIA |
| The Modesto Bee | Modesto | CA | Stanislaus | 59,500 SACRAMNTO-STKTON-MODESTO |
| The Monterey County Herald | Monterey | CA | Monterey | 25,863 MONTEREY-SALINAS |
| Salinas Valley Weekly | Monterey | CA | Monterey | 35,000 MONTEREY-SALINAS |
| Mount Shasta Herald | Mount Shasta | CA | Siskiyou | 4,920 MEDFORD-KLAMATH FALLS |
| The Napa Valley Register | Napa | CA | Napa | 14,300 SAN FRANCISCO-OAK-SAN JOSE |
| The Napa Valley Register | Napa | CA | Napa | 14,300 SAN FRANCISCO-OAK-SAN JOSE |
| Marin Indpendent Journal | Novato | CA | Marin | 30,483 SAN FRANCISCO-OAK-SAN JOSE |
| Oakdale Leader | Oakdale | CA | Stanislaus | 3,600 SACRAMNTO-STKTON-MODESTO |
| Alameda Times Star | Oakland | CA | Alameda | 4,540 SAN FRANCISCO-OAK-SAN JOSE |
| The Oakland Tribune | Oakland | CA | San Mateo | 35,157 SAN FRANCISCO-OAK-SAN JOSE |
| Inland Valley Daily Bulletin | Ontario | CA | San Bernardino | 42,899 LOS ANGELES |
| Antelope Valley Press | Palmdale | CA | Los Angeles | 19,500 LOS ANGELES |
| Paradise Post | Paradise | CA | Butte | 8,084 CHICO-REDDING |
| Star News | Pasadena | CA | Los Angeles | 21,623 LOS ANGELES |
| Mountain Democrat | Placerville | CA | Placer | 14,783 SACRAMNTO-STKTON-MODESTO |
| Tri-Valley Herald | Pleasanton | CA | Alameda | 23,820 SAN FRANCISCO-OAK-SAN JOSE |
| The Porterville Recorder | Porterville | CA | Tulare | 8,791 FRESNO-VISALIA |
| Portola Reporter | Portola | CA | Plumas | 2,475 SACRAMNTO-STKTON-MODESTO |
| Feather River Bulletin | Quincy | CA | Plumas | 3,742 SACRAMNTO-STKTON-MODESTO |
| Red Bluff Daily News | Red Bluff | CA | Tehama | 7,918 CHICO-REDDING |
| Redlands Daily Fact | Redlands | CA | San Bernardino | 7,324 LOS ANGELES |
| The Daily Indpendent | Ridgecrest | CA | Kern | 8,200 LOS ANGELES |
| The Sacramento Bee | Sacramento | CA | Sacramento | 176,000 SACRAMNTO-STKTON-MODESTO |
| The Sun | San Bernardino | CA | San Bernardino | 43,019 LOS ANGELES |
| The San Diego Union-Tribune | San Diego | CA | San Diego | 257,000 SAN DIEGO |
| San Jose Mercury News | San Jose | CA | Santa Clara | 173,504 SAN FRANCISCO-OAK-SAN JOSE |
| San Mateo County Times | San Mateo | CA | Alameda | 20,486 SAN FRANCISCO-OAK-SAN JOSE |
| The Signal | Santa Clarita | CA | Los Angeles | 10,046 LOS ANGELES |
| Santa Cruz Sentinel | Santa Cruz | CA | Santa Cruz | 25,531 MONTEREY-SALINAS |
| The Santa Maria Times | Santa Maria | CA | Santa Barbara | 20,418 SANTABARBRA-SANMAR-SANLUOB |
| Tahoe Daily Tribune | South Lake Tahoe | CA | El Dorado | 7,600 RENO |
| The Record | Stockton | CA | San Joaquin | 30,700 RENO |
| Lassen County Times | Susanville | CA | Lassen | 8,600 RENO |
| Westwood Pinepress | Susanville | CA | Lassen | 1,245 RENO |
| Daily Midway Driller | Taft | CA | Kern | 3,075 LOS ANGELES |
| Daily Breeze | Torrance | CA | Los Angeles | 58,621 LOS ANGELES |
| Sierra Sun | Truckee | CA | Nevada | 5,700 SACRAMNTO-STKTON-MODESTO |
| Turlock Journal | Turlock | CA | Stanislaus | 3,600 SACRAMNTO-STKTON-MODESTO |

Case 1:12-cv-03824-CRB Document 86-21 Filed 04/25/13 Page 585 of 103 PageID #: 575

# Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| Ukiah Daily Journal | Ukiah | CA | Mendocino | 7,774 | SAN FRANCISCO-OAK-SAN JOSE |
| Vacaville Reporter | Vacaville | CA | Solano | 17,187 | SACRAMNTO-STKTON-MODESTO |
| Vallejo Times Herald | Vallejo | CA | Solano | 17,311 | SAN FRANCISCO-OAK-SAN JOSE |
| Press-Dispatch | Victorville | CA | San Bernardino | 39,972 | LOS ANGELES |
| Visalia Times Delta/Tulare Advance Register | Visalia | CA | Tulare | 20,500 | FRESNO-VISALIA |
| Contra Costa Times | Walnut Creek | CA | Contra Costa | 146,500 | SAN FRANCISCO-OAK-SAN JOSE |
| San Gabriel Valley Tribune | West Covina | CA | Los Angeles | 30,385 | LOS ANGELES |
| The Daily News | Whittier | CA | Los Angeles | 11,431 | LOS ANGELES |
| The Willits News | Willits | CA | Mendocino | 3,030 | SAN FRANCISCO-OAK-SAN JOSE |
| Woodland Daily Democrat | Woodland | CA | Yolo | 10,096 | SACRAMNTO-STKTON-MODESTO |
| Los Angeles Daily News | Woodland Hills | CA | Los Angeles | 78,208 | LOS ANGELES |
| Siskiyou Daily News | Yreka | CA | Siskiyou | 5,945 | MEDFORD-KLAMATH FALLS |
| Daily Camera | Boulder | CO | Boulder | 27,000 | DENVER |
| The Burlington Record | Burlington | CO | Kit Carson | 3,370 | DENVER |
| Daily Record | Canon City | CO | Fremont | 5,300 | COLORADO SPRINGS-PUEBLO |
| Craig Daily Press | Craig | CO | Moffat | 3,535 | DENVER |
| The Denver Post | Denver | CO | Denver | 215,452 | DENVER |
| Fort Morgan Times | Fort Morgan | CO | Morgan | 2,800 | DENVER |
| The Greeley Tribune | Greeley | CO | Weld | 21,000 | DENVER |
| Lafayette News | Lafayette | CO | Boulder | 2,020 | DENVER |
| Daily Times - Call | Longmont | CO | Boulder | 21,715 | DENVER |
| Louisville Times | Louisville | CO | Boulder | 2,020 | DENVER |
| (Loveland) Daily Reporter - Herald | Loveland | CO | Larimer | 18,685 | DENVER |
| Steamboat Pilot | Steamboat Springs | CO | Routt | 5,355 | DENVER |
| Steamboat Today | Steamboat Springs | CO | Routt | 5,250 | DENVER |
| Journal Advocate | Sterling | CO | Logan | 2,900 | DENVER |
| The Chronicle News | Trinidad | CO | Las Animas | 4,080 | COLORADO SPRINGS-PUEBLO |
| The News-Times | Danbury | CT | Fairfield | 30,500 | NEW YORK |
| Journal Inquirer | Manchester | CT | Hartford | 45,450 | HARTFORD & NEW HAVEN |
| The Hour | Norwalk | CT | Fairfield | 9,000 | NEW YORK |
| Norwich Bulletin | Norwich | CT | New London | 25,149 | HARTFORD & NEW HAVEN |
| The Chronicle | Willimantic | CT | Windham | 7,000 | HARTFORD & NEW HAVEN |
| The Washington Examiner | Washington | DC | DC | 200,000 | WASHINGTON DC (HAGRSTWN) |
| Desoto Sun | Arcadia | FL | Desoto | 5,000 | FT. MYERS-NAPLES |
| The Polk County Democrat | Bartow | FL | Polk | 4,500 | TAMPA-ST. PETE (SARASOTA) |
| Charlotte Sun Herald | Charlotte Harbor | FL | Charlotte | 2,500 | FT. MYERS-NAPLES |
| Chiefland Citizen | Chiefland | FL | Levy | 3,500 | GAINESVILLE |
| Holmes County Advertisers | Chipley | FL | Holmes | 3,131 | PANAMA CITY |
| Washington County News | Chipley | FL | Washington | 3,131 | PANAMA CITY |
| The South Lake Press | Clermont | FL | Lake | 15,000 | ORLANDO-DAYTONA BCH-MELBRN |
| The Destin Log/The Walton Log | Destin | FL | Okaloosa | 6,452 | MOBILE-PENSACOLA (FT WALT) |
| Englewood Sun | Englewood | FL | Sarasota | 6,000 | TAMPA-ST. PETE (SARASOTA) |
| The Fort Meade Leader | Fort Meade | FL | Polk | 6,250 | TAMPA-ST. PETE (SARASOTA) |
| Frostproof News | Frostproof | FL | Polk | 4,500 | TAMPA-ST. PETE (SARASOTA) |
| The Florida Times-Union | Jacksonville | FL | Duval | 160,743 | JACKSONVILLE |
| Osceola News-Gazette | Kissimmee | FL | Osceola | 40,400 | ORLANDO-DAYTONA BCH-MELBRN |
| Lake Placid Journal | Lake Placid | FL | Highlands | 7,000 | TAMPA-ST. PETE (SARASOTA) |
| Lake Wales News | Lake Wales | FL | Polk | 4,750 | TAMPA-ST. PETE (SARASOTA) |
| The Daily Commercial | Leesburg | FL | Lake | 22,000 | ORLANDO-DAYTONA BCH-MELBRN |
| Suwannee Democrat | Live Oak | FL | Suwannee | 6,350 | TALLAHASSEE-THOMASVILLE |
| Jackson County Floridan | Marianna | FL | Jackson | 7,272 | PANAMA CITY |
| Santa Rosa Press-Gazette | Milton | FL | Santa Rosa | 7,070 | MOBILE-PENSACOLA (FT WALT) |
| North Port Sun | North Port | FL | Sarasota | 5,000 | TAMPA-ST. PETE (SARASOTA) |
| Palatka Daily News | Palatka | FL | Putnam | 7,300 | JACKSONVILLE |
| Walton Sun | Santa Rosa Beach | FL | Walton | 12,240 | PANAMA CITY |
| The News-Sun | Sebring | FL | Highlands | 8,000 | TAMPA-ST. PETE (SARASOTA) |
| St. Augustine Record | St. Augustine | FL | St. Johns | 21,776 | JACKSONVILLE |
| Treasure Coast News | Stuart | FL | Martin | 79,000 | WEST PALM BEACH-FT. PIERCE |
| Hardee Sun | Venice | FL | Sarasota | 6,000 | TAMPA-ST. PETE (SARASOTA) |
| Venice Gondolier Sun | Venice | FL | Sarasota | 10,000 | TAMPA-ST. PETE (SARASOTA) |
| The Herald Advocate | Wauchula | FL | Hardee | 4,000 | TAMPA-ST. PETE (SARASOTA) |
| News Chief | Winter Haven | FL | Polk | 8,413 | TAMPA-ST. PETE (SARASOTA) |
| Americus Times-Recorder | Americus | GA | Sumter | 4,400 | COLUMBUS GA |
| Athens Banner Herald | Athens | GA | Clarke | 22,000 | ATLANTA |
| The Augusta Chronicle | Augusta | GA | Richmond | 45,000 | AUGUSTA |

Case 1:12-Ca55312-WF-3264-CRB-Document86-21 Filed 04/25/13 Page 552 103 PageID #: 576

## Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| The Post Searchlight | Bainbridge | GA | Decatur | 7,575 | ATLANTA |
| The Brunswick News | Brunswick | GA | Glynn | 16,200 | JACKSONVILLE |
| The Daily Tribune News | Cartersville | GA | Bartow | 6,600 | ATLANTA |
| Columbus Ledger-Enquirer | Columbus | GA | Muscogee | 43,430 | COLUMBUS GA |
| The Rockdale News | Conyers | GA | Rockdale | 7,500 | ATLANTA |
| The Cordele Dispatch | Cordele | GA | Crisp | 4,058 | ALBANY GA |
| The Covington News | Covington | GA | Newton | 6,000 | ATLANTA |
| The Daily Citizen | Dalton | GA | Whitfield | 13,956 | CHATTANOOGA |
| The Courier Herald | Dublin | GA | Laurens | 10,000 | MACON |
| The Times | Gainesville | GA | Hall | 22,000 | ATLANTA |
| Griffin Daily News | Griffin | GA | Spalding | 8,500 | ATLANTA |
| Jackson Progress Argus | Jackson | GA | Butts | 3,998 | ATLANTA |
| The Press-Sentinel | Jesup | GA | Wayne | 6,565 | SAVANNAH |
| Clayton News-Daily | Jonesboro | GA | Clayton | 2,800 | ATLANTA |
| The News & Farmer | Louisville | GA | Jefferson | 4,000 | AUGUSTA |
| The Macon Telegraph | Macon | GA | Bibb | 36,000 | MACON |
| Daily Herald | McDonough | GA | Henry | 3,100 | ATLANTA |
| The Metter Advertiser | Metter | GA | Candler | 2,700 | SAVANNAH |
| The Union Recorder | Milledgeville | GA | Baldwin | 8,413 | MACON |
| The Observer | Moultrie | GA | Colquitt | 6,929 | ALBANY GA |
| Rome News Tribune | Rome | GA | Floyd | 17,271 | ATLANTA |
| Savannah Morning News | Savannah | GA | Chatham | 50,000 | SAVANNAH |
| The Statesboro Herald | Statesboro | GA | Bulloch | 8,000 | SAVANNAH |
| The Sylvania Telephone | Sylvania | GA | Scravem | 4,375 | SAVANNAH |
| Thomasville Times Enterprise | Thomasville | GA | Thomas | 9,898 | TALLAHASSEE-THOMASVILLE |
| Valdosta Daily Times | Valdosta | GA | Lowndes | 19,796 | TALLAHASSEE-THOMASVILLE |
| Dallas County News | Adel | IA | Adel | 1,500 | DES MOINES-AMES |
| NE Dallas County Record | Adel | IA | Adel | 1,500 | DES MOINES-AMES |
| The Algona Upper Des Moines | Algona | IA | Kossuth | 3,250 | DES MOINES-AMES |
| Butler County Tribune Journal | Allison | IA | Butler | 1,300 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| The Tribune | Ames | IA | Story | 11,378 | DES MOINES-AMES |
| The Britt News Tribune | Britt | IA | Hancock | 1,100 | ROCHESTR-MASON CITY-AUSTIN |
| Buffalo Center Tribune | Buffalo Center | IA | Winebago | 1,200 | ROCHESTR-MASON CITY-AUSTIN |
| The Hawk Eye | Burlington | IA | Des Moines | 21,634 | DAVENPORT-R.ISLAND-MOLINE |
| Daily Times Herald | Carroll | IA | Carroll | 6,161 | DES MOINES-AMES |
| Daily Iowegian | Centerville | IA | Appanoose | 2,771 | DES MOINES-AMES |
| Chronicle Times | Cherokee | IA | Cherokee | 2,552 | SIOUX CITY |
| Clarinda Herald-Journal | Clarinda | IA | Page | 1,212 | OMAHA |
| Clarksville Star | Clarksville | IA | Butler | 1,100 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Clinton Herald | Clinton | IA | Clinton | 11,900 | DAVENPORT-R.ISLAND-MOLINE |
| CWL Times | Corwith | IA | Hancock | 320 | ROCHESTR-MASON CITY-AUSTIN |
| The Daily Nonpareil | Council Bluffs | IA | Pottawattamie | 17,170 | OMAHA |
| Creston News Advertiser | Creston | IA | Union | 4,949 | DES MOINES-AMES |
| Wright County Monitor | Dows | IA | Wright | 600 | DES MOINES-AMES |
| Eagle Grove Eagle | Eagle Grove | IA | Wright | 1,600 | DES MOINES-AMES |
| The Fairfield Daily Ledger | Fairfield | IA | Jefferson | 3,359 | OTTUMWA-KIRKSVILLE |
| Forest City Summit | Forest City | IA | Winnebago | 1,750 | ROCHESTR-MASON CITY-AUSTIN |
| Village Vine | Freemont | IA | Mahaska | 1,450 | DES MOINES-AMES |
| Garner Leader & Signal | Garner | IA | Mahaska | 1,400 | ROCHESTR-MASON CITY-AUSTIN |
| The Grundy Register | Grundy Grove | IA | Grundy | 2,200 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Hamburg Reporter | Hamburg | IA | Fremont | 1,256 | OMAHA |
| Calhoun County Advocate | Hampton | IA | Calhoun | 550 | DES MOINES-AMES |
| Hampton Chonicle | Hampton | IA | Franklin | 3,330 | DES MOINES-AMES |
| Pioneer Enterprise | Hampton | IA | Franklin | 450 | DES MOINES-AMES |
| Kanawha Reporter | Kanawha | IA | Hancock | 550 | ROCHESTR-MASON CITY-AUSTIN |
| Keota Eagle | Keota | IA | Keokuk | 700 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Journal Express | Knoxville | IA | Marion | 1,644 | DES MOINES-AMES |
| Lake City Graphic | Lake City | IA | Calhoun | 1,000 | DES MOINES-AMES |
| LeMars Daily Sentinel | LeMars | IA | Plymouth | 2,694 | SIOUX CITY |
| Globe Gazette | Mason City | IA | Cerro Cordo | 15,400 | ROCHESTR-MASON CITY-AUSTIN |
| Mt. Pleasant News | Mount Pleasant | IA | Henry | 3,054 | DAVENPORT-R.ISLAND-MOLINE |
| New Sharon Sun | New Sharon | IA | Mahaska | 650 | DES MOINES-AMES |
| Newton Daily News | Newton | IA | Jasper | 5,202 | DES MOINES-AMES |
| Mitchell County Press News | Osage | IA | Mitchell | 2,550 | ROCHESTR-MASON CITY-AUSTIN |
| Osceola Sentinel-Tribune | Osceola | IA | Clarke | 3,636 | DES MOINES-AMES |

Case 1:12-cv-08164-CRB Document 86-21 Filed 04/25/13 Page 60 of 102 PageID #: 577

## Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| Oskaloosa Herald | Oskaloosa | IA | Marion | 3,200 | DES MOINES-AMES |
| The Ottumwa Courier | Ottumwa | IA | Wapello | 12,500 | OTTUMWA-KIRKSVILLE |
| The Chronicle | Pella | IA | Marion | 2,810 | DES MOINES-AMES |
| Sheffield Press | Sheffield | IA | Franklin | 800 | DES MOINES-AMES |
| Valley News Today | Shenandoah | IA | Page | 2,020 | OMAHA |
| Sigourney News Review | Sigourney | IA | Keokuk | 1,800 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Sioux City Journal | Sioux City | IA | Woodbury | 37,000 | SIOUX CITY |
| The Daily Reporter | Spencer | IA | Clay | 2,500 | SIOUX CITY |
| Pilot Tribune | Storm Lake | IA | Buena Vista | 2,000 | SIOUX CITY |
| The Washington Evening Journal | Washington | IA | Washington | 3,888 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Coeur d'Alene Press | Coeur d'Alene | ID | Kootenai | 21,423 | SPOKANE |
| Shoshone News-Press | Kellogg | ID | Shoshone | 4,200 | SPOKANE |
| Idaho Press Tribune | Nampa | ID | Canyon | 23,600 | BOISE |
| Idaho State Journal | Pacatello | ID | Bannock | 18,685 | IDAHO FALLS-POCATELLO |
| Priest River Times | Priest River | ID | Bonner | 2,800 | SPOKANE |
| Standard Journal | Rexburg | ID | Madison | 5,555 | IDAHO FALLS-POCATELLO |
| Bonner County Daily Bee | Sandpoint | ID | Bonner | 5,200 | SPOKANE |
| Bonners Ferry Herald | Sandpoint | ID | Boundary | 3,000 | SPOKANE |
| Times News | Twin Falls | ID | Twin Falls | 24,745 | TWIN FALLS |
| The Times Record | Aledo | IL | Mercer | 3,485 | DAVENPORT-R.ISLAND-MOLINE |
| The Telegraph | Alton | IL | Madison | 22,200 | ST. LOUIS |
| The Evening News | Benton | IL | Franklin | 2,500 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Daily Ledger | Canton | IL | Fulton | 5,641 | PEORIA-BLOOMINGTON |
| The Southern Illinoisan | Carbondale | IL | Jackson | 29,724 | PADUCAH-C.GIRD-HARBG-MT VN |
| Randolph County Herald-Tribune | Chester | IL | Randolph | 2,512 | ST. LOUIS |
| The Progress | Christopher | IL | Franklin | 1,000 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Northwest Herald | Crystal Lake | IL | McHenry | 28,200 | CHICAGO |
| Lake County Journals | Crystal Lake | IL | McHenry | 8,150 | CHICAGO |
| The Daily Chronicle | Dekalb | IL | DeKalb | 7,200 | CHICAGO |
| Suburban Life Publications | Downers Grove | IL | Cook | 101,000 | CHICAGO |
| Du Quoin Evening Call | Du Quoin | IL | Perry | 3,896 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Blade | Fairbury | IL | Livingston | 2,160 | PEORIA-BLOOMINGTON |
| The Clay County Advocate-Press | Flora | IL | Clay | 2,160 | TERRE HAUTE |
| The Journal-Standard | Freeport | IL | Stephenson | 9,500 | ROCKFORD |
| Register-Mail | Galesburg | IL | Knox | 12,000 | DAVENPORT-R.ISLAND-MOLINE |
| Geneseo Republic | Geneseo | IL | Henry | 5,979 | DAVENPORT-R.ISLAND-MOLINE |
| Kane County Chronicle | Geneva | IL | Kane | 7,100 | CHICAGO |
| The Daily Register | Harrisburg | IL | Saline | 6,253 | PADUCAH-C.GIRD-HARBG-MT VN |
| Jacksonville Journal Courier | Jacksonville | IL | Morgan | 14,836 | CHAMPAIGN&SPRNGFLD-DECATUR |
| The Daily Journal | Kankakee | IL | Kankakee | 23,300 | CHICAGO |
| Star-Courier | Kewanee | IL | Henry | 6,048 | DAVENPORT-R.ISLAND-MOLINE |
| The Courier | Lincoln | IL | Logan | 7,073 | CHAMPAIGN&SPRNGFLD-DECATUR |
| Rock Valley Publishing | Loves Park | IL | Boone | 1,600 | ROCKFORD |
| Elmhurst Independent | Machesney Park | IL | DuPage | 6,400 | ROCKFORD |
| Macomb Journal | Macomb | IL | McDonough | 4,220 | QUINCY-HANNIBAL-KEOKUK |
| Marion Daily Republican | Marion | IL | Williamson | 3,075 | PADUCAH-C.GIRD-HARBG-MT VN |
| Daily Review Atlas | Monmouth | IL | Warren | 1,537 | DAVENPORT-R.ISLAND-MOLINE |
| Morris Daily Herald | Morris | IL | Grundy | 7,720 | CHICAGO |
| Register-News | Mount Vernon | IL | Jefferson | 8,908 | PADUCAH-C.GIRD-HARBG-MT VN |
| Murphysboro American | Murphysboro | IL | Jackson | 1,859 | PADUCAH-C.GIRD-HARBG-MT VN |
| Newton Press-Mentor | Newton | IL | Jasper | 2,261 | TERRE HAUTE |
| Olney Daily Mail | Olney | IL | Richland | 3,675 | TERRE HAUTE |
| Oquawka Current | Oquawka | IL | Henderson | 1,025 | DAVENPORT-R.ISLAND-MOLINE |
| (Pekin) Daily Times | Pekin | IL | Tazwell | 7,500 | PEORIA-BLOOMINGTON |
| Chillicothe Times-Bulletin | Peoria | IL | Peoria | 3,215 | PEORIA-BLOOMINGTON |
| East Peoria Times-Courier | Peoria | IL | Tazewell | 5,000 | PEORIA-BLOOMINGTON |
| Morton Times-News | Peoria | IL | Tazewell | 5,000 | PEORIA-BLOOMINGTON |
| Washington Times-Reporter | Peoria | IL | Tazewell | 7,666 | PEORIA-BLOOMINGTON |
| Woodford Times | Peoria | IL | Woodford | 3,365 | PEORIA-BLOOMINGTON |
| Journal Star | Peoria | IL | Peoria | 55,000 | PEORIA-BLOOMINGTON |
| Daily Leader | Pontiac | IL | Livingston | 4,511 | PEORIA-BLOOMINGTON |
| Rockford Register Star | Rockford | IL | Winnegago | 39,500 | ROCKFORD |
| The Gallatin Democrat | Shawneetown | IL | Gallatin | 2,261 | PADUCAH-C.GIRD-HARBG-MT VN |
| Shelbyville Daily Union | Shelbyville | IL | Shelby | 2,300 | CHAMPAIGN&SPRNGFLD-DECATUR |
| State Journal Register | Springfield | IL | Sangamom | 39,490 | CHAMPAIGN&SPRNGFLD-DECATUR |

Case 1:12-cv-03264-CRB Document 86-21 Filed 04/25/13 Page 347 of 552 PageID #: 578

**Relish Carrier Newspaper List**

| | | | | | |
|---|---|---|---|---|---|
| Sauk Valley Newspaper | Sterling | IL | Whiteside | 21,947 | DAVENPORT-R.ISLAND-MOLINE |
| The Daily American | West Frankfort | IL | Franklin | 3,075 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Herald Tribune | Batesville | IN | Ripley | 3,150 | CINCINNATI |
| The News-Banner | Bluffton | IN | Wells | 5,252 | FT. WAYNE |
| Brazil Times | Brazil | IN | Clay | 4,157 | TERRE HAUTE |
| Connersville News Examiner | Conenrsville | IN | Fayette | 5,600 | INDIANAPOLIS |
| Banner - Graphic | Greencastle | IN | Putnam | 5,543 | INDIANAPOLIS |
| Greensburg Daily News | Greensburg | IN | Decatur | 5,200 | INDIANAPOLIS |
| Kokomo Tribune | Kokomo | IN | Howard | 20,000 | INDIANAPOLIS |
| The Daily World | Linton | IN | Greene | 5,444 | TERRE HAUTE |
| Logansport Pharos-Tribune | Logansport | IN | Cass | 9,000 | INDIANAPOLIS |
| The Courier Times | New Castle | IN | Henry | 6,300 | INDIANAPOLIS |
| The Paoli News | Paoli | IN | Orange | 2,800 | LOUISVILLE |
| The Rochester Sentinel | Rochester | IN | Fulton | 3,900 | SOUTH BEND-ELKHART |
| The Rushville Republican | Rushville | IN | Rush | 3,050 | INDIANAPOLIS |
| The Tribune | Seymour | IN | Jackson | 8,448 | LOUISVILLE |
| The Shelbyville News | Shelbyville | IN | Shelby | 6,200 | INDIANAPOLIS |
| Vincennes Sun-Commercial | Vincennes | IN | Knox | 7,000 | TERRE HAUTE |
| Zionsville Times Sentinel | Zionsville | IN | Boone | 4,120 | INDIANAPOLIS |
| Atchison Daily Globe | Atchison | KS | Atchison | 3,800 | KANSAS CITY |
| Rawlins County Square Deal | Atwood | KS | Rawlins | 1,000 | WICHITA-HUTCHINSON PLUS |
| Augusta Daily Gazette | Augusta | KS | Butler | 2,525 | WICHITA-HUTCHINSON PLUS |
| Dodge City Daily Globe | Dodge City | KS | Ford | 6,929 | WICHITA-HUTCHINSON PLUS |
| The El Dorado Times | El Dorado | KS | Butler | 3,517 | WICHITA-HUTCHINSON PLUS |
| Anderson County Advocate | Garnett | KS | Anderson | 1,200 | KANSAS CITY |
| The Goodland Daily News | Goodland | KS | Sherman | 1,950 | WICHITA-HUTCHINSON PLUS |
| The Hays Daily News | Hays | KS | Ellis | 10,400 | WICHITA-HUTCHINSON PLUS |
| Hiawatha World | Hiawatha | KS | Brown | 2,500 | TOPEKA |
| The Daily Union | Junction City | KS | Geary | 4,400 | TOPEKA |
| The Kiowa County Signal | Kiowa | KS | Kiowa | 800 | WICHITA-HUTCHINSON PLUS |
| Journal-World | Lawrence | KS | Douglas | 21,210 | KANSAS CITY |
| Louisburg Herald | Louisburg | KS | Miami | 1,700 | KANSAS CITY |
| McPherson Sentinel | McPherson | KS | McPherson | 4,040 | WICHITA-HUTCHINSON PLUS |
| The Newton Kansan | Newton | KS | Harvey | 7,918 | WICHITA-HUTCHINSON PLUS |
| The Norton Telegram | Norton | KS | Norton | 1,900 | WICHITA-HUTCHINSON PLUS |
| Bird City Times | Oberlin | KS | Cheyenne | 551 | WICHITA-HUTCHINSON PLUS |
| Colby Free Press | Oberlin | KS | Thomas | 1,950 | WICHITA-HUTCHINSON PLUS |
| The Oberlin Herald | Oberlin | KS | Decatur | 1,850 | WICHITA-HUTCHINSON PLUS |
| The St. Francis Herald | Oberlin | KS | Cheyenne | 1,250 | WICHITA-HUTCHINSON PLUS |
| Osawatomie Graphic | Osawatomie | KS | Miami | 1,975 | KANSAS CITY |
| Johnson County Sun | Overland Park | KS | Johnson | 27,000 | KANSAS CITY |
| Wednesday Sun | Overland Park | KS | Johnson | 20,000 | KANSAS CITY |
| The Miami County Republic | Paola | KS | Miami | 3,550 | KANSAS CITY |
| Pittsburg Morning Sun | Pittsburgh | KS | Crawford | 8,512 | JOPLIN-PITTSBURG |
| Linn County News | Pleasanton | KS | Linn | 2,300 | KANSAS CITY |
| The Pratt Tribune | Pratt | KS | Pratt | 1,700 | WICHITA-HUTCHINSON PLUS |
| The St. John News | St. John | KS | Stafford | 800 | WICHITA-HUTCHINSON PLUS |
| Topeka Capital Journal | Topeka | KS | Shawnee | 37,000 | TOPEKA |
| Wellington Daily News | Wellington | KS | Sumner | 2,626 | WICHITA-HUTCHINSON PLUS |
| The Daily Independent | Ashland | KY | Boyd | 16,208 | CHARLESTON-HUNTINGTON |
| Kentucky Standard | Bardstown | KY | Nelson | 9,700 | LOUISVILLE |
| The Tribune Courier | Benton | KY | Marshall | 4,500 | PADUCAH-C.GIRD-HARBG-MT VN |
| Daily News | Bowling Green | KY | Warren | 30,000 | BOWLING GREEN |
| McLean County News | Calhoun | KY | McLean | 1,800 | EVANSVILLE |
| The Advocate Messenger | Danville | KY | Boyle | 9,000 | LEXINGTON |
| The News-Enterprise | Elizabethtown | KY | Hardin | 17,124 | LOUISVILLE |
| The State Journal | Frankfort | KY | Franklin | 10,000 | LEXINGTON |
| Franklin Favorite | Franklin | KY | Simpson | 2,000 | NASHVILLE |
| Glasgow Daily Times | Glasgow | KY | Barren | 8,198 | BOWLING GREEN |
| Greenup County News-Times | Greenup | KY | Greenup | 3,547 | CHARLESTON-HUNTINGTON |
| Kentucky New Era | Hopkinsville | KY | Christian | 9,000 | NASHVILLE |
| Fort Campbell Courier | Hopkinsville | KY | Christian | 18,000 | NASHVILLE |
| The Record | Leitchfield | KY | Grayson | 5,939 | LOUISVILLE |
| The Sentinel-Echo | London | KY | Laurel | 7,918 | LEXINGTON |
| The Messenger | Madisonville | KY | Hopkins | 7,000 | EVANSVILLE |

Case 1:12-cv-03264-CRB Document 56-21 Filed 04/25/13 Page 65 PageID #: 579

## Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| The Ledger Independent | Maysville | KY | Mason | 6,500 | CINCINNATI |
| The Jessamine Journal | Nicholasville | KY | Jessamine | 7,437 | LEXINGTON |
| The Eagle Post | Oak Grove | KY | Christian | 4,500 | NASHVILLE |
| Messenger - Inquirer | Owensboro | KY | McLean | 25,000 | EVANSVILLE |
| The Times - Leader | Princeton | KY | Caldwell | 4,500 | PADUCAH-C.GIRD-HARBG-MT VN |
| Sentinel-News | Shelbyville | KY | Shelby | 8,512 | LOUISVILLE |
| The Pioneer News | Shepherdsville | KY | Bullitt | 7,000 | LOUISVILLE |
| The Commonwealth-Journal | Somerset | KY | Pulaski | 9,403 | LEXINGTON |
| The McCreary County Record | Whitley City | KY | McCreary | 3,682 | KNOXVILLE |
| The Winchester Sun | Winchester | KY | Clark | 5,858 | LEXINGTON |
| Bastrop Daily Enterprise | Bastrop | LA | Morehouse | 4,613 | MONROE-EL DORADO |
| Denham Springs-Livingston Parish News | Denham Springs | LA | Livingston | 12,400 | BATON ROUGE |
| Beauregard Daily News | DeRidder | LA | Beauregard | 3,500 | LAKE CHARLES |
| Ascension Citizen | Gonzales | LA | Ascension | 7,236 | BATON ROUGE |
| The Daily Star | Hammond | LA | Tangipahoa | 10,059 | NEW ORLEANS |
| American Press | Lake Charles | LA | Calcasieu | 35,000 | LAKE CHARLES |
| Leesville News Leader | Leesville | LA | Vernon | 3,500 | ALEXANDRIA LA |
| Southwest Daily News | Sulphur | LA | Calcasieu | 4,000 | LAKE CHARLES |
| The Sun Chronicle | Attleboro | MA | Bristol | 20,290 | PROVIDENCE-NEW BEDFORD |
| The Salem News | Beverly | MA | Essex | 22,500 | BOSTON (MANCHESTER) |
| Patriot Ledger | Dorchester | MA | Norfolk | 45,000 | BOSTON (MANCHESTER) |
| The Enterpirse | Dorchester | MA | Plymouth | 28,000 | BOSTON (MANCHESTER) |
| Fall River Herald News | Fall River | MA | Bristol | 21,643 | PROVIDENCE-NEW BEDFORD |
| Sentinel & Enterprise | Fitchburg | MA | Worcester | 16,900 | BOSTON (MANCHESTER) |
| Milford Daily News | Framingham | MA | Worcester | 8,940 | BOSTON (MANCHESTER) |
| Metro West Daily News | Framingham | MA | Middlesex | 26,216 | BOSTON (MANCHESTER) |
| Gloucester Daily Times | Gloucester | MA | Essex | 8,200 | BOSTON (MANCHESTER) |
| The Recorder | Greenfield | MA | Franklin | 14,352 | SPRINGFIELD-HOLYOKE |
| The Sun | Lowell | MA | Middlesex | 40,569 | BOSTON (MANCHESTER) |
| Inquirer and Mirror | Nantucket | MA | Nantucket | 10,500 | BOSTON (MANCHESTER) |
| Daily News Tribune | Needham Heights | MA | Middlesex | 4,920 | BOSTON (MANCHESTER) |
| The Standard Times | New Bedford | MA | Bristol | 24,500 | PROVIDENCE-NEW BEDFORD |
| The Daily News of Newburyport | Newburyport | MA | Essex | 10,300 | BOSTON (MANCHESTER) |
| North Adams Transcript | North Adams | MA | Berkshire | 6,767 | ALBANY-SCHENECTADY-TROY |
| Eagle Tribune | North Andover | MA | Essex | 38,250 | BOSTON (MANCHESTER) |
| Berkshire Eagle | Pittsfield | MA | Bershire | 30,300 | ALBANY-SCHENECTADY-TROY |
| Taunton Daily Gazette | Taunton | MA | Bristol | 9,927 | PROVIDENCE-NEW BEDFORD |
| The Enfield Press | Westfield | MA | Hampden | 2,850 | SPRINGFIELD-HOLYOKE |
| The Longmeadow News | Westfield | MA | Hampden | 1,550 | SPRINGFIELD-HOLYOKE |
| The Westfield News | Westfield | MA | Hampden | 4,400 | SPRINGFIELD-HOLYOKE |
| Telegram & Gazette | Worcester | MA | Worcester | 70,000 | BOSTON (MANCHESTER) |
| The Capital | Annapolis | MD | Anne Arundel | 47,312 | BALTIMORE |
| Cumberland Times - News | Cumberland | MD | Cumberland | 27,775 | WASHINGTON DC (HAGRSTWN) |
| The Star Democrat | Easton | MD | Talbot | 19,301 | BALTIMORE |
| Cecil Whig | Elkton | MD | Cecil | 15,000 | BALTIMORE |
| The Frederick News-Post | Frederick | MD | Frederick | 37,000 | WASHINGTON DC (HAGRSTWN) |
| Carroll County Times | Westminster | MD | Carroll | 26,131 | BALTIMORE |
| Kennebec Journal & Morning Sentinel | Augusta | ME | Kennebec | 25,000 | PORTLAND-AUBURN |
| Bangor Daily News | Bangor | ME | Penobscot | 56,000 | BANGOR |
| Aaroostook Republican | Caribou | ME | Aaroostook | 4,200 | PRESQUE ISLE |
| Piscataquis Observer | Dover-Foxcroft | ME | Piscataquis | 3,500 | BANGOR |
| Houlton Pioneer Times | Houlton | ME | Aaroostook | 5,450 | PRESQUE ISLE |
| Sun Journal | Lewiston | ME | Androscoggin | 36,865 | PORTLAND-AUBURN |
| Portland Press Herald | Portland | ME | Cumberland | 54,000 | PORTLAND-AUBURN |
| The Star Herald | Presque Isle | ME | Aaroostook | 6,300 | PRESQUE ISLE |
| Cheboygan Daily Tribune | Cheboygan | MI | Cheboygan | 4,408 | TRAVERSE CITY-CADILLAC |
| The Daily Reporter | Coldwater | MI | Branch | 5,996 | GRAND RAPIDS-KALMZOO-B.CRK |
| Gaylord Herald Times | Gaylord | MI | Otsego | 5,700 | TRAVERSE CITY-CADILLAC |
| Grand Haven Tribune | Grand Haven | MI | Ottawa | 8,800 | GRAND RAPIDS-KALMZOO-B.CRK |
| Oceana's Herald Journal | Hart | MI | Oceana | 6,200 | GRAND RAPIDS-KALMZOO-B.CRK |
| The Hillsdale Daily News | Hillsdale | MI | Hillsdale | 6,500 | LANSING |
| The Holland Sentinel | Holland | MI | Ottawa | 14,500 | GRAND RAPIDS-KALMZOO-B.CRK |
| Sentinel-Standard | Ionia | MI | Ionia | 3,178 | GRAND RAPIDS-KALMZOO-B.CRK |
| (The Ironwood) Daily Globe | Ironwood | MI | Gogebic | 6,300 | DULUTH-SUPERIOR |
| Ludington Daily News | Ludington | MI | Mason | 8,500 | GRAND RAPIDS-KALMZOO-B.CRK |

Case 1:12-cv-03264-WCB Document 86-21 Filed 04/25/13 Page 3 of 3 PageID #: 580

# Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| Monroe Evening News | Monroe | MI | Monroe | 19,500 | DETROIT |
| Petoskey News-Review | Petoskey | MI | Emmet | 10,000 | TRAVERSE CITY-CADILLAC |
| The Evening News | Sault Ste. Marie | MI | Chippewa | 7,688 | TRAVERSE CITY-CADILLAC |
| Sturgis Journal | Sturgis | MI | Saint Joseph | 6,868 | GRAND RAPIDS-KALMZOO-B.CRK |
| Traverse City Record Eagle | Traverse City | MI | Grand Traverse | 28,704 | TRAVERSE CITY-CADILLAC |
| White Lake Beacon | Whitehall | MI | Muskegon | 4,000 | GRAND RAPIDS-KALMZOO-B.CRK |
| Austin Daily Herald | Austin | MN | Mower | 5,444 | ROCHESTR-MASON CITY-AUSTIN |
| The Bemidji Pioneer | Bemidji | MN | Beltrami | 7,300 | MINNEAPOLIS-ST. PAUL |
| Brainerd Daily Dispatch | Brainerd | MN | Crowwing | 13,000 | MINNEAPOLIS-ST. PAUL |
| Tri-County News | Cottonwood | MN | Lyon | 1,356 | MINNEAPOLIS-ST. PAUL |
| Crookston Daily Times | Crookston | MN | Polk | 2,060 | FARGO-VALLEY CITY |
| Duluth News Tribune | Duluth | MN | St. Louis | 30,000 | MINNEAPOLIS-ST. PAUL |
| Faribault Daily News | Faribault | MN | Rice | 5,259 | MINNEAPOLIS-ST. PAUL |
| The Daily Journal | Fergus Falls | MN | Otter Tail | 7,000 | FARGO-VALLEY CITY |
| Herald Review | Grand Rapids | MN | Itasca | 6,929 | DULUTH-SUPERIOR |
| Granite Falls Advocate-Tribune | Granite Falls | MN | Yellow Medicine | 2,716 | MINNEAPOLIS-ST. PAUL |
| The Daily Tribune | Hibbing | MN | St. Louis | 4,603 | DULUTH-SUPERIOR |
| Hutchinson Leader | Hutchinson | MN | McLeod | 16,766 | MINNEAPOLIS-ST. PAUL |
| The Daily Journal | International Falls | MN | Koochiching | 3,300 | DULUTH-SUPERIOR |
| The Le Center Leader | Le Center | MN | Le Sueur | 1,024 | MINNEAPOLIS-ST. PAUL |
| Le Sueur News Herald | Le Sueur | MN | Le Sueur | 1,336 | MINNEAPOLIS-ST. PAUL |
| Litchfield Independent Review | Litchfield | MN | Meeker | 11,009 | MINNEAPOLIS-ST. PAUL |
| The Free Press | Mankato | MN | Blue Earth | 22,220 | MANKATO |
| Montevideo American News | Montevideo | MN | Chippewa | 3,691 | MINNEAPOLIS-ST. PAUL |
| Northfield News | Northfield | MN | Rice | 4,300 | MINNEAPOLIS-ST. PAUL |
| Owatonna People's Press | Owatonna | MN | Steele | 6,102 | MINNEAPOLIS-ST. PAUL |
| The Redwood Falls Gazette | Redwood Falls | MN | Redwood | 3,998 | MINNEAPOLIS-ST. PAUL |
| Post-Bulletin | Rochester | MN | Olmsted | 41,645 | ROCHESTR-MASON CITY-AUSTIN |
| Sleepy Eye Herald - Dispatch | Sleepy Eye | MN | Brown | 2,000 | MANKATO |
| St. James Plaindealer | St. James | MN | Watonwan | 2,361 | MANKATO |
| St. Peter Herald | St. Peter | MN | Nicollet | 1,980 | MINNEAPOLIS-ST. PAUL |
| Thief River Falls Times | Thief River Falls | MN | Pennington | 4,545 | FARGO-VALLEY CITY |
| The Mesabi Daily News | Virginia | MN | St. Louis | 9,403 | DULUTH-SUPERIOR |
| Waseca County News | Waseca | MN | Waseca | 2,848 | MINNEAPOLIS-ST. PAUL |
| West Central Tribune | Willmar | MN | Kandiyohi | 15,000 | MINNEAPOLIS-ST. PAUL |
| Winona Daily News | Winona | MN | Winona | 9,000 | LA CROSSE-EAU CLAIRE |
| Daily Globe | Worthington | MN | Nobles | 9,700 | SIOUX FALLS(MITCHELL) |
| Aurora Advertiser | Aurora | MO | Lawrence | 3,075 | SPRINGFIELD MO |
| Bolivar Herald -Free Press | Bolivar | MO | Polk | 5,500 | SPRINGFIELD MO |
| Boonville Daily News | Boonville | MO | Cooper | 2,222 | COLUMBIA-JEFFERSON CITY |
| Buffalo Reflex | Buffalo | MO | Dallas | 5,950 | SPRINGFIELD MO |
| Lake Sun Leader | Camdenton | MO | Camden | 5,025 | SPRINGFIELD MO |
| Southeast Missourian | Cape Girardeau | MO | Cape Girnardeau | 13,775 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Carthage Press | Carthage | MO | Jasper | 2,400 | JOPLIN-PITTSBURG |
| The Daily Statesman | Dexter | MO | Stoddard | 2,900 | PADUCAH-C.GIRD-HARBG-MT VN |
| Liberty Tribune | Gladstone | MO | Clay | 10,500 | KANSAS CITY |
| Hannibal Courier-Post | Hannibal | MO | Marion | 8,413 | QUINCY-HANNIBAL-KEOKUK |
| The Advertiser-Courier | Hermann | MO | Gasconade | 3,700 | ST. LOUIS |
| New Haven Leader | Hermann | MO | Franklin | 1,500 | ST. LOUIS |
| The Examiner | Independence | MO | Jackson | 9,200 | KANSAS CITY |
| Cash-Book Journal | Jackson | MO | Cape Girnardeau | 4,405 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Kearney Courier | Kearney | MO | Clay | 3,000 | KANSAS CITY |
| The Daily Dunklin Democrat | Kennett | MO | Dunklin | 3,200 | PADUCAH-C.GIRD-HARBG-MT VN |
| Kirksville Daily Express | Kirksville | MO | Adair | 6,432 | OTTUMWA-KIRKSVILLE |
| The Lebanon Daily Record | Lebanon | MO | Laclede | 4,949 | SPRINGFIELD MO |
| The Louisiana Press Journal | Louisiana | MO | Pike | 3,131 | ST. LOUIS |
| The Banner Press | Marble Hill | MO | Bollinger | 3,200 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Marshall Democrat News | Marshall | MO | Saline | 2,600 | KANSAS CITY |
| Maryville Daily Forum | Maryville | MO | Nodaway | 2,626 | ST. JOSEPH |
| Mexico Ledger | Mexico | MO | Audrain | 5,500 | COLUMBIA-JEFFERSON CITY |
| Evening Democrat | Moberly | MO | Randolph | 3,429 | COLUMBIA-JEFFERSON CITY |
| Moberly Monitor - Index | Moberly | MO | Randolph | 3,500 | COLUMBIA-JEFFERSON CITY |
| Neosho Daily News | Neosho | MO | Newton | 4,511 | JOPLIN-PITTSBURG |
| Sunday Herald-Tribune | Nevada | MO | Vernon | 4,000 | JOPLIN-PITTSBURG |
| Missourian-News | Portageville | MO | New Madrid | 1,200 | PADUCAH-C.GIRD-HARBG-MT VN |

Case 1:12-Ca65112-WF-JMRC4CRBculDocument6t36e21 0Fi20042571ge P50e6451103ageID #: 581

## Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| Rolla Daily News | Rolla | MO | Phelps | 7,045 | SPRINGFIELD MO |
| The Sedalia Democrat | Sedalia | MO | Pettis | 18,410 | KANSAS CITY |
| The Smithville Lake Herald | Smithville | MO | Clay | 2,350 | KANSAS CITY |
| St. Joseph News-Press | St. Joseph | MO | Buchanan | 30,000 | ST. JOSEPH |
| South Missourian-News | Thayer | MO | Oregon | 1,600 | SPRINGFIELD MO |
| The Daily Star-Journal | Warrensburg | MO | Johnson | 5,304 | KANSAS CITY |
| Warren County Record | Warrenton | MO | Warren | 3,775 | ST. LOUIS |
| Washington Missourian | Washington | MO | Franklin | 16,525 | ST. LOUIS |
| West Plains Daily Quill | West Plains | MO | Howell | 7,600 | SPRINGFIELD MO |
| The Monroe County Journal | Aberdeen | MS | Monroe | 6,000 | COLUMBUS-TUPELO-WEST POINT |
| The Daily Leader | Brookhaven | MS | Lincoln | 6,200 | JACKSON MS |
| Bolivar Commerical | Cleveland | MS | Boliver | 6,000 | GREENWOOD-GREENVILLE |
| The Daily Corinthian | Corinth | MS | Alcorn | 7,272 | MEMPHIS |
| The Itawamba County Times | Fulton | MS | Itawamba | 3,300 | COLUMBUS-TUPELO-WEST POINT |
| The Daily Star | Grenada | MS | Grenada | 5,670 | GREENWOOD-GREENVILLE |
| The Sun Herald | Gulfport | MS | Harrison | 41,500 | BILOXI-GULFPORT |
| The Lamar Times | Hattiesburg | MS | Lamar | 8,000 | HATTIESBURG-LAUREL |
| The South Reporter | Holly Springs | MS | Marshall | 5,200 | MEMPHIS |
| Chickasaw Journal/Times Post | Houston | MS | Chickasaw | 1,300 | COLUMBUS-TUPELO-WEST POINT |
| The Star-Herald | Kosciusko | MS | Attala | 4,949 | JACKSON MS |
| The Chronicle | Laurel | MS | Jones | 7,000 | HATTIESBURG-LAUREL |
| The Meridian Star | Meridan | MS | Lauderdale | 11,300 | MERIDIAN |
| New Albany Gazette | New Albany | MS | New Albany | 4,200 | COLUMBUS-TUPELO-WEST POINT |
| The Oxford Eagle | Oxford | MS | LaFayette | 6,060 | MEMPHIS |
| Picayune Item | Picayune | MS | Pearl River | 4,949 | NEW ORLEANS |
| The Pontotoc Progress | Pontotoc | MS | Pontotoc | 5,200 | COLUMBUS-TUPELO-WEST POINT |
| The Democrat | Senatobia | MS | Tate | 4,500 | MEMPHIS |
| Starkville Daily News | Starkville | MS | Oktibbeha | 6,060 | COLUMBUS-TUPELO-WEST POINT |
| Northeast Mississippi Daily Journal | Tupelo | MS | Lee | 39,000 | COLUMBUS-TUPELO-WEST POINT |
| The Tylertown Times | Tylertown | MS | Walthall | 2,250 | JACKSON MS |
| Vicksburg Post | Vicksburg | MS | Warren | 14,645 | JACKSON MS |
| Daily Times Leader | West Point | MS | Clay | 3,990 | COLUMBUS-TUPELO-WEST POINT |
| Belgrade News | Belgrade | MT | Gallatin | 4,500 | BUTTE-BOZEMAN |
| Lone Peak Lookout | Big Sky | MT | Gallatin | 3,000 | BUTTE-BOZEMAN |
| Billings Gazette | Billings | MT | Yellowstone | 39,000 | BILLINGS |
| Cut Bank Pioneer | Cut Bank | MT | Glacier | 1,500 | GREAT FALLS |
| Great Falls Tribune | Great Falls | MT | Cascade | 27,000 | GREAT FALLS |
| Ravalli Republic | Hamilton | MT | Ravalli | 5,858 | MISSOULA |
| The Indpendent Record Editorial | Helena | MT | Lewis & Clark | 13,500 | HELENA |
| The Western News | Libby | MT | Lincoln | 3,232 | SPOKANE |
| Shelby Promoter | Shelby | MT | Toole | 1,550 | GREAT FALLS |
| The Valierian | Valier | MT | Pondera | 250 | GREAT FALLS |
| West Yellowstone News | West Yellowstone | MT | Gallatin | 1,500 | BUTTE-BOZEMAN |
| Roanoke-Chowan News Herald | Ahoskie | NC | Hertford | 10,302 | NORFOLK-PORTSMTH-NEWPT NWS |
| The Stanly News & Press | Albemarle | NC | Stanly | 7,800 | CHARLOTTE |
| The Randolph Guide | Asheboro | NC | Randolph | 2,500 | GREENSBORO-H.POINT-W.SALEM |
| Watauga Democrat | Boone | NC | Watauga | 3,150 | CHARLOTTE |
| Avery Journal Times | Boone | NC | Avery | 4,020 | CHARLOTTE |
| Times-News | Burlington | NC | Alamance | 25,464 | GREENSBORO-H.POINT-W.SALEM |
| The Clayton News-Star | Clayton | NC | Johnston | 15,500 | RALEIGH-DURHAM (FAYETVLLE) |
| The Clemmons Courier | Clemmons | NC | Forsyth | 3,500 | GREENSBORO-H.POINT-W.SALEM |
| The Daily Record | Dunn | NC | Harnett | 9,000 | RALEIGH-DURHAM (FAYETVLLE) |
| The Herald Sun | Durham | NC | Durham | 30,000 | RALEIGH-DURHAM (FAYETVLLE) |
| The Daily Courier | Forest City | NC | Rutherford | 8,000 | GREENVLL-SPART-ASHEVLL-AND |
| The Gaston Gazette | Gastonia | NC | Gaston | 23,500 | CHARLOTTE |
| The Daily Dispatch | Henderson | NC | Vance | 8,000 | RALEIGH-DURHAM (FAYETVLLE) |
| Hickory Daily Record | Hickory | NC | Catawba | 20,400 | CHARLOTTE |
| The High Point Enterprise | High Point | NC | Guilford | 21,800 | GREENSBORO-H.POINT-W.SALEM |
| Denver Weekly | Huntersville | NC | Mecklenburg | 8,000 | CHARLOTTE |
| The Herald Weekly | Huntersville | NC | Mecklenburg | 25,000 | CHARLOTTE |
| Mountain Island Monitor | Huntersville | NC | Mecklenburg | 10,000 | CHARLOTTE |
| The Daily News | Jacksonville | NC | Onslow | 19,984 | GREENVILLE-N.BERN-WASHNGTN |
| Independent Tribune | Kannapolis | NC | Cabarrus | 12,000 | CHARLOTTE |
| Kinston Free Press | Kinston | NC | Lenior | 10,843 | GREENVILLE-N.BERN-WASHNGTN |
| News-Topic | Lenoir | NC | Caldwell | 8,800 | CHARLOTTE |

Case 1:12-cv-03824-CRB Document 86-2 Filed 04/25/13 Page 351 of 552 PageID #: 582

# Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| The McDowell New | Marion | NC | McDowell | 5,600 | GREENVLL-SPART-ASHEVLL-AND |
| Davie County Enterprise-Record | Mocksville | NC | Davie | 7,000 | GREENSBORO-H.POINT-W.SALEM |
| The Enquirer-Journal | Monroe | NC | Union | 6,300 | CHARLOTTE |
| The News Herald | Morganton | NC | Burke | 9,200 | CHARLOTTE |
| The Sun Journal | New Bern | NC | Craven | 14,613 | GREENVILLE-N.BERN-WASHNGTN |
| The News & Observer | Raleigh | NC | Wake | 130,500 | RALEIGH-DURHAM (FAYETVLLE) |
| The Salisbury Post | Salisbury | NC | Rowan | 18,500 | CHARLOTTE |
| The Sanford Herald | Sanford | NC | Lee | 9,000 | RALEIGH-DURHAM (FAYETVLLE) |
| Shelby Star | Shelby | NC | Cleveland | 10,800 | CHARLOTTE |
| The Pilot | Southern Pines | NC | Moore | 15,000 | RALEIGH-DURHAM (FAYETVLLE) |
| Statesville Record & Landmark | Statesville | NC | Iredell | 10,500 | CHARLOTTE |
| The Daily Southerner | Tarboro | NC | Edgecombe | 4,850 | RALEIGH-DURHAM (FAYETVLLE) |
| The Bismarck Tribune | Bismarck | ND | Burleigh | 29,290 | MINOT-BISMARCK-DICKINSON |
| Devils Lake Journal | Devils Lake | ND | Ramsey | 3,400 | FARGO-VALLEY CITY |
| The Dickinson Press | Dickinson | ND | Stark | 6,565 | MINOT-BISMARCK-DICKINSON |
| The Forum | Fargo | ND | Cass | 52,459 | FARGO-VALLEY CITY |
| Grand Forks Herald | Grand Forks | ND | Grand Forks | 32,663 | FARGO-VALLEY CITY |
| The Jamestown Sun | Jamestown | ND | Stutsman | 6,928 | FARGO-VALLEY CITY |
| BHG Inc. Newspapers | Minot | ND | Various | 5,555 | MINOT-BISMARCK-DICKINSON |
| Northern Sentry | Minot | ND | Mercer | 5,555 | MINOT-BISMARCK-DICKINSON |
| Ashland Gazette | Ashland | NE | Saunders | 2,000 | OMAHA |
| Beatrice Daily Sun | Breatrice | NE | Gage | 5,200 | LINCOLN & HASTINGS-KRNY |
| Columbus Telegram | Columbus | NE | Platte | 8,900 | OMAHA |
| Fremont Tribune | Fremont | NE | Dodge | 7,200 | OMAHA |
| Grand Island Independent | Grand Island | NE | Hall | 20,200 | LINCOLN & HASTINGS-KRNY |
| Journal - Register | Hebron | NE | Thayer | 1,700 | LINCOLN & HASTINGS-KRNY |
| Kearney Hub | Kearney | NE | Buffalo | 13,130 | LINCOLN & HASTINGS-KRNY |
| McCook Daily Gazette | McCook | NE | Red Willow | 5,050 | LINCOLN & HASTINGS-KRNY |
| The Minden Courier | Minden | NE | Kearny | 2,239 | LINCOLN & HASTINGS-KRNY |
| Nebraska City News-Press | Nebraska City | NE | Otoe | 2,208 | OMAHA |
| Norfolk Daily News | Norfolk | NE | Madison | 15,500 | SIOUX CITY |
| North Platte Telegraph | North Platte | NE | Lincoln | 12,867 | NORTH PLATTE |
| The Omaha World-Herald | Omaha | NE | Douglas | 166,260 | OMAHA |
| Star Herald | Scottsbluff | NE | Scotts Bluff | 15,150 | CHEYENNE-SCOTTSBLUF |
| Syracuse Journal-Democrat | Syracuse | NE | Otoe | 2,200 | OMAHA |
| Wahoo Newspaper | Wahoo | NE | Saunders | 2,000 | OMAHA |
| Waverly News | Waverly | NE | Saunders | 2,200 | LINCOLN & HASTINGS-KRNY |
| News-Time | York | NE | York | 4,545 | LINCOLN & HASTINGS-KRNY |
| Eagle Times | Claremont | NH | Sullivan | 7,900 | BURLINGTON-PLATTSBURGH |
| Concord Monitor | Concord | NH | Merrimack | 17,000 | BOSTON (MANCHESTER) |
| The Telegraph | Hudson | NH | Hillsborough | 20,000 | BOSTON (MANCHESTER) |
| Keene Sentinel | Keene | NH | Cheshire | 12,112 | BOSTON (MANCHESTER) |
| Laconia Citizen | Laconia | NH | Belknap | 7,500 | BOSTON (MANCHESTER) |
| New Jersey Herald | Newton | NJ | Sussex | 12,150 | NEW YORK |
| The Record | Woodland Park | NJ | Bergen | 166,040 | NEW YORK |
| Alamogordo Daily News | Alamogordo | NM | Otero | 6,500 | ALBUQUERQUE-SANTA FE |
| The Albuquerque Journal | Albuquerque | NM | Bernalillo | 104,000 | ALBUQUERQUE-SANTA FE |
| Carlsbad Current-Argus | Carlsbad | NM | Eddy | 6,600 | ALBUQUERQUE-SANTA FE |
| Deming Headlight | Deming | NM | Luna | 3,000 | ALBUQUERQUE-SANTA FE |
| The Daily Times | Farmington | NM | San Jaun | 19,000 | ALBUQUERQUE-SANTA FE |
| The Gallup Independent | Gallup | NM | McKinley | 22,000 | ALBUQUERQUE-SANTA FE |
| Hobbs News Sun | Hobbs | NM | Lea | 10,393 | ALBUQUERQUE-SANTA FE |
| Los Alamos Monitor | Las Alamos | NM | Los Alamos | 5,444 | ALBUQUERQUE-SANTA FE |
| Las Cruces Sun-News | Las Cruces | NM | Dona Ana | 21,500 | EL PASO |
| Las Vegas Optic | Las Vegas | NM | San Miguel | 4,949 | ALBUQUERQUE-SANTA FE |
| Roswell Daily Record | Roswell | NM | Chaves | 10,940 | ALBUQUERQUE-SANTA FE |
| The Ruidoso News | Ruidoso | NM | Lincoln | 6,300 | ALBUQUERQUE-SANTA FE |
| The Santa Fe New Mexican | Santa Fe | NM | Santa Fe | 21,250 | ALBUQUERQUE-SANTA FE |
| Nevada Appeal | Carson City | NV | Washoe | 10,050 | RENO |
| Lincoln County Record | Ely | NV | Lincoln | 2,000 | SALT LAKE CITY |
| Lahontan Valley News | Fallon | NV | Churchhill | 3,150 | RENO |
| The Record Courier | Gardnerville | NV | Douglas | 5,000 | RENO |
| Mineral County Independent News | Hawthorne | NV | Mineral | 1,500 | RENO |
| North Lake Tahoe Bonanza | Incline Village | NV | Washoe | 3,900 | RENO |
| The Humboldt Sun | Winnemucca | NV | Humboldt | 4,040 | RENO |

Case 1:12-cv-32664-CRB Document 86-21 Filed 04/25/13 Page 352 of 552 PageID #: 583

## Relish Carrier Newspaper List

| | | | | | |
|---|---|---|---|---|---|
| The Daily News | Batavia | NY | Genesee | 13,000 | BUFFALO |
| Messenger Post Newspapers | Canandaigua | NY | Ontario | 11,000 | ROCHESTER NY |
| Catskill Daily Mail | Catskill | NY | Greene | 3,500 | ALBANY-SCHENECTADY-TROY |
| Chatham Courier | Chatham | NY | Columbia | 1,800 | ALBANY-SCHENECTADY-TROY |
| Genesee Country Express | Dansville | NY | Livingston | 2,562 | ROCHESTER NY |
| Finger Lakes Times | Geneva | NY | Ontario | 14,500 | ROCHESTER NY |
| The Post Star | Glens Falls | NY | Warren | 25,500 | ALBANY-SCHENECTADY-TROY |
| The Evening Telegram | Herkimer | NY | Herkimer | 3,300 | UTICA |
| Hudson Register-Star | Hudson | NY | Columbia | 5,000 | ALBANY-SCHENECTADY-TROY |
| The Evening Times | Little Falls | NY | Herkimer | 2,000 | UTICA |
| Times Herald-Record | Middletown | NY | Orange | 59,000 | NEW YORK |
| New York Daily News | New York | NY | New York | 800,000 | NEW YORK |
| The Daily Star | Oneonta | NY | Chenango | 13,500 | UTICA |
| Cooperstown Crier | Oneonta | NY | Otsego | 1,811 | UTICA |
| The Palladium Times | Oswego | NY | Oswego | 6,322 | SYRACUSE |
| The Chronicle-Express | Penn Yan | NY | Yates | 3,838 | ROCHESTER NY |
| Press-Republican | Plattsburgh | NY | Clinton | 20,000 | BURLINGTON-PLATTSBURGH |
| The Daily Gazette | Schenectady | NY | Albany | 50,500 | ALBANY-SCHENECTADY-TROY |
| Mountain Eagle | Stamford | NY | Greene | 2,200 | BINGHAMTON |
| Watertown Daily Times | Watertown | NY | Jefferson | 26,000 | WATERTOWN |
| Windham Journal | Windham | NY | Columbia | 1,520 | ALBANY-SCHENECTADY-TROY |
| Ulster Townsman | Woodstock | NY | Ulster | 2,500 | NEW YORK |
| The Subarbanite | Akron | OH | Stark | 34,138 | CLEVELAND-AKRON (CANTON) |
| The Akron Beacon Journal | Akron | OH | Summit | 112,000 | CLEVELAND-AKRON (CANTON) |
| Review | Alliance | OH | Stark | 12,000 | CLEVELAND-AKRON (CANTON) |
| Ashland Times-Gazette | Ashland | OH | Ashland | 14,000 | CLEVELAND-AKRON (CANTON) |
| Star Beacon | Ashtabula | OH | Ashtabula | 13,750 | CLEVELAND-AKRON (CANTON) |
| The Athens Messenger | Athens | OH | Athens | 8,275 | CHARLESTON-HUNTINGTON |
| Vinton County Courier | Athens | OH | Vinton | 2,200 | CHARLESTON-HUNTINGTON |
| Gazette Publishing Company | Bellevue | OH | Huron | 3,350 | CLEVELAND-AKRON (CANTON) |
| The Bryan Times | Bryan | OH | Williams | 10,313 | TOLEDO |
| The Repository | Canton | OH | Stark | 66,000 | CLEVELAND-AKRON (CANTON) |
| The Herald | Circleville | OH | Pickaway | 6,600 | COLUMBUS OH |
| Cresent-News | Defiance | OH | Defiance | 16,200 | TOLEDO |
| The Delaware Gazette | Delaware | OH | Delaware | 8,119 | COLUMBUS OH |
| The Chronicle Telegram | Elyria | OH | Lorain | 25,755 | CLEVELAND-AKRON (CANTON) |
| Georgetown News Democrat | Georgetown | OH | Brown | 3,460 | CINCINNATI |
| Hillsboro Times Gazette | Hillsboro | OH | Highland | 3,637 | CINCINNATI |
| The Jackson County Times-Journal | Jackson | OH | Jackson | 5,500 | CHARLESTON-HUNTINGTON |
| Record Courier | Kent | OH | Portage | 18,000 | CLEVELAND-AKRON (CANTON) |
| Sugarcreek-Bellbrook Times | Kettering | OH | Greene | 1,100 | DAYTON |
| Times Community Newspapers - North | Kettering | OH | Fulton | 14,677 | DAYTON |
| Times Community Newspapers - South | Kettering | OH | Fulton | 11,300 | DAYTON |
| Logan Daily News | Logan | OH | Hocking | 3,900 | COLUMBUS OH |
| Madison Press | London | OH | Madison | 4,545 | COLUMBUS OH |
| Marysville Journal -Tribune | Marysville | OH | Union | 6,000 | COLUMBUS OH |
| Richwood Gazette | Marysville | OH | Union | 2,000 | COLUMBUS OH |
| The Independent | Massillon | OH | Stark | 13,837 | CLEVELAND-AKRON (CANTON) |
| Northwest Signal | Napoleon | OH | Henry | 4,242 | TOLEDO |
| Perry County Tribune | New Lexington | OH | Perry | 4,000 | COLUMBUS OH |
| The Times Reporter | New Philadelphia | OH | Stark | 24,240 | CLEVELAND-AKRON (CANTON) |
| Norwalk Reflector | Norwalk | OH | Huron | 9,000 | CLEVELAND-AKRON (CANTON) |
| The Register-Herald | Piqua | OH | Preble | 13,681 | DAYTON |
| Sandusky Register | Sandusky | OH | Erie | 24,400 | CLEVELAND-AKRON (CANTON) |
| The Sidney Daily News | Sidney | OH | Shelby | 12,924 | DAYTON |
| Troy Daily News | Troy | OH | Miami | 10,710 | DAYTON |
| Putnam County Sentinel | Van Wert | OH | Van Wert | 5,500 | FT. WAYNE |
| Times-Bulletin | Van Wert | OH | Van Wert | 5,000 | FT. WAYNE |
| Record Herald | Washington Court House | OH | Fayette | 5,068 | COLUMBUS OH |
| Fulton County Expositor | Wauseon | OH | Fulton | 4,848 | TOLEDO |
| The News Watchman | Waverly | OH | Pike | 3,629 | COLUMBUS OH |
| People's Defender | West Union | OH | Adams | 6,800 | CINCINNATI |
| Wilmington News Journal | Wilmington | OH | Clinton | 6,400 | CINCINNATI |
| Daily Record | Wooster | OH | Wayne | 22,664 | CLEVELAND-AKRON (CANTON) |
| Beavercreek News Current | Xenia | OH | Greene | 2,785 | DAYTON |

Case 1:12-Case112-mf-32664CRBcument86-21 Filed04/25/13 Page67552103geID #: 584

**Relish Carrier Newspaper List**

| | | | | | |
|---|---|---|---|---|---|
| Fairborn Daily Herald | Xenia | OH | Greene | 1,450 | DAYTON |
| The Xenia Daily Gazette | Xenia | OH | Greene | 4,150 | DAYTON |
| The Daily Ardmoreite | Ardmore | OK | Carter | 8,900 | SHERMAN-ADA |
| Express-Star | Chickasha | OK | Grady | 4,949 | OKLAHOMA CITY |
| Daily Progress | Claremore | OK | Rogers | 5,938 | TULSA |
| The Duncan Banner | Duncan | OK | Stephens | 6,500 | WICHITA FALLS & LAWTON |
| The Edmond Sun | Edmond | OK | Oklahoma | 4,200 | OKLAHOMA CITY |
| The American | Fairland | OK | Ottawa | 1,700 | JOPLIN-PITTSBURG |
| The Grove Sun | Grove | OK | Delaware | 2,800 | TULSA |
| McAlester News-Capital | McAlester | OK | Pittsburg | 9,403 | TULSA |
| Miami News-Record | Miami | OK | Ottawa | 3,500 | JOPLIN-PITTSBURG |
| Mustang Times | Mustang | OK | Canadian | 5,500 | OKLAHOMA CITY |
| The Nowata Star | Nowata | OK | Nowata | 2,500 | TULSA |
| The Daily Times | Pryor | OK | Mayes | 3,200 | TULSA |
| Sapulpa Daily Herald | Sapulpa | OK | Creek | 3,500 | TULSA |
| Shawnee News-Star | Shawnee | OK | Pottawatomie | 9,106 | OKLAHOMA CITY |
| News Press | Stillwater | OK | Adair | 7,800 | OKLAHOMA CITY |
| Tahlequah Daily Press | Tahlequah | OK | Cherokee | 3,959 | TULSA |
| Vinita Daily Journal | Vinita | OK | Craig | 3,000 | TULSA |
| Woodward News | Woodward | OK | Woodward | 4,751 | OKLAHOMA CITY |
| Albany-Democrat-Herald | Albany | OR | Linn | 16,100 | PORTLAND OR |
| The World | Coos Bay | OR | Coos | 9,000 | EUGENE |
| Corvallis Gazette Times | Corvallis | OR | Benton | 10,400 | EUGENE |
| Wallowa County Chieftain | Enterprise | OR | Wallowa | 3,030 | SPOKANE |
| The Register-Guard | Eugene | OR | Lane | 54,000 | EUGENE |
| The Hermiston Herald | Hermiston | OR | Umatilla | 3,838 | YAKIMA-PASCO-RCHLND-KNNWCK |
| Blue Mountain Eagle | John Day | OR | Grant | 3,030 | BOISE |
| Herald & News | Klamath Falls | OR | Klamath | 17,321 | MEDFORD-KLAMATH FALLS |
| Mail Tribune | Medford | OR | Jackson | 24,650 | MEDFORD-KLAMATH FALLS |
| East Oregonian | Pendleton | OR | Grant | 9,090 | YAKIMA-PASCO-RCHLND-KNNWCK |
| The News Review | Roseburg | OR | Douglas | 19,190 | EUGENE |
| East Penn Press | Allentown | PA | Lehigh | 8,000 | PHILADELPHIA |
| Northwestern Press | Allentown | PA | Lehigh | 3,000 | PHILADELPHIA |
| Parkland Press | Allentown | PA | Lehigh | 5,000 | PHILADELPHIA |
| Whitehall-Coplay Press | Allentown | PA | Lehigh | 7,000 | PHILADELPHIA |
| Bedford Gazette | Bedford | PA | Bedford | 9,421 | JOHNSTOWN-ALTOONA |
| Press Enterprise | Bloomsburg | PA | Columbia | 23,735 | WILKES BARRE-SCRANTON |
| The Sentinel | Carlisle | PA | Cumberland | 16,766 | HARRISBURG-LNCSTR-LEB-YORK |
| The Progress | Clearfield | PA | Clearfield | 11,200 | JOHNSTOWN-ALTOONA |
| The Express-Times | Easton | PA | Northampton | 51,439 | PHILADELPHIA |
| The Echo-Pilot | Greencastle | PA | Franklin | 2,562 | WASHINGTON DC (HAGRSTWN) |
| Hazleton Standard-Speaker | Hazleton | PA | Luzerne | 19,000 | WILKES BARRE-SCRANTON |
| The Wayne Independent | Honesdale | PA | Wayne | 4,100 | WILKES BARRE-SCRANTON |
| The Daily News | Huntingdon | PA | Huntingdon | 10,000 | JOHNSTOWN-ALTOONA |
| The Tribune-Democrat | Johnstown | PA | Cambria | 37,000 | JOHNSTOWN-ALTOONA |
| The Latrobe Bulletin | Latrobe | PA | West Moreland | 7,500 | PITTSBURGH |
| Salisbury Press | Lehighton | PA | Carbon | 3,000 | WILKES BARRE-SCRANTON |
| Times News | Lehighton | PA | Carbon | 16,420 | WILKES BARRE-SCRANTON |
| The Meadville Tribune | Meadville | PA | Crawford | 13,528 | ERIE |
| Lewisburg Daily Journal | Milton | PA | Northumberland | 1,020 | WILKES BARRE-SCRANTON |
| The Standard Journal | Milton | PA | Northumberland | 2,652 | WILKES BARRE-SCRANTON |
| New Castle News | New Castle | PA | Lawrence | 17,816 | PITTSBURGH |
| Trib Total Media | Pittsburgh | PA | Allegheny | 228,765 | PITTSBURGH |
| Republican-Herald/The News Item | Pottsville | PA | Schuylkill | 32,700 | WILKES BARRE-SCRANTON |
| Morning Times | Sayre | PA | Bradford | 6,222 | WILKES BARRE-SCRANTON |
| The Scranton Times | Scranton | PA | Lackawanna | 47,000 | WILKES BARRE-SCRANTON |
| The Pocono Record | Stroudsburg | PA | Monroe | 20,290 | WILKES BARRE-SCRANTON |
| The Daily Item | Sunbury | PA | Northumberland | 23,000 | WILKES BARRE-SCRANTON |
| The Daily Review | Towanda | PA | Bradford | 9,292 | WILKES BARRE-SCRANTON |
| The Daily Herald | Tyrone | PA | Huntingdon | 2,000 | JOHNSTOWN-ALTOONA |
| Observer-Reporter | Washington | PA | Washington | 36,000 | PITTSBURGH |
| The Record Herald | Waynesboro | PA | Franklin | 9,000 | WASHINGTON DC (HAGRSTWN) |
| The Citizens' Voice | Wilkes-Barre | PA | Luzerne | 29,000 | WILKES BARRE-SCRANTON |
| The Newport Daily News | Newport | RI | Newport | 11,000 | PROVIDENCE-NEW BEDFORD |
| The Westerly Sun | Westerly | RI | Washington | 10,670 | PROVIDENCE-NEW BEDFORD |

# Relish Carrier Newspaper List

| | | | | | |
|---|---|---|---|---|---|
| The People-Sentinel | Barnwell | SC | Barnwell | 6,000 | AUGUSTA |
| Bluffton Today | Bluffton | SC | Beaufort | 12,500 | SAVANNAH |
| Morning News | Florence | SC | Florence | 24,200 | FLORENCE-MYRTLE BEACH |
| Hampton County Guardian | Hampton | SC | Hampton | 1,020 | SAVANNAH |
| The Messenger | Hartsville | SC | Darlington | 3,550 | FLORENCE-MYRTLE BEACH |
| The Weekly Observer | Henmingway | SC | Williamsburg | 2,040 | CHARLESTON SC |
| Lake City News & Post | Lake City | SC | Florence | 1,371 | FLORENCE-MYRTLE BEACH |
| Marion Star & Mullins Enterprise | Lake City | SC | Marion | 2,550 | FLORENCE-MYRTLE BEACH |
| The Sun News | Myrtle Beach | SC | Horry | 45,000 | FLORENCE-MYRTLE BEACH |
| Jasper County Sun Times | Ridgeland | SC | Jasper | 1,337 | SAVANNAH |
| The Daily Journal | Seneca | SC | Oconee | 8,000 | GREENVLL-SPART-ASHEVLL-AND |
| The Daily Messenger | Seneca | SC | Oconee | 1,000 | GREENVLL-SPART-ASHEVLL-AND |
| The Item | Sumter | SC | Sumter | 15,000 | COLUMBIA SC |
| The Daily Republic | Mitchell | SD | Davison | 12,327 | SIOUX FALLS(MITCHELL) |
| Capital Journal | Pierre | SD | Hughes | 4,400 | SIOUX FALLS(MITCHELL) |
| Rapid City Journal | Rapid City | SD | Pennington | 30,684 | RAPID CITY |
| Public Opinion | Watertown | SD | Codington | 12,726 | SIOUX FALLS(MITCHELL) |
| Daily Press and Dakotan | Yankton | SD | Yankton | 8,686 | SIOUX FALLS(MITCHELL) |
| The Daily Post-Athenian | Athens | TN | McMinn | 9,700 | CHATTANOOGA |
| Chattanooga Times Free Press | Chattanooga | TN | Hamilton | 78,788 | CHATTANOOGA |
| Cleveland Daily Banner | Cleveland | TN | Bradley | 16,000 | CHATTANOOGA |
| Herald -Citizen | Cookeville | TN | Putman | 11,878 | NASHVILLE |
| The Leader | Covington | TN | Tipton | 5,543 | MEMPHIS |
| Crossville Chronicle | Crossville | TN | Cumberland | 7,062 | KNOXVILLE |
| The State Gazette | Dyersburg | TN | Dyer | 5,939 | MEMPHIS |
| Elizabethton Star | Elizabethton | TN | Carter | 9,000 | TRI-CITIES TN-VA |
| The Greeneville Sun | Greeneville | TN | Greene | 14,000 | TRI-CITIES TN-VA |
| Johnson City Press | Johnson City | TN | Washington | 31,300 | TRI-CITIES TN-VA |
| Herald & Tribune | Jonesborough | TN | Washington | 4,400 | TRI-CITIES TN-VA |
| Kingsport Times-News | Kingsport | TN | Hawkins | 42,000 | TRI-CITIES TN-VA |
| The Mt. Juliet News | Lebanon | TN | Wilson | 2,500 | NASHVILLE |
| The Hartsville Vidette | Lebanon | TN | Trousdale | 2,500 | NASHVILLE |
| The Lebanon Democrat | Lebanon | TN | Wilson | 8,000 | NASHVILLE |
| The News-Herald | Lenoir City | TN | Loudon | 5,836 | KNOXVILLE |
| The Daily Times | Maryville | TN | Blount | 18,300 | KNOXVILLE |
| Southern Standard | McMinnville | TN | Warren | 8,908 | NASHVILLE |
| Citizen Tribune | Morristown | TN | Hamblen | 19,004 | KNOXVILLE |
| Murfreesboro Post | Murfreesboro | TN | Rutherford | 21,000 | NASHVILLE |
| The Oak Ridger | Oak Ridge | TN | Anderson | 7,622 | KNOXVILLE |
| The News Leader | Parsons | TN | Decatur | 3,535 | JACKSON TN |
| Portland Leader | Portland | TN | Sumner | 2,000 | NASHVILLE |
| The Mountain Press | Sevierville | TN | Sevier | 9,300 | KNOXVILLE |
| Shelbyville Times Gazette | Shelbyville | TN | Bedford | 10,888 | NASHVILLE |
| Smithville Review | Smithville | TN | DeKalb | 3,535 | NASHVILLE |
| Manchester Times | Tullahoma | TN | Coffee | 9,595 | NASHVILLE |
| Manchester Times | Tullahoma | TN | Coffee | 9,595 | NASHVILLE |
| Cannon Courier | Woodbury | TN | Cannon | 3,500 | NASHVILLE |
| Abilene Reporter News | Abilene | TX | Taylor | 29,000 | ABILENE-SWEETWATER |
| Alvin Sun | Alvin | TX | Brazoria | 1,000 | HOUSTON |
| Amarillo Globe-News | Amarillo | TX | Potter | 30,000 | AMARILLO |
| Athens Daily Review | Athens | TX | Henderson | 5,252 | DALLAS-FT. WORTH |
| Lake Travis View | Austin | TX | Travis | 5,050 | AUSTIN |
| Westlake Picayune | Austin | TX | Travis | 4,400 | AUSTIN |
| Bastrop Advertiser | Bastrop | TX | Bastrop | 6,700 | AUSTIN |
| Lewisville Leader | Bastrop | TX | Denton | 10,500 | AUSTIN |
| The Bay City Tribune | Bay City | TX | Matagorda | 4,000 | HOUSTON |
| Baytown Sun | Baytown | TX | Harris | 7,000 | HOUSTON |
| The Bowie News | Bowie | TX | Montaque | 3,500 | WICHITA FALLS & LAWTON |
| Breckenridge American | Breckenridge | TX | Stephens | 1,783 | ABILENE-SWEETWATER |
| The Banner - Press | Brenham | TX | Washington | 6,434 | WACO-TEMPLE-BRYAN |
| The Brownsville Herald | Brownsville | TX | Cameron | 25,061 | HARLINGEN-WSLCO-BRNSVL-MCA |
| Brownwood Bulletin | Brownwood | TX | Brown | 5,500 | ABILENE-SWEETWATER |
| Bryan-College Station Eagle | Bryan | TX | Brazos | 24,745 | WACO-TEMPLE-BRYAN |
| Alvarado Star | Burelson | TX | Johnson | 375 | DALLAS-FT. WORTH |
| Burleson Star | Burelson | TX | Johnson | 3,300 | DALLAS-FT. WORTH |

Case 1:12-cv-03264-CRB Document 86-21 Filed 04/25/13 Page 65 of 103 PageID #: 586

## Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Region |
|---|---|---|---|---|---|
| Crowley Star | Burelson | TX | Tarrant | 745 | DALLAS-FT. WORTH |
| Everman Star | Burelson | TX | Tarrant | 289 | DALLAS-FT. WORTH |
| Joshua Star | Burelson | TX | Johnson | 687 | DALLAS-FT. WORTH |
| Kenne Star | Burelson | TX | Johnson | 554 | DALLAS-FT. WORTH |
| Canton Herald | Canton | TX | Van Zandt | 4,000 | DALLAS-FT. WORTH |
| Cleburne Times-Review | Cleburne | TX | Johnson | 3,000 | DALLAS-FT. WORTH |
| Corpus Christi Caller Times | Corpus Christi | TX | Nueces | 49,100 | CORPUS CHRISTI |
| Corsicana Daily Sun | Corsicana | TX | Navarro | 7,028 | DALLAS-FT. WORTH |
| El Paso Times | El Paso | TX | El Paso | 75,000 | EL PASO |
| Fort Worth Star-Telegram | Fort Worth | TX | Tarrant | 142,000 | DALLAS-FT. WORTH |
| Fredericksburg Standard-Radio Post | Fredericksburg | TX | Gillespie | 9,600 | AUSTIN |
| Gainesville Daily Register | Gainesville | TX | Cooke | 5,740 | DALLAS-FT. WORTH |
| Galveston County Daily News | Galveston | TX | Galveston | 24,500 | HOUSTON |
| The Gilmer Mirror | Gilmer | TX | Upshur | 4,545 | TYLER-LONGVIEW(LFKN&NCGD) |
| Glen Rose Reporter | Glen Rose | TX | Somervell | 2,000 | DALLAS-FT. WORTH |
| Lake County Sun | Graford | TX | Palo Pinto | 1,150 | DALLAS-FT. WORTH |
| The Graham Leader | Graham | TX | Young | 3,088 | WICHITA FALLS & LAWTON |
| Greenville Herald-Banner | Greenville | TX | Hunt | 8,000 | DALLAS-FT. WORTH |
| Henderson Daily News | Henderson | TX | Rusk | 6,060 | TYLER-LONGVIEW(LFKN&NCGD) |
| The Huntsville Item | Huntsville | TX | Walker | 5,939 | HOUSTON |
| West Kerr Current | Ingram | TX | Kerr | 1,500 | SAN ANTONIO |
| Jack County Herald | Jacksboro | TX | Jack | 1,266 | DALLAS-FT. WORTH |
| Cedar Park Citizen | Jonestown | TX | Williamson | 14,350 | AUSTIN |
| Leander Ledger | Jonestown | TX | Williamson | 9,700 | AUSTIN |
| Coppell Gazette | Jonestown | TX | Denton | 7,600 | AUSTIN |
| Flower Mound Leader | Jonestown | TX | Denton | 6,000 | AUSTIN |
| The Junction Eagle | Junction | TX | Kimble | 1,800 | SAN ANGELO |
| The Katy Times | Katy | TX | Harris | 6,000 | HOUSTON |
| Kaufman Herald | Kaufman | TX | Kaufman | 4,256 | DALLAS-FT. WORTH |
| Kerrville Daily Times | Kerrville | TX | Kerr | 9,000 | SAN ANTONIO |
| Longview News Journal | Longview | TX | Gregg | 29,795 | TYLER-LONGVIEW(LFKN&NCGD) |
| Lubbock Avalanche-Journal | Lubbock | TX | Lubbock | 30,850 | LUBBOCK |
| The Lufkin Daily News | Lufkin | TX | Angelina | 14,039 | TYLER-LONGVIEW(LFKN&NCGD) |
| The Monitor | Mabank | TX | Kaufman | 4,949 | DALLAS-FT. WORTH |
| Marshall News Messenger | Marshall | TX | Harrison | 7,575 | SHREVEPORT |
| The Mexia Daily News | Mexia | TX | Limestone | 2,771 | WACO-TEMPLE-BRYAN |
| Midland Reporter-Telegram | Midland | TX | Midland | 15,000 | ODESSA-MIDLAND |
| Mineral Wells Index | Mineral Wells | TX | Palo Pinto | 3,000 | DALLAS-FT. WORTH |
| The Daily Sentinel | Nochgadoches | TX | Nacogdoches | 8,989 | TYLER-LONGVIEW(LFKN&NCGD) |
| The Olney Enterprise | Olney | TX | Young | 1,000 | WICHITA FALLS & LAWTON |
| The Orange Leader | Orange | TX | Orange | 5,000 | BEAUMONT-PORT ARTHUR |
| Palestine Herald - Press | Palestine | TX | Anderson | 7,070 | DALLAS-FT. WORTH |
| Plainview Daily Herald | Plainview | TX | Hale | 6,632 | LUBBOCK |
| Port Arthur News | Port Arthur | TX | Jefferson | 13,500 | BEAUMONT-PORT ARTHUR |
| The Port Lavaca Wave | Port Lavaca | TX | Calhoun | 3,959 | HOUSTON |
| Rockport Pilot | Rockport | TX | Aransas | 4,949 | CORPUS CHRISTI |
| The Fort Bend Herald | Rosenburg | TX | Fort Bend | 8,413 | HOUSTON |
| Pflugerville Pflag | Round Rock | TX | Travis | 8,200 | AUSTIN |
| Round Rock Leader | Round Rock | TX | Williamson | 8,500 | AUSTIN |
| Carrollton Leader | Round Rock | TX | Denton | 3,100 | AUSTIN |
| Plano Star Courier | Round Rock | TX | Collin | 41,000 | AUSTIN |
| San Angelo Standard Times | San Angelo | TX | Tom Green | 18,300 | SAN ANGELO |
| San Marcos Daily Record | San Marcos | TX | Hays | 3,400 | AUSTIN |
| Seguin Gazette-Enterprise | Seguin | TX | Guadalupe | 6,060 | SAN ANTONIO |
| Herald Democrat | Sherman | TX | Grayson | 22,765 | SHERMAN-ADA |
| Smithville Times | Smithvilel | TX | Bastrop | 4,100 | AUSTIN |
| McKinney Courier Gazette | Smithvilel | TX | Collin | 4,000 | AUSTIN |
| Stephenville Empire-Tribune | Stephenville | TX | Erath | 4,800 | DALLAS-FT. WORTH |
| Temple Daily Telegram | Temple | TX | Bell | 18,500 | WACO-TEMPLE-BRYAN |
| Terrell Tribune | Terrell | TX | Kaufman | 2,969 | DALLAS-FT. WORTH |
| Texarkana Gazette | Texarkana | TX | Bowie | 34,000 | SHREVEPORT |
| Victoria Advocate | Victoria | TX | Victoria | 49,000 | VICTORIA |
| Waco Tribune - Herald | Waco | TX | McLennan | 37,370 | WACO-TEMPLE-BRYAN |
| Waxahachie Daily Light | Waxahachie | TX | Ellis | 5,000 | DALLAS-FT. WORTH |
| The Weatherford Democrat | Weatherford | TX | Parker | 6,000 | DALLAS-FT. WORTH |

Case 1:12-cv-08676-CRB Document 86-21 Filed 04/25/13 Page 356 of 552 PageID #: 587

# Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| Mid Valley Town Crier | Weslaco | TX | Hidalgo | 23,230 | HARLINGEN-WSLCO-BRNSVL-MCA |
| Wichita Falls Times Records News | Wichita Falls | TX | Wichita | 25,000 | WICHITA FALLS & LAWTON |
| Van Banner | Wills Point | TX | Van Zandt | 1,000 | DALLAS-FT. WORTH |
| Davis County Clipper | Bountiful | UT | Davis | 10,000 | SALT LAKE CITY |
| The Herald Journal | Logan | UT | Cache | 17,170 | SALT LAKE CITY |
| Standard-Examiner | Ogden | UT | Weber | 60,000 | SALT LAKE CITY |
| The Daily Herald | Provo | UT | Utah | 27,000 | SALT LAKE CITY |
| The Salt Lake Tribune/Deseret News | Salt Lake City | UT | Salt Lake | 125,000 | SALT LAKE CITY |
| Tooele Transcript Bulletin | Tooele | UT | Tooele | 7,500 | SALT LAKE CITY |
| Bristol Herald Courier | Bristol | VA | Sullivan | 30,000 | TRI-CITIES TN-VA |
| The Floyd Press | Floyd | VA | Floyd | 5,000 | ROANOKE-LYNCHBURG |
| Smyth County News & Messenger | Marion | VA | Smyth | 4,632 | TRI-CITIES TN-VA |
| The Virginian-Pilot | Norfolk | VA | Norfolk | 164,000 | NORFOLK-PORTSMTH-NEWPT NWS |
| Hampton Roads Saving Weekly | Norfolk | VA | Norfolk | 34,000 | NORFOLK-PORTSMTH-NEWPT NWS |
| Progress-Index | Petersburg | VA | Prince George | 15,150 | RICHMOND-PETERSBURG |
| Clinch Valley News | Richlands | VA | Tazewell | 2,400 | BLUEFIELD-BECKLEY-OAK HILL |
| Richlands News-Press | Richlands | VA | Tazewell | 3,798 | BLUEFIELD-BECKLEY-OAK HILL |
| Richmond Times-Dispatch | Richmond | VA | Richmond City | 121,000 | RICHMOND-PETERSBURG |
| Northern Virginia Daily | Strasburg | VA | Shenandoah | 14,000 | WASHINGTON DC (HAGRSTWN) |
| The Bland Messenger | Wytheville | VA | Bland | 2,500 | ROANOKE-LYNCHBURG |
| Wytheville Enterprise | Wytheville | VA | Wythe | 5,415 | ROANOKE-LYNCHBURG |
| Bennington Banner | Bennington | VT | Bennington | 7,575 | ALBANY-SCHENECTADY-TROY |
| Brattleboro Reformer | Brattleboro | VT | Windham | 10,100 | BOSTON (MANCHESTER) |
| St. Albans Messenger | St. Albans | VT | Franklin | 6,060 | BURLINGTON-PLATTSBURGH |
| The Bellingham Herald | Bellingham | WA | Whatcom | 19,000 | SEATTLE-TACOMA |
| The Chronicle | Centralia | WA | Lewis | 12,800 | SEATTLE-TACOMA |
| Daily Record | Ellensburg | WA | Kittitas | 5,741 | YAKIMA-PASCO-RCHLND-KNNWCK |
| The Herald | Everett | WA | Snohomish | 54,439 | SEATTLE-TACOMA |
| Columbia Basin Herald | Moses Lake | WA | Grant | 9,090 | SPOKANE |
| Skagit Valley Herald | Mount Vernon | WA | Skagit | 15,000 | SEATTLE-TACOMA |
| Peninsula Daily News | Port Angeles | WA | Clallam | 18,000 | SEATTLE-TACOMA |
| Seattle Times | Seattle | WA | King | 218,000 | SEATTLE-TACOMA |
| The Columbian | Vancouver | WA | Clark | 32,000 | PORTLAND OR |
| Walla Walla Union Bulletin | Walla Walla | WA | Walla Walla | 12,500 | YAKIMA-PASCO-RCHLND-KNNWCK |
| The Wenatchee World | Wenatchee | WA | Chelan | 20,500 | SEATTLE-TACOMA |
| Yakima Herald-Republic | Yakima | WA | Yakima | 34,200 | YAKIMA-PASCO-RCHLND-KNNWCK |
| Waupaca Buyers Guide | Antigo | WI | Langlade | 11,276 | WAUSAU-RHINELANDER |
| The Daily Press | Ashland | WI | Ashland | 6,000 | DULUTH-SUPERIOR |
| Baraboo News Republic | Baraboo | WI | Sauk | 4,242 | MADISON |
| Daily Citizen | Beaver Dam | WI | Dodge | 10,492 | MILWAUKEE |
| Rural Post | Bowler | WI | Shawano | 9,000 | GREEN BAY-APPLETON |
| Burlington Standard Press | Burlington | WI | Racine | 3,000 | MILWAUKEE |
| Cambridge News | Cambridge | WI | Dane | 2,647 | MADISON |
| Ozaukee County News Graphic | Cedarburg | WI | Ozaukee | 8,080 | MILWAUKEE |
| Clintonville Tribune Gazette | Clintonville | WI | Waupaca | 2,500 | GREEN BAY-APPLETON |
| Clintonville Buyers Guide | Clintonville | WI | Waupaca | 14,000 | MISSOULA |
| Herald-Independent | Cottage Grove | WI | Dane | 1,981 | MADISON |
| DeForest Times | DeForest | WI | Dane | 2,550 | MADISON |
| The Delavan Enterprise | Delavan | WI | Walworth | 2,000 | MILWAUKEE |
| The East Troy News | East Troy | WI | Walworth | 500 | MILWAUKEE |
| The Leader-Telegram | Eau Claire | WI | Eau Claire | 24,707 | MADISON |
| The Elkhorn Independent | Elkhorn | WI | Walworth | 1,000 | MILWAUKEE |
| Mukwonago Chief | Hartland | WI | Waukesha | 5,126 | MILWAUKEE |
| Reporter Focus | Hartland | WI | Waukesha | 9,282 | MILWAUKEE |
| Sawyer County Record | Hayward | WI | Sawyer | 6,000 | DULUTH-SUPERIOR |
| Manawa Advocate | Iola | WI | Waupaca | 500 | GREEN BAY-APPLETON |
| The Iola Herald | Iola | WI | Waupaca | 1,000 | GREEN BAY-APPLETON |
| The Janesville Gazette | Janesville | WI | Rock | 22,220 | WAUSAU-RHINELANDER |
| Kenosha News | Kenosha | WI | Kenosha | 26,310 | MILWAUKEE |
| La Crosse Tribune | La Crosse | WI | La Crosse | 27,000 | MILWAUKEE |
| Lake Geneva Times | Lake Geneva | WI | Walworth | 2,000 | MILWAUKEE |
| Lake Mills Leader | Lake Mills | WI | Jefferson | 2,907 | MILWAUKEE |
| Lodi Enteprise | Lodi | WI | Columbia | 2,540 | MADISON |
| Eagle Herald | Marinette | WI | Marinette | 9,000 | GREEN BAY-APPLETON |
| Marshfield Buyers Guide | Marshfield | WI | Clark | 21,513 | WAUSAU-RHINELANDER |

Case 1:12-cv-03864-CBA Document 86-21 Filed 04/25/13 Page 357 of 552 PageID #: 588

## Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| McFarland Thistle | McFarland | WI | Dane | 1,785 | MADISON |
| Foto News | Merrill | WI | Lincoln | 16,400 | WAUSAU-RHINELANDER |
| Milton Courier | Milton | WI | Rock | 3,519 | MADISON |
| The Monroe Times | Monroe | WI | Green | 5,050 | MADISON |
| New London Buyers Guide | New London | WI | Waupaca | 15,151 | GREEN BAY-APPLETON |
| Berlin/Ripon Ad Pack | Oshkosh | WI | Winneago | 12,700 | GREEN BAY-APPLETON |
| Oshkosh Buyers Guide | Oshkosh | WI | Winneago | 25,000 | GREEN BAY-APPLETON |
| The Park Falls Herald | Park Falls | WI | Price | 2,969 | MADISON |
| Daily Register | Portage | WI | Portage | 5,555 | MADISON |
| Poynette Press | Poynette | WI | Dane | 1,530 | MADISON |
| The Journal Times | Racine | WI | Racine | 26,000 | MILWAUKEE |
| Star Journal | Rhinelander | WI | Oneida | 16,000 | WAUSAU-RHINELANDER |
| Spooner Advocate | Spooner | WI | Washburn | 3,953 | MINNEAPOLIS-ST. PAUL |
| Stevens Point Buyers Guide | Stevens Point | WI | Portage | 21,097 | WAUSAU-RHINELANDER |
| The Star | Sun Prairie | WI | Dane | 5,396 | MADISON |
| The Daily Telegram | Superior | WI | Douglas | 5,000 | MILWAUKEE |
| Westosha Report | Twin Lakes | Wi | Walworth | 500 | MILWAUKEE |
| Westine Report | Union Grove | WI | Racine | 500 | MILWAUKEE |
| The Times Walworth | Walworth | WI | Walworth | 500 | MILWAUKEE |
| Waterford Post | Waterford | WI | Racine | 1,000 | MILWAUKEE |
| The Courier | Waterloo | WI | Jefferson | 2,309 | MILWAUKEE |
| Times Publishing Company | Watertown | WI | Jefferson | 8,050 | MILWAUKEE |
| Waukesha Freeman | Waukesha | WI | Waulkesha | 11,200 | MILWAUKEE |
| Waunakee Tribune | Waunakee | WI | Dane | 3,749 | MADISON |
| Waupaca County Post | Waupaca | WI | Waupaca | 7,300 | GREEN BAY-APPLETON |
| Marathon Buyers Guide | Wausau | WI | Marathon | 33,800 | WAUSAU-RHINELANDER |
| The Waushara Argus | Wautoma | WI | Waushara | 5,500 | GREEN BAY-APPLETON |
| West Bend Daily News | West Bend | WI | Washington | 9,343 | MILWAUKEE |
| The Chronicle | Weyauwega | WI | Waupaca | 2,500 | GREEN BAY-APPLETON |
| Whitewater Register | Whitewater | WI | Walworth | 1,000 | MILWAUKEE |
| Wisconsin Rapids Buyers Guide | Wisconsin Rapids | WI | Wood | 22,040 | GREEN BAY-APPLETON |
| The Register Herald | Beckley | WV | Raliegh | 22,904 | BLUEFIELD-BECKLEY-OAK HILL |
| Mineral Daily News Tribune | Keyser | WV | Mineral | 4,242 | WASHINGTON DC (HAGRSTWN) |
| Casper Star-Tribune | Casper | WY | Natrona | 24,500 | CASPER-RIVERTON |
| | | | | **15,061,439** | |

# EXHIBIT C

To:
From:       Barbara's Bakery Settlement Administrator
Subject:    Barbara's Bakery Settlement

## If You Bought a Barbara's Bakery Product
## You Could Get Up to $100 from a Settlement

*Includes: Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies*

Records show that you may have previously purchased a Barbara's Bakery product and that you may be eligible for a payment of up to $100 from a class action Settlement. The lawsuit claims that Barbara's Bakery violated state laws regarding the marketing and sale of certain products. Barbara's Bakery denies it did anything wrong. Please go to www.BarbarasBakerySettlement.com for a list of included products and / or to file a claim.

**What Does the Settlement Provide?**
A Settlement Fund of $4 million will pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) attorneys' fees and costs, and (4) a special service payment to the Class Representative. Barbara's Bakery has also agreed to change some of its business practices, including modifying its product labels and advertising. Any money remaining in the Settlement Fund after all claims are paid will be donated to charities and non-profit organizations. Additional details are in the Settlement Agreement available on the website.

**How Can I Get a Payment?** Submit a Claim Form online at www.BarbarasBakerySettlement.com or by mail by **Month 00, 2013**. The payment amount you receive will be based in part on the amount of products you purchased and the total number of claims made.

**What Are My Rights?** Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue Barbara's Bakery yourself, you must exclude yourself from the Settlement by **Month 00, 2013**. If you stay in the Settlement, you may object to it by **Month 00, 2013**.

The Court will hold a hearing on **Month 00, 2013** to consider whether to approve the Settlement and a request for attorneys' fees and costs up to $1 million and a special service payment of $2,500 from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

The detailed notice, available at www.BarbarasBakerySettlement.com or by calling 1-800-000-0000, further explains how to exclude yourself or object.

**For More Information: 1-800-000-0000     www.BarbarasBakerySettlement.com**

# If You Bought a Barbara's Bakery Product, You Could Get Up to $100 from a Settlement

*Includes: Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies*

Records show that you may have previously purchased a Barbara's Bakery product and that you may be eligible for a payment of up to $100 from a class action Settlement. The lawsuit claims that Barbara's Bakery violated state laws regarding the marketing and sale of certain products. Barbara's Bakery denies it did anything wrong. Please go to www.BarbarasBakerySettlement.com for a list of included products and / or to file a claim.

**What Does the Settlement Provide?** A Settlement Fund of $4 million will pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) attorneys' fees and costs, and (4) a special service payment to the Class Representative. Barbara's Bakery also has agreed to change some of its business practices, including modifying its product labels and advertising. Any money remaining in the Settlement Fund after all claims are paid will be donated to charities and non-profit organizations. Additional details are in the Settlement Agreement available on the website.

**How Can I Get a Payment?** Submit a Claim Form online at www.BarbarasBakerySettlement.com or by mail by **Month 00, 2013**. The payment amount you receive will be based in part on the amount of products you purchased and the total number of claims made.

**What Are My Rights?** Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue Barbara's Bakery yourself, you must exclude yourself from the Settlement by **Month 00, 2013**. If you stay in the Settlement, you may object to it by **Month 00, 2013**.

The Court will hold a hearing on **Month 00, 2013** to consider whether to approve the Settlement, a request for attorneys' fees and costs up to $1 million, and a special service payment of $2,500 from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

The detailed notice, available at www.BarbarasBakerySettlement.com or by calling 1-800-000-0000, further explains how to exclude yourself or object.

---

**For More Information: 1-800-000-0000     www.BarbarasBakerySettlement.com**

CLAIMS ADMINISTRATOR
PO BOX 0000
MINNEAPOLIS, MN 00000-0000

PRESOR ED
RS -CLASS MA L
U S POS AGE
PA D
Rust Consulting, nc

**Important Notice About Barbara's Bakery Product Settlement**

NAME
ADDRESS
CITY STATE ZIP CODE

# EXHIBIT D

Case 1:12-cv-02644-CBA Document 86-21 Filed 04/25/13 Page 363 of 552 PageID #: 594

# If You Bought a Barbara's Bakery Product Any Time From May 23, 2008 to Month 00, 0000

### *You Could Get Up to $100 From a Class Action Settlement*

---

**Included Products:** Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies

---

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

- There is a Settlement in a class action lawsuit that claims Barbara's Bakery violated state laws regarding the marketing and sale of its products (*see* Question 2). Barbara's Bakery denies it did anything wrong.
- Anyone who bought an eligible Barbara's Bakery product, referred to as the "Eligible Products" and listed below under Question 7, from May 23, 2008 to Month 00, 0000 is included in the Settlement. You may be entitled to a refund of up to $100.
- The Settlement will provide $4,000,000 to pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) a special service payment to the Class Representative, and (4) attorneys' fees and costs. Barbara's Bakery has also agreed to change some of its business practices.
- Your legal rights are affected whether you act or not.
- **Read this notice carefully because it explains decisions you must make and actions you must take <u>now</u>.**

| SUMMARY OF YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **DO NOTHING** | Get no payment. Give up your rights. |
| **SUBMIT A CLAIM FORM** | Submit a Claim Form by **Month 00, 0000** to get a payment (*see* Question 14). |
| **EXCLUDE YOURSELF** | Exclude yourself by **Month 00, 0000** and get no payment from the Settlement. This is the only choice that allows you to ever be part of any other lawsuit against Barbara's Bakery about the claims in this case (*see* Question 17). |
| **OBJECT** | Write to the Court by **Month 00, 0000** about why you don't like the Settlement (*see* Question 22). |
| **GO TO A HEARING** | Ask to speak in Court by **Month 00, 0000** about the fairness of the Settlement (*see* Question 26). |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.
- The Court in charge of this case still has to decide whether to approve the Settlement. If it does, and any appeals are resolved, payments will be distributed to those who qualify. Please be patient.

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION**...............................................................................................3

    1.    Why was this notice issued?
    2.    What is this lawsuit about?
    3.    Why is this a class action?
    4.    Why is there a Settlement?

**WHO IS PART OF THE SETTLEMENT?**.......................................................................3

    5.    Who is included in the Settlement?
    6.    Are there exceptions to being included?
    7.    Which products are included?
    8.    What if I'm still not sure if I'm included?

**THE SETTLEMENT BENEFITS – WHAT YOU CAN GET**..............................................6

    9.    What does the Settlement provide?
    10.    What can I get from the Settlement?
    11.    What happens if there are any funds remaining?
    12.    What am I giving up if I stay in the Class?
    13.    When will I get my payment, if any?

**HOW TO RECEIVE A PAYMENT**...............................................................................7

    14.    How can I get a payment?
    15.    What is the claim process?
    16.    What if I do nothing?

**EXCLUDING YOURSELF FROM THE SETTLEMENT**......................................................8

    17.    How can I get out of the Settlement?
    18.    If I exclude myself, can I still get a payment?
    19.    If I don't exclude myself, can I sue Barbara's Bakery for the same thing later?

**THE LAWYERS REPRESENTING THE CLASS**............................................................9

    20.    Do I have a lawyer in this case?
    21.    How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT**.........................................................................9

    22.    How can I tell the Court if I do not like the Settlement?
    23.    What is the difference between objecting and asking to be excluded?

**THE COURT'S FAIRNESS HEARING**.....................................................................10

    24.    When and where will the Court decide whether to approve the Settlement?
    25.    Do I have to come to the hearing?
    26.    May I speak at the fairness hearing?

**GETTING MORE INFORMATION**............................................................................11

    27.    How can I get more information?

# BASIC INFORMATION

### 1. Why was this notice issued?

The Court authorized this notice because you have a right to know about a proposed Settlement, and about your rights and options, before the Court decides whether to approve the Settlement. You will be informed of the progress of this Settlement and may receive a payment if you are a Class Member and submit a completed and timely Claim Form. This notice explains the lawsuit, the Settlement, and your legal rights. Judge Charles R. Breyer of the United States District Court for the Northern District of California is overseeing this case. The lawsuit is known as *Trammell v. Barbara's Bakery, Inc.,* Case Number 3:12-cv-02664-CRB. The person who sued is called the "Plaintiff." Barbara's Bakery is the "Defendant."

### 2. What is this lawsuit about?

The lawsuit claims that Barbara's Bakery violated certain state laws and consumer protection statutes regarding the marketing and sale of certain products. For example, Plaintiff claims that Barbara's Bakery misrepresented the nature of certain products to consumers by labeling them as "All Natural." Plaintiff claims that these products contain ingredients that are not "All Natural." Barbara's Bakery denies any and all claims of wrongdoing and does not admit any fault, wrongdoing or liability.

Information about the Settlement is summarized in this notice. More detail is provided in the Settlement Agreement, available at www.BarbarasBakerySettlement.com.

### 3. Why is this a class action?

In a class action, one or more people called "Class Representatives" (in this case, Plaintiff, Richard Trammell), sue on behalf of themselves and other people who have similar claims. Together, all of these people are "Class Members." One Court resolves the issues for all Class Members in a Class Action, except for those who exclude themselves from the Class (*see* Question 17).

### 4. Why is there a Settlement?

The Court has not decided in favor of the Plaintiff or Barbara's Bakery. Instead, both sides have agreed to the Settlement. By agreeing to the Settlement, they avoid the costs and uncertainty of a trial, and Class Members receive the benefits described in this notice. The proposed Settlement does not mean that any law was broken or that Barbara's Bakery did anything wrong. The parties believe that the Settlement is fair, reasonable, and adequate and will provide substantial benefit to the Class.

# WHO IS PART OF THE SETTLEMENT?

### 5. Who is included in the Settlement?

The Class includes all persons or entities that bought the Eligible Products (listed below under Question 7) from Barbara's Bakery U.S. Retailers, Barbara's Bakery, www.barbarasbakery.com, or other third-party retailers from May 23, 2008 through **Month 00, 0000**.

## 6. Are there exceptions to being included?

The Settlement does not include:

- Barbara Bakery's board members or executive-level officers, including its attorneys;
- Persons or entities who purchased the Eligible Products primarily for purposes of resale;
- Any claims for personal injury relating to the use of the Eligible Products;
- Distributors or re-sellers of the Eligible Products;
- The judge and magistrate judge and their immediate families presiding over the class action and the Court staff;
- Governmental entities;
- Any person who excludes him or herself from the Class (*see* Question 17); and
- Anyone who purchased the Eligible Products via the Internet or other remote means while not residing in the United States.

## 7. Which products are included?

The following Barbara's Bakery products are the Eligible Products:

---

**CEREALS:**

- **BROWN RICE CRISPS** (Fruit Juice Sweetened flavor);
- **CORN FLAKES** (Fruit Juice Sweetened flavor);
- **HIGH FIBER** (Cranberry, Flax & Granola, and Original flavors);
- **HOLE 'N OATS** (Fruit Juice Sweetened or Honey Nut flavors);
- **HONEST O'S** (Honey Nut, Multigrain, or Original flavors);
- **ORGANIC APPLE CINNAMON O'S**;
- **ORGANIC BREAKFAST O'S**;
- **ORGANIC BROWN RICE**;
- **ORGANIC BROWN RICE CRISPS**;
- **ORGANIC CORN FLAKES**;
- **ORGANIC CRISPY WHEATS**;
- **ORGANIC HONEY CRUNCH 'N OATS**;
- **ORGANIC HONEY NUT O'S**;
- **ORGANIC SNACKIMALS CEREAL** (Cinnamon Crunch or Vanilla Blast flavors);
- **ORGANIC WILD PUFFS** (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);
- **PUFFINS** (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);
- **PUFFIN PUFFS** (Crunchy Cocoa or Fruit Medley flavors);
- **SHREDDED OATS** (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, or Vanilla Almond flavors);
- **SHREDDED WHEAT**;
- **SHREDDED SPOONFULS** (Multigrain or Vanilla Blast flavors);
- **SHREDDED MINIS** (Blueberry Burst flavor);
- **TOASTED OATMEAL FLAKES** (Original flavor); and
- **ULTIMA ORGANIC** (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors).

---

| | |
|---|---|
| **CEREAL BARS:**<br>• **MULTIGRAIN CEREAL BARS** (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors);<br>• **FRUIT & YOGURT BARS** (Apple Cinnamon, Blueberry Apple, Cherry Apple, Strawberry Apple, or Traditional flavors); and<br>• **PUFFINS CEREAL AND MILK BARS** (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors). | **CHEESE PUFFS:**<br>• **BAKED CHEESE PUFFS** (Original or White Cheddar flavors); and<br>• **CHEESE PUFFS** (Jalapeno or Original flavors). |
| **FIG BARS:**<br>• **FIG BARS** (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free or Whole Wheat flavors). | **GRANOLA BARS:**<br>• **CRUNCHY ORGANIC GRANOLA BARS** (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors). |
| **SNACKIMALS ANIMAL COOKIES:**<br>• **SNACKIMALS ANIMAL COOKIES** (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors). | **ORGANIC MINI COOKIES:**<br>• **ORGANIC MINI COOKIES** (Chocolate, Ginger, or Oatmeal flavors). |
| **SNACK MIXES:**<br>• **BRUSCHETTA SNACK MIX;**<br>• **HONEY CINNAMON SNACK MIX;**<br>• **HONEY MUSTARD SNACK MIX;** and<br>• **SALSA SNACK MIX.** | **CRACKERS:**<br>• **CRISP COOKIES** (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread flavors);<br>• **GO GO GRAHAMS** (Chocolate, Cinnamon, Honey, or Lemon Ginger flavors);<br>• **PIZZA AND CHEESE BITES;**<br>• **RITE LITE ROUNDS** (Original, Poppy Seed, or Tamari Sesame flavors); and<br>• **WHEATINES** (Cracked Pepper, Original, or Sesame flavors). |

---

## 8. What if I'm still not sure if I'm included?

If you are not sure whether you are a Class Member, or have any other questions about the Settlement, visit the website, www.BarbarasBakerySettlement.com, or call the toll free number, 1-800-000-0000. You may also send questions to the Settlement Administrator at Barbara's Bakery Settlement, P.O. Box 0000, City, ST 00000.

## THE SETTLEMENT BENEFITS – WHAT YOU CAN GET

**9. What does the Settlement provide?**

If the Settlement is approved and becomes final, it will provide benefits to Class Members. Barbara's Bakery will pay $4,000,000 to a Settlement Fund to make payments to Class Members who file valid claims (*see* Question 14), as well as to pay for costs associated with the notice and administration of the Settlement, attorneys' fees and costs (*see* Question 21), and a special service payment to the Class Representative (*see* Question 21). The costs of notice and administration are estimated to be $790,000.

In addition, Barbara's Bakery has agreed to change their labeling and advertising of the Eligible Products so as not to make certain claims. For example, Barbara's Bakery will not say that the Eligible Products are "All Natural," have "no artificial additives," have "no artificial flavors," and have "no artificial preservatives." The Settlement Agreement, available at www. BarbarasBakerySettlement.com, has more information.

**10. What can I get from the Settlement?**

You can get up to $100 if you submit a valid Claim Form. The amount of your payment will depend on the total amount of money you spent on the Eligible Products at any time from May 23, 2008 until **Month 00, 0000** as follows:

| IF YOU SPENT: | YOU COULD RECEIVE A MAXIMUM OF: |
| :---: | :---: |
| More than $100.00 | $100.00 |
| $75.01 to $100.00 | $75.00 |
| $50.01 to $75.00 | $50.00 |
| $25.01 to $50.00 | $25.00 |
| $10.01 to $25.00 | $10.00 |
| $10.00 or less | $5.00 |

Payment amounts may be adjusted to ensure that all eligible Class Members receive a payment, as follows: If the total value of all approved claims is <u>greater</u> than the amount of money available to pay claims (after costs and fees have been deducted), eligible Class Members' payments will be reduced proportionally.

The actual amount available for each eligible Class Member will not be determined until after **Month 00, 0000** and all Claims Forms have been received, and may not be determined until after the Settlement is final.

### 11. What happens if there are any funds remaining?

If there are any funds remaining after all claims are processed, those funds will be distributed to the following non-profit organizations: Consumers Union (www.consumersunion.org) and Action for Healthy Kids (www.actionforhealthykids.org). No remaining funds will be returned to Barbara's Bakery.

### 12. What am I giving up if I stay in the Class?

Unless you exclude yourself from the Settlement, you can't sue Barbara's Bakery or be part of any other lawsuit against Barbara's Bakery about the issues in this case. Unless you exclude yourself, all of the decisions by the Court will bind you. The Settlement Agreement is available at www. BarbarasBakerySettlement.com and describes the claims that you give up if you remain in the Settlement.

### 13. When will I get my payment, if any?

Class Members who submit valid claims will receive their payments only after the Court grants final approval to the Settlement and after any appeals are resolved (*see* "The Court's Fairness Hearing" below). If there are appeals, resolving them can take time. Please be patient.

## How To Receive a Payment

### 14. How can I get a payment?

To get a payment under the Settlement, you must send in a Claim Form. You may access a Claim Form and other relevant documents at www.BarbarasBakerySettlement.com. A Claim Form also is attached to this Notice. Please read the instructions carefully, and fill out the form completely and accurately. Claim Forms can be submitted two ways: electronically or by mail. Your Claim Form must be submitted electronically no later than **Month 00, 0000** or by mail postmarked no later than **Month 00, 0000** and addressed to:

Barbara's Bakery Settlement
P.O. Box 0000
City, ST 00000

### 15. What is the claim process?

The Settlement Administrator will review each Claim Form. Proofs of purchase are not initially required. However, in some cases you may be asked to verify your purchase(s) of any of the Eligible Products, by providing receipt(s) or other documentation. If you do not respond to these requests, it may result in the denial of your claim. You will have 35 days from the date of the Settlement Administrator's request to provide your documentation.

### 16. What if I do nothing?

If you are a Class Member and you do nothing, you will <u>not</u> get any payment from the Settlement and you will be bound by the Court's decisions, including the Settlement's release and waiver of claims you may have against Barbara's Bakery that related to the claims made in the lawsuit. To receive a payment, you must complete and submit a Claim Form (*see* Question 14).

Questions? Visit www.BarbarasBakerySettlement.com or Call, Toll-Free, 1-000-000-0000

7

# EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from this Settlement, but you want to keep the right to sue or continue to sue Barbara's Bakery on your own about the legal issues in this case, then you must take steps to get out of the Class. This is called excluding yourself – or it is sometimes referred to as "opting out" of the Class.

## 17. How can I get out of the Settlement?

To exclude yourself from the Class, you must mail a letter or written request to the Settlement Administrator. Your request must include:

1. Your name, address, and telephone number;
2. A statement that you wish to be excluded from the Class in *Trammell v. Barbara's Bakery, Inc.,* Case Number 3:12-cv-02664; and
3. Your signature (you must personally sign the letter).

Please write "exclusion request" on the lower left-hand corner of the front of the envelope.

Your exclusion request must be postmarked no later than **Month 00, 0000**. Send your request to:

Barbara's Bakery Settlement
P.O. Box 0000
City, ST 00000

## 18. If I exclude myself, can I still get a payment?

No. You will not get a payment if you exclude yourself from the Settlement. If you request exclusion from the Class, then for each of the excluded Eligible Products:

- You will not be eligible for payment under the proposed Settlement;
- You will not be allowed to object to the terms of the proposed Settlement, and
- You will not be bound by any subsequent rulings entered in this case if the proposed Settlement is finally approved.

## 19. If I don't exclude myself, can I sue Barbara's Bakery for the same thing later?

No. If the Court approves the proposed Settlement and you do not exclude yourself from the Class, you give up (or "release") all claims that have been or could have been made in this lawsuit relating to the Eligible Products.

As part of this Settlement, the Court has preliminary stopped all Class Members and/or their representatives (who do not timely exclude themselves from the Class) from filing, participating in, or continuing litigation against Barbara's Bakery (or against any of its related parties or affiliates), and/or from receiving any benefits from any other lawsuit relating to the claims being resolved in this case.

Upon final approval of the Settlement, Plaintiffs and Barbara's Bakery will ask the Court to enter a permanent ruling forbidding all Class Members and/or their representatives and/or personnel from engaging in the activities described above. All Class Members will be bound by this order.

# THE LAWYERS REPRESENTING THE CLASS

### 20. Do I have a lawyer in this case?

The Court has appointed attorneys at the law firm of Ahdoot & Wolfson, P.C. to represent you and the other Class Members in this lawsuit. The lawyers representing you and the Class Members are called "Class Counsel." You will not be charged for the services of these lawyers.

You may contact Class Counsel as follows:

Robert Ahdoot / Tina Wolfson
Ahdoot & Wolfson, PC
2355 Westwood Boulevard, #337
Los Angeles, CA 90064-2109
classactioncounsel@gmail.com
Telephone: 888-333-8996

You have the right to retain your own lawyer to represent you in this case, but you are not obligated to do so. If you do hire your own lawyer, you will have to pay his or her fees and expenses. You also have the right to represent yourself before the Court without a lawyer.

### 21. How will the lawyers be paid?

Class Counsel have not been paid anything to date for their work on this case. Class Counsel will request attorneys' fees and expenses of up to $1,000,000 to be paid out of the $4,000,000 Settlement Fund. The attorneys' motion(s) for fees, costs, and expenses and Class Representative payment will be filed on or before **Month 00, 0000**. The motion(s) will be posted on the website at www.BarbarasBakerySettlement.com.

Class Counsel will also ask the Court for a special service payment of up to $2,500 for the Class Representative, Richard W. Trammell, for his work on behalf of the Class. Any special service payment will also be paid out of the $4,000,000 Settlement Fund.

## OBJECTING TO THE SETTLEMENT

You have the right to tell the Court that you do not agree with the Settlement or any or all of its terms.

### 22. How can I tell the Court if I do not like the Settlement?

If you choose to remain a Class Member, you have a right to object to any part of the proposed Settlement. The Court will consider your views.

To object, you must send a letter stating that you object to *Richard W. Trammell v. Barbara's Bakery, Inc.,* Case Number 3:12-cv-02664. Your written objection must also include:

1. Your name, address, and telephone number;
2. A written statement of your objection(s), including any legal support and/or any supporting evidence you wish to introduce;
3. A statement of whether you intend to appear and speak at the Fairness Hearing; and
4. Your signature.

QUESTIONS? VISIT WWW.BARBARASBAKERYSETTLEMENT.COM OR CALL, TOLL-FREE, 1-000-000-0000

If you choose to object, in order to be considered by the Court, your written objections must be filed with the Court by **Month 00, 0000** and mailed to each of the following three addresses, postmarked by **Month 00, 0000**:

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of the Court<br>United States District Court<br>Northern District of California<br>Phillip Burton Federal Building<br>& United States Courthouse<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 | Robert Ahdoot<br>Tina Wolfson<br>Ahdoot & Wolfson, P.C.<br>2355 Westwood Boulevard, #337<br>Los Angeles, CA 90064-2109 | Clement L. Glynn<br>Glynn & Finley LLP<br>100 Pringle Avenue<br>Suite 500<br>Walnut Creek, CA 94596 |

### 23. What is the difference between objecting and asking to be excluded?

Objecting is simply a way of telling the Court that you don't like something about the Settlement. You can only object if you stay in the Class. You will also be bound by any subsequent rulings in this case and you will not be able to file or participate in any other lawsuit based upon or relating to the claims of this lawsuit. If you object to the Settlement, you still remain a Class Member and you will still be eligible to submit a Claim Form. Excluding yourself is telling the Court that you don't want to be a part of the Class. If you exclude yourself, you have no basis to object to the Settlement and appear at the Fairness Hearing because it no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a final hearing (called a Fairness Hearing) to decide whether to finally approve the Settlement. You may attend and ask to speak, but you don't have to.

### 24. When and where will the Court decide whether to approve the Settlement?

On **Month 00, 0000 at 00:00 x.m.** the Court will hold a Fairness Hearing at the United States District Court for the Northern District of California, before the Honorable Charles R. Breyer, Senior District Judge, in Courtroom 6, Phillip Burton Federal Building & United States Courthouse, 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102.

The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.BarbarasBakerySettlement.com for updates. At this hearing the Court will consider whether the Settlement is fair, reasonable, and adequate. The Court will also decide whether to award attorneys' fees and costs, as well as a special payment to the Class Representative. If there are objections, the Court will consider them at that time. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

### 25. Do I have to come to the hearing?

No. Class Counsel will answer questions the Court may have at the Fairness Hearing. But you are welcome to come at your own expense. Please note that the Court has the right to change the date and/or time of the Fairness Hearing without further notice. If you are planning to attend the hearing, you should confirm the date and time before going to the Court.

**QUESTIONS? VISIT WWW.BARBARASBAKERYSETTLEMENT.COM OR CALL, TOLL-FREE, 1-000-000-0000**

## 26. May I speak at the fairness hearing?

Yes, you may ask the Court for permission to speak at the hearing. To do so, you must file a document called a "Notice of Intention to Appear." If you or your attorney wants to appear and speak at the Fairness Hearing, you (or your attorney) must mail a Notice of Intention to Appear at the Fairness Hearing to the addresses listed above in Question 22. Your Notice of Intention to Appear at the Fairness Hearing must be filed and received by the Court, Barbara's Bakery's Counsel, and Class Counsel no later than **Month 00, 0000**.

## GETTING ADDITIONAL INFORMATION

## 27. How can I get more information?

This notice summarizes the proposed Settlement. More details are in the Settlement Agreement. For a complete, definitive statement of the Settlement terms, refer to the Settlement Agreement at www.BarbarasBakerySettlement.com. You also may write with questions to the Settlement Administrator at Barbara's Bakery Settlement, P.O. Box 0000, City, ST 00000 or call the toll-free number, 1-800-000-0000.

## PLEASE DO NOT CALL THE COURT

Dated: **Month 00, 0000**              Clerk of the Court for the United States
                                       District Court for the Northern District of California

# EXHIBIT E

Case 4:13-cv-05723-... Document 30-21 Filed 04/25/13 Page ...

# If You Bought a Barbara's Bakery Product

## *You Could Get Up to $100 From a Settlement*

---

**Includes: Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies**

---

There is a class action Settlement involving Barbara's Bakery Products. The lawsuit claims that Barbara's Bakery violated state laws regarding the marketing and sale of certain products. Barbara's Bakery denies it did anything wrong.

### Who is included in the Settlement?

Anyone who bought an eligible Barbara's Bakery product from May 23, 2008 to Month 00, 0000 is included in the Settlement. A full list of products is available at the website located at www.BarbarasBakerySettlement.com or by calling 1-800-000-0000.

### What does the Settlement provide?

A Settlement Fund of $4 million will pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) attorneys' fees and costs and (4) a special service payment to the Class Representative. Barbara's Bakery has also agreed to change some of its business practices including modifying its product lables and advertising. Any money remaining in the Settlement Fund afer all claims are paid will be donated to charities and non-profit organizations. Additional details are in the Settlement Agreement available on the website.

### How can I get a payment?

Submit a Claim Form online or by mail by **Month 00, 2013**. The payment amount you receive will be based in part on the amount of products you purchased and the total number of claims made.

### What are my rights?

Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue Barbara's Bakery yourself, you must exclude yourself from the Settlement by **Month 00, 2013**. If you stay in the Settlement, you may object to it by **Month 00, 2013**.

The Court will hold a hearing on **Month 00, 2013** to consider whether to approve the Settlement, a request for attorneys' fees up to $1 million, and a special service payment of $2,500 from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

---

**For More Information: 1-800-000-0000
www.BarbarasBakerySettlement.com**

# EXHIBIT 2



# Shannon R. Wheatman, Ph.D.

Senior Vice President
Kinsella Media, LLC
2120 L Street NW, Suite 860
Washington, DC 20037
2010 – Present

Dr. Wheatman specializes in designing, developing, analyzing, and implementing large-scale legal notification plans. She is a court-recognized expert who provides testimony on the best notice practicable. Dr. Wheatman began her class action career in 2000 at the Federal Judicial Center where she was instrumental in the development of model notices to satisfy the plain language amendment to Rule 23. Her plain language expertise was advanced by her education, including her doctoral dissertation on plain language drafting of class action notice and her master's thesis on comprehension of jury instructions. Dr. Wheatman has been involved in over 200 class actions. Her selected case experience includes:

## Antitrust

*Blessing v. Sirius XM Radio Inc.*, No 09-CV-10035 HB (S.D.N.Y.).

*Brookshire Bros. v. Chiquita*, No. 05-CIV-21962 (S.D. Fla.).

*In re: Dynamic Random Memory (DRAM) Antitrust Litig.,* MDL No. 1486 (N.D. Cal.).

*In re Flonase Antitrust Litigation*, No. 08-CV-3301 (E.D. Pa.).

*In re: Metoprolol Succinate End-Payor Antitrust Litig.,* No. 06-cv-71 (D. De.).

*In re: Online DVD Rental Antitrust Litig.*, MDL No. 2029 (N.D. Cal.).

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827 (N.D. Cal.).

*Allen v. Dairy Farmers of America, Inc.*, No. 5:09-CV-00230-CR (D. Vt.).

*Sweetwater Valley Farm, Inc. v. Dean Foods*, No. 2:07-CV-208 (E.D. Tenn.).

## Consumer and Product Liability

*Beringer v. Certegy Check Servs., Inc.*, No. 8:07-cv-1434-T-23TGW (M.D. Fla.) (data breach).

*CSS Inc. v. FiberNet, L.L.C.*, No. 07-C-401 (Cir. Ct. W. Va.) (telecommunications).

*Donovan v. Philip Morris USA, Inc.,* No. 06-12234 NG (D. Mass.) (medical monitoring).

*FIA Card Services, N.A. v. Camastro*, No. 09-C-233 (Cir. Ct. W. Va.) (credit card arbitration).

*Glazer v. Whirlpool Corp.*, No. 1:08-WP-65001 (N.D. Ohio)(defective product).

*Grays Harbor v. Carrier Corp.*, No. 05-CIV-21962 (W.D. Wash.) (defective product).

*In Re: Checking Account Overdraft Litig.*, MDL No. 2036 (S.D. Fla.) (JP Morgan, U.S. Bank, BOA settlements; overdraft fees).

*In Re: Enfamil LIPIL Mktg. & Sales Practs. Litig.*, No. 11-MD-02222 (S.D. Fla.) (false advertising).

*In re: M3Power Razor System Marketing & Sales Practs. Litig.*, MDL 1704 (D. Mass.) (false advertising).

*In re Netflix Privacy Litig.*, No. 5:11-cv-00379 (N.D. Cal.) (privacy).

*In re: Pharmaceutical Industry Average Wholesale Price Litig.*, MDL No. 1456 (D. Mass.) (pharmaceutical).

*In re: SCBA Liquidation, Inc., f/k/a Second Chance Body Armor, Inc.,* No. 04-12515 (Bankr. W.D. Mich.) (defective product).

*In re: Toyota Motor Corp. Unintended Acceleration Mktg, Sales Practs, & Prods Litig.,* No. 8:10ML2151 (C.D. Cal.) (unintended acceleration).

*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Mktg & Sales Practs. Litig.*, No. M:09-CV-2015 (N.D. Cal.) (negative amortization).

*Keilholtz v. Lennox Hearth Prods.*, No. 08-CV-00836 (N.D. Cal.) (defective product).

*Kramer v. B2Mobile, LLC*, No. 10-cv-02722 (N.D. Cal.) (text messaging).

*Lee v. Carter Reed Co., L.L.C.*, No. UNN-L-39690-04 (N.J. Super. Ct.) (false advertising).

*Palace v. DaimlerChrysler*, No. 01-CH-13168 (Cir. Ct. Ill.) (defective product).

*Rowe v. UniCare Life & Health Ins. Co.*, No. 09-cv-02286 (N.D. Ill.) (data breach).

*Spillman v. Domino's Pizza*, No. 10-349 (M.D. La.) (robo-call).

*Wolph v. Acer*, No. 09-cv-01314 (N.D. Cal.) (false advertising).

### *Environmental/Property*

*Allen v. Monsanto Co.*, No. 041465 and *Carter v. Monsanto Co.*, No. 00-C-300 (Cir. Ct. W. Va.) (dioxin release).

*Angel v. U.S. Tire Recovery*, No. 06-C-855 (Cir. Ct. W.Va.) (tire fire).

*Ed Broome Inc. v. XTO Energy, Inc.,* No. 1:09-CV-147 (N.D. W. Va.) (oil & gas rights).

*Cather v. Seneca-Upshur Petroleum Inc.*, No. 1:09-cv-00139 (N.D. W. Va.) (oil & gas rights).



*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010,* MDL No. 2179 (E.D. La.) (BP oil spill).

*In Re Katrina Canal Breaches Litig.*, No. 05-4182 (E.D. La.) (Hurricanes Katrina and Rita).

*Jones v. Dominion Transmission Inc.*, No. 2.06-cv-00671 (S.D. W. Va.) (oil & gas rights).

*Thomas v. A. Wilbert Sons, LLC*, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish) (vinyl chloride water contamination).

### Government

Countrywide Mortgage Settlement, Department of Justice.

Iovate Settlement, Federal Trade Commission.

*Cobell v. Salazar*, No. 1:96cv01285 (D. D.C.), Depts. of Interior and Treasury.

National Mortgage Settlement, Attorneys General.

Walgreens Settlement, Federal Trade Commission.

### Insurance

*Beasley v. Hartford Ins. Co. of the Midwest*, No. CV-2005-58-1 (Cir. Ct. Ark.) (homeowners insurance).

*Bond v. Am. Family Ins. Co.*, No. CV06-01249 (D. Ariz) (property insurance).

*Burgess v. Farmers Ins. Co.*, No. 2001-292 (Dist. Ct. Okla.) (homeowners insurance).

*Campbell v. First Am. Title Ins. Co.*, No. 2:08-cv-311-GZS (D. Me.) (title insurance).

*DesPortes v. ERJ Ins. Co.,* No. SU2004CV-3564 (Ga. Super. Ct.) (credit premium insurance).

*Fogel v. Farmers Group, Inc.*, No. BC300142 (Super. Ct. Cal.)(management exchange fees).

*Guidry v. Am. Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct.) (cancer insurance).

*Gunderson v. F.A. Richard & Associates, Inc.*, No. 2004-2417-D. (14th Jud. D. Ct. La.) (PPO).

*Johnson v. Progressive Casualty Ins., Co.*, No. CV-2003-513 (Cir. Ct. Ark.) (automobile insurance).

*McFadden v. Progressive Preferred*, No. 09CV002886 (Ct. C.P. Ohio) (UM/UIM).

*Orrill v. Louisiana Citizens Fair Plan*, No. 05-11720 (Civ. Dist. Ct., Orleans Parish) (Hurricane Katrina property insurance).

*Purdy v. MGA Ins. Co.*, No. D412-CV-2012-298 (4th Jud. Ct. N. Mex.) (UM/UIM).

*Press v. Louisiana Citizens Fair Plan Prop. Ins. Co.*, No. 06-5530 (Civ. Dist. Ct., Orleans Parish) (Hurricane Katrina property insurance).

*Shaffer v. Continental Casualty Co.*, No. 06-2235 (C.D. Cal.) (long term care insurance).

*Sherrill v. Progressive Northwestern Ins. Co.*, No. DV-03-220 (18th D. Ct. Mont.) (automotive



premiums).

*Soto v. Progressive Mountain Ins. Co.*, No. 2002CV47 (Dist. Ct. Mont.) (personal injury insurance).

*Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark) (bodily injury claims).

### Securities

*In re Municipal Derivatives Antitrust Litig.*, MDL No. 1950 (S.D.N.Y.).

*In re Mutual Funds Investment Litig.,* MDL No. 1586 (Allianz Sub-Track, D. Md.).

### Canada

*Donnelly v. United Technologies Corp.,* No. 06-CV-320045 CP (Ont. S.C.J.) (defective product).

*Wener v. United Technologies Corp.*, 2008 QCCS 6605 (Québec) (defective product).

*Dolmage v. Ontario*, No. CV-09-376927CP00 (Ont. S.C.J.) (personal injury).

*Hall v. Gillette Canada Co.*, No. 47521CP (Ont. S.C.J.) (false advertising).

## Articles and Presentations

Shannon R. Wheatman, Speaker, *Class Action Developments and Settlements*, 18th Annual Consumer Financial Services Institute, New York, New York (Apr. 2013).

Shannon R. Wheatman, *Ensuring Procedural Fairness Through Effective Notice, in* National Conference on Class Actions: Recent Developments in Québec, in Canada and in the United States 83-99 (Yvon Blais ed., 2013).

Shannon R. Wheatman, Speaker, *Recent Trends in Class Actions in the United States*, National Conference on Class Actions: Recent Developments in Québec, in Canada and in the United States, Montreal, Canada (Mar. 2013).

Joshua P. Davis & Shannon R. Wheatman, Speaker, *Report on Model Jury Instructions in Civil Antitrust Cases, Presentation*, American Antitrust Institute's 6th Annual Private Antitrust Enforcement Conference, Washington, DC (Dec. 2012).

Shannon R. Wheatman & Katherine M. Kinsella, *International Class Action Notice, in* World Class Action: A Guide to Group and Representative Actions around the Globe 673-686 (Paul Karlsgodt ed., 2012).



Katherine Kinsella & Shannon Wheatman, *Class Notice and Claims Administration*, *in* Private Enforcement of Antitrust Law in the United States: A Handbook 338–348 (Albert A. Foer & Randy M. Stutz eds., 2012).

Shannon R. Wheatman, Webinar Speaker, *Class Action Notice Requirements: Challenges for Plaintiffs and Defendants*, Strafford Publications (July 2012).

Shannon R. Wheatman, Webinar Speaker, *How to Craft Plain Language Privacy Notices*, Int'l Assoc. of Privacy Professionals (Oct. 2011).

Shannon R. Wheatman, Speaker, *Improving Take-Up Rates in Class Actions*, The Canadian Institute's 12th Annual National Forum on Class Actions, Ontario, Canada (Sept. 2011).

Shannon R. Wheatman & Terri R. LeClercq, *Majority of Publication Class Action Notices Fail to Satisfy Rule 23 Requirements*, 30 Rev. Litig. 53 (2011).

Katherine Kinsella & Shannon Wheatman, *Class Notice and Claims Administration*, *in* The International Private Enforcement of Competition Law 264–274 (Albert A. Foer & Jonathan W. Cuneo eds., 2010).

Shannon R. Wheatman, Speaker, *Majority of Publication Class Action Notices Fail to Satisfy Plain Language Requirements*, Clarity International Conference, Lisbon, Portugal (Oct. 2010).

Shannon R. Wheatman, Webinar Speaker, *Class Action Notification With Electronic Media: Emerging Legal Issues*, Stratford Publications (Sept. 2010).

Shannon R. Wheatman & Thomas E. Willging, *Does Attorney Choice of Forum in Class Action Litigation Really Make a Difference?* 17 Class Actions & Derivatives Suits 1 (2007).

Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 Tulane Law Rev. 1771 (2006).

Thomas E. Willging & Shannon R. Wheatman, *Attorney Choice of Forum in Class Action Litigation: What Difference Does it Make?* Notre Dame L. Rev., 81 (2), 101, 161 (2006).

Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do you really want me to know my rights? The ethics behind due process in class action notice is more than just plain language: A desire to actually inform*. Geo. J. Legal Ethics, 18 (4), 1359-1382 (2005).



Thomas E. Willging & Shannon R. Wheatman, *An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation*. Federal Judicial Center (2005).

Elizabeth C. Wiggins & Shannon R. Wheatman, *So what's a concerned psychologist to do? Translating the research on interrogations, confessions, and entrapment into policy*, in Interrogations, Confessions and Entrapment 265–280 (G. Daniel Lassiter ed., 2004).

Thomas E. Willging & Shannon R. Wheatman, *Attorneys' Experiences and Perceptions of Class Action Litigation in Federal and State Courts. A Report to the Advisory Committee on Civil Rules Regarding a Case Based Survey*. Federal Judicial Center (2003).

Shannon R. Wheatman, *Survey of Bankruptcy Judges on Effectiveness of Case-Weights*. Federal Judicial Center (2003).

Elizabeth C. Wiggins & Shannon R. Wheatman, *Judicial Evaluation of Bankruptcy Judges*. Federal Judicial Center (2003).

Robert Niemic, Thomas Willging, & Shannon Wheatman, *Effects of Amchem/Ortiz on Filing of Federal Class Actions: Report to the Advisory Committee on Civil Rules*. Federal Judicial Center (2002).

Shannon Wheatman, Robert Niemic & Thomas Willging, *Report to the Advisory Committee on Civil Rules: Class Action Notices*. Federal Judicial Center (2002).

Elizabeth C. Wiggins & Shannon R. Wheatman, *Implementation of Selected Amendments to Federal Rule of Civil Procedure 26 by United States Bankruptcy Courts*. Federal Judicial Center (2001).

Shannon R. Wheatman & David R. Shaffer, *On finding for defendants who plead insanity: The crucial impact of dispositional instructions and opportunity to deliberate*. Law & Hum. Beh., 25(2), 165, 181(2001).

Shannon R. Wheatman, *Distance Learning in the Courts*. Federal Judicial Center (2000).

David R. Shaffer & Shannon R. Wheatman, *Does personality influence the effectiveness of judicial instructions?* Psychol. Pub. Pol'y & L., 6, 655, 676 (2000).

**Court Testimony**

*Spillman v. Domino's Pizza*, No. 10-349 (M.D. La.)



*PRC Holdings LLC v. East Resources, Inc.*, No. 06-C-81 (Cir. Ct. W. Va.).

*Guidry v. American Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct., Calcasieu Parish).

*Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark).

*Beasley v. The Reliable Life Insurance Co.*, No. CV-2005-58-1 (Cir. Ct. Ark).

## Depositions

*Thomas v. A. Wilbert Sons, LLC*, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish).

## Judicial Comments

*PRC Holdings, LLC v. East Resources, Inc.,* No. 06-C-81(E) (W.Va. Cir. Ct., Roane County).

"Notice was uniquely effective in this action because East's records of their leases allowed the Claims Administrator to provide individual notice by mail to most Class Members." - Hon. Thomas C. Evans, III (2012).

*Kramer v. B2Mobile, LLC*, No. 10-cv-02722 (N.D. Cal.).
"The Court approved Notice Plan to the Settlement Classes . . . was the best notice practicable under the circumstances, including comprehensive nationwide newspaper and magazine publication, website publication, and extensive online advertising. The Notice Plan has been successfully implemented and satisfies the requirements of Federal Rule of Civil Procedure 23 and Due Process." - Hon. Claudia A. Wilken (2012).

*Cather v. Seneca-Upshur Petroleum, Inc.,* No. 1:09-CV-00139 (N.D. W. Va.).
 "The Court finds that Class Members have been accorded the best notice as is practical under the circumstances, and have had the opportunity to receive and/or access information relating to this Settlement by reading the comprehensive written notice mailed to them . . . or by reading the published Notice in the local newspapers . . . The Court further finds that the Notice provided to the members of the Settlement Class had been effective and has afforded such class members a reasonable opportunity to be heard at the Final Fairness Hearing and to opt-out of the subject settlement should anyone so desire." – Hon. Irene M. Keeley (2012).

*In re: Checking Account Overdraft Fee Litigation*, No. 1:09-md-2036-JLK (S.D. Fla.)   (JP Morgan Settlement)
"The Court finds that the Settlement Class Members were provided with the best practicable notice; the notice was "reasonably calculated, under [the] circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Shutts*, 472 U.S. at 812 (quoting *Mullane*, 339 U.S. at 314-15). This Settlement with Chase was widely publicized, and any



Settlement Class Member who wished to express comments or objections had ample opportunity and means to do so." - Hon. James Lawrence King (2012).


*In re Netflix Privacy Litigation*, No. 5:11-cv-00379 (N.D. Cal.)
"The Notice Plan and the intent of the forms of Notice to the Settlement Class as set forth in the Settlement Agreement and Exhibits B through E to the Wheatman Declaration are approved pursuant to subsections (c)(2)(B) and (ed) of Federal Rule of Civil Procedure 23. - Hon. Edward J. Davila (2012)


*Purdy v. MGA Ins. Co.,* No. D412-CV-2012-298 (N.M. 4th Jud. Dist. Ct.)
"Notice of the Settlement Class was constitutionally adequate, both in terms of it substance and the manner in which it was disseminated. The Notice contained the essential elements necessary to satisfy due process . . . [T]he Notice also contained a clear and concise Claim Form, and a described a clear deadline and procedure for filing of Claims. Notice was directly mailed to all Class Members whose current whereabouts could be identified by reasonable effort. Notice reached a large majority of the Class Members. The Court finds that such notice constitutes the best notice practicable." – Hon. Eugenio Mathis (2012).


*Blessing v. Sirius XM Radio Inc*., No 09-CV-10035 HB (S.D.N.Y.).
 "The Court finds that the distribution of the Notice and the publication of the Publication Notice . . . constituted the best notice reasonably practicable under the circumstances . . . was reasonably calculated . . . constituted due, adequate, and sufficient notice to all Class members who could be identified with reasonable efforts; and . . . satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, R 23.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, and all other applicable law and rules." - Honorable Harold Baer, Jr. (2011).


*Fogel v. Farmers Group, Inc.*, No. BC300142 (Super. Ct. Cal.).
"The Court further finds and confirms that the Individual Notice (including the Proof of Claim), the Summary Notice, the reminder postcard, and the notice methodology: (a) constituted the best practicable notice . . . ; (b) constituted noticed that was reasonably calculated under the circumstances to apprise potential Class Members . . .; (c) were reasonable and constituted due, adequate, and sufficient notice to all persons or entities entitled to receive notice, and (d) met all applicable requirements of California law . . . ." - Hon. Laura Evans (2011).


*In Re: Enfamil LIPIL Mktg. & Sales Practs. Litig.*, No. 11-MD-02222 (S.D. Fla.)
"The Court finds that the Class Notice provided to Class Members, in the form and manner of distribution described above, constitutes the best notice practicable under the circumstances, and fully



satisfies the requirements of Federal Rules of Civil Procedure, Rule 23, the requirements of due process, and any other applicable law. The declarations filed with the Court demonstrate that the Parties have fully complied with the Court's Preliminary Approval Order (as amended by Order dated April 1, 201 1) and that the best notice practicable under the circumstances was in fact given to Class Members." - Hon. James I. Cohn (2011).

*Keilholtz v. Lennox Hearth Prods.*, No. 08-CV-00836 (N.D. Cal.)
"Notice has been provided to the Settlement Class of the pendency of the Actions, the conditional certification of the Settlement Class for purposes of this Settlement, and the preliminary approval of the Settlement Agreement and the Settlement contemplated thereby. The Court finds that said notice and the related Notice Plan provided for the best notice practicable under the circumstances to all Persons entitled to such notice and fully satisfied the requirements of Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure and the requirements of due process." - Hon. Claudia Wilken (2011).

*Rowe v. UniCare Life and Health Insurance Company*, No. 09-CV-02286 (N.D.Ill.)
"The form, content, and method of dissemination of the notice given to the Settlement Class were adequate and reasonable, and constituted the best notice practicable under the circumstances. The notice, as given, provided valid, due, and sufficient notice of the proposed settlement, the terms and conditions set forth in the Settlement Agreement, and these proceedings to all Persons entitled such notice, and said notice fully satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process." – Hon. William J. Hibbler (2011).

*Thomas v. A. Wilbert & Sons, LLC*, 55,127 (La. 18th Jud. Dist. Ct., Iberville Parish).
"[N]otices complied with all requirements of the federal and state constitutions, including the due process clauses, and applicable articles of the Louisiana Code of Civil Procedure, and constituted the best notice practicable under the circumstances and constituted due and sufficient notice to all potential members of the Thomas Subclass." – Hon. Jerome M. Winsberg (2011).

*In re: M3Power Razor System Marketing & Sales Pract. Litig.*, MDL 1704 (D. Mass).
"The form, content, and method of dissemination of the notice given to the Settlement Class was adequate and reasonable, and constituted the best notice practicable under the circumstances. The notice, as given, provided valid, due, and sufficient notice of the proposed settlement, the terms and conditions set forth in the Amended Settlement Agreement, and these proceedings to all Persons entitled to such notice, and said notice fully satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process." - Hon. Douglas P. Woodlock (2011).

*Soto v. Progressive Mountain Ins. Co.*, No. 2002CV47 (Dist. Ct. Colo.).
"Notice of the Settlement Class was constitutionally adequate, both in terms of its substance and the manner in which it was disseminated. The Notice contained the essential elements necessary to satisfy



due process . . . Finally, the Notice also contained a clear and concise Claim Form, and described a clear deadline and procedure for filing of claims. . . . Notice reached a large majority of the Class Members. The Court finds that such notice constitutes the best notice practicable." - Hon. J. Steven Patrick (2010).

*Press v. Louisiana Citizens Fair Plan Prop. Ins. Co.*, No. 06-5530 (Civ. Dist. Ct., Orleans Parish). "This notice methodology . . . constitutes reasonable and best practicable notice . . . constitutes due, adequate and sufficient notice to all persons entitled to receive notice; and . . . meets the requirements of the United States Constitution, Louisiana law, the Federal Rules of Civil Procedure and any other applicable rules of the Court . . ." - Hon. Sidney H. Cates, IV (2010).

*In Re Katrina Canal Breaches*, No. 05-4182 (E.D. La.). "The notice here was crafted by Shannon Wheatman, Ph.D., whose affidavit was received as evidence . . . . The entire notice was drafted in plain, comprehensible language . . . The Court finds this notice adequately reached the potential class. "- Hon. Stanwood R. DuVal, Jr. (2009).

*Jones v. Dominion Transmission Inc.*, No. 2.06-cv-00671 (S.D. W. Va.) "The Parties' notice expert Shannon R. Wheatman, Ph.D. . . testified that in this case . . . that the mailed notices reached approximately 95.4 percent of the potential class . . . I HOLD that personal jurisdiction exists over the Class Members because notice was reasonable and afforded the Settlement Class an opportunity to be heard and to opt out." - Hon. Joseph R. Goodwin (2009).

*Guidry v. American Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct.). "The facts show that the notice plan . . . as adequate to design and implementation . . . Dr. Shannon R. Wheatman, a notice expert, also testified at the fairness hearing as to the sufficiency of the notice plan. Dr. Wheatman testified that the notice form, content, and dissemination was adequate and reasonable, and was the best notice practicable." - Hon. G. Michael Canaday (2008).

*Webb v. Liberty Mutual Ins. Co.*, (March 3, 2008) No. CV-2007-418-3 (Cir. Ct. Ark). "Ms. Wheatman's presentation today was very concise and straight to the point . . . that's the way the notices were . . . So, I appreciate that . . . Having admitted and reviewed the Affidavit of Shannon Wheatman and her testimony concerning the success of the notice campaign, including the fact that written notice reached 92.5% of the potential Class members, the Court finds that it is unnecessary to afford a new opportunity to request exclusion to individual Class members who had an earlier opportunity to request exclusion but failed to do so . . . The Court finds that there was minimal opposition to the settlement. After undertaking an extensive notice campaign to Class members of approximately 10,707 persons, mailed notice reached 92.5% of potential Class members." - Hon. Kirk D. Johnson (2008).



*Sherrill v. Progressive Northwestern Ins. Co.*, No. DV-03-220 (18th D. Ct. Mont.).
"Dr. Wheatman's affidavit was very informative, and very educational, and very complete and thorough about the process that was undertaken here. . .  So I have reviewed all of these documents and the affidavit of Dr. Wheatman and based upon the information that is provided . . . and the significant number of persons who are contacted here, 90 percent, the Court will issue the order." - Hon. Mike Salvagni (2008).

*Shaffer v. Continental Casualty Co.*, No. 06-2235 (C.D. Cal.).
"The Class Notice and the notice methodology implemented pursuant to the Settlement Agreement, as described in part in the Declarations of . . . Shannon Wheatman . . . constituted the best practicable notice. . . was reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and met all applicable requirements of the Federal Rules of Civil Procedure, the Class Action Fairness Act, the United States Constitution (including the Due Process Clauses), the Rules of the Court, and any other applicable law." - Hon. Philip S. Gutierrez (2008).

*Gray's Harbor v. Carrier Corp.*, No. 05-05437(W.D. Wash.).
"The Court finds that this notice was the best notice practicable under the circumstances, that it provided due and adequate notice of the proceedings and of the matters set forth therein, and that it fully satisfied all applicable requirements of law and due process." - Hon. Ronald B. Leighton (2008).

*Beringer v. Certegy Check Servs., Inc.*, No. 8.07-cv-1434-T-23TGW (M.D. Fla.).
"The proposed form of notice and plan for publishing are reasonable and designed to advise members of the Settlement class of their rights . . . A nationally recognized notice specialist, Hilsoft Notifications, has developed the comprehensive Notice Plan. Here, Notice is reasonably calculated to reach the maximum number of potential Settlement Class Members and, thus, qualifies as the best notice practicable. The Notice Plan here is designed to reach the maximum number of Class Members, and it is Plaintiffs' goal to reach at least 80% of the Class—an extraordinary result in consumer class action litigation." - Hon. Steven D. Merryday (2008).

*Palace v. DaimlerChrysler Corp.*, No. 01-CH-13168 (Cir. Ct. Ill.).
"The form, content, and method of dissemination of the notice given to the Illinois class and to the Illinois Settlement Class were adequate and reasonable, and constituted the best notice practicable under the circumstances. The notice, as given, provided valid, due, and sufficient notice of the proposed Settlement, the terms and conditions set forth in the Settlement Agreement, and these proceedings, to all Persons entitled to such notice, and said notice fully satisfied the requirements of due process . . ." – Hon. Mary Anne Mason (2008).

*Johnson v. Progressive Casualty Ins., Co.*, No. CV-2003-513 (Cir. Ct. Ark.).
"Notice of the Settlement Class was constitutionally adequate, both in terms of its substance and the



manner in which it was disseminated . . . Notice was direct mailed to all Class members whose current whereabouts could be identified by reasonable effort. Notice reached a large majority of the Class members. The Court finds that such notice constitutes the best notice practicable . . . The forms of Notice and Notice Plan satisfy all of the requirements of Arkansas law and due process." - Hon. Carol Crafton Anthony (2007).

*Beasley v. The Reliable Life Insurance Co.*, No. CV-2005-58-1 (Cir. Ct. Ark).
"[T]he Court has, pursuant to the testimony regarding the notification requirements, that were specified and adopted by this Court, has been satisfied and that they meet the requirements of due process. They are fair, reasonable, and adequate. I think the method of notification certainly meets the requirements of due process . . . So the Court finds that the notification that was used for making the potential class members aware of this litigation and the method of filing their claims, if they chose to do so, all those are clear and concise and meet the plain language requirements and those are completely satisfied as far as this Court is concerned in this matter." - Hon. Joe Griffin (2007).

## Education and Experience

### Education

Ph.D., Social Psychology, 2001; The University of Georgia, Athens, GA
Dissertation Title: *The effects of plain language drafting on layperson's comprehension of class action notices.*

M.S., Social Psychology, 1999; The University of Georgia, Athens, GA
Thesis Title: *Effects of verdict choice, dispositional instructions, opportunity to deliberate, and locus of control on juror decisions in an insanity case.*

M.L.S., Legal Studies, 1996; The University of Nebraska-Lincoln, Lincoln, NE

B.A., Psychology, 1993; Millersville University of Pennsylvania, Millersville, PA
Honor's Thesis Title: *The effects of inadmissible evidence and judicial admonishment in individual versus group decisions in a mock jury simulation.*

### Related Experience

Hilsoft Notifications
Souderton, PA
2004-2009



Dr. Wheatman was the Vice President (2006-2009) and Notice Director (2004-2009) at Hilsoft Notifications, a legal notification firm.

Federal Judicial Center
Washington, DC
2000-2004

Dr. Wheatman was a Research Associate at the Federal Judicial Center. The Federal Judicial Center is the education and research agency for the Federal Courts. The Research Division performs empirical and explanatory research on federal judicial processes and court management. Dr. Wheatman worked with the Civil Rules Advisory Committee on a number of class action studies and with the Bankruptcy Administration Committee on judicial evaluations.

## *Supplementary Background*

Dr. Wheatman has a strong statistical background, having completed nine graduate level courses as well as teaching undergraduate statistics at the University of Georgia. She is also a member of several plain language organizations, including the Center for Plain Language, Clarity, and Scribes.



TINA WOLFSON, SBN 174806
twolfson@ahdootwolfson.com
ROBERT AHDOOT, SBN 172098
rahdoot@ahdootwolfson.com
**AHDOOT & WOLFSON, P.C.**
10850 Wilshire Boulevard, Suite 370
Los Angeles, California 90024
Tel: 310-474-9111; Fax: 310-474-8585

Counsel for Plaintiff
RICHARD W. TRAMMELL

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD W. TRAMMELL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BARBARA'S BAKERY, INC. a California corporation; and DOES 1-50,<br><br>Defendants | Case No. 12-CV-02664-CRB<br><br>**DECLARATION OF DAVID K. REY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: June 14, 2013<br>Time: 10:00 A.M.<br>Place: Courtroom 6 (17th Floor)<br><br>The Honorable Charles R. Breyer, Presiding |

1   GLYNN & FINLEY, LLP
    CLEMENT L. GLYNN, Bar No. 57117
2   ADAM FRIEDENBERG, Bar No. 205778
    JONATHAN A. ELDREDGE, Bar No. 238559
3   One Walnut Creek Center
    100 Pringle Avenue, Suite 500
4   Walnut Creek, CA 94596
    Telephone: (925) 210-2800
5   Facsimile: (925) 945-1975
    E-mail: afriedenberg@glynnfinley.com
6       jeldredge@glynnfinley.com

7   Attorneys for Defendant
    Barbara's Bakery, Inc.

8

9                 UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11

12  RICHARD W. TRAMMELL, individually   )  **Case No. C12-02664-CRB**
    and on behalf of all others similarly situated, )
13                            )  **<u>DECLARATION OF DAVID K. REY</u>**
            Plaintiff,         )
14                            )
        vs.                   )
15                            )
    BARBARA'S BAKERY, INC., a California )
16  corporation; and DOES 1-50,       )
                            )
17          Defendants.      )
                            )
18  _____ )

19

20      I, David K. Rey, say:

21        1.     I am the Vice President R&D and Quality at Weetabix Company, Inc.; the parent

22  company of Barbara's Bakery, Inc. ("Barbara's"). I know the following facts of my own

23  personal knowledge and from information collected by authorized employees of Barbara's

24  Bakery, Inc. and Weetabix Company, Inc., and if called upon could and would competently

25  testify thereto.

26        2.     I am familiar with the settlement agreement in this matter and the terms requiring

27  Barbara's to re-label its product packaging for certain products defined as "Eligible Products" in

28  the settlement agreement, and am familiar with Barbara's efforts to eliminate genetically

1  modified organisms ("GMO") from certain of its Eligible Products as described in the settlement

2  agreement as well as verifying the non-GMO status through the Non-GMO Project's verification

3  program.

4       3.     The costs associated with relabeling Barbara's Eligible Products, eliminating

5  GMO ingredients from certain of the Eligible Products and submitting certain of the Eligible

6  Products to the Non-GMO Project will be approximately $1,100,000 after we complete the

7  conversions in 2013.  These costs include but are not limited to package rebranding, Non-GMO

8  Project verification program costs, product production trials and associated paid time for

9  employees involved in the transition.  Barbara's will continue to incur costs to comply with the

10  settlement agreement and to maintain the non-GMO status on certain of its Eligible Products at a

11  magnitude of approximately $1,200,000 each year.  These costs include but are not limited to

12  ongoing Non-GMO Project verification program costs, associated paid time for employees

13  involved in the verification process and annual upcharge costs associated with non-GMO

14  ingredient sourcing.

15

16       I declare under penalty of perjury under the laws of the State of California that the

17  foregoing is true and correct.  Executed this 18th day of April 2013, in Marlborough,

18  Massachusetts.

19

20                                            David K. Rey

21

22

23

24

25

26

27

28

DECLARATION OF DAVID K. REY

1  TINA WOLFSON, SBN 174806
   twolfson@ahdootwolfson.com
2  ROBERT AHDOOT, SBN 172098
   rahdoot@ahdootwolfson.com
3  **AHDOOT & WOLFSON, P.C.**
4  10850 Wilshire Boulevard, Suite 370
   Los Angeles, California 90024
5  Tel: 310-474-9111; Fax: 310-474-8585

6  Counsel for Plaintiff
   RICHARD W. TRAMMELL
7

8

9           **UNITED STATES DISTRICT COURT**

10          **NORTHERN DISTRICT OF CALIFORNIA**

11

12
    RICHARD W. TRAMMELL, individually and on    Case No. 12-CV-02664-CRB
13  behalf of all others similarly situated,
                                                 **DECLARATION OF ELISA ODABASHIAN**
14                                               **IN SUPPORT OF PLAINTIFF'S MOTION**
                                                 **FOR PRELIMINARY APPROVAL OF**
15                  Plaintiffs,                  **CLASS ACTION SETTLEMENT**

16                  v.                           Date:  June 14, 2013
                                                 Time: 10:00 A.M.
17  BARBARA'S BAKERY, INC. a California          Place: Courtroom 6 (17th Floor)
    corporation; and DOES 1-50,
18                                               The Honorable Charles R. Breyer, Presiding
19                  Defendants

20

21

22

23

24

25

26

27

28

_____

12-CV-02664-CRB: DECL. OF E. ODABASHIAN ISO MOT. FOR PRELIM. APPROVAL

I, Elisa Odabashian, declare as follows:

1.      I am Director of the West Coast Office and State Campaigns for Consumers Union of the United States, Inc. ("Consumers Union"), a not-for-profit organization exempt from federal income taxes under Section 501(c)(3) of the Internal Revenue Code.  I have personal knowledge of the facts contained in this declaration and, if called as a witness, would be competent to testify to them.

2.      Consumers Union, the non-profit policy and advocacy arm of Consumer Reports, has a long history of working to protect consumers in the marketplace.  Since its first issue in 1936, Consumer Reports has never accepted paid ads.  Free from the pressures of advertisers and commercial influence, Consumer Reports has tackled some of the toughest safety issues of the time, evaluating new products and technologies, warning consumers about potential dangers and unfounded claims by advertisers, and fighting for accurate labeling, especially on products that contain potentially dangerous chemicals. Consumers Union has long been on the cutting edge of reporting risks and advocating for improvements in the quality and safety of the consumer marketplace.  Its mission: to work for a fair, just, and safe marketplace for all consumers and to empower consumers to protect themselves. The organization was founded in 1936 when advertising first flooded the mass media.  Consumers lacked a reliable source of information they could depend on to help them distinguish hype from fact and good products from bad ones.  Since then Consumers Union, and its flagship publication, Consumer Reports, have filled that vacuum with a broad range of consumer information.

3.      Consumers Union has four offices spread throughout the United States.  It is headquartered in Yonkers, New York and has offices in Austin, Texas, Washington, D.C., and San Francisco, California.

4.      Consumers Union employs attorneys, policy analysts, grassroots organizers, researchers, media experts, and outreach specialists who advocate for consumer protections in the areas of financial services, food safety, product safety, health care, and clean energy. Consumers Union has received more than two-dozen *cy pres* awards since the early 1980s, and is currently named as a *cy pres* recipient in eight pending cases.

Case 1:12-cv-02664-CRB Document 36-4 Filed 04/25/13 Page 395 of 552 PageID #: 626

5.     Consumers Union's advocates sponsor and weigh in on legislation, push for regulatory reforms, watchdog the implementation of new laws, run public education and marketplace campaigns, support and oppose state ballot measures, publish reports that highlight original research, and are trusted and much-consulted experts in the media. More than 1.3 million consumers have signed up to follow Consumers Union and take action on issues that impact them. Consumers Union's Share Your Story database empowers consumers to describe their experiences in the marketplace dealing with egregious and/or unsafe practices and products—or to describe their interactions with good corporate actors. Consumers Union works with the storytellers to develop and fact-check their stories and, with permission, provides them to reporters who are writing about a particular problem in the marketplace and to legislators who are looking for real-life "victims" of a particular problem their legislation is endeavoring to fix. People who share their stories become some of Consumers Union's most active and engaged volunteers.

6.     Consumers Union, voted one of the most trusted organizations in America in a Harris Poll (http://voices.yahoo.com/poll-consumer-reports-trusted-most-moveonorg-least-708171.html), fights for consumer protections in the products and services that consumers often encounter in the marketplace, and is tireless in its efforts on behalf of its only constituency—the public.

7.      The following are some examples of Consumers Union's efforts to combat misleading and confusing food labels in the marketplace, ensure that food labels are meaningful, educate consumers about genetically engineered foods, and protect the integrity of the "organic" label:

a.     *Greener Choices* Website - Products For a Better Planet: http://www.greenerchoices.org/.  Consumers Union has designed and funded GreenerChoices.org, a Web-based initiative to inform, engage, and empower consumers about environmentally friendly products and practices. GreenerChoices.org offers an accessible, reliable, and practical source of information on buying "greener" products that have minimal environmental impact and meet personal needs.

b.     *Eco-Labels* Website & iPhone / iPad App - Webpage and Greener Choices includes an "*Eco-Labels*" web page (" http://www.greenerchoices.org/eco-labels/) that helps and

---

12-CV-02664-CRB: DECL. OF E. ODABASHIAN ISO MOT. FOR PRELIM. APPROVAL

2

Case 1:12-cv-02664-CRB Document 36-4 Filed 04/25/13 Page 55 PageID #: 627

provides information to consumers to evaluate the truth and meaning of product labels that purport to be green.   In addition, Consumer Reports has designed and made available the *Eco-Labels* iPhone and iPad App that provides consumers information on the environmental claims on labels. (*See* http://news.consumerreports.org/money/2011/11/new-eco-label-mobile-app-for-iphone-and-ipad-decodes-green-product-labels-and-claims.html).  In addition, Consumers Union's Dr. Urvashi Rangan, Ph.D., who developed *Eco-Labels*, conducts lectures and talks regarding food labeling. (*See* TedxManhattan Talk "From Fables to Labels;" http://www.greenerchoices.org/products.cfm?product=0212fablestolabels&pcat=food).

       c.    *Not In My Food* Website - Consumer Union has also designed and launched a food advocacy website: http://notinmyfood.org.  Designed by Consumers Union's team of food safety advocates, notinmyfood.org works for a food system that assures food is safe, affordable, and processed in a suitable manner. In addition, notinmyfood.org works for clear and accurate labeling in all food products, including information regarding whether food ingredients contains GMO.  The goal of notinmyfood.org is to create a safer and more transparent food system for all people.

       d.    Other examples of Consumers Union's active role in accurate food labeling, including the labeling of products with GMO ingredients, include:

             i.    Functional Food Make Some Big Promises; In Most Cases, Health Claims Are Based on Flimsy Facts: http://www.consumerreports.org/cro/2012/06/functional-food-makes-some-big-promises/index.htm.

             ii.    National Organic Standards Board Decision a Victory for Organics Preservation of Antibiotics: http://www.consumersunion.org/news/national-organic-standards-board-decision-a-victory-for-organics-preservation-of-antibiotics/.

             iii.    Dr. Michael Hansen—"Reasons for Labeling Genetically Engineered Foods": http://notinmyfood.org/document/reasons-for-labeling-of-genetically-engineered-foods.

iv. Consumer Reports *Viewpoint* on GMO Labeling: http://www.consumerreports.org/cro/magazine/2013/02/viewpoint/index.htm.

v. Consumers Union Expert to Testify in Washington on GE Food: http://notinmyfood.org/press_release/cu-expert-to-testify-in-washington-on-ge-food.

vi. Where Does Your Food Come From? Changes Are Looming for Food Labels: http://www.consumerreports.org/cro/2013/02/where-does-your-food-come-from/index.htm.

vii. Consumer Reports *From Our President*: If Truth Be Told: http://www.consumerreports.org/cro/magazine/2013/03/from-our-president-if-truth-be-told/index.htm.

viii. Grocery Aisle Gotchas; Don't Fall for Marketing Claims that Sound Like Health Promises: http://www.consumerreports.org/cro/2012/04/grocery-aisle-gotchas/index.htm.

ix. Overfished or Not; Assessing Seafood Claims: http://consumerreports.org/cro/magazine-archive/2011/december/food/fake-fish/overfishing/index.htm.

x. Consumer Reports Poll: Two-Thirds of Americans Want FDA to Inspect Domestic and Foreign Food Supply; Organic Fish Label Misleading: http://pressroom.consumerreports.org/pressroom/2008/11/consumer-reports-poll-two-thirds-of-americans-want-the-fda-to-inspect-domestic-and-foreign-food-supply.html.

xi. Eeeew! We're Eating WHAT? Ten Surprising Things Food Labels Don't Say About Food: http://consumerreports.org/cro/shopping/2011/june/ten-food-shockers/overview/index.htm.

xii. Consumer Reports Finds Misleading, Unapproved Labels that Confuse Consumers: http://pressroom.consumerreports.org/pressroom/2012/06/

consumer-reports-poll-majority-of-americans-want-meat-raised-

without-antibiotics-sold-at-local-supermarkets.html.

    xiii.    Consumers Union's Letter to USDA Expresses Concern About

Confusing Claims Re Antibiotics on Meat: http://notinmyfood.org/

press_release/cu-letter-to-usda-expresses-concern-about-confusing-

claims-about-antibiotics-on-meat.

    xiv.    USDA Will Investigate Unapproved Antibiotics Labels:

http://notinmyfood.org/posts/3260-usda-will-investigate-unapproved-

antibiotics-labels.

    xv.    Chemical and Agribusiness Interests Defeat California's Prop 37:

http://pressroom.consumerreports.org/pressroom/2012/11/measure-

would-have-required-labeling-of-genetically-engineered-foodsan-

francisco-ca-californias-proposition-37-which.html.

    xvi.    Consumer Reports Baby Food Buying Guide: Is Organic Food Better?

http://www.consumerreports.org/cro/baby-food/buying-guide.htm.

8.    To provide a further sense of the breadth of our consumer advocacy work, the following are some examples of Consumers Union's efforts to combat false advertising, scams, and misleading labels:

    a.    *Fuel Economy Claims*: Consumer Reports made headlines recently by revealing that its fuel-economy testing of the 2013 Ford Fusion Hybrid and the C-Max Hybrid showed fewer miles per gallon than advertised. Forbes reported: "just weeks after the magazine assailed Ford for how the complexity of the MYFord Touch system continued to confuse American car buyers, Consumer Reports alleged that the Ford Fusion Hybrid delivered only 39 mpg in its tests of the vehicle in highway and city driving, far short of the 47 mpg Ford claims for the model. Similarly in the magazine's tests, the C-Max Hybrid hit only a combined 37 mpg, far short of the 47 mpg Ford claims for it." The Environmental Protection Agency has responded by saying it will investigate Ford's mileage claims per Consumer Reports' findings.

b.  *Homeowner Insurance Scams in the Wake of Hurricane Sandy*:  Consumer Reports issued advice to consumers on how to deal with insurance companies that don't live up to their promises in the wake of Hurricane Sandy: http://news.consumerreports.org/money/2012/10/in-sandyswake-roll-up-your-sleeves--for-possible-fight-with-yourhome-insurer.html.

c.  *Consumer Reports Monthly Selling It Column*: For more than twenty years, each monthly issue of Consumer Reports features a column called Selling It, which exposes misleading or deceptive claims on products. A dedicated email address is offered for consumers to write about false claims they encounter. A book was published that culls from many years of Selling It columns and brings to the attention of millions of consumers the worst come-ons in the marketplace. Amazon.com describes the book: "Whether showing what's inside 'official government' envelopes, illustrating the lunacies of labeling, debunking mysterious medical potions, or looking at the ever-more-clever ways in which packaging is designed to deceive, Consumer Reports Selling It exposes and informs in equal parts. With historical context and tips for consumers, Selling It offers entertaining reading and constructive solutions, and proves again that in today's marketplace, vigilance is all."

d.  *Seafood Mislabeling:* Consumer Reports featured an investigative piece on the mislabeling of fish and seafood, in which one-fifth of the seafood we purchased was mislabeled:

      i.     http://www.consumerreports.org/cro/magazinearchive/2011/december/food/fake-fish/overview/index.htm.

      ii.    Such mislabeling harms consumers when expensive seafood is switched for less desirable, cheaper fish, when consumers mistakenly eat species that are high in mercury or other contaminants, and when consumers find out that they've mistakenly purchased species that are endangered.

e.  *Reverse Mortgage Scams:* Consumer Reports published an investigative story about consumers who were misled by reverse mortgage brokers: http://www.consumerreports.org/cro/magazinearchive/september-2009/personal-finance/reversemortgages/overview/reverse-mortgages-ov.htm.

f.   *Infomercials*: Consumer Reports warned consumers not to fall for infomercials: http://www.consumerreports.org/cro/magazinearchive/2010/february/ shopping/infomercialproducts/overview/infomercial-products-ov.htm.

g.   *Banning Use of "Organic" Label on Fish and Seafood*: Consumers Union helped pass legislation in California that prohibited the use of the "organic" label on fish and seafood, as there is no standard set for organic fish or seafood. Consumers often pay more fish and seafood that is mislabeled "organic."

h.   *Dietary Supplements*: Consumers Union has pushed long and hard for the regulation of dietary supplements, through its advocacy work in legislatures and at FDA, and in several Consumer Reports pieces on supplement products that make false claims:

    i.   http://www.consumerreports.org/cro/2012/05/dangeroussupplements/index.htm.

    ii.   Under the current system, FDA considers dietary supplements as "foods" instead of "drugs," so supplements are not subjected to pre-market safety testing, and no government authority is checking to make sure that what is on the supplement label is true. Consumers Union sponsored a bill in California that lead to the banning of the dangerous sports supplement, ephedra, which caused strokes and heart attacks. Shortly thereafter, FDA banned ephedra nationwide. Just one of many examples of the continuing effort by Consumer Reports to warn consumers about false claims by supplement makers is this piece on heart health: http://www.consumerreports.org/cro/2012/04/ heartsupplements-proceed-with-caution/index.htm.

i.   *Antibiotics In Meat*: Consumers Union is working to stop the overuse of antibiotics on farms in the production of food animals, which has led to the development of superbugs that make human medicines ineffective. Consumer Reports issued a report that found more than 20 different labels in the marketplace pertaining to "antibiotic-free" meat, all of which are meaningless since there is no standard for such a label. Four of the labels found are illegal, and

Consumers Union is working with USDA to go after those companies to remove those illegal claims from the marketplace, as well as working to set a standard for an antibiotics-free claim on meat: http://www.consumerreports.org/cro/2012/06/antibiotics-arewidely-used-by-u-s-meat-industry/index.htm.

      j.  In addition, Consumers Union provides a significant amount of information to educate consumers about false advertising. The following are some recent headlines and the website pages at which the articles can be found: (i) "Refunds coming to buyers of Oreck products with 'false' health claims" (*See* http://news.consumerreports.org/appliances/2012/05/consumers-who-bought-two-oreck-products-getpartial-refund-due-to-false-claims.html); (ii) "Selling it: MATCHING GAS MASKS OPTIONAL" (*See* http://www.consumerreports.org/cro/selling/selling-it-june-2008/selling-it-ov.htm); (iii) "6 outrageous health claims busted in 2012: The FTC had a busy year cracking down on products with overblown promises" (*See* http://www.consumerreports.org/cro/2012/12/6-outrageous-health-claims-busted-in-2012/index.htm); (iv) "Food, supplement, or drug?: What to make of nutraceutical claims" (*See* http://www.consumerreports.org/cro/2012/04/foodsupplement-or-drug/index.htm); (v) "Be your own consumer watchdog: How to check out a company before you commit your cash:" (*See* http://www.consumerreports.org/cro/2011/01/be-your-ownconsumer-watchdog/index.htm); (vi) "Your rights as a consumer: The law is often on your side when you do battle with a retailer. Here's what you need to know to win the day" (*See* http://www.consumerreports.org/cro/2010/09/your-rights-as-a-consumer/index.htm; and (vii) "Functional food makes some big promises: In most cases, health claims are based on flimsy facts" (*See* http://www.consumerreports.org/cro/2012/06/functionalfood-makes-some-big-promises/index.htm).

   9.  Consumers Union does not plan a single, one-time use of the *cy pres* funds, but rather, a continuation of its *Eco-Labels* and Greener Choices consumer education work on food labels (which have been funded by foundation support), to support its mission of protecting consumers from false advertising, as well as meeting the national demand by universities, academic societies and the media for fact-based research, surveys, expert testimony, talks, and panel participation on genetically engineered food.

10.    In the event Consumers Union receives any Residual Funds from the Settlement, it will not use the Residual Funds for litigation or lobbying purposes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 24, 2013 at San Francisco, California.


By:_____
        ELISA ODABASHIAN

1  TINA WOLFSON, SBN 174806
   twolfson@ahdootwolfson.com
2  ROBERT AHDOOT, SBN 172098
   rahdoot@ahdootwolfson.com
3  **AHDOOT & WOLFSON, P.C.**
4  10850 Wilshire Boulevard, Suite 370
   Los Angeles, California 90024
5  Tel: 310-474-9111; Fax: 310-474-8585

6  Counsel for Plaintiff
   RICHARD W. TRAMMELL
7

8

9                 **UNITED STATES DISTRICT COURT**

10               **NORTHERN DISTRICT OF CALIFORNIA**

11

12
   RICHARD W. TRAMMELL, individually and on      Case No. 12-CV-02664-CRB
13 behalf of all others similarly situated,
                                                  **DECLARATION OF MARY HALEY IN**
14                                                **SUPPORT OF PLAINTIFF'S MOTION FOR**
                                                  **PRELIMINARY APPROVAL OF CLASS**
15                 Plaintiffs,                    **ACTION SETTLEMENT**

16                 v.                             Date:  June 14, 2013
                                                  Time: 10:00 A.M.
17 BARBARA'S BAKERY, INC. a California            Place: Courtroom 6 (17th Floor)
   corporation; and DOES 1-50,
18                                                The Honorable Charles R. Breyer, Presiding
19                 Defendants

20

21

22

23

24

25

26

27

28

   12-CV-02664-CRB: DECL. OF M. HALEY ISO MOT. FOR PRELIM. APPROVAL

I, Mary Haley, declare as follows:

1. I am the Chief Operating Officer for Action for Healthy Kids, a not-for-profit organization exempt from federal income taxes under Section 501(c)(3) of the Internal Revenue Code. I have personal knowledge of the facts contained in this declaration, or am informed and believe based on company documents and conversation with colleagues, and if called as a witness, would be competent to testify to them.

2. Action for Healthy Kids ("AFHK") promotes education of children and parents regarding proper nutrition, healthy living, healthy food ingredients, and understanding food labeling in order to fight childhood obesity, undernourishment and physical inactivity.

3. AFHK reaches over fifty thousand (50,000) diverse volunteers including parents, teachers, students, school administrators, and communities across the country in an effort to engage everyone in ending the nation's childhood obesity epidemic.

4. Due to budgetary pressures and academic priorities, nutrition education is often among the first activities cut in an attempt to balance the school budget.

5. In order to address these critical needs, AFHK supports hundreds of schools around the country with grants to provide children with education regarding healthier foods and knowledge of healthful eating, which often includes educational programs designed to promote accurate understanding of food labeling and advertising. In addition, fifty-one (51) State Teams (one in each state and Washington, D.C.) develop an annual action plan, meet regularly and have assessment measures that address statewide and/or local needs.

6. For example, in 2012, AFHK made grants to four hundred (400) schools across the country. These funds are used for a variety of purposes, however, all grant recipients were required to use some of the funds to teach nutrition education to their students. This education includes the promotion of better understanding of product labeling and information available on a food label. Often, nutrition education – including information about how to make healthy choices based on information found on food labels and packaging – comes in the form of various nutrition education curricula purchased by grant recipients. AFHK estimates that these grants reached approximately three hundred and two thousand (302,000) elementary, middle and high school students.

12-CV-02664-CRB: DECL. OF M. HALEY ISO MOT. FOR PRELIM. APPROVAL

7.    AFHK education programs also extend to parents.  For example, in addition to school-based initiatives, AFHK's *Parents for Healthy Kids* program is designed to mobilize parents as leaders in healthy lifestyles at home and in schools.  This program includes the expenditure of resources on education regarding childhood obesity, with plans underway to include information and education regarding understanding of product labeling and information available on the label.

8.    In addition, in recent years, AFHK has seen a growing number of grant recipients use funds to post signage in school cafeterias about the nutritional value/calorie count of the various foods served. In middle and high schools, precise details are posted; in elementary schools, foods are color-coded (green = good, healthy food; red = do not eat too much/too often).  Grant recipients' goals are not only to familiarize children, and in-turn parents, about healthy food choices, but also to condition these student and their parents to read and properly understand product labels.

9.    In addition to direct grants, AFHK also makes its *Game On!* curriculum free for use by any elementary school.  *Game On! The Ultimate Wellness Challenge* challenges school staff, students, and their families to incorporate healthy food choices and physical activity into their daily lives and into the culture of their school community.  This no-cost, step-by-step online guide provides all the resources needed to host a successful elementary school wellness program.  The *Game On!* framework features over 35 "Eat Better and Move More Challenges" that emphasize healthy eating and physical activity before, during, and after school.  *Game On!* is founded on core U.S. Department of Health and Human Services, U.S. Department of Agriculture (USDA), and President's Council on Fitness, Sports and Nutrition principles, outstanding programs from a number of federal agencies, AFHK's studies and initiatives, and free and low-cost resources from other leading organizations.

10.    Though *Game On!* focuses on wellness solutions for elementary schools, the flexible framework exists for middle and high schools as well.  *Fuel Up to Play 60* empowers middle school students to take control of their own health, and gives middle schools the tools to ensure healthy eating and physical activity is part of the everyday culture on campus.  AFHK partners with the National Dairy Council and the National Football League to offer *Fuel Up to Play 60*.  High school students have very powerful voices and can significantly impact their environment in positive ways.

12-CV-02664-CRB: DECL. OF M. HALEY ISO MOT. FOR PRELIM. APPROVAL

AFHK's Students Taking Charge program empowers high school students to be change agents in their schools around nutrition and physical activity initiatives. Students can choose from "Grab 'N' Go" project ideas, or create their own to make their school a healthy place to learn and grow.

11. All of these programs include some degree of education regarding how to read and understand food product labeling.

12. AFHK does not plan a single, one-time use of any *cy pres* funds that may be awarded to it from this action but, rather, a continuation of its education initiatives described above, in order to support its mission of fostering sound nutrition in children and its vision of helping children develop the lifelong habits necessary to promote health. Helping children understand what is in their food, including through an understanding of food labels as well as an understanding of what they should be looking for in the foods they consume, are key to these goals.

13. In the event AFHK received Residual Funds from the Settlement it will not use the Residual Funds for litigation or lobbying purposes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 24, 2013 at Chicago, Illinois.

By: _____
MARY HALEY

12-CV-02664-CRB: DECL. OF M. HALEY ISO MOT. FOR PRELIM. APPROVAL

3

Attachment 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

RICHARD W. TRAMMELL,

     Plaintiff,

  v.

BARBARA'S BAKERY, INC., *et al.*,

     Defendants.

Case No. 3:12-cv-02664-CRB

**[PROPOSED] ORDER PRELIMINARILY CERTIFYING A CLASS FOR SETTLEMENT PURPOSES, PRELIMINARILY APPROVING THE CLASS SETTLEMENT, APPOINTING CLASS COUNSEL, DIRECTING ISSUANCE OF NOTICE TO THE CLASS, SCHEDULING A FAIRNESS HEARING, AND ISSUING RELATED ORDERS**

Honorable Charles R. Breyer, Presiding

WHEREAS:

This motion was brought before the Court by Plaintiff Richard W. Trammell ("Plaintiff");

*Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664-CRB, originally was filed on May 23, 2012 in the United States District Court for the Northern District of California (the "Action");

The Action alleges, on behalf of a nationwide class of consumers, that Barbara's Bakery violated California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §17200, *et seq.*, False Advertising Law ("FAL"), Bus. & Prof. Code §17500, *et seq.*, Consumers Legal Remedies Act ("CLRA"), Civ. Code §1770, *et seq.*, and breached an express warranty;

A first amended complaint was filed on June 28, 2012, and a second amended complaint was filed on January 30, 2013. The amended complaints allege causes of action identical to the original complaint, and re-alleged Barbara's Bakery's, Inc.'s ("Barbara's Bakery") violations of California's consumer protection laws;

Barbara's Bakery filed an answer to the first amended complaint on July 19, 2012, in which it expressly denied any and all wrongdoing alleged in the action, and neither admitted nor conceded any actual or potential fault, wrongdoing, or liability in connection with any facts or claims that have been or could have been alleged against it in this action. Barbara's Bakery filed an answer to the second amended complaint on February 5, 2013, which was substantively identical to the original answer;

Class Counsel has conducted a thorough examination, investigation, and evaluation of the relevant law, facts, and allegations to assess the merits of the claims and potential claims to determine the strength of both defenses and liability sought in the Action;

Class Counsel, on behalf of Plaintiff and the other members of the Class, engaged in extensive discovery. In particular, Barbara's Bakery has produced the following documentation regarding the Eligible Products: (i) label design and product formulation; (ii) marketing, advertising, media, and public relations; and (iii) financial information. In total, Plaintiff's Counsel was given access to over thirty (30) banker's boxes of documents and approximately seventy (70) Gigabytes (GB) of data. Class Counsel also conducted interviews of primary Barbara's Bakery's corporate witnesses who have been involved with the Eligible Products to address the following subjects: (i) sales and marketing; (ii) labeling; (iii) finance; (iv) document collection and retention; and (v) Barbara's Bakery's efforts to

eliminate GMO ingredients from its products. Before entering into this Settlement Agreement, Class Counsel conducted a thorough examination and evaluation of the relevant law, facts, and allegations to assess the merits of the claims and could reasonably assess the strength of Plaintiff's claims and Barbara's Bakery's liability, including its defenses; and

The Parties having entered into a Settlement Agreement in which the Parties have agreed to settle the Action, pursuant to the terms of the Settlement Agreement, subject to the approval and determination of the Court as to the fairness, reasonableness, and adequacy of the Settlement which, if approved, will result in dismissal of the Action with prejudice; and The Court having reviewed the Settlement Agreement, including the exhibits attached thereto (together, the "Settlement Agreement"), and all prior proceedings herein, and good cause appearing based on the record;

THEREFORE, IT IS **ORDERED, ADJUDGED, AND DECREED** as follows (all capitalized terms being defined as they are defined in the Settlement Agreement unless otherwise specified or defined herein):

1. **Stay of the Action**. All non-settlement-related proceedings in the Action are hereby stayed and suspended until further order of this Court.

2. **Preliminary Class Certification for Settlement Purposes Only**. The Action is preliminarily certified as a class action for settlement purposes only, pursuant to Fed. R. Civ. P. 23(a) and (b)(3). The Court preliminarily finds for settlement purposes that: (a) the Class certified herein is numerous, and that joinder of all such persons would be impracticable, (b) there are issues of law and fact that are typical and common to the Class, and that those issues predominate over individual questions; (c) a class action on behalf of the certified Class is superior to other available means of adjudicating this dispute; and (d) as set forth in paragraph 4, below, Plaintiff and Class Counsel are adequate representatives of the Class. Barbara's Bakery retains all rights to assert that this action may not be certified as a class action, other than for settlement purposes.

3. **Class Definition**. The Class shall consist of all persons who, during the Class Period, purchased in the United States any Eligible Products. Excluded from the Class are: (a) Barbara's Bakery's board members or executive-level officers, including its attorneys; (b) persons who purchased the Eligible Products primarily for the purpose of resale; (c) retailers or re-sellers of the

Eligible Products; (d) governmental entities; (e) persons who timely and properly exclude themselves from the Class as provided in the Agreement; (f) persons who purchased the Eligible Products via the Internet or other remote means while not residing in the United States; and (g) the Court, the Court's immediate family, and Court staff.

"Class Period" means the period from May 23, 2008, up to and including the date of the first dissemination of the Summary Settlement Notice or Class Notice, whichever is earlier

"Eligible Products" means any of the following Barbara's Bakery products purchased by Class Members during the Class Period:

**A.** **Cereals**:

    i.      BROWN RICE CRISPS (Fruit Juice Sweetened flavor);

    ii.     CORN FLAKES (Fruit Juice Sweetened flavor);

    iii.    HIGH FIBER (Cranberry, Flax & Granola, or Original flavors);

    iv.    HOLE 'N OATS (Fruit Juice Sweetened or Honey Nut flavors);

    v.      HONEST O's (Honey Nut, Multigrain, or Original flavors);

    vi.    ORGANIC APPLE CINNAMON O's;

    vii.   ORGANIC BREAKFAST O's;

    viii.  ORGANIC BROWN RICE;

    ix.    ORGANIC BROWN RICE CRISPS;

    x.      ORGANIC CORN FLAKES;

    xi.    ORGANIC CRISPY WHEATS;

    xii.   ORGANIC HONEY CRUNCH 'N OATS;

    xiii.  ORGANIC HONEY NUT O's;

    xiv.  ORGANIC SNACKIMALS CEREAL (Cinnamon Crunch or Vanilla Blast flavors);

    xv.   ORGANIC WILD PUFFS (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);

    xvi.  PUFFINS (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);

    xvii. PUFFIN PUFFS (Crunchy Cocoa or Fruit Medley flavors);

4

xviii.  SHREDDED OATS (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, or Vanilla Almond flavors);

xix.    SHREDDED WHEAT;

xx.     SHREDDED SPOONFULS (Multigrain or Vanilla Blast flavors);

xxi.    SHREDDED MINIS (Blueberry Burst flavor);

xxii.   TOASTED OATMEAL FLAKES (Original flavor); and

xxiii.  ULTIMA ORGANIC (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors).

B.  **Cereal Bars**:

i.      MULTIGRAIN CEREAL BARS (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors);

ii.     FRUIT & YOGURT BARS (Apple Cinnamon, Blueberry Apple, Cherry Apple, Strawberry Apple, or Traditional flavors); and

iii.    PUFFINS CEREAL AND MILK BARS (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors).

C.  **Cheese Puffs**:

i.      BAKED CHEESE PUFFS (Original or White Cheddar flavors); and

ii.     CHEESE PUFFS (Jalapeno or Original flavors).

D.  **Fig Bars:**

i.      FIG BARS (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free, or Whole Wheat flavors).

E.  **Granola Bars**:

i.      CRUNCHY ORGANIC GRANOLA BARS (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors).

F.  **Snackimals Animal Cookies**:

i.      SNACKIMALS ANIMAL COOKIES (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors).

G.    **Organic Mini-Cookies**:

    i.    ORGANIC MINI COOKIES (Chocolate, Ginger, or Oatmeal flavors).

H.    **Snack Mixes**:

    i.    BRUSCHETTA SNACK MIX;

    ii.    HONEY CINNAMON SNACK MIX;

    iii.    HONEY MUSTARD SNACK MIX; and

    iv.    SALSA SNACK MIX.

I.    **Crackers**:

    i.    CRISP COOKIES (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread);

    ii.    GO GO GRAHAMS (Chocolate, Cinnamon, Honey, or Lemon Ginger);

    iii.    PIZZA AND CHEESE BITES;

    iv.    RITE LITE ROUNDS (Original, Poppy Seed, or Tamari Sesame flavors); and

    v.    WHEATINES (Cracked Pepper, Original, or Sesame flavors).

4.    <u>**Class Representatives and Class Counsel**</u>.  Plaintiff, Richard W. Trammell, is designated as the representative of the conditionally certified Class.  The Court preliminarily finds that he is similarly situated to absent Class Members and therefore typical of the Class, and that he will be an adequate Class Representative.  Tina Wolfson and Robert Ahdoot of Ahdoot & Wolfson, PC, whom the Court finds are experienced and adequate counsel, are hereby designated as Class Counsel.

5.    <u>**Preliminary Settlement Approval**</u>.  Upon preliminary review, the Court finds that the Settlement Agreement, and the Settlement it incorporates, appears fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e); Manual for Complex Litigation (Fourth) § 21.632 (2004).  Accordingly, the Settlement Agreement is preliminarily approved and is sufficient to warrant sending notice to the Class.

6.    <u>**Jurisdiction**</u>.  The Court has subject-matter jurisdiction over the Action pursuant to 28 U.S.C. §§ 1332 and 1367, and personal jurisdiction over the Parties before it.  Additionally, venue is proper in this District pursuant to 28 U.S.C. § 1391.

7.     **Fairness Hearing**.  A Fairness Hearing shall be held on _____ at _____ at the United States District Court for the Northern District of California, 450 Golden Gate Avenue, 17th Floor, Courtroom 6, San Francisco, California, 94102, to determine, among other things: (a) whether the Action should be finally certified as a class action for settlement purposes pursuant to Fed. R. Civ. P. 23(a) and (b)(3); (b) whether the settlement of the Action should be approved as fair, reasonable and adequate, and finally approved pursuant to Fed. R. Civ. P. 23(e); (c) whether the Action should be dismissed with prejudice pursuant to the terms of the Settlement Agreement; (d) whether Class Members should be bound by the release set forth in the Settlement Agreement; (e) whether Class Members and related persons should be subject to a permanent injunction; (f) whether the application of Class Counsel for an award of Attorneys' Fees and Expenses should be approved pursuant to Fed. R. Civ. P. 23(h); and (g) whether the application of the named Plaintiff for an incentive award should be approved.  The submissions of the Parties in support of the settlement, including Plaintiff's Counsel's application for Attorneys' Fees and Expenses and incentive awards, shall be filed with the Court no later than fourteen (14) days prior to the deadline for the submission of objections and may be supplemented up to seven (7) days prior to the Fairness Hearing.

8.     **Administration**.  In consultation with and with the approval of Barbara's Bakery, Class Counsel is hereby authorized to establish the means necessary to administer the proposed settlement and implement the Claim Process, in accordance with the terms of the Agreement.

9.     **Class Notice**.  The proposed Class Notice, Summary Settlement Notice, the notice methodology described in the Settlement Agreement, and the Declaration of the Media Notice Administrator are hereby approved.

a.     Pursuant to the Settlement Agreement, the Court appoints Kinsella Media, LLC to be the Notice Administrator and Rust Consulting, Inc. to be the Settlement Administrator to help implement the terms of the Settlement Agreement.

b.     Beginning not later than ten (10) calendar days after entry of the Preliminary Approval Order and to be substantially completed not later than twenty-five (25) calendar days after entry of the Preliminary Approval Order and subject to the requirements of the Preliminary Approval Order, the Settlement Agreement, and the Declaration of the Notice Administrator, the Notice

Administrator shall commence sending the Class Notice by Electronic Mail ("E-mail") to: (i) each reasonably identifiable Class Member's last known E-mail address, reasonably obtainable from Barbara's Bakery, which addresses shall be provided to the Notice Administrator by Barbara's Bakery, no later than one (1) business day after the day of entry of the Preliminary Approval Order, subject to the existence of such information; and (ii) each appropriate State and Federal official, as specified in 28 U.S.C. §1715, and shall otherwise comply with Fed. R. Civ. P. 23 and any other applicable statute, law, or rule, including but not limited to the Due Process Clause of the United States Constitution.

c.    The Notice Administrator shall have the publication of the Summary Settlement Notice substantially completed no later than ninety (90) calendar days after entry of this Preliminary Approval Order.  The Notice Administrator shall publish the Summary Settlement Notice as described in the Declaration of the Notice Administrator and in such additional newspapers, magazines, and/or other media outlets as shall be agreed upon by the Parties.

d.    No later than forty-five (45) calendar days after entry of the Preliminary Approval Order, the Notice Administrator shall send the Summary Settlement Notice by First Class U.S. Mail, proper postage prepaid, to each Class Member whose E-mail address returned a message as undeliverable, subject to the existence of such information as provided by Barbara's Bakery pursuant to Section IV.B.1.a of this Agreement.  The Notice Administrator shall: (a) re-mail any Summary Settlement Notices returned by the United States Postal Service with a forwarding address that are received by the Notice Administrator no later than sixty (60) calendar days after entry of the Preliminary Approval Order; and (b) by itself or using one or more address research firms, as soon as practicable following receipt of any returned Summary Settlement Notices that do not include a forwarding address, research any such returned mail for better addresses and promptly mail copies of the Summary Settlement Notices to the better addresses so found.

e.    Prior to the dissemination of the Class Notice as set forth above in paragraphs 9(a) to 9(d), the Notice Administrator shall establish an Internet website, www.BarbarasBakerySettlement.com, that will inform Class Members of the terms of this Agreement, their rights, dates and deadlines, and related information.  The web site shall include, in .pdf format, materials agreed upon by the Parties and as further ordered by this Court.

8

f. Prior to the dissemination of the Class Notice as set forth above in paragraphs 9(a) to 9(d), the Notice Administrator shall establish a toll-free telephone number that will provide Settlement-related information to Class Members.

g. The Notice Administrator shall timely disseminate any remaining notice, as stated in the Settlement Agreement and/or the Declaration of the Notice Administrator.

h. Not later than ten (10) calendar days before the date of the Fairness Hearing, the Notice Administrator and/or Settlement Administrator shall file with the Court: (a) a list of those persons who have opted out or excluded themselves from the Settlement; and (b) the details outlining the scope, methods, and results of the notice program.

10. **Findings Concerning Notice**. The Court finds that the form, content, and method of giving notice to the Class as described in Paragraph 9 of this order: (a) will constitute the best practicable notice; (b) are reasonably calculated, under the circumstances, to apprise the Class Members of the pendency of the Action, the terms of the proposed settlement, and their rights under the proposed settlement, including but not limited to their rights to object to or exclude themselves from the proposed settlement and other rights under the terms of the Settlement Agreement; (c) are reasonable and constitute due, adequate, and sufficient notice to all Class Members and other persons entitled to receive notice; and (d) meet all applicable requirements of law, including but not limited to 28 U.S.C. § 1715, Fed. R. Civ. P. 23(c) and (e), and the Due Process Clause(s) of the United States Constitution. The Court further finds that all of the notices are written in simple terminology, are readily understandable by Class Members, and comply with the Federal Judicial Center's illustrative class action notices.

11. **Exclusion from Class**. Any Class Member who wishes to be excluded from the Class must mail a personally signed, written request for exclusion to the Settlement Administrator at the addressed provided in the Class Notice, postmarked no later than October 14, 2013, or as the Court otherwise may direct, to the Notice Administrator, in care of the address provided in the Class Notice. Any person or entity requesting exclusion is requested to include in the signed written request the information set forth under Question 17 of the Class Notice. So-called "mass" or "class" opt-outs shall not be allowed. The Settlement Administrator shall forward copies of any written requests for

9

exclusion to Class Counsel and Barbara's Bakery's Counsel. The Settlement Administrator shall file a list reflecting all timely requests for exclusion with the Court no later than ten (10) calendar days before the Fairness Hearing. If the proposed settlement is finally approved, any potential Class Member who has not submitted a timely written request for exclusion from the Class shall be bound by all subsequent proceedings, orders, and judgments in the Action, including but not limited to the Release, even if the potential Class Member previously initiated or subsequently initiates any litigation against any or all of the Released Parties relating to the claims and transaction released in the Action. Persons who properly exclude themselves from the Class shall not be entitled to participate in the benefits of the Settlement Agreement. Barbara's Bakery's Counsel shall provide to the Settlement Administrator, within ten (10) business days of the entry of this Preliminary Approval Order, a list of all counsel for anyone who has litigation against Barbara's Bakery that involves Eligible Products. The Settlement Administrator shall mail copies of the Class Notice to all such legal counsel. Barbara's Bakery will promptly direct the Settlement Administrator to serve the Class Notice on counsel for any Class Members who subsequently initiate litigation, arbitration, or other proceedings against Barbara's Bakery relating to claims alleging events occurring during the Class Period, the Eligible Products, and/or otherwise involving the Release.

12. **Objections and Appearances**. Any Class Member or counsel hired at any Class Member's own expense who complies with the requirements of this paragraph may object to any aspect of the proposed settlement.

a. Any Class Member who has not filed a timely written request for exclusion and who wishes to object to the fairness, reasonableness, or adequacy of the Settlement Agreement, the proposed Settlement, the award of Attorneys' Fees and Expenses, or the individual award to Plaintiff, must deliver to the Class Counsel identified in the Class Notice and to Barbara's Bakery's Counsel, and file with the Court, no later than October 14, 2013, or as the Court otherwise may direct: (a) a written statement of objections, as well as the specific reason(s), if any, for each objection, including any legal and factual support the Class Member wishes to bring to the Court's attention; (b) any evidence or other information the Class Member wishes to introduce in support of the objections; (c) a statement of whether the Class Member intends to appear and argue at the Fairness Hearing; and (d) a

list of all the Class Member's purchase(s) of Eligible Products. Class Members may do so either on their own or through an attorney retained at their own expense. Any Class Member filing an objection may be required to sit for deposition regarding matters concerning the objection. Any Class Member who fails to comply with the provisions in this section shall waive and forfeit any and all rights he or she may have to object, and shall be bound by all the terms of the Settlement Agreement, this Order, and by all proceedings, orders, and judgments, including, but not limited to, the Release in the Settlement Agreement in the Action.

b. Any Class Member, including a Class Members who files and serves a written objection, as described above, may appear at the Fairness Hearing, either in person or through personal counsel hired at the Class Member's expense, to object to or comment on the fairness, reasonableness, or adequacy of the Settlement Agreement or the proposed Settlement, or to the award of Attorneys' Fees and Expenses or the individual award to Plaintiff. Class Members or their attorneys who intend to make an appearance at the Fairness Hearing must deliver a notice of intention to appear to one of the Class Counsel identified in the Class Notice and to Barbara's Bakery's Counsel, and file said notice with the Court, no later than October 14, 2013, or as the Court may otherwise direct.

c. Any interested party may file a reply to any written objection, as described in Section 12(a) herein. A reply to an objection must be served and filed no later than seven (7) calendar days before the Fairness Hearing.

13. **Preliminary Injunction**. All Class Members and/or their representatives who do not timely exclude themselves from the Class are hereby preliminarily barred and enjoined from filing, commencing, prosecuting, maintaining, intervening in, participating in, conducting, or continuing litigation as class members, putative class members, or otherwise against Barbara's Bakery (or against any of its related parties or affiliates), and/or from receiving any benefits from, any lawsuit, administrative, or regulatory proceeding or order in any jurisdiction, based on or relating to the claims or causes of actions or the facts, and circumstances relating thereto, relating to the Eligible Products, the Action, and/or the Release. In addition, all such persons are hereby preliminarily barred and enjoined from filing, commencing, or prosecuting a lawsuit against Barbara's Bakery (or against any of its related parties or affiliates) as a class action, a separate class, or group for purposes of pursuing a

11

putative class action (including by seeking to amend a pending complaint to include class allegations or by seeking class certification in a pending action in any jurisdiction) on behalf of Class Members who do not timely exclude themselves from the Class, arising out of, based on, or relating to the claims, causes of action, facts, and/or circumstances relating thereto, relating to the Eligible Products, the Action, and/or the Release.  Pursuant to 28 U.S.C. §§ 1651(a) and 2283, the Court finds that issuance of this preliminary injunction is necessary and appropriate in aid of the Court's continuing jurisdiction and authority over this Action.

14.    **Post-Office Box(es)**.  The Settlement Administrator or their designated agent(s) shall rent one or more post-office boxes in the name of the Clerk of the Court, to be used for receiving requests for exclusion from the Class and any other communications.  Other than the Court or the Clerk of Court and the Notice Administrator, only Barbara's Bakery, Barbara's Bakery's Counsel, Class Counsel, and their designated agents shall have access to these post-office box(es).

15.    **Disclosure of Objections**.  The Settlement Administrator, Barbara's Bakery's Counsel, and Class Counsel shall promptly furnish to each other copies of any and all objections or written requests for exclusion that might come into their possession.

16.    **Termination of Settlement**.  This Order shall become null and void and shall be without prejudice to the rights of the parties, all of whom shall be restored to their respective positions existing immediately before this Court entered this Order, if: (a) the settlement is not finally approved by the Court, or does not become final, pursuant to the terms of the Settlement Agreement; (b) the settlement is terminated in accordance with the Settlement Agreement; or (c) the settlement does not become effective as required by the terms of the Settlement Agreement for any other reason.  In such event, the settlement and Settlement Agreement shall become null and void and be of no further force and effect, and neither the Settlement Agreement nor the Court's orders, including this Order, relating to the settlement shall be used or referred to for any purpose whatsoever.

17.    **Use of Order**.  This Order shall be of no force or effect if the settlement does not become final and shall not be construed or used as an admission, concession, or declaration by or against Barbara's Bakery of any fault, wrongdoing, breach, or liability.  Nor shall this Order be construed or used as an admission, concession, or declaration by or against Plaintiff or the other Class

Members that their claims lack merit or that the relief requested is inappropriate, improper, unavailable, or as a waiver by any party of any defenses or claims he, she, or it may have in this Action or in any other lawsuit.

18. **Retaining Jurisdiction**. This Court shall maintain continuing jurisdiction over these settlement proceedings to assure the effectuation thereof for the benefit of the Class.

19. **Continuance of Hearing**. The Court reserves the right to adjourn or continue the Fairness Hearing without further written notice.


_____
Honorable Charles R. Breyer
UNITED STATES DISTRICT JUDGE

Attachment 4

1   GLYNN & FINLEY, LLP
    CLEMENT L. GLYNN, Bar No. 57117
2   ADAM FRIEDENBERG, Bar No. 205778
    JONATHAN A. ELDREDGE, Bar No. 238559
3   One Walnut Creek Center
    100 Pringle Avenue, Suite 500
4   Walnut Creek, CA 94596
    Telephone: (925) 210-2800
5   Facsimile: (925) 945-1975
    E-mail: afriedenberg@glynnfinley.com
6           jeldredge@glynnfinley.com

7   Attorneys for Defendant
    Barbara's Bakery, Inc.

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11
                                      )    **Case No. C12-02664-CRB**
12  RICHARD W. TRAMMELL, individually )
    and on behalf of all others similarly situated, )
13                                    )    **DEFENDANT BARBARA'S BAKERY,**
                  Plaintiff,          )    **INC.'S NOTICE OF MOTION AND**
14                                    )    **MOTION FOR PRELIMINARY**
                                      )    **APPROVAL OF CLASS ACTION**
15        vs.                         )    **SETTLEMENT AND REQUEST FOR**
                                      )    **PRELIMINARY INJUNCTION**
    BARBARA'S BAKERY, INC., a California )
16  corporation; and DOES 1-50,      )
                                      )
17                Defendants.         )    Date:  June 14, 2013
                                      )    Time:  10:00 a.m.
18                                    )    Place: Courtroom 6
                                      )    Judge: The Honorable Charles R. Breyer
19  _____ )
                                           Complaint Filed: May 23, 2012
20

21  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

22          PLEASE TAKE NOTICE THAT on June 14, 2013 at 10:00 a.m., or as soon thereafter as

23  the matter may be heard, before the Honorable Charles R. Breyer, Defendant Barbara's Bakery,

24  Inc. ("Barbara's") will, and hereby does, move for an order from this Court granting its motion

25  for preliminary approval of class action settlement and request for preliminary injunction.

26          This motion is made on the following grounds:  Barbara's requests that the Court issue a

27  preliminary injunction enjoining related litigation pending in the Eastern District of New York

28  and Superior Court of California pursuant to the Court's authority under the All Writs Act, 28

                                      - 1 -
    NOTICE AND MOTION FOR PRELIM. APPROVAL OF CLASS ACTION SETTLEMENT

1  U.S.C. § 1651, the Anti-Injunction Act, 28 U.S.C. § 2283, and Federal Rules of Civil Procedure,

2  Rule 23(d). Such an injunction is necessary to allow the Court to oversee and manage the

3  settlement in this action and to protect the interests of the settlement class.

4       Defendant's motion is based upon this Notice of Motion and Motion, the accompanying

5  Memorandum of Points and Authorities, Declaration of Jonathan A. Eldredge and on such other

6  evidence and argument as may be presented before or at the hearing on this motion or of which

7  the Court may take judicial notice.

8

9       Dated: April 26, 2013

10                                       GLYNN & FINLEY, LLP
                                     CLEMENT L. GLYNN

11                                       ADAM FRIEDENBERG
                                     JONATHAN A. ELDREDGE

12                                       One Walnut Creek Center
                                     100 Pringle Avenue, Suite 500

13                                       Walnut Creek, CA 94596

14                                     By_____/s/ Jonathan A. Eldredge_____

15                                       Attorneys for Defendant
                                     Barbara's Bakery, Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

1   GLYNN & FINLEY, LLP
    CLEMENT L. GLYNN, Bar No. 57117
2   ADAM FRIEDENBERG, Bar No. 205778
    JONATHAN A. ELDREDGE, Bar No. 238559
3   One Walnut Creek Center
    100 Pringle Avenue, Suite 500
4   Walnut Creek, CA 94596
    Telephone: (925) 210-2800
5   Facsimile: (925) 945-1975
    E-mail: afriedenberg@glynnfinley.com
6           jeldredge@glynnfinley.com

7   Attorneys for Defendant
    Barbara's Bakery, Inc.

8

9                   UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11
                                        )   **Case No. C12-02664-CRB**
12  RICHARD W. TRAMMELL, individually   )
    and on behalf of all others similarly situated, )  **DEFENDANT BARBARA'S BAKERY,**
13                                      )   **INC.'S MEMORANDUM OF POINTS**
                 Plaintiff,             )   **AND AUTHORITIES IN SUPPORT OF**
14                                      )   **ITS MOTION FOR PRELIMINARY**
         vs.                            )   **APPROVAL OF CLASS ACTION**
15                                      )   **SETTLEMENT AND REQUEST FOR**
    BARBARA'S BAKERY, INC., a California )  **PRELIMINARY INJUNCTION**
16  corporation; and DOES 1-50,         )
                                        )   Date:   June 14, 2013
17               Defendants.            )   Time:   10:00 a.m.
                                        )   Place:  Courtroom 6
18                                      )   Judge:  The Honorable Charles R. Breyer
                                        )
19  _____  )   Complaint Filed: May 23, 2012

20

21  **I.      INTRODUCTION**

22          Defendant Barbara's Bakery, Inc. ("Barbara's") joins in Plaintiff Richard W. Trammell's

23  "Motion for Preliminary Approval of Class Action Settlement" (Docket No. 36).  In addition,

24  Barbara's requests that the Court issue a preliminary injunction enjoining related litigation

25  pending in the Eastern District of New York and Superior Court of California pursuant to the

26  Court's authority under the All Writs Act, 28 U.S.C. § 1651, the Anti-Injunction Act, 28 U.S.C.

27  § 2283, and Federal Rules of Civil Procedure, Rule 23(d).  Such an injunction, which is included

28  in the Proposed Preliminary Approval Order filed with Plaintiff's Motion (Docket No. 38), is

1   necessary to allow the Court to oversee and manage the settlement in this action and to protect

2   the interests of the settlement class.

3   **II.    FACTUAL BACKGROUND**

4         On May 23, 2013, this action was filed.  (Docket No. 1.)  The Second Amended

5   Complaint is the operative complaint.  (Docket No. 29.)  Plaintiff, on behalf of himself and a

6   putative class, seeks relief related to Barbara's alleged false representations that its products are

7   "all natural" when the products allegedly contain genetically modified organisms ("GMO")

8   and/or other allegedly synthetic or artificial ingredients.  (*Id.*)  As discussed in Plaintiff's motion

9   for preliminary approval, after discovery and extensive settlement discussions, including two

10   mediations before the Honorable Eugene Lynch (Ret.) of JAMS, the parties have settled this

11   action and seek the Court's approval of that settlement.  (Docket No. 36.)  The settlement, if

12   approved, will preliminarily certify a national class related, *inter alia,* to claims that Barbara's

13   falsely represented its products as "all natural" when they allegedly contained GMO and/or other

14   allegedly synthetic or artificial ingredients.  (*Id.*)

15         On November 5, 2012, *Silber v. Barbara's Bakery, Inc.*, Case No. 1:12-cv-05511-WFK-

16   RLM, was filed in the Eastern District of New York.  (Declaration of Jonathan A. Eldredge

17   ("Eldredge Decl."), ¶ 2 and Exh. A.)  As in the instant case, the plaintiff in *Silber*, on behalf of

18   herself and a putative class, alleges that Barbara's falsely represented its products are "all

19   natural" when the products allegedly contain GMO and/or other allegedly synthetic or artificial

20   ingredients.  (*Id.*)  Barbara's answered the complaint and, following counsel's refusal to stipulate

21   to a stay, recently made Rule 26 initial disclosures and served limited discovery to which no

22   responses are yet due.  (*Id.*)  Plaintiff has served, but not filed,[1] a motion for preliminary

23   injunction; Barbara's served its opposition and requested that the New York district court

24   continue the hearing until after this Court rules on Plaintiff's motion for preliminary approval.

25   (*Id.*)  The hearing on the motion for preliminary injunction is set for May 7, 2013.  (*Id.*)  No class

26   / / /

27

28   [1]    Pursuant to Local Rule, all papers (moving, opposition and reply) are filed at the same time.

has been certified (or class certification motion filed) and no settlement discussions have taken place in light of the *Trammell* settlement. (*Id.*)

On November 7, 2012, *Rojas v. Barbara's Bakery, Inc.*, Case No. CGC-12-525911, was filed in the Superior Court of California, County of San Francisco. (Eldredge Decl., ¶ 3 and Exh. B.) Again, as in the instant case, the plaintiff in *Rojas*, on behalf of himself and a putative class, alleges that Barbara's falsely represented its products are "all natural" when the products allegedly contain GMO. (*Id.*) Barbara's has answered the complaint; no discovery has been taken. (*Id.*) No class has been certified (or class certification motion filed) and no settlement discussions have taken place in light of the *Trammell* settlement. (*Id.*)

On December 11, 2012, *Moro v. Barbara's Bakery, Inc.*, Case No. 1:12-cv-06087-WFK-RLM, was filed in the Eastern District of New York. (Eldredge Decl., ¶ 4 and Exh. C.) Once again, as in the instant case, the *Moro* plaintiff, on behalf of herself and a putative class, alleges that Barbara's falsely represented its products are "all natural" when the products allegedly contain GMO and other allegedly synthetic or artificial ingredients. (*Id.*) Barbara's has answered the complaint, Rule 26 initial disclosures were made and limited discovery has been served but not answered (again because opposing counsel refused to stay the case voluntarily in light of the instant settlement). (*Id.*) No class has been certified (or class certification motion filed) and no settlement discussions have taken place in light of the *Trammell* settlement. (*Id.*)

Shortly after a settlement-in-principle was reached in the *Trammell* action, counsel in the *Silber*, *Rojas* and *Moro* matters were notified that a national class settlement was reached and that the settlement agreement would effectively moot the claims asserted in those matters. (Eldredge Decl., ¶ 5.) Counsel objected that they were not involved in the settlement discussions even though *Trammell* was filed more than five months before any of the other actions and hence was much more developed. (*Id.*) Although we understand that counsel have been anxious to see the settlement agreement, the sudden urgency of prosecuting their later filed cases appears driven by a desire to claim fees rather than protecting the class whose interests are well served by the subject settlement. Now that counsel will have seen the settlement agreement, we hope that they will reconsider their refusal to await developments in this case. But if they persist in seeking to

1    litigate elsewhere the issues resolved by the subject settlement, this Court should issue its order

2    preventing such wasteful conduct.

3    **III.    ARGUMENT**

4         Federal district courts have the power to issue an injunction against continued federal and

5    state proceedings pursuant to the All Writs Act, 28 U.S.C. § 1651 (federal courts have the

6    authority to "issue all writs necessary or appropriate in the aid of their jurisdictions and agreeable

7    to the usages and principles of law."), the Anti-Injunction Act, 28 U.S.C. § 2283 (allowing

8    federal courts to enjoin state proceedings where "it is necessary to protect the court's

9    jurisdiction[.]" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998)) and Federal

10   Rules of Civil Procedure, Rule 23(d), which "vests a district court with the authority and

11   discretion to protect the interests and rights of class members and to ensure its control over the

12   integrity of the settlement approval process. '[A] district court has both the duty and the broad

13   authority to exercise control over a class action and to enter appropriate orders governing the

14   conduct of counsel and parties.' [Citation.]" *Hanlon*, 150 F.3d at 1025). *See also Kaufman v.*

15   *Am. Express Travel Related Services Comp., Inc.*, 264 F.R.D. 438, 449 (N.D. Ill. 2009) ("There

16   is ample authority supporting the court's power to stay pending federal and state cases to

17   effectuate class action settlement approval." [Citations.]"); *Liles v. Del Campo*, 350 F.3d 742,

18   746-47 (8th Cir. 2003) ("The district court enjoined proceedings in related litigation to preserve

19   the settlement fund, to eliminate the risk of inconsistent or varying adjudications that would

20   deplete the fund, to avoid confusion among the class members, and to save scarce judicial

21   resources. The court acted within its discretion in issuing the injunction because enjoining

22   related litigation was necessary to ensure the enforceability of the order approving the

23   preliminary settlement and to prevent further draining of the limited settlement fund.").

24        This issue was recently addressed in the multi-district litigation *In re Skechers Toning*

25   *Shoe Products Liability Litigation*, 2012 WL 3312668 (W.D. Ky. 2012). In *Skechers*, the parties

26   "as part of the settlement agreement, . . . move[d] for an injunction that would enjoin all similar

27   class actions proceeding in other state and federal courts." *Id.* at * 12. After discussing its

28   authority under the All Writs Act and Anti-Injunction Act, the district court granted the request

- 4 -

1  finding that "an injunction is necessary in aid of the Court's jurisdiction in order to avoid

2  confusion of the issues and interference of the approved settlement."  *Id.* at * 12; *see also id.* at *

3  14 ("that issuance of an injunction is necessary in aid of its jurisdiction over this case in order to

4  prevent frustration and disruption in the resolution of these issues.").

5  Here, the matter at bar settled after extensive settlement negotiations and two mediations,

6  and the settlement agreement has been submitted to the Court for review and approval.  (*See*

7  Docket No. 36.)  The three pending cases (*Silber*, *Rojas* and *Moro*) seek relief based on the same

8  alleged false advertising; each asserts that Barbara's "all natural" representations concerning its

9  products that allegedly contain GMO and synthetic or artificial ingredients are false and

10  misleading to consumers.  (Eldredge Decl., ¶¶ 2-5, Exhs. A-C.)  This Court's ability to manage

11  and oversee the certification and settlement of the national class would be impaired if competing

12  federal and state actions were allowed to proceed while the Court administers the settlement that

13  has now been reached.  Indeed, counsel in the *Silber* matter has already requested injunctive

14  relief (following notice of the *Trammell* settlement in an obvious attempt to seek a portion of the

15  attorneys' fees that may be awarded by this Court) that will be mooted by what the parties in

16  *Trammell* negotiated with the aid of a skilled and respected mediator, as now embodied in the

17  settlement agreement.  The agreed-upon injunctive relief is set forth in the *Trammell* settlement

18  agreement that has been submitted for the Court's review and approval.  It is in the interest of the

19  class members that all matters related to the national class be overseen by this Court pursuant to

20  the settlement agreement that has now been submitted for review and approval.

21  Pursuant to the settlement agreement and proposed class notice, the plaintiffs in the

22  *Silber*, *Rojas* and *Moro* actions are entitled to opt out their *individual* claims.  If they do so, their

23  *individual* claims would be allowed to proceed; however, they may not proceed as class actions

24  or seek relief that would conflict with this Court's orders concerning the national class.

25  **IV.  CONCLUSION**

26  Barbara's respectfully requests that the Court enter a preliminary injunction enjoining

27  related litigation pending in the Eastern District of New York and the Superior Court of

28  California, including the *Silber*, *Rojas* and *Moro* actions, and all future litigation related to the

1   national class and allegations in this action.  A form of order was submitted with Plaintiff's

2   motion for preliminary approval (Docket No. 38), and Barbara's Bakery joins in the request that

3   the Court enter that order.

4

5          Dated:  April 26, 2013

6                                                      GLYNN & FINLEY, LLP
                                                       CLEMENT L. GLYNN
7                                                      ADAM FRIEDENBERG
                                                       JONATHAN A. ELDREDGE
8                                                      One Walnut Creek Center
                                                       100 Pringle Avenue, Suite 500
9                                                      Walnut Creek, CA  94596

10                                                     By____/s/ Jonathan A. Eldredge_____
                                                          Attorneys for Defendant
11                                                        Barbara's Bakery, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  GLYNN & FINLEY, LLP
   CLEMENT L. GLYNN, Bar No. 57117
2  ADAM FRIEDENBERG, Bar No. 205778
   JONATHAN A. ELDREDGE, Bar No. 238559
3  One Walnut Creek Center
   100 Pringle Avenue, Suite 500
4  Walnut Creek, CA 94596
   Telephone: (925) 210-2800
5  Facsimile: (925) 945-1975
   E-mail: afriedenberg@glynnfinley.com
6          jeldredge@glynnfinley.com

7  Attorneys for Defendant
   Barbara's Bakery, Inc.

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11
                                    )    **Case No. C12-02664-CRB**
12  RICHARD W. TRAMMELL, individually )
    and on behalf of all others similarly situated, )  **DECLARATION OF JONATHAN A.**
13                                   )    **ELDREDGE**
                  Plaintiff,         )
14                                   )
       vs.                           )    Date:   June 14, 2013
15                                   )    Time:   10:00 a.m.
    BARBARA'S BAKERY, INC., a California )  Place:  Courtroom 6
16  corporation; and DOES 1-50,       )    Judge:  The Honorable Charles R. Breyer
                                      )
17                Defendants.         )    Complaint Filed: May 23, 2012
                                      )
18  _____ )

19          I, Jonathan A. Eldredge, say:

20          1.      I am an attorney licensed to practice in the State of California, and I am a member

21  of the bar of this Court.  I am associated with Glynn & Finley LLP, attorneys for defendant

22  Barbara's Bakery, Inc.  I know the following facts of my own personal knowledge and if called

23  upon could and would competently testify thereto.

24          2.      On November 5, 2012, *Silber v. Barbara's Bakery, Inc.*, Case No. 1:12-cv-05511-

25  WFK-RLM, was filed in the Eastern District of New York.  Attached as **Exhibit A** is a true and

26  correct copy of the operative complaint in *Silber*.  As in the instant case, the plaintiff in *Silber*,

27  on behalf of herself and a putative class, alleges that Barbara's falsely represented its products

28  are "all natural" when the products allegedly contain GMO and/or other allegedly synthetic or

                                    - 1 -

1   artificial ingredients.  (*See* Exh. A.)  Barbara's answered the complaint and, following counsel's

2   refusal to stipulate to a stay, recently made Rule 26 initial disclosures and served limited

3   discovery to which no responses are yet due.   Plaintiff has served, but not filed, a motion for

4   preliminary injunction; Barbara's served its opposition and requested that the New York district

5   court continue the hearing until after this Court rules on Plaintiff's motion for preliminary

6   approval.  The hearing on the motion for preliminary injunction is set for May 7, 2013.  No class

7   has been certified (or class certification motion filed) and no settlement discussions have taken

8   place in light of the *Trammell* settlement.

9         3.       On November 7, 2012, *Rojas v. Barbara's Bakery, Inc.*, Case No. CGC-12-

10  525911, was filed in the Superior Court of California, County of San Francisco.  Attached as

11  **Exhibit B** is a true and correct copy of the operative complaint in *Rojas*.  Again, as in the instant

12  case, the plaintiff in *Rojas*, on behalf of himself and a putative class, alleges that Barbara's

13  falsely represented its products are "all natural" when the products allegedly contain GMO.  (*See*

14  Exh. B.)  Barbara's has answered the complaint; no discovery has been taken.  No class has been

15  certified (or class certification motion filed) and no settlement discussions have taken place in

16  light of the *Trammell* settlement.

17        4.       On December 11, 2012, *Moro v. Barbara's Bakery, Inc.*, Case No. 1:12-cv-

18  06087-WFK-RLM, was filed in the Eastern District of New York.  Attached as **Exhibit C** is a

19  true and correct copy of the operative complaint in *Moro*.  Once again, as in the instant case, the

20  *Moro* plaintiff, on behalf of herself and a putative class, alleges that Barbara's falsely represented

21  its products are "all natural" when the products allegedly contain GMO and other allegedly

22  synthetic or artificial ingredients.  (*See* Exh. C.)  Barbara's has answered the complaint, Rule 26

23  initial disclosures were made and limited discovery has been served but not answered (again

24  because opposing counsel refused to stay the case voluntarily in light of the instant settlement).

25  No class has been certified (or class certification motion filed) and no settlement discussions

26  have taken place in light of the *Trammell* settlement.

27        5.       Shortly after a settlement-in-principle was reached in the *Trammell* action,

28  counsel in the *Silber*, *Rojas* and *Moro* matters were notified that a national class settlement was

1     reached and that the settlement agreement would effectively moot the claims asserted in those

2     matters.  Counsel objected that they were not involved in the settlement discussions even though

3     *Trammell* was filed more than five months before any of the other actions and hence was much

4     more developed.

5

6         I declare under penalty of perjury under the laws of the State of California that the

7     foregoing is true and correct.  Executed this 26th day of April 2013, in Walnut Creek, California.

8

9                                 /s/ Jonathan A. Eldredge
                                        Jonathan A. Eldredge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JONATHAN A. ELDREDGE

# EXHIBIT A

★ FILED ★

2012 NOV -5 PM 5:00

CLERK
U.S. DISTRICT COURT
E.D.N.Y.
AFTER HOURS DROP BOX

**REESE RICHMAN LLP**
Kim E. Richman
Michael R. Reese
875 Avenue of the Americas, 18th Floor
New York, New York 10001
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
Email: krichman@reeserichman.com
mreese@reeserichman.com

**THE GOLAN FIRM**
Yvette Golan
1919 Decatur St.
Houston, Texas 77007
Telephone: (866) 298-4150, ext. 101
Facsimile: (928) 441-8250
Email: ygolan@tgfirm.com

*Counsel for Plaintiff and the Proposed Class*

CV 12 - 5511

GLASSER, J.

J. ORENSTEIN, M.J.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIN SILBER, on behalf of herself and all others similarly situated,<br><br>              Plaintiff,<br><br>vs.<br><br>BARBARA'S BAKERY, INC.,<br><br>              Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Erin Silber ("Plaintiff"), on behalf of herself and all others similarly situated, by and through her undersigned counsel, alleges the following based upon her own personal knowledge and the investigation of her counsel. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a proposed class action against Barbara's Bakery, Inc. ("Barbara's Bakery" or "Defendant") for misleading consumers about the nature of the ingredients of its cereal products sold under the Puffins brand name, namely Puffins Original; Puffins Peanut Butter and Chocolate; Puffins Multigrain; Puffins Peanut Butter; Puffins Cinnamon; Puffins Honey Rice; Puffin Puffs, Crunchy Cocoa; Puffin Puffs, Fruit Medley; and other similar varieties ("Puffins," "Product," or "Products").[1]

2.     Now part of a worldwide cereal conglomerate, Defendant has based its brand on being wholesome, healthy, and environmentally friendly by providing "natural" foods. Even its logo promises "All Natural Since 1971." *See* Exhibit 1, attached hereto.

3.     During a period of time from September 21, 2006, to the conclusion of this action (the "Class Period"), Defendant engaged and continues to engage in a widespread marketing campaign on the Product packaging, website, and advertisements to mislead consumers about the nature of the ingredients in Puffins. Specifically, Defendant prominently placed the statement "All Natural Since 1971" on the front of the Product packaging, *see* Exhibit 2, attached hereto, even though Defendant knew the statement was false and misleading. Defendant also repeated the "All Natural" and "All Natural Since 1971" misrepresentations on the back and side labels of the Product packaging, making it the focal point of its product advertising. *See* Exhibit 2.

---

[1] Defendant has discontinued offering some Products and regularly introduces new products that are also falsely labeled as "100% natural" or "all natural." The identity of these additional products will be ascertained through discovery and are included in the list of Products.

Defendant also prominently placed the label "100% natural" on the Puffin Puffs Crunchy Cocoa and Puffin Puffs Fruit Medley Products. *See* http://shop.barbarasbakery.com/Puffin-Puffs-Crunchy-Cocoa/p/BAR-206454&c=BarbarasBakery@Cereals@Puffins (last visited Sept. 12, 2012); http://shop.barbarasbakery.com/Puffin-Puffs-Fruit-Medley/p/

BAR-206256&c=BarbarasBakery@Cereals@Puffins (last visited Sept. 12, 2012). Defendant further states on the Product website that Puffins is "100% Natural." *See* http://www.barbarasbakery.com/cereals-puffins/ (last visited Sept. 12, 2012).

4.      Defendant conveyed its misrepresentations about the Products through a widespread marketing and advertising campaign on the Product packaging, on various websites, including http://www.barbarasbakery.com, and in Product advertisements and promotional materials.

5.      The representation that the Products are "All Natural" is central to the marketing of the Products and is displayed prominently on their packaging. The misrepresentations were uniform and were communicated to Plaintiff and every other member of the Class at every point of purchase and consumption.

6.      Unfortunately for consumers and their children, Puffins is not "All Natural" or "100% natural." Rather, the Products contain various synthetic ingredients and corn that is derived from unnatural, genetically modified plants (a/k/a genetically modified organisms, or "GMOs"). A recent study found that Puffins contains more than 50% genetically engineered corn. Cornucopia Institute, *Cereal Crimes: How "Natural" Claims Deceive Consumers and Undermine the Organic Label – A Look Down the Cereal and Granola Aisle* (2011) ("Cornucopia Cereal Report"), *available at* http://www.cornucopia.org/2011/10/natural-vs-organic-cereal/. Further testing by an independent lab hired by Plaintiff's counsel has confirmed

that Puffins contains GMO corn – corn whose genes have been unnaturally altered so that they include genes of a virus and a bacteria. *See* Exhibit 3, attached hereto. It is impossible for corn to naturally obtain these genes.

7.      Furthermore, as described in greater detail herein, Defendant adds a substantial amount of unnaturally processed and synthetic additives to its so-called "All Natural" Products.

8.      These synthetic and excessively processed ingredients are not mere trace ingredients in the Products. For example, there is more synthetic dietary fiber – NutraFlora, a combination of 1-ketose (1-kestotriose; GF2), nystose (1,1-kestotetraose; GF3), and 1F-B-fructofuranosyl-nystose (1,1,1-kestopentaose; GF4) – than any natural fiber in the so-called All Natural Puffins Multigrain. *See* Exhibit 2.

9.      Through this deceptive practice, Defendant was able to command a premium price by deceiving consumers about the attributes of its Products and distinguishing the Products from similar cereals. Defendant was motivated to mislead consumers for no other reason than to take away market share from competing products, thereby increasing its own profits.

10.     The term "natural" has been at least partially defined by federal agencies and regulations. The Food and Drug Administration ("FDA") has defined the outer boundaries of the use of the term "natural" by stating that a product is not natural if it contains synthetic or artificial ingredients. According to federal regulations, an ingredient is synthetic if it is:

> [a] substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes.

7 C.F.R. § 205.2. An ingredient is artificial if it "is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof." 21 C.F.R.

§ 101.22(a).

11.     Similarly, the USDA's Food Safety and Inspection Service ("FSIS") defines a "natural" product as a product that does not contain any artificial or synthetic ingredient and does not contain any ingredient that is more than "minimally processed."

12.     Defendant explained what it meant by "all natural" on its Product packaging. On the back and side labels of its products, Defendant promised that its products contained "No Artificial Flavors, Additives or Preservatives." *See* Exhibit 2. Additionally, as Defendant promised on its back-label packaging of its products, "[t]here are never any artificial preservatives or additives in our cereals because that's Barbara's way." *Id.* With only minor and non-substantive variations, Defendant made this promise on the back label of all the Puffins products. *Id.*

13.     Research shows that a majority of consumers expect "natural" foods to be free of genetically engineered ingredients, and many consumers consider the absence of genetically modified organisms ("GMOs") to be important. *See* Cornucopia Cereal Report.

14.     Indeed, a 2010 poll by the Hartman Group found that a majority of consumers believed the term "natural" implied absence of genetically modified organisms ("GMOs"). Canada Organic Trade Association, *Consumer Confusion About the Difference: "Natural" and "Organic" Product Claims* (2010), at 6, *available at* http://www.ocpro.ca/docs/Library/White%20Paper%20Nat-Org%20COTA.pdf (citing The Hartman Group, *Beyond Organic and Natural* (2010), *available at* http://www.hartman-group.com/publications/reports/beyond-organic-and-natural). Similarly, two polls from 2009 and 2010 showed a majority of consumers said the "natural" label was either "important" or "very important." Context Marketing, *Beyond Organic: How Evolving Consumer Concerns Influence Food Purchases* (2009), *available at*

http://www.contextmarketing.com/foodissuesreport.pdf.

15.     "Unnatural" is a defining characteristic of GMO foods.   For example, the Monsanto Company, an agricultural company that pioneered GMO seeds, defines GMOs as plants or animals with their **"genetic makeup altered to exhibit traits that are not naturally theirs."**  In general, genes are taken (copied) from one organism that shows a desired trait and transferred into the genetic code of another organism."  *See* Monsanto > News & Views > Glossary, http://www.monsanto.com/newsviews/Pages/glossary.aspx#g (last visited Sept. 12, 2012) (emphasis added).   Additionally, the World Health Organization defines GMOs as "organisms in which the genetic material (DNA) has been **altered in a way that does not occur naturally.**  It allows selected individual genes to be transferred from one organism into another, also between non-related species."  *See* World Health Organization (WHO) > Food safety > 20 questions on genetically modified foods, http://www.who.int/foodsafety/publications/biotech/ 20questions/en/ (last visited Sept. 12, 2012) (emphasis added).

16.     Because Puffins contains synthetic ingredients and GMO corn, Defendant's claims that Puffins are "All Natural" or "100% natural" are false, misleading, and designed to deceive consumers into purchasing its Products.  Plaintiff brings this action to stop Defendant's misleading practice.

## JURISDICTION AND VENUE

17.     This court has jurisdiction over all causes of action asserted herein, pursuant to 28 U.S.C. §1332(d), because the aggregate claims of the class exceed the sum or value of $5,000,000.00, and there is diversity of citizenship between proposed class members and the Defendant.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) and (2).

CLASS ACTION COMPLAINT

6

Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false information regarding the quality of Defendant's Products, occurred within this district.

## PARTIES

19.     Plaintiff Erin Silber is a citizen of New York because Ms. Silber is domiciled in Brooklyn, New York, and has no intention of changing her domicile. Ms. Silber bought a 10 oz. box of Puffins Original cereal at a local supermarket in New York during the Class Period, prior to the commencement of this action. Ms. Silber relied upon the statement that the Product was "All Natural Since 1971" in deciding to purchase the Product. Had Ms. Silber known at the time that the Product was not, in fact, made "All Natural Since 1971," but, instead, made with GMOs, she would not have purchased the Product.

20.     Defendant Barbara's Bakery, Inc. is a California corporation with its principal place of business in Marlborough, Massachusetts. Barbara's Bakery, Inc. is a wholly-owned subsidiary of the Weetabix North America, which is the North American arm of Weetabix Food Company, a United Kingdom-based company and worldwide cereal conglomerate. Barbara's Bakery markets its Products to consumers throughout the United States.

## SUBSTANTIVE ALLEGATIONS

21.     Defendant sells several types of cereal under the Puffins brand that are widely consumed by both children and adults. Each of the Puffins cereals is sold with a label on the front of the box that states prominently "All Natural Since 1971." Defendant also prominently places the label "100% natural" on its Puffin Puffs Crunchy Cocoa and Puffin Puffs Fruit Medley Products. *See* http://shop.barbarasbakery.com/Puffin-Puffs-Crunchy-Cocoa/p/BAR-206454&c=BarbarasBakery@Cereals@Puffins (last visited Sept. 12, 2012); http://shop.barbarasbakery.com/Puffin-Puffs-Fruit-Medley/p/BAR-

206256&c=BarbarasBakery@Cereals@Puffins (last visited Sept. 12, 2012). Defendant's website further states that Puffins is "100% Natural." *See* http://www.barbarasbakery.com/cereals-puffins/ (last visited Sept. 12, 2012).

22.     The back of the Puffins cereal box also features numerous slogans and representations to induce the purchaser into believing the Product is all natural, including the following statements:

- "Eat the Way you Live, Naturally."
- "At Barbara's®, we believe the best things in life are all natural – like smiles, hugs, and our super tasty Multigrain Puffins made with whole oats, brown rice and corn . . . ."
- "healthy living, naturally"
- "Honest Goodness. Give our other all natural products a try."
- "Celebrate Family! In 1971, when Barbara started our company, Petaluma was at the heart of the natural foods movement. Petaluma is still a place of farms, milk cows, and people deeply connected to nature. The movement has spread and our family of products has grown too. We chose a few of our favorite cereals to create a "family size." Now everyone can enjoy Barbara's original vision – make great tasting, healthy foods what people love – all without artificial ingredients or preservatives. Gather the family around the table and enjoy!"
- "Make friends with All Natural Goodness."
- "A Naturally Dynamic Duo. At Barbara's®, our recipe for success is great taste and all-natural ingredients . . . ."

*See* Exhibit 2.

23.     Similarly, on its website Defendant makes numerous statements and representations to re-enforce the "All Natural" part of its brand. For example, at the top of the homepage, a changing banner appears with the following slogans:

- "Eat Natural, Live Natural. Start with Breakfast."
- "Let's eat the way we live. Naturally."
- "A hug, a smile, and whole grains. The best things in life are

CLASS ACTION COMPLAINT

8

natural."

- "We believe sunny afternoons should be spent outside. And snacks should be natural."

http://www.barbarasbakery.com (last visited Sept. 12, 2012); *see also* Exhibit 1.

24.    In recounting the company's history, and referring to its purported founder, Defendant states, among other things: "Barbara, then 17, found her calling in real food and opened a small natural bakery in Northern California. She had a simple plan—make wholesome food taste incredibly delicious. Inspired by good health, family, and the kitchen table as the cornerstones of the good life, she used whole grains and oats just as nature intended—free from anything artificial. ... Today, a few of us wish we still wore flowers in our hair like Barbara did. And, we know our mission is clear: healthy people, naturally. We carry on Barbara's commitment to create the best-tasting natural products free of artificial preservatives and ingredients, hydrogenated oils, and refined white sugar." http://www.barbarasbakery.com/about/ (last visited Sept. 12, 2012).

25.    Another page of the website boasts as follows:

**We've Got a New Look and it's Just as Natural as Our Ingredients**

We've been making great tasting naturally healthy food—free of artificial colors, preservatives and harmful additives since 1971. Our bold, simplified look, featuring 100% recycled carbon neutral GreenChoice cartons makes it easier for health conscious consumers to find us in their local grocery store.

It's all part of our long-term commitment to natural ingredients. Barbara's is a company born and raised on the values of the natural foods movement of the early 1970s. These pioneers believed that promoting sustainable agriculture and green living along with eating natural and organic would lead to healthier, happier lives.

Barbara opened a small natural bakery with a strong commitment to healthier foods, but with a slightly different point of view: what good is healthy food if no one will eat it? She made sure that her naturally wholesome foods taste great as well. It's no surprise that Barbara's is still thriving and we still live by the principle our

CLASS ACTION COMPLAINT

9

founder believed in: that making great tasting recipes with all-natural ingredients will make your family healthier and happier. Naturally.

**All Natural Since 1971.**

http://www.barbarasbakery.com/new-look/ (last visited Sept. 12, 2012).

26.     In fact, since Defendant's trademark logo itself contains the "All Natural Since 1971" claim, any consumer who purchases any of Defendant's Products or views any of Defendant's advertisements is exposed to Defendant's "All Natural Since 1971" claim. *See* Exhibit 1. Defendant systematically conveys the "All Natural Since 1971" misrepresentation on cereal boxes, bags, on its website, TV commercials, and even social media, such as Facebook.

27.     A study conducted by the Rudd Center for Food Policy and Obesity at Yale University found that specific nutrition-related health claims on cereal boxes result in parents believing those products to be healthier than other children's cereals. Such claims also lead to greater willingness in parents to buy those cereals for their children. *See* Karen N. Peart, *Parents Often Misled by Health Claims on Children's Cereal Packages*, Yale News (Aug. 10, 2011), http://opac.yale.edu/news/article.aspx?id=8782 (last visited Sept. 12, 2012).

28.     GMOs have created controversy around the world due to concerns about food safety, the effect on natural ecosystems, gene flow (a/k/a "gene migration" or "genetic drift") into non-GMO crops, and other issues. Indeed, a team of scientists recently reported that genetically modified corn was found to increase the incidence of tumors in test subjects and to decrease their life expectancies. *See* Gilles-Eric Séralini et al., *Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize*, 50 Food & Chem. Toxicology 4221, 4221 (2012). One consumer response to such concerns has been to purchase products represented as "natural" rather than food products that are derived from GMOs.

29.     A product that is derived from GMOs is unnatural by definition. In accordance

CLASS ACTION COMPLAINT

with expert definitions, consumers reasonably interpret GMOs as unnatural.

30.     A Cornucopia Institute study found that Puffins products were contaminated with high levels of genetically engineered ingredients – Puffins contained more than 50% genetically engineered corn.   *See* Cornucopia Cereal Report.   Testing by Biogen Laboratories, an independent lab hired by Plaintiff's counsel, has confirmed that Puffins cereal contains non-natural, GMO ingredients. *See* Exhibit 3.

31.     Natural breeding can take place only between closely related life forms, *e.g.*, wheat with wheat).  Natural breeding techniques cannot add the genes of a different organism, *e.g.*, a wheat with a fish.  Instead, to add genes of an organism to a different organism, scientists must use genetic engineering, producing an organism that could not otherwise exist in nature.

32.     An independent lab confirms that the genetically modified corn in Puffins Products contains genes of a bacteria (*Agrobacterium tumefaciens*) and a virus (cauliflower mosaic virus, or CaMV).  Naturally existing corn could never obtain the genes of a virus or a bacteria, just as a cat could never have the genes of a fish.  Such breeding is unnatural.

33.     The virus and bacteria genes were added to the corn in Puffins Products so that other foreign genes would be activated.   The source of these other genes is still being ascertained, and may come from bacteria, viruses, insects, or animals.  In the past, corn has been engineered with mouse genes, jellyfish genes, hepatitis virus genes, rabies virus genes, chicken genes, and even human genes.   *See, e.g.*, USDA APHIS Permit Nos. 98-117-01r (corn genetically engineered to express human hemoglobin protein chains); 98-117-02r (human procollagen type chain protein); 98-117-03r (human serum albumin protein); 98-117-04r (rabies virus G glycoprotein); Nat. Biotech. 18: 670-674 (chicken gene).  Reasonable consumers would agree that such genetically modified "corn" is unnatural.   For example, scientists have

CLASS ACTION COMPLAINT

11

genetically engineered corn with jellyfish genes so the corn would glow in the dark. Reasonable consumers would believe that glow-in-the-dark corn is not natural corn but is artificial or man-made corn.

34.    The genetically modified corn is fundamentally different from naturally existing corn. Inserting the foreign genes will alter even the original genes, just as inserting a new letter can alter the meaning of a word. The foreign genes will reduce or increase the natural corn gene's function, and sometimes blocking its expression altogether. These unexpected consequences can yield alterations in the nutritional content of the food, toxic and allergenic effects, poor crop performance, and generations of environmental damage.

35.    These artificial, manmade plants are also "synthetic" under federal definition, as they were "formulated or manufactured by a chemical process or by a process that chemically changes a substance." 7 C.F.R. § 205.2.

36.    In accordance with expert definitions and common sense, reasonable consumers understand that such genetically modified ingredients are *not* natural.

37.    Puffins also contains one or more of the below synthyetic or artificial substances:

*NutraFlora.*    Defendant falsely describes *NutraFlora*® as "natural dietary fiber." According to the manufacturer of NutraFlora, it is a combination of 1-ketose (1-kestotriose; GF2), nystose (1,1-kestotetraose; GF3), and 1F-B-fructofuranosyl-nystose (1,1,1-kestopentaose; GF4). NutraFlora is manufactured by producing B-fructofuranosidase, combining it with sucrose, and processing it with synthetic and hazardous compounds such as hydrochloric acid and/or sodium hydroxide. 7 C.F.R. § 205.605; 40 C.F.R. § 116.4. Thus, the National Organic Standards Board concluded that NutraFlora is "formulated or manufactured by a chemical process" that "chemically changes" the substance, and the substance is not created by "naturally

occurring biological processes."

*Annatto.*   Annatto is an "artificial color" or "artificial coloring."   21 C.F.R. § 101.22(a)(4).  Under federal regulation, annatto extract is prepared from annatto seed using one or more food-grade extractants: alkaline aqueous solution, alkaline propylene glycol, ethyl alcohol or alkaline solutions thereof, edible vegetable oils or fats, mono- and diglycerides from the glycerolysis of edible vegetable oils or fats.  The alkaline alcohol or aqueous extracts may be treated with food-grade acids to precipitate annatto pigments, which are separated from the liquid and dried, with or without intermediate recrystallization, using the solvents acetone, ethylene dichloride, hexane, isopropyl alcohol, methyl alcohol, methylene chloride, and/or trichloroethylene.  Food-grade alkalis or carbonates may be added to adjust alkalinity.  21 C.F.R. § 73.30.

*Calcium carbonate.*  Calcium carbonate requires production processes that render it no longer "natural."  It is produced from calcium hydroxide, calcium chloride, or as a byproduct in the lime soda process.  21 C.F.R. § 184.1191.  Federal regulations recognize calcium hydroxide as a synthetic compound, 7 C.F.R. § 205.605(b), and the FDA has declared that calcium chloride renders a food no longer "natural."  FDA Warning letter to Karl A. Hirzel, Hirzel Canning Co. (Aug. 29, 2001).  The lime soda process employs hazardous and synthetic substances and requires processing techniques so excessive so as to render the finished product unnatural.  *See infra* (discussion of calcium chloride).  In fact, the Environmental Protection Agency ("EPA") has promulgated regulations specifically addressing the environmental impact of calcium carbonate produced through the lime process and by recovery from Solvay waste products.  40 C.F.R. § 415.300 *et seq.*  When used in drugs, it is recognized as a synthetic compound.  21 C.F.R. § 73.1070(a)(1).

*Ferric orthophosphate*.  Ferric orthophosphate is also synthetic, produced by reacting sodium phosphate (a synthetic substance) with ferric chloride or ferric citrate.  21 C.F.R. §184.1301; 7 C.F.R. § 205.605(b).

*Tocopherols*.  Defendant falsely represents that some of the products contain "Natural Vitamin E (mixed tocopherols to maintain freshness)."  In fact, tocopherols are not natural, but are chemical preservatives and synthetic substances.  7 C.F.R. § 205.605(b) (synthetic); 21 C.F.R. § 182.3890 (chemical preservatives).  They are produced by molecular distillation, solvent extraction, or absorption chromatography.  The ingredient is not natural, but synthetic.

Moreover, these tocopherol substances are not vitamin E, have a different molecular structure from vitamin E, and are synthetic substances, not a natural vitamin.  As the following graphics demonstrate, D-alpha tocopherol acetate ($C_{31}H_{52}O_3$):



is chemically and molecularly distinct from Vitamin E ($C_{29}H_{50}O_2$):



CLASS ACTION COMPLAINT
14

*Retinyl palmitate.* Defendant adds vitamin A to some of its foods as retinyl palmitate, which "is prepared by esterifying retinol with palmitic acid." 21 C.F.R. § 184.1930(a)(3). It is a synthetic substance. 21 CFR § 205.605(b). Moreover, retinyl palmitate is not vitamin A, as Defendant claims. As the graphics below demonstrate, retinyl palmitate, $C_{36}H_{60}O_2$:



is chemically different from the natural vitamin A existing in foods, retinol, $C_{20}H_{30}O$:

*Ascorbic acid.* Ascorbic acid is a federally-declared synthetic substance and a chemical preservative. 7 C.F.R. § 205.605(b) (synthetic); U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995) (synthetic); 21 C.F.R. § 182.3013 (chemical preservative). While the precise production methodology employed by Defendant is not yet known, the classical Reichstein-Grussner method of synthesis starts with reduction of D-glucose to D-sorbitol by hydrogenation over a nickel catalyst. The sorbitol is partially oxidized by protecting four of the hydroxyl groups with acetone (synthetic) and sulfuric acid (synthetic), and then chemical oxidization to carboxylic acid. Acid hydrolysis finally yields the ascorbic acid.

Ascorbic acid does not have the same positive health benefits as natural vitamin C. For example, natural vitamin C is associated with a lower risk of most types of cancer. Yet evidence from most randomized clinical trials suggests that vitamin C supplementation does not affect cancer risk.

*Vitamin D3.* Defendant adds "vitamin D3" to some of the products. Vitamin D is a synthetic compound. *See* 7 C.F.R. § 205.605(b). To be added to foods, it is produced by ultraviolet irradiation of ergosterol isolated from yeast and related fungi and is purified by crystallization, by ultraviolet irradiation of 7-dehydrocholesterol produced from cholesterol, and/or by concentrating irradiated ergosterol and irradiated 7-dehydrocholesterol, which themselves are separated from the reacting materials of the prior two methodologies. 21 C.F.R. § 184.1950(a).

38. Other ingredients in Puffins are derived from natural sources, but undergo such extensive processing that they can no longer be considered to be "natural." For example, *dehydrated cane juice* requires extensive processing to extract cane syrup from the sugar cane,

including the use of synthetic compounds such as phosphoric acid and calcium hydroxide, both synthetic substances. *See* 7 C.F.R. § 205.605. Moreover, Defendant misleadingly represents that the ingredient is "cane juice" or a derivate thereof, when in fact, "cane juice" is not a juice at all, but a sugar or a syrup. Thus, the FDA has declared that such "cane juice" representations to be misleading. FDA Guidance for Industry: Ingredients Declared as Evaporated Cane Juice; Draft Guidance, October 2009.

39.     Despite knowing that GMOs are not natural, that synthetic ingredients are not natural, and that its Products contain synthetic ingredients and GMOs, Defendant has engaged in a widespread marketing and advertising campaign to portray the Products as being "All Natural Since 1971" and/or "100% natural." Defendant engaged in this misleading and deceptive campaign to charge a premium and take away market share from other similar products.

40.     Research shows that products purported to be "natural," such as Puffins, are often priced higher than equivalent organic products, suggesting that companies, including Defendant, are taking advantage of consumer confusion between certified organic labels and the natural label, knowing that some consumers value "natural" over even organic products. *See* Cornucopia Cereal Report. For example, a consumer can purchase organically grown corn puffs, such as Nature's Path unsweetened organic corn puffs, for approximately 40 cents per ounce, while the consumer must pay a premium price of nearly 60 cents per ounce for genetically engineered corn puffs of Puffins cereal at approximately $5.59 for a 10-ounce box. *Compare* http://www.organicdirect.com/natures-path-organic-corn-puffs-cereal-p-28648.html, *with* http://www.organicdirect.com/barbaras-bakery-original-puffins-1210-oz-p-28450.html (last visited Sept. 12, 2012).

41.     As stated herein, the widespread marketing campaign portraying the Products as

CLASS ACTION COMPLAINT

being "All Natural Since 1971" and/or "100% natural" is misleading and deceptive to consumers and their children because the Products are made with synthetic ingredients and unnatural GMO corn (which has been verified by research studies and independent testing), and Defendant's marketing and other materials do not disclose this fact.

42. Consumers frequently rely on food label representations and information in making purchase decisions. Here, Plaintiff and the other Class members reasonably relied to their detriment on Defendant's misleading representations and omissions. Defendant's misleading affirmative statements about the "naturalness" of its Products obscured the material facts that Defendant failed to disclose about the unnaturalness of its Products.

43. Plaintiff and the other Class members were among the intended recipients of Defendant's deceptive representations and omissions. Defendant made the deceptive representations and omissions on the Products with the intent to induce Plaintiff's and the other Class members' purchase of the Products. Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions. Thus, Plaintiff's and the other Class members' reliance upon Defendant's misleading and deceptive representations and omissions may be presumed.

44. The materiality of those representations and omissions also establishes causation between Defendant's conduct and the injuries sustained by Plaintiff and the Class.

45. Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the other Class members.

CLASS ACTION COMPLAINT
18

46.     In making the false, misleading, and deceptive representations and omissions, Defendant knew and intended that consumers would pay a premium for "natural" products over comparable products that are not "natural," furthering Defendant's private interest of increasing sales for its Products and decreasing the sales of products that are truthfully offered as "natural" by Defendant's competitors.

47.     As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiff and the other Class members in that they:

- paid a sum of money for Products that were not as represented;

- paid a premium price for Products that were not as represented;

- were deprived the benefit of the bargain because the Products they purchased were different than what Defendant warranted;

- were deprived the benefit of the bargain because the Products they purchased had less value than what was represented by Defendant;

- did not receive Products that measured up to their expectations as created by Defendant;

- ingested Products that were other than what was represented by Defendant;

- ingested Products that Plaintiff and the other members of the Class did not expect or consent to;

- ingested Products that were artificial, synthetic, or otherwise unnatural;

- ingested Products that were of a lower quality than what Defendant promised;

- were denied the benefit of knowing what they ingested;

- were denied the benefit of truthful food labels;

- were forced unwittingly to support an industry that contributes to environmental, ecological, and/or health damage;

- were denied the benefit of supporting an industry that sells natural foods and contributes to environmental sustainability; and

CLASS ACTION COMPLAINT

- were denied the benefit of the beneficial properties of the natural foods promised.

48.     Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the other Class members would not have been injured. Among other things, they would not have been denied the benefit of the bargain; they would not have ingested a substance that they did not expect or consent to; they would not have been forced unwittingly to support an industry that contributes to environmental damage; and they would not have suffered the other injuries listed above. Accordingly, Plaintiff and the other Class members have suffered injury in fact as a result of Defendant's wrongful conduct

49.     Plaintiff and the other Class members all paid money for the Products. However, Plaintiff and the other Class members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiff and the other Class members purchased, purchased more of, or paid more for, the Products than they would have had they known the truth about the Products' unnaturalness. Accordingly, Plaintiff and the other Class members have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

## CLASS ALLEGATIONS

50.     Plaintiff Erin Silber brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a nationwide class of persons who purchased Defendant's Products during the Class Period (the "Class").

51.     Additionally, Plaintiff Erin Silber brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a sub-class all persons in New York who purchased Defendant's Products during the Class Period (the "New York Sub-Class").

52.     Excluded from the Class are officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, Defendant's legal representatives, heirs, successors, or assigns, and any entity in which they have or have had a controlling interest.

53.     Plaintiff reserves the right to revise the Class definitions based on facts learned in the course of litigating this matter.

54.     At this time, Plaintiff does not know the exact number of the Class or the New York Sub-Class members; however, given the nature of the claims and the number of retail stores selling Defendant's Products nationally, Plaintiff believes that members are so numerous that joinder of all of them is impracticable.

55.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

       a.    Whether Defendant labeled, marketed, advertised, and/or sold the Products to Plaintiff and the other Class members using false, misleading, and/or deceptive statements or representations, including statements or representations concerning the quality of the ingredients of its Products;

       b.    Whether Defendant omitted and/or misrepresented material facts in connection with the sales of its Products;

       c.    Whether Defendant participated in and pursued the common course of conduct complained of herein; and

       d.    Whether Defendant's labeling, marketing, advertising, and/or selling of its Products as being "All Natural Since 1971" and/or "100% natural" constitutes a deceptive consumer sales practice.

56.     Plaintiff's claims are typical of those of the Class members because Plaintiff, like all members of the Class, purchased Defendant's Products at a premium in a typical consumer setting and sustained damages from Defendant's wrongful conduct.

57.     Plaintiff's claims are typical of those of the New York Sub-Class members because Plaintiff, like all members of the New York Sub-Class, purchased Defendant's Products at a premium in a typical consumer setting within the state of New York and sustained damages from Defendant's wrongful conduct.

58.     Plaintiff will adequately protect the interests of the Class members. Plaintiff has retained counsel that is experienced in litigating complex class actions. Neither Plaintiff nor her counsel have any interests adverse to those of the other Class members.

59.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

60.     The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Rule 23(b)(2) are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

61.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions may be dispositive of the interests of all members of the Class, although certain Class members are not parties to such actions.

62.     Defendant's conduct is generally applicable to the Class as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Defendant's systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Violation of the Massachusetts General Laws chapter 93A, §§ 2 and 9)

63.     Plaintiff realleges and incorporates the above paragraphs of this Class Action Complaint as if set forth herein.

64.     Chapter 93A, section 2 of the Massachusetts General Laws (M.G.L.) provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Chapter 93A, section 9 of the M.G.L. permits any consumer injured by a violation of M.G.L. ch. 93A, § 2 to bring a civil action, including a class action, for damages and injunctive relief.

65.     In violation of M.G.L. ch. 93A, § 2, Defendant engaged in false and misleading marketing concerning the qualities of its Products.

66.     As fully alleged above, by advertising, marketing, distribution, and/or selling the Products to Plaintiff and other members of the Class, Defendant engaged in and continues to engage in deceptive acts and practices.

67.     Defendant's practices also violate M.G.L. ch. 106, §§ 2-313 (Express Warranty), 2-314 (Implied Warranty of Merchantability), and 2-315 (Implied Warranty of Fitness for a Particular Purpose) and, as such, are unfair in violation of M.G.L. ch. 93A, § 2.

68.     Plaintiff and the other members of the Class further seek to enjoin such unlawful deceptive acts and practices as described above.  Each of the Class members will be irreparably harmed unless the unlawful actions of Defendant are enjoined in that Defendant will continue to falsely and misleadingly advertise the healthy nature of its Products.  Towards that end, Plaintiff and the Class request an order granting them injunctive relief as follows:  order disclosures

CLASS ACTION COMPLAINT
23

and/or disclaimers on the labeling or advertising of Defendant's Products and/or remove the GMOs from the ingredients.

69.     Absent injunctive relief, Defendant will continue to manufacture and sell its Products as an "All Natural" and/or "100% natural" food product to the detriment of consumers.

70.     In this regard, Defendant has violated, and continues to violate, M.G.L. ch. 93A, § 2.  As a direct and proximate result of Defendant's violation of M.G.L. ch. 93A, § 2 as described above, Plaintiff and the other members of the Class have suffered damages in an amount to be determined at trial.

71.     On September 21, 2012, Plaintiff, through her counsel, provided a draft copy of this Complaint along with a letter to provide Defendant with notice of the claims and allegations asserted herein.  Defendant responded to the letter through counsel, in a letter dated October 19, 2012, and declined to "tender a response to [Plaintiff's] demand for an offer of settlement."

72.     Therefore, Plaintiff prays for relief as set forth below.

## SECOND CAUSE OF ACTION

### (Breach of Express Warranties under M.G.L. ch. 106, § 2-313)

73.     Plaintiff realleges and incorporates the above paragraphs of this Class Action Complaint as if set forth herein.

74.     Defendant provided Plaintiff and the other members of the Class with written express warranties, including, but not limited to, warranties that its Products were "All Natural Since 1971" and/or "100% natural," as set forth above.

75.     Defendant breached these warranties by providing Products that contained synthetic ingredients and unnatural GMO corn and did not otherwise conform to Defendant's warranties.

76.     This breach resulted in damages to Plaintiff and the other members of the Class who bought Products but did not receive the goods as warranted, in that the Products were not natural because they contained GMOs and other unnatural ingredients.

77.     As a proximate result of Defendant's breach of warranties, Plaintiff and the other Class members have suffered damages in an amount to be determined by the Court and/or jury in that, among other things, they purchased and paid for Products that did not conform to what was promised as promoted, marketed, advertised, packaged, and labeled by Defendant and they were deprived of the benefit of their bargain and spent money on Products that did not have any value or had less value than warranted or Products that they would not have purchased and used had they known the true facts about them.

78.     Therefore, Plaintiff prays for relief as set forth below.

## THIRD CAUSE OF ACTION

### (Breach of Implied Warranty of Merchantability under M.G.L. ch. 106, § 2-314)

79.     Plaintiff realleges and incorporates the above paragraphs of this Class Action Complaint as if set forth herein.

80.     Plaintiff and the other Class members purchased Defendant's Products, which were promoted, marketed, advertised, packaged, and labeled as "All Natural Since 1971" and/or "100% natural." Pursuant to these sales, Defendant impliedly warranted that its Products would be merchantable and fit for the ordinary purposes for which such goods are used and would conform to the promises or affirmations of fact made in the Products' promotions, marketing, advertising, packaging, and labels. In doing so, Plaintiff and the other Class members relied on Defendant's representations that the Products had particular characteristics, as set forth above, and, at or about that time, Defendant sold the Products to Plaintiff and the other Class members.

By its representations regarding the reputable nature of the company and its products and by its promotion, marketing, advertising, packaging, and labeling of the Products, Defendant warranted that the Products were "All Natural Since 1971" and/or "100% natural" and had particular characteristics, as set forth above. Plaintiff and the other Class members bought the Products relying on Defendant's representations that its Products were "All Natural Since 1971" and/or "100% natural" when, in fact and unbeknownst to Plaintiff and the other Class members, the corn in the Products was not all natural because it contained GMO corn, and the Products contained other synthetic ingredients.

81.     Defendant breached the warranty implied at the time of sale in that Plaintiff and the other Class members did not receive goods that were "All Natural Since 1971" and "100% natural" as represented and, thus, the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, advertised, packaged, labeled, or sold.

82.     As a proximate result of this breach of warranty by Defendant, Plaintiff and the other Class members have suffered damages in an amount to be determined by the Court and/or jury in that, among other things, they purchased and paid for Products that did not conform to what was promised as promoted, marketed, advertised, packaged, and labeled by Defendant and they were deprived of the benefit of their bargain and spent money on Products that did not have any value or had less value than warranted or Products they would not have purchased and used had they known the true facts about them.

83.     Therefore, Plaintiff prays for relief as set forth below.

## FOURTH CAUSE OF ACTION

### (Breach of Implied Warrant of Fitness for Particular Purpose

### under M.G.L. ch. 106, § 2-315)

84.     Plaintiff realleges and incorporates the above paragraphs of this Class Action Complaint as if set forth herein.

85.     Plaintiff and the other Class members purchased Defendant's Products, which were promoted, marketed, advertised, packaged, and labeled as "All Natural Since 1971" and/or "100% natural."  Pursuant to these sales and by Defendant's promotion, marketing, advertising, packaging, and labeling, Defendant impliedly warranted that its Products were "All Natural Since 1971" and/or "100% natural."  Plaintiff and the other Class members bought the Products from Defendant relying on Defendant's skill and judgment in furnishing suitable goods as well as its representation that its Products were "All Natural Since 1971" and/or "100% natural." However, Defendant's Products were not "All Natural Since 1971" or "100% natural" in that they contained *un*natural GMO corn and other synthetic ingredients.

86.     Defendant breached the warranty implied at the time of sale in that Plaintiff and the other Class members did not receive Products that were "All Natural Since 1971" and/or "100% natural" as represented, and, thus, the goods were not fit for the purpose as promoted, marketed, advertised, packaged, labeled, or sold.

87.     As a result of this breach of warranty by Defendant, Plaintiff and the other Class members have suffered damages in an amount to be determined by the Court and/or jury in that, among other things, they purchased and paid for Products that did not conform to what was promised as promoted, marketed, advertised, packaged, and labeled by Defendant and they were deprived of the benefit of their bargain and spent money on Products that did not have any value

or had less value than warranted or Products they would not have purchased and used had they known the true facts about them.

88.     Therefore, Plaintiff prays for relief as set forth below.

## FIFTH CAUSE OF ACTION

### (Fraud, Deceit, and/or Misrepresentation under Massachusetts Common Law)

89.     Plaintiff realleges and incorporates the above paragraphs of this Class Action Complaint as if set forth herein.

90.     Defendant, through its promotion, marketing, advertising, packaging, and labeling of the Products, makes uniform representations and offers regarding the quality of the Products, as described above. Defendant engaged in, and continues to engage in, such fraudulent, misrepresentative, false, and/or deceptive acts with full knowledge that such acts were, and are, in fact, misrepresentative, false, or deceptive.

91.     The aforementioned misrepresentations, deceptive, and/or false acts and omissions concern material facts that are essential to the analysis undertaken by Plaintiff and the other Class members in deciding whether to purchase Defendant's Products.

92.     Plaintiff and the other Class members would have acted differently had they not been misled – *i.e.*, they would not have paid a premium price for the Products and/or they would not have purchased the Products had they known the truth about the unnatural ingredients in the Products.

93.     Defendant has a duty to correct the misinformation it disseminates through its advertising of the Products. By not informing Plaintiff and the other Class members, Defendant breached this duty. Defendant also gained financially from, and as a result of, this breach. Moreover, Defendant has a duty to disclose the omitted facts because Defendant was in

possession of knowledge about the identity, formulation, and production of the Products and of their ingredients, and this information is not reasonably available to consumers.

94.    By and through such deceit, misrepresentations, and/or omissions, Defendant intended to induce Plaintiff and the other Class members to alter their position to their detriment.

95.    Plaintiff and the other Class members justifiably and reasonably relied on Defendant's misrepresentations and, as a result, were damaged by Defendant.

96.    As a direct and proximate result of Defendant's deceit and/or misrepresentations, Plaintiff and the other Class members have suffered damages in an amount equal to the amount they paid or the premium they paid for Defendant's Products.  The exact amount will be proven at trial.

97.    Defendant acted with intent to defraud, or with reckless or negligent disregard of the rights of Plaintiff and the other Class members.

98.    Plaintiff and the other Class members are entitled to punitive damages due to Defendant's willful fraud and deceit.

99.    Therefore, Plaintiff prays for relief as set forth below.

## SIXTH CAUSE OF ACTION

### (Unjust Enrichment under Massachusetts Common Law)

100.    Plaintiff realleges and incorporates the above paragraphs of this Class Action Complaint as if set forth herein.

101.    As a result of Defendant's deceptive, fraudulent, and misleading labeling, advertising, marketing, and sales of the Products, Defendant was enriched, at the expense of Plaintiff and the other Class members through the payment of the purchase price for Defendant's Products.

102.    Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits that it received from Plaintiff and the other Class members in light of the fact that the Products purchased by Plaintiff and the other Class members were not what Defendant purported them to be.  Thus, it would be unjust or inequitable for Defendant to retain the benefit without restitution to Plaintiff and the other Class members for the monies paid to Defendant for such Products.

103.    Therefore, Plaintiff prays for relief as set forth below.

## SEVENTH CAUSE OF ACTION

### (Violation of the New York General Business Law § 349)

### (New York Sub-Class Only)

104.    Plaintiff realleges and incorporates the above paragraphs of this Class Action Complaint as if set forth herein.

105.    Defendant engaged in false and misleading marketing concerning the qualities of its Products.

106.    As fully alleged above, by advertising, marketing, distribution, and/or selling the Products to Plaintiff and other members of the New York Sub-Class, Defendant engaged in and continues to engage in deceptive acts and practices.

107.    Plaintiff and the other members of the New York Sub-Class further seek to enjoin such unlawful deceptive acts and practices as described above.  Each of the New York Sub-Class members will be irreparably harmed unless the unlawful actions of the Defendant are enjoined in that Defendant will continue to falsely and misleadingly advertise the healthy nature of its Products.  Towards that end, Plaintiff and the New York Sub-Class request an order granting them injunctive relief as follows:  order disclosures and/or disclaimers on the labeling or

advertising of the Defendant's Products and/or remove the GMOs from the ingredients.

108.    Absent injunctive relief, Defendant will continue to manufacture and sell its Products as an "All Natural" and/or "100% natural" food product to the detriment of consumers.

109.    In this regard, Defendant has violated, and continues to violate, section 349 of the New York General Business Law (GBL), which makes deceptive acts and practices unlawful. As a direct and proximate result of Defendant's violation of GBL § 349 as described above, Plaintiff and the other members of the New York Sub-Class have suffered damages in an amount to be determined at trial.

110.    Therefore, Plaintiff prays for relief as set forth below.

## EIGHTH CAUSE OF ACTION

### (Breach of Express Warranties under New York Common Law)

### (New York Sub-Class Only)

111.    Plaintiff realleges and incorporates the above paragraphs of this Class Action Complaint as if set forth herein.

112.    Defendant provided Plaintiff and other members of the New York Sub-Class with written express warranties, including, but not limited to, warranties that its Products were "All Natural Since 1971" and/or "100% natural," as set forth above.

113.    Defendant breached these warranties by providing Products that contained synthetic ingredients and unnatural GMO corn and did not otherwise conform to Defendant's warranties.

114.    This breach resulted in damages to Plaintiff and the other members of the New York Sub-Class who bought Defendant's Products but did not receive the goods as warranted in that the Products were not natural because they contained GMOs and other unnatural ingredients.

115.   As a proximate result of Defendant's breach of warranties, Plaintiff and the other New York Sub-Class members have suffered damages in an amount to be determined by the Court and/or jury in that, among other things, they purchased and paid for Products that did not conform to what was promised as promoted, marketed, advertised, packaged, and labeled by Defendant and they were deprived of the benefit of their bargain and spent money on Products that did not have any value or had less value than warranted or Products that they would not have purchased and used had they known the true facts about them.

116.   Therefore, Plaintiff prays for relief as set forth below.

## NINTH CAUSE OF ACTION

### (Breach of Implied Warranty of Merchantability under New York Common Law)

### (New York Sub-Class Only)

117.   Plaintiff realleges and incorporates the above paragraphs of this Class Action Complaint as if set forth herein.

118.   Plaintiff and the other New York Sub-Class members purchased Defendant's Products, which were promoted, marketed, advertised, packaged, and labeled as "All Natural Since 1971" and/or "100% natural." Pursuant to these sales, Defendant impliedly warranted that its Products would be merchantable and fit for the ordinary purposes for which such goods are used and would conform to the promises or affirmations of fact made in the Products' promotions, marketing, advertising, packaging, and labels.  In doing so, Plaintiff and the other New York Sub-Class members relied on Defendant's representations that the Products had particular characteristics, as set forth above, and, at or about that time, Defendant sold the Products to Plaintiff and the other New York Sub-Class members.  By its representations regarding the reputable nature of the company and its products and by its promotion, marketing,

advertising, packaging, and labeling of the Products, Defendant warranted that the Products were "All Natural Since 1971" and/or "100% natural" and had particular characteristics, as set forth above. Plaintiff and the other New York Sub-Class members bought the Products relying on Defendant's representations that its Products were "All Natural Since 1971" and/or "100% natural" when, in fact and unbeknownst to Plaintiff and the other New York Sub-Class members, the corn in the Products was not all natural because it contained GMO corn, and the Products contained other synthetic ingredients.

119.    Defendant breached the warranty implied at the time of sale in that Plaintiff and the other New York Sub-Class members did not receive goods that were "All Natural Since 1971" and "100% natural" as represented and, thus, the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, advertised, packaged, labeled, or sold.

120.    As a proximate result of this breach of warranty by Defendant, Plaintiff and the other New York Sub-Class members have suffered damages in an amount to be determined by the Court and/or jury in that, among other things, they purchased and paid for Products that did not conform to what was promised as promoted, marketed, advertised, packaged, and labeled by Defendant and they were deprived of the benefit of their bargain and spent money on Products that did not have any value or had less value than warranted or Products they would not have purchased and used had they known the true facts about them.

121.    Therefore, Plaintiff prays for relief as set forth below.

## TENTH CAUSE OF ACTION

### (Breach of Implied Warrant of Fitness for Particular Purpose

### under New York Common Law)

### (New York Sub-Class Only)

122.   Plaintiff realleges and incorporates the above paragraphs of this Class Action Complaint as if set forth herein.

123.   Plaintiff and the other New York Sub-Class members purchased Defendant's Products, which were promoted, marketed, advertised, packaged, and labeled as "All Natural Since 1971" and/or "100% natural."  Pursuant to these sales and by Defendant's promotion, marketing, advertising, packaging, and labeling, Defendant impliedly warranted that its Products were "All Natural Since 1971" and/or "100% natural."  Plaintiff and the other New York Sub-Class members bought the Products from Defendant relying on Defendant's skill and judgment in furnishing suitable goods as well as its representation that its Products were "All Natural Since 1971" and/or "100% natural."  However, Defendant's Products were not "All Natural Since 1971" or "100% natural" in that they contained *un*natural GMO corn and other synthetic ingredients.

124.   Defendant breached the warranty implied at the time of sale in that Plaintiff and the other New York Sub-Class members did not receive Products that were "All Natural Since 1971" and/or "100% natural" as represented, and, thus, the goods were not fit for the purpose as promoted, marketed, advertised, packaged, labeled, or sold.

125.   As a result of this breach of warrant by Defendant, Plaintiff and the other New York Sub-Class members have suffered damages in an amount to be determined by the Court and/or jury in that, among other things, they purchased and paid for Products that did not

conform to what was promised as promoted, marketed, advertised, packaged, and labeled by Defendant and they were deprived of the benefit of their bargain and spent money on Products that did not have any value or had less value than warranted or Products they would not have purchased and used had they known the true facts about them.

126.     Therefore, Plaintiff prays for relief as set forth below.

## ELEVENTH CAUSE OF ACTION

### (Fraud, Deceit, and/or Misrepresentation under New York Common Law)

### (New York Sub-Class Only)

127.     Plaintiff realleges and incorporates the above paragraphs of this Class Action Complaint as if set forth herein.

128.     Defendant, through its promotion, marketing, advertising, packaging, and labeling of the Products, makes uniform representations and offers regarding the quality of the Products, as described above.   Defendant engaged in, and continues to engage in, such fraudulent, misrepresentative, false, and/or deceptive acts with full knowledge that such acts were, and are, in fact, misrepresentative, false, or deceptive.

129.     The aforementioned misrepresentations, deceptive, and/or false acts and omissions concern material facts that are essential to the analysis undertaken by Plaintiff and the other New York Sub-Class members in deciding whether to purchase Defendant's Products.

130.     Plaintiff and the other New York Sub-Class members would have acted differently had they not been misled – *i.e.*, they would not have paid a premium price for the Products and/or they would not have purchased the Products had they known the truth about the unnatural ingredients in the Products.

131.     Defendant has a duty to correct the misinformation it disseminates through its

advertising of the Products. By not informing Plaintiff and the other New York Sub-Class members, Defendant breached this duty. Defendant also gained financially from, and as a result of, this breach. Moreover, Defendant has a duty to disclose the omitted facts because Defendant was in possession of knowledge about the identity, formulation, and production of the Products and of their ingredients, and this information is not reasonably available to consumers.

132. By and through such deceit, misrepresentations, and/or omissions, Defendant intended to induce Plaintiff and the other New York Sub-Class members to alter their position to their detriment.

133. Plaintiff and the other New York Sub-Class members justifiably and reasonably relied on Defendant's misrepresentations and, as a result, were damaged by Defendant.

134. As a direct and proximate result of Defendant's deceit and/or misrepresentations, Plaintiff and the other New York Sub-Class members have suffered damages in an amount equal to the amount they paid or the premium they paid for Defendant's Products. The exact amount will be proven at trial.

135. Defendant acted with intent to defraud, or with reckless or negligent disregard of the rights of, Plaintiff and the other New York Sub-Class members.

136. Plaintiff and the other New York Sub-Class members are entitled to punitive damages due to Defendant's willful fraud and deceit.

137. Therefore, Plaintiff prays for relief as set forth below.

## TWELFTH CAUSE OF ACTION

### (Unjust Enrichment under New York Common Law)

### (New York Sub-Class Only)

138. Plaintiff realleges and incorporates the above paragraphs of this Class Action

Complaint as if set forth herein.

139. As a result of Defendant's deceptive, fraudulent, and misleading labeling, advertising, marketing, and sales of the Products, Defendant was enriched, at the expense of Plaintiff and the other New York Sub-Class members through the payment of the purchase price for Defendant's Products.

140. Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits that it received from Plaintiff and the other New York Sub-Class members in light of the fact that the Products purchased by Plaintiff and the other New York Sub-Class members were not what Defendant purported them to be. Thus, it would be unjust or inequitable for Defendant to retain the benefit without restitution to Plaintiff and the other New York Sub-Class members for the monies paid to Defendant for such Products.

141. Therefore, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

THEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment against Defendant as follows:

A.     For an Order certifying the Class under Rule 23, naming Plaintiff Erin Silber as Class representative and designating her counsel as counsel for the Class;

B.     For an Order declaring that Defendant has committed the violations alleged herein;

C.     For declaratory and injunctive relief pursuant to, without limitation, chapter 93A, section 2 of the Massachusetts General Laws; or, in the alternative, for declaratory and injunctive relief pursuant to, without limitation, section 349 of the New York General Business Law;

D.     For an Order providing restitution, disgorgement, and all other forms of equitable monetary relief to Plaintiff and the other Class members;

E.     For an Order awarding compensatory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

F.     For an Order awarding prejudgment interest on all amounts awarded;

G.     For an Order awarding Plaintiff and the other Class members their reasonable attorneys' fees and expenses and costs of suit; and

H.     For such further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 5, 2012      By:     **REESE RICHMAN LLP**

*[signature]*

Kim E. Richman
Michael R. Reese
875 Avenue of the Americas, 18th Floor
New York, New York 10001
Telephone:    (212) 643-0500
Facsimile:     (212) 253-4272
Email:         krichman@reeserichman.com
                  mreese@reeserichman.com

**THE GOLAN FIRM**
Yvette Golan
1919 Decatur St.
Houston, Texas 77007
Telephone:    (866) 298-4150, ext. 101
Facsimile:     (928) 441-8250
Email:         ygolan@tgfirm.com

*Counsel for Plaintiff and the Proposed Class*

*Silber v. Barbara's Bakery*                                        Ex. 1-1

Barbara's Bakery Website, home page, as of October 26, 2012
http://www.barbarasbakery.com





Case 2:12-cv-09331-KES-SC Document 1 Filed 11/09/12 Page 41 of 58 PageID #: 41

*Silber v. Barbara's Bakery*                                    Ex. 1-2

**Barbara's Bakery Website, home page, as of October 26, 2012**
**http://www.barbarasbakery.com**





Case 1:12-cv-02664-CRB Document 44-20 Filed 04/26/13 Page 35 PageID #: 706

*Silber v. Barbara's Bakery*                                                    Ex. 1-3

**Barbara's Bakery Logo**



Case 1:12-cv-02664-CRB Document 41-20 Filed 01/26/18 Page 476 of 552 PageID #: 707

*Silber v. Barbara's Bakery*          Ex. 2-1

**Front-label of all Barbara's Bakery cereals**



*Silber v. Barbara's Bakery*
**Back label Puffins Original**

Ex. 2-2



All Natural Since 1971
**BARBARA'S®**
*Petaluma, California*

# Tasty Goodness for the Whole Family!

Wake up to a "YUM"-inspiring Puffins crunch! Rich in fiber and remarkable natural flavor, a bowlful will boost your energy and bring on the smiles. With just 90 calories and 5 grams of sugar, Puffins are a low fat start to your day. We use only the finest natural ingredients — always free of artificial preservatives or additives — because that's Barbara's way.

*Puffins*
ORIGINAL

Toasted, lightly sweetened crunchy perfection!

*healthy living, naturally*

Make a Puffins breakfast or snack part of saying "yes" to your healthy, active lifestyle. Good health habits are built with dedicated repetition, day after day...and bowl by bowl. Let Barbara's delicious natural foods help you create the healthy lifestyle you deserve.

### BARBARA'S &
# Project Puffin

Giving back to the community is a commitment Barbara's made decades ago. When we created Puffins cereals, we were inspired to collaborate with Project Puffin and help world-renowned ornithologist Dr. Stephen Kress carry out an innovative seabird habitat restoration project off the coast of Maine. Puffins are one of nature's most amazing seabirds: they fly under water and live nine months at sea, returning to land only to raise their pufflings. Maine's decimated puffin population has thrived with Dr. Kress' unique vision, passion, and belief in the positive impact of human stewardship. You can get involved by visiting **BarbarasBakery.com** or **ProjectPuffin.org.**



**Honest goodness.**
**Give our other all natural**
**products a try.**

*All Natural Since 1971*

Case 1:12-cv-06511-VEK-02664-CRB Document 1-204716/04/2612 4Page552Page 19 # 709



# The Best Things in Life are Natural.

Morning at Barbara's finds us in the kitchen with big red bowls, munching on crunchy Peanut Butter Puffins. Each mouthful is a burst of real peanut butter and the best whole grain oats and corn. We happen to think our cereal is one incredibly delicious combo of great taste and natural nutrition. Plus, it's low in fat and always free of artificial flavors, preservatives, and additives – because that's Barbara's way.



## Puffins
### PEANUT BUTTER CEREAL

*Real peanuts make a melt-in-your-mouth, sweet and savory bite.*

### MEET BABS
#### One of our adopted Puffins

Babs is a 34-year-old female puffin who came to Eastern Egg Rock, Maine on July 11, 1977 with 98 other puffin chicks. Dr. Stephen Kress and Project Puffin transplanted her from Great Island, Newfoundland to help repopulate the tiny island and restore it to its former nesting colony. The original colony was nearly decimated by humans in the late 1800's. Babs has been returning to Eastern Egg Rock year after year for 34 years and has hatched a total of 21 chicks. Talk about a finely feathered success story!

When we adopt a puffin, we help keep the colony growing. You can get involved, too. Learn more at BarbarasBakery.com or ProjectPuffin.org.

*healthy living, naturally*

People, like puffin birds, are creatures of habit. Healthy human habits can be as simple as a walk with the dog or as intense as a rigorous hike. The challenge is to make a plan and stick with it. Keep the healthy habits that serve you (like Puffins for breakfast) and think about tossing those that don't.





**Honest goodness.**
**Give our other all-natural**
**products a try.**

### All Natural Since 1971

Silber v. Barbara's Bakery

**Back label of Puffins Multigrain**

Ex. 2-4



*Silber v. Barbara's Bakery*
**Back label of Puffins Honey Rice**

Ex. 2-5





*Silber v. Barbara's Bakery*
**Back label of Puffins Cinnamon**

Ex. 2-7



# Make Friends with All Natural Goodness.

Here at Barbara's we think a breakfast of wholesome grains is like that invigorating feeling you get after taking a deep breath of fresh air. That's why our high fiber Cinnamon Puffins are absolute sweetness with only 6 grams of sugar and just 90 calories per serving. There are never any artificial preservatives or additives in our cereals because that's Barbara's way.

*Puffins*
CINNAMON

*Wake up to comforting sweetness and a toasty crunch.*

*healthy living, naturally*

People, like puffin birds, are simply creatures of habit. Take the breakfast challenge: review your habits and make a commitment to toss out a not-so-healthy habit – just for today. Then, challenge yourself to do it again tomorrow. Good habits are built day by day...and bowl by bowl!

## Puffin Trivia
### Fun Facts About Our Favorite Seabird

- Puffins can live up to 20 years or more. The oldest known puffin lived to be 36.
- Female puffins lay only one egg per year and usually keep the same mate every season.
- Puffins can fly up to 55 miles per hour.
- When diving for food, a puffin can carry up to 20 fish in its beak.
- Puffins are usually 10 inches tall - the height of a quart of milk.
- The majority of a Puffin's life is spent in the open ocean.





**Honest goodness.**
**Give our other all natural products a try.**

*All Natural Since 1971*

*Silber v. Barbara's Bakery*
**Side labels**

Ex. 2-8



# Puffins GRAIN

**MULTIGRAIN**

## DIETARY FEATURES

Gluten Free

8g Whole Grains per
Serving is 16% of your
Daily Whole Grain Needs

High in Calcium

Good Source of Fiber

Only 6g Sugar per Serving

Excellent Source of
Vitamin C, D & Iron

Naturally Fat Free

0g Trans Fat per Serving

Low Sodium

No Artificial Flavors,
Additives or Preservatives

Vegetarian

Kosher Ⓤ

### *giving back*
Our role in the community is
important to us - that's why we
created Barbara's for a Brighter
Future. For nearly 20 years we
have made it part of our culture
to give back through programs
that support our values. Our
work with Project Puffin has
helped to restore puffins to their
historic nesting ground off the
coast of Maine. To learn more,
visit BarbarasBakery.com or
ProjectPuffin.org

*We print this packaging on
environmentally friendly post
consumer cardboard stock.
See the bottom of this box for
more details.*

 

**BarbarasBakery.com**

---



## BARBARA'S

# Puffins CEREAL

**CINNAMON**

## DIETARY FEATURES

24% of your Daily
Fiber Needs

Only 90 Calories
per Serving

Only 6g Sugar
per Serving

Excellent Source of
Antioxidant Vitamin C

Low Fat

0g Trans Fat per Serving

No Artificial Flavors,
Additives or Preservatives

Naturally Cholesterol Free

Vegetarian

Kosher Ⓤ

### *giving back*
Our role in the community is
important to us - that's why we
created Barbara's for a Brighter
Future. For nearly 20 years we
have made it part of our culture
to give back through programs
that support our values. Our
work with Project Puffin has
helped to restore puffins to their
historic nesting ground off the
coast of Maine. To learn more,
visit BarbarasBakery.com or
ProjectPuffin.org

*We print this packaging on
environmentally friendly post
consumer cardboard stock.
See the bottom of this box for
more details.*



**BarbarasBakery.com**

---



## BARBARA'S

# Puffins CEREAL

**PEANUT BUTTER & CHOCOLATE**
NATURALLY FLAVORED

## DIETARY FEATURES

Low Fat

Good Source of Fiber

Only 6g of Sugar per
Serving

Good Source of Calcium,
Iron & Vitamin D

No Artificial Flavors,
Additives or
Preservatives

0g Trans Fat per Serving

Vegetarian

### *giving back*
Our role in the community is
important to us - that's why we
created Barbara's for a Brighter
Future. For nearly 20 years we
have made it part of our culture
to give back through programs
that support our values. Our
work with Project Puffin has
helped to restore puffins to their
historic nesting ground off the
coast of Maine. To learn more
visit BarbarasBakery.com or
ProjectPuffin.org

*We print this packaging on
environmentally friendly post
consumer cardboard stock.
See the bottom of this box for
more details.*



**BarbarasBakery.com**

*Silber v. Barbara's Bakery*
**Side labels**

Ex. 2-9



**Puffins**

HONEY RICE

**DIETARY FEATURES**

Gluten Free

Made with Whole
Grain Brown Rice

22g Whole Grains per
Serving is 45% of your
Daily Whole Grain Needs

Good Source of Calcium

Good Source of Fiber

Only 6g Sugar per Serving

Low Fat & Low Sodium

0g Trans Fat per Serving

No Artificial Flavors,
Additives or Preservatives

Naturally Cholesterol Free

Vegetarian

Kosher Ⓤ

*giving back*

Our role in the community is
important to us - that's why we
created Barbara's for a Brighter
Future. For nearly 30 years we
have made it part of our culture
to give back through programs
that support our values. Our
work with Project Puffin has
helped to restore puffins to their
historic nesting ground off the
coast of Maine. To learn more,
visit BarbarasBakery.com or
ProjectPuffin.org.

*We print this packaging on
environmentally friendly post
consumer cardboard stock.
See the bottom of this box for
more details.*

 

BarbarasBakery.com



**BARBARA'S**

**Puffins**

PEANUT BUTTER

**DIETARY FEATURES**

Low Fat

Only 6g Sugar per Serving

No Artificial Flavors,
Additives or Preservatives

0g Trans Fat per Serving

Naturally Cholesterol Free

Vegan

Kosher Ⓤ

*giving back*

Our role in the community is
important to us - that's why we
created Barbara's for a Brighter
Future. For nearly 30 years we
have made it part of our culture
to give back through programs
that support our values. Our
work with Project Puffin has
helped to restore puffins to their
historic nesting ground off the
coast of Maine. To learn more,
visit BarbarasBakery.com or
ProjectPuffin.org.

*We print this packaging on
environmentally friendly post
consumer cardboard stock.
See the bottom of this box for
more details.*



BarbarasBakery.com



**BARBARA'S**

**Puffins**

ORIGINAL

**DIETARY FEATURES**

20% of your Daily
Fiber Needs

Excellent Source of
Antioxidant Vitamin C

Only 5g Sugar

Low Fat

Only 90 Calories
per Serving

Naturally Cholesterol Free

0g Trans Fat per Serving

No Artificial Flavors,
Additives or Preservatives

Vegetarian

Kosher Ⓤ

*giving back*

Our role in the community is
important to us - that's why we
created Barbara's for a Brighter
Future. For nearly 30 years we
have made it part of our culture
to give back through programs
that support our values. Our
work with Project Puffin has
helped to restore puffins to their
historic nesting ground off the
coast of Maine. To learn more,
visit BarbarasBakery.com or
ProjectPuffin.org.

*We print this packaging on
environmentally friendly post
consumer cardboard stock.
See the bottom of this box for
more details.*



BarbarasBakery.com

*Silber v. Barbara's Bakery*
Ingredient labels

Ex. 2-10



## Puffins
### PEANUT BUTTER & CHOCOLATE
*All Natural Since 1971*

**Nutrition Facts**
Serving Size 3/4 Cup (30g)
Servings Per Container About 10

| Amount Per Serving | Cereal | With 1/2 Cup Vit. A & D Fortified Skim Milk |
|---|---|---|
| Calories | 110 | 150 |
| Calories from Fat | 10 | 10 |

| | % Daily Value** | |
|---|---|---|
| **Total Fat** 1g* | 2% | 2% |
| Saturated Fat 0g | 0% | 0% |
| Trans Fat 0g | | |
| **Cholesterol** 0mg | 0% | 2% |
| **Sodium** 105mg | 4% | 6% |
| **Potassium** 70mg | 2% | 8% |
| **Total Carbohydrate** 24g | 8% | 10% |
| Dietary Fiber 3g | 12% | 12% |
| Soluble Fiber 1g | | |
| Insoluble Fiber 2g | | |
| Sugars 6g | | |
| **Protein** 2g | | |

| | | |
|---|---|---|
| Vitamin A | 0% | 6% |
| Vitamin C | 0% | 0% |
| Calcium | 20% | 35% |
| Iron | 15% | 15% |
| Vitamin D | 20% | 30% |

*Amount in cereal. ¾ cup Vitamin A & D Fortified Skim Milk contributes an additional 40 Calories, 5mg Cholesterol, 50mg Sodium, 210mg Potassium, 6g Total Carbohydrate (6g Sugars), 4g Protein.

**Percent daily values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs.

| | Calories: | 2,000 | 2,500 |
|---|---|---|---|
| Total Fat | Less Than | 65g | 80g |
| Sat Fat | Less Than | 20g | 25g |
| Cholesterol | Less Than | 300mg | 300mg |
| Sodium | Less Than | 2,400mg | 2,400mg |
| Potassium | | 3,500mg | 3,500mg |
| Total Carbohydrate | | 300g | 375g |
| Dietary Fiber | | 25g | 30g |

Calories per gram:
Fat 9 • Carbohydrate 4 • Protein 4

**Ingredients:** Corn Meal, Dehydrated Cane Juice, Brown Rice Flour, Whole Oat Flour, Fructan (Nutra Flora® Natural Dietary Fiber), Natural Peanut Butter (Ground Peanuts, Salt), Cocoa Powder, Oat Hull Fiber, Calcium Carbonate, Rice Flour, Baking Soda, Expeller Pressed High Oleic Oil (Canola And/or Sunflower), Natural Chocolate Flavor With Other Natural Flavors, Sea Salt, Caramel Color, Iron (Ferric Orthophosphate), Annatto (For Color), Vitamin D3, Vitamin E (Mixed Tocopherols to Maintain Freshness).

Contains peanuts. Manufactured in a facility that also processes milk, soy, hazelnuts, almonds, coconut, and wheat.

Manufactured for Barbara's Bakery, Inc.®
Petaluma CA 94954
Visit Us Online at BarbarasBakery.com
Product of U.S.A.
©2011 Barbara's Bakery, Inc.®

---

## Puffins
### CINNAMON
*All Natural Since 1971*

**Nutrition Facts**
Serving Size 2/3 Cup (30g)
Servings Per Container About 9

| Amount Per Serving | Cereal | With 1/2 Cup Vit. A & D Fortified Skim Milk |
|---|---|---|
| Calories | 90 | 130 |
| Calories from Fat | 10 | 10 |

| | % Daily Value** | |
|---|---|---|
| **Total Fat** 1g* | 2% | 2% |
| Saturated Fat 0g | 0% | 0% |
| Trans Fat 0g | | |
| **Cholesterol** 0mg | 0% | 2% |
| **Sodium** 150mg | 6% | 8% |
| **Potassium** 45mg | 1% | 7% |
| **Total Carbohydrate** 26g | 9% | 11% |
| Dietary Fiber 6g | 24% | 24% |
| Sugars 6g | | |
| **Protein** 2g | | |

| | | |
|---|---|---|
| Vitamin A | 0% | 6% |
| Vitamin C | 20% | 20% |
| Calcium | 2% | 15% |
| Iron | 4% | 4% |

*Amount in cereal. ½ cup Vitamin A & D Fortified Skim Milk contributes an additional 40 Calories, 5mg Cholesterol, 50mg Sodium, 210mg Potassium, 6g Total Carbohydrate (6g Sugars), 4g Protein.

**Percent daily values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs.

| | Calories: | 2,000 | 2,500 |
|---|---|---|---|
| Total Fat | Less Than | 65g | 80g |
| Sat Fat | Less Than | 20g | 25g |
| Cholesterol | Less Than | 300mg | 300mg |
| Sodium | Less Than | 2,400mg | 2,400mg |
| Potassium | | 3,500mg | 3,500mg |
| Total Carbohydrate | | 300g | 375g |
| Dietary Fiber | | 25g | 30g |

Calories per gram:
Fat 9 • Carbohydrate 4 • Protein 4

**Ingredients:** Yellow Corn Meal With Added Corn Bran, Unsulphured Molasses, Whole Oat Flour, Expeller Pressed High Oleic Oil (Canola and/or Sunflower), Salt, Cinnamon, Natural Flavor, Baking Soda, Vitamin C (Ascorbic Acid), Natural Vitamin E (Mixed Tocopherols to Maintain Freshness).

Manufactured in a facility that also processes milk, soy, hazelnuts, almonds, coconut, and wheat.

Manufactured for Barbara's Bakery, Inc.®
Petaluma CA 94954
Visit Us Online at BarbarasBakery.com
Product of Canada.
©2011 Barbara's Bakery, Inc.®

---

## Puffins
### MULTIGRAIN
*All Natural Since 1971*

**Nutrition Facts**
Serving Size 3/4 Cup (30g)
Servings Per Container About 9

| Amount Per Serving | Cereal | With 1/2 Cup Vit. A & D Fortified Skim Milk |
|---|---|---|
| Calories | 110 | 150 |
| Calories from Fat | 0 | 0 |

| | % Daily Value** | |
|---|---|---|
| **Total Fat** 0g* | 0% | 0% |
| Saturated Fat 0g | 0% | 0% |
| Trans Fat 0g | | |
| **Cholesterol** 0mg | 0% | 2% |
| **Sodium** 80mg | 3% | 5% |
| **Potassium** 65mg | 2% | 8% |
| **Total Carbohydrate** 25g | 8% | 10% |
| Dietary Fiber 3g | 12% | 12% |
| Soluble Fiber 1g | | |
| Insoluble Fiber 2g | | |
| Sugars 6g | | |
| **Protein** 2g | | |

| | | |
|---|---|---|
| Vitamin A | 0% | 6% |
| Vitamin C | 25% | 25% |
| Calcium | 25% | 35% |
| Iron | 25% | 25% |
| Vitamin D | 25% | 35% |

*Amount in cereal. ½ cup Vitamin A & D Fortified Skim Milk contributes an additional 40 Calories, 5mg Cholesterol, 50mg Sodium, 210mg Potassium, 6g Total Carbohydrate (6g Sugars), 4g Protein.

**Percent daily values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs.

| | Calories: | 2,000 | 2,500 |
|---|---|---|---|
| Total Fat | Less Than | 65g | 80g |
| Sat Fat | Less Than | 20g | 25g |
| Cholesterol | Less Than | 300mg | 300mg |
| Sodium | Less Than | 2,400mg | 2,400mg |
| Potassium | | 3,500mg | 3,500mg |
| Total Carbohydrate | | 300g | 375g |
| Dietary Fiber | | 25g | 30g |

Calories per gram:
Fat 9 • Carbohydrate 4 • Protein 4

**Ingredients:** Corn Flour, Dehydrated Cane Juice, Whole Grain Brown Rice Flour, Whole Grain Pure Oat Flour, Fructan (NutraFlora® Natural Dietary Fiber), Oat Hull Fiber, Calcium Carbonate, Baking Soda, Natural Flavor, Caramel Color, Sea Salt, Annatto, Vitamin C (Ascorbic Acid), Iron (Ferric Orthophosphate), Vitamin D3, Natural Vitamin E (Mixed Tocopherols to Maintain Freshness).

Manufactured in a facility that also processes milk, soy, hazelnuts, almonds, coconut, and wheat. Verified to contain less than 20 ppm gluten.

Manufactured for Barbara's Bakery, Inc.®
Petaluma CA 94954
Visit Us Online at BarbarasBakery.com
Product of Canada.
©2011 Barbara's Bakery, Inc.®

**Silber v. Barbara's Bakery**
**Ingredient labels**

Ex. 2-11



## Puffins ORIGINAL — All Natural Since 1971

**Nutrition Facts**
Serving Size 3/4 Cup (30g)
Servings Per Container About 9

| Amount Per Serving | Cereal | With 1/2 Cup Vit. A & D Fortified Skim Milk |
|---|---|---|
| Calories | 90 | 130 |
| Calories from Fat | 5 | 5 |

| | % Daily Value** | |
|---|---|---|
| Total Fat 1g* | 2% | 2% |
| Saturated Fat 0g | 0% | 0% |
| Trans Fat 0g | | |
| Cholesterol 0mg | 0% | 2% |
| Sodium 190mg | 8% | 10% |
| Potassium 85mg | 2% | 8% |
| Total Carbohydrate 23g | 8% | 10% |
| Dietary Fiber 5g | 20% | 20% |
| Sugars 4g | | |
| Protein 2g | | |
| Vitamin A | 0% | 6% |
| Vitamin C | 25% | 25% |
| Calcium | 0% | 15% |
| Iron | 2% | 2% |

* Amount in cereal. ½ cup Vitamin A & D Fortified Skim Milk contributes an additional 40 Calories, 5mg Cholesterol, 50mg Sodium, 210mg Potassium, 6g Total Carbohydrate (6g Sugars), 4g Protein.

** Percent daily values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs:

| | Calories: | 2,000 | 2,500 |
|---|---|---|---|
| Total Fat | Less Than | 65g | 80g |
| Sat Fat | Less Than | 20g | 25g |
| Cholesterol | Less Than | 300mg | 300mg |
| Sodium | Less Than | 2,400mg | 2,400mg |
| Potassium | | 3,500mg | 3,500mg |
| Total Carbohydrate | | 300g | 375g |
| Dietary Fiber | | 25g | 30g |

Calories per gram:
Fat 9 • Carbohydrate 4 • Protein 4

**Ingredients:** Yellow Corn Flour, Corn Bran Flour, Unsulphured Molasses, Whole Oat Flour, Expeller Pressed High Oleic Oil (Canola and/or Sunflower), Salt, Baking Soda, Vitamin C (Ascorbic Acid), Natural Vitamin E (Mixed Tocopherols to Maintain Freshness).

*Manufactured in a facility that also processes milk, soy, hazelnuts, almonds, coconut, and wheat.*

Manufactured for Barbara's Bakery, Inc.®
Petaluma CA 94954
Visit Us Online at BarbarasBakery.com
Product of Canada.
©2011 Barbara's Bakery, Inc.®

## Puffins PEANUT BUTTER — All Natural Since 1971

**Nutrition Facts**
Serving Size 3/4 Cup (30g)
Servings Per Container About 10

| Amount Per Serving | Cereal | With 1/2 Cup Vit. A & D Fortified Skim Milk |
|---|---|---|
| Calories | 110 | 150 |
| Calories from Fat | 20 | 20 |

| | % Daily Value** | |
|---|---|---|
| Total Fat 2g* | 3% | 3% |
| Saturated Fat 0.5g | 3% | 3% |
| Trans Fat 0g | | |
| Cholesterol 0mg | 0% | 2% |
| Sodium 230mg | 10% | 12% |
| Potassium 105mg | 3% | 9% |
| Total Carbohydrate 23g | 8% | 10% |
| Dietary Fiber 2g | 8% | 8% |
| Sugars 6g | | |
| Protein 3g | | |
| Vitamin A | 2% | 6% |
| Vitamin C | 0% | 0% |
| Calcium | 2% | 15% |
| Iron | 4% | 4% |

* Amount in cereal. ½ cup Vitamin A & D Fortified Skim Milk contributes an additional 40 Calories, 5mg Cholesterol, 50mg Sodium, 210mg Potassium, 6g Total Carbohydrate (6g Sugars), 4g Protein.

** Percent daily values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs:

| | Calories: | 2,000 | 2,500 |
|---|---|---|---|
| Total Fat | Less Than | 65g | 80g |
| Sat Fat | Less Than | 20g | 25g |
| Cholesterol | Less Than | 300mg | 300mg |
| Sodium | Less Than | 2,400mg | 2,400mg |
| Potassium | | 3,500mg | 3,500mg |
| Total Carbohydrate | | 300g | 375g |
| Dietary Fiber | | 25g | 30g |

Calories per gram:
Fat 9 • Carbohydrate 4 • Protein 4

**Ingredients:** Corn Meal, Dehydrated Cane Juice, Natural Peanut Butter (Ground Peanuts, Salt), Whole Oat Flour, Rice Flour, Sea Salt, Natural Vitamin E (Mixed Tocopherols to Maintain Freshness), Baking Soda.

*Contains peanuts. Manufactured in a facility that also processes milk, soy, hazelnuts, almonds, coconut, and wheat.*

Manufactured for Barbara's Bakery, Inc.®
Petaluma CA 94954
Visit Us Online at BarbarasBakery.com
Product of U.S.A.
©2011 Barbara's Bakery, Inc.®

## Puffins HONEY RICE — All Natural Since 1971

**Nutrition Facts**
Serving Size 3/4 Cup (30g)
Servings Per Container About 9

| Amount Per Serving | Cereal | With 1/2 Cup Vit. A & D Fortified Skim Milk |
|---|---|---|
| Calories | 120 | 160 |
| Calories from Fat | 5 | 5 |

| | % Daily Value** | |
|---|---|---|
| Total Fat 1g* | 2% | 2% |
| Saturated Fat 0g | 0% | 0% |
| Trans Fat 0g | | |
| Cholesterol 0mg | 0% | 2% |
| Sodium 80mg | 3% | 5% |
| Potassium 65mg | 2% | 8% |
| Total Carbohydrate 25g | 8% | 10% |
| Dietary Fiber 3g | 12% | 12% |
| Soluble Fiber 2g | | |
| Insoluble Fiber 1g | | |
| Sugars 6g | | |
| Protein 2g | | |
| Vitamin A | 0% | 6% |
| Vitamin C | 0% | 0% |
| Calcium | 10% | 25% |
| Iron | 4% | 4% |
| Zinc | 4% | 6% |

* Amount in cereal. ½ cup Vitamin A & D Fortified Skim Milk contributes an additional 40 Calories, 5mg Cholesterol, 50mg Sodium, 210mg Potassium, 6g Total Carbohydrate (6g Sugars), 4g Protein.

** Percent daily values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs:

| | Calories: | 2,000 | 2,500 |
|---|---|---|---|
| Total Fat | Less Than | 65g | 80g |
| Sat Fat | Less Than | 20g | 25g |
| Cholesterol | Less Than | 300mg | 300mg |
| Sodium | Less Than | 2,400mg | 2,400mg |
| Potassium | | 3,500mg | 3,500mg |
| Total Carbohydrate | | 300g | 375g |
| Dietary Fiber | | 25g | 30g |

Calories per gram:
Fat 9 • Carbohydrate 4 • Protein 4

**Ingredients:** Whole Grain Brown Rice Flour, Dehydrated Cane Juice, Fructan (NutraFlora® Natural Dietary Fiber), Expeller Pressed High Oleic Oil (Canola and/or Sunflower), Honey, Calcium Carbonate, Salt, Natural Flavor, Natural Vitamin E (Mixed Tocopherols to Maintain Freshness).

*Manufactured in a facility that also processes milk, soy, hazelnuts, almonds, coconut, and wheat. Verified to contain less than 20 ppm gluten.*

Manufactured for Barbara's Bakery, Inc.®
Petaluma CA 94954
Visit Us Online at BarbarasBakery.com
Product of Canada.
©2011 Barbara's Bakery, Inc.®

## Puffin Puffs, Fruit Medley

3/4 cup (30g)

Amount Per Serving
Calories 120    Calories from Fat 10

|  | % Daily Value* |
|---|---|
| Total Fat 1g* | 2% |
| Saturated Fat 0g | 0% |
| Trans Fat 0g | |
| Cholesterol 0mg | 0% |
| Sodium 80mg | 3% |
| Potassium 70mg | 2% |
| Total Carbohydrate 26g | 9% |
| Dietary Fiber <1g | 12% |
| Sugars 7g | |
| Protein 2g | |

| Vitamin A | 20% | Vitamin C | 20% |
|---|---|---|---|
| Calcium | 0% | Iron | 2% |

*Percent Daily Values are based on a 2,000 Calorie Diet.

INGREDIENTS: CORN FLOUR, DEHYDRATED CANE JUICE, CORN MEAL, BLUE CORN MEAL, WHOLE OAT FLOUR, FRUCTAN (NUTRAFLORA® NATURAL DIETARY FIBER), OAT HULL FIBER, EXPELLER PRESSED HIGH OLEIC OIL (CANOLA AND/OR SUNFLOWER), SALT, NATURAL FLAVOR, CITRIC ACID, ANNATTO, VITAMIN C (ASCORBIC ACID), VITAMIN A (VITAMIN A PALMITATE).

*MANUFACTURED IN A FACILITY THAT ALSO PROCESSES MILK, HAZELNUTS, COCONUT AND WHEAT. *AMOUNT IN CEREAL.*

## Puffins Original

3/4 cup (27g)

Amount Per Serving
Calories 90    Calories from Fat 5

|  | % Daily Value* |
|---|---|
| Total Fat 1g* | 2% |
| Saturated Fat 0g | 0% |
| Trans Fat 0g | |
| Cholesterol 0mg | 0% |
| Sodium 190mg | 8% |
| Potassium 85mg | 2% |
| Total Carbohydrate 23g | 8% |
| Dietary Fiber 5g | 20% |
| Sugars 5g | |
| Protein 2g | |

| Vitamin A | 0% | Vitamin C | 25% |
|---|---|---|---|
| Calcium | 0% | Iron | 2% |

*Percent Daily Values are based on a 2,000 Calorie Diet.

INGREDIENTS: YELLOW CORN FLOUR, CORN BRAN FLOUR, UNSULPHURED MOLASSES, WHOLE OAT FLOUR, EXPELLER PRESSED HIGH OLEIC OIL (CANOLA AND/OR SUNFLOWER), SALT, BAKING SODA, VITAMIN C (ASCORBIC ACID), NATURAL VITAMIN E (MIXED TOCOPHEROLS TO MAINTAIN FRESHNESS). MADE ON EQUIPMENT THAT MANUFACTURES PRODUCTS CONTAINING WHEAT.

*MANUFACTURED IN A FACILITY THAT ALSO PROCESSES MILK, HAZELNUTS, ALMONDS, COCONUT AND WHEAT. *AMOUNT IN CEREAL.*

*Silber v. Barbara's Bakery*

Ex. 2-13

## Puffin Fuffs, Crunchy Cocoa

3/4 cup (30g)

Amount Per Serving
Calories 120    Calories from Fat 5

| | % Daily Value* |
|---|---|
| Total Fat 1g* | 2% |
| Saturated Fat 0g | 0% |
| Trans Fat 0g | |
| Cholesterol 0mg | 0% |
| Sodium 80mg | 3% |
| Potassium 35mg | 2% |
| Total Carbohydrate 24g | 8% |
| Dietary Fiber <3g | 12% |
| Sugars 7g | |
| Protein 2g | |

| | | | |
|---|---|---|---|
| Vitamin A | 0% | Vitamin C | 0% |
| Calcium | 25% | Iron | 25% |

*Percent Daily Values are based on a 2,000 Calorie Diet.

INGREDIENTS: CORN MEAL, DEHYDRATED CANE JUICE, WHOLE OAT FLOUR, COCOA POWDER, FRUCTAN (NUTRAFLORA® NATURAL DIETARY FIBER), OAT HULL FIBER, CALCIUM CARBONATE, SALT, NATURAL FLAVOR, IRON.

*MANUFACTURED IN A FACILITY THAT ALSO PROCESSES MILK, HAZELNUTS, COCONUT, AND WHEAT. *AMOUNT IN CEREAL.*

## Puffins Honey Rice

3/4 cup (30g)

Amount Per Serving
Calories 120    Calories from Fat 5

| | % Daily Value* |
|---|---|
| Total Fat 1g* | 2% |
| Saturated Fat 0g | 0% |
| Trans Fat 0g | |
| Cholesterol 0mg | 0% |
| Sodium 80mg | 3% |
| Potassium 65mg | 2% |
| Total Carbohydrate 26g | 9% |
| Dietary Fiber 3g | 12% |
| Sugars 6g | |
| Protein 2g | |

| | | | |
|---|---|---|---|
| Vitamin A | 0% | Vitamin C | 0% |
| Calcium | 10% | Iron | 4% |
| Zinc | 4% | | |

*Percent Daily Values are based on a 2,000 Calorie Diet

INGREDIENTS: WHOLE GRAIN BROWN RICE FLOUR, DEHYDRATED CANE JUICE, FRUCTAN (NUTRAFLORA® NATURAL DIETARY FIBER), EXPELLER PRESSED HIGH OLEIC OIL (CANOLA AND/OR SUNFLOWER), HONEY, CALCIUM CARBONATE, SALT, NATURAL FLAVOR, NATURAL VITAMIN E (MIXED TOCOPHEROLS TO MAINTAIN FRESHNESS).

*MANUFACTURED IN A FACILITY THAT ALSO PROCESSES MILK, SOY, HAZELNUTS, ALMONDS COCONUT AND WHEAT. VERIFIED TO CONTAIN LESS THAN 20 PPM GLUTEN *AMOUNT IN CEREAL.*

Puffins Cinnamon

3/4 cup (30g)

Amount Per Serving
Calories 90    Calories from Fat 10

|  | % Daily Value* |
|---|---|
| Total Fat 1g* | 2% |
| Saturated Fat 0g | 0% |
| Trans Fat 0g |  |
| Cholesterol 0mg | 0% |
| Sodium 150mg | 6% |
| Potassium 45mg | 1% |
| Total Carbohydrate 26g | 9% |
| Dietary Fiber <6g | 24% |
| Sugars 6g |  |
| Protein 2g |  |

| Vitamin A | 0% | Vitamin C | 20% |
| Calcium | 2% | Iron | 4% |

*Percent Daily Values are based on a 2,000 Calorie Diet.

YELLOW CORN MEAL WITH ADDED CORN BRAN, UNSULFHURED MOLASSES, WHOLE OAT FLOUR, EXPELLER PRESSED HIGH OLEIC OIL (CANOLA AND/OR SUNFLOWER), SALT, CINNAMON, NATURAL FLAVOR, BAKING SODA, VITAMIN C (ASCORBIC ACID), NATURAL VITAMIN E (MIXED TOCOPHEROLS TO MAINTAIN FRESHNESS)

*MANUFACTURED IN A FACILITY THAT ALSO PROCESSES MILK, HAZELNUTS, ALMONDS, COCONUT AND WHEAT. *AMOUNT IN CEREAL.*

## Puffins Peanut Butter

3/4 cup (30g)

Amount Per Serving
Calories 110    Calories from Fat 5

|  | % Daily Value* |
|---|---|
| Total Fat 2g | 3% |
| Saturated Fat 0.5g | 3% |
| Trans Fat 0g |  |
| Cholesterol 0mg | 0% |
| Sodium 230mg | 10% |
| Potassium 65mg | 2% |
| Total Carbohydrate 23g | 8% |
| Dietary Fiber 2g | 8% |
| Sugars 6g |  |
| Protein 3g |  |

| Vitamin A | 2% | Vitamin C | 0% |
| Calcium | 2% | Iron | 4% |

*Percent Daily Values are based on a 2,000 Calorie Diet.

INGREDIENTS:CORN MEAL, DEHYDRATED CANE JUICE, NATURAL PEANUT BUTTER (GROUND PEANUTS, SALT), WHOLE OAT FLOUR, RICE FLOUR, SEA SALT, NATURAL VITAMIN E (MIXED TOCOPHEROLS TO MAINTAIN FRESHNESS), BAKING SODA. CONTAINS PEANUT BUTTER.

*MANUFACTURED IN A FACILITY THAT ALSO PROCESSES MILK, HAZELNUTS, ALMONDS, COCONUT AND WHEAT. *AMOUNT IN CEREAL.*

## Puffins Peanut Butter and Chocolate

3/4 cup (30g)

Amount Per Serving
Calories 110    Calories from Fat 10

| | % Daily Value* |
|---|---|
| Total Fat 1g* | 2% |
| Saturated Fat 0g | 0% |
| Trans Fat 0g | |
| Cholesterol 0mg | 0% |
| Sodium 105mg | 4% |
| Potassium 70mg | 2% |
| Total Carbohydrate 24g | 8% |
| Dietary Fiber 3g | 12% |
| Sugars 6g | |
| Protein 2g | |

| | | | |
|---|---|---|---|
| Vitamin A | 0% | Vitamin C | 25% |
| Calcium | 20% | Iron | 15% |
| Vitamin D | 20% | | |

*Percent Daily Values are based on a 2,000 Calorie Diet.

INGREDIENTS: CORN MEAL, DEHYDRATED CANE JUICE, BROWN RICE FLOUR, WHOLE OAT FLOUR, FRUCTAN (NUTRA FLORA®, NATURAL DIETARY FIBER), NATURAL PEANUT BUTTER (GROUND PEANUTS, SALT), COCOA POWDER, OAT HULL FIBER, CALCIUM CARBONATE, RICE FLOUR, BAKING SODA, EXPELLER PRESSED HIGH OLEIC OIL (CANOLA AND/OR SUNFLOWER), NATURAL CHOCOLATE FLAVOR WITH OTHER NATURAL FLAVORS, SEA SALT, CARAMEL COLOR, IRON (FERRIC ORTHOPHOSPHATE), ANNATTO, VITAMINE D3, VITAMIN E (MIXED TOCOPHEROLS TO MAINTAIN FRESHNESS).

*CONTAINS PEANUT BUTTER. MANUFACTURED IN A FACILITY THAT ALSO PROCESSES MILK, HAZELNUTS, ALMONDS, COCONUT AND WHEAT.*

## Puffins Multigrain

3/4 cup (30g)

Amount Per Serving
Calories 110    Calories from Fat 5

| | % Daily Value* |
|---|---|
| Total Fat 0g* | 0% |
| Saturated Fat 0g | 0% |
| Trans Fat 0g | |
| Cholesterol 0mg | 0% |
| Sodium 80mg | 3% |
| Potassium 65mg | 2% |
| Total Carbohydrate 25g | 8% |
| Dietary Fiber 3g | 12% |
| Sugars 6g | |
| Protein 2g | |

| | | | |
|---|---|---|---|
| Vitamin A | 0% | Vitamin C | 25% |
| Calcium | 25% | Iron | 25% |
| Vitamin D | 25% | | |

*Percent Daily Values are based on a 2,000 Calorie Diet.

INGREDIENTS: CORN FLOUR, DEHYDRATED CANE JUICE, BROWN WHOLE GRAIN RICE FLOUR, WHOLE GRAIN PURE OAT FLOUR, FRUCTAN (NUTRAFLORA® NATURAL DIETARY FIBER), OAT HULL FIBER, CALCIUM CARBONATE, BAKING SODA, NATURAL FLAVOR, CARAMEL COLOR, SALT, ANNATTO, VITAMIN C (ASCORBIC ACID), IRON (FERRIC ORTHOPHOSPHATE), VITAMIN D3, NATURAL VITAMIN E (MIXED TOCOPHEROLS TO MAINTAIN FRESHNESS).

*NO PEANUT INGREDIENTS USED IN THIS FACILITY. MANUFACTURED IN A FACILITY THAT ALSO PROCESSES MILK, HAZELNUTS, ALMONDS, COCONUT AND WHEAT. VERIFIED TO CONTAIN LESS THAN 20 PPM GLUTEN. *AMOUNT IN CEREAL.*

 **Laboratory Developments, L.L.C.**

P.O. Box 55364 Portland, OR 97238 • 503.705.0666 • Email: nkahl@msn.com

**Reese Richman, LLP**
875 Avenue of the Americas, 18th Floor
New York, New York 10001

**Michael R. Reese**
212.643.0500- Phone
212.253.4272- Fax

## CERTIFICATE OF ANALYSIS

February 10, 2012

For samples received 1-18-12 for the detection of genetically modified organisms (GMO).

**Results:**

| Sample No. | Sample Description | | GMO |
|---|---|---|---|
| 0118002-RR | Barbara's Brand Puffins Cereal | | |
| | | 35S | Present |
| | | NOS | Present |

**Notes:**
Test sample was analyzed for the presence of GMO by qualitative PCR analysis. DNA was extracted and analyzed for the presence of the 35S promoter and NOS terminator. No inhibition was observed and corn DNA was detected at normal levels.

GMO Detection Limit = 0.01%

Approved By:

Nidal Kahl, Director

Confidential Analysis Page 1 of 1

www.BiogenLabDevelopments.com • 888. 9 BIOGEN • 503.698.7846 Office • 503.698.7847-Fax • Federal ID# 93-1313827

# EXHIBIT B

Benjamin M. Lopatin, Esq.
Cal. Bar No.: 281730
*lopatin@hwrlawoffice.com*
**THE LAW OFFICES OF
HOWARD W. RUBINSTEIN, P.A.**
One Embarcadero Center, Suite 500
San Francisco, CA 94111
(800) 436-6437
(415) 692-6607 (fax)

*Attorney for Plaintiff GABRIEL ROJAS
and the Proposed Class*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| **GABRIEL ROJAS,** individually and on behalf of all others similarly situated, | Case No.: |
| | Unlimited Civil Division |
| *Plaintiff,* | **CLASS ACTION COMPLAINT FOR:** |
| | 1. Violations of Cal. Bus. & Prof. C. §§ 17200, *et seq.* |
| *vs.* | 2. Violations of Cal. Bus. & Prof. C. §§ 17500, *et seq.* |
| **BARBARA'S BAKERY, INC.,** a California corporation, | 3. Violations of Cal. Civ. C. §§ 1750, *et seq.* |
| | *California Class Representation* |
| *Defendant.* | *Jury Trial Requested* |

Plaintiff, GABRIEL ROJAS, by and through his undersigned counsel, hereby files this Class Action Complaint, individually, and on behalf of all others similarly situated—and makes these allegations based on information and belief and/or which are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery—against Defendant, Barbara's Bakery, Inc. ("BARBARA'S" or "Defendant"), as follows:

## I. INTRODUCTION

1. Defendant has made false, misleading statements that are likely to deceive reasonable consumers.

---

*CLASS ACTION COMPLAINT*
Page 1 of 19

2. Defendant has mistakenly or misleadingly represented that its products are "All Natural Since 1971," when in fact, they are not, because they contain Genetically Modified Organisms ("GMOs") in the form of corn, soy, soy derivatives, and/or corn derivatives.

3. Defendant sells the following varieties of its products that misleadingly and mistakenly claim to be "All Natural Since 1971:"

## CORN BASED GMO PRODUCTS

a) Multigrain Cereal Bars
  1) Multigrain Cereal Bar Apple Cinnamon
  2) Multigrain Cereal Bar Raspberry
  3) Multigrain Cereal Bar Triple Berry
  4) Multigrain Cereal Bar Strawberry
  5) Multigrain Cereal Bar Blueberry
  6) Multigrain Cereal Bar Cherry

b) Cheese Puffs
  1) Cheese Puffs Jalapeno (also has Soy GMO)
  2) Cheese Puffs Original
  3) Cheese Puffs Bakes Original
  4) Cheese Puffs Bakes White Cheddar

c) Puffins Cereals
  1) Puffins Peanut Butter and Chocolate
  2) Puffins Multigrain
  3) Puffins Original
  4) Puffins Peanut Butter
  5) Puffins Cinnamon
  6) Puffin Puffs, Crunchy Cocoa
  7) Puffin Puffs, Fruit Medley

d) Shredded Wheat Cereals
  1) Shredded Minis Blueberry Burst
  2) Shredded Spoonfulls multigrain

e) High Fiber Cereals
  1) High Fiber Original
  2) High Fiber Flax & Granola
  3) High Fiber Cranberry

f) Barbara's Classics Cereals
  1) Corn Flakes

2)  Hole 'n Oats Honey Nut
3)  Hole 'n Oats:  Fruit Juice Sweetened

**SOY BASED GMO PRODUCTS**

g)  Fruit & Yogurt Bars
   1)  Fruit & Yogurt Bar Strawberry Apple
   2)  Fruit & Yogurt Bar Blueberry Apple

h)  Fig Bars
   1)  Fig Bars Whole Wheat
   2)  Fig Bars Multigrain
   3)  Fig Bars Wheat Free Raspberry
   4)  Fig Bars Blueberry Low Fat

i)  Snackimals Cookies
   1)  Snackimals Double Chocolate
   2)  Snackimals Chocolate Chip
   3)  Snackimals Wheat Free Oatmeal
   4)  Snackimals Peanut Butter

**(collectively, "the Products").**

4.      Defendant's "All Natural Since 1971" statement prominently displayed on the Products' packaging and/or labeling is false, misleading, and likely to deceive reasonable consumers, such as Plaintiff and members of the Class, because the Products are not "All Natural," due to the presence of soy, corn, soy derivatives, and/or corn derivative GMOs.

5.      GMOs are plants that grow from seeds in which DNA splicing has been used to place genes from another source into a plant.  Contrary to Defendant's express or implied representations, the Products use plants or plant derivatives grown or created from GMOs.

## II. VENUE AND JURISDICTION

6.      This Court has jurisdiction over all causes of action asserted herein, pursuant to the California Constitution.

7.      Venue is proper in Court pursuant to Cal. Civ. P. § 395.5.  Defendant conducts business in this jurisdiction and many of the wrongful and unlawful acts and omissions of

---

*CLASS ACTION COMPLAINT*
Page 3 of 19

Defendant, which are described herein, were committed by Defendant in the County of San Francisco, State of California.

8.     In addition, San Francisco County is the county where all of the Plaintiff's causes of action accrued, as this is the County where the Plaintiff, Gabriel Rojas, was exposed to the unlawful, unfair, and misleading advertising, and where he purchased the Products.

9.     The **"**Declaration of Benjamin M. Lopatin, Esq., Pursuant to Civil Code §1780(c) of the Consumer Legal Remedies Act, Civil Code §§1750 et seq." regarding venue under the California Consumer Legal Remedies Act ("CLRA") is submitted herewith and is incorporated herein by reference.

## III. PARTIES

10.     Plaintiff is an individual more than 18 years old, and is a citizen of California, who resides in the city and County of San Francisco.  Plaintiff respectfully requests a jury trial on all damage claims.

11.     Plaintiff has purchased several of the Products that claimed to be "All Natural Since 1971," including purchases of Barbara's Puffins Cinnamon Cereal, Puffins Peanut Butter Cereal and Barbara's White Cheddar Cheese Puffs during August and September of 2012 in San Francisco, California.  *See* **Exhibit 1**, *Scanned Copy of Products' Packaging Purchased by Plaintiff*, attached hereto and incorporated herein.

12.     In purchasing the Products, Plaintiff read and relied on the material statement that the Products are "All Natural Since 1971."  For example, Plaintiff purchased the Products believing them to be "All Natural Since 1971" because he read and relied on Barbara's material statement that the Products are "All Natural Since 1971," prominently displayed on the Products' front and rear labeling/packaging.  Plaintiff has been damaged by his purchase of the

Products because the labeling and advertising for the Product was and is false and/or misleading under California law; therefore, the Products are worth less than what Plaintiff paid for it and/or Plaintiff did not receive what he reasonably intended to receive when purchasing the Products.

13. Defendant, Barbara's, Inc. ("Barbara's") is a California licensed corporation with its principal place of business located in the State of Massachusetts, at 300 Nickerson Road, Marlborough, MA 01752. Barbara's lists with the California Secretary of State a Registered Agent designated as CT Corporation System, 818 W. Seventh Street, Los Angeles, California 90017. Therefore, Barbara's can be considered a "citizen" of the State of California.

14. BARBARA'S is the owner, manufacturer and distributor of the Products, and is the company that created and/or authorized the false, misleading and deceptive labeling and advertising for the Products and is the company that promoted, marketed, and sold the Products at issue in this County.

15. The labeling and advertising for the Products relied upon by Plaintiff was prepared and/or approved by BARBARA'S and its agents, and was disseminated by BARBARA'S and its agents through labeling and advertising containing the misrepresentations alleged herein. The labeling and advertising for the Products was designed to encourage consumers to purchase the Products and reasonably misled the reasonable consumer, i.e. Plaintiff and the Class.

16. Plaintiff alleges that, at all relevant times, BARBARA'S and its subsidiaries, affiliates, and other related entities, as well as their respective employees, were the agents, servants and employees of BARBARA'S, and at all relevant times, each acted within the purpose and scope of that agency and employment. Plaintiff further alleges on information and belief that at all times relevant herein, the distributors and retailers who delivered and sold the

Products, as well as their respective employees, also were Barbara's agents, servants and employees, and at all times herein, each was acting within the purpose and scope of that agency and employment.

17.     Additionally, Plaintiff alleges that, in committing the wrongful acts alleged herein, BARBARA'S, in concert with its subsidiaries, affiliates, and/or other related entities and their respective employees, planned, participated in and furthered a common scheme to induce members of the public to purchase the Products by means of false, misleading, deceptive and fraudulent representations, and that BARBARA'S participated in the making of such representations in that it disseminated those misrepresentations and/or caused them to be disseminated.

18.     Whenever reference in this Complaint is made to any act by BARBARA'S or its subsidiaries, affiliates, distributors, retailers and other related entities, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of BARBARA'S committed, knew of, performed, authorized, ratified and/or directed that act or transaction on behalf of BARBARA'S while actively engaged in the scope of their duties.

## IV. FACTUAL ALLEGATIONS

19.     BARBARA'S manufactures, distributes, markets, advertises, and sells the Products identified above in paragraphs 3(a)–(i).

20.     The Products claim to be "All Natural Since 1971," when in fact, they are not, because they contain GMOs in the form of corn soy, soy derivatives, and/or corn derivatives within its ingredients.

21.     Defendant's "All Natural Since 1971" statement prominently displayed on the Products' packaging and/or labeling is false, misleading, and likely to deceive reasonable

consumers, such as Plaintiff and members of the Class, because the Products are not "All Natural Since 1971," due to the presence of GMOs.

22. GMOs are plants that grow from seeds in which DNA splicing has been used to place genes from another source into a plant. Contrary to Defendant's express or implied representations, the Products use plants or plant derivatives grown or created from GMOs.

23. The Products are not "All Natural." Genetically modified corn and soy products contain genes and/or DNA that would not normally be in them, and are thus not natural, thereby causing the Products to fail to be "All Natural Since 1971."

24. Defendant manufactures, markets, advertises, distributes and sells the Products in stores located throughout California claiming to be "All Natural Since 197,1" specifically, on the front and rear labeling and/or packaging for the Products.

25. As a result, through a variety of advertising, including but not limited to the packaging and labeling of the Products, BARBARA'S has made false and misleading material statements and representations regarding the Products that have been relied upon by Plaintiff and members of the Class to their economic detriment.

26. Simply put, the Products contain GMOs and are thus not "All Natural." Therefore, Defendant's advertising and labeling statement that the Products are "All Natural Since 1971" is false and likely to mislead reasonable consumers, such as Plaintiff and members of the Class.

27. Plaintiff, like members of the Class, purchased the Products relying on the material misrepresentation that it was "All Natural Since 1971" at the time of purchase.

28.    Plaintiff based his purchase upon Barbara's material statement that the Products were "All Natural Since 1971," which he read on the front labeling of the Products, and relied upon prior to making his purchase.

29.    Plaintiff would not have purchased the Products if he had known that the Defendant's Products are not "All Natural Since 1971" because they contain GMOs.

30.    Plaintiff and members of the Class have been economically damaged by their purchase of the Products because it is not "All Natural Since 1971."

31.    At a minimum, Plaintiff contends that Defendant should cease labeling the Products "All Natural Since 1971."

32.    Plaintiff therefore brings this class action to secure, among other things, equitable relief and actual damages, statutory damages, and punitive damages for the Class against BARBARA'S for false and misleading advertising in violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq*., California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200 *et seq.*; and California's False Advertising Law ("FAL"), Bus. & Prof. Code §§ 17500 *et seq*.

## V. <u>CLASS ACTION ALLEGATIONS</u>

43.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

44.    Pursuant to Cal. Civ. Code § 1781 and Cal. Code of Civil Procedure § 382, Plaintiff brings this class action and seeks certification of the claims and certain issues in this action on behalf of a Class defined as:

> **all California persons who have purchased Barbara's products claiming to be "All Natural Since 1971," containing corn or soy ingredients, for personal use, during the period extending from**

**November 6, 2008, through and to the filing date of this Complaint.**

45. Pursuant to Rule 3.760, *et seq.*, of the California Rules of Court, Plaintiff reserves the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

46. Excluded from the Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

47. NUMEROSITY: Plaintiff is informed and believes, and on that basis alleges, that the Plaintiff Class is so numerous that individual joinder of all members would be impracticable. Based on the annual sales of the Products and the popularity of the Products, it is apparent that the number of consumers of the Products would be so large as to make joinder impossible as the Class is comprised of hundreds of thousands of consumers geographically dispersed throughout the United States. While the exact number of Class members is currently unknown, such information can be ascertained through appropriate discovery.

48. COMMONALITY: Defendant's practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the putative Class were and are similarly affected by having purchased and used the Products, and the relief sought herein is for the benefit of Plaintiff and members of the putative Class. Questions of law and fact common to the Plaintiff Class exist that predominate over questions affecting only individual members, including, *inter alia*:

(a)     Whether Defendant's practices and representations made in connection with the advertising, marketing, promotion and sales of the Products were deceptive, unlawful or unfair in any respect, thereby violating California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

(b)     Whether Defendant's practices and representations made in connection with the advertising, marketing, promotion and sales of the Products were deceptive, unlawful or unfair in any respect, thereby violating California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

(c)     Whether Defendant violated California's Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq.*, by the practices and representations made in connection with the advertising, marketing, promotion and sales of the Products within California; and

(d)     Whether Defendant's conduct as set forth above economically injured consumers and if so, the extent of the injury.

49.     <u>TYPICALITY</u>:  The claims asserted by Plaintiff in this action are typical of the claims of the members of the Plaintiff Class, as the claims arise from the same course of conduct by Defendant, all members of the Class have been similarly affected by Defendant's course of conduct, and the relief sought is common.

50.     <u>ADEQUACY</u>: Plaintiff will fairly and adequately represent and protect the interests of the members of the Plaintiff Class. Plaintiff has no interest adverse to the interests of the other Class members.  Plaintiff has retained competent counsel with substantial experience in both consumer protection and class action litigation, who are committed to vigorously prosecuting this action on behalf of the class.

51.  <u>SUPERIORITY</u>: A class action is superior to other available methods for the fair and efficient adjudication of the present controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that individual actions would engender.  The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, are far superior than any difficulties that might be argued with regard to the management of this class action. This superiority makes class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that the representative Plaintiff or any other members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

52.  Certification of this class action is appropriate under California Civil Code § 1781 and California Code of Civil Procedure §382 because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members.  Certification also is appropriate because Defendant acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of consumers of the Products, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

<div align="center">

**VI. FIRST CAUSE OF ACTION:**
**<u>VIOLATIONS OF CAL. BUS & PROF. CODE §§ 17200 *ET SEQ.*</u>**

</div>

53.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the each of the preceding paragraphs of this Complaint.

54.    This cause of action is brought on behalf of Plaintiff and members of the general public pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq*., which provides that "unfair competition shall mean and include any unlawful, unfair or deceptive business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter I (commencing with Section 17500) as Part 3 of Division 7 of the Business and Professions Code."

55.    Defendant has violated the Act by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.  Specifically, Defendant has represented that the Products are "All Natural Since 1971," when in fact, they are not, because they contain GMOs in the form of corn, soy, soy derivatives, and/or corn derivatives.

56.    Plaintiff alleges that Defendant committed unfair business acts and/or practices, as set forth in detail above. The utility of Defendant's practices related to the deceptive labeling and advertising of the Products is negligible, if any, when weighed against the harm to the general public.

57.    The harmful impact upon members of the general public who purchased and used the Products outweighs any reasons or justifications by Defendant for the deceptive labeling and advertising practices employed to sell the Products that misleadingly claims to be "All Natural Since 1971."

58.    Defendant had an improper motive (profit before accurate marketing) in its practices related to the deceptive labeling and advertising of the Products, as set forth above.

59.     The use of such unfair business acts and practices was and is under the sole control of Defendant, and was deceptively hidden from members of the general public in Defendant's marketing, advertising and labeling of the Products.

60.     Defendant committed a deceptive act or practice by making the labeling and advertising representations set forth in detail above. These deceptive acts and practices had a capacity, tendency, and/or were likely to deceive or confuse reasonable consumers.

61.     Defendant also committed an unlawful business practice by violating the FAL and CLRA as set forth in detail below. These violations serve as predicate violations of this prong of the UCL.

62.     As a purchaser and consumer of Defendant's Products, and as a member of the general public who purchased and used the Products, Plaintiff is entitled to and does bring this class action seeking all available remedies under the UCL.

63.     Defendant's labeling and advertising practices, as set forth above, were intended to promote the sale of the Products and constitute unfair, deceptive and/or unlawful business practices within the meaning of California Bus. & Prof. Code §§ 17200 *et seq.*

64.     Pursuant to California Bus. & Prof. Code § 17203, Plaintiff, on behalf of herself and members of the general public, seeks an order of this Court requiring Defendant to restore to Plaintiff and other purchasers of the Products all monies that may have been acquired by Defendant as a result of such unfair, deceptive and/or unlawful business acts or practices.

65.     Plaintiff and purchasers of the Products will be denied an effective and complete remedy in the absence of such an order.

66.     As a result of Defendant's violations of the UCL, Plaintiff and purchasers of the Products are entitled to restitution for out-of-pocket expenses and economic harm.

67.     Pursuant to Civil Code § 3287(a), Plaintiff and purchasers of the Products are further entitled to pre-judgment interest as a direct and proximate result of Defendant's wrongful conduct.

68.     The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and purchasers of the Products are entitled to interest in an amount according to proof.

### VII. SECOND CAUSE OF ACTION:
### <u>VIOLATIONS OF CAL. BUS. & PROF. CODE §§ 17500 *ET SEQ.*</u>

69.     Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

33.     In violation of California Bus. & Prof. Code § 17500, Defendant disseminated, or caused to be disseminated, the deceptive Products labeling and advertising representations that misleadingly claim that the Products are "All Natural Since 1971," when in fact, they are not because they contain GMOs in the form of corn, soy, soy derivatives, and/or corn derivatives.

70.     Defendant's Products' labeling and advertising representations are misleading because they cannot support the claims that the Products is "All Natural Since 1971."

71.     Defendant's labeling and advertising representations for the Products is by their very nature unfair, deceptive and/or unlawful within the meaning of California Bus. & Prof. Code §§ 17500 *et seq.*

72.     The representations were likely to deceive reasonable consumers and did deceive reasonable consumers such as Plaintiff and members of the Class.

73.     In making and disseminating the deceptive representations alleged herein, Defendant knew or should have known that the representations were misleading, and acted in violation of California's Bus. & Prof. Code §§ 17500 *et seq.*

74.     As a direct and proximate result of Defendant's wrongful conduct, Plaintiff and purchasers of the Products have suffered substantial monetary and non-monetary damage.

75.     Pursuant to Bus. & Prof. Code § 17535, Plaintiff, on behalf of herself and other purchasers of the Products, seeks an order of this Court requiring Defendant to restore to purchasers of the Products all monies that may have been acquired by Defendant as a result of such unfair, deceptive and/or unlawful acts or practices.

76.     As a result of Defendant's violations of the FAL, Plaintiff and purchasers of the Products are entitled to restitution for out-of-pocket expenses and economic harm.

77.     Pursuant to Civil Code § 3287(a), Plaintiff and purchasers of the Products are further entitled to pre-judgment interest as a direct and proximate result of Defendant's wrongful conduct.

78.     The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and purchasers of the Products are entitled to interest in an amount according to proof.

### VIII. THIRD CAUSE OF ACTION:
### FOR VIOLATIONS OF CAL. CIV. CODE §§ 1750 *ET SEQ.*

79.     Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

80.     This cause of action is brought pursuant to Cal. Civ. Code §§ 1750 *et seq.*

81. Plaintiff and each California purchaser of the Products are "consumers" within the meaning of Civil Code §1761(d).

82. The purchases of the Products by Plaintiff and California purchasers were and are "transactions" within the meaning of Civil Code §1761(e).

83. Defendant's "All Natural Since 1971" statement prominently displayed on the Products' packaging and/or labeling is false, misleading, and likely to deceive reasonable consumers, such as Plaintiff and members of the Class because they contain GMOs in the form of corn, soy, soy derivatives, and/or corn derivatives.

84. Defendant's marketing, labeling, advertising and sales of the Products within California, therefore violated the CLRA in at least the following respects:

    a. In violation of Civil Code § 1770(a)(5), BARBARA'S represented that the Products have characteristics, ingredients, uses, and benefits which they do not have;

    b. In violation of Civil Code § 1770(a)(7), BARBARA'S represented that the Products are of a particular standard, quality, or grade, which they are not;

    c. In violation of Civil Code §1770(a)(9), BARBARA'S advertised the Products with an intent not to sell the Products as advertised;

    d. In violation of Civil Code § 1770(a)(14), BARBARA'S represented that the purchase of the Products confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

    e. In violation of Civil Code § 1770(a)(16), BARBARA'S represented that the subject of the sale of the Products has been supplied in accordance with a previous representation when it has not.

85.     Plaintiff seeks and is entitled to equitable relief in the form of an order requiring Defendant to make full restitution to California purchasers of the Products of all monies wrongfully obtained as a result of the conduct described above.

86.     Plaintiff, on or about October 4, 2012, by and through counsel, notified Defendant in writing of the particular violations of Section 1770 of the CLRA, and demanded that it take certain corrective actions within the period prescribed by the CLRA for such demands.

87.     However, Defendant failed to adequately respond to the demands for corrective action within the time prescribed by the CLRA.  Therefore, Plaintiff requests statutory and actual damages, as well as punitive damages, interest and attorneys' fees as authorized by Section 1780(a) of the CLRA.

88.     In addition, Plaintiff seeks and is entitled to, pursuant to Section 1780(a)(2) of the CLRA, an order for the equitable relief described above, as well as costs, attorney's fees and any other relief which the Court deems proper.

## IX. **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually, and on behalf of all others similarly situated, prays for relief pursuant to each cause of action set forth in this Complaint as follows:

1.     For an order certifying that the action may be maintained as a class action, certifying Plaintiff as representative of the Class, and designating his attorneys as Class counsel.

2.     For an award of equitable relief as follows:

(a)     Enjoining Defendant from making any claims for the Products found to violate the UCL, FAL, or CLRA as set forth above;

(b)     Requiring Defendant to make full restitution of all monies wrongfully obtained as a result of the conduct described in this Complaint; and

(c)     Requiring Defendant to disgorge all ill-gotten gains flowing from the conduct described in this Complaint.

3.      For an award of attorney's fees pursuant to, *inter alia*, §1780(d) of the CLRA and Code of Civil Procedure §1021.5.

4.      For actual damages in an amount to be determined at trial;

5.      For actual, statutory, and punitive damages as may be provided for by statute for violations of the CLRA (Third Cause of Action), because the demanded corrections failed to take place within the thirty (30) day notice period.

6.      For an award of costs and any other award the Court might deem appropriate;

7.      For pre- and post-judgment interest on any amounts awarded; and

8.      Providing such further relief as may be just and proper.

Dated: <u>November 6, 2012</u>          By: _____

                                        Benjamin M. Lopatin, Esq. (SBN: 281730)
                                        *lopatin@hwrlawoffice.com*
                                        **THE LAW OFFICES OF**
                                        **HOWARD W. RUBINSTEIN, P.A.**
                                        One Embarcadero Center, Suite 500
                                        San Francisco, CA 94111
                                        (800) 436-6437
                                        (415) 692-6607 (fax)

                                        *Attorneys for Plaintiff GABRIEL ROJAS*
                                        *and the Proposed Class*

## X. JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues so triable.

1

2     Dated: November 6, 2012

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Respectfully Submitted,**

By: _____

   Benjamin M. Lopatin, Esq. (SBN: 281730)
   *lopatin@hwrlawoffice.com*
   **THE LAW OFFICES OF**
   **HOWARD W. RUBINSTEIN, P.A.**
   One Embarcadero Center, Suite 500
   San Francisco, CA 94111
   (800) 436-6437
   (415) 692-6607 (fax)

   *Attorneys for Plaintiff GABRIEL ROJAS*
   *and the Proposed Class*

Case 1:12-cv-02604-CRB Document 61-3 Filed 04/26/13 Page 15 of 27 PageID #: 743

# EXHIBIT

# 1



All Natural Since 1971

# BARBARA'S

*Petaluma, California*

$ 5.99

**90** calories

**6**g fiber

only **6**g sugar

# Puffins

CINNAMON

CEREAL

*Puffins*

CINNAMON

*All Natural Since 1971*

## Nutrition Facts
Serving Size 2/3 Cup (30g)
Servings Per Container About 9

| Amount Per Serving | Cereal | With 1/2 Cup Vit. A & D Fortified Skim Milk |
|---|---|---|
| **Calories** | 90 | 130 |
| Calories from Fat | 10 | 10 |
| | **% Daily Value** | |
| **Total Fat** 1g* | 2% | 2% |
| Saturated Fat 0g | 0% | 0% |
| Trans Fat 0g | | |
| **Cholesterol** 0mg | 0% | 2% |
| **Sodium** 150mg | 6% | 8% |
| **Potassium** 45mg | 1% | 7% |
| **Total Carbohydrate** 28g | 9% | 11% |
| Dietary Fiber 6g | 24% | 24% |
| Sugars 6g | | |
| **Protein** 2g | | |
| Vitamin A | 0% | 6% |
| Vitamin C | 20% | 20% |
| Calcium | 2% | 15% |
| Iron | 4% | 4% |

*Amount in cereal. 1/2 cup Vitamin A & D Fortified Skim Milk contributes an additional 40 Calories, 5mg Cholesterol, 50mg Sodium, 210mg Potassium, 6g Total Carbohydrate (6g Sugars), 4g Protein.

** Percent daily values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs:

| | | Calories: | 2,000 | 2,500 |
|---|---|---|---|---|
| Total Fat | Less Than | | 65g | 80g |
| Sat Fat | Less Than | | 20g | 25g |
| Cholesterol | Less Than | | 300mg | 300mg |
| Sodium | Less Than | | 2,400mg | 2,400mg |
| Potassium | | | 3,500mg | 3,500mg |
| Total Carbohydrate | | | 300g | 375g |
| Dietary Fiber | | | 25g | 30g |

Calories per gram:
Fat 9 • Carbohydrate 4 • Protein 4

**Ingredients:** Yellow Corn Meal With Added Corn Bran, Unsulphured Molasses, Whole Oat Flour, Expeller Pressed High Oleic Oil (Canola and/or Sunflower), Salt, Cinnamon, Natural Flavor, Baking Soda, Vitamin C (Ascorbic Acid), Natural Vitamin E (Mixed Tocopherols to Maintain Freshness).

*Manufactured in a facility that also processes milk, soy, hazelnuts, almonds, coconut, and wheat.*

Manufactured for Barbara's Bakery, Inc.
Petaluma CA 94954
Visit Us Online at BarbarasBakery.com

Product of Canada.
©2011 Barbara's Bakery, Inc.

ENLARGED TO SHOW TEXTURE
SERVING SUGGESTION

NET WT 10 OZ (283g)



# Make Friends with All Natural Goodness.

**BARBARA'S**
All Natural Since 1971
*Petaluma, California*

Here at Barbara's®, we think a breakfast of wholesome grains is like that invigorating feeling you get after taking a deep breath of fresh air. That's why our high fiber Cinnamon Puffins are absolute sweetness with only 6 grams of sugar and just 90 calories per serving. There are never any artificial preservatives or additives in our cereals because that's Barbara's way.

## Puffins CEREAL
### CINNAMON

*Wake up to comforting sweetness and a toasty crunch.*

*healthy living, naturally*

People, like puffin birds, are simply creatures of habit. Take the breakfast challenge: review your habits and make a commitment to toss out a not-so-healthy habit – just for today. Then, challenge yourself to do it again tomorrow. Good habits are built day by day...and bowl by bowl!

### Puffin Trivia
Fun Facts About Our Favorite Seabird

🖋 Puffins can live up to 20 years or more. The oldest known puffin lived to be 36.

🖋 Female puffins lay only one egg per year and usually keep the same mate every season.

🖋 Puffins can fly up to 55 miles per hour.

🖋 When diving for food, a puffin can carry up to 20 fish in its beak.

🖋 Puffins are usually 10 inches tall - the height of a quart of milk.

🖋 The majority of a Puffin's life is spent in the open ocean.



*Dr. Stephen Kress, creator of Audubon's Project Puffin and an Atlantic Puffin*



**Honest goodness.
Give our other all natural products a try.**

*All Natural Since 1971*

---

**BARBARA'S**
All Natural Since 1971
*Petaluma, California*

## Puffins
### CINNAMON

### DIETARY FEATU

24% of your Dail
Fiber Needs

Only 90 Calorie
per Serving

Only 6g Sugar
per Serving

Excellent Source
Antioxidant Vitami

Low Fat

0g Trans Fat per Ser

No Artificial Flavor
Additives or Preserva

Naturally Cholesterol

Vegetarian

Kosher Ⓤ

*giving back*

Our role in the community important to us - that's why created Barbara's for a Brigh Future. For nearly 20 years have made it part of our cult to give back through progra that support our values. work with Project Puffin h helped to restore puffins to th historic nesting ground off t coast of Maine. To learn m visit BarbarasBakery.com o ProjectPuffin.org.

*We print this packaging on environmentally friendly po consumer cardboard stock. See the bottom of this box fo more details.*



BarbarasBakery.co



Case 1:12-cv-02604-CRB Document 41-3 Filed 04/26/13 Page 255 of 27 PageID #: 747





# The Best Things in Life are Natural.

Morning at Barbara's® finds us in the kitchen with big red bowls, munching on crunchy Peanut Butter Puffins. Each mouthful is a burst of real peanut butter and the best whole grain oats and corn. We happen to think our cereal is one incredibly delicious combo of great taste and natural nutrition. Plus, it's low in fat and always free of artificial flavors, preservatives, and additives – because that's Barbara's way.

## Puffins
CEREAL
### PEANUT BUTTER

*Real peanuts make a melt-in-your-mouth, sweet and savory bite.*



## Puffins
CEREAL
### PEANUT BUTTER

#### DIETARY FEATURE

Low Fat

Only 6g Sugar per Servin

No Artificial Flavors, Additives or Preservativ

0g Trans Fat per Servin

Naturally Cholesterol Fr

Vegan

Kosher Ⓤ

## healthy living, naturally

People, like puffin birds, are creatures of habit. Healthy human habits can be as simple as a walk with the dog or as intense as a rigorous hike. The challenge is to make a plan and stick with it. Keep the healthy habits that serve you (like Puffins for breakfast) and think about tossing those that don't.



Honest goodness. Give our other all natural products a try.

### MEET BABS
One of our adopted Puffins

Babs is a 34-year-old female puffin who came to Eastern Egg Rock, Maine on July 11, 1977 with 98 other puffin chicks. Dr. Stephen Kress and Project Puffin transplanted her from Great Island, Newfoundland to help repopulate the tiny island and restore it to its former nesting colony. The original colony was nearly decimated by humans in the late 1800's. Babs has been returning to Eastern Egg Rock year after year for 34 years and has hatched a total of 21 chicks. Talk about a finely feathered success story!

When we adopt a puffin, we help keep the colony growing. You can get involved, too. Learn more at BarbarasBakery.com or ProjectPuffin.org.



*Mom is home with breakfast!*

## giving back

Our role in the community i important to us - that's why w created Barbara's for a Brighte Future. For nearly 20 years w have made it part of our cultur to give back through program that support our values. Our work with Project Puffin has helped to restore puffins to the historic nesting ground off the coast of Maine. To learn mor visit BarbarasBakery.com ProjectPuffin.org.

*We print this packaging on environmentally friendly post consumer cardboard stock. See the bottom of this box fo more details.*



BarbarasBakery.com

## All Natural Since 1971



baked!

# Cheese Puffs

## WHITE CHEDDAR

when it's made with the natural goodness of stone ground corn and real cheese! So, hop on the couch, invite some friends over, and start crunching on the ultimate guilt-free snack.

Real snacks that satisfy!

## all natural, always

- Made with real white cheddar cheese
- Made with natural stone ground white corn
- No artificial flavors or preservatives
- No hydrogenated oils

## giving back

Our community is at the heart of who we are and that's why we created Barbara's for a Brighter Future more than 20 years ago. Whether it's teaching kids how to garden or sponsoring Project Puffin off the coast of Maine, we enjoy giving to important programs that support our values. To learn more, stop by BarbarasBakery.com.

## Nutrition Facts
Serving Size: 1 oz. 1-1/2 Cup (28g)
Servings Per Container: About 5

**Amount Per Serving**

| Calories 160 | Calories from Fat 90 |
|---|---|

| | % Daily Value* |
|---|---|
| **Total Fat** 10g | 16% |
| Saturated Fat 1g | 5% |
| Trans Fat 0g | |
| **Cholesterol** 0mg | 0% |
| **Sodium** 200mg | 8% |
| **Total Carbohydrate** 12g | 4% |
| Dietary Fiber 1g | 5% |
| Sugars 1g | |
| **Protein** 2g | |

| Vitamin A 0% | • | Vitamin C 0% |
|---|---|---|
| Calcium 2% | • | Iron 2% |

*Percent daily values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs:

| | | Calories: | 2,000 | 2,500 |
|---|---|---|---|---|
| Total Fat | Less than | | 65g | 80g |
| Saturated Fat | Less than | | 20g | 25g |
| Cholesterol | Less than | | 300mg | 300mg |
| Sodium | Less than | | 2,400mg | 2,400mg |
| Total Carbohydrate | | | 300g | 375g |
| Dietary Fiber | | | 25g | 30g |

Calories per gram:
Fat 9  •  Carbohydrate 4  •  Protein 4

INGREDIENTS: WHITE CORNMEAL, EXPELLER PRESSED HIGH OLEIC (CANOLA, SUNFLOWER OR SAFFLOWER) OIL, WHITE CHEDDAR CHEESE ((CULTURED PASTEURIZED MILK, SALT, NATURAL ENZYMES), WHEY (MILK), DRY BUTTERMILK, SALT, DISODIUM PHOSPHATE (A NATURAL FLAVORING AGENT), CITRIC ACID), SALT, LACTIC ACID.

*Contains milk. Manufactured in a facility that also processes sesame seeds, soy, wheat, peanuts, almond, cashew, filbert, hazelnut, macadamia nut, pecan, pine nut, pistachio, walnut, and coconut.*

Manufactured for The Weetabix Company, Inc.
300 Nickerson Road, Marlborough, MA 01752
Visit Us Online at BarbarasBakery.com

Product of U.S.A.
©2012 Barbara's Bakery, Inc.®
With all correspondence, please include Best By Date.

0  70617 00076  2

## Feeling adventurous?
Try our other
all natural cheese puffs.

## ORIGINAL FLAVOR
## JALAPEÑO FLAVOR
## ORIGINAL BAKED

512   9646   (A)

Case 1:12-cv-02664-CRB Document 41-4 Filed 04/26/13 Page 519 of 552 PageID #: 750

# EXHIBIT C

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

OLYMPIA MORO, on Behalf of Herself and all Others
Similarly Situated,

*Plaintiff*

v.

BARBARA'S BAKERY, INC.,

*Defendant*

)
)
)
)
)
)
)

CV 12 - 6087

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  BARBARA'S BAKERY, INC.
C T CORPORATION SYSTEM
818 W SEVENTH ST.
LOS ANGELES, CA 90017

KUNTZ, J.

MANN, M.J.

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Juan E. Monteverde, Esq.
FARUQI & FARUQI, LLP
369 Lexington Avenue, 10th Floor
New York, New York 10017
Tel: 212-983-9330

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: ___12/11/2012___

*Signature of Clerk or Deputy Clerk*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK **CV 12 - 6087**

| | |
|---|---|
| OLYMPIA MORO, on Behalf of Herself and all Others Similarly Situated, | Civil Action No. |
| Plaintiffs, | **COMPLAINT and DEMAND FOR JURY TRIAL** |
| v. | |
| BARBARA'S BAKERY, INC., | KUNTZ, J. |
| Defendant. | |

Plaintiff, by her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.       This is a class action against Barbara's Bakery, Inc. ("Barbara's Bakery" or the "Defendant") for passing off genetically modified organisms ("GMOs") and synthetic ingredients as "all natural" or "100% natural." Barbara's Bakery sells various cereal products under its Puffins brand, including, but not limited to, Puffins Original, Puffins Peanut Butter and Chocolate, Puffins Multigrain, Puffins Peanut Butter, Puffins Cinnamon, Puffins Honey Rice, Puffin Puffs Crunchy Cocoa and Puffin Puffs Fruit Medley (the "Mislabeled Puffins Products"). The Defendant's labels for each of these products bears the phrase "All Natural" and/or "100% Natural" in large, prominent typeface print. In fact, the Mislabeled Puffins Products are not "100% Natural." The Mislabeled Puffins Products are made from synthetic ingredients and GMOs.

2.     Genetic engineering ("GE") or genetic modification ("GM") of food involves the laboratory process of artificially inserting genes into the DNA of food crops or animals. The result is called a genetically modified organism ("GMO"). GMOs can be engineered with genes from bacteria, viruses, insects, animals, or even humans.  The primary purpose in genetic modification is to make the plants tolerant of pesticides and herbacides.  Due to such genetic modification, residues of herbacides and pesticides are often found in GMO plants and grains, as well as the oils derived therefrom.  The resulting product, thus, is not "100% natural," because both the genetic mutations and the chemical residues are artificial.

3.     Studies have shown that most Americans say they would not eat products made from GMOs if accurately labeled.  Therefore, Barbara's Bakery misled consumers to believe that the Mislabeled Puffins Products were high quality and healthy "100% natural" cereal products when they were not, to command a premium price for their cereal products, take away market share from its competitors and increase its own profits.

4.     In October 2011 public interest group, The Cornucopia Institute, released its report entitled *Cereal Crimes: How "Natural" Claims Deceive Consumers and Undermine the Organic Label – A Look Down the Cereal and Granola Aisle*[1] (the "Cornucopia Study").  In connection with the Cornucopia Study, the institute tested various "natural" products for GMOs.  The Cornucopia Institute's testing revealed that the Defendant's Puffins brand cereal products contained more than 50% genetically engineered corn.

---

[1] Available at http://cornucopia.org/cereal-scorecard/docs/Cornucopia_Cereal_Report.pdf (last accessed November 28, 2012).

5.     Barbara's Bakery's marketing, advertisements product packaging and labels are replete with representations that the Mislabeled Puffins Products are "100% natural." By misrepresenting the Mislabeled Puffins Products as being "100% Natural," when in fact they were not, Barbara's Bakery actively deprived consumers of the information they needed to make their own choices for a healthy lifestyle.

6.     Defendant's marketing of these genetically modified cereals is like a rigged gas pump that charges the higher price for *premium* gasoline but secretly pumps *regular* gasoline into your car's tank.  By passing off lower quality cereals as being "All Natural" or "100% Natural," Barbara's Bakery is able to charge substantially higher prices for the Mislabeled Puffins Products.

7.     A customer cheated by a rigged gas pump is unlikely to discover the ruse, since very few customers are able to measure the octane of the gasoline at the point of sale. Similarly, customers cheated by Defendant's mislabeling of its Puffins brand cereal products cannot investigate or test Defendant's marketing claims regarding the composition, nutritional value and health qualities  at the grocery store to determine they are actually made from GMO's and synthetic ingredients rather than natural ingredients.

8.     Plaintiffs seek relief in this action individually, and as a class action on behalf of all purchasers of the Mislabeled Puffins Products labeled and marketed as being "All Natural" and/or "100% Natural", for Defendant's violations of the Magnuson-Moss Act, 15 U.S.C. § 2301, *et. seq.*, for unjust enrichment, breach of express warranty, breach of implied warranties, fraudulent concealment, violation of the violation of the New York General Business Law (G.B.L.) §349, *et seq.,* and violation of the G.B.L. §350, *et seq.*

3

## THE PARTIES

9.       Plaintiff Olympia Moro is a citizen of the State of New York. Plaintiff
Moro purchased Defendant's Mislabeled Puffins Products, which was represented as
being "All Natural" or "100% Natural" from a retail store in New York. Plaintiff saw
and read Barbara's Bakery's misrepresentations that the Mislabeled Puffins Products are
"All Natural" or "100% Natural" and relied on such misrepresentations in deciding to
purchase the Mislabeled Puffins Products. Plaintiff would not have purchased the
Mislabeled Puffins Products had she known that they were made from synthetic
ingredients and GMOs.

10.      Defendant Barbara's Bakery is a California corporation with its principal
place of business located at 300 Nickerson Rd., Marlborough, MA 01752. Barbara's
Bakery was founded in Northern California in 1971 by Barbara Jaffe. In 1986, Jaffe sold
the company to Weetabix Food Co., a British cereal maker owned by Lion Capitol.
Barbara's bakery is a wholly owned subsidiary of Weetabix Food Co. Barbara's Bakery
manufactures, markets and sells various cereal and snack products, including the
Mislabeled Puffins Products. In 2007, 55% of Barbara's Bakery cereal options offered
through the largest organic food distributor were certified organic, and one product was
"made with organic ingredients." In 2011, only 20% of Barbara's Bakery products were
certified organic.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal
question). This Court has supplemental jurisdiction over state law claims pursuant to 28
U.S.C. § 1367.

4

12.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class Members is a citizen of a state different from Defendant.

13.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions and acts giving rise to the claims herein occurred in this District.

## FACTS COMMON TO ALL CLAIMS

### A.     Consumer Expectations for the Term "Natural"

14.     "Natural" generally is thought to mean no artificial ingredients or preservatives. A 2010 poll by the Hartman Group cited in the Cornucopia Study shows a majority of consumers understand the term "natural" to mean the absence of pesticides, herbicides and genetically modified foods.

5



Meaning of "organic" and "natural"

15.    The Department of Agriculture ("USDA") has stated that an ingredient is synthetic and not natural if it is "formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes." 7 C.F.R. § 205.2. Moreover, the USDA has stated that an ingredient is artificial if it "is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof." 21 C.F.R. § 101.22(a)(1).

16. For example, in a July 22, 2011a warning letter to Bagels Forever, Inc.[2], the USDA stated it "considers use of the term "natural" on a food label to be truthful and non-misleading only when nothing artificial or synthetic has been included in, or has been added to, a food that would not normally be expected to be in the food (58 FR 2302, 2407, January 6, 1993; 21 CFR 101.22)."

17. Plaintiff and Class Members expected nothing artificial or synthetic to have been included in, or have been added to the Mislabeled Puffins Products because Barbara's Bakery represented the Mislabeled Puffins Products to be "All Natural" and "100% Natural."

**B. GMOs Are Not Natural**

18. Genetic modification involves the insertion or deletion of genes. When genes are inserted, they usually come from a different species. To do this artificially may require attaching the genes to a virus, which is a small infectious agent that can replicate only inside the living cells of organisms. Alternatively, extra genetic material in some instances may be inserted into the nucleus of the intended host with a very small syringe, or with very small particles fired from a gene gun. Other methods of genetic modification exploit natural forms of gene transfer, such as the ability of agrobacterium, a genus of gram-negative bacteria, which uses horizontal gene transfer to cause tumors in plants, resulting in GMOs.

19. Monsanto is considered the mother of agricultural biotechnology. Mosanto's website recognizes that there is nothing "natural" about GMO crops, defining "Genetically Modified Organisms (GMO)" as ***Plants or animals that have had their***

---

[2] Available at http://www.fda.gov/ICECI/EnforcementActions/Warning Letters/2011ucm26756.htm (last accessed November 28, 2012).

*genetic makeup altered to exhibit traits that are not naturally theirs.* In general, genes are taken (copied) from one organism that shows a desired trait and transferred into the genetic code of another organism." *See Glossary,* available at http://www.monsanto.com/newsviews/pages/glossary.aspx#g (last accessed November 28, 2012).

20. One of the most common uses of genetic modification or engineering is to make crops resistant to herbicides, such as Monsanto's weed killing product named Roundup. Monsantos' "Roundup Ready" or "Roundup Ready 2" ("RR System") crops have been genetically engineered to permit direct, "over the top" application of the Monsanto herbicide glyphosate (the active ingredient in Roundup) allowing farmers to drench both their crops and crop land with the herbicide so as to be able to kill nearby weeds (and any other green thing the herbicide touches). Rather than the traditional tilling of the ground to control weeds, the RR System relies on its herbicide to control them. Similar genetic modification has been performed with respect to other brands and types of herbicides, such as Bayer's LibertyLink herbicide.

21. In fact, the RR System, which has been applied to rape-seed (source of canola oil), soybeans, and to the "SmartStax" system for corn, was specifically designed to require the exclusive use of Monsanto's herbicide, Roundup. Consequently, David Ehrenfeld, Professor of Biology at Rutgers University, has concluded that, "Genetic Engineering is often justified as a human technology, one that feeds more people with better food. Nothing could be further from the truth. With very few exceptions, the whole point of genetic engineering is to increase sales of chemicals and bio-engineered products to dependent farmers." Ehrenfeld, David, *A Techno-Pox upon the Land.* Harper's

8

Magazine (Oct. 1997). The widespread adoption of Roundup Ready crops in the United States combined with the emergence of glyphosate-resistant weeds has driven a more than 15-fold increase in the use of glyphosate on major field crops from 1994 to 2005.

22. Testing has shown that even when concentrations of herbicides such as Roundup below those permitted or recommended by the FDA are applied to crops, a residue of Roundup and other similar types of herbicides remain in the crops when harvested. This fact, along with the widespread usage of Roundup has led biochemist Gilles-Eric Séralini, a member for years of the French Commission on Biomolecular Genetics to conclude that, while Roundup and similar products were originally used against weeds, *"they have become a food product, since they are used on GMOs, which can absorb them without dying."* *See Roundup Doesn't Poison Only Weeds*, available at http://archive.truthout.org/article/roundup-doesnt-poison-only-weeds (last accessed November 28, 2012).

23. Moreover, testing to determine the existence of GMOs in food and feed is routinely done using molecular techniques like DNA microarrays or real-time polymerase chain reaction ("qPCR"). Such sophisticated testing is not available or economically feasible for consumers to conduct on the foods which they purchase.

24. As seen in the Cornucopia Study, a majority of consumers expect "natural" foods to be free of GMOs.

## C. Defendant's Representations That The Mislabeled Puffins Products Are "100% Natural"

25. Throughout Defendant's marketing materials, advertising, website, labeling, packaging and point of sale materials, Barbara's Bakery represents that its Mislabeled Puffins Products are "All Natural" or "100% Natural."

9

26.    The label for each of the Mislabeled Puffins Products prominently features

in large type "100% Natural" and/or "All Natural since 1971." For example:









27.     Barbara's Bakery also maintains a website for the purposes of marketing the Mislabeled Puffins Products.[3]  With respect to its Mislabeled Puffins Products, the website proclaims its Mislabeled Puffin Products are "100% Natural.":

---

[3] *See* http://www.barbarasbakery.com/cereals-puffins/ (last accessed November 28, 2012).

## Perfect for these dietary needs

✔ 100% Natural
✔ Dairy Free
✔ Low Fat
✔ Wheat Free Ingredients
✔ Gluten Free (Honey Rice & Multigrain)
✔ Cholesterol Free
✔ Vegetarian

28.   Similarly, on the main page of its website[4], Barbara's Bakery represents:





---

[4] *See* http://www.barbarasbakery.com/ (last accessed November 28, 2012).

13



29.     Likewise, on its online store for its Mislabeled Puffins Products[5], Barbara's Bakery states "Starting your day the Barbara's way means great-tasting cereals that always include all natural, wholesome ingredients like: whole oat and whole wheat grains, real vanilla, cinnamon, flax, blueberry, pomegranate, cocoa and other popular ingredients."

30.     Barbara's Bakery also recognizes that consumers are increasingly concerned about the types of foods they put into their bodies. On the Barbara's Bakery website, in the "About Us" section[6], Defendant states its commitment is "to create the

_____

[5] *See*
http://shop.barbarasbakery.com/Cereals/c/BarbarasBakery@Cereals?gclid=CJbdsqfk8rMCFYKK4AodomsAwA (last accessed November 28, 2012).
[6] *See* http://www.barbarasbakery.com/about/ (last accessed November 28, 2012).

14

best-tasting natural products free of artificial preservatives and ingredients, hydrogenated oils, and refined white sugar."

31. Based on the investigation of Plaintiff's counsel, however, the Mislabeled Puffins Products are not "All natural" or "100% Natural," but rather are made from synthetic ingredients and GMOs which are susceptible – if not likely – to contain trace amounts of herbicides.

**D. The Mislabeled Puffins Products are not "All Natural" or "100% Natural"**

32. The October 2011 Cornucopia Study[7] revealed that the Mislabeled Puffins Products contain more than 50% genetically engineered corn, a GMO. GMOs are artificial, man-made and synthetic under the USDA's definition, is that they are "formulated or manufactured by a chemical process or by a process that chemically changes a substance." 7 C.F.R § 205.2.

33. In addition to GMOs, the Mislabeled Puffins Products contain other synthetic ingredients, including but not limited to:

- Annatto - an "artificial color" or "artificial coloring." 21 C.F.R. § 101.2(a)(4), 21 C.F.R. § 70.3(f), 21 C.F.R. § 73.30;

- Ferric orthophosphate – a synthetic ingredient prepared by reaction of sodium phosphate with ferric chloride or ferric citrate. 21 C.F.R. § 184.1301;

- Tocopherols – a synthetic chemical preservative. 21 C.F.R. § 205.605(b), 21 C.F.R. § 182.3890;

---

[7] Available at http://cornucopia.org/cereal-scorecard/docs/Cornucopia_Cereal_Report.pdf (last accessed November 28, 2012).

15

- Retinyl palmitate (Vitamin A palmitate) – the synthetic palmitate ester of retinol, prepared by esterifying retinol with palmitic acid. 21 C.F.R. § 184.1930(a)(3); and

- Ascorbic acid – a synthetic substance and chemical preservative. 21 C.F.R. § 205.605(b), 21 C.F.R. § 182.3013.

34.     Defendant's Mislabeled Puffins Products contain GMOs and synthetic ingredients. Thus, the Mislabeled Puffins Products are neither "All Natural" nor "100% Natural."

        **E.     Defendant's "All Natural" and "100% Natural" Claims are Material**

35.     Defendant's representations that the Mislabeled Puffins Products are "all Natural" or "100% Natural" are material to consumers of food products.

36.     Defendant's representations that the Mislabeled Puffins Products are "all Natural" or "100% Natural" pertained to the composition, attributes, characteristics, nutritional value, health qualities and value of the Mislabeled Puffins Products. Therefore, Plaintiff and members of the Class purchased products that they would not have purchased or paid more than they otherwise would have been willing to pay if the Mislabeled Puffins Products they purchased had been labeled accurately.

                                **CLASS ACTION ALLEGATIONS**

37.     Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 (a), (b)(1), (b)(2), and (b)(3) on behalf of all purchasers of Mislabeled Puffins Products in the United States (the "Class").

38.     Plaintiff also seeks to represent a subclass defined as all members of the Class who purchased the Mislabeled Puffins Products in New York ("New York Subclass").

16

39.     Members of the Class and New York Subclass are so numerous that their individual joinder herein is impracticable. Members of the Class and Subclass number in the thousands. The precise number of Class Members and their identities are unknown to Plaintiff at this time, but will be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Barbara's Bakery and third party retailers and vendors.

40.     Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to:

(a)     whether Barbara's Bakery violated the Magnuson-Moss Act, 15 U.S.C. § 201, *et seq.*;

(b)     whether Barbara's Bakery was unjustly enriched by its conduct;

(c)     whether Barbara's Bakery breached an express warranty made to Plaintiff and the Class;

(d)     whether Barbara's Bakery breached the implied warranty of merchantability made to Plaintiff and the Class;

(e)     whether Barbara's Bakery advertises, or markets the Mislabeled Puffins Products in a way that is false or misleading;

(f)     whether the Mislabeled Puffins Products fail to conform to the representations, which were published, disseminated and advertised to Plaintiff and the Class;

(g)     whether Barbara's Bakery concealed from Plaintiff and the Class that the Mislabeled Puffins Products did not conform to its stated representations;

17

(h)     whether, by the misconduct set forth in this Complaint, Barbara's Bakery has engaged in unfair, fraudulent or unlawful business practices with respect to the advertising, marketing and sales of the Mislabeled Puffins Products;

(i)     whether Barbara's Bakery violated G.B.L. § 349, *et seq.*;

(j)     whether Barbara's Bakery violated G.B.L. § 350, *et seq.*; and

(k)     whether, as a result of Defendant's misconduct as alleged herein, Plaintiff and Class Members are entitled to restitution, injunctive, and/or monetary relief and, if so, the amount and nature of such relief.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct. Plaintiff has no interests antagonistic to the interests of the other members of the Class. Plaintiff and all members of the Class have sustained economic injury arising out of Defendant's violations of common and statutory law as alleged herein.

42.     Plaintiff is an adequate representative of the Class because her interest does not conflict with the interests of the Class Members she seeks to represent, she has retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class Members will be fairly and adequately protected by Plaintiff and her counsel.

43.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class Members. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and

multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I

### (Violation of Magnuson-Moss Act (15 U.S.C. § 2301, *et seq.*)

44. Plaintiff and Class Members reallege and incorporate by reference each allegation set forth above and further allege as follows.

45. Plaintiffs bring this claim individually and on behalf of the members of the Class and New York Subclass against defendant Barbara's Bakery.

46. The Mislabeled Puffins Products are consumer products as defined in 15 U.S.C..§2301(1).

47. Plaintiff and Class Members are consumers as defined in 15 U.S.C..§2301(3).

48. Defendant Barbara's Bakery is a supplier and warrantor as defined in 15 U.S.C. §2301(4) and (5).

49. In connection with the sale of the Mislabeled Puffins Products, Barbara's Bakery issued written warranties as defined in 15 U.S.C. §2301(6), which warranted that the products were "All Natural" or "100% Natural."

50. In connection with the sale of the Mislabeled Puffins Products, Barbara's Bakery impliedly warranted as defined in 15 U.S.C. §2301(7), that the products were of

19

merchantable quality, such that the products were of the same average grade, quality, and value as similar goods sold under similar circumstances.

51.     By reason of Defendant's breach of the express written warranties stating that the Wesson Oils were "All Natural" and "100% Natural," and by Defendant's breach of its implied warranties, Barbara's Bakery has violated the statutory rights due to Plaintiff and Class Members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §2301 *et seq.*, thereby damaging Plaintiff and Class Members.

## COUNT II

### (Unjust Enrichment)

52.     Plaintiff and Class Members reallege and incorporate by reference each allegation set forth above and further allege as follows.

53.     Plaintiff brings this claim individually and on behalf of the members of the Class, and on behalf of the New York Subclass against Defendants.

54.     Plaintiff and Class Members conferred a benefit on Defendants by purchasing the Mislabeled Puffins Products.

55.     Defendants have been unjustly enriched in retaining the revenues derived from Class Members' purchases of its Mislabeled Puffins Products, which retention under these circumstances is unjust and inequitable because Defendants misrepresented that the Mislabeled Puffins Products were "All Natural" and "100% Natural," when in fact, they were not. Instead, the Mislabeled Puffins Products were made from synthetic ingredients and GMOs that contained a genetic makeup not found in nature which made them susceptible – if not likely – to contain trace amounts of herbicides also not found in nature, which caused injuries to Plaintiff and Class Members because: (a) they would not have purchased the Mislabeled Puffins Products on the same terms if the true facts

20

concerning their actual composition had been known; (b) they paid a price premium due to the mislabeling of the Mislabeled Puffins Products; and (c) the Mislabeled Puffins Products did not have the composition, attributes, characteristics, nutritional value, health qualities or value as promised.

56. Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendants must pay restitution to Plaintiff and the Class Members for its unjust enrichment, as ordered by the Court.

## COUNT III

### (For Breach Of Express Warranty)

57. Plaintiff and Class Members reallege and incorporate by reference each allegation set forth above and further allege as follows.

58. Plaintiffs bring this claim on behalf of the nationwide Class under New York law and on behalf of the New York Subclass under New York law.

59. Barbara's Bakery, as the designer, manufacturer, marketer, distributor, or seller expressly warranted that the Mislabeled Puffins Products were "All Natural" and "100% Natural."

60. In fact, the Mislabeled Puffins Products were made from synthetic ingredients and GMOs that contained a genetic makeup not found in nature which made them susceptible – if not likely – to contain trace amounts of herbicides also not found in nature.

61. Plaintiff and Class Members were injured as a direct and proximate result of Defendant's breach because: (a) they would not have purchased the Mislabeled Puffins Products on the same terms if the true facts concerning their actual composition

21

had been known; (b) they paid a price premium due to the mislabeling of the Mislabeled Puffins Products; and (c) the Mislabeled Puffins Products did not have the composition, attributes, characteristics, nutritional value, health qualities or value as promised.

## COUNT IV

### (For Breach Of Implied Warranty of Merchantability)

62. Plaintiff and Class Members reallege and incorporate by reference each allegation set forth above and further allege as follows.

63. Plaintiffs bring this claim on behalf of the nationwide Class under New York law and on behalf of the New York Subclass under New York law.

64. By representing that the Mislabeled Puffins Products were "All Natural" and "100% Natural" in marketing and advertising as described herein, Barbara's Bakery impliedly warranted that such product were of merchantable quality, such that the products were of the same average grade, quality, and value as similar goods sold under similar circumstances.

65. Plaintiff and Class Members relied on Defendant's representations that the Mislabeled Puffins Products were "All Natural" and "100% Natural" when they purchased the Mislabeled Puffins Products.

66. Barbara's Bakery breached the warranty implied at the time of sale in that the Plaintiff and Class Members did not receive goods that were "All Natural" or "100% Natural" as represented and thus, the Mislabeled Puffins Products were not merchantable as fit for the ordinary purposes for which those goods are used or as promoted, marketed, advertised, packaged, labeled, or sold.

67. At all times relevant to this action, Barbara's Bakery has breached its implied warrantied concerning the Mislabeled Puffins Products because the Mislabeled

22

Puffins Products are not "All Natural" or "100% Natural" but are made from synthetic ingredients and GMOs.

68. Plaintiff and Class Members were injured as a direct and proximate result of Defendant's breach because: (a) they would not have purchased the Mislabeled Puffins Products on the same terms if the true facts concerning their actual composition had been known; (b) they paid a price premium due to the mislabeling of the Mislabeled Puffins Products; and (c) the Mislabeled Puffins Products did not have the composition, attributes, characteristics, nutritional value, health qualities or value as promised.

## COUNT V

### (Fraudulent Concealment / Nondisclosure)

69. Plaintiff and Class Members reallege and incorporate by reference each allegation set forth above and further allege as follows.

70. Plaintiff brings this claim on behalf of the nationwide Class under New York law and on behalf of the New York Subclass under New York law.

71. Barbara's Bakery knew at the time of sale that that the Mislabeled Puffins Products were not "All Natural" or "100% Natural."

72. Barbara's Bakery fraudulently concealed from and/or intentionally failed to disclose to Plaintiff, the Class, and all others in the chain of distribution (*e.g.*, concealments and omissions in Defendant's communications with wholesalers, retailers, and others in the chain of distribution that were ultimately passed on to Plaintiff and the Class) that Mislabeled Puffins Products were not "All Natural" or "100% Natural," but instead were made from synthetic ingredients and GMOs that contained a genetic makeup that does not appear in nature and were therefore susceptible – if not likely to contain trace amounts of herbicides, and therefore did not have composition, attributes,

23

characteristics, nutritional value, health qualities, or value of "All Natural" or "100% Natural" cereal products.

73.     Barbara's Bakery had exclusive knowledge of the ingredients from which the Mislabeled Puffins Products were made, and it would not be anticipated that consumers, wholesalers or retailers would conduct independent tests on the Mislabeled Puffins Products to determine whether the Mislabeled Puffins Products were made from synthetic ingredients and GMOs or whether they contained trace amounts of herbicides. The defect is latent and not something that Plaintiff or Class Members could, in the exercise of reasonable diligence, have discovered independently prior to purchase, because it is not feasible for individual consumers to conduct their own laboratory analysis of the Mislabeled Puffins Products prior to purchase.

74.     Barbara's Bakery had the capacity to, and did, deceive consumers into believing that they were purchasing "All Natural" or "100% Natural" cereal products.

75.     Barbara's Bakery undertook active and ongoing steps to conceal the defect. Plaintiff is aware of nothing in Defendant's advertising, publicity or marketing materials that discloses the truth about the defect, despite Defendant's awareness of this fact.

76.     The facts concealed and/or not disclosed by Barbara's Bakery to Plaintiff and the Class are material facts in that a reasonable person would have considered them important in deciding whether to purchase (or to pay the same price for) cereal products.

77.     Since Barbara's Bakery elected to make representations regarding the fact that the Mislabeled Puffins Products were "All Natural" or "100% Natural," Barbara's

Bakery had a duty to accurately disclose at the time of same the fact that Mislabeled Puffins Products were made from synthetic ingredients and GMOs.

78. Barbara's Bakery intentionally concealed and/or failed to disclose the fact that the Mislabeled Puffins Products were made from synthetic ingredients and GMOs for the purpose of inducing the Plaintiff and the Class to act thereon.

79. Plaintiff and the Class justifiably acted or relied upon the concealed and/or non-disclosed facts to their detriment, as evidenced by their purchase of the Mislabeled Puffins Ingredients.

80. Had Plaintiff and the Class known of the true facts regarding concerning the actual composition of the Mislabeled Puffins Products, they would not have purchased (or would have paid less for) the Mislabeled Puffins Products.

## COUNT VI

### (Violation Of New York General Business Law § 349)

81. Plaintiff and Class Members reallege and incorporate by reference each allegation set forth above and further allege as follows.

82. Plaintiff brings this claim on behalf of the New York Subclass under New York law.

83. Barbara's Bakery engaged in making false and misleading marketing and advertising claims, representing that Mislabeled Puffins Products were "All Natural" and "100% Natural," when in fact the Mislabeled Puffins Products are made from synthetic ingredients and GMOs and thus are neither "All Natural" nor "100% Natural."

84. As set for above, by advertising, marketing, distributing and/or selling Mislabeled Puffins Products to Plaintiff and the New York Subclass, Barbara's Bakery engaged in, and continues to engage in, deceptive acts and practices.

85.     Plaintiff and other members of the New York Subclass further seek to enjoin such unlawful deceptive acts and practices as described above. Each of the members of the New York Subclass will be irreparably harmed unless the unlawful actions of Barbara's Bakery are enjoined in that Barbara's Bakery will continue to falsely and misleadingly advertise the Mislabeled Puffins Products as being "All Natural" and "100% Natural." Therefore, Plaintiff and the New York Subclass request an order granting them injunctive relief ordering appropriate disclosures and/or disclaimers in the advertising, marketing and promotion of the Mislabeled Puffins Products.

86.     Absent such injunctive relief, Barbara's Bakery will continue to advertise, market and sell the Mislabeled Puffins Products as being "All Natural" and "100% Natural," even though the products are contain synthetic ingredients and GMOS and are not "All Natural" and "100% Natural," to the detriment of consumers.

87.     In this regard, Barbara's Bakery has violated, and continue to violate, G.B.L. § 349, which makes deceptive acts and practices unlawful. As a direct and proximate result of Defendant's violation of G.B.L. § 349 as alleged above, Plaintiff and other members of the New York Subclass have suffered damages, in an amount to be determined at trial.

## COUNT VII

### (Violation Of New York General Business Law § 350)

88.     Plaintiff and Class Members reallege and incorporate by reference each allegation set forth above and further allege as follows.

89.     Plaintiff brings this claim on behalf of the New York Subclass under New York law.

26

90.     Barbara's Bakery engaged in making false and misleading marketing and advertising claims, representing that Mislabeled Puffins Products were "All Natural" and "100% Natural," when in fact the Mislabeled Puffins Products are made from synthetic ingredients and GMOs and thus are neither "All Natural" nor "100% Natural."

91.     New York G.B.L. § 350-a defines "false advertising" as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect."

92.     As set for above, by advertising, marketing, distributing and/or selling Mislabeled Puffins Products to Plaintiff and the New York Subclass, Barbara's Bakery engaged in, and continues to engage in, false advertising.

93.     Plaintiff and other members of the New York Subclass further seek to enjoin such false advertising as described above. Each of the members of the New York Subclass will be irreparably harmed unless the unlawful actions of Barbara's Bakery are enjoined in that Barbara's Bakery will continue to falsely and misleadingly advertise and market the Mislabeled Puffins Products as "All Natural" and "100% Natural." Therefore, Plaintiff and the New York Subclass request an order granting them injunctive relief ordering appropriate disclosures and/or disclaimers in the advertising, marketing and promotion of the Mislabeled Puffins Products.

94.     Absent such injunctive relief, Barbara's Bakery will continue to advertise, market and sell the Mislabeled Puffins Products as "All Natural" and "100% Natural," even though the products contain synthetic ingredients and GMOs and are not "All Natural" or "100% Natural," to the detriment of consumers.

27

95.     In this regard, Barbara's Bakery has violated, and continue to violate, G.B.L. § 350, which makes deceptive acts and practices unlawful.  As a direct and proximate result of Defendant's violation of G.B.L. § 350 as alleged above, Plaintiff and other members of the New York Subclass have suffered damages, in an amount to be determined at trial.

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Barbara's Bakery, as follows:

A.      For an order certifying the nationwide Class and the New York Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as Class Representative and her attorneys as Class Counsel to represent the Class Members;

B.      For an order declaring the Defendant's conduct violates the statutes referenced herein;

C.      For an order finding in favor of the Plaintiff, the nationwide Class and the New York Subclass on all counts asserted herein;

D.      For an order awarding compensatory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

E.      For prejudgment interest on all amounts awarded;

F.      For an order of restitution and all other forms of equitable monetary relief;

G.      For injunctive relief as pleaded or as the Court may deem proper; and

H.      For an order awarding Plaintiff and the Class and New York Subclass their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable in this action.

DATED: December 11, 2012

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: _____
Nadeem Faruqi (NF-1184)
Juan E. Monteverde (JM-8169)
369 Lexington Avenue, 10th Floor
New York, NY 10017
Tel: 212-983-9330
Fax: 212-983-9331
Email: nfaruqi@faruqilaw.com
jmonteverde@faruqilaw.com

*Attorneys for Plaintiff*

1  GLYNN & FINLEY, LLP
   CLEMENT L. GLYNN, Bar No. 57117
2  ADAM FRIEDENBERG, Bar No. 205778
   JONATHAN A. ELDREDGE, Bar No. 238559
3  One Walnut Creek Center
   100 Pringle Avenue, Suite 500
4  Walnut Creek, CA 94596
   Telephone: (925) 210-2800
5  Facsimile: (925) 945-1975
   E-mail: afriedenberg@glynnfinley.com
6         jeldredge@glynnfinley.com

7  Attorneys for Defendant
   Barbara's Bakery, Inc.

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12  RICHARD W. TRAMMELL, individually           )   **Case No. C12-02664-CRB**
    and on behalf of all others similarly situated, )
13                                               )   **PROOF OF SERVICE RE DEFENDANT**
              Plaintiff,                          )   **BARBARA'S BAKERY, INC.'S**
14                                               )   **MOTION FOR PRELIMINARY**
                                                 )   **APPROVAL OF CLASS ACTION**
15       vs.                                      )   **SETTLEMENT AND REQUEST FOR**
                                                 )   **PRELIMINARY INJUNCTION**
16  BARBARA'S BAKERY, INC., a California         )
    corporation; and DOES 1-50,                  )
17                                               )   Date:  June 14, 2013
              Defendants.                         )   Time:  10:00 a.m.
18                                               )   Place: Courtroom 6
                                                 )   Judge: The Honorable Charles R. Breyer
19  _____         )
                                                     Complaint Filed: May 23, 2012
20

21

22

23

24

25

26

27

28

_____

                                PROOF OF SERVICE

1                            Docket No.  C12-02664-CRB

<u>PROOF OF SERVICE BY FEDERAL EXPRESS</u>

2

3           I, Beverly Carter, the undersigned, hereby certify and declare under penalty of

4  perjury that the following statements are true and correct:

5          1.     I am over the age of 18 years and am not a party to the within cause.

6          2.     My business address is One Walnut Creek Center, 100 Pringle Avenue,

7  Suite 500, Walnut Creek, CA  94596.

8          3.     On April 26, 2013, I served a copy of the following documents entitled

9  exactly:

10      **a.**  **DEFENDANT BARBARA'S BAKERY, INC.'S NOTICE OF**
           **MOTION AND MOTION FOR PRELIMINARY APPROVAL OF**
11           **CLASS ACTION SETTLEMENT AND REQUEST FOR**
           **PRELIMINARY INJUNCTION**
12

13      **b.**  **DEFENDANT BARBARA'S BAKERY, INC.'S MEMORANDUM**
           **OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION**
           **FOR PRELIMINARY APPROVAL OF CLASS ACTION**
14           **SETTLEMENT AND REQUEST FOR PRELIMINARY**
           **INJUNCTION**
15

      **c.**  **DECLARATION OF JONATHAN A. ELDREDGE**
16

17  by Federal Express overnight delivery.  A true copy thereof was enclosed in a sealed envelope

18  addressed as follows:

19             ***Gabriel Rojas, et al. v. Barbara's Bakery, Inc.***
            San Francisco Superior Court Case No. CGC-12-525911
20

                Benjamin M. Lopatin, Esq.
21          The Law Offices of Howard W. Rubinstein, P.A.
             One Embarcadero Center, Suite 500
22            San Francisco, CA  94111
              ***Attorneys for Plaintiff***
23        ***Gabriel Rojas and the Proposed Class***
           **T: 800-436-6437; F: 415-692-6607**
24          Email:  lopatin@hwrlawoffice.com

25  / / /

26  / / /

27  / / /

28  / / /

- 1 -

PROOF OF SERVICE

***Olympia Moro, et al. v. Barbara's Bakery, Inc.***
U.S. District Court, Eastern District of New York
Case No. CV 12-06087

Juan E. Monteverde, Esq.
Faruqi & Faruqi, LLP
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone: (212) 983-9330
***Attorneys for Plaintiffs***

***Erin Silber, et al. v. Barbara's Bakery, Inc.***
U.S. District Court, Eastern District of New York
Case No. CV 12-05511

Michael Robert Reese, Esq.
Kim Richman, Esq.
**Reese Richman LLP**
875 Avenue of the Americas, 18th Floor
New York, NY 10001
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
Email: krichman@reeserichman.com
mreese@reeserichman.com

Yvette Golan
**The Golan Firm**
1919 Decatur Street, 3rd Floor
Houston, TX 77007
Telephone: (866) 298-4150, ext. 101
Facsimile: (928) 441-8250
Email: ygolan@tgfirm.com

***Attorneys for Plaintiffs***

I caused said envelopes to be hand-delivered by Federal Express, with guaranteed delivery before noon on the following business day.

Executed this 26th day of April, 2013 at Walnut Creek, California.

_____
Beverly Carter

- 2 -

PROOF OF SERVICE