# REESE RICHMAN LLP

May 1, 2013

**<u>Via CM/ECF, Electronic Mail, and U.S. Postal Service</u>**

NIXON PEABODY LLP
Barbara A. Lukeman
437 Madison Avenue
New York, New York  10022
Telephone:     (212) 307-5500
Facsimile:     (212) 307-5598
Email:          blukeman@nixonpeabody.com


GLYNN & FINLEY, LLP
James M. Hanlon, Jr.
Clement Glynn
One Walnut Creek Center
100 Pringle Avenue, Suite 500
Walnut Creek, California  94596
Telephone:     (202) 344-4000
Facsimile:     (202) 344-8300
Email:          jhanlon@glynnfinley.com
                cglynn@glynnfinley.com

> Re:     ***<u>Silber v. Barbara's Bakery, Inc.</u>***, No. 1:12-cv-05511-WFK-RLM

Counsel,

I represent plaintiff Erin Silber in the above-referenced action. Pursuant to Judge Kuntz's Individual Rules, enclosed are the following documents:

- Preliminary Injunction bundle:

    - **PLAINTIFF'S NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**
    - **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
    - **DECLARATION OF YVETTE GOLAN IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** and Exhibits 1–23
    - **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**
    - **[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
    - **CERTIFICATE OF SERVICE**
    - Cover letter regarding Barbara's Bakery, Inc.'s Opposition to Motion for Preliminary Injunction
    - **OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**
    - **DECLARATION OF CLEMENT L. GLYNN IN SUPPORT OF BARBARA'S**

Cover letter
May 1, 2013
Page 2 of 2

> **BAKERY INC.'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**
> o **CERTIFICATE OF SERVICE**
> o Cover letter regarding preliminary injunction bundle
> o **REPLY IN FURTHER SUPPORT OF PLAINTIFF ERIN SILBER'S MOTION FOR PRELIMINARY INJUNCTION**
> o **SUPPLEMENTAL DECLARATION OF YVETTE GOLAN IN SUPPORT OF PLAINTIFF ERIN SILBER'S MOTION FOR PRELIMINARY INJUNCTION** and Exhibits 1–4
> o **CERTIFICATE OF SERVICE**

Very truly yours,

Kim Richman

Enclosures

cc:   blukeman@nixonpeabody.com
      cglynn@glynnfinley.com
      jhanlon@glynnfinley.com

      NIXON PEABODY LLP
      Barbara A. Lukeman
      437 Madison Avenue
      New York, New York  10022

      GLYNN & FINLEY, LLP
      James M. Hanlon, Jr.
      Clement Glynn
      One Walnut Creek Center
      100 Pringle Avenue, Suite 500
      Walnut Creek, California  94596

      United States District Judge William F. Kuntz, II (via U.S. Postal Service only)
      United States District Court
      225 Cadman Plaza East
      Brooklyn, New York  11201

      Magistrate Judge Roanne L. Mann (via U.S. Postal Service only, without enclosures)
      United States District Court
      225 Cadman Plaza East
      Brooklyn, New York  11201

**THE GOLAN FIRM**
Yvette Golan
1919 Decatur St.
Houston, Texas  77007
Telephone:     (866) 298-4150, ext. 101
Facsimile:     (928) 441-8250
Email:         ygolan@tgfirm.com

**REESE RICHMAN LLP**
Kim E. Richman
Michael R. Reese
875 Avenue of the Americas, 18th Floor
New York, New York  10001
Telephone:     (212) 643-0500
Facsimile:     (212) 253-4272
Email:         krichman@reeserichman.com
               mreese@reeserichman.com

*Counsel for Plaintiff Erin Silber and the Proposed Classes*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIN SILBER, on behalf of herself and all others similarly situated,<br><br>                          Plaintiff,<br><br>        v.<br><br>BARBARA'S BAKERY, INC.,<br><br>                          Defendant. | Case No. 1:12-cv-05511-WFK-RLM<br><br>**REPLY IN FURTHER SUPPORT OF PLAINTIFF ERIN SILBER'S MOTION FOR PRELIMINARY INJUNCTION** |
| OLYMPIA MORO, on behalf herself and all others similarly situated,<br><br>                          Plaintiff,<br><br>        v.<br><br>BARBARA'S BAKERY, INC.,<br><br>                          Defendant. | Case No. 1:12-cv-06087-WFK-RLM |

*DATE OF SERVICE*: May 1, 2013

Plaintiff Erin Silber ("Silber") brings her Motion for a Preliminary Injunction ("Motion") enjoining defendant Barbara's Bakery, Inc. ("Barbara's") from falsely labeling its Products[1] to protect the American public from adulteration of our food supply.  Silber, a mother of two children, seeks to protect both adults and children alike from Barbara's Bakery's deception.

Barbara's concedes the salient points made in Silber's Memorandum of Law in Support of her Motion for Preliminary Injunction ("Opening Brief").  Indeed, Barbara's leaves merits issues "for another day."  Opposition to Motion for Preliminary Injunction ("Opposition"), at 2 n.2.  Further, Barbara's does not contest that the balance of hardships favors Silber.  Barbara's also does not dispute that an injunction is in the public interest because the deception at issue is ongoing and widespread.  Barbara's does not oppose Silber's Request for Judicial Notice, nor does Barbara's oppose Silber's argument that this Court should not require a bond.  Barbara's thus concedes all these points to Silber.

Instead, Barbara's asks this Court to deny Silber's Motion because the United States District Court for the Northern District of California *might* approve a proposed settlement in a similar case, *Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664-CRB.  Alternatively, Barbara's asks this Court to stay Silber's Motion pending the Northern District of California's consideration of the *Trammell* settlement.  The *Trammell* court has not made any ruling on the proposed settlement, and has not held that the proposed settlement would dispose of Silber's case.  On April 29, 2013, Silber received notice that Barbara's filed a Motion for Preliminary Approval of Class Action Settlement and Request for Preliminary Injunction in *Trammell*, asking the Northern District of California to issue an order enjoining this Court from proceeding with

---

[1] This Reply in Further Support of Plaintiff's Motion for Preliminary Injunction uses the terms "Product" and "Products" as those terms are defined in Silber's Complaint, No. 1:12-cv-05511-WFK-RLM, Dkt. 1, at ¶ 1, ¶ 1 n1.

Silber's action here.  The Northern District also has not ruled on Barbara's motion. This issue will not be decided until mid-June, at the earliest.

## FACTUAL BACKGROUND

In its Opposition, Barbara's glosses over material distinctions between *Silber* and *Trammell*, and fails to disclose the distinctions between the relief the *Trammell* settlement might accomplish and the relief Silber's Motion requests.

Barbara's attempts to paint Silber's case as a "copycat" action of the *Trammell* action pending in California.  As the procedural history of the two matters demonstrates, however, *Trammell* began as a much more limited action, challenging a small subset of products for having only one ingredient, genetically modified corn.  *See* Supplemental Declaration of Yvette Golan in Support of Plaintiff Erin Silber's Motion for Preliminary Injunction ("Supp. Golan Decl."), Ex. 1 (Trammell's original Complaint), Ex. 2 (Trammell's First Amended Complaint).

Not only does Barbara's mischaracterize the *Trammell* suit's history, it also mischaracterizes Silber's suit.  In its Opposition, Barbara's falsely states that "[t]he core claim" in Silber's action is that the Products contain genetically modified ingredients ("GMOs"). Opposition at 1.  In fact, Silber's suit challenges not just GMOs, but an array of various synthetic ingredients.  Compl., No. 1:12-cv-05511-WFK-RLM, Dkt. 1, at ¶¶ 6–7, 37–38.  Thus, while Mr. Trammell's initial complaint addressed only GMOs, Silber's case has always been about synthetic ingredients in Barbara's Products.  Silber's case has also always been about a broader selection of Products than the *Trammell* action.  Only after Silber filed her initial Complaint, the *Trammell* suit was enlarged, attempting to co-opt the claims, the products, and the ingredients that were first brought in Silber's Complaint.  *See* Supp. Golan Decl., Ex. 3 (Trammell's Second Amended Complaint).

## ARGUMENT

I.     **The *Trammell* Settlement Will Not Provide the Relief Silber Requests, and Dismissing or Staying Silber's Action Will Only Serve to Delay Its Resolution**

Barbara's mistakenly argues that if the *Trammell* court approves the proposed settlement, "Barbara's will be under court order to undertake the steps that plaintiff seeks to compel by [her motion for preliminary injunction], which will be mooted."

***Even if*** the Northern District of California approves the *Trammell* settlement (which it may not), [2] the settlement will not provide the relief Ms. Silber seeks.  In particular, the settlement does not provide for immediate cessation of Barbara's illegal conduct.  According to the settlement's terms, Barbara's will not be compelled to change its labels and other marketing materials until March 1, 2014, or three months after the California court approves the *Trammell* settlement—whichever is later.  Supp. Golan Decl., Ex. 4, at 16 (*Trammell* Proposed Settlement Agreement).  Thus, the earliest Barbara's will be compelled to change its alleged misrepresentations is March, 1, 2014, which is ***ten months away***.  The *Trammell* settlement also permits Barbara's to sell off its inventory of falsely labeled Products containing genetically modified and synthetic ingredients even beyond that date.  *Id.*

In short, it could be well ***over a year*** before Barbara's Product labeling no longer misleads consumers.  This is a far cry from the immediate cessation Silber's Motion requests before this Court.  Thus, even if the *Trammell* settlement is approved, Barbara's illegal conduct will continue to irreparably harm the public.

Staying the instant Motion or denying it without prejudice would permit Barbara's falsely labeled Products to be sold for another year—Products that consumers like Silber would have

---

[2]  At its discretion, Barbara's can terminate the *Trammell* Settlement Agreement and refuse any of the labeling changes if the Northern District of California does not approve the settlement in its entirety.  Supp. Golan Decl., Ex. 4, at 34-35.

avoided had they been properly labeled.  Staying Silber's Motion would only prolong Barbara's Bakery's violation of New York law and delay the relief Silber requests.

**II.    Barbara's Concedes to Almost All of Silber's Arguments**

Silber argued in her Opening Brief that her claims for violation of New York General Business Law § 349 and the New York common law prohibitions on unjust enrichment and misrepresentation have a ***clear and substantial likelihood of success*** on the merits.  Opening Brief, at 10–17 (New York General Business Law § 349), 17–18 (misrepresentation), 18 (unjust enrichment).  Barbara's makes no effort whatsoever to refute Silber's argument, other than to reserve its ability to object on another day, Opposition at 2 n.2.

Further, Silber argued in her Opening Brief that the balance of hardships tips ***decidedly*** in her favor because "the general public will be significantly harmed if Barbara's is allowed to continue falsely advertising and labeling the Products."  Opening Brief, at 19.  *See also id.* at 19–20 (emphasizing the public furor that has already been expressed concerning products that are falsely labeled "natural" due to the presence of GMOs).  Again, Barbara's does not even attempt to refute Silber's arguments, effectively conceding Silber is correct that Barbara's false labels are causing widespread, public harm.

Nor does Barbara's oppose Silber's Request for Judicial Notice.

Finally, Barbara's does not oppose Silber's request that this Court not require a bond.  Opening Brief, at 20–22.  Barbara's does not dispute, for example, that satisfying a bond in an action under New York General Business Law § 349 "would be impossible for almost every consumer."  *Id.*, at 20 (citing and quoting *McDonald v. N. Shore Yacht Sales, Inc.*, 134 Misc. 2d 910, at 917–18, 513 N.Y.S.2d 590 (Sup. Ct. 1987).

By failing to address Silber's arguments in its Opposition, Barbara's concedes those

arguments.  *See, e.g.*, *DMAC LLC v. City of Peekskill*, No. 09 CIV. 5093 GAY, 2012 WL 4459290, at *2 (S.D.N.Y. Sept. 26, 2012) ("Here, in its opposition to the instant motion, the [defendant] does not address plaintiffs' arguments … and, thus, effectively concedes [those arguments]."); *Malec v. Metro. Life Ins. Co., Inc.*, No. 03-CV-969A, 2007 WL 969086, at *21 (W.D.N.Y. Mar. 30, 2007) ("It appears that the plaintiff concedes this argument inasmuch as she does not address this issue in her papers."); *Martin v. Town of Westport*, 329 F. Supp. 2d 318, 325 (D. Conn. 2004) ("[Plaintiff] does not address [the issue] in his opposition brief, and the Court construes [Plaintiff's] failure to respond to [Defendant's] argument as a concession…").

### III.    Silber Has Demonstrated Irreparable Harm

#### A.    Silber's Motion Is Timely

Barbara's argues Silber's Motion should be denied because she purportedly delayed—filing her Motion supposedly "five months" after her Complaint.  Opposition at 9–10.  This argument fails on the facts and on the law.  First, Silber dutifully investigated her claims and brought her Motion as soon as she could—waiting only for Barbara's to file its Answer.  Roughly two weeks later, Barbara's asked Silber to wait, causing any supposed delay.  It cannot now argue that equity demands that it be protected.  Second, case law simply does not support the proposition that a four-and-a-half month delay rebuts the presumption of irreparable harm.

Silber filed her Complaint on November 5, 2012, and filed her Motion less than four-and-a-half months later, on March 18, 2013.  Silber spent two of these months anticipating Barbara's Answer, which contained key admissions Silber relied upon in her Motion, namely that its Products contain GMOs and ingredients such as tocopherols, ascorbic acid, annatto, and NutraFlora.  *See* Answer, No. 1:12-cv-05511-WFK-RLM, Dkt. 9 (filed Jan. 29, 2013); Opening Brief at 6.  Roughly two weeks later, during the planning meeting held pursuant to Federal Rule

5

of Civil Procedure 26(f) on February 15, Barbara's *asked* Silber to delay her litigation further and postpone all scheduling dates, informing Silber it would file a settlement in *Trammell* and insisting the *Trammell* settlement would resolve Silber's claims.  Supp. Golan Decl., at ¶ 6. Barbara's promised it would file the settlement in *Trammell* within 30 days.  *See* No. 1:12-cv-05511-WFK-RLM, Dkt. 11, at 3 (Explanation 1); Supp. Golan Decl., at ¶ 6.  Barbara's then asked the Court to postpone the initial conference, contending the additional time was necessary to allow Silber to study the settlement (once filed).  No. 1:12-cv-05511-WFK-RLM, Dkt. 12. Thirty days came and went, with no settlement filed.  Three days later, on March 18, 2013, Silber filed her Motion.  Three days is not a significant enough delay to deny a motion to enjoin.

Barbara's is also inaccurate as to the amount of delay needed to rebut a presumption of irreparable harm.  In fact, Barbara's cites to no case that has held that a four-and-a-half-month "delay" could rebut the presumption of irreparable harm.  Barbara's instead cites to *Tough Traveler, Ltd. v. Outbound Products*, where the plaintiff delayed **13 months** after discovering the wrong before filing a motion for preliminary injunction.  Opposition at 9–10 (citing *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 968 (2d Cir. 1995)).  Barbara's also cites to *Marcy Playground, Inc. v. Capitol Records, Inc.*, where the plaintiff delayed **15 months** before filing her motion.  Opposition at 10 (citing *Marcy Playground, Inc. v. Capitol Records, Inc.,* 6 F.Supp.2d 277, 281–82 (S.D.N.Y.1998) (delay of 15 months between discovery of alleged infringement and moving for preliminary injunction rebutted presumption of irreparable harm)). *Accord Kadant, Inc. v. Seeley Mach., Inc.*, 244 F. Supp. 2d 19, 34 (N.D.N.Y. 2003) (summarizing cases).

Moreover, unlike in the case at bar, there were no explanations for the delays in *Tough Traveler* and *Marcy Playground* such as (i) efforts to investigate the claims, (ii) awaiting an

Answer that made key admissions, or (iii) being asked to wait by opposing counsel for a settlement they promised would cover the dispute. *Tough Traveler, Ltd.*, 60 F.3d at 968 ("[D]elay may not negate the presumption of irreparable harm if the delay was caused by … the plaintiff's making good faith efforts to investigate the alleged infringement[.]"); *Marcy Playground, Inc.*, 6 F.Supp.2d at 281 ("[D]elay attributable to good faith investigation" does not defeat "the presumption of irreparable injury.").

Indeed, courts faced with as long as eight-month delays have refused to rebut the presumption of irreparable harm. *See, e.g.*, *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992) (author's eight-month delay in filing claim did not rebut presumption of irreparable harm); *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 79 (2d Cir. 1988) (reversing denial of preliminary injunction, holding delay not unreasonable where plaintiff brought an action seven months after infringing product was released to the market); *Kuklachev v. Gelfman*, 629 F. Supp. 2d 236, 251 (E.D.N.Y. 2008) *aff'd*, 361 F. App'x 161 (2d Cir. 2009) (granting injunction, holding delay of 15–20 months did not rebut presumption of irreparable harm); *Kadant, Inc. v. Seeley Machine, Inc.*, 244 F. Supp. 2d 19, 34 (N.D.N.Y. 2003) (holding delay of "approximately four months" did not rebut presumption).

### B. The Availability of Monetary Relief Does Not Bar Enjoining False and Deceptive Advertising

Barbara's makes a smattering of arguments in the hope of convincing the Court that Silber failed to show irreparable harm and that Barbara's should be permitted to continue to falsely advertise its Products. Barbara's ignores the fact that in cases seeking to enjoin deceptive advertising, the availability of monetary relief is beside the point. In deceptive advertising cases, irreparable injury is ***presumed***. In false advertising cases, "the contention that plaintiffs failed to prove the existence of the usual equitable grounds for relief, such as irreparable damage, is

7

plainly irrelevant. Where an injunction is authorized by statute it is enough if the statutory conditions are satisfied." *Barkley v. United Homes, LLC*, 848 F. Supp. 2d 248, 273–74 (E.D.N.Y. 2012) (granting injunction to consumers to halt deceptive advertising) (quoting *Henderson v. Burd*, 133 F.2d 515, 517 (2d Cir. 1943); *see also Tough Traveler, Ltd.*, 60 F.3d at 967 ("When a plaintiff has shown a 'high probability of confusion,' there is normally a presumption of irreparable harm.").

Barring an injunction whenever monetary relief is available would gut New York General Business Law § 349's ("Section 349") ability to do what it was enacted to do: halt deceptive advertising. It would render Section 349's express grant of an injunction meaningless. *See* N.Y. Gen. Bus. Law § 349 (A plaintiff "may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."). In enacting the injunctive provisions of Section 349, "the Legislature intended the irreparable injury at issue to be irreparable injury to the public at large, not just to one consumer." *McDonald*, 513 N.Y.S.2d at 595 ("[A] very significant number of consumers could be adversely affected by the false advertisement placed by this defendant. This constitutes sufficient irreparable injury to warrant preliminary relief.").

Barbara's attempts to distinguish these cases by arguing that they were brought by competitors, not consumers. Barbara's offers no justification why a court would apply the irreparable harm presumption to protect deceived consumers only in cases brought by competitors, and not in cases by deceived consumers. Indeed, the analysis under the New York General Business Law is the same as under the Lanham Act. *See* Opening Brief at 11–12, n.20. Moreover, Barbara's is incorrect on the law; courts have routinely applied the irreparable harm presumption to protect deceived consumers in cases brought by deceived consumers. *See, e.g.,*

*Barkley*, 848 F. Supp. 2d at 273–74.

Barbara's incorrectly argues the presumption is not available in a preliminary injunction setting.  Opposition at 14 n.6.  However, the Second Circuit regularly applies the presumption of irreparable harm to grant ***preliminary*** injunctions.  *King*, 976 F.2d at 831 (applying presumption to grant preliminary injunction); *Hasbro, Inc.*, 858 F.2d at 79 (applying presumption and reversing denial of preliminary injunction); *Kuklachev*, 629 F. Supp. 2d at 251, *aff'd*, 361 F. App'x 161 (2d Cir. 2009) (applying presumption to grant preliminary injunction); *Tough Traveler*, 60 F.3d at 967 (recognizing presumption available in suit for preliminary injunction).

## CONCLUSION

For the foregoing reasons and the reasons stated in her Opening Brief, Plaintiff Erin Silber respectfully requests this Court grant her Motion for Preliminary Injunction.

Dated: May 1, 2013                                     Respectfully submitted,

**THE GOLAN FIRM**

 */s/ Yvette Golan*
Yvette Golan
1919 Decatur St.
Houston, Texas  77007
Telephone:      (866) 298-4150, ext. 101
Facsimile:      (928) 441-8250
Email:          ygolan@tgfirm.com

**REESE RICHMAN LLP**
Kim E. Richman
Michael R. Reese
875 Avenue of the Americas, 18th Floor
New York, New York  10001
Telephone:      (212) 643-0500
Facsimile:      (212) 253-4272
Email:          krichman@reeserichman.com
                mreese@reeserichman.com

*Counsel for Plaintiff Erin Silber*

**THE GOLAN FIRM**
Yvette Golan
1919 Decatur St.
Houston, Texas  77007
Telephone:      (866) 298-4150, ext. 101
Facsimile:      (928) 441-8250
Email:          ygolan@tgfirm.com

**REESE RICHMAN LLP**
Kim E. Richman
Michael R. Reese
875 Avenue of the Americas, 18th Floor
New York, New York  10001
Telephone:      (212) 643-0500
Facsimile:      (212) 253-4272
Email:          krichman@reeserichman.com
                mreese@reeserichman.com

*Counsel for Plaintiff Erin Silber and the Proposed Classes*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIN SILBER, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BARBARA'S BAKERY, INC.,<br><br>Defendant. | Case No. 1:12-cv-05511-WFK-RLM<br><br>**SUPPLEMENTAL DECLARATION OF YVETTE GOLAN IN SUPPORT OF PLAINTIFF ERIN SILBER'S MOTION FOR PRELIMINARY INJUNCTION** |
| OLYMPIA MORO, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BARBARA'S BAKERY, INC.<br><br>Defendant. | Case No. 1:12-cv-06087-WFK-RLM |

*DATE OF SERVICE*: May 1, 2013

Pursuant to 28 U.S.C. § 1746, I, Yvette Golan, declare as follows:

1.      I am an attorney licensed to practice law in Texas and Illinois, and I have been admitted to this Court by *pro hac vice*.  I am a member of the law firm The Golan Firm, which, together with Reese Richman LLP, is counsel of record for Erin Silber, plaintiff in the above-captioned action.  The matters set forth herein are of my own personal knowledge and if called and sworn as a witness, I could competently testify regarding them.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the Class Action Complaint filed in *Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664-CRB (N.D. Cal.), as ECF No. 1 on May 23, 2012 and the accompanying civil cover sheet.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the First Amended Class Action Complaint filed in *Trammell* as ECF No. 5 on June 28, 2012.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Second Amended Class Action Complaint filed in *Trammell* as ECF No. 29 on January 30, 2013.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the Settlement Agreement filed in *Trammell* as ECF No. 37 on April 25, 2013, and Exhibits 1–10 thereto.

6.      *Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664-CRB (N.D. Cal.), was filed on May 23, 2012, alleging only that certain of Barbara's Bakery, Inc.'s ("Defendant") products contained genetically modified ingredients ("GMOs").  Mr. Trammell amended his Complaint on June 28, 2012, but still only alleged that certain of Defendant's products contained GMOs.  Erin Silber filed *Silber v. Barbara's Bakery*, No. 1:12-cv-05511-WFK-RLM, on November 5, 2012, including allegations based on the presence of both GMOs and synthetic ingredients in certain of Defendant's products.  Defendant answered Ms. Silber's Complaint on January 29, 2013, and answered the *Trammell* Complaint on February 5, 2013.  Mr. Trammell

amended his Complaint for a second time on January 30, 2013, including allegations based on the presence of both GMOs and synthetic ingredients in certain of Defendant's products.  On February 4, 2013, this Court scheduled the initial *Silber* discovery conference for March 12, 2013.  Counsel for Ms. Silber met and conferred with counsel for Defendant on February 15, 2013.  During the meet-and-confer, counsel for Defendant told Ms. Silber's counsel that they were settling *Trammell*, claimed preliminary approval papers for the settlement would be filed in the Northern District of California in 30 days, and asked Ms. Silber's counsel to adjourn the initial discovery conference from March 12, 2013, to April 15, 2013.  The parties to *Silber* filed their Joint 26(f) Report on February 21, 2013.  Defendant filed a letter requesting adjournment of the *Silber* discovery conference with this Court on February 25, 2013, and the Court ordered the adjournment the same day.  Thirty days from the February 15, 2013 meet and confer transpired, and still the parties to *Trammell* had not filed any preliminary approval papers.  Ms. Silber filed her motion for a preliminary injunction on March 18, 2013.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 1, 2013, at Houston, Texas.

*/s/ Yvette Golan*
Yvette Golan

# EXHIBIT 1

Supplemental Declaration of Yvette Golan

JS 44 C4ND (Rev. 12/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
RICHARD W. TRAMMELL, individually and on behalf of all others similarly situated,

**DEFENDANTS**
BARBARA'S BAKERY, INC. a California corporation; and DOES 1-50

(b) County of Residence of First Listed Plaintiff **Los Angeles**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Sonoma**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
AHDOOT & WOLFSON, P.C.,
10850 WILSHIRE BLVD., STE. 370,
LOS ANGELES, CA 90024: T: 310-474-9111; F: 310-474-8585

Attorneys *(If Known)* 12-2664JSC

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | Liability / ☐ 368 Asbestos Personal Injury Product | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 340 Marine / Liability | | | ☐ 480 Consumer Credit |
| | ☐ 345 Marine Product | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability / **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | | ☐ 862 Black Lung (923) | |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | Product Liability / ☐ 380 Other Personal | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | ☐ 360 Other Personal / Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | Injury / ☐ 385 Property Damage | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| | ☐ 362 Personal Injury - Product Liability | ☐ 791 Empl. Ret. Inc. | | ☐ 896 Arbitration |
| **REAL PROPERTY** | Med. Malpractice | Security Act | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| | **CIVIL RIGHTS** / **PRISONER PETITIONS** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | Act/Review or Appeal of Agency Decision |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / ☐ 510 Motions to Vacate | | | |
| ☐ 220 Foreclosure | ☐ 441 Voting / Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / **Habeas Corpus:** | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ / ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | Accommodations / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | ☐ 448 Education / ☐ 555 Prison Condition | (Prisoner Petition) | | |
| | / ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Class Action Fairness Act, 28 U.S.C. Section 1132(d)

Brief description of cause:
Cal. False Advertising Law, Cal. Unfair Competition Law, Breach of Express Warranty

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** Excess of $5 million
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

## IX. DIVISIONAL ASSIGNMENT (Civil L.R. 3-2)
*(Place an "X" in One Box Only)*
☒ SAN FRANCISCO/OAKLA ND ☐ SAN JOSE ☐ EUREKA

DATE 05/23/2012

SIGNATURE OF ATTORNEY OF RECORD *(signature)*

FILED BY FAX

E-filing

TINA WOLFSON, SBN 174806
twolfson@ahdootwolfson.com
ROBERT AHDOOT, SBN 172098
rahdoot@ahdootwolfson.com
THEODORE W. MAYA, SBN 223242
twolfson@ahdootwolfson.com
**AHDOOT & WOLFSON, P.C.**
10850 Wilshire Boulevard, Suite 370
Los Angeles, California 90024
Tel: 310-474-9111; Fax: 310-474-8585

Counsel for Plaintiff
RICHARD W. TRAMMELL



FILED

MAY 23 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JSC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

CV 12 2664

RICHARD W. TRAMMELL, individually
and on behalf of all others similarly situated,

Plaintiffs,

v.

BARBARA'S BAKERY, INC. a California
corporation; and DOES 1-50,

Defendants

Case No.

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

FILED BY FAX
PURSUANT TO LOCAL RULES

CLASS ACTION COMPLAINT

1  Plaintiff Richard W. Trammell, by and through his counsel, brings this Class
2  Action Complaint against Barbara's Bakery, Inc., on behalf of himself and all others
3  similarly situated, and alleges, upon personal knowledge as to his own actions and his
4  counsel's investigations, and upon information and belief as to all other matters, as
5  follows:

6  ## NATURE OF THE CASE

7  1.  In recent years, consumers have become more willing to pay a premium
8  for food and beverages that they perceive to be healthy, organic, natural and non-
9  genetically modified. As a result, the market for natural or organic foods and beverages
10  has grown rapidly, yielding billions of dollars in revenue for food and beverage
11  manufacturers.

12  2.  Barbara's Bakery, Inc. ("Barbara's" or "Defendant") is a wholly owned
13  subsidiary of Weetabix North America, which is the North American arm of Weetabix
14  Food Company, a United Kingdom-based company and worldwide cereal
15  conglomerate. In March 2012, 60% of the Weetabix Food Company was sold to
16  "Bright Food," a firm from Shanghai, China for 1.2 Billion British pounds
17  (approximately \$1.9 Billion).

18  3.  Barbara's has been striving to "raise its profile in the \$31 billion U.S.
19  market for health food." (http://www.barbarasbakery.com/news/barbaras-bakery-
20  rebranding-turns-to-petaluma-legacy/ (last visited on May 21, 2012)).

21  4.  Defendant manufactures, markets and sells the cereal "Puffins" nationwide
22  from its manufacturing plant in Petaluma, California. Corn-based Puffins® are
23  available in the "Original," "Multigrain," "Peanut Butter," "Cinnamon," "Peanut Butter
24  and Chocolate," "Crunchy Cocoa," and "Fruit Medley" varieties (collectively, the
25  "Products.")

26  5.  In an effort to capture a segment of the lucrative health food market,
27  Defendant has systematically marketed and advertised Puffins® as "all natural" on the
28

1

CLASS ACTION COMPLAINT

1  cereal boxes and bags, on its website, TV commercials and social media such as
2  Facebook, so that any United States consumer who purchases Puffins® is exposed to
3  Defendant's "all natural" claim.

4       6.      This claim is deceptive and misleading because Puffins® are made with
5  unnatural ingredients. Specifically, Puffins® are made with GMO plants whose genes
6  have been altered by scientists in a lab for the express purpose of causing those plants
7  to exhibit traits that are not naturally their own. GMO are not natural by design.

8       7.      Accordingly, Barbara's misleads and deceives reasonable consumers,
9  including the named Plaintiffs and the other members of the Class, by portraying a
10  product made from unnatural ingredients as "All Natural."

11      8.      Barbara's conduct harms consumers by inducing them to purchase and
12  consume a product with GMO on the false premise that the product is "all natural."

13      9.      Plaintiff brings claims against Defendant individually and on behalf of a
14  nationwide class of all other similarly situated purchasers of corn-based Puffins® for
15  violations of California's Unfair Competition Law, Cal. Bus & Prof. Code §§ 17200, *et*
16  *seq*. ("UCL"), the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*.
17  ("FAL"), and breach of express warranties. Plaintiffs seek an order requiring
18  Defendant to, among other things: (1) cease the unlawful marketing; (2) conduct a
19  corrective advertising campaign; and (3) pay damages and restitution to Plaintiff and
20  Class members in the amounts paid to purchase the products at issue.

21                          **JURISDICTION AND VENUE**

22      10.     The Court has subject matter jurisdiction over this action pursuant to 28
23  U.S.C. § 1332(d)(2), because the proposed class has more than 100 members, the class
24  contains at least one member of diverse citizenship from Defendant, and the amount in
25  controversy exceeds $5 million.

26
27
28

                                    2

1    11.    The Court has personal jurisdiction over Defendant because Defendant is
2  incorporated in California and has its primary manufacturing facility in Petaluma,
3  California. Defendant is authorized to, and conducts, substantial business in California.

4    12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1),
5  because a substantial part of the events and omissions giving rise to this action occurred
6  in this District in Defendant's primary manufacturing plant in Petaluma, California.

7                                    **PARTIES**

8    13.    Plaintiff Richard W. Trammell is a resident of Los Angeles, California and
9  Granger, Texas. Mr. Trammell has purchased numerous Products in Los Angeles,
10  California and in Austin, Texas over the past four years in reliance on Defendant's
11  representations that the Products were "All Natural". These representations and
12  omissions were material to Mr. Trammell's decision to purchase the Products. Mr.
13  Trammell was willing to pay for the Products because of the representations that they
14  were "all natural" and would not have purchased the Products, would not have paid as
15  much for the Products, or would have purchased alternative products in absence of the
16  representations.

17    14.    Defendant Barbara's Bakery, Inc. is a California corporation with its
18  principal place of business at 3900 Cypress Drive, Petaluma, California 94954.
19  Defendant manufactures and distributes the Products from its manufacturing plant in
20  Petaluma, California to consumers in California and throughout the United States.

21                       **SUBSTANTIVE ALLEGATIONS**

22  **Defendant Deceptively Labels The Corn-Based Puffins® As "All Natural"**

23    15.    Throughout the Class Period, Defendant systematically marketed and
24  advertised Puffins® cereal as "all natural" in product packaging, print advertisements,
25  in television commercials, on its website, and on social media sites such as Facebook.
26  The "all natural" message is inherently intertwined with Barbara's Bakery® brand
27  definition and recognition.

28

                                    3
                       CLASS ACTION COMPLAINT

16.     Defendants label every box or bag of Puffins as "All Natural Since 1971" next to a red heart with an image of a stalk of grain in it, in the same color block as the brand name Barbara's®. The color block spans across a bucolic scene, also in the shape of a heart, of a small farm with rows of crops, trees, mountains and sky and the words "Petaluma, California":



4

CLASS ACTION COMPLAINT

1      17.     The back of the box or bag also features numerous slogans and

2  representations to induce the purchaser into believing that the product is all natural,

3  including the following statements:

4         &bull; "Eat the Way you Live, Naturally."

5         &bull; "At Barbara's®, we believe the best things in life are all natural – like

6              smiles, hugs, and our super tasty Multigrain Puffins made with whole oats,

7              brown rice and corn…"

8         &bull; "healthy living, naturally"

9         &bull; "Honest Goodness. Give our other all natural products a try."

10        &bull; "Celebrate Family! In 1971, when Barbara started our company, Petaluma

11            was at the heart of the natural foods movement. Petaluma is still a place of

12            farms, milk cows, and people deeply connected to nature. The movement

13            has spread and our family of products has grown too. We chose a few of our

14            favorite cereals to create a "family size." Now everyone can enjoy

15            Barbara's original vision – make great tasting, healthy foods what people

16            love – all without artificial ingredients or preservatives. Gather the family

17            around the table and enjoy!"

18        &bull; "*healthy living, naturally*

19            Make a Puffins breakfast or snack part of saying "yes" to your healthy,

20            active lifestyle. Good health habits are built with dedicated repetition, day

21            after day…and bowl after bowl. Let Barbara's delicious natural foods help

22            you create the healthy lifestyle you deserve."

23        &bull; "Make Friends with All Natural Goodness."

24        &bull; "A Naturally Dynamic Duo. At Barbara's®, our recipe for success is great

25            taste and all-natural ingredients…"

26        &bull; "The Best Things in Life are Natural. Morning at Barbara's® finds us in

27            the kitchen with big red bowls, munching on crunchy Peanut Butter

28

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Puffins.  Each mouthful is a burst of real peanut butter and the best whole grain oats and corn.  We happen to think our cereal is one incredibly delicious combo of great taste and natural nutrition.  Plus, it's low in fat and always free of artificial flavors, preservatives and additives –because that's Barbara's way":



6

CLASS ACTION COMPLAINT

1   18.    Similarly, on its website http//www.bararasbakery.com, Defendant makes
2   numerous statements and representations to re-enforce the "all natural" part of its brand.

3   19.    For example, at the top of the homepage, a changing banner appears with
4   the following slogans:

5       • Eat Natural, Live Natural. Start with Breakfast.

6       • Let's eat the way we live. Naturally.

7       • A hug, a smile, and whole grains. The best things in life are natural.

8       • We believe sunny afternoons should be spent outside. And snacks should be
9           natural.

10  (http://www.barbarasbakery.com (last visited on May 21, 2012)).

11  20.    In recounting the company's history, and referring to its alleged founder,
12  Defendant states, among other things: "Barbara, then 17, found her calling in real food
13  and opened a small natural bakery in Northern California. She had a simple plan -
14  make wholesome food taste incredibly delicious. Inspired by good health, family, and
15  the kitchen table as the cornerstones of the good life, she used whole grains and oats
16  just as nature intended – free from anything artificial... Today, a few of us wish we
17  still wore flowers in our hair like Barbara did. And, we know our mission is clear:
18  healthy people, naturally. We carry on Barbara's commitment to create the best-tasting
19  natural products free of artificial preservatives and ingredients, hydrogenated oils, and
20  refined white sugar." (http://www.barbarasbakery.com/about/ (last visited on May 21,
21  2012)).

22  21.    Another page of the website boasts as follows:

23  "**We've Got a New Look and it's Just as Natural as Our Ingredients**.

24          We've been making great tasting naturally healthy food—free of artificial
25  colors, preservatives and harmful additives since 1971. Our bold, simplified look,
26  featuring 100% recycled carbon neutral GreenChoice cartons makes it easier for
27  health conscious consumers to find us in their local grocery store.

28

7

CLASS ACTION COMPLAINT

1    It's all part of our long-term commitment to natural ingredients. Barbara's

2    is a company born and raised on the values of the natural foods movement of the

3    early 1970s. These pioneers believed that promoting sustainable agriculture and

4    green living along with eating natural and organic would lead to healthier, happier

5    lives.

6    Barbara opened a small natural bakery with a strong commitment to

7    healthier foods, but with a slightly different point of view: what good is healthy

8    food if no one will eat it? She made sure that her naturally wholesome foods taste

9    great as well. It's no surprise that Barbara's is still thriving and we still live by the

10   principle our founder believed in: that making great tasting recipes with all-

11   natural ingredients will make your family healthier and happier. Naturally.

12   **All Natural Since 1971**."

13  (http://www.barbarasbakery.com/new-look/ (last visited on May 21, 2012)).

14   22.    The "all natural" claim is re-enforced and re-iterated throughout television

15  commercials for the Products. For example, one TV ad entitled "Pass the Puffins"

16  features a mother and her twin sons at breakfast, conversing with an animated puffin

17  bird as follows:

18
19           Mom: I found the greatest cereal. It's all natural and it's called
                   Penguins cereal.
20           Puffin: No, no, it's called Puffins.
             Mom: Even my kids love the naturally sweet taste and the cute
21                   penguin on the box.
22           Puffin: Ah, I am kind of cute, thank you . . . but I'm also a
                   puffin, not a penguin.  We don't even live in the same
23                   hemisphere!
24           Mom: [smiles] ...and Penguins has only five grams of sugar.
             Puffin: [squawks in frustration, then addresses twin sons]
25                   Does- Does she get your names right?
             [Twins look at each other with blank expressions]
26           Puffin: ...that's excusable.
27           Narrator voiceover: Puffins Cereal, in the natural food aisle.
             Puffin: Pass the Puffins.
28

8

1    ["Pass the Puffins" text on screen]

2    (http://www.barbarasbakery.com/ (last visited May 23, 2012).)

3    23.    By consistently and systematically marketing and advertising Puffins as
4    "all natural," throughout the Class Period, Defendant ensured that all consumers
5    purchasing Puffins would be exposed to its "all natural" claim.

6    24.    A claim that a product is "natural" is material to a reasonable consumer.

7    **Genetically-Modified Organisms Are Not Natural**

8    25.    The dictionary defines the term "natural" as "existing in or produced by
9    nature: not artificial." (Webster's Ninth New Collegiate Dictionary 788 (1990)). This
10   common dictionary definition of the term "natural" is consistent with the expectations
11   of a reasonable consumer.

12   26.    Genetically-modified organisms ("GMO") are not natural, let alone "all
13   natural." Monsanto, the company that makes GMO, defines GMO as "Plants or
14   animals that have had their genetic makeup altered to exhibit *traits that are not*
15   *naturally theirs*. In general, genes are taken (copied) from one organism that shows a
16   desired trait and transferred into the genetic code of another organism."
17   (http://www.monsanto.com/newsviews/Pages/glossary.aspx#g (last visited May 21,
18   2012) (emphasis added)). "Unnatural" is a defining characteristic of genetically
19   modified foods.

20   27.    Romer Labs, a company that provides diagnostic solutions to the
21   agricultural industry, defines GMO as "[a]griculturally important plants [that] are
22   often genetically modified by the insertion of DNA material from outside the organism
23   into the plant's DNA sequence, allowing the plant to *express novel traits that normally*
24   *would not appear in nature*, such as herbicide or insect resistance. Seed harvested
25   from GMO plants will also contain these [sic] modification."
26   (http://www.romerlabs.comlen/analytes/genetically-modified-organisms.html (last
27   visited May 21, 2012) (emphasis added)).

28

9

CLASS ACTION COMPLAINT

28. That GMO are not natural is further evidenced by the explanations of health and environmental organizations, such as The World Health Organization, which defines genetically-modified organisms as "organisms in which *the genetic material (DNA) has been altered in a way that does not occur naturally.* The technology is oftencalled 'modern biotechnology' or 'gene technology', sometimes also 'recombinant DNA technology' or 'genetic engineering'. It allows selected individual genes to be transferred from one organism into another, also between non-related species. Such methods are used to create GM plants – which are then used to grow GM food crops." (World Health Organization, 20 Questions on Genetically Modified(GM) Foods at http://www.who.int/foodsafety/publications/biotech/en/20questions_en.pdf (last visited May 21, 2012, 2012).

29. The Environmental Protection Agency has distinguished conventional breeding of plants "through natural methods, such as cross-pollination" from genetic engineering using modern scientific techniques. (United States Environmental Protection Agency, Prevention, Pesticides and Toxic Substances, Questions & Answers Biotechnology: Final Plant-Pesticide/Plant Incorporated Protectants (PIPs) Rules (Jul. 19, 2001) at http://www.epa.gov/scipoly/biotech/pubs/qanda.pdf ("*Conventional breeding* is a method in which genes for pesticidal traits are introduced into a plant *through natural methods*, such as cross-pollination.... Genetically engineered plant-incorporated protectants are created through a process that utilizes several different modem scientific techniques to introduce a specific pesticide-producing gene into a plant's DNA genetic material.") (emphasis of "through natural methods" added; remaining emphasis in original) (last visited May 21, 2012)).

30. As indicated by the definitions above, which come for a wide array of sources, including industry, government, and health organizations, GMO are not "all

10

1 | natural." GMO are "created" artificially in a laboratory through genetic engineering.
2 | Thus, by claiming that its Products are "all natural," Defendant deceives and misleads
3 | reasonable consumers.

4 | **The Corn-Based Puffins Cereals are Made From GMO Corn**

5 | 31.     Based on independent third party testing, Defendant's Products are made
6 | from genetically modified corn.

7 | 32.     Defendant's "all natural" representations are false, deceptive, misleading,
8 | and unfair to consumers, who are injured in fact by purchasing a product that
9 | Defendant claims are "all natural" when in fact they are not.

10 | **CLASS ACTION ALLEGATIONS**

11 | 33.     Plaintiffs seek relief in their individual capacity and seek to represent a
12 | class consisting of all others who are similarly situated. Pursuant to Fed. R. Civ. P.
13 | 23(a) and (b)(2) and/or (b)(3), Plaintiffs seek certification of a class initially defined as
14 | follows:

15 | All consumers in the United States who from May 23, 2008 until the final
16 | disposition of this case (the "Class Period"), purchased the following
17 | Barbara Bakery® Products: (1) Puffins® Original; (2) Puffins®
18 | Multigrain; (3) Puffins® Peanut Butter; (4) Puffins® Cinnamon; (5)
19 | Puffins® Peanut Butter and Chocolate; (6) Puffins® Crunchy Cocoa; and
20 | (7) Puffins® Fruit Medley.

21 | 34.     Excluded from the Class are Defendant and its subsidiaries and affiliates,
22 | Defendant's executives, board members, legal counsel, the judges and all other court
23 | personnel to whom this case is assigned, and their immediate families.

24 | 35.     Plaintiff reserves the right to amend or modify the Class definition with
25 | greater specificity or division into subclasses after they have had an opportunity to
26 | conduct discovery.

27

28

11
CLASS ACTION COMPLAINT

1    36.    Numerosity. Fed. R. Civ. P. 23(a)(1). The potential members of the Class
2    as defined are so numerous that joinder of all members is unfeasible and not practicable.
3    While the precise number of Class members has not been determined at this time,
4    Plaintiff is informed and believes that many thousands or millions of consumers have
5    purchased the listed Products.

6    37.    Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of
7    law and fact common to the Class, which predominate over any questions affecting only
8    individual Class members. These common questions of law and fact include, without
9    limitation:

10                a.    Whether Defendant falsely and/or misleadingly misrepresented the
11                      Products as being "All Natural";
12                b.    Whether Defendant's misrepresentations are likely to deceive
13                      reasonable consumers;
14                c.    Whether Defendant violated California Civil Code § 1750, *et seq.*;
15                d.    Whether Defendant violated California Business and Professions
16                      Code § 17500, *et seq.*;
17                e.    Whether Defendant violated California Business and Professions
18                      Code § 17200, *et seq.*;
19                f.    The nature of the relief, including equitable relief, to which Plaintiff
20                      and the Class members are entitled.

21    38.    Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the
22    claims of the Class. Plaintiffs and all Class members were exposed to uniform practices
23    and sustained injury arising out of and caused by Defendant's unlawful conduct.

24    39.    Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly
25    and adequately represent and protect the interests of the members of the Class.
26    Plaintiffs' Counsel are competent and experienced in litigating class actions.

27

28

12
CLASS ACTION COMPLAINT

1    40.    Superiority of Class Action. Fed. R. Civ. P. 23(b)(3). A class action is
2  superior to other available methods for the fair and efficient adjudication of this
3  controversy since joinder of all the members of the Class is impracticable.
4  Furthermore, the adjudication of this controversy through a class action will avoid the
5  possibility of inconsistent and potentially conflicting adjudication of the asserted
6  claims. There will be no difficulty in the management of this action as a class action.

7    41.    Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2). Defendant's
8  misrepresentations are uniform as to all members of the Class. Defendant has acted or
9  refused to act on grounds that apply generally to the Class, so that final injunctive relief
10  or declaratory relief is appropriate with respect to the Class as a whole.

11                          **FIRST CAUSE OF ACTION**

12          **(California False Advertising Law – Cal. Bus. & Prof. Code § 17500, *et seq*.)**

13    42.    Plaintiff incorporates by reference and re-alleges paragraphs 1-41.

14    43.    Defendant publicly disseminated untrue or misleading advertising or
15  intended not to sell its Products as advertised in violation of California Business &
16  Professional Code § 17500, *et seq*., by representing that the Products are "All Natural,"
17  when they are not.

18    44.    Defendant committed such violations of the False Advertising Law with
19  actual knowledge or in the exercise of reasonable care should have known was untrue
20  or misleading.

21    45.    Plaintiff reasonably relied on Defendant's representations and/or omissions
22  made in violation of California Business & Professional Code § 17500, *et seq*.

23    46.    As a direct and proximate result of Defendant's violations, Plaintiffs
24  suffered injury in fact and lost money.

25    47.    Plaintiff, on behalf of himself and Class members, seeks equitable relief in
26  the form of an order requiring Defendant to refund Plaintiff and all Class members all
27  monies they paid for the Products, and injunctive relief in the form of an order

28

                                    13

1  prohibiting Defendant from engaging in the alleged misconduct and performing a
2  corrective advertising campaign.

3  ## SECOND CAUSE OF ACTION

4  **(California Unfair Competition Law – Cal. Bus. & Prof. Code § 17200, *et seq.*)**

5  48.  Plaintiffs incorporate by reference and realleges paragraphs 1-41.

6  49.  Defendant engaged in unlawful, unfair, and/or fraudulent conduct under
7  California Business & Professional Code § 17200, *et seq.*, by representing that the
8  Products are "All Natural," when they are not.

9  50.  Defendant's conduct is unlawful in that it violates the Consumers Legal
10  Remedies Act, California Civil Code § 1750, *et seq.*, the False Advertising Law,
11  California Business & Professions Code § 17500.

12  51.  Defendant's conduct is unfair in that it offends established public policy
13  and/or is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to
14  Plaintiff and Class members. The harm to Plaintiff and Class members arising from
15  Defendant's conduct outweighs any legitimate benefit Defendant derived from the
16  conduct. Defendant's conduct undermines and violates the stated spirit and policies
17  underlying the Consumers Legal Remedies Act and the False Advertising Law as
18  alleged herein.

19  52.  Defendant's actions and practices constitute "fraudulent" business
20  practices in violation of the UCL because, among other things, they are likely to
21  deceive reasonable consumers. Plaintiffs relied on Defendant's representations and
22  omissions.

23  53.  As a direct and proximate result of Defendant's violations, Plaintiffs
24  suffered injury in fact and lost money.

25  54.  Plaintiffs, on behalf of themselves and Class members, seek equitable
26  relief in the form of an order requiring Defendant to refund Plaintiffs and all Class
27  members all monies they paid for Products, and injunctive relief in the form of an order
28

14
## CLASS ACTION COMPLAINT

1 prohibiting Defendant from engaging in the alleged misconduct and performing a
2 corrective advertising campaign.

3 **THIRD CAUSE OF ACTION**

4 **(Breach of Express Warranty)**

5    55.    Plaintiff incorporates by reference and realleges paragraphs 1-41.

6    56.    Plaintiff brings this claim individually and on behalf of the Class.

7    57.    Plaintiff and each member of the Class formed a contract with Defendants at
8 the time Plaintiffs and the other members of the Class purchased one or more of the
9 Products. The terms of that contract include the promises and affirmations of fact made
10 by Defendant on the packaging of the Products and through the marketing campaign,
11 as described above. The Products' packaging and advertising constitute express
12 warranties, became part of the basis of the bargain, and are part of a standardized
13 contract between Plaintiff and the members of the Class on the one hand, and Defendant
14 on the other.

15    58.    All conditions precedent to Defendants' liability under this contract
16 have been performed by Plaintiff and the Class.

17    59.    Defendant breached the terms of this contract, including the express
18 warranties, with Plaintiff and the Class by not providing the beverages that could
19 provide the benefits promised, i.e. that the Products were "all natural."

20    60.    As a result of Defendant's breach of its contract, Plaintiffs and the Class
21 have been damaged in the amount of the purchase price of any and all of the Products
22 they purchased.

23     **WHEREFORE**, Plaintiff, on behalf of himself and Class members, prays for
24 relief as follows:

25    A.    For an order that this action may be maintained as a class action under
26 Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed Class
27 representative, and that Plaintiff's counsel be appointed as counsel for the Class;

28

1    B.    For an order requiring Defendant to refund Plaintiff and all Class
2  members for the deceptively advertised beverages;

3    C.    For an order prohibiting Defendant from engaging in the misconduct
4  described herein;

5    D.    For an award of attorneys' fees;

6    E.    For an award of the costs of suit incurred herein, including expert
7  witness fees;

8    F.    For an award of interest, including prejudgment interest, at the legal
9  rate; and

10    G.    For such other and further relief as this Court deems just and proper.

11                    **DEMAND FOR JURY TRIAL**

12  Plaintiff demands trial by jury of all claims so triable.

13

14  Dated: May 23, 2012              Respectfully submitted,
15                                   **AHDOOT & WOLFSON, PC**
16
17                                   Tina Wolfson
                                     Robert Ahdoot
18                                   Bradley King
19                                   10850 Wilshire Blvd., Suite 370
                                     Los Angeles, California 90024
20                                   Tel: 310-474-9111
21                                   Facsimile: 310-474-8585

22                                   Counsel for Plaintiff
23                                   Richard W. Trammell

24
25
26
27
28

                              16
                    CLASS ACTION COMPLAINT

# EXHIBIT 2

Supplemental Declaration of Yvette Golan

1  TINA WOLFSON, SBN 174806
   twolfson@ahdootwolfson.com
2  ROBERT AHDOOT, SBN 172098
   rahdoot@ahdootwolfson.com
3  THEODORE W. MAYA, SBN 223242
4  tmaya@ahdootwolfson.com
5  **AHDOOT & WOLFSON, P.C.**
   10850 Wilshire Boulevard, Suite 370
6  Los Angeles, California 90024
7  Tel: 310-474-9111; Fax: 310-474-8585

8  Counsel for Plaintiff
   RICHARD W. TRAMMELL

9

10

11                **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13

14
   RICHARD W. TRAMMELL, individually     Case No. 12-CV-02664-JSC
15 and on behalf of all others similarly situated,
16                                        **FIRST AMENDED CLASS ACTION COMPLAINT**
17                    Plaintiffs,
                                          JURY TRIAL DEMANDED
18                        v.

19 BARBARA'S BAKERY, INC. a California
20 corporation; and DOES 1-50,

21                    Defendants

22

23

24

25

26

27

28
   ─────────────────────────────────────
              FIRST AMENDED CLASS ACTION COMPLAINT
                   CASE NO. 12-CV-02664-JSC

1    Plaintiff Richard W. Trammell, by and through his counsel, brings this Class
2  Action Complaint against Barbara's Bakery, Inc., on behalf of himself and all others
3  similarly situated, and alleges, upon personal knowledge as to his own actions and his
4  counsel's investigations, and upon information and belief as to all other matters, as
5  follows:

6                          **NATURE OF THE CASE**

7    1.    In recent years, consumers have become more willing to pay a premium
8  for food and beverages that they perceive to be healthy, organic, natural and non-
9  genetically modified.  As a result, the market for natural or organic foods and beverages
10  has grown rapidly, yielding billions of dollars in revenue for food and beverage
11  manufacturers.

12    2.    Barbara's Bakery, Inc. ("Barbara's" or "Defendant") is a wholly owned
13  subsidiary of Weetabix North America, which is the North American arm of Weetabix
14  Food Company, a United Kingdom-based company and worldwide cereal
15  conglomerate.  In March 2012, 60% of the Weetabix Food Company was sold to
16  "Bright Food," a firm from Shanghai, China for 1.2 Billion British pounds
17  (approximately $1.9 Billion).

18    3.    Barbara's has been striving to "raise its profile in the $31 billion U.S.
19  market for health food."  (http://www.barbarasbakery.com/news/barbaras-bakery-
20  rebranding-turns-to-petaluma-legacy/ (last visited on May 21, 2012)).

21    4.    Defendant manufactures, markets and sells the cereal "Puffins" nationwide
22  from its manufacturing plant in Petaluma, California. Corn-based Puffins® are
23  available in the "Original," "Multigrain," "Peanut Butter," "Cinnamon," "Peanut Butter
24  and Chocolate," "Crunchy Cocoa," and "Fruit Medley" varieties (collectively, the
25  "Products").

26    5.    In an effort to capture a segment of the lucrative health food market,
27  Defendant has systematically marketed and advertised Puffins® as "all natural" on the

28

                                    1
                   FIRST AMENDED CLASS ACTION COMPLAINT
                          CASE NO. 12-CV-02664-JSC

1  cereal boxes and bags, on its website, TV commercials and social media such as
2  Facebook, so that any United States consumer who purchases Puffins® is exposed to
3  Defendant's "all natural" claim.

4      6.      This claim is deceptive and misleading because Puffins® are made with
5  unnatural ingredients. Specifically, Puffins® are made with GMO plants whose genes
6  have been altered by scientists in a lab for the express purpose of causing those plants
7  to exhibit traits that are not naturally their own. GMO are not natural by design.

8      7.      Accordingly, Barbara's misleads and deceives reasonable consumers,
9  including the named Plaintiffs and the other members of the Class, by portraying a
10 product made from unnatural ingredients as "All Natural."

11     8.      Barbara's conduct harms consumers by inducing them to purchase and
12 consume a product with GMO on the false premise that the product is "all natural."

13     9.      Plaintiff brings claims against Defendant individually and on behalf of a
14 nationwide class of all other similarly situated purchasers of corn-based Puffins® for
15 violations of California's Unfair Competition Law, Cal. Bus & Prof. Code §§ 17200, *et*
16 *seq.* ("UCL"), the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*
17 ("FAL"), and breach of express warranties. Plaintiffs seek an order requiring
18 Defendant to, among other things: (1) cease the unlawful marketing; (2) conduct a
19 corrective advertising campaign; and (3) pay damages and restitution to Plaintiff and
20 Class members in the amounts paid to purchase the products at issue.

21                        **JURISDICTION AND VENUE**

22     10.     The Court has subject matter jurisdiction over this action pursuant to 28
23 U.S.C. § 1332(d)(2), because the proposed class has more than 100 members, the class
24 contains at least one member of diverse citizenship from Defendant, and the amount in
25 controversy exceeds $5 million.

26
27
28

                                    2
                FIRST AMENDED CLASS ACTION COMPLAINT
                        CASE NO. 12-CV-02664-JSC

11.     The Court has personal jurisdiction over Defendant because Defendant is incorporated in California and has its primary manufacturing facility in Petaluma, California.  Defendant is authorized to, and conducts, substantial business in California.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1), because a substantial part of the events and omissions giving rise to this action occurred in this District in Defendant's primary manufacturing plant in Petaluma, California.

## PARTIES

13.     Plaintiff Richard W. Trammell is a resident of Los Angeles, California and Granger, Texas.  Mr. Trammell has purchased numerous Products in Los Angeles, California and in Austin, Texas over the past four years in reliance on Defendant's representations that the Products were  "All Natural".  These representations and omissions were material to Mr. Trammell's decision to purchase the Products.  Mr. Trammell was willing to pay for the Products because of the representations that they were "all natural" and would not have purchased the Products, would not have paid as much for the Products, or would have purchased alternative products in absence of the representations.

14.     Defendant Barbara's Bakery, Inc. is a California corporation with its principal place of business at 3900 Cypress Drive, Petaluma, California 94954.  Defendant manufactures and distributes the Products from its manufacturing plant in Petaluma, California to consumers in California and throughout the United States.

## SUBSTANTIVE ALLEGATIONS

### Defendant Deceptively Labels The Corn-Based Puffins® As "All Natural"

15.     Throughout the Class Period, Defendant systematically marketed and advertised Puffins® cereal as "all natural" in product packaging, print advertisements, in television commercials, on its website, and on social media sites such as Facebook.  The "all natural" message is inherently intertwined with Barbara's Bakery® brand definition and recognition.

3

1    16.    Defendants label every box or bag of Puffins as "All Natural Since 1971"
2  next to a red heart with an image of a stalk of grain in it, in the same color block as the
3  brand name Barbara's®. The color block spans across a bucolic scene, also in the
4  shape of a heart, of a small farm with rows of crops, trees, mountains and sky and the
5  words "Petaluma, California":



FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-JSC

17.    The back of the box or bag also features numerous slogans and representations to induce the purchaser into believing that the product is all natural, including the following statements:

- "Eat the Way you Live, Naturally."
- "At Barbara's®, we believe the best things in life are all natural – like smiles, hugs, and our super tasty Multigrain Puffins made with whole oats, brown rice and corn…"
- "healthy living, naturally"
- "Honest Goodness.  Give our other all natural products a try."
- "Celebrate Family! In 1971, when Barbara started our company, Petaluma was at the heart of the natural foods movement.  Petaluma is still a place of farms, milk cows, and people deeply connected to nature.  The movement has spread and our family of products has grown too.  We chose a few of our favorite cereals to create a "family size."  Now everyone can enjoy Barbara's original vision – make great tasting, healthy foods what people love – all without artificial ingredients or preservatives.  Gather the family around the table and enjoy!"
- "*healthy living, naturally*
  Make a Puffins breakfast or snack part of saying "yes" to your healthy, active lifestyle.  Good health habits are built with dedicated repetition, day after day…and bowl after bowl.  Let Barbara's delicious natural foods help you create the healthy lifestyle you deserve."
- "Make Friends with All Natural Goodness."
- "A Naturally Dynamic Duo.  At Barbara's®, our recipe for success is great taste and all-natural ingredients…"
- "The Best Things in Life are Natural.  Morning at Barbara's® finds us in the kitchen with big red bowls, munching on crunchy Peanut Butter Puffins.

5

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-JSC

1    Each mouthful is a burst of real peanut butter and the best whole grain oats

2    and corn.  We happen to think our cereal is one incredibly delicious combo

3    of great taste and natural nutrition.  Plus, it's low in fat and always free of

4    artificial flavors, preservatives and additives –because that's Barbara's

5    way":



FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-JSC

1    18.    Similarly, on its website http//www.bararasbakery.com, Defendant makes

2  numerous statements and representations to re-enforce the "all natural" part of its brand.

3    19.    For example, at the top of the homepage, a changing banner appears with

4  the following slogans:

5         • Eat Natural, Live Natural. Start with Breakfast.

6         • Let's eat the way we live. Naturally.

7         • A hug, a smile, and whole grains.  The best things in life are natural.

8         • We believe sunny afternoons should be spent outside. And snacks should be

9            natural.

10      (http://www.barbarasbakery.com (last visited on May 21, 2012)).

11    20.    In recounting the company's history, and referring to its alleged founder,

12  Defendant states, among other things: "Barbara, then 17, found her calling in real food

13  and opened a small natural bakery in Northern California.  She had a simple plan  -

14  make wholesome food taste incredibly delicious.  Inspired by good health, family, and

15  the kitchen table as the cornerstones of the good life, she used whole grains and oats

16  just as nature intended – free from anything artificial…  Today, a few of us wish we

17  still wore flowers in our hair like Barbara did. And, we know our mission is clear:

18  healthy people, naturally. We carry on Barbara's commitment to create the best-tasting

19  natural products free of artificial preservatives and ingredients, hydrogenated oils, and

20  refined white sugar."  (http://www.barbarasbakery.com/about/ (last visited on May 21,

21  2012)).

22    21.    Another page of the website boasts as follows:

23    " **We've Got a New Look and it's Just as Natural as Our Ingredients**.

24         We've been making great tasting naturally healthy food—free of artificial

25    colors, preservatives and harmful additives since 1971. Our bold, simplified look,

26    featuring 100% recycled carbon neutral GreenChoice cartons makes it easier for

27    health conscious consumers to find us in their local grocery store.

28

7

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-JSC

1   It's all part of our long-term commitment to natural ingredients. Barbara's

2   is a company born and raised on the values of the natural foods movement of the

3   early 1970s. These pioneers believed that promoting sustainable agriculture and

4   green living along with eating natural and organic would lead to healthier, happier

5   lives.

6   Barbara opened a small natural bakery with a strong commitment to

7   healthier foods, but with a slightly different point of view: what good is healthy

8   food if no one will eat it? She made sure that her naturally wholesome foods taste

9   great as well. It's no surprise that Barbara's is still thriving and we still live by the

10  principle our founder believed in: that making great tasting recipes with all-

11  natural ingredients will make your family healthier and happier. Naturally.

12  **All Natural Since 1971**."

13  (http://www.barbarasbakery.com/new-look/ (last visited on May 21, 2012)).

14  22.    The "all natural" claim is re-enforced and re-iterated throughout television

15  commercials for the Products.  For example, one TV ad entitled "Pass the Puffins"

16  features a mother and her twin sons at breakfast, conversing with an animated puffin

17  bird as follows:

18          Mom: I found the greatest cereal.  It's all natural and it's called
19              Penguins cereal.
20          Puffin: No, no, it's called Puffins.
        Mom: Even my kids love the naturally sweet taste and the cute
21              penguin on the box.
        Puffin: Ah, I am kind of cute, thank you . . . but I'm also a
22              puffin, not a penguin.  We don't even live in the same
23              hemisphere!
        Mom: [smiles] ...and Penguins has only five grams of sugar.
24      Puffin: [squawks in frustration, then addresses twin sons]
25              Does- Does she get your names right?
         [Twins look at each other with blank expressions]
26      Puffin: ...that's excusable.
27      Narrator voiceover: Puffins Cereal, in the natural food aisle.
        Puffin: Pass the Puffins.
28

8

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-JSC

1    ["Pass the Puffins" text on screen]

2  (http://www.barbarasbakery.com/ (last visited May 23, 2012).)

3    23.    By consistently and systematically marketing and advertising Puffins as

4  "all natural," throughout the Class Period, Defendant ensured that all consumers

5  purchasing Puffins would be exposed to its "all natural" claim.

6    24.    A claim that a product is "natural" is material to a reasonable consumer.

7    **Genetically-Modified Organisms Are Not Natural**

8    25.    The dictionary defines the term "natural" as "existing in or produced by

9  nature: not artificial." (Webster's Ninth New Collegiate Dictionary 788 (1990)). This

10  common dictionary definition of the term "natural" is consistent with the expectations

11  of a reasonable consumer.

12    26.    Genetically-modified organisms ("GMO") are not natural, let alone "all

13  natural." Monsanto, the company that makes GMO, defines GMO as "Plants or

14  animals that have had their genetic makeup altered to exhibit *traits that are not*

15  *naturally theirs*. In general, genes are taken (copied) from one organism that shows a

16  desired trait and transferred into the genetic code of another organism."

17  (http://www.monsanto.com/newsviews/Pages/glossary.aspx#g (last visited May 21,

18  2012) (emphasis added)). "Unnatural" is a defining characteristic of genetically

19  modified foods.

20    27.    Romer Labs, a company that provides diagnostic solutions to the

21  agricultural industry, defines GMO as "[a]griculturally important plants [that] are

22  often genetically modified by the insertion of DNA material from outside the organism

23  into the plant's DNA sequence, allowing the plant to *express novel traits that normally*

24  *would not appear in nature*, such as herbicide or insect resistance. Seed harvested

25  from GMO plants will also contain these [sic] modification."

26  (http://www.romerlabs.cornlen/analytes/genetically-modified-organisms.html (last

27  visited May 21, 2012) (emphasis added)).

28

9

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-JSC

28.     That GMO are not natural is further evidenced by the explanations of

health and environmental organizations, such as The World Health Organization,

which defines genetically-modified organisms as "organisms in which *the genetic*

*material (DNA) has been altered in a way that does not occur naturally*.  The

technology is oftencalled 'modern biotechnology' or 'gene technology', sometimes also

'recombinant DNA technology' or 'genetic engineering'. It allows selected individual

genes to be transferred from one organism into another, also between non-related

species.  Such methods are used to create GM plants – which are then used to grow

GM food crops."  (World Health Organization, 20 Questions on Genetically

Modified(GM) Foods at

http://www.who.int/foodsafety/publications/biotech/en/20questions_en.pdf (last

visited  May 21, 2012).

29.     The Environmental Protection Agency has distinguished conventional

breeding of plants "through  natural  methods,  such  as  cross-pollination" from

genetic  engineering  using  modern  scientific  techniques.  (United States

Environmental Protection Agency, Prevention, Pesticides and Toxic  Substances,

Questions & Answers Biotechnology: Final Plant-Pesticide/Plant Incorporated

Protectants (PIPs) Rules (Jul. 19, 2001) at

http://www.epa.gov/scipoly/biotech/pubs/qanda.pdf ("*Conventional breeding* is a

method in which genes for pesticidal traits are introduced into a plant *through natural*

*methods*, such as cross-pollination....  Genetically engineered plant-incorporated

protectants are created through a process that utilizes several different modem

scientific techniques to introduce a specific pesticide-producing gene into a plant's

DNA genetic material.") (emphasis of "through natural methods" added; remaining

emphasis in original) (last visited May 21, 2012)).

30.     As indicated by the definitions above, which come for a wide array of

sources, including industry, government, and health organizations, GMO are not "all

10

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-JSC

1   natural."  GMO are "created" artificially in a laboratory through genetic engineering.

2   Thus, by claiming that its Products are "all natural," Defendant deceives and misleads

3   reasonable consumers.

4                    **The Corn-Based Puffins Cereals are Made From GMO Corn**

5          31.    Based on independent third party testing, Defendant's Products are made

6   from genetically modified corn.

7          32.    Defendant's "all natural" representations are false, deceptive, misleading,

8   and unfair to consumers, who are injured in fact by purchasing a product that

9   Defendant claims are "all natural" when in fact they are not.

10                          **CLASS ACTION ALLEGATIONS**

11         33.    Plaintiff seeks relief in his individual capacity and seeks to represent a

12  class consisting of all others who are similarly situated.  Pursuant to Fed. R. Civ. P.

13  23(a) and (b)(2) and/or (b)(3), Plaintiff seeks certification of a class initially defined as

14  follows:

15         All consumers in the United States who from May 23, 2008 until the final

16         disposition of this case (the "Class Period"), purchased the following

17         Barbara Bakery® Products:  (1) Puffins® Original; (2) Puffins®

18         Multigrain; (3) Puffins® Peanut Butter; (4) Puffins® Cinnamon; (5)

19         Puffins® Peanut Butter and Chocolate; (6) Puffins® Crunchy Cocoa;  and

20         (7) Puffins® Fruit Medley.

21         34.    Excluded from the Class are Defendant and its subsidiaries and affiliates,

22  Defendant's executives, board members, legal counsel, the judges and all other court

23  personnel to whom this case is assigned, and their immediate families.

24         35.    Plaintiff reserves the right to amend or modify the Class definition with

25  greater specificity or division into subclasses after they have had an opportunity to

26  conduct discovery.

27

28

11

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-JSC

36.     Numerosity.  Fed. R. Civ. P. 23(a)(1).  The potential members of the Class as defined are so numerous that joinder of all members is unfeasible and not practicable. While the precise number of Class members has not been determined at this time, Plaintiff is informed and believes that many thousands or millions of consumers have purchased the listed Products.

37.     Commonality.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members.  These common questions of law and fact include, without limitation:

      a.     Whether Defendant falsely and/or misleadingly misrepresented the Products as being "All Natural";

      b.     Whether Defendant's misrepresentations are likely to deceive reasonable consumers;

      c.      Whether Defendant violated California Civil Code § 1750, *et seq.*;

      d.     Whether Defendant violated California Business and Professions Code § 17500, *et seq.*;

      e.     Whether Defendant violated California Business and Professions Code § 17200, *et seq.*;

      f.     The nature of the relief, including equitable relief, to which Plaintiff and the Class members are entitled.

38.     Typicality.  Fed. R. Civ. P. 23(a)(3).  Plaintiff's claims are typical of the claims of the Class.  Plaintiffs and all Class members were exposed to uniform practices and sustained injury arising out of and caused by Defendant's unlawful conduct.

39.     Adequacy of Representation.  Fed. R. Civ. P. 23(a)(4).  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

1    40.    Superiority of Class Action. Fed. R. Civ. P. 23(b)(3). A class action is

2  superior to other available methods for the fair and efficient adjudication of this

3  controversy since joinder of all the members of the Class is impracticable.

4  Furthermore, the adjudication of this controversy through a class action will avoid the

5  possibility of inconsistent and potentially conflicting adjudication of the asserted

6  claims. There will be no difficulty in the management of this action as a class action.

7    41.    Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2). Defendant's

8  misrepresentations are uniform as to all members of the Class. Defendant has acted or

9  refused to act on grounds that apply generally to the Class, so that final injunctive relief

10  or declaratory relief is appropriate with respect to the Class as a whole.

11  **FIRST CAUSE OF ACTION**

12  **(California False Advertising Law – Cal. Bus. & Prof. Code § 17500, *et seq*.)**

13    42.    Plaintiff incorporates by reference and re-alleges paragraphs 1-41.

14    43.    Defendant publicly disseminated untrue or misleading advertising or

15  intended not to sell its Products as advertised in violation of California Business &

16  Professional Code § 17500, *et seq*., by representing that the Products are "All Natural,"

17  when they are not.

18    44.    Defendant committed such violations of the False Advertising Law with

19  actual knowledge or in the exercise of reasonable care should have known was untrue

20  or misleading.

21    45.    Plaintiff reasonably relied on Defendant's representations and/or omissions

22  made in violation of California Business & Professional Code § 17500, *et seq*.

23    46.    As a direct and proximate result of Defendant's violations, Plaintiffs

24  suffered injury in fact and lost money.

25    47.    Plaintiff, on behalf of himself and Class members, seeks equitable relief in

26  the form of an order requiring Defendant to refund Plaintiff and all Class members all

27  monies they paid for the Products, and injunctive relief in the form of an order

28

13

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-JSC

1  prohibiting Defendant from engaging in the alleged misconduct and performing a
2  corrective advertising campaign.

3  **SECOND CAUSE OF ACTION**

4  **(California Unfair Competition Law – Cal. Bus. & Prof. Code § 17200, *et seq*.)**

5      48.    Plaintiff incorporates by reference and realleges paragraphs 1-41.

6      49.    Defendant engaged in unlawful, unfair, and/or fraudulent conduct under
7  California Business & Professional Code § 17200, *et seq*., by representing that the
8  Products are "All Natural," when they are not.

9      50.    Defendant's conduct is unlawful in that it violates the Consumers Legal
10 Remedies Act, California Civil Code § 1750, *et seq*., the False Advertising Law,
11 California Business & Professions Code § 17500.

12     51.    Defendant's conduct is unfair in that it offends established public policy
13 and/or is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to
14 Plaintiff and Class members.  The harm to Plaintiff and Class members arising from
15 Defendant's conduct outweighs any legitimate benefit Defendant derived from the
16 conduct.  Defendant's conduct undermines and violates the stated spirit and policies
17 underlying the Consumers Legal Remedies Act and the False Advertising Law as
18 alleged herein.

19     52.    Defendant's actions and practices constitute "fraudulent" business
20 practices in violation of the UCL because, among other things, they are likely to
21 deceive reasonable consumers.  Plaintiffs relied on Defendant's representations and
22 omissions.

23     53.    As a direct and proximate result of Defendant's violations, Plaintiffs
24 suffered injury in fact and lost money.

25     54.    Plaintiffs, on behalf of themselves and Class members, seek equitable
26 relief in the form of an order requiring Defendant to refund Plaintiffs and all Class
27 members all monies they paid for Products, and injunctive relief in the form of an order

28

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-JSC

Case3:12-cv-02664-CRB Document5 Filed06/28/12 Page16 of 22

prohibiting Defendant from engaging in the alleged misconduct and performing a corrective advertising campaign.

## THIRD CAUSE OF ACTION

### (Breach of Express Warranty)

55. Plaintiff incorporates by reference and realleges the preceding paragraphs.

56. Plaintiff brings this claim individually and on behalf of the Class.

57. Plaintiff and each member of the Class formed a contract with Defendants at the time Plaintiffs and the other members of the Class purchased one or more of the Products. The terms of that contract include the promises and affirmations of fact made by Defendant on the packaging of the Products and through the marketing campaign, as described above. The Products' packaging and advertising constitute express warranties, became part of the basis of the bargain, and are part of a standardized contract between Plaintiff and the members of the Class on the one hand, and Defendant on the other.

58. All conditions precedent to Defendants' liability under this contract have been performed by Plaintiff and the Class.

59. Defendant breached the terms of this contract, including the express warranties, with Plaintiff and the Class by not providing the products that could provide the benefits promised, i.e. that the Products were "all natural."

60. As a result of Defendant's breach of its contract, Plaintiffs and the Class have been damaged in the amount of the purchase price of any and all of the Products they purchased.

## FOURTH CAUSE OF ACTION

### (Violation of Consumer Legal Remedies Act – Civil Code § 1750 *et seq.*)

61. Plaintiff incorporates by reference and realleges the preceding paragraphs.

62. Plaintiff brings this claim individually and on behalf of the Class.

63. This cause of action is brought pursuant to the Consumers Legal Remedies

15

Act, California Civil Code § 1750, *et seq.* (the "CLRA") because Defendant's actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

64.     Plaintiff and each member of the Class are consumers as defined by California Civil Code §1761(d).

65.     The Products are goods within the meaning of Civil Code §1761(a).

66.     Defendant violated the CLRA in at least the following respects:

      a.     in violation of §1770(a)(5), Defendant represented that the Products have approval, characteristics, and uses or benefits which they do not have;

      b.     in violation of §1770(a)(7), Defendant represented that the Products are of a particular standard, quality or grade, or that the Products are of a particular style, or model, when they are of another;

      c.     in violation of §1770(a)(9), Defendant has advertised the Products with intent not to sell them as advertised; and

      d.     in violation of §1770(a)(16), Defendant represented that the Products have been supplied in accordance with previous representations, when they were not.

67.     Defendant affirmatively represented to consumers that the Products are "all natural."

68.     Defendant omitted to state that the Products contain GMO corn.

69.     This sort of information is relied upon by consumers in making purchasing decisions, and is fundamental to the decision to purchase food products.

70.     Plaintiff relied upon Defendant's misrepresentations to her detriment.

71.     Defendant's misrepresentations constitute unfair, deceptive, and misleading business practices in violation of Civil Code §1770(a).

72.     Defendant's deceptive acts and omissions occurred in the course of selling

16

1  a consumer product and have occurred continuously through the filing of this

2  Complaint.

3      73.      On May 23, 2012, Plaintiff notified Defendant in writing by certified mail

4  of the violations alleged herein and demanded that Defendant remedy those violations.

5  A copy of the letter Plaintiff sent to Defendant is attached herein as Exhibit A.

6      74.      Defendant failed to remedy the violations alleged herein by June 22, 2012.

7  Consequently, Plaintiff hereby amends the Complaint to add claims for actual, punitive,

8  and statutory damages pursuant to the CLRA.

9      **WHEREFORE**, Plaintiff, on behalf of himself and Class members, prays for

10  relief as follows:

11      A.      For an order that this action may be maintained as a class action under

12  Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed Class

13  representative, and that Plaintiff's counsel be appointed as counsel for the Class;

14      B.      For an order requiring Defendant to refund Plaintiff and all Class

15  members for the Products;

16      C.      For an order prohibiting Defendant from engaging in the misconduct

17  described herein;

18      D.      For an award of attorneys' fees;

19      E.      For an award of the costs of suit incurred herein, including expert

20  witness fees;

21      F.      For an award of interest, including prejudgment interest, at the legal

22  rate; and

23      G.      For such other and further relief as this Court deems just and proper.

24  ////

25  ////

26  ////

27  ////

28

17

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-JSC

1

## DEMAND FOR JURY TRIAL

2       Plaintiff demands trial by jury of all claims so triable.

3

4   Dated: June 28, 2012               Respectfully submitted,

5                          **AHDOOT & WOLFSON, PC**

6

7                          Tina Wolfson

8                          Robert Ahdoot

                              Theodore W. Maya

9                          10850 Wilshire Blvd., Suite 370

                              Los Angeles, California 90024

10                        Tel: 310-474-9111

11                        Facsimile: 310-474-8585

12                        Counsel for Plaintiff

13                        Richard W. Trammell

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-JSC

Exhibit A



# AHDOOT & WOLFSON, PC

### ATTORNEYS

May 23, 2012

**VIA CERTIFIED US MAIL**
**RETURN RECEIPT REQUESTED**

Vice President Kent Spalding
Barbara's Bakery, Inc.
3900 Cypress Drive
Petaluma, California 94954

>             **Re:    Richard Trammell v. Barbara's Bakery, Inc.**
>
>                     **California Consumer Legal Remedies Act Demand**
>                     **Civil Code Section 1782**

Dear Mr. Spalding:

        Please be advised that this firm represents Richard Trammell on behalf of himself and all others similarly situated in an action against Barbara's Bakery, Inc. ("Defendant"). This notice is being sent to you pursuant to California Civil Code Section 1782(a)(2). Enclosed please find a complaint being filed today in the Northern District of California concerning the following allegations, which we intend to amend to state a claim under the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*. ("CLRA").

        Our client seeks to maintain a class action on behalf of all consumers nationwide who purchased Defendant's Puffins® Original, Puffins® Multigrain, Puffins® Peanut Butter, Puffins® Cinnamon, Puffins® Peanut Butter and Chocolate, Puffins® Crunchy Cocoa, and Puffins® Fruit Medley (hereinafter, the "Falsely Labeled Cereals"). Our client alleges through this action that the Falsely Labeled Cereals have been and continue to be marketed with the claim that they are "All Natural."

        It is alleged that these representations were and are false, and that Defendant knew or should have known at the time it made these representations that they were false, because Defendant used genetically modified organisms ("GMOs") in the Falsely Labeled Cereals. Nonetheless, Defendant continues to make false and misleading "all natural" representations in its advertising and packaging of the Falsely Labeled Cereals.

Barbara's Bakery, Inc.
Vice President Kent Spalding
California Civil Code §1782 Demand
May 23, 2012
Page 2

These practices constitute violations of California Civil Code Section 1770 in at least the following respects:

(a)     in violation of Section 1770(a)(5), Defendant represented that the Falsely Labeled Cereals have characteristics and benefits that these goods do not have;

(b)     in violation of Section 1770(a)(7), Defendant represented that its goods are of a particular standard, quality, or grade, or that its goods are of a particular style or model, when they are of another;

(c)     in violation of Section 1770(a)(9), Defendant has advertised the Falsely Labeled Cereals with the intent not to sell these goods as advertised; and

(d)     in violation of Section 1770(a)(16), Defendant has represented that the Falsely Labeled Cereals were supplied in accordance with previous representations, when in fact they were not.

In light of the foregoing, and pursuant to Civil Code Section 1782(a)(2), it is hereby demanded on behalf of Mr. Trammell, and all others similarly situated, that Defendant immediately correct, repair, replace, and otherwise rectify the violations of Civil Code Section 1770, through the following actions: that Defendant cease and desist in making representations regarding the Falsely Labeled Cereals that are not in fact true, that Defendant engage in a corrective advertising campaign which will alert the public to its misconceptions about the Falsely Labeled Cereals, and that Defendant refund the purchase price paid for the Falsely Labeled Cereals, plus interest, costs and fees, to all purchasers of the Falsely Labeled Cereals.

Our client's amended complaint will include claims for injunctive relief, actual damages, punitive damages, and all other damages permitted under the California Consumer Legal Remedies Act unless appropriate correction, repair, replacement, refund, or other remedy is given, or agreed to be given within thirty (30) days after receipt of this notice pursuant to Civil Code Section 1782(b).

Sincerely,
AHDOOT & WOLFSON, PC

By:  Tina Wolfson

(Enclosures)

# EXHIBIT 3

Supplemental Declaration of Yvette Golan

1   TINA WOLFSON, SBN 174806
    twolfson@ahdootwolfson.com
2   ROBERT AHDOOT, SBN 172098
    rahdoot@ahdootwolfson.com
3   THEODORE W. MAYA, SBN 223242
    tmaya@ahdootwolfson.com
4   BRADLEY K. KING, SBN 274399
    bking@ahdootwolfson.com
5
    **AHDOOT & WOLFSON, P.C.**
6   10850 Wilshire Boulevard, Suite 370
    Los Angeles, California 90024
7   Tel: 310-474-9111; Fax: 310-474-8585
8
    Counsel for Plaintiff
9   RICHARD W. TRAMMELL
10
11              **UNITED STATES DISTRICT COURT**
12             **NORTHERN DISTRICT OF CALIFORNIA**
13
14
15  RICHARD W. TRAMMELL, individually and on      Case No. 12-CV-02664-CRB
    behalf of all others similarly situated,
16                                                **SECOND AMENDED CLASS ACTION
                                                  COMPLAINT**
17                  Plaintiffs,
                                                  JURY TRIAL DEMANDED
18                      v.
19
    BARBARA'S BAKERY, INC. a California
20  corporation; and DOES 1-50,
21                  Defendants
22
23
24
25
26
27
28

---

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-CRB

Plaintiff Richard W. Trammell, by and through his counsel, brings this Class Action Complaint against Barbara's Bakery, Inc., on behalf of himself and all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1.      In recent years, consumers have become more willing to pay a premium for food and beverages that they perceive to be healthy, organic, natural and non-genetically modified.  As a result, the market for natural or organic foods and beverages has grown rapidly, yielding billions of dollars in revenue for food and beverage manufacturers.

2.      Barbara's Bakery, Inc. ("Barbara's" or "Defendant") is a wholly owned subsidiary of Weetabix North America, which is the North American arm of Weetabix Food Company, a United Kingdom-based company and worldwide cereal conglomerate.  In March 2012, 60% of the Weetabix Food Company was sold to "Bright Food," a firm from Shanghai, China for £1.2 Billion British pounds (approximately $1.9 Billion).

3.      Barbara's has been striving to "raise its profile in the $31 billion U.S. market for health food."  (http://www.barbarasbakery.com/news/barbaras-bakery-rebranding-turns-to-petaluma-legacy/ (last visited on May 21, 2012)).

4.      Defendant manufactures, markets and sells various cereal, multigrain cereal, and snack foods nationwide from its manufacturing plant in Petaluma, California, including but not limited to (1) Original Puffins Cereal, (2) Multigrain Puffins Cereal, (3) Peanut Butter Puffins Cereal, (4) Cinnamon Puffins Cereal, (5) Peanut Butter and Chocolate Puffins Cereal; (6) Crunchy Cocoa Puffins Cereal, (7) Fruit Medley Puffins Cereal, (8) Multigrain Cereal Bar Apple Cinnamon, (9) Multigrain Cereal Bar Blueberry, (10) Multigrain Cereal Bar Cherry, (11) Multigrain Cereal Bar Raspberry, (12) Multigrain Cereal Bar Strawberry, (13) Multigrain Cereal Bar Original, (14) Multigrain Cereal Bar Triple Berry, (15) Cheese Puffs Original, (16) Cheese Puffs Bakes Original, (17) Cheese Puffs Bakes White Cheddar, (18) Cheese Puffs Jalapeño, (19) Shredded Minis Blueberry Burst, (20) Shredded Spoonfulls Multigrain, (21) High Fiber Original, (22) High Fiber Cranberry, (23) High Fiber Flax & Granola, (24) Corn Flakes, (25) Hole 'n Oats Fruit Juice Sweetened, (26) Hole 'n Oats Honey Nut, (27) Fruit &

1

Yogurt Bar Blueberry Apple, (28) Fruit & Yogurt Bar Strawberry Apple, (29) Fig Bars Blueberry Low Fat, (30) Fig Bars Multigrain, (31) Fig Bars Wheat Free Raspberry, (32) Fig Bars Whole Wheat, (33) Snackimals Chocolate Chip, (34) Snackimals Double Chocolate, (35) Snackimals Peanut Butter, (36) Honey Rice, and (37) Snackimals Wheat Free Oatmeal (collectively, the "Products").

5.     In an effort to capture a segment of the lucrative health food market, Defendant has systematically marketed and advertised the Products as "all natural" on the cereal boxes and bags, on its website, TV commercials and social media such as Facebook, so that any United States consumer who purchases the Products is exposed to Defendant's "all natural" claim.

6.     This claim is deceptive and misleading because the Products are made with unnatural ingredients.  Specifically, the Products are made with plants whose genes have been altered by scientists in a lab for the express purpose of causing those plants to exhibit traits that are not naturally their own.  Genetically modified organisms ("GMOs") are not natural by design.  In addition, the Products contain synthetic ingredients that are chemically-derived and not natural.

7.     Accordingly, Barbara's misleads and deceives reasonable consumers, including the named Plaintiffs and the other members of the Class, by portraying a product made from unnatural ingredients as "All Natural."

8.     Barbara's conduct harms consumers by inducing them to purchase and consume a product with GMOs on the false premise that the product is "all natural."

9.     Plaintiff brings claims against Defendant individually and on behalf of a nationwide class of all other similarly situated purchasers of the Products for violations of California's Unfair Competition Law, Cal. Bus & Prof. Code §§ 17200, *et seq*. ("UCL"), the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*. ("FAL"), and breach of express warranties.  Plaintiff seeks an order requiring Defendant to, among other things: (1) cease the unlawful marketing; (2) conduct a corrective advertising campaign; and (3) pay damages and restitution to Plaintiff and Class members in the amounts paid to purchase the products at issue.

////

////

////

2

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-CRB

**JURISDICTION AND VENUE**

10.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the proposed class has more than 100 members, the class contains at least one member of diverse citizenship from Defendant, and the amount in controversy exceeds $5 million.

11.     The Court has personal jurisdiction over Defendant because Defendant is incorporated in California and has its primary manufacturing facility in Petaluma, California.  Defendant is authorized to, and conducts, substantial business in California.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1), because a substantial part of the events and omissions giving rise to this action occurred in this District in Defendant's primary manufacturing plant in Petaluma, California.

**PARTIES**

13.     Plaintiff Richard W. Trammell is a resident of Los Angeles, California and Granger, Texas.  Mr. Trammell has purchased numerous Products in Los Angeles, California and in Austin, Texas over the past four years in reliance on Defendant's representations that the Products were  "All Natural."  These representations and omissions were material to Mr. Trammell's decision to purchase the Products.  Mr. Trammell was willing to pay for the Products because of the representations that they were "all natural" and would not have purchased the Products, would not have paid as much for the Products, or would have purchased alternative products in absence of the representations.

14.     Defendant Barbara's Bakery, Inc. is a California corporation with its principal place of business at 3900 Cypress Drive, Petaluma, California 94954.  Defendant manufactures and distributes the Products from its manufacturing plant in Petaluma, California to consumers in California and throughout the United States.

**SUBSTANTIVE ALLEGATIONS**

**Defendant Deceptively Labels The Corn-Based Puffins® As "All Natural"**

15.     Throughout the Class Period, Defendant systematically marketed and advertised the Products as "all natural" in product packaging, print advertisements, in television commercials, on its

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-CRB

website, and on social media sites such as Facebook.  The "all natural" message is inherently intertwined with the Barbara's Bakery brand definition and recognition.

16.     For example, Defendant labels every box or bag of the Products as "All Natural Since 1971" next to a red heart with an image of a stalk of grain in it, in the same color block as the brand name Barbara's.  The color block spans across a bucolic scene, also in the shape of a heart, of a small farm with rows of crops, trees, mountains and sky and the words "Petaluma, California":



SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-CRB

17.     The back of such boxes or bags also features numerous slogans and representations to induce the purchaser into believing that the Products are all natural, including the following statements:

- "Eat the Way you Live, Naturally."
- "At Barbara's®, we believe the best things in life are all natural – like smiles, hugs, and our super tasty Multigrain Puffins made with whole oats, brown rice and corn…"
- "healthy living, naturally"
- "Honest Goodness.  Give our other all natural products a try."
- "Celebrate Family! In 1971, when Barbara started our company, Petaluma was at the heart of the natural foods movement.  Petaluma is still a place of farms, milk cows, and people deeply connected to nature.  The movement has spread and our family of products has grown too.  We chose a few of our favorite cereals to create a "family size."  Now everyone can enjoy Barbara's original vision – make great tasting, healthy foods what people love – all without artificial ingredients or preservatives.  Gather the family around the table and enjoy!"
- "*healthy living, naturally*

    Make a Puffins breakfast or snack part of saying "yes" to your healthy, active lifestyle.  Good health habits are built with dedicated repetition, day after day…and bowl after bowl.  Let Barbara's delicious natural foods help you create the healthy lifestyle you deserve."
- "Make Friends with All Natural Goodness."
- "A Naturally Dynamic Duo.  At Barbara's®, our recipe for success is great taste and all-natural ingredients…"
- "The Best Things in Life are Natural.  Morning at Barbara's® finds us in the kitchen with big red bowls, munching on crunchy Peanut Butter Puffins.  Each mouthful is a burst of real peanut butter and the best whole grain oats and corn.  We happen to think our cereal is one incredibly delicious combo of great taste and natural nutrition.  Plus, it's low in fat

5

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-CRB

1  and always free of artificial flavors, preservatives and additives –because that's Barbara's

2  way":



SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-CRB

18. Similarly, on its website http//www.bararasbakery.com, Defendant makes numerous statements and representations to re-enforce the "all natural" part of its brand.

19. For example, at the top of the homepage, a changing banner appears with the following slogans:

- Eat Natural, Live Natural. Start with Breakfast.
- Let's eat the way we live. Naturally.
- A hug, a smile, and whole grains. The best things in life are natural.
- We believe sunny afternoons should be spent outside. And snacks should be natural.

(http://www.barbarasbakery.com (last visited on January 7, 2013).)

20. In recounting the company's history, and referring to its alleged founder, Defendant states, among other things: "Barbara, then 17, found her calling in real food and opened a small natural bakery in Northern California. She had a simple plan - make wholesome food taste incredibly delicious. Inspired by good health, family, and the kitchen table as the cornerstones of the good life, she used whole grains and oats just as nature intended – free from anything artificial… Today, a few of us wish we still wore flowers in our hair like Barbara did. And, we know our mission is clear: healthy people, naturally. We carry on Barbara's commitment to create the best-tasting natural products free of artificial preservatives and ingredients, hydrogenated oils, and refined white sugar." (http://www.barbarasbakery.com/about/ (last visited on January 7, 2013).)

21. Another page of the website boasts as follows:

" **We've Got a New Look and it's Just as Natural as Our Ingredients**.

We've been making great tasting naturally healthy food—free of artificial colors, preservatives and harmful additives since 1971. Our bold, simplified look, featuring 100% recycled carbon neutral GreenChoice cartons makes it easier for health conscious consumers to find us in their local grocery store.

It's all part of our long-term commitment to natural ingredients. Barbara's is a company born and raised on the values of the natural foods movement of the early 1970s. These pioneers believed that promoting sustainable agriculture and green living along with eating natural and organic would lead to healthier, happier lives.

7

Barbara opened a small natural bakery with a strong commitment to healthier foods, but with a slightly different point of view: what good is healthy food if no one will eat it? She made sure that her naturally wholesome foods taste great as well. It's no surprise that Barbara's is still thriving and we still live by the principle our founder believed in: that making great tasting recipes with all-natural ingredients will make your family healthier and happier. Naturally.

**All Natural Since 1971**."

(http://www.barbarasbakery.com/new-look/ (last visited on January 7, 2013).)

22.     The "all natural" claim is re-enforced and re-iterated throughout television commercials for the Products.  For example, one TV ad entitled "Pass the Puffins" features a mother and her twin sons at breakfast, conversing with an animated puffin bird as follows:

> Mom: I found the greatest cereal.  It's all natural and it's called Penguins cereal.
> Puffin: No, no, it's called Puffins.
> Mom: Even my kids love the naturally sweet taste and the cute penguin on the box.
> Puffin: Ah, I am kind of cute, thank you . . . but I'm also a puffin, not a penguin.  We don't even live in the same hemisphere!
> Mom: [smiles] ...and Penguins has only five grams of sugar.
> Puffin: [squawks in frustration, then addresses twin sons] Does- Does she get your names right?
>  [Twins look at each other with blank expressions]
> Puffin: ...that's excusable.
> Narrator voiceover: Puffins Cereal, in the natural food aisle.
> Puffin: Pass the Puffins.
>
>  ["Pass the Puffins" text on screen]

(http://www.barbarasbakery.com/ (last visited January 7, 2013).)

23.     By consistently and systematically marketing and advertising the Products as "all natural," throughout the Class Period, Defendant ensured that all consumers purchasing the Products would be exposed to its "all natural" claim.

24.     A claim that a product is "natural" is material to a reasonable consumer.

////

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-CRB

**Genetically Modified Organisms Are Not Natural**

25.     The dictionary defines the term "natural" as "existing in or produced by nature:  not artificial."  (Webster's Ninth New Collegiate Dictionary 788 (1990).)  This common dictionary definition of the term "natural" is consistent with the expectations of a reasonable consumer.

26.     GMOs are not natural, let alone "all natural."  Monsanto, the company that makes GMOs, defines GMOs as "Plants or animals that have had their genetic makeup altered to exhibit *traits that are not naturally theirs*.  In general, genes are taken (copied) from one organism that shows a desired trait and transferred into the genetic code of another organism." (http://www.monsanto.com/newsviews/Pages/glossary.aspx#g (last visited January 7, 2013) (emphasis added).)  "Unnatural" is a defining characteristic of genetically modified foods.

27.     Romer Labs, a company that provides diagnostic solutions to the agricultural industry, defines GMOs as "[a]griculturally important plants [that] are often genetically modified by the insertion of DNA material from outside the organism into the plant's DNA sequence, allowing the plant to *express novel traits that normally would not appear in nature*, such as herbicide or insect resistance.  Seed harvested from GMO plants will also contain these [sic] modification." (http://www.romerlabs.cornlen/analytes/genetically-modified-organisms.html (last visited January 7, 2013) (emphasis added).)

28.     That GMOs are not natural is further evidenced by the explanations of health and environmental organizations, such as The World Health Organization, which defines GMOs as "organisms in which *the genetic material (DNA) has been altered in a way that does not occur naturally*.  The technology is often called 'modern biotechnology' or 'gene technology', sometimes also 'recombinant DNA technology' or 'genetic engineering'.  It allows selected individual genes to be transferred from one organism into another, also between non-related species.  Such methods are used to create GM plants – which are then used to grow GM food crops."  (World Health Organization, 20 Questions on Genetically Modified (GM) Foods at http://www.who.int/foodsafety/publications/biotech/en/20questions_en.pdf (last visited January 7, 2013).)

9

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-CRB

29.     The Environmental Protection Agency has distinguished conventional breeding of plants "through natural methods, such as cross-pollination" from genetic engineering using modern scientific techniques. (United States Environmental Protection Agency, Prevention, Pesticides and Toxic Substances, Questions & Answers Biotechnology: Final Plant-Pesticide/Plant Incorporated Protectants (PIPs) Rules (Jul. 19, 2001) at http://www.epa.gov/scipoly/biotech/pubs/qanda.pdf ("*Conventional breeding* is a method in which genes for pesticidal traits are introduced into a plant *through natural methods*, such as cross-pollination. . . . Genetically engineered plant-incorporated protectants are created through a process that utilizes several different modem scientific techniques to introduce a specific pesticide-producing gene into a plant's DNA genetic material.") (emphasis of "through natural methods" added; remaining emphasis in original) (last visited January 7, 2013).)

30.     As indicated by the definitions above, which come for a wide array of sources, including industry, government, and health organizations, GMOs are not "all natural." GMOs are "created" artificially in a laboratory through genetic engineering. Thus, by claiming that its Products are "all natural," Defendant deceives and misleads reasonable consumers.

## The Products Are Made From Genetically Modified Organisms

31.     Based on independent third party testing, Defendant's Products are made from GMOs. As listed in Paragraph 4 above, Products (1) through (25) contain GMO corn, whereas Products (26) through (35) contain GMO soy.

32.     Defendant's "all natural" representations are false, deceptive, misleading, and unfair to consumers, who are injured in fact by purchasing a product that Defendant claims are "all natural" when in fact they are not.

## The Products Contain Synthetic, Chemically-Derived Ingredients

33.     The Food and Drug Administration ("FDA") has established guidelines that define the appropriate boundaries for using the term "natural"; according to the FDA, a product is not natural if it contains synthetic ingredients, including added color or artificial flavoring. The exact definition provided by the FDA states: "'natural' [means] that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food." 58 Fed. Reg. 2302, 2407 (Jan. 6, 1993).

10

34. The term "synthetic" is also defined in federal statute as "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes." 7 U.S.C. § 6502(21).

35. The Products contain one or more synthetic substances or non-natural ingredients, which include but are not limited to:

a. <u>Annatto</u>: Chemically extracted annatto seed used for artificial coloring. 21 C.F.R. 101.22(a)(4).

b. <u>Ascorbic Acid</u>: An artificial form of Vitamin C produced through a series of chemical processes; commonly used in beverages as a preservative. Federal statute classifies Ascorbic Acid as a synthetic ingredient. 7 C.F.R. § 205.605(b).

c. <u>Calcium Carbonate</u>: Lime soda processed with Calcium Hydroxide and other chemical compounds; commonly used for artificial coloring. Calcium Hydroxide is classified as synthetic. 7 C.F.R. § 205.605(b).

d. <u>Ferric Orthophosphate</u>: Produced by reacting Ferric Chloride or Ferric Citrate with Sodium Phosphate, a classified synthetic ingredient. 7 C.F.R. § 205.605(b).

e. <u>Nutra Flora</u>: A synthetic fiber supplement produced with chemical compounds that include hydrochloric acid and sodium hydroxide.

f. <u>Retinyl Palmitate</u>: A synthetic substance derived by esterifying retinol with palmitic acid. It is commonly listed as Vitamin A but is chemically different than natural Vitamin A, or retinol.

g. <u>Tocopherols</u>: Classified as a synthetic ingredient. 7 C.F.R. § 205.605(b). Commonly misrepresented (as Defendant does here) as "natural Vitamin E," despite being chemically distinct from naturally occurring Vitamin E.

h. <u>Vitamin D3</u>: Although it is naturally produced by human skin, for foods Vitamin D3 is chemically derived by ultraviolet irradiation and used as an additive.

11

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-CRB

36.     The Products also contain ingredients from natural sources that have been extensively processed using synthetic substances. As an example, "Dehydrated Cane Juice" is the end product of sugar cane being processed with Phosphoric Acid and Calcium Hydroxide to extract cane syrup prior to dehydration. Phosphoric Acid and Calcium Hydroxide are classified as synthetic ingredients. 7 C.F.R. § 205.605(b). The FDA has also indicated that the use of the term "cane juice" is misleading, since it is not "juice" but syrup derived from sugar. *See* FDA Guidance for Industry: Ingredients Declared as Evaporated Cane Juice; Draft Guidance, October 2009.

## CLASS ACTION ALLEGATIONS

37.     Plaintiff seeks relief in his individual capacity and seeks to represent a class consisting of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3), Plaintiff seeks certification of a class initially defined as follows:

> All consumers in the United States who from May 23, 2008 until the final disposition of this case (the "Class Period"), purchased the following Barbara's Bakery Products: (1) Original Puffins Cereal, (2) Multigrain Puffins Cereal, (3) Peanut Butter Puffins Cereal, (4) Cinnamon Puffins Cereal, (5) Peanut Butter and Chocolate Puffins Cereal; (6) Crunchy Cocoa Puffins Cereal, (7) Fruit Medley Puffins Cereal, (8) Multigrain Cereal Bar Apple Cinnamon, (9) Multigrain Cereal Bar Blueberry, (10) Multigrain Cereal Bar Cherry, (11) Multigrain Cereal Bar Raspberry, (12) Multigrain Cereal Bar Strawberry, (13) Multigrain Cereal Bar Original, (14) Multigrain Cereal Bar Triple Berry, (15) Cheese Puffs Original, (16) Cheese Puffs Bakes Original, (17) Cheese Puffs Bakes White Cheddar, (18) Cheese Puffs Jalapeño, (19) Shredded Minis Blueberry Burst, (20) Shredded Spoonfulls Multigrain, (21) High Fiber Original, (22) High Fiber Cranberry, (23) High Fiber Flax & Granola, (24) Corn Flakes, (25) Hole 'n Oats Fruit Juice Sweetened, (26) Hole 'n Oats Honey Nut, (27) Fruit & Yogurt Bar Blueberry Apple, (28) Fruit & Yogurt Bar Strawberry Apple, (29) Fig Bars Blueberry Low Fat, (30) Fig Bars Multigrain, (31) Fig Bars Wheat Free Raspberry, (32) Fig Bars Whole Wheat, (33) Snackimals Chocolate Chip, (34) Snackimals Double Chocolate, (35) Snackimals Peanut Butter, (36) Honey Rice, and (37) Snackimals Wheat Free Oatmeal.

12

38.     Excluded from the Class are Defendant and its subsidiaries and affiliates, Defendant's executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, and their immediate families.

39.     Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division into subclasses after they have had an opportunity to conduct discovery.

40.     Numerosity.  Fed. R. Civ. P. 23(a)(1).  The potential members of the Class as defined are so numerous that joinder of all members is unfeasible and not practicable.  While the precise number of Class members has not been determined at this time, Plaintiff is informed and believes that many thousands or millions of consumers have purchased the Products.

41.     Commonality.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

    a.     Whether Defendant falsely and/or misleadingly misrepresented the Products as being "All Natural";

    b.     Whether Defendant's misrepresentations are likely to deceive reasonable consumers;

    c.     Whether Defendant violated California Civil Code § 1750, *et seq.*;

    d.     Whether Defendant violated California Business and Professions Code § 17500, *et seq.*;

    e.     Whether Defendant violated California Business and Professions Code § 17200, *et seq.*;

    f.     The nature of the relief, including equitable relief, to which Plaintiff and the Class members are entitled.

42.     Typicality.  Fed. R. Civ. P. 23(a)(3).  Plaintiff's claims are typical of the claims of the Class.  Plaintiff and all Class members were exposed to uniform practices and sustained injury arising out of and caused by Defendant's unlawful conduct.

13

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-CRB

43. <u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

44. <u>Superiority of Class Action</u>. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

45. <u>Injunctive and Declaratory Relief</u>. Fed. R. Civ. P. 23(b)(2). Defendant's misrepresentations are uniform as to all members of the Class. Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

## **FIRST CAUSE OF ACTION**

### **(California False Advertising Law – Cal. Bus. & Prof. Code § 17500, *et seq.*)**

46. Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

47. Defendant publicly disseminated untrue or misleading advertising or intended not to sell the Products as advertised in violation of California Business & Professional Code § 17500, *et seq.*, by representing that the Products are "All Natural," when they are not.

48. Defendant committed such violations of the False Advertising Law with actual knowledge or in the exercise of reasonable care should have known was untrue or misleading.

49. Plaintiff reasonably relied on Defendant's representations and/or omissions made in violation of California Business & Professional Code § 17500, *et seq.*

50. As a direct and proximate result of Defendant's violations, Plaintiff suffered injury in fact and lost money.

51. Plaintiff, on behalf of himself and Class members, seeks equitable relief in the form of an order requiring Defendant to refund Plaintiff and all Class members all monies they paid for the Products, and injunctive relief in the form of an order prohibiting Defendant from engaging in the alleged misconduct and performing a corrective advertising campaign.

## SECOND CAUSE OF ACTION

**(California Unfair Competition Law – Cal. Bus. & Prof. Code § 17200, *et seq.*)**

52.     Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

53.     Defendant engaged in unlawful, unfair, and/or fraudulent conduct under California Business & Professional Code § 17200, *et seq.*, by representing that the Products are "All Natural," when they are not.

54.     Defendant's conduct is unlawful in that it violates the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.*, the False Advertising Law, California Business & Professions Code § 17500.

55.     Defendant's conduct is unfair in that it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Plaintiff and Class members.  The harm to Plaintiff and Class members arising from Defendant's conduct outweighs any legitimate benefit Defendant derived from the conduct.  Defendant's conduct undermines and violates the stated spirit and policies underlying the Consumers Legal Remedies Act and the False Advertising Law as alleged herein.

56.     Defendant's actions and practices constitute "fraudulent" business practices in violation of the UCL because, among other things, they are likely to deceive reasonable consumers.  Plaintiff relied on Defendant's representations and omissions.

57.     As a direct and proximate result of Defendant's violations, Plaintiff suffered injury in fact and lost money.

58.     Plaintiff, on behalf of himself and Class members, seeks equitable relief in the form of an order requiring Defendant to refund Plaintiff and all Class members all monies they paid for the Products, and injunctive relief in the form of an order prohibiting Defendant from engaging in the alleged misconduct and performing a corrective advertising campaign.

## THIRD CAUSE OF ACTION

**(Breach of Express Warranty)**

59.     Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

60.     Plaintiff brings this claim individually and on behalf of the Class.

15

61.     Plaintiff and each member of the Class formed a contract with Defendants at the time Plaintiff and the other members of the Class purchased one or more of the Products.  The terms of that contract include the promises and affirmations of fact made by Defendant on the packaging of the Products and through the marketing campaign, as described above.  The Products' packaging and advertising constitute express warranties, became part of the basis of the bargain, and are part of a standardized contract between Plaintiff and the members of the Class on the one hand, and Defendant on the other.

62.     All conditions precedent to Defendants' liability under this contract have been performed by Plaintiff and the Class.

63.     Defendant breached the terms of this contract, including the express warranties, with Plaintiff and the Class by not providing the products that could provide the benefits promised, i.e. that the Products were "all natural."

64.     As a result of Defendant's breach of its contract, Plaintiff and the Class have been damaged in the amount of the purchase price of any and all of the Products they purchased.

## FOURTH CAUSE OF ACTION

### (Violation of Consumer Legal Remedies Act – Civil Code § 1750 *et seq.*)

65.     Plaintiff incorporates by reference and re-alleges the preceding paragraphs.

66.     Plaintiff brings this claim individually and on behalf of the Class.

67.     This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* (the "CLRA") because Defendant's actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

68.     Plaintiff and each member of the Class are consumers as defined by California Civil Code §1761(d).

69.     The Products are goods within the meaning of Civil Code §1761(a).

70.     Defendant violated the CLRA in at least the following respects:

        a.      in violation of  §1770(a)(5), Defendant represented that the Products have approval, characteristics, and uses or benefits which they do not have;

16

b.    in violation of §1770(a)(7), Defendant represented that the Products are of a particular standard, quality or grade, or that the Products are of a particular style, or model, when they are of another;

c.    in violation of §1770(a)(9), Defendant has advertised the Products with intent not to sell them as advertised; and

d.    in violation of §1770(a)(16), Defendant represented that the Products have been supplied in accordance with previous representations, when they were not.

71.    Defendant affirmatively represented to consumers that the Products are "all natural."

72.    Defendant omitted to state that the Products contain GMOs.

73.    This sort of information is relied upon by consumers in making purchasing decisions, and is fundamental to the decision to purchase food products.

74.    Plaintiff relied upon Defendant's misrepresentations to her detriment.

75.    Defendant's misrepresentations constitute unfair, deceptive, and misleading business practices in violation of Civil Code §1770(a).

76.    Defendant's deceptive acts and omissions occurred in the course of selling a consumer product and have occurred continuously through the filing of this Complaint.

77.    On May 23, 2012, Plaintiff notified Defendant in writing by certified mail of the violations alleged herein and demanded that Defendant remedy those violations. Defendant received Plaintiff's letter on May 29, 2012.

78.    Defendant failed to remedy the violations alleged herein by June 28, 2012. Consequently, Plaintiff hereby previously amended the Complaint to add claims for actual, punitive, and statutory damages pursuant to the CLRA.

**WHEREFORE**, Plaintiff, on behalf of himself and Class members, prays for relief as follows:

A.    For an order that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed Class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.    For an order requiring Defendant to refund or pay restitution to Plaintiff and all Class members for the Products;

C.    For an order prohibiting Defendant from engaging in the misconduct described herein;

D.    For an award of damages;

E.    For an award of attorneys' fees;

F.    For an award of the costs of suit incurred herein, including expert witness fees;

G.    For an award of interest, including prejudgment interest, at the legal rate; and

H.    For such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury of all claims so triable.


Dated:  January 17, 2013                    Respectfully submitted,
                                            **AHDOOT & WOLFSON, PC**


                                            Tina Wolfson
                                            Robert Ahdoot
                                            Theodore W. Maya
                                            Bradley K. King
                                            10850 Wilshire Blvd., Suite 370
                                            Los Angeles, California 90024
                                            Tel: 310-474-9111
                                            Facsimile: 310-474-8585

                                            Counsel for Plaintiff
                                            Richard W. Trammell

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02664-CRB

# EXHIBIT 4

Supplemental Declaration of Yvette Golan

TINA WOLFSON, SBN 174806
twolfson@ahdootwolfson.com
ROBERT AHDOOT, SBN 172098
rahdoot@ahdootwolfson.com
AHDOOT & WOLFSON, PC
10850 Wilshire Boulevard, Suite 370
Los Angeles, California 90024
Tel: 310-474-9111; Fax: 310-474-8585

*Counsel for Plaintiff, Richard W. Trammell*

CLEMENT L. GLYNN, SBN 57117
cglynn@glynnfinley.com
JONATHAN A. ELDREDGE, SBN 238559
jeldredge@glynnfinley.com
GLYNN & FINLEY, LLP
100 Pringle Avenue, Suite 500
Walnut Creek, California 94596
Tel: 925-210-2801; Fax: 925-945-1975

*Counsel for Defendant, Barbara's Bakery, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD W. TRAMMELL,<br><br>      Plaintiff,<br><br>   v.<br><br>BARBARA'S BAKERY, INC., *et al.*,<br><br>      Defendants. | Case No. 3:12-cv-02664-CRB<br><br>**SETTLEMENT AGREEMENT**<br><br>Honorable Charles R. Breyer, Presiding<br><br>Complaint Filed: May 23, 2012 |

1
2

**TABLE OF CONTENTS**

3
4

**Page**

5
6

I.      INTRODUCTION.................................................................................................1

II.     DEFINITIONS.....................................................................................................4

III.    CERTIFICATION OF THE SETTLEMENT CLASS…………………………...10

IV.     SETTLEMENT CONSIDERATION..................................................................11

V.      NOTICE TO THE CLASS.................................................................................19

VI.     REQUESTS FOR EXCLUSION.......................................................................27

VII.    OBJECTIONS TO SETTLEMENT AND APPEARANCE
        AT FAIRNESS HEARING ..............................................................................27

VIII.   RELEASE AND WAIVER.................................................................................28

IX.     ATTORNEYS' FEES AND EXPENSES AND INDIVIDUAL
        PLAINTIFF AWARDS …………………………………………………………...31

X.      PRELIMINARY APPROVAL ORDER, FINAL ORDER, FINAL JUDGMENT AND
        RELATED ORDERS   …………………………………………………………...32

XI.     MODIFICATION OR TERMINATION OF THIS AGREEMENT...............................34

XII.    GENERAL MATTERS AND RESERVATIONS..........................................................37

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

Case 3:12-cv-02664-CRB Document 137 Filed 04/25/13 Page 81 of 330 PageID #: 1292

# **TABLE OF EXHIBITS**

**Document**                                                        **Exhibit Number**

Claim Form ........................................................................................................ 1

Class Notice ...................................................................................................... 2

Final Order ........................................................................................................ 3

Final Judgment .................................................................................................. 4

Preliminary Approval Order .............................................................................. 5

Summary Settlement Notice .............................................................................. 6

Settlement Claim Procedures and Claim Calculation Protocol ......................... 7

Notice Administrator Declaration ..................................................................... 8

Non-GMO Project Standards ……………………………………………….... 9

Stipulated Undertaking Re: Attorneys' Fees and Expenses   …..…………….…………………….. 10

**IT IS HEREBY STIPULATED AND AGREED**, by, between and among Plaintiff Richard Trammell ("Plaintiff") and Defendant Barbara's Bakery, Inc. ("Defendant" or "Barbara's Bakery"), with all terms as defined below, through their duly-authorized counsel, that the above-captioned action, *Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664 (N.D. Cal.), and the matters raised therein, are settled and judgment shall be entered on the terms and conditions set forth in this Settlement Agreement and the release set forth herein, subject to the approval of the Court.

# I.    **INTRODUCTION**

A.    Plaintiff's national class action complaint (including subsequent amendments thereto) in the instant case, entitled *Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664, and initially filed on May 23, 2012, in the United States District Court for the Northern District of California (the "Action"), alleges, *inter alia*, that Barbara's Bakery manufactured, marketed, and sold various food, cereals, and snack products (collectively, the "Eligible Products"). The Action alleges that through a nationwide advertising campaign, Barbara's Bakery sold its products by advertising that they were "All Natural." Plaintiff challenged these advertisements, asserting, *inter alia*, that Defendant's products are not "All Natural" in that they contain ingredients that are synthetic, and/or artificial, and/or ingredients containing and/or derived from Genetically Modified Organisms ("GMO"). Plaintiff alleged that Barbara's Bakery violated the California Unfair Competition Law, Bus. & Prof. Code §17200, *et seq.* ("UCL"), False Advertising Law, Bus & Prof. Code §17500, *et seq.* ("FAL"), Consumer Legal Remedies Act, Civil Code § 1750, *et seq.* ("CLRA") and constituted a breach of an express warranty.

B.    Plaintiff, as settlement class representative, believes that the claims settled herein have merit. However, Plaintiff and Class Counsel recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the claims through trial, appeal, and ancillary actions. They have also taken into account the uncertain outcome and the risk of any litigation, as well as the difficulties and delay inherent in such litigation. They believe that the settlement set forth in this Agreement confers substantial benefits upon the Class Members. Based upon their evaluation, they have determined that the settlement set forth in this Agreement is fair, reasonable and adequate and in the best interest of the settlement class.

C.    Defendant has denied and continues to deny all liability with respect to any and all of the claims alleged in the Action or the facts alleged in support thereof and has denied and continues to deny all charges of wrongdoing or liability against it arising out of or relating to any conduct, acts, or omissions alleged in the Action. Defendant's willingness to resolve the Action on the terms and conditions embodied in this Agreement is based on, *inter alia*: (i) the time and expense associated with litigating this Action through trial and any appeals; (ii) the benefits of resolving the Action, including limiting further expense, inconvenience, and distraction, disposing of burdensome litigation, and permitting Defendant to conduct its business unhampered by the distractions of continued litigation; and (iii) the uncertainty and risk inherent in any litigation.

D.    Before entering into this Agreement, Class Counsel conducted an extensive and thorough examination, investigation, and evaluation of the relevant law, facts and allegations to assess the merits of the claims and potential claims to determine the strength of both defenses and liability sought in the Action.

E.    Class Counsel obtained extensive class discovery, including voluminous documents and electronic information. Plaintiff, through Class Counsel, thoroughly reviewed the documents obtained, the materials available electronically, and conducted detailed interviews of witnesses. In particular, Plaintiff obtained discovery, regarding the Eligible Products in the following categories: (i) label design and product formulation; (ii) marketing, advertising, media, and public relations; and (iii) financial information. In total, Plaintiff obtained over thirty (30) banker's boxes of documents and approximately seventy (70) Gigabytes (GB) of data through discovery. In addition, Class Counsel conducted interviews of primary Barbara's Bakery's corporate witnesses who have been involved with the Eligible Products to address the following subjects: (i) sales and marketing; (ii) labeling; (iii) finance; (iv) document collection and retention; and (v) Barbara's Bakery's efforts to eliminate GMO ingredients from its products.

F.    This Agreement is the product of extensive, arms-length, and vigorously-contested settlement discussions. After numerous settlement discussions between counsel, the Parties engaged in two (2) mediation sessions with the Honorable Eugene F. Lynch (Ret.) of JAMS, and continued lengthy and months long negotiations thereafter. Before and during settlement discussions, the Parties

had an arm's length exchange of sufficient information to permit Plaintiff and Class Counsel to evaluate the claims and potential defenses and to meaningfully conduct informed settlement discussions.

G.    Based upon their review, investigation, and evaluation of the facts and law relating to the matters alleged in the pleadings, Plaintiff and Class Counsel, on behalf of Plaintiff and the other members of the proposed Class, have agreed to settle the Action pursuant to the provisions of this Agreement, after considering, among other things: (1) the substantial benefits to the Class Members under the terms of this Agreement; (2) the risks, costs and uncertainty of protracted litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such litigation; and (3) the desirability of consummating this Agreement promptly in order to provide effective relief to the Class Members.

H.    Barbara's Bakery has vigorously denied and continues to dispute all of the claims and contentions alleged in the Action. Barbara's Bakery expressly denies any and all wrongdoing alleged in the pleadings and does not admit or concede any actual or potential fault, wrongdoing, liability, or damage of any kind to Plaintiff and the putative class or in connection with any facts or claims that have been or could have been alleged against it in the Action. Barbara's Bakery further denies that it acted improperly or wrongfully in any way, and believes that the Action has no merit. Even though Barbara's Bakery expressly denies any wrongdoing, Barbara's Bakery considers it desirable for these cases to be settled and dismissed, because this Settlement will finally put Plaintiff's claims and the underlying matters to rest and will avoid the substantial expense, burden, and uncertainty associated with the continued litigation of these claims.

I.    Barbara's Bakery has agreed to class action treatment of the claims alleged in the Action solely for the purpose of compromising and settling those claims on a class basis as set forth herein;

J.    This Agreement, any negotiations, proceedings, or documents related to the Agreement, its implementation, or its judicial approval (as well as the fact of this Agreement and any acts or documents related to the Agreement or its implementation) cannot be asserted or used by any person to support a contention that class certification is proper or improper or that liability does or does not

3

exist, or for any other reason, in the above-captioned action or in any other proceedings; provided, however, that Class Members, Class Counsel, Defendant, other related persons, and any person who is a beneficiary or a release set forth herein, may reference and file this Agreement, and any resulting Order or Judgment, with the Court, or any other tribunal or proceeding, in connection with the implementation or enforcement of its terms (including but not limited to the releases granted therein, or any dispute related thereto). Nothing in this Agreement, nor in any court order approving this Agreement, shall be construed as a criticism or an endorsement of the Eligible Products.

NOW THEREFORE, it is hereby STIPULATED AND AGREED, by and between the Parties, through their respective counsel, that: (a) the Action be fully and finally compromised, settled and released upon final settlement approval by the Court after the hearings as provided for in this Agreement; and (b) upon such approval by the Court, a Final Order and Final Judgment, substantially in the form attached hereto as Exhibits "3" and "4," respectively, be entered dismissing the Action with prejudice upon the following terms and conditions of this Agreement.

## II.    DEFINITIONS

A.    As used in this Agreement and the attached exhibits (which are an integral part of this Agreement and are incorporated in their entirety by reference), the following terms have the following meanings, unless this Agreement specifically provides otherwise:

1.    "Action" means the lawsuit entitled *Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664 (N.D. Cal.).

2.    "Agreement" or "Settlement" means this Settlement Agreement and its exhibits, attached hereto or incorporated herein, including any subsequent amendments agreed to by the Parties and any exhibits to such amendments.

3.    "Attorneys' Fees and Expenses" means such funds as may be awarded by the Court to Class Counsel from Defendant to compensate Plaintiff's Counsel for their fees and expenses in connection with the Action and the Settlement, as described in Section IX of this Agreement.

4.    "Barbara's Bakery" means Defendant, Barbara's Bakery, Inc.

5.    "Barbara's Bakery's Counsel" or "Defendant's Counsel" means Glynn & Finley, LLP.

4

6.      "Claim" means the claim of a Class Member or his or her representative submitted on a Claim Form as provided in this Agreement.

7.      "Claimant" means a Class Member who has submitted a Claim.

8.      "Claim Form" means the document, in substantially the same form attached as Exhibit 1 to this Agreement.

9.      "Claim Period" means the time period in which Class Members may submit a Claim Form for review to the Settlement Administrator.  The Claim Period shall run for one hundred eighty (180) calendar days from the date of the first dissemination of the Summary Settlement Notice or Class Notice, whichever is earlier.

10.      "Claim Process" means that process for submitting Claims described in this Agreement.

11.      "Class" means all persons who, during the Class Period, purchased in the United States any of the Eligible Products.  Excluded from the Class are: (a) Barbara's Bakery's board members or executive-level officers, including its attorneys; (b) persons who purchased the Eligible Products primarily for the purpose of resale; (c) retailers or re-sellers of the Eligible Products; (d) governmental entities; (e) persons who timely and properly exclude themselves from the Class as provided in the Agreement; (f) persons who purchased the Eligible Products via the Internet or other remote means while not residing in the United States; and (g) the Court, the Court's immediate family, and Court staff.

12.      "Class Member" means a member of the Class.

13.      "Class Counsel" means:  Robert Ahdoot and Tina Wolfson of Ahdoot & Wolfson, PC.

14.      "Class Notice" means a notice substantially in the form attached as Exhibit 2 to this Agreement.

15.      "Class Period" means the period from May 23, 2008, up to and including the date of the first dissemination of the Summary Settlement Notice or Class Notice, whichever is earlier.

16.      "Court" means the United States District Court for the Northern District of California.

5

17.    "Eligible Products" or "Eligible Product" means any of the following Barbara's Bakery products, of any size, purchased by Class Members during the Class Period:

        a.    **Cereals**:

           i.    BROWN RICE CRISPS (Fruit Juice Sweetened flavor);

           ii.    CORN FLAKES (Fruit Juice Sweetened flavor);

           iii.    HIGH FIBER (Cranberry, Flax & Granola, or Original flavors);

           iv.    HOLE 'N OATS (Fruit Juice Sweetened or Honey Nut flavors);

           v.    HONEST O's (Honey Nut, Multigrain, or Original flavors);

           vi.    ORGANIC APPLE CINNAMON O's;

           vii.    ORGANIC BREAKFAST O's;

           viii.    ORGANIC BROWN RICE;

           ix.    ORGANIC BROWN RICE CRISPS;

           x.    ORGANIC CORN FLAKES;

           xi.    ORGANIC CRISPY WHEATS;

           xii.    ORGANIC HONEY CRUNCH 'N OATS;

           xiii.    ORGANIC HONEY NUT O's;

           xiv.    ORGANIC SNACKIMALS CEREAL (Cinnamon Crunch or Vanilla Blast flavors);

           xv.    ORGANIC WILD PUFFS (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);

           xvi.    PUFFINS (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);

           xvii.    PUFFIN PUFFS (Crunchy Cocoa or Fruit Medley flavors);

           xviii.    SHREDDED OATS (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, or Vanilla Almond flavors);

           xix.    SHREDDED WHEAT;

           xx.    SHREDDED SPOONFULS (Multigrain or Vanilla Blast flavors);

           xxi.    SHREDDED MINIS (Blueberry Burst flavor);

6

xxii.    TOASTED OATMEAL FLAKES (Original flavor); and

xxiii.    ULTIMA ORGANIC (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors).

b.    **Cereal Bars**:

i.    MULTIGRAIN CEREAL BARS (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors);

ii.    FRUIT & YOGURT BARS (Apple Cinnamon, Blueberry Apple, Cherry Apple, Strawberry Apple, or Traditional flavors);

iii.    PUFFINS CEREAL AND MILK BARS (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors).

c.    **Cheese Puffs**:

i.    BAKED CHEESE PUFFS (Original or White Cheddar flavors); and

ii.    CHEESE PUFFS (Jalapeno or Original flavors).

d.    **Fig Bars:**

i.    FIG BARS (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free or Whole Wheat flavors).

e.    **Granola Bars**:

i.    CRUNCHY ORGANIC GRANOLA BARS (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors).

f.    **Snackimals Animal Cookies**:

i.    SNACKIMALS ANIMAL COOKIES (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors).

g.    **Organic Mini-Cookies**:

i.    ORGANIC MINI COOKIES (Chocolate, Ginger, or Oatmeal flavors).

h.    **Snack Mixes**:

i.    BRUSCHETTA SNACK MIX;

ii.    HONEY CINNAMON SNACK MIX;

7

iii.  HONEY MUSTARD SNACK MIX; and

iv.  SALSA SNACK MIX.

i.  **Crackers**:

    i.  CRISP COOKIES (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread flavors);

    ii.  GO GO GRAHAMS (Chocolate, Cinnamon, Honey, or Lemon Ginger flavors);

    iii.  PIZZA AND CHEESE BITES;

    iv.  RITE LITE ROUNDS (Original, Poppy Seed, or Tamari Sesame flavors); and

    v.  WHEATINES (Cracked Pepper, Original or Sesame flavors).

18.  "Fairness Hearing" means the hearing at or after which the Court shall make a final decision whether to approve this Agreement as fair, reasonable, and adequate. The Parties shall request that the Court schedule the Fairness Hearing for a date that is in compliance with the provisions of 28 U.S.C. §1715(d), but no later than one hundred eighty-five (185) calendar days, after entry of Preliminary Approval Order.

19.  "Final Order and Final Judgment" means the Court's order approving the Settlement and this Agreement, as described in Section X of this Agreement, which is to be substantially in the forms attached as Exhibits 3 and 4, respectively, to this Agreement.

20.  "Final Settlement Date" means the date on which the Final Order and Final Judgment approving this Agreement becomes final.  For purposes of this Agreement:

    a.  if no appeal has been taken from the Final Order and Judgment, "Final Settlement Date" means the date on which the time to appeal therefrom has expired; or

    b.  if any appeal has been taken from the Final Order and Final Judgment, "Final Settlement Date" means the date on which all appeals therefrom, including petitions for rehearing or re-argument, petitions for rehearing en banc and petitions for certiorari or any other form of review, have been finally disposed of in a manner that affirms the Final Order and Judgment; or

    c.  if the Class Counsel and Defendant agree in writing, "Final Settlement

8

Date" can occur on any other agreed date.

21. "Notice Administrator" means the Court-appointed third-party agent or administrator agreed to by the Parties and appointed by the Court. The Parties agree that Kinsella Media, LLC shall be retained to design, consult on, and implement the notice and related requirements of this Agreement.

22. "Parties" means Plaintiff and Barbara's Bakery, collectively, as each of those terms is defined in this Agreement.

23. "Plaintiff" means Richard W. Trammell.

24. "Plaintiff's Counsel" means counsel for the Plaintiff in the Action, who are: Ahdoot & Wolfson, PC.

25. "Preliminary Approval Order" means the order to be entered by the Court preliminarily approving the Settlement as outlined in Section X of this Agreement and should be substantially in the form attached as Exhibit 5 to this Agreement.

26. "Release" means the release and waiver set forth in Section VIII of this Agreement and in the Final Order and Final Judgment.

27. "Released Parties" means Barbara's Bakery, its past and present officers, directors, employees, stockholders, agents, attorneys, administrators, parent (The Weetabix Company, Inc. and Weetabix Limited), successors, subsidiaries, suppliers, distributors, assigns, affiliates, joint-ventures, partners, members, divisions, predecessors, authorized retailers, resellers, and wholesalers of Eligible Products for resale.

28. "Settlement Administrator" means the third-party agent or administrator agreed to by the Parties and appointed by the Court. The Parties agree that Rust Consulting, Inc. shall be retained to implement the mailed notice, the website, claim review and related requirements of this Agreement, subject to the Court's approval.

29. "Settlement Claim Procedures and Claim Calculation Protocol" means the protocol attached hereto as Exhibit 7.

30. "Settlement Fund" means the Four Million Dollars ($4,000,000.00) that Barbara's Bakery will pay or cause to be paid, pursuant to the terms of Section IV.A of this

9

Agreement.

31.     "Settlement Fund Balance" means the balance remaining in the Settlement Fund after payment of (i) all costs of notice and administration (including the Initial Deposit and Period Payments as defined in Section IV.A.1 herein), (ii) the Incentive Award (as defined in Section IX.F herein) to the representative Plaintiff, and (iii) the Attorneys' Fees and Expenses.

32.     "Summary Settlement Notice" means the Summary Class Notice to be disseminated by publication substantially in the form of Exhibit 6 attached to this Agreement.

33.     "Synthetic Ingredients" means an ingredient that is formulated or manufactured by a chemical (or biochemical) process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, including but not limited to the following: allegedly synthetic ingredients identified in Plaintiff's Second Amended Complaint, Annatto, Ascorbic Acid, Calcium Carbonate, Ferric Orthophosphate, Fructooligosaccarides, Nutra Flora, Retinyl Palmitate, Tocopherols, Vitamin D3 and "Dehydrated Cane Juice."

B.     Other capitalized terms used in this Agreement but not defined in this Section II shall have the meanings ascribed to them elsewhere in this Agreement.

C.     The terms "he or she" and "his or her" include "it" or "its" where applicable.

III.     **CERTIFICATION OF THE SETTLEMENT CLASS**

Barbara's Bakery, while continuing to deny that the Action meets the requisites for class certification under Fed. R. Civ. P. 23 for any purpose other than settlement, consents, solely for purposes and in consideration of the Settlement, to the certification of the settlement Class, to the appointment of Class Counsel, and to the conditional approval of Plaintiff as a suitable representative of the Class. The certification of the settlement Class, the appointment of Plaintiff as the class representative, and the appointment of Plaintiff's Counsel to act as Class Counsel, shall be binding only with respect to this Settlement and this Agreement. If the Court fails to approve this Agreement and the Settlement proposed herein for any reason, or if this Agreement and the Settlement proposed herein is terminated, cancelled, or fails to become effective for any reason whatsoever, this class certification, to which the Parties have stipulated solely for the purposes and in consideration of the Settlement of this Action, this Agreement, and all the provisions of the Preliminary Approval Order,

10

shall be vacated by their own terms, and the litigation of the Action shall revert to its status with respect to class certification as it existed prior to the date of this Agreement. In that event, Barbara's Bakery shall retain all rights it had immediately preceding the execution of this Agreement to object to the maintenance of the Action as a class action, and in that event, nothing in this Agreement or other papers or proceedings related to the Settlement shall be used as evidence or argument by any party concerning whether the Action may properly be maintained as a class action under applicable law.

## IV.    SETTLEMENT CONSIDERATION

Settlement relief shall consist of three components: (1) refunds to Class Members who submit valid Claims; (2) Defendant's agreement to change its labeling and advertising to omit the terms "all natural," "no artificial additives," "no artificial preservatives," and "no artificial flavors;" and (3) certain conduct changes implemented by Barbara's Bakery relating to the use of ingredients that contain GMO in certain Barbara's Bakery's products.

A.    Settlement Fund:

1.    Barbara's Bakery agrees to pay or cause to be paid the sum of Four Million Dollars and No Cents ($4,000,000.00) as follows:

a.    Initial Deposit: Within five (5) calendar days after the entry of the Preliminary Approval Order, the sum of Two Hundred and Fifty Thousand Dollars and No Cents ($250,000.00) ("Initial Deposit") to the Settlement Administrator, for the initial notice and administration expenses that are likely to be incurred. This deadline may be extended by mutual consent of the Parties.

b.    Periodic Payment(s): Within ten (10) calendar days after the submission of any reasonable invoice submitted by the Settlement Administrator and / or Notice Administrator, and approved by Class Counsel and Defense Counsel, the sum of said approved invoice to the Settlement Administrator or Notice Administrator, as applicable. ("Periodic Payment(s)").

c.    First Fee Payment: Funding for the payment of the First Fee Payment (as this term is defined in Section IX.C) shall be made in accordance with Section IX of this Agreement. The deadline may be extended by mutual consent of the Parties.

11

d.    <u>Settlement Fund Balance Payment</u>:  Within ten (10) calendar days after the Final Settlement Date, Defendant shall pay or cause to be paid to the Class Action Class Administrator an amount equal to the Settlement Fund Balance to be used for the payment of Class Member Claims.

e.    <u>Final Fee Payment</u>: Funding for the payment of the Final Fee Payment (as this term is defined in Section IX.E) shall be made in accordance with Section IX of this Agreement. The deadline may be extended by mutual consent of the Parties.

f.    <u>Incentive Award Payment</u>: Funding for the payment of the Incentive Award (as this term is defined in Section IX.F) shall be made in accordance with Section IX of this Agreement.  The deadline may be extended by mutual consent of the Parties.

2.    Settlement Fund proceeds shall be used for the payment of: (a) the costs and expenses that are associated with disseminating the notice to the Class, including, but not limited to, the Class Notice and the Summary Settlement Notice; (b) the costs and expenses associated with the administration of the Settlement; (c) timely, valid, and approved Claims submitted by Class Members pursuant to the Claim Process; (d) the Residual Funds, if any, pursuant to Section IV.D.3 of this Agreement; (e) payment of the Attorneys Fees and Expenses; and (f) payment of the Incentive Award to the Plaintiff.  Class Counsel must approve any payment of costs or expenses under subsections (a) and (b) of this paragraph.  Approval and payment of Claims under subsection (c) of this paragraph shall be in accordance with the terms and conditions of this Agreement and the Settlement Claim Procedures and Claim Calculation Protocol.  Payment of Attorneys Fees and Expenses under subsection (e) of this paragraph and the Incentive Award under subsection (f) of this paragraph shall be in accordance with Section IX of this Agreement and subject to Court approval.

3.    Barbara's Bakery shall not be liable for payment of any costs, expenses, or Claims authorized under this paragraph beyond its deposit or payment of the full amount of the Settlement Fund as provided in this Agreement. The Parties agree that the Settlement Fund and Barbara's Bakery payment of Four Million Dollars and No Cents ($4,000,000.00) is the full extent of Barbara's Bakery cash payment obligation under this Agreement.  This payment, pursuant to the terms and conditions of this Agreement, and any other non-monetary obligations of and considerations due

12

from Barbara's Bakery set forth in this Agreement, will be in full satisfaction of all individual and class claims asserted in the Action.

      **B.**    <u>Claim Form Submission, Review, and Administration of the Settlement:</u>

      1.    Class Members may submit a Claim through the Claim Process during the Claim Period and the Settlement Administrator shall review and process the Claim pursuant to this Agreement and the Settlement Claim Procedures and Claim Calculation Protocol, which is attached as Exhibit 7 to this agreement. As part of the Claim Process, Class Members shall be eligible for the relief provided in this Agreement, provided Class Members complete and timely submit the Claim Form, which shall be included with the Class Notice, to the Settlement Administrator within the Claim Period, except as otherwise provided in this Agreement and the Settlement Claim Procedures and Claim Calculation Protocol.

      2.    As further specified in the Settlement Claim Procedures and Claim Calculation Protocol, the Claim Form shall advise Class Members that the Settlement Administrator has the right to request verification of the purchase of Eligible Products, including, but not limited to, documentation demonstrating purchase of any and all of the Eligible Products during the Class Period. If the Class Member does not timely comply and/or is unable to produce documents to substantiate and/or verify the information on the Claim Form and the Claim is otherwise not approved, the Claim shall be disqualified.

      3.    Each Class Member shall submit a Claim Form stating to the best of their knowledge the total amount of their purchases of the Eligible Products. The Claim Form shall be signed under an affirmation, substantially in the following language: "I declare or affirm, under penalty of perjury, that the information in this claim form is true and correct to the best of my knowledge and that I purchased the amount of the Eligible Product(s) claimed above during the Claim Period. I understand that my claim form may be subject to audit, verification and Court review." Claim Forms will be: (a) included on the Settlement website to be designed and administered by the Settlement Administrator; and (b) made readily available from the Settlement Administrator, as provided in the Preliminary Approval Order. In the event a Class Member submits an otherwise valid Claim Form, but fails to indicate the amount of his/her purchases of the Eligible Products during the

13

Class Period, as requested by the Claim Form, that Class Member will be entitled to the minimum payment amount available to eligible Class Member pursuant to Section IV.C.1.

4.    The Settlement Administrator shall provide periodic updates to Class Counsel and to Barbara's Bakery regarding Claim Form submissions beginning within seven (7) business days after the commencement of the dissemination of the Class Notice or the Summary Settlement Notice and continuing on a monthly basis thereafter.

5.    The Settlement Administrator shall begin to pay timely, valid, and approved Claims commencing no later than one hundred and twenty (120) calendar days after the close of the Claim Period so long as this period is after the Final Settlement Date, or sooner upon Barbara's Bakery and Plaintiff's Counsel's joint direction, but not before the issuance of the Court's Final Order and Final Judgment approving the Settlement. In the event the Final Settlement Date falls after the close of the Claim Period, then the Settlement Administrator shall begin to pay timely, valid, and approved Claims commencing no later than one hundred and twenty (120) calendar days after the Final Settlement Date. The Settlement Administrator shall have completed the payment to Class Members who have submitted timely, valid and approved Claims pursuant to the Claim Process no later than one hundred sixty (160) calendar days after either the Final Settlement Date or the close of the Claim Period, whichever is later.

C.    <u>Relief Available to Class Members</u>

1.    The relief to be provided to each eligible Class Member, who submits a Claim Form pursuant to the terms and conditions of this Agreement, shall be determined as follows:

a.    Class Members whose total purchases of any of the Eligible Products during the Class Period amount to more than One Hundred Dollars ($100), are entitled to a payment of One Hundred Dollars ($100) subject to the adjustments set forth in Section IV.D.

b.    Class Members whose total purchases of any of the Eligible Products during the Class Period amount to more than Seventy-Five Dollars ($75), up to and including One Hundred Dollars ($100), are entitled to a payment of Seventy-Five Dollars ($75) subject to the adjustments set forth in Section IV.D.

c.    Class Members whose total purchases of any of the Eligible Products

14

during the Class Period amount to more than Fifty Dollars ($50), up to and including Seventy-Five Dollars ($75), are entitled to a payment of Fifty Dollars ($50) subject to the adjustments set forth in Section IV.D.

                d.      Class Members whose total purchases of any of the Eligible Products during the Class Period amount to more than Twenty-Five Dollars ($25), up to and including Fifty Dollars ($50), are entitled to a payment of Twenty-Five Dollars ($25) subject to the adjustments set forth in Section IV.D.

                e.      Class Members whose total purchases of any of the Eligible Products during the Class Period amount to more than Ten Dollars ($10), up to and including Twenty-Five Dollars ($25), are entitled to a payment of Ten Dollars ($10) subject to the adjustments set forth in Section IV.D.

                f.      Class Members whose total purchases of any of the Eligible Products during the Class Period amount to Ten Dollars ($10) or less (but more than zero ($0)), are entitled to a payment of Five Dollars ($5) subject to the adjustments set forth in Section IV.D.

        D.    <u>Adjustments and Remaining Funds</u>

        1.      If the total of the timely, valid and approved Claims submitted by Class Members exceeds the available relief, minus any fees, payments, and costs set forth in this Agreement, each eligible Class Member's Initial Claim Amount shall be reduced on a *pro rata* basis, such that the aggregate value of the cash payments does not exceed the Settlement Fund Balance. The Settlement Administrator shall determine each authorized Class Member's *pro rata* share based upon each Class Member's Claim Form and the total number of valid Claims. Accordingly, the actual amount recovered by each Class Member will not be determined until after the Claim Period has ended and all Claims Forms have been received, and may not be determined until after the Final Settlement Date.

        2.      In no event shall an individual Class Member's recovery amount exceed the individual recovery amounts specified in Section IV.C.

        3.      If there are any funds remaining in the Settlement Fund Balance from the claim program, including, but not limited to, any funds remaining in the Settlement Fund Balance after all Claims have been paid or un-cashed distributions made payable to eligible Class Members ("Residual

Funds"), the Settlement Administrator shall equally distribute the Residual Funds to the following non-profit organizations: Consumers Union (www.consumersunion.org) and Action for Healthy Kids (www.actionforhealthykids.org). The Residual Funds will not be returned to Defendant. Defendant represents and warrants that any payment of Residual Funds to any charities, non-profit organizations, or government entit(ies) shall not reduce any of its donations or contributions to any entity, charity, charitable foundation or trust, and / or non-profit organization. To be eligible to receive funds from the Residual Funds, each of the foregoing non-profit organizations must declare that they will not use the Residual Funds they receive (if any) for litigation or lobbying purposes.

E. Agreement to Change Product Labeling

1. In addition to the relief discussed above, as part of this Agreement and as a result of the Action and the efforts of Plaintiff and Plaintiff's Counsel, within three (3) months after the Final Settlement Date or by March 1, 2014, whichever is later, Barbara's Bakery shall (i) modify the labeling of the Eligible Products so that they no longer contain "all natural," "no artificial additives," "no artificial preservatives" or "no artificial flavors" statements on the product labeling; (ii) not refer to or represent any of its products that contain GMO, Synthetic Ingredients, artificial ingredients, or artificial flavors, including all of the Eligible Products, as "all natural," "no artificial additives," "no artificial preservatives" or "no artificial flavors" either on the given product's label or any media or advertising, including Barbara's Bakery's website; and (iii) Barbara's Bakery shall effect the relabeling of all Barbara's Bakery's products that contain GMO, Synthetic Ingredients, artificial ingredients, or artificial flavors, including all of the Eligible Products, to eliminate any "all natural," "no artificial additives," "no artificial preservatives" or "no artificial flavors" references and redesign the label to eliminate the use of the "All Natural" language on any Barbara's Bakery's product, including any of the Eligible Products. For the purposes of this Agreement, sales of Eligible Products already in inventory prior to the Final Settlement Date or March 1, 2014, whichever is later, shall not constitute a violation of this Agreement. Nothing in this provision shall be construed as preventing Barbara's Bakery from advertising and/or labeling its products that do not contain GMO, Synthetic Ingredients, artificial ingredients, and artificial flavors as "all natural," "no artificial additives," "no artificial preservatives" or "no artificial flavors," respectively. In addition, Barbara's Bakery shall

16

make no claims (on a product label or otherwise) to the effect that any Barbara's Bakery product does not contain GMO, except as allowed by the Non-GMO Project or substantially similar and independent non-GMO certifying organization, and only for any given product that has been approved and / or verified by the Non-GMO Project's verification program or substantially similar and independent certifying organization's Non-GMO verification program.  Nothing contained herein shall prohibit Defendant from disclosing that any given product contains GMO ingredients either on a product label or otherwise, or require Defendant to disclose that a product contains GMO on product labels or advertisements.

2.      Nothing in this Agreement shall prevent Defendant from implementing the changes referenced in this paragraph prior to the Final Settlement Date or prior to March 1, 2014.

3.      Nothing in this Agreement shall prevent Defendant from making "natural flavor" claims in accordance with applicable U.S. Food and Drug Administration ("FDA") regulations.

4.      The terms and requirements of the relief described in Section IV.E.1 shall expire on the earliest of the following dates: (i) three (3) years after the Final Settlement Date; or (ii) the date upon which there are changes to any applicable statute, regulation, or other law that Defendant reasonably believes would require a modification to any of the product labeling in order to comply with the applicable statute, regulation, or law; or (iii) the date upon which there are any changes to any applicable federal or state statutes or regulations that would allow Defendant to label products that contain GMO, Synthetic Ingredients, and /or artificial flavor and ingredients to be labeled "all natural," "no artificial additives," "no artificial preservatives" or "no artificial flavors," including, but not limited to, changes in FDA, Federal Trade Commission, U.S. Department of Agriculture and other applicable government agencies' regulations, guidances or pronouncements. Plaintiff and his counsel agree that this Agreement does not preclude Defendant from making further disclosures or any labeling changes that (i) Defendant reasonably believes is necessary to comply with any statute, regulation, or other law of any kind (including but not limited to the Federal Food, Drug, and Cosmetic Act, FDA regulations, and/or the California Sherman Food, Drug, and Cosmetic Law); or (ii) are necessitated by product changes and/or reformulations to ensure that Defendant provides accurate product descriptions.

17

F.     Elimination of GMO Ingredients From Certain Eligible Products

1.     In addition to the relief discussed above, Barbara's Bakery represents and warrants that it has eliminated the use of GMO ingredients, in accordance with the Non-GMO Project Standard (a copy of which is attached hereto as Exhibit 9 and available at http://www.nongmoproject.org/product-verification/non-gmo-project-standard/ (last visited April 15, 2013) (the "Non-GMO Project Standard"), in the following Eligible Products: BROWN RICE CRISPS Cereal (Fruit Juice Sweetened flavor), CORN FLAKES Cereal (Fruit Juice Sweetened), HONEST O'S Cereal (Honey Nut, Multigrain and Original flavors), PUFFINS Cereal (Multigrain), ORGANIC SNACKIMALS CEREAL (Cinnamon Crunch and Vanilla Blast flavors, SHREDDED OATS Cereal (Blueberry Burst, Cinnamon Crunch, Shredded Wheat, and Vanilla Almond flavors), and SNACKIMALS ANIMAL COOKIES (Chocolate Chip, Oatmeal, Peanut Butter, Snickerdoodle and Vanilla flavors) (collectively the "First Group of Non-GMO Products").  Barbara's Bakery represents and warrants that the First Group of Non-GMO Products were approved by the Non-GMO Project's (www.nongmoproject.com) Verification Program.

2.     In addition to the relief discussed above, Barbara's Bakery represents and warrants that it has and will make continuing reasonable efforts to eliminate the use of GMO ingredients, in accordance with the Non-GMO Project Standard, in the following Eligible Products: PUFFINS (Honey Rice flavor), TOASTED OATMEAL FLAKES (Original flavor), SNACKIMALS ANIMAL COOKIES (Double Chocolate flavor) (collectively, the "Second Group of Non-GMO Products"). Barbara's Bakery represents and warrants that it has submitted the Second Group of Non-GMO Products for approval to the Non-GMO Project's Product Verification Program.  Barbara's Bakery anticipates that the Second Group of Non-GMO Products will be approved by the Non-GMO Project by August 2013.

3.     In addition to the relief discussed above, Barbara's Bakery represents and warrants that as of the date of this Agreement, Barbara's Bakery is in the process of eliminating GMO ingredients, in accordance with the Non-GMO Project Standard, from the following Eligible Products: HIGH FIBER Cereal (Cranberry, Flax & Granola, and Original flavors), PUFFINS Cereal (Cinnamon, Original, Peanut Butter, and Peanut Butter & Chocolate flavors), PUFFINS PUFFS Cereal (Cocoa

18

Crunch and Fruit Medley flavors), and FIG BARS (Multigrain, Raspberry and Whole Wheat flavors) (collectively, the "Third Group of Non-GMO Products"). Barbara's Bakery represents and warrants that it intends to submit the Third Group of Non-GMO Products for approval to the Non-GMO Project's Product Verification Program. Barbara's Bakery agrees to employ reasonable efforts to obtain the Non-GMO Project's approval for the Third Group Non-GMO Products by the Final Settlement Date or by March 1, 2014, whichever is later.

## V.     NOTICE TO THE CLASS

### A.     Duties of the Settlement Administrator and the Notice Administrator

1.     The Parties shall jointly recommend and retain Rust Consulting, Inc. to be the Settlement Administrator and Kinsella Media, LLC to be the Notice Administrator to help implement the terms of this Agreement. Following the Court's preliminary approval of this Agreement and the Court's appointment of the proposed Settlement Administrator and the proposed Notice Administrator, the Notice Administrator shall disseminate notice to the Class as provided for in the Declaration of the Notice Administrator, substantially in the form attached as Exhibit 8 to this Agreement, as specified in the Preliminary Approval Order and in this Agreement, and in order to comply with all applicable laws, including, but not limited to, the Due Process Clause of the Constitution. The Settlement Administrator and Notice Administrator shall abide by the terms, conditions, and obligations of the Agreement, the Settlement Claim Procedures and Claim Calculation Protocol, and the Orders issued by the Court in this Action.

2.     The Notice Administrator shall be responsible for, without limitation, consulting on and designing the notice to the Class via various forms of media, including implementing the media purchases. In particular, the Notice Administrator shall be responsible for: (a) arranging for the publication of the Summary Settlement Notice; (b) designing and implementing notice to the Class by various electronic media, including social media and electronic publications; (c) press releases, as discussed in the Declaration of the Notice Administrator attached as Exhibit 8 to this Agreement; (d) responding to requests from Class Counsel and/or Barbara's Bakery's Counsel; and (e) otherwise implementing and/or assisting with the dissemination of the notice of the Settlement.

3. The Settlement Administrator shall be responsible for, without limitation, dissemination of Class Notice by E-mail and mail, as provided in this Agreement, and implementing the terms of the Claim Process and related administrative activities that include communications with Class Members concerning the Settlement, Claim Process, and their options thereunder. In particular, the Settlement Administrator shall be responsible for: (a) printing, mailing, or arranging for the mailing of the Class Notice; (b) handling returned mail not delivered to Class Members; (c) attempting to obtain updated address information for any Class Notice returned without a forwarding address; (d) making any additional mailings required under the terms of this Agreement; (e) establishing a website that contains the Claim Form that can be completed and submitted on-line; (f) establishing a toll-free voice response unit to which Class Members may refer for information about the Action and the Settlement; (g) receiving and maintaining on behalf of the Court any Class Member correspondence regarding requests for exclusion and objections to the Settlement; (h) forwarding inquiries from Class Members to Class Counsel or their designee for a response, if warranted; (i) establishing a post office box for the receipt of Claim Forms, exclusion requests, and any correspondence; (j) reviewing Claim Forms according to the review protocols set forth in this Agreement and in the Settlement Claim Procedures and Claim Calculation Protocol, attached hereto as Exhibit 7; and (k) otherwise implementing and/or assisting with the claim review process and payment of the claims, pursuant to the terms and conditions of this Agreement.

4. The Notice Administrator and the Settlement Administrator shall coordinate their activities to minimize costs in effectuating the terms of this Agreement.

5. Because the names of Class Members and other personal information about them will be provided to the Settlement Administrator and the Notice Administrator for purposes of providing cash benefits and processing opt out requests, the Settlement Administrator and the Notice Administrator will execute a confidentiality and non-disclosure agreement with Barbara's Bakery, Defense Counsel, and Class Counsel and will take all reasonable steps to ensure that any information provided to it by Class Members and/or the Parties will be used solely for the purpose of effecting this Settlement.

6. The Settlement Administrator and Notice Administrator shall administer the Settlement in accordance with the terms of this Agreement (including but not limited to the Settlement Claim Procedures and Claim Calculation Protocol, attached hereto as Exhibit 7) and, without limiting the foregoing, shall:

a. Treat any and all documents, communications, and other information and materials received in connection with the administration of the Settlement as confidential and shall not disclose any or all such documents, communications or other information to any person or entity except as provided for in this Agreement or by court order;

b. Receive opt out and other requests from members of the Class to exclude themselves from the Settlement and provide to Class Counsel and Defense Counsel a copy thereof within seven (7) days of receipt. If the Settlement Administrator and/or Notice Administrator receive any exclusion forms or other requests from Class Members to exclude themselves from the Settlement after the deadline for the submission of such forms and requests, the Settlement Administrator and/or Notice Administrator shall promptly provide Class Counsel and Defense Counsel with copies thereof.

c. Receive and maintain on behalf of the Court all correspondence from any Class Member regarding the Settlement.

7. If the Settlement Administrator and/or the Notice Administrator make a material or fraudulent misrepresentation to, or conceal requested material information from, Class Counsel, Barbara's Bakery, or Barbara's Bakery's Counsel, then the Party to whom the misrepresentation is made shall, in addition to any other appropriate relief, have the right to demand that the Settlement Administrator and/or the Notice Administrator, as applicable, immediately be replaced. If the Settlement Administrator and/or the Notice Administrator fail to perform adequately on behalf of the Parties, the Parties may agree to remove the Settlement Administrator and/or the Notice Administrator. Neither Party shall unreasonably withhold consent to remove the Settlement Administrator and/or the Notice Administrator. The Parties will attempt to resolve any disputes regarding the retention or dismissal of the Settlement Administrator and/or the Notice Administrator in good faith, and, if they are unable to do so, will refer the matter to the Court for resolution.

21

8.      The Settlement Administrator shall begin accepting Claim Forms as they are submitted by Class Members for processing.

9.      Not later than ten (10) calendar days before the date of the Fairness Hearing, the Settlement Administrator and Notice Administrator shall file with the Court: (a) a list of those persons who have opted out or excluded themselves from the Settlement; and (b) the details outlining the scope, methods and results of the notice program.

10.     The Settlement Administrator shall promptly provide copies of any requests for exclusion, objections, and/or related correspondence to Class Counsel and Barbara's Bakery's Counsel.

11.     No later than ten (10) calendar days after this Agreement is filed with the Court, Barbara's Bakery shall mail or cause the items specified in 28 U.S.C. §1715(b) to be mailed to each State and Federal official, as specified in 28 U.S.C. §1715(a).

12.     The Settlement Administrator shall administer the Settlement in accordance with the terms of this Agreement and in accordance with the Claim Procedure and Claim Calculation Protocol, attached hereto as Exhibit 7.

13.     Any Class Member who, in accordance with the terms and conditions of this Agreement, neither seeks exclusion from the Class nor files a Claim Form, will not be entitled to receive any cash pursuant to this Stipulation of Settlement, but will be bound together with all Class Members by all of the terms of this Agreement, including the terms of the Final Order and Judgment to be entered in the Action and the releases provided for herein, and will be barred from bringing any action in any forum (state or federal) against any of the Released Parties concerning the matters subject to the Release.

14.     Claim Forms that do not meet the requirements set forth in this Agreement and in the Claim Form instructions shall be rejected.  Where a good faith basis exists, the Settlement Administrator may reject a Class Member's Claim Form for, among other reasons, the following:

a.      The Class Member failed to provide adequate support of their claim pursuant to a request of the Settlement Administrator;

b.      The Class Member purchased products that are not covered by the terms

of this Stipulation of Settlement;

        c.     Failure to fully complete and/or sign the Claim Form;

        d.     Illegible Claim Form;

        e.     More than one Claim Form is submitted by persons who reside in the same household;

        f.     The Claim Form is fraudulent;

        g.     The Claim Form is duplicative of another Claim Form;

        h.     The person submitting the Claim Form is not a Class Member;

        i.     The person submitting the Claim Form is requesting that funds be paid to a person or entity that is not the Class Member for whom the Claim Form is submitted;

        j.     Failure to submit a Claim Form by the end of the Claim Period; and/or

        k.     The Claim Form otherwise does not meet the requirements of this Agreement.

        15.     The Settlement Administrator shall determine whether a Claim Form meets the requirements set forth in this Agreement. Each Claim Form shall be submitted to and reviewed by the Settlement Administrator, who shall determine in accordance with the terms and conditions of this Agreement the extent, if any, to which each claim shall be allowed. The Settlement Administrator shall have the authority to determine whether a claim by any Class Member is complete and timely. The Settlement Administrator shall use all reasonable efforts and means to identify and reject duplicate and/or fraudulent claims, including, without limitation, indexing all funds provided to Class Members.

        16.     Any Class Member who fails to submit a Claim Form by the end of the Claim Period shall be forever barred from receiving any benefit pursuant to this Agreement, but shall in all other respects be bound by all of the terms of this Agreement, the terms of the Final Order and Judgment to be entered in the Action, and the releases provided for herein, and will be barred from bringing any action in any forum (state or federal) against any of the Released Parties concerning any of the matters subject to the Release. The Claim Form will be deemed to have been submitted when the attestation form are posted, if received with a postmark or equivalent mark by a courier company

indicated on the envelope or mailer with the instructions set out in the Claim Form. In all other cases, the Claim Form shall be deemed to have been submitted when it is actually received by the Settlement Administrator.

17. Class Counsel and Defense Counsel shall have the right to inspect the Claim Forms and supporting documentation received by the Settlement Administrator at any time upon reasonable notice.

18. All notification duties imposed by 28 U.S.C. §1715, including the corresponding expenses, shall be separate and in addition to any other obligation imposed herein.

19. Barbara's Bakery and the Released Parties are not obligated to (and will not be obligated to) compute, estimate, or pay any taxes on behalf of Plaintiff (or his counsel), any Class Member, Plaintiff's Counsel, the Notice Administrator and/or the Settlement Administrator.

B. Class Notice:

1. Dissemination of the Mailed Class Notice

a. No later than five (5) calendar days after entry of the Preliminary Approval Order, Barbara's Bakery shall provide the Notice Administrator with the name, mailing address, and e-mail address of each reasonably identifiable Class Member that it possesses.

b. Beginning not later than ten (10) calendar days after entry of the Preliminary Approval Order and to be substantially completed not later than twenty-five (25) calendar days after entry of the Preliminary Approval Order, and subject to the requirements of the Preliminary Approval Order and the Settlement Agreement, the Notice Administrator shall send the Class Notice by Electronic Mail ("E-Mail") to: (i) each reasonably identifiable Class Member's last known E-Mail address; and (ii) each appropriate State and Federal official, as specified in 28 U.S.C. §1715, and shall otherwise comply with Fed. R. Civ. P. 23 and any other applicable statute, law, or rule, including but not limited to, the Due Process Clause of the United States Constitution.

c. No later than forty-five (45) calendar days after entry of the Preliminary Approval Order, the Notice Administrator shall send the Summary Settlement Notice by First Class U.S. Mail, proper postage prepaid, to each Class Member whose E-mail address returned a message as undeliverable, subject to the existence of such information as provided by Barbara's Bakery pursuant

24

to Section V.B.1.a of this Agreement.

d.     The Notice Administrator shall: (i) re-mail any Summary Settlement Notices returned by the United States Postal Service with a forwarding address that are received by the Notice Administrator; and (ii) by itself or using one or more address research firms, as soon as practicable following receipt of any returned Summary Settlement Notices that do not include a forwarding address, research any such returned mail for better addresses and promptly mail copies of the Summary Settlement Notice to the better addresses so found.

e.     Barbara's Bakery's Counsel shall provide to the Notice Administrator, within ten (10) business days of the entry of the Preliminary Approval Order, a list of all counsel for anyone who has litigation against Barbara's Bakery that involves the Eligible Products. The Notice Administrator shall mail copies of the Class Notice to all such legal counsel. Barbara's Bakery will promptly direct the Notice Administrator to serve the Class Notice on counsel for any Class Members who subsequently initiate litigation, arbitration, or other proceedings against Barbara's Bakery relating to claims alleging events occurring during the Class Period, the Eligible Products, and/or otherwise involving the Release.

2.     Contents of the Class Notice: The Claim Form and the Class Notice shall be in a form substantially similar to the document attached to this Agreement as Exhibits 1 and 2, respectively, and shall advise Class Members of the following:

a.     General Terms: The Class Notice shall contain a plain and concise description of the nature of the Action and the proposed Settlement, including information on the identity of Class Members, how the proposed Settlement would provide relief to the Class and Class Members, what claims are released under the proposed Settlement and other relevant terms and conditions.

b.     Opt-Out Rights: The Class Notice shall inform Class Members that they have the right to opt out of the Settlement. The Class Notice shall provide the deadlines and procedures for exercising this right.

c.     Objection to Settlement: The Class Notice shall inform Class Members of their right to object to the proposed Settlement and appear at the Fairness Hearing. The Class

25

Notice shall provide the deadlines and procedures for exercising these rights.

                d.    <u>Fees and Expenses</u>:  The Class Notice shall inform Class Members about the amounts being sought by Plaintiff's Counsel as Attorneys' Fees and Expenses and the individual awards to Plaintiff, and that such amounts will be paid out of the Settlement Fund.

                e.    <u>Consumer Information</u>:  The Class Notice shall inform the Class Members that any information they provide may be submitted to a federal or state agency in the administration of this relief.

                f.    <u>Claim Form</u>:  The Class Notice shall include the Claim Form, which shall inform the Class Member that he or she must fully complete and timely return the Claim Form within the Claim Period to be eligible to obtain relief pursuant to this Agreement.

    C.    <u>The Summary Settlement Notice</u>:  The Notice Administrator shall have the publication of the Summary Settlement Notice substantially completed no later than ninety (90) calendar days after entry of the Preliminary Approval Order as described in the Declaration of the Notice Administrator, attached as Exhibit 8, and in such additional newspapers, magazines, and/or other media outlets as shall be agreed upon by the Parties.  The form of Summary Settlement Notice agreed upon by the Parties is in the form substantially similar to the one attached to the Agreement as Exhibit 6.

    D.    <u>Internet Web site</u>:  Prior to the dissemination of the Class Notice pursuant to Section V.B.1 to Section V.C, the Notice Administrator shall establish an Internet website, www.BarbarasBakerySettlement.com, that will inform Class Members of the terms of this Agreement, their rights, dates and deadlines and related information.  The web site shall include, in .pdf format, materials agreed upon by the Parties and/or required by the Court. Banner ads on the Internet shall direct Class Members to the website.

    E.    <u>Toll-Free Telephone Number</u>:  Prior to the dissemination of the Class Notice pursuant to Section V.B.1 to Section V.C, the Notice Administrator shall establish a toll-free telephone number that will provide Settlement-related information to Class Members.

## VI.   REQUESTS FOR EXCLUSION

A.     Members of the Class may elect to opt out of the Class or the Settlement, relinquishing their rights to benefits hereunder.  Members of the Class who opt out of the Settlement will not release their claims pursuant to this Agreement.  Putative class members wishing to opt out of the Settlement must send to the Settlement Administrator by U.S. Mail a personally signed letter including their name and address, and providing a clear statement communicating that they elect to be excluded from the Class. Any request for exclusion or opt out must be postmarked on or before the  opt out deadline date specified in the Preliminary Approval Order.  The date of the postmark on the return-mailing envelope shall be the exclusive means used to determine whether a request for exclusion has been timely submitted.  The Settlement Administrator shall forward copies of any written requests for exclusion to Class Counsel and Barbara's Bakery's Counsel.  The Settlement Administrator shall file a list reflecting all requests for exclusion with the Court no later than ten (10) calendar days before the Fairness Hearing.

B.     Any potential Class Member who does not file a timely written request for exclusion as provided in the preceding Section VI.A shall be bound by all subsequent proceedings, orders, and judgments, including, but not limited to, the Release, in the Action, even if he or she has litigation pending or subsequently initiates litigation against Barbara's Bakery relating to the claims and transactions released in the Action.

## VII.   OBJECTIONS TO SETTLEMENT AND APPEARANCE AT FAIRNESS HEARING

A.     Any Class Member who has not filed a timely written request for exclusion and who wishes to object to the fairness, reasonableness, or adequacy of this Agreement or the proposed Settlement, or to the award of Attorneys' Fees and Expenses, or the individual awards to Plaintiff, must deliver to the Class Counsel identified in the Class Notice and to Barbara's Bakery's Counsel, and file with the Court (through the Court's Management / Electronic Case Files ("CM/ECF") or through any other method in which the Court will accept filings), no later than the objection deadline date specified in the Preliminary Approval Order, or as the Court otherwise may direct, a written statement of the objections, as well as the specific reason(s), if any, for each objection, including any legal support the Class Member wishes to bring to the Court's attention, any evidence or other

information the Class Member wishes to introduce in support of the objections, and a statement of whether the Class Member intends to appear and argue at the Fairness Hearing. Class Members may do so either on their own or through an attorney retained at their own expense. The Parties shall request that the Court allow any interested party to file a reply to any objection, as described in this Section VII.A, no later than seven (7) calendar days before the Fairness Hearing.

B.     Any Class Member, including one who files and serves a written objection, as described in the preceding Section VII.A, may appear at the Fairness Hearing, either in person or through personal counsel hired at the Class Member's expense, to object to or comment on the fairness, reasonableness, or adequacy of this Agreement or the proposed Settlement, or to the award of Attorneys' Fees and Expenses or any award to the individual Plaintiff. Class Members or their attorneys who intend to make an appearance at the Fairness Hearing must deliver a notice of intention to appear to one of the Class Counsel identified in the Class Notice and to Barbara's Bakery's Counsel, and file said notice with the Court (through CM/ECF or through any other method in which the Court will accept filings), no later than the date specified in the Preliminary Approval Order, or as the Court may otherwise direct.

C.     Any Class Member who fails to comply with the provisions of Section VII.A above shall waive and forfeit any and all rights he or she may have to object, and shall be bound by all the terms of this Agreement and by all proceedings, orders and judgments, including, but not limited to, the Release, in the Action.

D.     Any Class Member who objects to the Settlement shall be entitled to all of the benefits of the Settlement if this Agreement and the terms contained therein are approved, as long as the objecting Class Member complies with all requirements of this Agreement applicable to Class Members, including the timely submission of Claim Forms and other requirements contained in this Agreement.

## VIII.   RELEASE AND WAIVER

A.     The Parties agree to the following release and waiver, which shall take effect upon entry of the Final Order and Final Judgment.

B.      In consideration for the Settlement benefits described in this Agreement, Plaintiff and

28

the other members of the Class, on behalf of themselves, their heirs, guardians, assigns, executors, administrators, predecessors, and/or successors, will fully, finally and forever release, relinquish, acquit, and discharge the Released Parties from, and shall not now or hereafter institute, maintain, or assert on their own behalf, on behalf of the Class, any and all manner of claims, actions, causes of action, suits, rights, debts, sums of money, payments, obligations, reckonings, contracts, agreements, executions, promises, damages, liens, judgments, and demands of whatever kind, type or nature whatsoever, both at law and in equity, whether past, present, or future, mature or not yet mature, known or unknown, suspected or unsuspected, contingent or non-contingent, that arose during the Class Period, whether based on federal, state, or local law, statute, ordinance, regulation, code, contract, common law, or any other source, or any claim that Plaintiff or Class Members ever had, now have, may have, or hereafter can, shall, or may ever have against the Released Parties that were or reasonably could have been alleged in the Action or in any other court, tribunal, arbitration panel, commission, agency, or before any governmental and/or administrative body, or any other adjudicatory body, on the basis of, connected with, arising from, or in any way whatsoever relating to claims that were or reasonably could have been alleged in the Action, including, but without in any way limiting the generality of the foregoing, arising from, directly or indirectly, or in any way whatsoever pertaining or relating to (1) the claims alleged in the Action, (2) any communications, disclosures, nondisclosures, representations, statements, claims, omissions, warnings, messaging, marketing, advertising, promotion, packaging, displays, brochures, sale, and/or resale by the Released Parties of the Eligible Products arising from or in any way whatsoever relating to claims that were or reasonably could have been alleged in the Action; (3) any claims for rescission, restitution, or unjust enrichment for all damages of any kind related to the purchase, sale, or marketing of the Eligible Products arising from or in any way whatsoever relating to claims that were or reasonably could have been alleged in the Action; (4) violations of any state's deceptive, unlawful and/or unfair business and/or trade practices, false, misleading or fraudulent advertising, consumer fraud and/or consumer protection statutes related to the purchase, sale, or marketing of the Eligible Products arising from or in any way whatsoever relating to claims that were or reasonably could have been alleged in the Action; (5) any violation of the Uniform Commercial Code, any breaches of express, implied, and/or

Case 1:12-cv-02664-CRB Document 37 Filed 04/25/13 Page 33 of 48 PageID #: 1322
Case3:12-cv-02664-CRB Document 37 Filed 04/25/13 Page 33 of 48
1322

any other warranties, any similar federal, state, or local statutes, codes related to the purchase, sale, or marketing of the Eligible Products arising from or in any way whatsoever relating to claims that were or reasonably could have been alleged in the Action; or (6) damages, costs, expenses, extra-contractual damages, compensatory damages, exemplary damages, special damages, penalties, punitive damages and/or damage multipliers, disgorgement, declaratory relief, expenses, interest, and/or attorneys' fees and costs related to the purchase, sale, or marketing of the Eligible Products arising from or in any way whatsoever relating to claims that were or reasonably could have been alleged in the Action.

C. Notwithstanding the language in this section and/or this Agreement, the Plaintiff and the other members of the Class are not releasing (1) any claims of or relating to personal injury; and (2) any of Defendant's obligations pursuant to this Agreement.

D. Plaintiff represents and warrants that he is the sole and exclusive owner of all claims that he is personally releasing under this Agreement. Plaintiff further acknowledges that he has not assigned, pledged, or in any manner whatsoever, sold, transferred, assigned or encumbered any right, title, interest or claim arising out of or in any way whatsoever pertaining to the Action, including without limitation, any claim for benefits, proceeds or value under the Action.

E. Without in any way limiting its scope, and, except to the extent otherwise specified in the Agreement, this Release covers by example and without limitation, any and all claims for attorneys' fees, costs, expert fees, or consultant fees, interest, or litigation fees, costs or any other fees, costs, and/or disbursements incurred by Plaintiff's Counsel, or by Plaintiff or the Class Members.

F. Plaintiff expressly understands and acknowledges, and all Class Members will be deemed by the Final Order and Final Judgment to acknowledge, that certain principles of law, including, but not limited to, **Section 1542 of the Civil Code of the State of California, provide that "a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."** To the extent that anyone might argue that these principles of law are applicable, Plaintiff hereby agrees that the provisions of all such principles of law or similar federal or state laws, rights, rules, or legal principles, to the extent they are found to be applicable herein, are hereby knowingly and voluntarily waived, relinquished and released

30

by Plaintiff and all Class Members.

G.      Nothing in this Release shall preclude any action to enforce the terms of the Agreement, including participation in any of the processes detailed in the Agreement.

H.      Plaintiff and Defendant hereby agree and acknowledge that the provisions of this Release together constitute an essential and material term of the Agreement and shall be included in any Final Order and Final Judgment entered by the Court.

## IX.      ATTORNEYS' FEES AND EXPENSES AND INDIVIDUAL PLAINTIFF AWARD

A.      Class Counsel agrees to make and Barbara's Bakery agrees not to oppose, an application for an award of Attorneys' Fees and Expenses in the Action that will not exceed an amount equal to twenty-five percent (25%) of the Settlement Fund (One Million Dollars ($1,000,000), which shall be the sole aggregate compensation paid by Barbara's Bakery for Class Counsel representing the Class.  The ultimate award of Attorneys' Fees and Expenses will be determined by the Court.

B.      The denial, downward modification, or failure to grant the request for Attorneys' Fees and Expenses shall not constitute grounds for modification or termination of this Agreement or the proposed Settlement.  The Parties negotiated the amount of the Attorneys' Fees and Expenses to be sought by Class Counsel only after reaching an agreement upon the relief provided to the Class.

C.      Barbara's Bakery agrees to pay, and shall pay or cause to be paid, an initial payment to Class Counsel of seven-tenths (7/10) of the amount of Attorneys' Fees and Expenses awarded by the Court ("First Fee Payment"), within ten (10) calendar days after entry of the Court's order so awarding Attorneys' Fees and Expenses, notwithstanding any appeal, and upon service of a fully executed Stipulated Undertaking and Order by Class Counsel, substantively in the form attached hereto as Exhibit 10, to Barbara's Bakery's Counsel.  The Stipulated Undertaking and Order shall provide that Class Counsel are jointly and severally liable to Barbara's Bakery for the repayment of the First Fee Payment, without interest, should the Final Order be reversed or the fee order reversed or reduced on appeal. In addition, no interest will accrue on such amounts at any time.

D.      If the Final Order and Final Judgment (or the order awarding Attorneys' Fees and Expenses) is reversed, vacated, modified, and/or remanded for further proceedings or otherwise disposed of in any manner other than one resulting in an affirmance, then Plaintiff's Counsel (or, as

31

applicable, any and all successor(s) or assigns of their respective firms) shall, within ten (10) calendar days of such event, (i) repay to Barbara's Bakery, as applicable, the full amount of the First Fee Payment paid to them, or (ii) repay to Barbara's Bakery the amount by which the award of Attorneys' Fees and Expenses has been reduced. Counsel Counsel (or, as applicable, any and all successor(s) or assigns of their firm) shall be jointly and severally liable for repayment to Barbara's Bakery of the First Fee Payment, without interest, and each such entity shall execute a guarantee of repayment concurrently with this Agreement.

E.     Barbara's Bakery agrees to pay and shall pay or cause to be paid a final payment of the remaining three-tenths (3/10) of the Attorneys' Fees and Expenses awarded by the Court ("Final Fee Payment"), to Class Counsel within ten (10) calendar days after the Final Settlement Date.

F.     Class Counsel may petition the Court for an incentive award of up to Two Thousand Five Hundred Dollars ($2,500.00) for Plaintiff. The purpose of such an award shall be to compensate Plaintiff for efforts and risks taken by him on behalf of the Class. Barbara's Bakery agrees to pay and shall pay or cause to be paid an incentive award made and approved by the Court ("Incentive Award") within ten (10) calendar days after the occurrence of the Final Settlement Date in accordance with the instructions provided by Class Counsel.

G.     Barbara's Bakery shall not be liable for or obligated to pay any fees, expenses, costs, or disbursements to, or incur any expense on behalf of, any person or entity, either directly or indirectly, in connection with the Action or this Settlement Agreement, other than the amount or amounts expressly provided for in this Settlement Agreement.

## X.     PRELIMINARY APPROVAL ORDER, FINAL ORDER, FINAL JUDGMENT AND RELATED ORDERS

A.     The Parties shall seek from the Court, within fifteen (15) business days after the execution of this Agreement, a Preliminary Approval Order in a form substantially similar to Exhibit 5. The Preliminary Approval Order shall, among other things:

1.     Certify a nationwide settlement-only class, approve Plaintiff Richard W. Trammell as class representative and appoint Tina Wolfson and Robert Ahdoot of Ahdoot & Wolfson, PC as counsel for the class, pursuant to Fed. R. Civ. P. 23;

32

2.      Preliminarily approve the Settlement;

3.      Require the dissemination of the Notice and the taking of all necessary and appropriate steps to accomplish this task;

4.      Determine that the notice complies with all legal requirements, including, but not limited to, the Due Process Clause of the United States Constitution;

5.      Schedule a date and time for a Fairness Hearing to determine whether the Preliminary Approval Order should be finally approved by the Court;

6.      Require Class Members who wish to exclude themselves to submit an appropriate and timely written request for exclusion as directed in the Agreement and Class Notice and that a failure to do so shall bind those Class Members who remain in the Class;

7.      Require Class Members who wish to object to the Agreement to submit an appropriate and timely written statement as directed in the Agreement and Class Notice;

8.      Require Class Members who wish to appear to object to the Agreement to submit an appropriate and timely written statement as directed in the Agreement and Class Notice;

9.      Require attorneys representing individual Class Members, at their own expense, to file a notice of appearance as directed in the Agreement and Class Notice;

10.     Issue a preliminary injunction pursuant to the Agreement;

11.     Appoint the Settlement Administrator and/or the Notice Administrator;

12.     Authorize Barbara's Bakery to take all necessary and appropriate steps to establish the means necessary to implement the Agreement;

13.     Issue other related orders to effectuate the preliminary approval of the Agreement.

B.      After the Fairness Hearing, the Parties shall seek to obtain from the Court a Final Order and Final Judgment in the forms substantially similar to Exhibits 3 and 4, respectively.  The Final Order and Final Judgment shall, among other things:

1.      Find that the Court has personal jurisdiction over all Class Members, the Court has subject matter jurisdiction over the claims asserted in the Action, and that venue is proper.

2.      Finally approve the Agreement and Settlement, pursuant to Fed. R. Civ. P. 23;

33

3.     Finally certify the Class for settlement purposes only;

4.     Find that the notice and the notice dissemination methodology complied with all laws, including, but not limited to, the Due Process Clause of the United States Constitution;

5.     Dismiss the Action with prejudice;

6.     Incorporate the Release set forth in the Agreement and make the Release effective as of the date of the Final Order and Final Judgment;

7.     Issue a permanent injunction pursuant to the Agreement;

8.     Authorize the Parties to implement the terms of the Agreement;

9.     Retain jurisdiction relating to the administration, consummation, enforcement, and interpretation of the Agreement, the Final Order and Final Judgment, and for any other necessary purpose; and

10.     Issue related Orders to effectuate the final approval of the Agreement and its implementation.

## XI.     MODIFICATION OR TERMINATION OF THIS AGREEMENT

A.     The terms and provisions of this Agreement may be amended, modified, or expanded by written agreement of the Parties and approval of the Court; provided, however that, after entry of the Final Order and Final Judgment, the Parties may by written agreement effect such amendments, modifications, or expansions of this Agreement and its implementing documents (including all exhibits hereto) without further notice to the Class or approval by the Court if such changes are consistent with the Court's Final Order and Final Judgment and do not limit the rights of Class Members under this Agreement.

B.     This Agreement shall terminate at the discretion of either Barbara's Bakery or Plaintiff, through Class Counsel, if: (1) the Court, or any appellate court(s), rejects, modifies, or denies approval of any portion of this Agreement that the terminating party reasonably determines is material, including, without limitation, the terms of relief, the findings, or conclusions of the Court, the provisions relating to notice, the definition of the Class, and/or the terms of the Release; or (2) the Court, or any appellate court(s), does not enter or completely affirm, or alters or expands, any portion of the Final Order and Judgment, or any of the Court's findings of fact or conclusions of law, that the

34

terminating party in his or her sole judgment and discretion reasonably determines is material. The terminating party must exercise the option to withdraw from and terminate this Agreement, as provided in this Section XI, by a signed writing served on the other Parties no later than twenty (20) calendar days after receiving notice of the event prompting the termination. In the event that a terminating party exercises his or her option to withdraw from and terminate this Agreement, this Agreement and the Settlement proposed herein shall become null and void and the Parties will be returned to their respective positions existing immediately before the execution of this Agreement.

C. If an option to withdraw from and terminate this Agreement arises under Section IX.B above, neither Barbara's Bakery nor Plaintiff is required for any reason or under any circumstance to exercise that option and any exercise of that option shall be in good faith.

D. If this Agreement is terminated pursuant to Section IX.B, above, then:

1. This Agreement shall be null and void and shall have no force or effect, and no Party to this Agreement shall be bound by any of its terms, except for the terms of this Section XI.D of this Agreement;

2. The Parties will petition to have any stay orders entered pursuant to this Agreement lifted;

3. All of its provisions, and all negotiations, statements, and proceedings relating to it shall be without prejudice to the rights of Barbara's Bakery, Plaintiff or any Class Member, all of whom shall be restored to their respective positions existing immediately before the execution of this Agreement, except that the Parties shall cooperate in requesting that the Court set a new scheduling order such that neither party's substantive or procedural rights is prejudiced by the attempted Settlement;

4. Released Parties expressly and affirmatively reserve all defenses, arguments, and motions as to all claims that have been or might later be asserted in the Action, including, without limitation, the argument that the Action may not be litigated as a class action;

5. Plaintiffs and all other Class Members, on behalf of themselves and their heirs, assigns, executors, administrators, predecessors, and successors, expressly and affirmatively reserve and do not waive all motions as to, and arguments in support of, all claims, causes of actions or

35

remedies that have been or might later be asserted in the Action including, without limitation, any argument concerning class certification, consumer fraud, and treble or other damages;

6. Neither this Agreement, the fact of its having been made, nor the negotiations leading to it, nor any discovery or action taken by a Party or Class Member pursuant to this Agreement, or any documents or communications pertaining to this Agreement shall be admissible or entered into evidence for any purpose whatsoever in the Action or in any proceeding, other than to enforce the terms of this Agreement;

7. The Parties stipulate that any Settlement-related order(s) or judgment(s) entered in this Action after the date of execution of this Agreement shall be deemed vacated and shall be without any force or effect;

8. All costs incurred in connection with the Settlement, including, but not limited to, notice, publication, and customer communications (excluding the Attorneys' Fees and Expenses) will be paid from the Settlement Fund, and any remaining amounts from the Initial Deposit or the Settlement Fund will be returned to Barbara's Bakery with an accounting of amounts spent within ten (10) calendar days. Neither the Class, Plaintiff nor Class Counsel shall be responsible for any of these costs or other Settlement-related costs; and

9. Notwithstanding the terms of this paragraph, if Settlement is not consummated, Plaintiff's Counsel may include any time spent in Settlement efforts as part of any statutory fee petition filed at the conclusion of the case, and Barbara's Bakery reserves the right to object to the reasonableness of such requested fees.

E. Notwithstanding any provision herein, the amount of any award by the Court, if any, for the Incentive Award or the Attorneys' Fees and Expenses shall not operate to terminate or cancel this Agreement. The Parties negotiated the amount of the Attorneys' Fees and Expenses and the Incentive Award to be sought by Class Counsel and Plaintiff, respectively, only after reaching an agreement upon the relief provided to the Class.

## XII.    GENERAL MATTERS AND RESERVATIONS

A.    The obligation of the Parties to conclude the proposed Settlement is and shall be contingent upon entry by the Court of the Final Order and Final Judgment approving the Settlement, from which the time to appeal has expired or which has remained unmodified after any appeal(s).

B.    This Agreement reflects, among other things, the compromise and settlement of disputed claims among the Parties hereto, and neither this Agreement nor the releases provided in it, nor any consideration for the Agreement, nor any actions taken to carry out this Agreement are intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or the validity of any claim, or defense, or of any point of fact or law (including but not limited to matters respecting class certification) on the part of any party.  Barbara's Bakery expressly denies the allegations of Plaintiff's complaints.  Neither this Agreement, nor the fact of settlement, nor the settlement proceedings, nor settlement negotiations, nor any related document, shall be used as an admission of any fault or omission by Barbara's Bakery, or be offered or received in evidence as an admission, concession, presumption, or inference of any wrongdoing by Barbara's Bakery in any proceeding, other than such proceedings as may be necessary to consummate, interpret, or enforce this Agreement.

C.    The Parties and their counsel agree to keep the existence and contents of this Agreement confidential until the date on which the Agreement is filed with the Court, provided, however, that this section shall not prevent Barbara's Bakery from disclosing such information, prior to the date on which the Agreement is filed, to state and federal agencies, independent accountants, actuaries, advisors, financial analysts, insurers, or attorneys, nor shall it prevent the Parties and their counsel from disclosing such information to persons or entities (such as experts, courts, co-counsel, and/or administrators) to whom the Parties agree disclosure must be made in order to effectuate the terms and conditions of this Agreement; provided further, that Barbara's Bakery may disclose publicly the terms of the Agreement that it deems necessary to meet its regulatory obligations or fiduciary duties.

D.    Plaintiff and Plaintiff's Counsel agree that the confidential information made available to them solely through the settlement process was made available, as agreed to, on the condition that

37

neither Plaintiff nor his counsel may disclose it to third parties (other than experts or consultants retained by Plaintiff in connection with this case); that it not be the subject of public comment; that it not be used by Plaintiff or Plaintiff's Counsel in any way in this litigation should the Settlement not be achieved, and that it is to be returned if the Settlement is not concluded; provided, however, that nothing contained in this Agreement shall prohibit Plaintiff from seeking such information through formal discovery or from referring to the existence of such information in connection with the Settlement of this litigation.

E.     Within one hundred and eighty (180) calendar days after the Final Settlement Date (unless the time is extended by agreement of the Parties), Plaintiff's Counsel, and any expert or other consultant employed by them in such capacity or any other individual with access to documents provided by Barbara's Bakery to Plaintiff's Counsel, shall either: (i) return to Barbara's Bakery's Counsel, all such documents and materials (and all copies of which documents in whatever form made or maintained) produced by Barbara's Bakery in the Action and any and all handwritten notes summarizing, describing, or referring to such documents; or (ii) certify to Barbara's Bakery's Counsel that all such documents and materials (and all copies of such documents in whatever form made or maintained) produced by Barbara's Bakery in the Action any and all handwritten notes summarizing, describing, or referring to such documents have been destroyed, provided, however, that this section shall not apply to any documents made part of the record in connection with a Claim, nor to any documents made part of a Court filing, nor to Plaintiff's Counsel's work product.  Barbara's Bakery's Counsel agrees to hold all documents returned by Plaintiff's Counsel, and any expert or other consultant or any other individual employed by Plaintiff's Counsel in such capacity with access to documents provided by Barbara's Bakery until one year after the distribution of the Settlement Fund Balance to Class Members who submitted valid Claim Forms.

F.     Two (2) years after the distribution of the Settlement Fund Balance to Class Members who submitted acceptable Claim Forms, the Settlement Administrator and Notice Administrator shall destroy any and all documents and materials related to the Action or this Settlement, including any Claim Forms, information related to Class Members, and  any and all information and/or documentation submitted by or relating to Class Members.

38

G.     Barbara's Bakery's execution of this Agreement shall not be construed to release — and Barbara's Bakery expressly does not intend to release — any claim Barbara's Bakery may have or make against any insurer for any cost or expense incurred in connection with this Settlement, including, without limitation, for attorneys' fees and costs.

H.     Class Counsel represent that: (1) they are authorized by Plaintiff to enter into this Agreement on behalf of Plaintiff; and (2) they are seeking to protect the interests of the Class. Class Counsel shall take all necessary actions to accomplish approval of the Settlement, the Class Notice, and dismissal of the Action, pursuant to the terms and conditions of this Agreement.

I.     Plaintiff represents and certifies that: (1) he has agreed to serve as a representative of the Class; (2) he is willing, able, and ready to perform all of the duties and obligations of a representative of the Class; (3) he has read the operative complaint, or has had the contents of such pleadings described to him; (4) he is familiar with the results of the fact-finding undertaken by Class Counsel; (5) he has read this Agreement or has received a detailed description of it from Class Counsel and he has agreed to its terms; (6) he has consulted with Class Counsel about the Action and this Agreement and the obligations imposed on a representative of the Class; (7) he has authorized Class Counsel to execute this Agreement on his behalf; and (8) he shall remain and serve as a representative of the Class until the terms of the Agreement are effectuated, this Agreement is terminated in accordance with its terms, or the Court at any time determines that Plaintiff cannot represent the Class.

J.     Barbara's Bakery represents and warrants that the individual(s) executing this Agreement is/are authorized to enter into this Agreement on behalf of Barbara's Bakery.

K.     The Parties (including their counsel, successors, and assigns) agree to cooperate fully and in good faith with one another and to use their best efforts to effectuate the Settlement, including without limitation in seeking preliminary and final Court approval of this Agreement and the Settlement embodied herein, carrying out the terms of this Agreement, and promptly agreeing upon and executing all such other documentation as may be reasonably required to obtain final approval by the Court of the Settlement. In the event that the Court fails to approve the Settlement or fails to issue the Final Order and Final Judgment, the Parties agree to use all reasonable efforts, consistent with this Agreement and subject to Section XI.B herein, to cure any defect identified by the Court. Each party

will cooperate with the other party in connection with effectuating the Settlement or the administration of claims thereunder. Any requests for cooperation shall be narrowly tailored and reasonably necessary for the requesting party to recommend the Settlement to the Court, and to carry out its terms.

L.   This Agreement, complete with its exhibits, sets forth the sole and entire agreement among the Parties with respect to its subject matter, and it may not be altered, amended, or modified except by written instrument executed by Class Counsel and Barbara's Bakery's Counsel. The Parties expressly acknowledge that no other agreements, arrangements, or understandings not expressed in this Agreement exist among or between them and that in deciding to enter into this Agreement, they rely solely upon their judgment and knowledge. This Agreement supersedes any prior agreements, understandings, or undertakings (written or oral) by and between the Parties regarding the subject matter of this Agreement.

M.   This Agreement and any amendments thereto shall be governed by and interpreted according to the laws of the State of California, notwithstanding its conflict of laws provisions.

N.   Any disagreement and/or action to enforce this Agreement shall be commenced and maintained only in the Court in which this Action is pending.

O.   Whenever this Agreement requires or contemplates that one of the Parties shall or may give notice to the other, notice shall be provided by e-mail and/or next-day (excluding Saturdays, Sundays and Legal Holidays) express delivery service as follows:

      1.   If to Barbara's Bakery, then to:

Clement L. Glynn
GLYNN & FINLEY, LLP
100 Pringle Avenue, Suite 500
Walnut Creek, California  94596
Telephone:  925-210-2801
Facsimile:  925-945-1975
E-mail: cglynn@glynnfinley.com

40

2. If to Plaintiff, then to:

Tina Wolfson
Robert Ahdoot
AHDOOT & WOLFSON, PC
10850 Wilshire Blvd., Suite 370
Los Angeles, California 90024
Telephone: 310-474-9111
Facsimile: 310-474-8585
E-mail: twolfson@ahdootwolfson.com
          rahdoot@ahdootwolfson.com

P.     All time periods set forth herein shall be computed in calendar days unless otherwise expressly provided. In computing any period of time prescribed or allowed by this Agreement or by order of the Court, the day of the act, event, or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a Legal Holiday (as defined in Fed. R. Civ. P. 6(a)(6)), or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the office of the clerk of the court inaccessible, in which event the period shall run until the end of the next day that is not one of the aforementioned days.

Q.     The Parties reserve the right, subject to the Court's approval, to agree to any reasonable extensions of time that might be necessary to carry out any of the provisions of this Agreement.

R.     The Class, Plaintiff, Class Counsel, Barbara's Bakery, or Barbara's Bakery's Counsel shall not be deemed to be the drafter of this Agreement or of any particular provision, nor shall they argue that any particular provision should be construed against its drafter or otherwise resort to the *contra proferentem* canon of construction.  All Parties agree that the Parties' counsel drafted this Agreement during and as a result of extensive arm's length negotiations.  No parol or other evidence may be offered to explain, construe, contradict, or clarify its terms, the intent of the Parties or their counsel, or the circumstances under which this Agreement was made or executed.

S.     The headings in this Agreement are inserted merely for the purpose of convenience and shall not affect the meaning or interpretation of this document.

T.     The Parties expressly acknowledge and agree that this Agreement and its exhibits, along with all related drafts, motions, pleadings, conversations, negotiations, and correspondence,

41

constitute an offer of compromise and a compromise within the meaning of Federal Rule of Evidence 408 and any equivalent rule of evidence in any state.  In no event shall this Agreement, any of its provisions or any negotiations, statements, or court proceedings relating to its provisions in any way be construed as, offered as, received as, used as, or deemed to be evidence of any kind in the Action, any other action, or in any judicial, administrative, regulatory, or other proceeding, except in a proceeding to enforce this Agreement or the rights of the Parties or their counsel.  Without limiting the foregoing, neither this Agreement nor any related negotiations, statements, or court proceedings shall be construed as, offered as, received as, used as or deemed to be evidence or an admission or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including, but not limited to, the Released Parties, Plaintiff, or the Class, or as a waiver by the Released Parties, Plaintiff, or the Class of any applicable privileges, claims, or defenses.

U.      Plaintiff expressly affirms that the allegations contained in the complaints filed in the Action were made in good faith and have a basis in fact, but considers it desirable for the Action to be settled and dismissed because of the substantial benefits that the proposed Settlement will provide to Class Members.

V.      The Parties, their successors and assigns, and their counsel undertake to implement the terms of this Agreement in good faith, and to use good faith in resolving any disputes that may arise in the implementation of the terms of this Agreement.

W.      The waiver by one party of any breach of this Agreement by another party shall not be deemed a waiver of any prior or subsequent breach of this Agreement.

X.      If one party to this Agreement considers another party to be in breach of its obligations under this Agreement, that party must provide the breaching party with written notice of the alleged breach and provide a reasonable opportunity to cure the breach before taking any action to enforce any rights under this Agreement.

Y.      The Parties, their successors and assigns, and their counsel agree to cooperate fully with one another in seeking Court approval of this Agreement and to use their best efforts to effect the prompt consummation of this Agreement and the proposed Settlement.

1         Z.     This Agreement may be signed with a facsimile signature and in counterparts, each of

2    which shall constitute a duplicate original.

3         Agreed to on the date indicated below.

4

5    APPROVED AND AGREED TO BY THE PLAINTIFF

6

7
8    BY_____          DATE_____
          RICHARD W. TRAMMELL

9

10   APPROVED AND AGREED TO BY CLASS COUNSEL

11

12   BY_____          DATE_____
          Tina Wolfson
13        AHDOOT & WOLFSON, PC

14

15
     APPROVED AND AGREED TO BY AND ON BEHALF OF
16   BARBARA'S BAKERY, INC.

17
18   BY_____          DATE _April 25, 2013_
     NAME:    STEPHEN VAN TASSEL
19   TITLE:    CEO

20

21   APPROVED AND AGREED TO BY BARBARA'S BAKERY'S COUNSEL

22

23   BY_____          DATE_ 4. 25. 13 _
          Clement L. Glynn
24        GLYNN & FINLEY, LLP

25

26

27

28                            43

Z.     This Agreement may be signed with a facsimile signature and in counterparts, each of which shall constitute a duplicate original.

Agreed to on the date indicated below.

APPROVED AND AGREED TO BY THE PLAINTIFF

BY _____     DATE 24 Apr. 13
    RICHARD W. TRAMMELL

APPROVED AND AGREED TO BY CLASS COUNSEL

BY _____     DATE _____
    Tina Wolfson
    AHDOOT & WOLFSON, PC

APPROVED AND AGREED TO BY AND ON BEHALF OF
BARBARA'S BAKERY, INC.

BY _____     DATE _____
NAME:
TITLE:

APPROVED AND AGREED TO BY BARBARA'S BAKERY'S COUNSEL

BY _____     DATE _____
    Clement L. Glynn
    GLYNN & FINLEY, LLP

43

Z.      This Agreement may be signed with a facsimile signature and in counterparts, each of which shall constitute a duplicate original.

Agreed to on the date indicated below.

APPROVED AND AGREED TO BY THE PLAINTIFF

BY_____          DATE_____
    RICHARD W. TRAMMELL

APPROVED AND AGREED TO BY CLASS COUNSEL

BY_____          DATE_____4/25/13_____
    Tina Wolfson
    AHDOOT & WOLFSON, PC

APPROVED AND AGREED TO BY AND ON BEHALF OF
BARBARA'S BAKERY, INC.

BY_____          DATE_____
NAME:
TITLE:

APPROVED AND AGREED TO BY BARBARA'S BAKERY'S COUNSEL

BY_____          DATE_____
    Clement L. Glynn
    GLYNN & FINLEY, LLP

Case 1:12-cv-02664-CRB Document 37 Filed 04/25/13 Page 1 of 30 PageID #: 1338

**EXHIBIT 1**

| Must Be Postmarked No Later Than **Month XX, 2013** | UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA | For Official Use Only 01 |

## BARBARA'S BAKERY SETTLEMENT CLAIM FORM

To receive a payment, you must accurately complete this Claim Form and submit it by **Month 00, 2013**. Failure to do so will result in a reduction or the denial of your Claim. You will not be given an opportunity to cure or fix any deficiencies in this claim form. Claim Forms may be submitted online at www.BarbarasBakerySettlement.com or by mail to: *Barbara's Bakery Settlement,* P.O. Box XXXX, Faribault, MN 55021-xxxx.

### A. CLASS MEMBER INFORMATION

First Name

Last Name

Street Address

City

State

Zip Code

E-mail Address (optional)

### B. PURCHASE INFORMATION

What is the total amount of your household's purchases of Eligible Products from May 23, 2008 to Month XX, 2013 (see page 2 for the list of Eligible Products)? *Please check the appropriate box:*

☐ More than $100

☐ Between $75.01 and $100

☐ Between $50.01 and $75

☐ Between $25.01 and $50

☐ Between $10.01 and $25

☐ Less than $10

### C. SIGN AND DATE YOUR CLAIM FORM

I declare, under penalty of perjury, that the information in this claim form is true and correct to the best of my knowledge and that I purchased the amount of the Eligible Product(s) claimed above from May 23, 2008 to Month XX, 2013. I understand that my claim form may be subject to audit, verification, and Court review.

| Signature | Type/Print Name | Date |

**Eligible Products**

**Cereals:**
- Brown Rice Crisps (Fruit Juice Sweetened flavor);
- Corn Flakes (Fruit Juice Sweetened flavor);
- High Fiber (Cranberry, Flax & Granola, and Original flavors);
- Hole 'n Oats (Fruit Juice Sweetened or Honey Nut flavors);
- Honest O's (Honey Nut, Multigrain, or Original flavors);
- Organic Apple Cinnamon O's;
- Organic Breakfast O's;
- Organic Brown Rice;
- Organic Brown Rice Crisps;
- Organic Corn Flakes;
- Organic Crispy Wheats;
- Organic Honey Crunch 'N Oats;
- Organic Honey Nut O's;
- Organic Snackimals Cereal (Cinnamon Crunch or Vanilla Blast flavors);

**Cereals:**
- Organic Wild Puffs (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);
- Puffins (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);
- Puffin Puffs (Crunchy Cocoa, or Fruit Medley flavors);
- Shredded Oats (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, Vanilla Almond flavors);
- Shredded Wheat;
- Shredded Spoonfuls (Multigrain or Vanilla Blast flavors);
- Shredded Minis (Blueberry Burst flavor);
- Toasted Oatmeal Flakes (Original flavor); and
- Ultima Organic (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors).

**Cereal Bars:**
- Multigrain Cereal Bars (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors);
- Fruit & Yogurt Bars (Apple Cinnamon, Blueberry Apple, Cherry Apple, or Strawberry Apple or Traditional flavors); and
- Puffins Cereal and Milk Bars (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors).

**Cheese Puffs:**
- Baked Cheese Puffs (Original or White Cheddar flavors); and
- Cheese Puffs (Jalapeno or Original flavors).

**Fig Bars:**
- Fig Bars (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free or Whole Wheat flavors).

**Granola Bars:**
- Crunchy Organic Granola Bars (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors).

**Snackimals Animal Cookies:**
- Snackimals Animal Cookies (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors).

**Organic Mini Cookies:**
- Organic Mini Cookies (Chocolate, Ginger, or Oatmeal flavors).

**Snack Mixes:**
- Bruschetta Snack Mix;
- Honey Cinnamon Snack Mix;
- Honey Mustard Snack Mix; and
- Salsa Snack Mix

**Crackers:**
- Crisp Cookies (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread flavors);
- Go Go Grahams (Chocolate, Cinnamon, Honey, Lemon Ginger flavors);
- Pizza and Cheese Bites; Rite Lite Rounds (Original, Poppy Seed, or Tamari Sesame flavors); and
- Wheatines (Cracked Pepper, Original or Sesame flavors).

**EXHIBIT 2**

3:12-cv-02664-CRB – EXHIBIT TO SETTLEMENT AGREEMENT

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

# If You Bought a Barbara's Bakery Product Any Time From May 23, 2008 to Month 00, 0000

## *You Could Get Up to $100 From a Class Action Settlement*

| **Included Products:** Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies |
| --- |

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

- There is a Settlement in a class action lawsuit that claims Barbara's Bakery violated state laws regarding the marketing and sale of its products (*see* Question 2). Barbara's Bakery denies it did anything wrong.
- Anyone who bought an eligible Barbara's Bakery product, referred to as the "Eligible Products" and listed below under Question 7, from May 23, 2008 to Month 00, 0000 is included in the Settlement. You may be entitled to a refund of up to $100.
- The Settlement will provide $4,000,000 to pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) a special service payment to the Class Representative, and (4) attorneys' fees and costs. Barbara's Bakery has also agreed to change some of its business practices.
- Your legal rights are affected whether you act or not.
- **Read this notice carefully because it explains decisions you must make and actions you must take <u>now</u>.**

| SUMMARY OF YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
| --- | --- |
| **DO NOTHING** | Get no payment. Give up your rights. |
| **SUBMIT A CLAIM FORM** | Submit a Claim Form by **Month 00, 0000** to get a payment (*see* Question 14). |
| **EXCLUDE YOURSELF** | Exclude yourself by **Month 00, 0000** and get no payment from the Settlement. This is the only choice that allows you to ever be part of any other lawsuit against Barbara's Bakery about the claims in this case (*see* Question 17). |
| **OBJECT** | Write to the Court by **Month 00, 0000** about why you don't like the Settlement (*see* Question 22). |
| **GO TO A HEARING** | Ask to speak in Court by **Month 00, 0000** about the fairness of the Settlement (*see* Question 26). |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.
- The Court in charge of this case still has to decide whether to approve the Settlement. If it does, and any appeals are resolved, payments will be distributed to those who qualify. Please be patient.

| **WHAT THIS NOTICE CONTAINS** |
|---|

**BASIC INFORMATION**.................................................................................**3**
    1.   Why was this notice issued?
    2.   What is this lawsuit about?
    3.   Why is this a class action?
    4.   Why is there a Settlement?

**WHO IS PART OF THE SETTLEMENT?**.................................................**3**
    5.   Who is included in the Settlement?
    6.   Are there exceptions to being included?
    7.   Which products are included?
    8.   What if I'm still not sure if I'm included?

**THE SETTLEMENT BENEFITS – WHAT YOU CAN GET**.............................**6**
    9.   What does the Settlement provide?
    10.  What can I get from the Settlement?
    11.  What happens if there are any funds remaining?
    12.  What am I giving up if I stay in the Class?
    13.  When will I get my payment, if any?

**HOW TO RECEIVE A PAYMENT**........................................................**7**
    14.  How can I get a payment?
    15.  What is the claim process?
    16.  What if I do nothing?

**EXCLUDING YOURSELF FROM THE SETTLEMENT**...................................**8**
    17.  How can I get out of the Settlement?
    18.  If I exclude myself, can I still get a payment?
    19.  If I don't exclude myself, can I sue Barbara's Bakery for the same thing later?

**THE LAWYERS REPRESENTING THE CLASS**........................................**9**
    20.  Do I have a lawyer in this case?
    21.  How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT**...................................................**9**
    22.  How can I tell the Court if I do not like the Settlement?
    23.  What is the difference between objecting and asking to be excluded?

**THE COURT'S FAIRNESS HEARING**...................................................**10**
    24.  When and where will the Court decide whether to approve the Settlement?
    25.  Do I have to come to the hearing?
    26.  May I speak at the fairness hearing?

**GETTING MORE INFORMATION**.......................................................**11**
    27.  How can I get more information?

QUESTIONS? VISIT WWW.BARBARASBAKERYSETTLEMENT.COM OR CALL, TOLL-FREE, 1-000-000-0000

# BASIC INFORMATION

| 1.  Why was this notice issued? |
| --- |

The Court authorized this notice because you have a right to know about a proposed Settlement, and about your rights and options, before the Court decides whether to approve the Settlement. You will be informed of the progress of this Settlement and may receive a payment if you are a Class Member and submit a completed and timely Claim Form. This notice explains the lawsuit, the Settlement, and your legal rights. Judge Charles R. Breyer of the United States District Court for the Northern District of California is overseeing this case. The lawsuit is known as *Trammell v. Barbara's Bakery, Inc.,* Case Number 3:12-cv-02664-CRB. The person who sued is called the "Plaintiff." Barbara's Bakery is the "Defendant."

| 2.  What is this lawsuit about? |
| --- |

The lawsuit claims that Barbara's Bakery violated certain state laws and consumer protection statutes regarding the marketing and sale of certain products. For example, Plaintiff claims that Barbara's Bakery misrepresented the nature of certain products to consumers by labeling them as "All Natural." Plaintiff claims that these products contain ingredients that are not "All Natural." Barbara's Bakery denies any and all claims of wrongdoing and does not admit any fault, wrongdoing or liability.

Information about the Settlement is summarized in this notice. More detail is provided in the Settlement Agreement, available at www.BarbarasBakerySettlement.com.

| 3.  Why is this a class action? |
| --- |

In a class action, one or more people called "Class Representatives" (in this case, Plaintiff, Richard Trammell), sue on behalf of themselves and other people who have similar claims. Together, all of these people are "Class Members." One Court resolves the issues for all Class Members in a Class Action, except for those who exclude themselves from the Class (*see* Question 17).

| 4.  Why is there a Settlement? |
| --- |

The Court has not decided in favor of the Plaintiff or Barbara's Bakery. Instead, both sides have agreed to the Settlement. By agreeing to the Settlement, they avoid the costs and uncertainty of a trial, and Class Members receive the benefits described in this notice. The proposed Settlement does not mean that any law was broken or that Barbara's Bakery did anything wrong. The parties believe that the Settlement is fair, reasonable, and adequate and will provide substantial benefit to the Class.

# WHO IS PART OF THE SETTLEMENT?

| 5.  Who is included in the Settlement? |
| --- |

The Class includes all persons or entities that bought the Eligible Products (listed below under Question 7) from Barbara's Bakery U.S. Retailers, Barbara's Bakery, www.barbarasbakery.com, or other third-party retailers from May 23, 2008 through **Month 00, 0000**.

---

**6. Are there exceptions to being included?**

The Settlement does not include:

- Barbara Bakery's board members or executive-level officers, including its attorneys;
- Persons or entities who purchased the Eligible Products primarily for purposes of resale;
- Any claims for personal injury relating to the use of the Eligible Products;
- Distributors or re-sellers of the Eligible Products;
- The judge and magistrate judge and their immediate families presiding over the class action and the Court staff;
- Governmental entities;
- Any person who excludes him or herself from the Class (*see* Question 17); and
- Anyone who purchased the Eligible Products via the Internet or other remote means while not residing in the United States.

---

**7. Which products are included?**

The following Barbara's Bakery products are the Eligible Products:

---

**CEREALS:**

- **BROWN RICE CRISPS** (Fruit Juice Sweetened flavor);
- **CORN FLAKES** (Fruit Juice Sweetened flavor);
- **HIGH FIBER** (Cranberry, Flax & Granola, and Original flavors);
- **HOLE 'N OATS** (Fruit Juice Sweetened or Honey Nut flavors);
- **HONEST O'S** (Honey Nut, Multigrain, or Original flavors);
- **ORGANIC APPLE CINNAMON O'S**;
- **ORGANIC BREAKFAST O'S**;
- **ORGANIC BROWN RICE**;
- **ORGANIC BROWN RICE CRISPS**;
- **ORGANIC CORN FLAKES**;
- **ORGANIC CRISPY WHEATS**;
- **ORGANIC HONEY CRUNCH 'N OATS**;
- **ORGANIC HONEY NUT O'S**;
- **ORGANIC SNACKIMALS CEREAL** (Cinnamon Crunch or Vanilla Blast flavors);
- **ORGANIC WILD PUFFS** (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);
- **PUFFINS** (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);
- **PUFFIN PUFFS** (Crunchy Cocoa or Fruit Medley flavors);
- **SHREDDED OATS** (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, or Vanilla Almond flavors);
- **SHREDDED WHEAT**;
- **SHREDDED SPOONFULS** (Multigrain or Vanilla Blast flavors);
- **SHREDDED MINIS** (Blueberry Burst flavor);
- **TOASTED OATMEAL FLAKES** (Original flavor); and
- **ULTIMA ORGANIC** (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors).

---

| CEREAL BARS: | CHEESE PUFFS: |
|---|---|
| • **MULTIGRAIN CEREAL BARS** (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors); <br> • **FRUIT & YOGURT BARS** (Apple Cinnamon, Blueberry Apple, Cherry Apple, Strawberry Apple, or Traditional flavors); and <br> • **PUFFINS CEREAL AND MILK BARS** (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors). | • **BAKED CHEESE PUFFS** (Original or White Cheddar flavors); and <br> • **CHEESE PUFFS** (Jalapeno or Original flavors). |
| **FIG BARS:** | **GRANOLA BARS:** |
| • **FIG BARS** (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free or Whole Wheat flavors). | • **CRUNCHY ORGANIC GRANOLA BARS** (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors). |
| **SNACKIMALS ANIMAL COOKIES:** | **ORGANIC MINI COOKIES:** |
| • **SNACKIMALS ANIMAL COOKIES** (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors). | • **ORGANIC MINI COOKIES** (Chocolate, Ginger, or Oatmeal flavors). |
| **SNACK MIXES:** | **CRACKERS:** |
| • **BRUSCHETTA SNACK MIX**; <br> • **HONEY CINNAMON SNACK MIX**; <br> • **HONEY MUSTARD SNACK MIX**; and <br> • **SALSA SNACK MIX**. | • **CRISP COOKIES** (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread flavors); <br> • **GO GO GRAHAMS** (Chocolate, Cinnamon, Honey, or Lemon Ginger flavors); <br> • **PIZZA AND CHEESE BITES**; <br> • **RITE LITE ROUNDS** (Original, Poppy Seed, or Tamari Sesame flavors); and <br> • **WHEATINES** (Cracked Pepper, Original, or Sesame flavors). |

## 8. What if I'm still not sure if I'm included?

If you are not sure whether you are a Class Member, or have any other questions about the Settlement, visit the website, www.BarbarasBakerySettlement.com, or call the toll free number, 1-800-000-0000. You may also send questions to the Settlement Administrator at Barbara's Bakery Settlement, P.O. Box 0000, City, ST 00000.

## THE SETTLEMENT BENEFITS – WHAT YOU CAN GET

| 9. What does the Settlement provide? |
|---|

If the Settlement is approved and becomes final, it will provide benefits to Class Members. Barbara's Bakery will pay $4,000,000 to a Settlement Fund to make payments to Class Members who file valid claims (*see* Question 14), as well as to pay for costs associated with the notice and administration of the Settlement, attorneys' fees and costs (*see* Question 21), and a special service payment to the Class Representative (*see* Question 21). The costs of notice and administration are estimated to be $790,000.

In addition, Barbara's Bakery has agreed to change their labeling and advertising of the Eligible Products so as not to make certain claims. For example, Barbara's Bakery will not say that the Eligible Products are "All Natural," have "no artificial additives," have "no artificial flavors," and have "no artificial preservatives." The Settlement Agreement, available at www. BarbarasBakerySettlement.com, has more information.

| 10. What can I get from the Settlement? |
|---|

You can get up to $100 if you submit a valid Claim Form. The amount of your payment will depend on the total amount of money you spent on the Eligible Products at any time from May 23, 2008 until **Month 00, 0000** as follows:

| IF YOU SPENT: | YOU COULD RECEIVE A MAXIMUM OF: |
|---|---|
| More than $100.00 | $100.00 |
| $75.01 to $100.00 | $75.00 |
| $50.01 to $75.00 | $50.00 |
| $25.01 to $50.00 | $25.00 |
| $10.01 to $25.00 | $10.00 |
| $10.00 or less | $5.00 |

Payment amounts may be adjusted to ensure that all eligible Class Members receive a payment, as follows: If the total value of all approved claims is <u>greater</u> than the amount of money available to pay claims (after costs and fees have been deducted), eligible Class Members' payments will be reduced proportionally.

The actual amount available for each eligible Class Member will not be determined until after **Month 00, 0000** and all Claims Forms have been received, and may not be determined until after the Settlement is final.

---

**11. What happens if there are any funds remaining?**

If there are any funds remaining after all claims are processed, those funds will be distributed to the following non-profit organizations: Consumers Union (www.consumersunion.org) and Action for Healthy Kids (www.actionforhealthykids.org). No remaining funds will be returned to Barbara's Bakery.

---

**12. What am I giving up if I stay in the Class?**

Unless you exclude yourself from the Settlement, you can't sue Barbara's Bakery or be part of any other lawsuit against Barbara's Bakery about the issues in this case. Unless you exclude yourself, all of the decisions by the Court will bind you. The Settlement Agreement is available at www.BarbarasBakerySettlement.com and describes the claims that you give up if you remain in the Settlement.

---

**13. When will I get my payment, if any?**

Class Members who submit valid claims will receive their payments only after the Court grants final approval to the Settlement and after any appeals are resolved (*see* "The Court's Fairness Hearing" below). If there are appeals, resolving them can take time. Please be patient.

## HOW TO RECEIVE A PAYMENT

---

**14. How can I get a payment?**

To get a payment under the Settlement, you must send in a Claim Form. You may access a Claim Form and other relevant documents at www.BarbarasBakerySettlement.com. A Claim Form also is attached to this Notice. Please read the instructions carefully, and fill out the form completely and accurately. Claim Forms can be submitted two ways: electronically or by mail. Your Claim Form must be submitted electronically no later than **Month 00, 0000** or by mail postmarked no later than **Month 00, 0000** and addressed to:

Barbara's Bakery Settlement
P.O. Box 0000
City, ST 00000

---

**15. What is the claim process?**

The Settlement Administrator will review each Claim Form. Proofs of purchase are not initially required. However, in some cases you may be asked to verify your purchase(s) of any of the Eligible Products, by providing receipt(s) or other documentation. If you do not respond to these requests, it may result in the denial of your claim. You will have 35 days from the date of the Settlement Administrator's request to provide your documentation.

---

**16. What if I do nothing?**

If you are a Class Member and you do nothing, you will <u>not</u> get any payment from the Settlement and you will be bound by the Court's decisions, including the Settlement's release and waiver of claims you may have against Barbara's Bakery that related to the claims made in the lawsuit. To receive a payment, you must complete and submit a Claim Form (*see* Question 14).

QUESTIONS? VISIT WWW.BARBARASBAKERYSETTLEMENT.COM OR CALL, TOLL-FREE, 1-000-000-0000

# EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from this Settlement, but you want to keep the right to sue or continue to sue Barbara's Bakery on your own about the legal issues in this case, then you must take steps to get out of the Class. This is called excluding yourself – or it is sometimes referred to as "opting out" of the Class.

### 17. How can I get out of the Settlement?

To exclude yourself from the Class, you must mail a letter or written request to the Settlement Administrator. Your request must include:

1. Your name, address, and telephone number;
2. A statement that you wish to be excluded from the Class in *Trammell v. Barbara's Bakery, Inc.,* Case Number 3:12-cv-02664; and
3. Your signature (you must personally sign the letter).

Please write "exclusion request" on the lower left-hand corner of the front of the envelope.

Your exclusion request must be postmarked no later than **Month 00, 0000**. Send your request to:

Barbara's Bakery Settlement
P.O. Box 0000
City, ST 00000

### 18. If I exclude myself, can I still get a payment?

No. You will not get a payment if you exclude yourself from the Settlement. If you request exclusion from the Class, then for each of the excluded Eligible Products:

- You will not be eligible for payment under the proposed Settlement;
- You will not be allowed to object to the terms of the proposed Settlement, and
- You will not be bound by any subsequent rulings entered in this case if the proposed Settlement is finally approved.

### 19. If I don't exclude myself, can I sue Barbara's Bakery for the same thing later?

No. If the Court approves the proposed Settlement and you do not exclude yourself from the Class, you give up (or "release") all claims that have been or could have been made in this lawsuit relating to the Eligible Products.

As part of this Settlement, the Court has preliminary stopped all Class Members and/or their representatives (who do not timely exclude themselves from the Class) from filing, participating in, or continuing litigation against Barbara's Bakery (or against any of its related parties or affiliates), and/or from receiving any benefits from any other lawsuit relating to the claims being resolved in this case.

Upon final approval of the Settlement, Plaintiffs and Barbara's Bakery will ask the Court to enter a permanent ruling forbidding all Class Members and/or their representatives and/or personnel from engaging in the activities described above. All Class Members will be bound by this order.

## THE LAWYERS REPRESENTING THE CLASS

### 20. Do I have a lawyer in this case?

The Court has appointed attorneys at the law firm of Ahdoot & Wolfson, P.C. to represent you and the other Class Members in this lawsuit. The lawyers representing you and the Class Members are called "Class Counsel." You will not be charged for the services of these lawyers.

You may contact Class Counsel as follows:

Robert Ahdoot / Tina Wolfson
Ahdoot & Wolfson, PC
2355 Westwood Boulevard, #337
Los Angeles, CA 90064-2109
classactioncounsel@gmail.com
Telephone: 888-333-8996

You have the right to retain your own lawyer to represent you in this case, but you are not obligated to do so. If you do hire your own lawyer, you will have to pay his or her fees and expenses. You also have the right to represent yourself before the Court without a lawyer.

### 21. How will the lawyers be paid?

Class Counsel have not been paid anything to date for their work on this case. Class Counsel will request attorneys' fees and expenses of up to $1,000,000 to be paid out of the $4,000,000 Settlement Fund. The attorneys' motion(s) for fees, costs, and expenses and Class Representative payment will be filed on or before **Month 00, 0000**. The motion(s) will be posted on the website at www.BarbarasBakerySettlement.com.

Class Counsel will also ask the Court for a special service payment of up to $2,500 for the Class Representative, Richard W. Trammell, for his work on behalf of the Class. Any special service payment will also be paid out of the $4,000,000 Settlement Fund.

## OBJECTING TO THE SETTLEMENT

You have the right to tell the Court that you do not agree with the Settlement or any or all of its terms.

### 22. How can I tell the Court if I do not like the Settlement?

If you choose to remain a Class Member, you have a right to object to any part of the proposed Settlement. The Court will consider your views.

To object, you must send a letter stating that you object to *Richard W. Trammell v. Barbara's Bakery, Inc.,* Case Number 3:12-cv-02664. Your written objection must also include:

1. Your name, address, and telephone number;
2. A written statement of your objection(s), including any legal support and/or any supporting evidence you wish to introduce;
3. A statement of whether you intend to appear and speak at the Fairness Hearing; and
4. Your signature.

**QUESTIONS? VISIT WWW.BARBARASBAKERYSETTLEMENT.COM OR CALL, TOLL-FREE, 1-000-000-0000**

If you choose to object, in order to be considered by the Court, your written objections must be filed with the Court by **Month 00, 0000** and mailed to each of the following three addresses, postmarked by **Month 00, 0000**:

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of the Court<br>United States District Court<br>Northern District of California<br>Phillip Burton Federal Building<br>& United States Courthouse<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 | Robert Ahdoot<br>Tina Wolfson<br>Ahdoot & Wolfson, P.C.<br>2355 Westwood Boulevard, #337<br>Los Angeles, CA 90064-2109 | Clement L. Glynn<br>Glynn & Finley LLP<br>100 Pringle Avenue<br>Suite 500<br>Walnut Creek, CA 94596 |

**23. What is the difference between objecting and asking to be excluded?**

Objecting is simply a way of telling the Court that you don't like something about the Settlement. You can only object if you stay in the Class. You will also be bound by any subsequent rulings in this case and you will not be able to file or participate in any other lawsuit based upon or relating to the claims of this lawsuit. If you object to the Settlement, you still remain a Class Member and you will still be eligible to submit a Claim Form. Excluding yourself is telling the Court that you don't want to be a part of the Class. If you exclude yourself, you have no basis to object to the Settlement and appear at the Fairness Hearing because it no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a final hearing (called a Fairness Hearing) to decide whether to finally approve the Settlement. You may attend and ask to speak, but you don't have to.

**24. When and where will the Court decide whether to approve the Settlement?**

On **Month 00, 0000 at 00:00 x.m.** the Court will hold a Fairness Hearing at the United States District Court for the Northern District of California, before the Honorable Charles R. Breyer, Senior District Judge, in Courtroom 6, Phillip Burton Federal Building & United States Courthouse, 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102.

The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.BarbarasBakerySettlement.com for updates. At this hearing the Court will consider whether the Settlement is fair, reasonable, and adequate. The Court will also decide whether to award attorneys' fees and costs, as well as a special payment to the Class Representative. If there are objections, the Court will consider them at that time. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

**25. Do I have to come to the hearing?**

No. Class Counsel will answer questions the Court may have at the Fairness Hearing. But you are welcome to come at your own expense. Please note that the Court has the right to change the date and/or time of the Fairness Hearing without further notice. If you are planning to attend the hearing, you should confirm the date and time before going to the Court.

## 26. May I speak at the fairness hearing?

Yes, you may ask the Court for permission to speak at the hearing. To do so, you must file a document called a "Notice of Intention to Appear." If you or your attorney wants to appear and speak at the Fairness Hearing, you (or your attorney) must mail a Notice of Intention to Appear at the Fairness Hearing to the addresses listed above in Question 22. Your Notice of Intention to Appear at the Fairness Hearing must be filed and received by the Court, Barbara's Bakery's Counsel, and Class Counsel no later than **Month 00, 0000**.

# GETTING ADDITIONAL INFORMATION

## 27. How can I get more information?

This notice summarizes the proposed Settlement. More details are in the Settlement Agreement. For a complete, definitive statement of the Settlement terms, refer to the Settlement Agreement at www.BarbarasBakerySettlement.com. You also may write with questions to the Settlement Administrator at Barbara's Bakery Settlement, P.O. Box 0000, City, ST 00000 or call the toll-free number, 1-800-000-0000.

## PLEASE DO NOT CALL THE COURT

Dated: **Month 00, 0000**                    Clerk of the Court for the United States
                                             District Court for the Northern District of California

Case 1:12-cv-02664-CRB Document 237-8 Filed 05/04/25 Page 1 of 30 PageID #: 1353

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RICHARD W. TRAMMELL,<br><br>Plaintiff,<br><br>v.<br><br>BARBARA'S BAKERY, INC., *et al.*,<br><br>Defendants. | Case No. 3:12-cv-02664-CRB<br><br>**FINAL ORDER APPROVING CLASS ACTION SETTLEMENT**<br><br>Honorable Charles R. Breyer, Presiding |

This motion for final approval, having been brought before the Court jointly by the Parties, the Parties having entered into a Settlement Agreement, with its attached exhibits, (collectively, the "Settlement Agreement"), signed and filed with this Court on _____, 2013, to settle *Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664-CRB (the "Action"); and

The Court having entered an Order dated [DATE_____] (the "Preliminary Approval Order"), preliminarily certifying the putative class in this action for settlement purposes only under Fed. R. Civ. P. 23(a) and (b)(3), ordering individual and publication notice to potential Class Members, scheduling a Fairness Hearing for [DATE_____], providing potential Class Members with an opportunity either to exclude themselves from the Settlement Class or to object to the proposed settlement and issuing related Orders; and the Court having held a Fairness Hearing on [DATE_____] to determine whether to grant final approval of the proposed settlement and issue related relief; and

The Court having considered the papers submitted by the Parties and by all other persons who timely submitted papers in accordance with the Preliminary Approval Order, and having heard oral presentations by the Parties and all persons who complied with the Preliminary Approval Order, and based on all of the foregoing, together with this Court's familiarity with the Action, it is hereby **ORDERED, ADJUDGED, AND DECREED** as follows:

1.  **Incorporation of Other Documents**.  This Final Order Approving Class Action Settlement incorporates and makes a part hereof: (a) the Settlement Agreement, including all amendments and exhibits thereto, and definitions included therein, which was signed and filed with this Court on _____, 2013; (b) the briefs, affidavits, declarations, and other materials filed in support of the settlement and Class Counsel's request for an award of attorneys' fees and reimbursement of expenses; (c) the record at the Fairness Hearing; (d) the documents listed on the docket sheet or otherwise submitted to the Court; and (e) all prior proceedings in the Action.

2.  **Jurisdiction**.  Because due, adequate, and the best practicable notice has been disseminated and all potential Class Members have been given the opportunity to exclude themselves from or object to this class action settlement, the Court has personal jurisdiction over all Class Members (as defined below).  The Court has subject-matter jurisdiction over the claims asserted in the

complaint and/or the Action pursuant to 28 U.S.C. §§ 1332 and 1367, including, without limitation, jurisdiction to approve the proposed settlement and the Settlement Agreement and all exhibits attached thereto, grant final certification to the Class, dismiss the Action on the merits and with prejudice, and issue related orders. The Court finds that venue is proper in this district pursuant to 28 U.S.C. § 1391.

3.  **Final Class Certification**. The Class preliminarily certified by this Court is hereby finally certified for settlement purposes only under Fed. R. Civ. P. 23(a), (b)(3), and (c)(2), the Court finding that the Class fully satisfies all the applicable requirements of Fed. R. Civ. P. 23 and due process. The Class shall consist of all persons who, during the Class Period, May 23, 2008 to [DATE_____], purchased in the United States any Eligible Products (as this term is defined in the Settlement Agreement). Excluded from the Class are: (a) Barbara's Bakery board members or executive-level officers, including its attorneys; (b) persons who purchased the Eligible Products primarily for the purpose of resale; (c) retailers or re-sellers of the Eligible Products; (d) governmental entities; (e) persons who timely and properly exclude themselves from the Class as provided in the Agreement; (f) persons who purchased the Eligible Products via the Internet or other remote means while not residing in the United States; and (g) the Court, the Court's immediate family, and Court staff.

4.  **Requests for Exclusion**. The Court finds that only those persons and entities listed in Exhibit __ to the Declaration of [_____ of the Settlement Administrator] and filed with the Court have submitted timely and valid requests for exclusion from the Class and are therefore not bound by this Final Order and accompanying Final Judgment. Attached hereto as Exhibit A is the list of persons or entities who submitted timely and valid requests for exclusion from the Class. Class Counsel and Barbara's Bakery's Counsel may mutually agree to allow additional Class Members to exclude themselves or to withdraw their exclusion requests by filing an appropriate notice with the Court.

5.  **Adequacy of Representation**. Class Plaintiff Richard W. Trammell has adequately represented the Settlement Class for purposes of entering into and implementing the Settlement. Tina Wolfson and Robert Ahdoot, of Ahdoot & Wolfson, PC, are experienced and adequate Class Counsel. Class Plaintiff and Class Counsel have satisfied the requirements of Fed. R. Civ. P. 23(a)(4) and 23(g).

2

6. **Class Notice**. The Court finds that the dissemination of the Class Notice, the publication of the Summary Settlement Notice, the establishment of a website containing settlement-related materials, the establishment of a toll-free telephone number, and all other notice methods set forth in the Settlement Agreement and the Notice Administrator's Declaration and the notice dissemination methodology implemented pursuant to the Settlement Agreement and this Court's Preliminary Approval Order, as described in the Notice Administrator's Declaration, a copy of which is incorporated herein and made a part hereof:

a. constituted the best practicable notice to Class Members under the circumstances of the Action;

b. constituted notice that was reasonably calculated, under the circumstances, to apprise Class Members of (i) the pendency of this action; (ii) the terms of the proposed settlement; (iii) their rights under the proposed settlement; (iv) their right to exclude themselves from the Class and the proposed settlement; (v) their right to object to any aspect of the proposed settlement (including, but not limited to, final certification of the Settlement Class, the fairness, reasonableness, or adequacy of the proposed settlement, the adequacy of the Class's representation by Plaintiff or Class Counsel, and/or the award of attorneys' fees); (vi) their right to appear at the Fairness Hearing – either on their own or through counsel hired at their own expense – if they did not exclude themselves from the Class; and (vii) the binding effect of the Orders and Judgment in this action, whether favorable or unfavorable, on all persons who did not request exclusion from the Class;

c. constituted notice that was reasonable, due, adequate, and sufficient notice to all persons and entities entitled to be provided with notice; and

d. constituted notice that met all applicable requirements of the Federal Rules of Civil Procedure, 28 U.S.C. §1715, the Due Process Clause of the United States Constitution, and any other applicable law, as well as complied with the Federal Judicial Center's illustrative class action notices.

7. **Final Settlement Approval**. The terms and provisions of the proposed settlement and Settlement Agreement, including all exhibits, have been entered into in good faith and are hereby fully and finally approved as fair, reasonable, and adequate as to, and in the best interests of, each of the

Parties and the Class Members, and in full compliance with all applicable requirements of the Federal Rules of Civil Procedure, the Class Action Fairness Act (P.L. 109-2), the United States Constitution (including the Due Process Clause), and any other applicable law. The settlement is approved and all objections to the settlement are overruled as without merit. The Parties and Class Members are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions. Class Counsel shall take all steps necessary and appropriate to provide Class Members with the benefits to which they are entitled under the terms of the Settlement Agreement.

8. **Early Implementation**. Barbara's Bakery and Class Counsel are hereby authorized, and without requiring further approval of this Court, to implement the settlement before the Final Settlement Date (as defined in the Settlement Agreement), in which case all provisions of the Settlement Agreement specifying actions to be taken on or after the Final Settlement Date shall, to the extent necessary, be deemed to provide that those actions shall be taken on or after the date the Parties elect to implement the settlement.

9. **Binding Effect**. The terms of the Settlement Agreement and of this Final Order and the accompanying Final Judgment shall be forever binding on Plaintiff, Barbara's Bakery, and all Class Members, as well as their heirs, executors and administrators, predecessors, successors and assigns, and those terms shall have *res judicata* and other preclusive effect in all pending and future claims, lawsuits, or other proceedings maintained by or on behalf of any such persons, to the extent those claims, lawsuits, or other proceedings involve matters that were or could have been raised in the Action or are otherwise encompassed by the Release.

10. **Release**. The Release, which is set forth in Section VIII of the Settlement Agreement, is expressly incorporated herein in all respects, including all defined terms used therein, is effective as of the date of this Final Order and the accompanying Final Judgment, and forever discharges the Released Parties from any claims or liabilities arising from or related to the Release.

11. **Permanent Injunction**. All Class Members and/or their representatives who have not been timely excluded from the Class are hereby permanently barred and enjoined from bringing, filing, commencing, prosecuting, maintaining, intervening in, participating in, continuing, or receiving any benefits from, as class members or otherwise, any lawsuit (including putative class actions),

4

arbitration, administrative, regulatory, or other proceeding in any jurisdiction that is covered by the Release. All Class Members and all persons in active concert or participation with Class Members are permanently barred and enjoined from organizing or soliciting the participation of any Class Members who did not timely exclude themselves from the Class into a separate class or group for purposes of pursuing a putative class action, any claim, or lawsuit in any jurisdiction that is covered by the Release. Pursuant to 28 U.S.C. §§1651(a) and 2283, the Court finds that issuance of this permanent injunction is necessary and appropriate in aid of the Court's continuing jurisdiction and authority over the Action.

12. **Enforcement of Settlement**. Nothing in this Final Order or in the accompanying Final Judgment shall preclude any action to enforce the terms of the Settlement Agreement; nor shall anything in this Final Order or in the accompanying Final Judgment preclude Plaintiff or other Class Members from participating in the Claim Process described in the Settlement Agreement if they are entitled to do so under the terms of the Settlement Agreement.

13. **Attorneys' Fees and Expenses**. Class Counsel are hereby awarded attorneys' fees and reimbursement of their disbursements and expenses in the amount of $_____, which amount is approved as fair and reasonable, pursuant to Fed. R. Civ. P. 23(h) and is in accordance with the terms of the Settlement Agreement. The Court finds that the above stated award of attorneys' fees is fair and reasonable in consideration of, among other things, the efforts of Class Counsel and the settlement they achieved for the Class, and that the amount of expenses is reasonable and were reasonably incurred in the course of the litigation. Class Counsel, in their discretion, shall allocate and distribute this award of attorneys' fees and expenses among Plaintiff's Counsel. All objections to Class Counsel's request for an award of attorneys' fees and reimbursement of expenses are hereby overruled.

14. **Incentive Award**. The Court hereby awards $_____ to Plaintiff Richard W. Trammell as an incentive award in his capacity as a representative Plaintiff in the Action.

15. **No Other Payments**. The preceding two paragraphs of this Final Order cover, without limitation, any and all claims against the Released Parties for attorneys' fees and expenses, costs, or disbursements incurred by Class Counsel or any other counsel representing Plaintiff or Class

5

Members, or incurred by Plaintiff or the Class Members, or any of them, in connection with or related in any manner to the Action, the settlement of the Action, the administration of such settlement, and/or the Release, except to the extent otherwise specified in this Final Order and accompanying Final Judgment and the Settlement Agreement. Plaintiff is not precluded from seeking attorneys' fees, expenses, costs, or disbursements from an objecting Class Member or his or her counsel (and not Barbara's Bakery or its counsel) in connection with an appeal filed by an objecting Class Member.

16. **Modification of Settlement Agreement**. The Parties are hereby authorized, without needing further approval from the Court, to agree to and adopt such amendments to, and modifications and expansions of, the Settlement Agreement, and all exhibits attached, as are consistent with this Final Order and the accompanying Final Judgment and do not limit the rights of Class Members under the Settlement Agreement.

17. **Retention of Jurisdiction**. The Court has jurisdiction to enter this Final Order and the accompanying Final Judgment. Without in any way affecting the finality of this Final Order and/or the accompanying Final Judgment, this Court expressly retains jurisdiction as to all matters relating to the administration, consummation, enforcement, and interpretation of the Settlement Agreement and of this Final Order and the accompanying Final Judgment, and for any other necessary purpose, including, without limitation:

a. enforcing the terms and conditions of the Settlement Agreement and resolving any disputes, claims, or causes of action that, in whole or in part, are related to or arise out of the Settlement Agreement, this Final Order, or the accompanying Final Judgment (including, without limitation, whether a person or entity is or is not a Class Member and whether claims or causes of action allegedly related to this case are or are not barred by this Final Order and the accompanying Final Judgment);

b. entering such additional Orders as may be necessary or appropriate to protect or effectuate this Final Order and the accompanying Final Judgment, dismissing all claims on the merits and with prejudice, and permanently enjoining Class Members from initiating or pursuing related proceedings, or to ensure the fair and orderly administration of this settlement; and

c.   entering any other necessary or appropriate Orders to protect and effectuate this Court's retention of continuing jurisdiction; provided, however, that nothing in this paragraph is intended to restrict the ability of the Parties to exercise their rights under paragraphs 8 and 16 or as otherwise provided in the Settlement Agreement.

18.   **No Admissions**.  Neither this Final Order, the accompanying Final Judgment, nor the Settlement Agreement (nor any other document referred to herein, nor any action taken to carry out this Final Order or the accompanying Final Judgment) is, may be construed as, or may be used as an admission or concession by or against Barbara's Bakery or the Released Parties of the validity of any claim or defense or any actual or potential fault, wrongdoing, or liability whatsoever Barbara's Bakery continues to deny that the Action meets the requisites for class certification under Fed. R. Civ. P. 23 for any purpose other than settlement.  Entering into or carrying out the Settlement Agreement, and any negotiations or proceedings related to it, shall not in any event be construed as, or deemed evidence of, an admission or concession as to Barbara's Bakery's denials or defenses and shall not be offered or received in evidence in any action or proceeding against any Party hereto in any court, administrative agency, or other tribunal for any purpose whatsoever, except as evidence of the settlement or to enforce the provisions of this Final Order, the accompanying Final Judgment, and the Settlement Agreement; provided, however, that this Final Order, the accompanying Final Judgment, and the Settlement Agreement may be filed in any action against or by Barbara's Bakery or the Released Parties to support a defense of *res judicata*, collateral estoppel, release, waiver, good-faith settlement, judgment bar or reduction, full faith and credit, or any other theory of claim preclusion, issue preclusion, similar defense, or counterclaim.

19.   **Dismissal of Action**.  The Action (including all individual and Class claims presented therein) are hereby dismissed on the merits and with prejudice, without fees or costs to any Party except as otherwise provided in this Order and the accompanying Final Judgment and the Settlement Agreement.

_____
Honorable Charles R. Breyer
UNITED STATES DISTRICT JUDGE

7

1        Exhibit A – List of persons who Requested Exclusion

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 1:12-cv-02664-CRB Document 37-4 Filed 04/25/13 Page 152 of 330 PageID #: 1363

**EXHIBIT 4**

3:12-cv-02664-CRB – EXHIBIT TO SETTLEMENT AGREEMENT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RICHARD W. TRAMMELL, | Case No. 3:12-cv-02664-CRB |
| Plaintiff, | **FINAL JUDGMENT** |
| v. | |
| BARBARA'S BAKERY, INC., *et al.*, | Honorable Charles R. Breyer, Presiding |
| Defendants. | |

IT IS on this _____ day of _____, 2013, HEREBY ADJUDGED AND DECREED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 58 THAT:

1.  The settlement of this class action on the terms set forth in the Parties' Settlement Agreement, with exhibits (collectively, the "Settlement Agreement"), and definitions included therein, signed and filed with this Court on _____, 2013, is finally approved, and the following class is granted final certification for settlement purposes only under Fed. R. Civ. P. 23(a) and (b)(3): all persons who, during the Class Period, May 23, 2008 to [DATE_____], purchased in the United States any Eligible Products. "Eligible Products" means any of the following Barbara's Bakery, Inc.'s ("Barbara's Bakery") products:

**A.   Cereals:**

    i.     BROWN RICE CRISPS (Fruit Juice Sweetened flavor);

    ii.    CORN FLAKES (Fruit Juice Sweetened flavor);

    iii.   HIGH FIBER (Cranberry, Flax & Granola, or Original flavors);

    iv.   HOLE 'N OATS (Fruit Juice Sweetened or Honey Nut flavors);

    v.    HONEST O'S (Honey Nut, Multigrain, or Original flavors);

    vi.   ORGANIC APPLE CINNAMON O'S;

    vii.  ORGANIC BREAKFAST O'S;

    viii. ORGANIC BROWN RICE;

    ix.   ORGANIC BROWN RICE CRISPS;

    x.    ORGANIC CORN FLAKES;

    xi.   ORGANIC CRISPY WHEATS;

    xii.  ORGANIC HONEY CRUNCH 'N OATS;

    xiii. ORGANIC HONEY NUT O'S;

    xiv. ORGANIC SNACKIMALS CEREAL (Cinnamon Crunch or Vanilla Blast flavors);

    xv.  ORGANIC WILD PUFFS (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);

    xvi. PUFFINS (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);

1

xvii.  PUFFIN PUFFS (Crunchy Cocoa or Fruit Medley flavors);

xviii.  SHREDDED OATS (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, or Vanilla Almond flavors);

xix.  SHREDDED WHEAT;

xx.  SHREDDED SPOONFULS (Multigrain or Vanilla Blast flavors);

xxi.  SHREDDED MINIS (Blueberry Burst flavor);

xxii.  TOASTED OATMEAL FLAKES (Original flavor); and

xxiii.  ULTIMA ORGANIC (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors).

B.  **Cereal Bars**:

i.  MULTIGRAIN CEREAL BARS (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors);

ii.  FRUIT & YOGURT BARS (Apple Cinnamon, Blueberry Apple, Cherry Apple, Strawberry Apple, or Traditional flavors); and

iii.  PUFFINS CEREAL AND MILK BARS (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors).

C.  **Cheese Puffs**:

i.  BAKED CHEESE PUFFS (Original or White Cheddar flavors); and

ii.  CHEESE PUFFS (Jalapeno or Original flavors).

D.  **Fig Bars:**

i.  FIG BARS (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free, or Whole Wheat flavors).

E.  **Granola Bars**:

i.  CRUNCHY ORGANIC GRANOLA BARS (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors).

F.  **Snackimals Animal Cookies**:

i.  SNACKIMALS ANIMAL COOKIES (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors).

2

G. **Organic Mini-Cookies**:

    i.    ORGANIC MINI COOKIES (Chocolate, Ginger, or Oatmeal flavors).

H. **Snack Mixes**:

    i.    BRUSCHETTA SNACK MIX;

    ii.    HONEY CINNAMON SNACK MIX;

    iii.    HONEY MUSTARD SNACK MIX; and

    iv.    SALSA SNACK MIX.

I. **Crackers**:

    i.    CRISP COOKIES (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread flavors);

    ii.    GO GO GRAHAMS (Chocolate, Cinnamon, Honey, or Lemon Ginger flavors);

    iii.    PIZZA AND CHEESE BITES;

    iv.    RITE LITE ROUNDS (Original, Poppy Seed, or Tamari Sesame flavors); and

    v.    WHEATINES (Cracked Pepper, Original, or Sesame flavors).

2.    The Court finds that only those persons and entities listed in Exhibit ___ to the Declaration of _____ and filed with the Court, a copy of which is attached hereto as Exhibit A, have submitted timely and valid requests for exclusion from the Class and are therefore not bound by this Final Judgment and accompanying Final Order. Class Counsel and Barbara's Bakery's Counsel may mutually agree to allow additional Class Members to exclude themselves or to withdraw their exclusion requests by filing an appropriate notice with the Court.

3.    The Class Notice, the Summary Settlement Notice, the website, the toll-free telephone number, all other notices in the Settlement Agreement, the Declaration of the Notice Administrator, and the notice methodology implemented pursuant to the Settlement Agreement: (a) constituted the best practicable notice under the circumstances; (b) constituted notice that was reasonably calculated to apprise Class Members of the pendency of the Action, the terms of the settlement, and their rights under the settlement, including, but not limited to, their right to object to or exclude themselves from the proposed settlement and to appear at the Fairness Hearing; (c) were reasonable and constituted due, adequate, and sufficient notice to all persons entitled to receive notice; and (d) met all applicable

3

requirements of law, including, but not limited to, the Federal Rules of Civil Procedure, 28 U.S.C. §1715, and the Due Process Clause(s) of the United States Constitution, as well as complied with the Federal Judicial Center's illustrative class action notices.

4.   The claims in *Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664-CRB (the "Action") are dismissed on the merits and with prejudice according to the terms (including the Release) set forth in the Parties' Settlement Agreement and in the Court's Final Order Approving Class Action Settlement, (the "Final Approval Order"), without costs to any party except as provided in the Final Approval Order.

5.   All Class Members and/or their representatives who have not been timely excluded from the Class are permanently barred and enjoined from bringing, filing, commencing, prosecuting, maintaining, intervening in, participating (as class members or otherwise) in, or receiving any benefits from any other lawsuit (including putative class action lawsuits), arbitration, administrative, regulatory, or other proceeding, order, or cause of action in law or equity in any jurisdiction that is covered by the Release.  In addition, all Class Members and all persons in active concert or participation with Class Members are permanently barred and enjoined from organizing Class Members who have not been excluded from the Class into a separate class for purposes of pursuing, as a purported class action, any lawsuit (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action) that is covered by the Release. Pursuant to 28 U.S.C. §§1651(a) and 2283, the Court finds that issuance of this permanent injunction is necessary and appropriate in aid of the Court's continuing jurisdiction and authority over the Action.

6.   Class Counsel shall take all steps necessary and appropriate to provide Class Members with the benefits to which they are entitled under the terms of the Settlement Agreement and pursuant to the Orders of the Court.

7.   Class Counsel shall be awarded $_____ in attorneys' fees and expenses, which amount is approved as fair and reasonable, in accordance with the terms of the Settlement Agreement.

8.   Plaintiff Richard W. Trammell shall be awarded $_____ as an incentive award in his capacity as a representative Plaintiff in the Action.

4

9.     The Court will retain continuing jurisdiction over the Action for the reasons and purposes set forth in this Court's Final Approval Order.

_____
Honorable Charles R. Breyer
UNITED STATES DISTRICT JUDGE

Exhibit A – List of persons who Requested Exclusion

Case 1:12-cv-02664-CRB Document 84-2 Filed 05/04/25 Page 160 of 330 PageID #:

**EXHIBIT 5**

3:12-cv-02664-CRB – EXHIBIT TO SETTLEMENT AGREEMENT

1

2

3

4

5

6

7

8

9

10

11          **UNITED STATES DISTRICT COURT**

12          **NORTHERN DISTRICT OF CALIFORNIA**

13

14   RICHARD W. TRAMMELL,              Case No. 3:12-cv-02664-CRB

15          Plaintiff,                 **[PROPOSED] ORDER PRELIMINARILY
                                        CERTIFYING A CLASS FOR SETTLEMENT**
16      v.                             **PURPOSES, PRELIMINARILY APPROVING
                                        THE CLASS SETTLEMENT, APPOINTING**
17   BARBARA'S BAKERY, INC., *et al.*,  **CLASS COUNSEL, DIRECTING ISSUANCE OF
                                        NOTICE TO THE CLASS, SCHEDULING A**
18          Defendants.                **FAIRNESS HEARING, AND ISSUING RELATED
                                        ORDERS**
19

20

21                                      Honorable Charles R. Breyer, Presiding

22

23

24

25

26

27

28

WHEREAS:

This motion was brought before the Court by Plaintiff Richard W. Trammell ("Plaintiff");

*Trammell v. Barbara's Bakery, Inc.*, No. 3:12-cv-02664-CRB, originally was filed on May 23, 2012 in the United States District Court for the Northern District of California (the "Action");

The Action alleges, on behalf of a nationwide class of consumers, that Barbara's Bakery violated California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §17200, *et seq.*, False Advertising Law ("FAL"), Bus. & Prof. Code §17500, *et seq.*, Consumers Legal Remedies Act ("CLRA"), Civ. Code §1770, *et seq.*, and breached an express warranty;

A first amended complaint was filed on June 28, 2012, and a second amended complaint was filed on January 30, 2013. The amended complaints allege causes of action identical to the original complaint, and re-alleged Barbara's Bakery's, Inc.'s ("Barbara's Bakery") violations of California's consumer protection laws;

Barbara's Bakery filed an answer to the first amended complaint on July 19, 2012, in which it expressly denied any and all wrongdoing alleged in the action, and neither admitted nor conceded any actual or potential fault, wrongdoing, or liability in connection with any facts or claims that have been or could have been alleged against it in this action. Barbara's Bakery filed an answer to the second amended complaint on February 5, 2013, which was substantively identical to the original answer;

Class Counsel has conducted a thorough examination, investigation, and evaluation of the relevant law, facts, and allegations to assess the merits of the claims and potential claims to determine the strength of both defenses and liability sought in the Action;

Class Counsel, on behalf of Plaintiff and the other members of the Class, engaged in extensive discovery. In particular, Barbara's Bakery has produced the following documentation regarding the Eligible Products: (i) label design and product formulation; (ii) marketing, advertising, media, and public relations; and (iii) financial information. In total, Plaintiff's Counsel was given access to over thirty (30) banker's boxes of documents and approximately seventy (70) Gigabytes (GB) of data. Class Counsel also conducted interviews of primary Barbara's Bakery's corporate witnesses who have been involved with the Eligible Products to address the following subjects: (i) sales and marketing; (ii) labeling; (iii) finance; (iv) document collection and retention; and (v) Barbara's Bakery's efforts to

2

eliminate GMO ingredients from its products. Before entering into this Settlement Agreement, Class Counsel conducted a thorough examination and evaluation of the relevant law, facts, and allegations to assess the merits of the claims and could reasonably assess the strength of Plaintiff's claims and Barbara's Bakery's liability, including its defenses; and

The Parties having entered into a Settlement Agreement in which the Parties have agreed to settle the Action, pursuant to the terms of the Settlement Agreement, subject to the approval and determination of the Court as to the fairness, reasonableness, and adequacy of the Settlement which, if approved, will result in dismissal of the Action with prejudice; and The Court having reviewed the Settlement Agreement, including the exhibits attached thereto (together, the "Settlement Agreement"), and all prior proceedings herein, and good cause appearing based on the record;

THEREFORE, IT IS **ORDERED, ADJUDGED, AND DECREED** as follows (all capitalized terms being defined as they are defined in the Settlement Agreement unless otherwise specified or defined herein):

1. **Stay of the Action**. All non-settlement-related proceedings in the Action are hereby stayed and suspended until further order of this Court.

2. **Preliminary Class Certification for Settlement Purposes Only**. The Action is preliminarily certified as a class action for settlement purposes only, pursuant to Fed. R. Civ. P. 23(a) and (b)(3). The Court preliminarily finds for settlement purposes that: (a) the Class certified herein is numerous, and that joinder of all such persons would be impracticable, (b) there are issues of law and fact that are typical and common to the Class, and that those issues predominate over individual questions; (c) a class action on behalf of the certified Class is superior to other available means of adjudicating this dispute; and (d) as set forth in paragraph 4, below, Plaintiff and Class Counsel are adequate representatives of the Class. Barbara's Bakery retains all rights to assert that this action may not be certified as a class action, other than for settlement purposes.

3. **Class Definition**. The Class shall consist of all persons who, during the Class Period, purchased in the United States any Eligible Products. Excluded from the Class are: (a) Barbara's Bakery's board members or executive-level officers, including its attorneys; (b) persons who purchased the Eligible Products primarily for the purpose of resale; (c) retailers or re-sellers of the

Eligible Products; (d) governmental entities; (e) persons who timely and properly exclude themselves from the Class as provided in the Agreement; (f) persons who purchased the Eligible Products via the Internet or other remote means while not residing in the United States; and (g) the Court, the Court's immediate family, and Court staff.

"Class Period" means the period from May 23, 2008, up to and including the date of the first dissemination of the Summary Settlement Notice or Class Notice, whichever is earlier

"Eligible Products" means any of the following Barbara's Bakery products purchased by Class Members during the Class Period:

**A.    Cereals**:

      i.    BROWN RICE CRISPS (Fruit Juice Sweetened flavor);

      ii.    CORN FLAKES (Fruit Juice Sweetened flavor);

      iii.    HIGH FIBER (Cranberry, Flax & Granola, or Original flavors);

      iv.    HOLE 'N OATS (Fruit Juice Sweetened or Honey Nut flavors);

      v.    HONEST O'S (Honey Nut, Multigrain, or Original flavors);

      vi.    ORGANIC APPLE CINNAMON O'S;

      vii.    ORGANIC BREAKFAST O'S;

      viii.    ORGANIC BROWN RICE;

      ix.    ORGANIC BROWN RICE CRISPS;

      x.    ORGANIC CORN FLAKES;

      xi.    ORGANIC CRISPY WHEATS;

      xii.    ORGANIC HONEY CRUNCH 'N OATS;

      xiii.    ORGANIC HONEY NUT O'S;

      xiv.    ORGANIC SNACKIMALS CEREAL (Cinnamon Crunch or Vanilla Blast flavors);

      xv.    ORGANIC WILD PUFFS (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);

      xvi.    PUFFINS (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);

      xvii.    PUFFIN PUFFS (Crunchy Cocoa or Fruit Medley flavors);

4

xviii. SHREDDED OATS (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, or Vanilla Almond flavors);

xix. SHREDDED WHEAT;

xx. SHREDDED SPOONFULS (Multigrain or Vanilla Blast flavors);

xxi. SHREDDED MINIS (Blueberry Burst flavor);

xxii. TOASTED OATMEAL FLAKES (Original flavor); and

xxiii. ULTIMA ORGANIC (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors).

B. **Cereal Bars**:

i. MULTIGRAIN CEREAL BARS (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors);

ii. FRUIT & YOGURT BARS (Apple Cinnamon, Blueberry Apple, Cherry Apple, Strawberry Apple, or Traditional flavors); and

iii. PUFFINS CEREAL AND MILK BARS (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors).

C. **Cheese Puffs**:

i. BAKED CHEESE PUFFS (Original or White Cheddar flavors); and

ii. CHEESE PUFFS (Jalapeno or Original flavors).

D. **Fig Bars:**

i. FIG BARS (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free, or Whole Wheat flavors).

E. **Granola Bars**:

i. CRUNCHY ORGANIC GRANOLA BARS (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors).

F. **Snackimals Animal Cookies**:

i. SNACKIMALS ANIMAL COOKIES (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors).

5

G.  **Organic Mini-Cookies**:

    i.   ORGANIC MINI COOKIES (Chocolate, Ginger, or Oatmeal flavors).

H.  **Snack Mixes**:

    i.   BRUSCHETTA SNACK MIX;

    ii.   HONEY CINNAMON SNACK MIX;

    iii.   HONEY MUSTARD SNACK MIX; and

    iv.   SALSA SNACK MIX.

I.  **Crackers**:

    i.   CRISP COOKIES (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread);

    ii.   GO GO GRAHAMS (Chocolate, Cinnamon, Honey, or Lemon Ginger);

    iii.   PIZZA AND CHEESE BITES;

    iv.   RITE LITE ROUNDS (Original, Poppy Seed, or Tamari Sesame flavors); and

    v.   WHEATINES (Cracked Pepper, Original, or Sesame flavors).

4.  **Class Representatives and Class Counsel**.  Plaintiff, Richard W. Trammell, is designated as the representative of the conditionally certified Class.  The Court preliminarily finds that he is similarly situated to absent Class Members and therefore typical of the Class, and that he will be an adequate Class Representative.  Tina Wolfson and Robert Ahdoot of Ahdoot & Wolfson, PC, whom the Court finds are experienced and adequate counsel, are hereby designated as Class Counsel.

5.  **Preliminary Settlement Approval**.  Upon preliminary review, the Court finds that the Settlement Agreement, and the Settlement it incorporates, appears fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e); Manual for Complex Litigation (Fourth) § 21.632 (2004).  Accordingly, the Settlement Agreement is preliminarily approved and is sufficient to warrant sending notice to the Class.

6.  **Jurisdiction**.  The Court has subject-matter jurisdiction over the Action pursuant to 28 U.S.C. §§ 1332 and 1367, and personal jurisdiction over the Parties before it.  Additionally, venue is proper in this District pursuant to 28 U.S.C. § 1391.

7.      **Fairness Hearing**.  A Fairness Hearing shall be held on _____ at _____ at the United States District Court for the Northern District of California, 450 Golden Gate Avenue, 17th Floor, Courtroom 6, San Francisco, California, 94102, to determine, among other things: (a) whether the Action should be finally certified as a class action for settlement purposes pursuant to Fed. R. Civ. P. 23(a) and (b)(3); (b) whether the settlement of the Action should be approved as fair, reasonable and adequate, and finally approved pursuant to Fed. R. Civ. P. 23(e); (c) whether the Action should be dismissed with prejudice pursuant to the terms of the Settlement Agreement; (d) whether Class Members should be bound by the release set forth in the Settlement Agreement; (e) whether Class Members and related persons should be subject to a permanent injunction; (f) whether the application of Class Counsel for an award of Attorneys' Fees and Expenses should be approved pursuant to Fed. R. Civ. P. 23(h); and (g) whether the application of the named Plaintiff for an incentive award should be approved.  The submissions of the Parties in support of the settlement, including Plaintiff's Counsel's application for Attorneys' Fees and Expenses and incentive awards, shall be filed with the Court no later than fourteen (14) days prior to the deadline for the submission of objections and may be supplemented up to seven (7) days prior to the Fairness Hearing.

8.      **Administration**.  In consultation with and with the approval of Barbara's Bakery, Class Counsel is hereby authorized to establish the means necessary to administer the proposed settlement and implement the Claim Process, in accordance with the terms of the Agreement.

9.      **Class Notice**.  The proposed Class Notice, Summary Settlement Notice, the notice methodology described in the Settlement Agreement, and the Declaration of the Media Notice Administrator are hereby approved.

a.      Pursuant to the Settlement Agreement, the Court appoints Kinsella Media, LLC to be the Notice Administrator and Rust Consulting, Inc. to be the Settlement Administrator to help implement the terms of the Settlement Agreement.

b.      Beginning not later than ten (10) calendar days after entry of the Preliminary Approval Order and to be substantially completed not later than twenty-five (25) calendar days after entry of the Preliminary Approval Order and subject to the requirements of the Preliminary Approval Order, the Settlement Agreement, and the Declaration of the Notice Administrator, the Notice

Administrator shall commence sending the Class Notice by Electronic Mail ("E-mail") to: (i) each reasonably identifiable Class Member's last known E-mail address, reasonably obtainable from Barbara's Bakery, which addresses shall be provided to the Notice Administrator by Barbara's Bakery, no later than one (1) business day after the day of entry of the Preliminary Approval Order, subject to the existence of such information; and (ii) each appropriate State and Federal official, as specified in 28 U.S.C. §1715, and shall otherwise comply with Fed. R. Civ. P. 23 and any other applicable statute, law, or rule, including but not limited to the Due Process Clause of the United States Constitution.

c.       The Notice Administrator shall have the publication of the Summary Settlement Notice substantially completed no later than ninety (90) calendar days after entry of this Preliminary Approval Order.  The Notice Administrator shall publish the Summary Settlement Notice as described in the Declaration of the Notice Administrator and in such additional newspapers, magazines, and/or other media outlets as shall be agreed upon by the Parties.

d.       No later than forty-five (45) calendar days after entry of the Preliminary Approval Order, the Notice Administrator shall send the Summary Settlement Notice by First Class U.S. Mail, proper postage prepaid, to each Class Member whose E-mail address returned a message as undeliverable, subject to the existence of such information as provided by Barbara's Bakery pursuant to Section IV.B.1.a of this Agreement.  The Notice Administrator shall: (a) re-mail any Summary Settlement Notices returned by the United States Postal Service with a forwarding address that are received by the Notice Administrator no later than sixty (60) calendar days after entry of the Preliminary Approval Order; and (b) by itself or using one or more address research firms, as soon as practicable following receipt of any returned Summary Settlement Notices that do not include a forwarding address, research any such returned mail for better addresses and promptly mail copies of the Summary Settlement Notices to the better addresses so found.

e.       Prior to the dissemination of the Class Notice as set forth above in paragraphs 9(a) to 9(d), the Notice Administrator shall establish an Internet website, www.BarbarasBakerySettlement.com, that will inform Class Members of the terms of this Agreement, their rights, dates and deadlines, and related information.  The web site shall include, in .pdf format, materials agreed upon by the Parties and as further ordered by this Court.

f.    Prior to the dissemination of the Class Notice as set forth above in paragraphs 9(a) to 9(d), the Notice Administrator shall establish a toll-free telephone number that will provide Settlement-related information to Class Members.

g.    The Notice Administrator shall timely disseminate any remaining notice, as stated in the Settlement Agreement and/or the Declaration of the Notice Administrator.

h.    Not later than ten (10) calendar days before the date of the Fairness Hearing, the Notice Administrator and/or Settlement Administrator shall file with the Court: (a) a list of those persons who have opted out or excluded themselves from the Settlement; and (b) the details outlining the scope, methods, and results of the notice program.

10.    **Findings Concerning Notice**.  The Court finds that the form, content, and method of giving notice to the Class as described in Paragraph 9 of this order: (a) will constitute the best practicable notice; (b) are reasonably calculated, under the circumstances, to apprise the Class Members of the pendency of the Action, the terms of the proposed settlement, and their rights under the proposed settlement, including but not limited to their rights to object to or exclude themselves from the proposed settlement and other rights under the terms of the Settlement Agreement; (c) are reasonable and constitute due, adequate, and sufficient notice to all Class Members and other persons entitled to receive notice; and (d) meet all applicable requirements of law, including but not limited to 28 U.S.C. § 1715, Fed. R. Civ. P. 23(c) and (e), and the Due Process Clause(s) of the United States Constitution.  The Court further finds that all of the notices are written in simple terminology, are readily understandable by Class Members, and comply with the Federal Judicial Center's illustrative class action notices.

11.    **Exclusion from Class**.  Any Class Member who wishes to be excluded from the Class must mail a personally signed, written request for exclusion to the Settlement Administrator at the addressed provided in the Class Notice, postmarked no later than October 14, 2013, or as the Court otherwise may direct, to the Notice Administrator, in care of the address provided in the Class Notice. Any person or entity requesting exclusion is requested to include in the signed written request the information set forth under Question 17 of the Class Notice.  So-called "mass" or "class" opt-outs shall not be allowed.  The Settlement Administrator shall forward copies of any written requests for

9

exclusion to Class Counsel and Barbara's Bakery's Counsel.  The Settlement Administrator shall file a list reflecting all timely requests for exclusion with the Court no later than ten (10) calendar days before the Fairness Hearing.  If the proposed settlement is finally approved, any potential Class Member who has not submitted a timely written request for exclusion from the Class shall be bound by all subsequent proceedings, orders, and judgments in the Action, including but not limited to the Release, even if the potential Class Member previously initiated or subsequently initiates any litigation against any or all of the Released Parties relating to the claims and transaction released in the Action. Persons who properly exclude themselves from the Class shall not be entitled to participate in the benefits of the Settlement Agreement.  Barbara's Bakery's Counsel shall provide to the Settlement Administrator, within ten (10) business days of the entry of this Preliminary Approval Order, a list of all counsel for anyone who has litigation against Barbara's Bakery that involves Eligible Products. The Settlement Administrator shall mail copies of the Class Notice to all such legal counsel. Barbara's Bakery will promptly direct the Settlement Administrator to serve the Class Notice on counsel for any Class Members who subsequently initiate litigation, arbitration, or other proceedings against Barbara's Bakery relating to claims alleging events occurring during the Class Period, the Eligible Products, and/or otherwise involving the Release.

12.    **Objections and Appearances**.  Any Class Member or counsel hired at any Class Member's own expense who complies with the requirements of this paragraph may object to any aspect of the proposed settlement.

a.    Any Class Member who has not filed a timely written request for exclusion and who wishes to object to the fairness, reasonableness, or adequacy of the Settlement Agreement, the proposed Settlement, the award of Attorneys' Fees and Expenses, or the individual award to Plaintiff, must deliver to the Class Counsel identified in the Class Notice and to Barbara's Bakery's Counsel, and file with the Court, no later than October 14, 2013, or as the Court otherwise may direct: (a) a written statement of objections, as well as the specific reason(s), if any, for each objection, including any legal and factual support the Class Member wishes to bring to the Court's attention; (b) any evidence or other information the Class Member wishes to introduce in support of the objections; (c) a statement of whether the Class Member intends to appear and argue at the Fairness Hearing; and (d) a

list of all the Class Member's purchase(s) of Eligible Products. Class Members may do so either on their own or through an attorney retained at their own expense. Any Class Member filing an objection may be required to sit for deposition regarding matters concerning the objection. Any Class Member who fails to comply with the provisions in this section shall waive and forfeit any and all rights he or she may have to object, and shall be bound by all the terms of the Settlement Agreement, this Order, and by all proceedings, orders, and judgments, including, but not limited to, the Release in the Settlement Agreement in the Action.

b. Any Class Member, including a Class Members who files and serves a written objection, as described above, may appear at the Fairness Hearing, either in person or through personal counsel hired at the Class Member's expense, to object to or comment on the fairness, reasonableness, or adequacy of the Settlement Agreement or the proposed Settlement, or to the award of Attorneys' Fees and Expenses or the individual award to Plaintiff. Class Members or their attorneys who intend to make an appearance at the Fairness Hearing must deliver a notice of intention to appear to one of the Class Counsel identified in the Class Notice and to Barbara's Bakery's Counsel, and file said notice with the Court, no later than October 14, 2013, or as the Court may otherwise direct.

c. Any interested party may file a reply to any written objection, as described in Section 12(a) herein. A reply to an objection must be served and filed no later than seven (7) calendar days before the Fairness Hearing.

13. **Preliminary Injunction**. All Class Members and/or their representatives who do not timely exclude themselves from the Class are hereby preliminarily barred and enjoined from filing, commencing, prosecuting, maintaining, intervening in, participating in, conducting, or continuing litigation as class members, putative class members, or otherwise against Barbara's Bakery (or against any of its related parties or affiliates), and/or from receiving any benefits from, any lawsuit, administrative, or regulatory proceeding or order in any jurisdiction, based on or relating to the claims or causes of actions or the facts, and circumstances relating thereto, relating to the Eligible Products, the Action, and/or the Release. In addition, all such persons are hereby preliminarily barred and enjoined from filing, commencing, or prosecuting a lawsuit against Barbara's Bakery (or against any of its related parties or affiliates) as a class action, a separate class, or group for purposes of pursuing a

putative class action (including by seeking to amend a pending complaint to include class allegations or by seeking class certification in a pending action in any jurisdiction) on behalf of Class Members who do not timely exclude themselves from the Class, arising out of, based on, or relating to the claims, causes of action, facts, and/or circumstances relating thereto, relating to the Eligible Products, the Action, and/or the Release. Pursuant to 28 U.S.C. §§ 1651(a) and 2283, the Court finds that issuance of this preliminary injunction is necessary and appropriate in aid of the Court's continuing jurisdiction and authority over this Action.

14.    **Post-Office Box(es)**.  The Settlement Administrator or their designated agent(s) shall rent one or more post-office boxes in the name of the Clerk of the Court, to be used for receiving requests for exclusion from the Class and any other communications.  Other than the Court or the Clerk of Court and the Notice Administrator, only Barbara's Bakery, Barbara's Bakery's Counsel, Class Counsel, and their designated agents shall have access to these post-office box(es).

15.    **Disclosure of Objections**.  The Settlement Administrator, Barbara's Bakery's Counsel, and Class Counsel shall promptly furnish to each other copies of any and all objections or written requests for exclusion that might come into their possession.

16.    **Termination of Settlement**.  This Order shall become null and void and shall be without prejudice to the rights of the parties, all of whom shall be restored to their respective positions existing immediately before this Court entered this Order, if: (a) the settlement is not finally approved by the Court, or does not become final, pursuant to the terms of the Settlement Agreement; (b) the settlement is terminated in accordance with the Settlement Agreement; or (c) the settlement does not become effective as required by the terms of the Settlement Agreement for any other reason.  In such event, the settlement and Settlement Agreement shall become null and void and be of no further force and effect, and neither the Settlement Agreement nor the Court's orders, including this Order, relating to the settlement shall be used or referred to for any purpose whatsoever.

17.    **Use of Order**.  This Order shall be of no force or effect if the settlement does not become final and shall not be construed or used as an admission, concession, or declaration by or against Barbara's Bakery of any fault, wrongdoing, breach, or liability.  Nor shall this Order be construed or used as an admission, concession, or declaration by or against Plaintiff or the other Class

Members that their claims lack merit or that the relief requested is inappropriate, improper, unavailable, or as a waiver by any party of any defenses or claims he, she, or it may have in this Action or in any other lawsuit.

18. **Retaining Jurisdiction**. This Court shall maintain continuing jurisdiction over these settlement proceedings to assure the effectuation thereof for the benefit of the Class.

19. **Continuance of Hearing**. The Court reserves the right to adjourn or continue the Fairness Hearing without further written notice.

_____
Honorable Charles R. Breyer
UNITED STATES DISTRICT JUDGE

Case 1:12-cv-02664-CRB   Document 37-6   Filed 04/25/13   Page 174 of 330

**EXHIBIT 6**

3:12-cv-02664-CRB – EXHIBIT TO SETTLEMENT AGREEMENT

# If You Bought a
# Barbara's Bakery Product

### *You Could Get Up to $100*
### *From a Settlement*

**Includes:** Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies

There is a class action Settlement involving Barbara's Bakery Products. The lawsuit claims that Barbara's Bakery violated state laws regarding the marketing and sale of certain products. Barbara's Bakery denies it did anything wrong.

### Who is included in the Settlement?
Anyone who bought an eligible Barbara's Bakery product from May 23, 2008 to Month 00, 0000 is included in the Settlement. A full list of products is available at the website located at www.BarbarasBakerySettlement.com or by calling 1-800-000-0000.

### What does the Settlement provide?
A Settlement Fund of $4 million will pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) attorneys' fees and costs, and (4) a special service payment to the Class Representative. Barbara's Bakery has also agreed to change some of its business practices, including modifying its product labels and advertising. Any money remaining in the Settlement Fund after all claims are paid will be donated to charities and non-profit organizations. Additional details are in the Settlement Agreement available on the website.

### How can I get a payment?
Submit a Claim Form online at www.BarbarasBakerySettlement.com or by mail by **Month 00, 2013**. The payment amount you receive will be based in part on the amount of products you purchased and the total number of claims made.

### What are my rights?
Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue Barbara's Bakery yourself, you must exclude yourself from the Settlement by **Month 00, 2013**. If you stay in the Settlement, you may object to it by **Month 00, 2013**.

The Court will hold a hearing on **Month 00, 2013** to consider whether to approve the Settlement, a request for attorneys' fees and costs up to $1 million, and a special service payment of $2,500 from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

### For More Information: 1-800-000-0000
### **www.BarbarasBakerySettlement.com**

Case 4:02864-CRB Document 61-27 Filed 05/01/13 Page 1387

# If You Bought a Barbara's Bakery Product

## *You Could Get Up to $100 From a Settlement*

---

### Includes: Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies

---

There is a class action Settlement involving Barbara's Bakery Products. The lawsuit claims that Barbara's Bakery violated state laws regarding the marketing and sale of certain products. Barbara's Bakery denies it did anything wrong.

### Who is included in the Settlement?

Anyone who bought an eligible Barbara's Bakery product from May 23, 2008 to Month 00, 0000 is included in the Settlement. A full list of products is available at the website located at www.BarbarasBakerySettlement.com or by calling 1-800-000-0000.

### What does the Settlement provide?

A Settlement Fund of $4 million will pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) attorneys' fees and costs and (4) a special service payment to the Class Representative. Barbara's Bakery has also agreed to change some of its business practices including modifying its product lables and advertising. Any money remaining in the Settlement Fund afer all claims are paid will be donated to charities and non-profit organizations. Additional details are in the Settlement Agreement available on the website.

### How can I get a payment?

Submit a Claim Form online or by mail by **Month 00, 2013**. The payment amount you receive will be based in part on the amount of products you purchased and the total number of claims made.

### What are my rights?

Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue Barbara's Bakery yourself, you must exclude yourself from the Settlement by **Month 00, 2013**. If you stay in the Settlement, you may object to it by **Month 00, 2013**.

The Court will hold a hearing on **Month 00, 2013** to consider whether to approve the Settlement, a request for attorneys' fees up to $1 million, and a special service payment of $2,500 from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

---

## For More Information: 1-800-000-0000
## www.BarbarasBakerySettlement.com

Case 1:12-cv-02664-CRB Document 61-2 Filed 06/04/13 Page 1 of 60 PageID #:

# EXHIBIT 7

3:12-cv-02664-CRB – EXHIBIT TO SETTLEMENT AGREEMENT

## Settlement Claim Procedures and Claim Calculation Protocol

This Settlement Claim Procedures and Claim Calculation Protocol (collectively, the "Protocol") are part of the Settlement Agreement ("Agreement") and shall be used by the Settlement Administrator to review, address, implement, and process those Claims submitted pursuant to the Agreement and otherwise implement the terms of the Claim Process in the Agreement. All capitalized terms used in this Protocol shall have the same meaning given them in the Agreement.

1.   **Settlement Administrator's Role and Duties**

(a)   The Settlement Administrator shall be selected by the agreement of the Parties and recommended to and approved by the Court.

(b)   The Settlement Administrator must consent, in writing, to serve and shall abide by the obligations of the Agreement, this Protocol, and the Orders issued by the Court.

(c)   The Settlement Administrator warrants that it knows of no reason why it cannot fairly and impartially administer the Claim Process set forth in the Agreement. The Settlement Administrator shall not process the Claim of any Class Member if the Settlement Administrator, Barbara's Bakery, or Class Counsel determines that there is a conflict of interest. In the event that the Settlement Administrator, Barbara's Bakery, or Class Counsel learns of a conflict of interest as to a Claim, that party shall give written notice to the other parties, who shall resolve any such circumstances by further written agreement. Any unresolved dispute over such conflict of interest shall be submitted to the Court for resolution.

(d)   The Settlement Administrator shall keep a clear and careful record of all communications with Claimants, all claims decisions, all expenses, and all tasks performed in administering the Claim Process.

(e)   The costs of the Settlement Administrator shall be paid by Barbara's Bakery pursuant to the Settlement Agreement.

(f)   The Settlement Administrator shall take all reasonable efforts to administer the Claims efficiently and to avoid unnecessary fees and expenses. As soon as work commences, the Settlement Administrator shall provide a detailed written accounting of all fees and expenses on a regular basis to Class Counsel and Barbara's Bakery's Counsel, and shall respond promptly to inquiries by Class Counsel and Barbara's Bakery's Counsel concerning fees and expenses.

(g)   The Parties are entitled to observe and monitor the performance of the Settlement Administrator to assure compliance with the Agreement and this Protocol. The Settlement Administrator shall promptly respond to all inquiries and requests for information made by Barbara's Bakery, its counsel, or Class Counsel.

2.    **Locating, Obtaining, and Submitting Claim Forms**

(a)    The Claim Form, which is substantially similar to the form attached as Exhibit 1 to the Agreement, shall be available as part of the Class Notice, on the Internet website at www.BarbarasBakerySettlement.com, and by contacting by telephone or by mail or other similar service the Settlement Administrator and/or Notice Administrator. The Claim Form on the Internet website and the hard copy Claim Form shall be consistent in content.

(b)    The Claim Form shall advise Class Members that, upon request, the Settlement Administrator has the right to request information and/or documentation necessary to verify the purchase of the Eligible Products, including, but not limited to, receipt(s) or other documentation demonstrating purchase of any and all of the Eligible Products during the Class Period. If the Class Member does not timely comply and/or is unable to produce documents to substantiate and/or verify the information on the Claim Form and the Claim is otherwise not approved, the Claim may be reduced or denied.

(c)    Class Members may submit a Claim to the Settlement Administrator during the Claim Period. As part of the Claim Process, Class Members shall be eligible for the relief provided in the Agreement, provided Class Members complete and timely submit the Claim Form to the Settlement Administrator within the Claim Period, subject to the terms herein and in the Agreement.

(d)    Claims may be submitted by completing the Claim Forms in hard copy by mail or other similar delivery service or on-line through a web-based Claim Form at the Internet website, www.BarbarasBakerySettlement.com.

(e)    The Settlement Administrator and/or Notice Administrator shall establish and maintain an Internet website, www.BarbarasBakerySettlement.com, that shall be easily accessible through commonly used Internet Service Providers for the submission of claims. The Internet website shall be designed to permit Class Members to readily and easily submit Claims and obtain information about the Class Members' rights and options under the Agreement. The Internet website shall be maintained continuously until the end of the Claim Period. The Settlement Administrator shall be solely responsible for receiving and processing requests for Claim Forms and for promptly delivering Claim Forms to the Class Members who request them.

(f)    The Settlement Administrator also shall establish a toll-free telephone number that will have recorded information answering frequently asked questions about certain terms of the Settlement, including, but not limited to, the Claim Process and instructions about how to request a Claim Form and/or Class Notice.

3.    **Claim Form Review and Processing**

(a)    The Settlement Administrator shall begin the Claim Process so that it is completed within the time period specified in the Agreement. Except as provided

in Paragraph 3(b)(iii) (below), Class Members must submit their Claims so that they are postmarked or submitted online no later than the end of the Claim Period.

(b)    The Settlement Administrator shall gather, review, prepare, and address the Claim Forms received pursuant to the Claim Process and the Agreement.

(i)    Claims that have been properly submitted shall be designated as Approved Claims. The Settlement Administrator shall examine the Claim Form before designating the Claim as an Approved Claim, to determine that the information on the Claim Form is reasonably complete and contains sufficient information to enable the mailing of the settlement payment to the Claimant.

(ii)    No Claimant may submit more than one Claim Form. The Settlement Administrator shall identify any Claim Forms that appear to seek relief on behalf of the same Claimant ("Duplicative Claim Forms"). The Settlement Administrator shall determine whether there is any duplication of Claims, if necessary by contacting the Claimant(s) or their counsel. The Settlement Administrator shall designate any such Duplicative Claims as rejected Claims to the extent they allege the same damages or allege damages on behalf of the same Claimant.

(iii)    The Settlement Administrator shall exercise, in its discretion, all usual and customary steps to prevent fraud and abuse and take any reasonable steps to prevent fraud and abuse in the Claim Process. The Settlement Administrator may, in its discretion, deny in whole or in part any Claim to prevent actual or possible fraud or abuse.

(iv)    By agreement of the Parties, the Parties can instruct the Settlement Administrator to take whatever steps they deem appropriate to preserve the Settlement Fund to further the purposes of the Agreement if the Settlement Administrator identifies actual or possible fraud or abuse relating to the submission of Claims, including, but not limited to, denying in whole or in part any Claim to prevent actual or possible fraud or abuse.

(c)    The Class Action Settlement Administrator shall provide periodic reports to Class Counsel and Barbara's Bakery's Counsel regarding the implementation of the Agreement and this Protocol.

(i)    The Settlement Administrator may review timely submitted Claim Forms and approve or contest any of the Claims, including, but not limited to, requesting that the Class Member submit documentation demonstrating purchase of the Eligible Products during the Class Period.

(ii)    If a Claim Form is not contested, that Claim shall be processed for payment by the Settlement Administrator. If a Claim Form is contested,

3

the Settlement Administrator shall promptly notify the Parties and mail a letter that advises the Claimant of the reason(s) why the Claim Form was contested and request, if applicable, any and all additional information and/or documentation, to validate the Claim and have it submitted for payment. The additional information and/or documentation can include, for example, receipts evidencing purchase of the Eligible Products and/or the payment amount. The Claimant shall have thirty-five (35) days from the date of the postmarked letter sent by the Settlement Administrator to respond to the request from the Settlement Administrator and the Claimant shall be so advised.

(A) In the event the Claimant timely provides the requested information and/or documentation, the Claim shall be deemed validated and shall be processed by the Settlement Administrator for payment.

(B) In the event the Claimant does not timely and completely provide the requested information and/or documentation, the Settlement Administrator shall reduce or deny the Claim unless Barbara's Bakery and Class Counsel otherwise agree.

(d) The Settlement Administrator's reduction or denial of a Claim pursuant to paragraph 3(c)(iii) above is final and may not be appealed by the Claimant, Class Counsel, Barbara's Bakery, or Barbara's Bakery's Counsel. However, if a Claimant's Claim is reduced or denied because the Settlement Administrator determined that the documentation submitted to support Claimant's Claim was not sufficient to prove up the Claim, the Settlement Administrator shall provide a report to Class Counsel and Barbara's Bakery's Counsel who shall meet and confer in an attempt to resolve these deficient Claims. If Class Counsel reasonably recommends payment of the Claim or payment of a reduced claim amount and Barbara's Bakery agrees (and Barbara's Bakery's agreement shall not be unreasonably withheld), then Class Counsel shall instruct the Settlement Administrator to pay those Claims. Class Counsel may petition the Court in the event Barbara's Bakery's agreement is unreasonably withheld.

(e) The Settlement Administrator shall provide all information gathered in investigating Claims, including, but not limited to, copies of all correspondence and email and all notes of the Settlement Administrator, the decision reached, and all reasons supporting the decision, if requested by Class Counsel or Barbara's Bakery.

4. **Claim Calculation and Payment of Valid Claims**

(a) As specified in the Agreement, the Settlement Administrator shall select the timely, valid, and approved Claims submitted pursuant to the Claim Process to be paid from the Settlement Fund Balance subject to any *pro rata* adjustments pursuant to the terms and conditions of the Agreement.

4

(b)     The Settlement Administrator shall begin to pay timely, valid, and approved Claims within one hundred and twenty (120) days after the close of the Claim Period, so long as this period is after the Final Settlement Date, or sooner upon Barbara's Bakery and Class Counsel's joint discretion, but not before the issuance of the Court's Final Order and Final Judgment approving the Settlement.  In the event the Final Settlement Date falls after the close of the Claim Period, then the Settlement Administrator shall begin to pay timely, valid, and approved Claims commencing one hundred and twenty (120) days after the Final Settlement Date. Not later than one hundred sixty (160) days after either the occurrence of the Final Settlement Date or the close of the Claim Period, whichever is later, the Settlement Administrator shall have completed the payment to Class Members who have submitted timely, valid and approved Claims pursuant to the Claim Process, provided, further however, that Barbara's Bakery and Class Counsel may, at their joint discretion, commence this payment period after final approval of the settlement by the Court, but before the attainment of the Final Settlement Date.

(c)     The relief to be provided to eligible Class Members shall be as set forth in the Agreement.

**EXHIBIT 8**

1

2

3

4

5

6

7

8

9

10      **UNITED STATES DISTRICT COURT**
        **NORTHERN DISTRICT OF CALIFORNIA**

11

12   RICHARD W. TRAMMELL,                    Case No. 3:12-cv-02664-CRB

13          Plaintiff,                       **DECLARATION OF SHANNON R.**
                                             **WHEATMAN, PH.D.**
14          v.                               **ON ADEQUACY OF NOTICE PLAN**

15   BARBARA'S BAKERY, INC., *et al.*,

16          Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

**3:12-cv-02664-CRB: DECLARATION OF SHANNON R. WHEATMAN**
**ON ADEQUACY OF NOTICE PLAN**

I, Shannon R. Wheatman, being duly sworn, hereby declare as follows:

1.  I am a Senior Vice President of Kinsella Media, LLC ("KM"), an advertising and notification firm in Washington, D.C. specializing in the design and implementation of class action and bankruptcy notification programs. My business address is 2120 L Street, NW, Suite 860, Washington, D.C. 20037. My telephone number is (202) 686-4111.

2.  This report will describe my experiences in designing and implementing notices and notice plans, my credentials to opine on the overall adequacy of the notice effort, as well as describe the notices (the "Notice" or "Notices") proposed here for *Trammell v. Barbara's Bakery, Inc.*, including how they were developed and why I believe they will be effective. Attached as **Exhibit 1** is the proposed Notice Plan.

## RELEVANT EXPERIENCE

3.  I have served as a qualified class action notice expert in many major class actions. State and federal courts have accepted my analyses and expert testimony on whether information is effectively communicated to people. My curriculum vitae is attached as **Exhibit 2**.

4.  I have testified in court as an expert in *Spillman v. RPM Pizza, Inc.*, No. 10-349 (M.D. La.); *PRC Holdings LLC v. East Resources, Inc.*, No. 06-C-81 (Cir. Ct. W. Va.); *Guidry v. American Public Life Ins. Co*., No. 2008-3465 (14th Jud. Dist. Ct., Calcasieu Parish); *Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark); and *Beasley v. The Reliable Life Insurance Co*., No. CV-2005-58-1 (Cir. Ct. Ark). I have been deposed as an expert in *Thomas v. A. Wilbert Sons, LLC*, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish).

5.  I have been involved in some of the largest and most complex national notification programs in the country, including: *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827 (N.D. Cal.) (involving tens of millions of consumers); *In re: Oil Spill by the Oil Rig*

*"Deepwater Horizon" in the Gulf of Mexico on April 20, 2010,* MDL No. 2179 (E.D. La.); *Kramer v. B2Mobile, LLC* (text messaging case involving 40 million consumers), No. 10-cv-02722 (N.D. Cal.); *In Re: Enfamil LIPIL Mkt'g & Sales Pract. Litig.* (consumer fraud settlement involving millions of infant formula purchasers), No. 11-MD-02222 (S.D. Fla.); *Fogel v. Farmers Group, Inc* ($455 million settlement involving tens insureds), No. BC300142 (Cal. Super. Ct., LA County); *In re Katrina Canal Breaches Consolidated Litig.* (settlement obtained for Hurricane Katrina and Rita survivors), No. 05-4182 (E.D. La.); *Lockwood v. Certegy Check Services, Inc.* (data theft settlement involving over 37 million consumers), No. 8:07CV-1434 (M.D. Fla.); *Grays Harbor Adventist Christian School v. Carrier Corp.* (defective product settlement involving high efficiency furnaces), No. 05-05437 (W.D. Wash.); and many others.

6. Courts have admitted my expert testimony on quantitative and qualitative evaluations of the effectiveness of notice programs and several courts have commented favorably, on the record, regarding the effectiveness of notice plans I have done. Selected judicial comments are included in the attached curriculum vitae.

7. My qualifications include expertise in the form and content of notice. For example, while serving with the Federal Judicial Center ("FJC"), I played an integral part in the development of the illustrative, "model" forms of notice, designed to satisfy the plain language requirements of Federal Rule of Civil Procedure 23(c)(2). This research formed the basis for my doctoral dissertation, *The Effects of Plain Language Drafting on Layperson's Comprehension of Class Action Notices* (2001) (Ph.D. dissertation, University of Georgia). To assist judges and attorneys, in state as well as federal courts, the FJC has posted the notices at www.fjc.gov.

8. I have authored and co-authored articles on notice and due process. I believe notice and due process depend upon clear communication with the people affected. *See, e.g.,*

Shannon R. Wheatman & Terri R. LeClercq, *Majority of Class Action Publication Notices Fail to Satisfy Rule 23 Requirements*, 30 REV. LITIG. 53 (2011); Katherine Kinsella & Shannon R. Wheatman, *Class Notice and Claims Administration*, in The International Private Enforcement of Competition Law 264–274 (Albert A. Foer & Jonathan W. Cuneo eds., 2010); Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do you really want me to know my rights? The ethics behind due process in class action notice is more than just plain language: A desire to actually inform*, GEO J. LEGAL ETHICS, 18 (4), 1359-1382 (2005); Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 TULANE LAW REV. 1771 (2006).

9. KM was retained to design and implement the Notice Program in this litigation. I submit this declaration to describe the elements of the Notice Program.

## Overview

10. The proposed Notice Program was designed to reach the greatest practicable number of Class Members ensuring that they will be exposed to the Notice, to see, review, and understand it.

11. I have been involved in drafting the various forms of Notice described below. All forms of Notice are noticeable, clear, concise, and in plain, easily understood language.

12. In developing the Notice Program, it was determined that the most practicable way to reach Class Members is through the use of direct notice, paid media, earned media, and an informational website.

13. As detailed below, in my opinion, the Notice Program represents the best notice practicable.

Case 3:12-cv-02664-CRB Document 37 Filed 06/04/13 Page 66 of 300

## NOTICE PLAN SUMMARY

14. Although each case is unique, the methods and tools used in developing the Notice Program for this Settlement have been employed in many other court-approved notice plans.

### *Direct Notice*

15. Notice will be sent via email or mail to known Class Members who purchased Barbara's Bakery products online of their rights and how they may participate in the Settlement.

16. It is my understanding that Rust Consulting Inc. will make three delivery attempts to any email that bounces back. Rust will also take measures to ensure the maximum deliverability of the emails, including among other things, utilizing a vendor that has contacts with Internet Service Providers ("ISPs") to ensure that the ISPs understand that the emails are non-soliciting.

17. After the Court grants approval to the Notice Plan and Notices, potential Class Members will be sent a Summary Notice in the form of a Postcard Notice or Email Notice.

### *Publication Notice*

18. To effectively reach Class Members, KM recommends a paid media program.

19. To design the paid media segment of the notice program, KM analyzed syndicated data available from the 2012 Doublebase Survey[1] from GfK MediaMark Research, Inc. ("GfK

---

[1] GfK MRI produces an annual Doublebase, a study of 50,000+ adults consisting of two full years of data. The MediaMark sample consists of 26,000+ respondents. Fieldwork is done in two waves per year, each lasting six months and consisting of 13,000 interviews. At the end of the interview, the fieldworker presents a self-administered questionnaire that measures approximately 500 product/service categories, 6,000 brands, and various lifestyle activities. Resulting data is weighted to reflect the probabilities of selection inherent in the sample design

MRI"). GfK MRI is a nationally accredited media and marketing research firm that provides syndicated data on audience size, composition, and other relevant factors pertaining to major media including broadcast, magazines, newspapers, and outdoor advertising. MRI provides a single-source measurement of major media, products, services, and in-depth consumer demographic and lifestyle/psychographic characteristics.

20. Using GfK MRI, KM selected demographics that encompass the characteristics of Class Members. Media vehicles were then analyzed and selected for their strength and efficiency in reaching these demographic targets.

21. KM chose adults 18 years of age or older that bought food labeled as natural or organic ("Healthy Food Purchasers") as the primary target audience. GfK MRI provides specific data on this target audience.

22. To effectively reach this Class, KM recommends a broad-based notice program that utilizes national consumer magazines, a newspaper supplement, and Internet ad networks in order to meet due process standards and provide the best notice practicable under the circumstances.

23. KM chose the specific consumer magazines listed below because they provide good coverage of Healthy Food Purchasers. The Publication Notice will appear in the following consumer magazines:

   a. A half-page ad (3.5" x 10") once in *Parents* with an estimated circulation of 2,200,000.

   b. A half-page ad (3.375" x 10") once in *People* with an estimated circulation of 3,475,000.

---

and then balanced so that major study demographics match the most recent independent estimates.

c. A half-page ad (3.5" x 10") once in *Southern Living* with an estimated circulation of 2,800,000.

24. The Publication Notice will appear in the following newspaper supplement:

d. A two-fifths-page ad once in *Relish* with an estimated circulation of 15,000,000.

25. Internet advertising will include the following placements:

a. Banner advertisements measuring 728 x 90, 300 x 250, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the 24/7 Real Media Network. 24/7 Real Media is a network that represents over 5,000 websites.

b. A banner advertisement measuring 100 x 100 pixels will appear, on a rotating basis, on Facebook.com, which is a free, global social networking website that helps people communicate with friends, family, and coworkers.

c. Banner advertisements measuring 728 x 90, 300 x 250, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the Microsoft Media Network, which is a premium ad network of top-ranked commercial sites.

d. Banner advertisements measuring 728 x 90, 300 x 250, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the Specific Media Network. Specific Media is an online media company that enables advertisers to target audiences through advanced proprietary technologies across a premium network.

e. Banner advertisements measuring 728 x 90, 300 x 250, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the Yahoo! Network. Yahoo is a leading Internet brand and global online network of integrated services providing users with entertainment and other quality content.

26. For the purpose of evaluating the strength and efficiency of the media, the national consumer magazines, newspaper supplement, and Internet[2] were measured against the target audience to establish the estimated *reach*[3] of the media program and the estimated *frequency*[4] of exposure to the media vehicles.

      e.  An estimated 80.1% Healthy Food Purchasers will be reached with an average frequency of 2.3 times.

27. All print advertising will carry a toll-free number and website address for potential Class Members to request or access the Long Form Notice.

### *Earned Media*

28. An earned media program will be implemented in order to amplify the paid media program and provide additional notice to Class Members. The earned media program will feature:

      f.  A press release distributed on PR Newswire's Full National Circuit, reaching approximately 5,000 media outlets and 5,400 websites. The press release will highlight the toll-free telephone number and Settlement website address so that Class Members can obtain complete information.

### *Online Media*

29. A website will be established at www.BarbarasBakerySettlement.com to enable

---

[2] MRI does not measure the U.S. territories and possessions newspapers or the trade publications. Therefore, their contribution to the overall reach of the media is not calculated.

[3] Reach is the estimated number of different people exposed to a specific vehicle or combination of vehicles. It can be expressed as whole number or percentage of the total population.

[4] Frequency is the estimated average number of opportunities an audience member has to see the notice.

potential Class Members to get information on the Settlement.

***Other***

30. A toll-free phone number will be established allowing Class Members to call and request that a Notice be mailed to them or listen to frequently asked questions.

31. A post office box will be established allowing Class Members to contact Class Counsel by mail with any specific requests or questions.

## THE FORM AND CONTENT OF THE NOTICES

32. Attached as **Exhibits C**, **D**, and **E** to the Notice Plan are copies of the Email Notice, Postcard Notice, Long Form Notice, and Publication Notice.

33. The Notices effectively communicate information about the Settlement.

34. Rule 23(c)(2) of the Federal Rules of Civil Procedure requires class action notices to be written in "plain, easily understood language." KM applies the plain language requirement in drafting notices in federal and state class actions. The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its experience and expertise to draft notices that effectively convey the necessary information to Class Members.

35. The Summary Notices (Email, Postcard, and Publication Notices) are designed to capture the Class Member's attention with clear, concise, plain language. They direct readers to the case website for more information. The plain language text provides important information regarding the subject of the litigation, the Class definition, and the legal rights available to Class Members. No important or required information is missing or omitted. In fact, these Notices state all required information, without omitting significant facts that Class Members need to understand their rights. The Summary Notices refer readers to the Long Form Notice which is available to those who call or visit the website.

36. The Long Form Notice will be available at the website or by calling the toll-free number. The Long Form Notice provides substantial information, including all specific instructions Class Members need to follow to properly exercise their rights, and background on the issues in the case. It is designed to encourage readership and understanding, in a well-organized and reader-friendly format.

37. In preparing the Notices in this Settlement, I have employed communications methods that are well-established in my field. I have embraced the high standards embodied in the Advisory Committee's notes accompanying the 2003 changes to Rule 23(c)(2):

> *The direction that the class-certification notice be couched in plain easily understood language is added as a reminder of the need to work unremittingly at the difficult task of communicating with class members.*

### Conclusion

38. It is my opinion that the reach of the target audience and the number of exposure opportunities to the notice information is adequate and reasonable under the circumstances, and it is consistent with the standards employed by KM in notification programs designed to reach members of settlement groups or classes. The Notice Program as designed is fully compliant with Rule 23 of the Federal Rules of Civil Procedure, and in my opinion, it is the best notice practicable.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Washington, D.C. this 24th day of April 2013.

Shannon R. Wheatman

Case 1:12-cv-02664-CRB Document 37-8 Filed 05/04/13 Page 42 of 303 PageID #: 1405

# EXHIBIT 1



# NOTICE PROGRAM

## *Trammell v. Barbara's Bakery, Inc.*

### *Case* No. 12-CV-02664-CRB

United States District Court

Northern District of California

© 2013 KINSELLA MEDIA, LLC

# TABLE OF CONTENTS

| | PAGE |
|---|---|
| **FIRM OVERVIEW** | 4 |
| **CASE BACKGROUND** | |
| Situation Analysis | 6 |
| Class Definition | 7 |
| **NOTICE PROGRAM OVERVIEW** | |
| Program Components | 10 |
| Direct Notice | 11 |
| Paid Media Program | 12 |
| Paid Media Placements Summary | 13 |
| **PAID MEDIA METHODOLOGY** | 15 |
| **TARGET AUDIENCE** | |
| Selection Methodology | 17 |
| Demographics | 18 |
| Media Usage | 20 |
| **PAID MEDIA PLACEMENTS** | |
| Newspaper Supplement | 23 |
| Consumer Magazines | 24 |
| Target Audience's Print Readership | 25 |
| Internet Advertising | 26 |
| **NATIONAL MEDIA DELIVERY** | 28 |
| **NOTICE DESIGN** | |
| Direct Notice | 30 |
| Detailed Notice | 31 |
| Publication Notice | 32 |
| Website and Internet Ads | 33 |

© 2013 KINSELLA MEDIA, LLC

**EARNED MEDIA PROGRAM**     34

**TOLL-FREE TELEPHONE SUPPORT**     35

**EXHIBITS**

    Exhibit A – KM Case Experience

    Exhibit B – Relish Newspaper Supplement

    Exhibit C – Direct Notice

    Exhibit D – Detailed Notice

    Exhibit E – Publication Notice

© 2013 KINSELLA MEDIA, LLC

# FIRM OVERVIEW

Kinsella Media, LLC ("KM") is a nationally recognized legal notification firm in Washington, D.C. specializing in the design and implementation of notification programs to reach unidentified putative class members primarily in consumer and antitrust class actions and claimants in bankruptcy and mass tort litigation.

KM has developed and directed some of the largest and most complex national notification programs, primarily in antitrust, bankruptcy, consumer fraud, mass tort, and product liability litigation. Specific cases have spanned a broad spectrum of issues, including asbestos, breast implants, home siding and roofing products, infant formula, pharmaceuticals, polybutylene plumbing, tobacco, and Holocaust claims. The firm has developed or consulted on over 700 notification programs and has placed over $300 million in paid media notice. A selection of KM's case experience is attached as Exhibit A.

KM develops advertisements, press materials, websites, and other notice materials that bridge the gap between litigation complexities and the need for a clear and simple explanation of legal rights. The firm employs industry-recognized tools of media measurement to quantify the adequacy of the notice for the court, and ensures all notice materials are in "plain language" and are fully compliant with Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") and comparable state guidelines.

Case 1:12-cv-02664-CRB Document 37-8 Filed 05/04/25 Page 99 of 303 PageID #: 1410

*Trammell v. Barbara's Bakery, Inc.*

# CASE BACKGROUND

*Trammell v. Barbara's Bakery, Inc.*

# CASE BACKGROUND:
# SITUATION ANALYSIS

This Notice Program is submitted by Kinsella Media, LLC ("KM") in connection with *Trammell v. Barbara's Bakery, Inc.* in the U.S. District Court for the Northern District of California. This document outlines the efforts that will be made to provide notice of the Settlement to reach consumers.

The lawsuit claims, *inter alia*, that Barbara's Bakery, Inc. manufactured, marketed, and sold various food, cereals, and snack products ("Eligible Products") as "all natural" when the Eligible Products are made with unnatural ingredients. Plaintiff alleges that, as a result, consumers purchased and consumed a product on the false premise that the product is "all natural." The lawsuit claims this conduct violated California's Unfair Competition Law, False Advertising Law, Consumer Legal Remedies Act, and constituted breach of an express warranty.

The goal of the Notice Program is to inform as many Class Members as possible about the Settlement and how it will affect their rights. The Notice Program recommends a paid media approach.

# CASE BACKGROUND:
## CLASS DEFINITION

The Class is defined as:

> All persons who, during the Class Period, purchased in the United States any of the Eligible Products. "Eligible Products" means any of the following Barbara's Bakery products, of any size, purchased by Class Members during the Class Period:

- **Cereals**:
  BROWN RICE CRISPS
  CORN FLAKES
  HIGH FIBER
  HOLE 'N OATS
  HONEST O'S
  ORGANIC APPLE CINNAMON O'S
  ORGANIC BREAKFAST O'S
  ORGANIC BROWN RICE
  ORGANIC BROWN RICE CRISPS
  ORGANIC CORN FLAKES
  ORGANIC CRISPY WHEATS
  ORGANIC HONEY CRUNCH 'N
   OATS
  ORGANIC HONEY NUT O'S
  ORGANIC SNACKIMALS CEREAL
  ORGANIC WILD PUFFS
  PUFFINS
  PUFFIN PUFFS
  SHREDDED OATS
  SHREDDED WHEAT
  SHREDDED SPOONFULS
  SHREDDED MINIS
  TOASTED OATMEAL FLAKES

  ULTIMA ORGANIC
- **Cereal Bars**:
  MULTIGRAIN CEREAL BARS
  FRUIT & YOGURT BARS
  PUFFINS CEREAL AND MILK BARS
- **Cheese Puffs**:
  BAKED CHEESE PUFFS
  CHEESE PUFFS
- **FIG BARS**
- **CRUNCHY ORGANIC GRANOLA BARS**
- **SNACKIMALS ANIMAL COOKIES**
- **ORGANIC MINI COOKIES**
- **Snack Mixes**:
  BRUSCHETTA SNACK MIX
  HONEY CINNAMON SNACK MIX
  HONEY MUSTARD SNACK MIX
  SALSA SNACK MIX
- **Crackers**:
  CRISP COOKIES
  GO GO GRAHAMS
  PIZZA AND CHEESE BITES
  RITE LITE ROUNDS
  WHEATINES

"Class Period" means the period from May 23, 2008, up to and including the date of the first dissemination of the Summary Settlement Notice or Class Notice, whichever is earlier. Excluded from the Class are: (a) Barbara's Bakery's board members or executive-level officers, including its attorneys; (b) persons who purchased the Eligible Products primarily for the purpose of resale; (c) retailers or re-sellers of the Eligible Products; (d) governmental entities;

*Trammell v. Barbara's Bakery, Inc.*

(e) persons who timely and properly exclude themselves from the Class as provided in the Agreement; (f) persons who purchased the Eligible Products via the Internet or other remote means while not residing in the United States; and (g) the Court, the Court's immediate family, and Court staff.

*Trammell v. Barbara's Bakery, Inc.*

# PAID PROGRAM OVERVIEW

NOTICE PROGRAM OVERVIEW:
# PROGRAM COMPONENTS

This Notice Program outlines procedures to provide notice of the settlement of *Trammell v. Barbara's Bakery, Inc.* as a class action, consistent with the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure.

Based on information provided by Plaintiffs' Counsel, the results of research on Class Members and their response to media and the media habits of the target audience, KM recommends the following two-part notice program.

➢ **DIRECT NOTICE:** Direct Notice to potential Class Members will consist of:

> ➢ A summary of the Settlement will be emailed to a list of known Class Members who purchased Barbara's Bakery products online.

> ➢ A Postcard Notice will be sent via first-class mail to a list of known Class Members who do not receive an email notice.

➢ **PAID MEDIA-BASED NOTICE:** After careful research of the demographics of Class Members, KM recommends broad paid media notice comprised of print and Internet vehicles that will reach those Class Members, including:

> ➢ Consumer magazines and a newspaper supplement, and

> ➢ Internet banner ads on multiple networks and hundreds of targeted websites.

➢ **EARNED MEDIA:** KM recommends amplifying paid media notice efforts with earned media outreach through a press release sent to major media outlets.

To complement the Notice Program and to ensure Class Members' easy access to updated information, KM recommends a dedicated informational website.

NOTICE PROGRAM OVERVIEW:
## DIRECT NOTICE

Direct Notice will consist of emailing a summary of the Settlement to identifiable Class Members, informing them of their legal rights and how they may participate in or opt-out of the Classes. The Notice will be sent to known Class Members who purchased Barbara's Bakery products online. Any email notices that are returned as non-deliverable after three attempts, will be re-mailed in the form of a Postcard Notice to any known address of Class Member who purchased Barbara's Bakery products online.

## NOTICE PROGRAM OVERVIEW:
## PAID MEDIA PROGRAM

Direct Notice will be provided to all identifiable Class Members. To reach Class Members, KM recommends the use of measurable paid media. Paid media advertising is guaranteed to appear, allowing for control of the content, timing, and positioning of the message. Newspapers, consumer magazines, television, radio, and the Internet, among other sources, offer paid media opportunities.

In considering which media to use for this case, KM evaluated the media consumption habits of the following target audience: Adults 18 years of age and older that bought food labeled as natural or organic ("Healthy Food Purchasers").

Based on data regarding the target audience's media consumption, KM researched the most appropriate media vehicles that would be best for this case. KM reviewed available consumer magazines, newspaper supplements, and Internet channels for reach of the target audiences as well as compatibility of the editorial.

# NOTICE PROGRAM OVERVIEW:
## PAID MEDIA PLACEMENTS SUMMARY

The following list provides a brief summary of KM's recommended media placements in this case. More detailed information about each publication and its applicability to the target audience in this case appears in the Paid Media Placements section of this plan.

## PRINT PUBLICATIONS
### Newspaper Supplement
- *Relish*

### Consumer Magazines
- *Parents*
- *People*
- *Southern Living*

## ONLINE MEDIA
### Internet Banner Ads
- 24/7 Network
- Facebook.com
- Microsoft Media Network
- Specific Media Network
- Yahoo! Network

*Trammell v. Barbara's Bakery, Inc.*

# PAID MEDIA METHODOLOGY

*Trammell v. Barbara's Bakery, Inc.*

# PAID MEDIA METHODOLOGY

KM notice programs directed to unidentified class members: (1) identify the demographics of class members and establish a target audience, (2) outline the methodology for selecting the media and other program elements and how they relate to product usage or exposure, and (3) provide results that quantify for the court the adequacy of the notice based upon recognized tools of media measurement.

In the wake of the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the reliability of a notice expert's testimony should be tested against the standards developed within the media industry for determining to what degree and at what frequency a target audience has been reached. In assessing the expert's reliability, the court must determine whether the testifying expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. That showing would likely require evidence that the expert's data and methodology are similar to that used by professionals in the relevant field.

In keeping with the *Daubert* and *Kumho* rulings, KM employs methodology and measurement tools used in the media planning and advertising industry for designing and measuring the adequacy of a paid media program to reach a particular audience.

Choosing a target audience that encompasses the characteristics of class members is the first step in designing the paid media program. KM chooses media vehicles based on their ability to provide effective and cost-efficient penetration of the target audience. Then it measures selected vehicles against the target audience to quantify the reach of the media program and the frequency of exposure to the media vehicles. Reach and frequency estimates are two of the primary measurements used to quantify the media penetration of a target audience.

➤ *Reach* is the estimated number of different people exposed to a specific vehicle or combination of vehicles. It can be expressed as whole number or percentage of the total population.

➤ *Frequency* is the estimated average number of opportunities an audience member has to see the notice.

# TARGET AUDIENCE

Target Audience:
# Selection Methodology

To develop a profile of the demographics and media habits of potential Class Members, KM analyzed syndicated data available from GfK MRI's *2012 Doublebase Study*[1].

GfK MRI is the leading U.S. supplier of multimedia audience research. As a nationally accredited research firm, it provides information concerning magazines, television, radio, Internet and other media to leading national advertisers and over 450 advertising agencies – including 90 of the top 100 in the U.S. GfK MRI's nationally syndicated data are widely used by these companies as the basis for the majority of the media and marketing plans written for advertised brands in the U.S.

Specifically, GfK MRI presents a single-source measurement of major media, products, services, and in-depth consumer demographic and lifestyle characteristics. GfK MRI provides data on media usage, audience composition, and other relevant factors pertaining to all major media types as well as the readership of print vehicles.

Therefore, to adequately reach the Class, KM will purchase and measure media against the following primary target:

➢ Adults 18 years of age and older that bought food labeled as natural or organic ("Healthy Food Purchasers")

---

[1] Since 1979, GfK MRI's *Survey of the American Consumer* has conducted detailed polling of a large sample of U.S. adults about the media they see and hear and about the products they use. Participants in the survey are identified by age, occupation, income, education and by where they live, among other things. They are asked what magazines and newspapers they read, what TV shows and cable channels they watch, and are asked questions about Internet access and radio formats. Survey data indicate the brands and products they use from among 500 categories and 6000 consumer brands. The data from this survey is used by media practitioners industry-wide to characterize media and product users by demographics and to account for and compare the size and make-up of media audiences. The *Doublebase Study* consists of two years of *Survey of the American Consumer* data. (GfK MRI was known until mid-2010 as Mediamark Research & Intelligence, or MRI.)

*Trammell v. Barbara's Bakery, Inc.*

Case 1:12-cv-02664-MCR Document 37-8 Filed 05/04/13 Page 30 of 33 PageID #: 1423

TARGET AUDIENCE:
## DEMOGRAPHICS

Based on GfK MRI data, the graph below outlines the demographics of Healthy Food Purchasers and the demographics of adults 18 years and older ("Adults 18+") for comparison purposes:

| DEMOGRAPHICS | ADULTS 18+ | HEALTHY FOOD PURCHASERS |
|---|---|---|
| **Gender** | | |
| Male | 48.4% | 31.6% |
| Female | 51.6% | 68.4% |
| **Age** | | |
| 18-24 | 12.8% | 11.3% |
| 25-34 | 17.9% | 17.8% |
| 35-44 | 17.7% | 19.0% |
| 45-54 | 19.3% | 21.0% |
| 55-64 | 15.5% | 18.0% |
| 65+ | 16.8% | 13.0% |
| **Education** | | |
| Graduated/Attended College | 55.4% | 69.7% |
| Graduated High School | 30.8% | 22.7% |
| **Household Income[2]** | | |
| Under $20,000 | 13.9% | 8.9% |
| $20,000 - $39,999 | 19.7% | 14.5% |
| $40,000 - $59,999 | 17.0% | 15.9% |
| $60,000 - $74,999 | 10.9% | 10.3% |
| $75,000+ | 38.6% | 50.4% |
| $100,000+ | 25.1% | 33.9% |
| **Ethnicity[3]** | | |
| Caucasian | 76.1% | 79.6% |
| African-American | 11.7% | 9.4% |
| Hispanic | 14.0% | 11.2% |
| Asian | 3.2% | 4.1% |
| Other | 9.5% | 7.4% |

---

[2] The total percentages listed do not equal exactly 100% percent because GfK MRI rounds up all percentages to the nearest tenth of a decimal.

[3] The GfK MRI *Doublebase Study* allows for multi-classification of an individual's ethnicity. Therefore, the sum of all ethnicities may be greater than 100%.

*Trammell v. Barbara's Bakery, Inc.*

| Location[4] | ADULTS 18+ | HEALTHY FOOD PURCHASERS |
|---|---|---|
| A & B "Urban" Counties | 71.7% | 79.6% |
| C & D "Rural" Counties | 28.3% | 20.4% |

Based on these data, Healthy Food Purchasers are more likely than the average adult to be/have:

➢ Women

➢ 25-64 years of age

➢ Educated

➢ A household income over $75,000

➢ Living in urban counties

---

[4] "A" Counties, as defined by A.C. Nielsen Company ("Nielsen"), are all counties belonging to the 25 largest metropolitan areas. These metro areas correspond to the Metropolitan Statistical Area and include the largest cities and consolidated areas in the United States. "B" Counties, as defined by Nielsen, are all counties not included under A that have either a population greater than 150,000 or are in a metro area with a population greater than 150,000 according to the latest census. "C" Counties, as defined by Nielsen, are all counties not included under A or B that either have a population greater than 40,000 or are in a metro area with a population greater than 40,000 according to the latest census. "D" Counties are, essentially, rural counties.

## TARGET AUDIENCE:
## MEDIA USAGE

Individuals spend varying amounts of time with different media. Certain demographic groups may be heavy consumers, light consumers, or non-users of a particular medium. For example, GfK MRI data shows that individuals who are less educated are likely to be heavy television viewers and light newspaper readers. Conversely, highly educated individuals are more likely to be heavy newspaper readers and light television viewers.

KM notice plans focus on the media types used most often by the target audiences. To examine the media habits of the target audience, KM compares the target audience's media usage to that of the average adult 18 years of age and older ("Adult 18+") in usage quintiles reported by GfK MRI. The study ranks respondents based on their amount of exposure to a medium and divides them into five equal-sized groups ("quintiles") from heaviest usage (1) to lightest usage (5).

The media usage of the target audience in each quintile is expressed as an index. An index of 100 is the average adult's usage of a particular medium. Therefore, an index above 100 indicates a heavier usage of the medium than the average adult, and an index below 100 indicates a lighter usage of the medium than the average adult.

The target audience's top two quintiles (heaviest and next heaviest usage) for each type of media are:

| MEDIA | ADULTS 18+ | HEALTHY FOOD PURCHASERS |
|---|---|---|
| **Magazine** | | |
| Quintile 1 | 100.0 | 113.0 |
| Quintile 2 | 100.0 | 113.0 |
| **Newspaper** | | |
| Quintile 1 | 100.0 | 100.0 |
| Quintile 2 | 100.0 | 97.0 |
| **Radio** | | |
| Quintile 1 | 100.0 | 96.0 |
| Quintile 2 | 100.0 | 108.0 |
| **Television** | | |
| Quintile 1 | 100.0 | 67.0 |
| Quintile 2 | 100.0 | 84.0 |
| **Internet** | | |
| Quintile 1 | 100.0 | 125.0 |
| Quintile 2 | 100.0 | 114.0 |

These data indicate the following regarding the target audience's media consumption habits:

*Trammell v. Barbara's Bakery, Inc.*

➢ Heavy consumers of Internet and magazines

➢ Average consumers of newspapers and radio

➢ Light television viewers

© 2013 KINSELLA MEDIA, LLC

*Trammell v. Barbara's Bakery, Inc.*

# PAID MEDIA PLACEMENTS

*Trammell v. Barbara's Bakery, Inc.*

P<small>AID</small> M<small>EDIA</small> P<small>LACEMENTS</small>:
## N<small>EWSPAPER</small> S<small>UPPLEMENTS</small>

*Relish* is a publication known as a newspaper supplement that is inserted into weekend or Sunday editions newspapers nationwide.  These magazines, printed on newsprint, contain articles written for broad, general appeal and encourage readership through brevity.  Issues are typically fewer than 30 pages.  For this Notice Program, KM recommends this newspaper supplement because of its cost-effective reach capability.

*Relish* appears in 1,008 papers. A list of the newspapers into which the selected supplement is inserted is attached as Exhibit B.

KM recommends the following newspaper supplement placement:

## relish

- ➤ A two-fifths-page ad (4.75" x 6.625") once in *Relish* with an estimated circulation of 15,000,000.[5]

- ➤ *Relish* is published monthly and is a food-focused newspaper supplement.  The magazine brings readers useful cooking tips, recipes, and new products for the kitchen.

- ➤ 37.8% of Healthy Food Purchasers read an average issue of *Relish*.

---

[5] The GfK MRI readership estimate for *Relish* is reflective of the broader readership measurement of the newspaper carrier groups into which these supplements are inserted.  A custom study, conducted in 2003, by GfK MRI indicates that the actual readership of the supplements is less than that of the carrier papers.  While this study provided directional insight into the audience, the data provided is highly variable and insufficient for use in specific computation of reach and frequency.  Therefore, the use of carrier paper readership for the newspaper supplements remains an accredited methodology

PAID MEDIA PLACEMENTS:
## CONSUMER MAGAZINES

Most adults read one or more magazines during an average month and nearly three out of five adults read or look at a magazine daily. Heavy readers read 16 or more magazines per month. Weekly magazines quickly accumulate readership and provide timely and efficient notice to readers. KM chose the specific consumer magazines listed below because they are among the highest ranking in coverage of the target audience.

KM recommends the following consumer magazine placements:



- ➢ A half-page ad (3.5" x 10") once in *Parents* with an estimated circulation of 2,200,000.

- ➢ *Parents* is published monthly and provides information and advice in raising healthy children.

- ➢ 6.6% of Healthy Food Purchasers read an average issue of *Parents*.

- ➢ A half-page ad (3.375" x 10") once in *People* with an estimated circulation of 3,475,000.

- ➢ *People* is a weekly publication covering contemporary personalities in entertainment, politics, business, and other current events.

- ➢ 21.8% of Healthy Food Purchasers read an average issue of *People*.

- ➢ A half-page ad (3.5" x 10") once in *Southern Living* with an estimated circulation of 2,800,000.

- ➢ *Southern Living* is a monthly publication covering food, travel, homes, and gardens between the South's traditional and cosmopolitan attitudes.

- ➢ Healthy Food Purchasers are 24% more likely than the average adult to be *Southern Living* readers.

PAID MEDIA PLACEMENTS:
## TARGET AUDIENCE'S PRINT READERSHIP

Readership includes both primary readers and pass-along readers. Primary readers purchase a publication or are members of a household where the publication was purchased. Pass-along readers are those who read the publication outside the home, in places such as a doctor's office. The table below indicates the estimated number of readers in the target audience of an average issue of the magazine or newspaper supplement:

| PUBLICATION | INSERTIONS | HEALTHY FOOD PURCHASERS |
|---|---|---|
| *Parents* | 1 | 1,374,000 |
| *People* | 1 | 4,543,000 |
| *Southern Living* | 1 | 1,670,000 |
| *Relish* | 1 | 7,866,000 |

*Trammell v. Barbara's Bakery, Inc.*

## PAID MEDIA PLACEMENTS:
## INTERNET ADVERTISING

GfK MRI provides data on Internet usage by asking survey respondents about their online usage during the 30 days prior to the survey. According to GfK MRI, 88.2% of Healthy Food Purchasers used the Internet during the last 30 days.

Accordingly, KM recommends incorporating Internet advertising into the Notice Program in order to provide potential Class Members with additional national notice opportunities beyond the broad-reaching print program. Internet advertising delivers an immediate message and allows the viewer of an advertisement to instantly click through to a website for further information.

### WEBSITE ADVERTISING

KM recommends placing ads on a wide range of websites, enabling maximum exposure opportunities to reach the broad audience of Healthy Food Purchasers. In addition, websites with audiences that are highly comprised of the specific target audiences were also selected. KM also recommends using advanced targeting to reach Healthy Food Purchasers and to optimize based on performance during the campaign. After optimization additional Internet sites may be used to increase exposure to the message. (Delivery of Internet impressions to specific sites and categories within sites are subject to availability at the time KM purchases the media.)

KM recommends 247,000,000+ impressions in the following Web placements:



- ➤ 24/7 Real Media is a network that represents over 5,000 websites.

- ➤ Banner advertisements measuring 728 x 90 pixels, 300 x 250 pixels, and 160 x 600 pixels will appear, on a rotating basis, on websites that are part of the 24/7 Real Media Network.

**facebook**

- ➤ Facebook.com is a free, global social networking website that helps people communicate with friends, family and coworkers.

- ➤ A banner advertisement measuring 100 x 100 pixels will appear, on a rotating basis, on Facebook.com.

*Trammell v. Barbara's Bakery, Inc.*



➢ Microsoft Media Network is a premium ad network of top-ranked commercial sites.

➢ Banner advertisements measuring 728 x 90 pixels, 300 x 250 pixels, and 160 x 600 pixels will appear, on a rotating basis, on the Microsoft Media Network.

**specificmedia**

➢ Specific Media is an online media company that enables advertisers to target audiences through advanced proprietary technologies across a premium network.

➢ Banner advertisements measuring 728 x 90 pixels, 300 x 250 pixels, and 160 x 600 pixels will appear, on a rotating basis, on the Specific Media Network.

**YAHOO!**

➢ Yahoo! is a leading Internet brand and a global online network of integrated services providing users with entertainment and other quality content.

➢ Banner advertisements measuring 728 x 90 pixels, 300 x 250, and 120 x 600 pixels will appear, on a rotating basis, on various Yahoo! Web pages.

# NATIONAL MEDIA DELIVERY

The paid media program outlined in this plan provides Class Members with multiple exposure opportunities to media vehicles carrying the Notice and delivers the following estimated reach and frequency measurements to the target audience defined by the 2012 ComScore/GfK MRI Media+ Fusion (12-12/S12) Study[6] from GfK MRI and comScore:

> ➤ An estimated 80.1% of Healthy Food Purchasers will be reached with an average estimated frequency of 2.3 times, delivering at least 38,000,000 gross impressions.[7]

---

[6] GfK MRI Net+ Fusion combines GfK MRI's *Survey of the American Consumer* and Nielsen Online's NetView, providing a single-source dataset of off-line and online media usage by American consumers. Nielsen uses a patented metering technology and representative panels of Internet users to collect and report consumer Internet usage. The GfK MRI survey provides data on magazine and newspaper reading, television viewing, radio listening, product consumption, psychographic characteristics, computer and Internet access configurations, and geo-demographic characteristics. Combining the two datasets provides unduplicated audience estimates across print and online media.

[7] Gross Impressions are the duplicated sum of audiences to the media vehicles containing the notice.

# NOTICE DESIGN

*Trammell v. Barbara's Bakery, Inc.*

NOTICE DESIGN:
## DIRECT NOTICE

The plain language Email and Postcard Notices (Exhibit C) are designed to alert Class Members to the litigation by using an informative headline. This headline will enable Class Members to quickly determine if they may be affected by the litigation. Plain language text provides important information regarding the subject of the litigation, the Class definition, and the legal rights available to Class Members. The Email and Postcard Notices include all of the substantive information required by Rule 23.


Each notice will prominently feature a toll-free number and website address for Class Members to obtain the Detailed Notice and other information.

## NOTICE DESIGN:
## DETAILED NOTICE

The Detailed Notice (Exhibit D) will be compliant with Rule 23 and consistent with the Federal Judicial Center's "illustrative" class action notices. Specifically, the Detailed Notice will clearly and concisely state in plain, easily understood language:

- ➤ The nature of the action;

- ➤ The definition of the class certified;

- ➤ The class claims, issues, or defenses;

- ➤ That a class member may enter an appearance through an attorney if the member so desires;

- ➤ That the Court will exclude from the class any member who requests exclusion;

- ➤ The time and manner for requesting exclusion; and

- ➤ The binding effect of a class judgment on members under Rule 23 (c)(3).

The Detailed Notice will prominently feature a toll-free number and website address for Class Members to obtain more information and file a claim.

Notice Design:
## PUBLICATION NOTICE

Rule 23(c)(2) of the Federal Rules of Civil Procedure requires notices in 23(b)(3) class actions to be written in "plain, easily understood language." KM applies the plain language requirement in drafting all notices in federal and state class actions. The firm maintains a strong commitment to adhering to the plain language requirement, while drawing on its experience and expertise to draft notices that effectively convey the necessary information to Class Members.

The plain language Publication Notice (Exhibit E), is designed to alert Class Members to the litigation by using a bold headline. This headline will enable Class Members to quickly determine if they are potentially affected by the litigation. Plain language text provides important information regarding the subject of the litigation, the Class definition and the legal rights available to Class Members. The Publication Notice will include all the substantive information required by Rule 23.

Each advertisement will prominently feature a toll-free number and website address to obtain the Detailed Notice and other information.

*Trammell v. Barbara's Bakery, Inc.*

# Notice Design:
## Website and Internet Ads

An informational interactive website is a critical component of the Notice Program. A website is a constant information source instantly accessible to millions. In this case, the site will capitalize on the Internet's ability to distribution information and provide access to customer service.

## Website Design

Combining clean site design, consistent site navigation cues and search engine optimization, the website will provide Class Members with easy access to the details of the litigation.

> ➤ **Clean Design:** The site will be designed for ease of navigation and comprehension, with user-friendly words and icons. Clearly labeled content will include the Detailed Notice, court documents, and answers to frequently asked questions. A "Contact Us" page will provide a toll-free number for individuals seeking additional information and the address or email of Class Counsel.

> ➤ **Online Registration/Claim Filing:** In an effort to make it even easier for Class Members to receive information/make claims, the website will allow users to request hard copies of materials, and/or make a claim online.

## Internet Banner Ad Design

KM will design Internet banner advertisements to alert Class Members to the litigation by using a bold headline. The headline will enable Class Members to quickly determine if they may be affected by the litigation. When users click on the banner advertisement, they will be connected to the informational website that contains complete information about their legal rights.

# EARNED MEDIA PROGRAM

Earned media provides additional notice to Class Members, amplifying the paid media program. Earned media, as opposed to paid media, occurs by disseminating a message about the Settlement to the media without a guarantee that it will appear. KM will distribute the message to media outlets (newspapers, websites, television, and radio stations) hoping to spark press interest and generate coverage.

The earned media outreach for this program will focus primarily on key daily newspapers, websites, wire services, national newspaper bureaus, and major television and radio outlets.

## TRADITIONAL PRESS RELEASE

KM will distribute a press release on PR Newswire's US1 national wire, reaching more than 5,500 print and broadcast outlets and more than 5,400 websites and online databases. The press release will highlight the toll-free telephone number and Settlement website address so that Class Members can obtain complete information.

## TOLL-FREE TELEPHONE SUPPORT

A toll-free interactive voice response system (IVR) will be established to service Class Members calling as a result of seeing the paid media notice. Callers requesting the Detailed Notice will be prompted to input the telephone number of the residence where they would like to receive the Notice.

The system uses an address look-up database to locate the corresponding address of the resident. A portion of the address will be read back to the caller for address verification. For successful look-ups, the caller will be asked to speak the Class Member's full name and to spell the last name. If the look-up fails, is incorrect, or the call is placed from a rotary dial telephone, callers will be prompted to state their name, address, and telephone number.

# EXHIBIT A



# Kinsella Media, LLC

## Relevant Case Experience

### Antitrust

*Big Valley Milling, Inc. v. Archer Daniels Midland Co.,* No. 65-C2-96-000215 (Minn. Dist. Ct. Renville County) (lysine).

*Carlson v. Abbott Laboratories*, No. 94-CV-002608 (Wis. Cir. Ct. Milwaukee County) (infant formula).

*Comes v. Microsoft Corp.,* No. CL8231 (Iowa Dist. Ct. Polk County

*Connecticut v. Mylan Laboratories, Inc.,* No. 99-276, MDL No. 1290 (D.D.C.) (pharmaceutical).

*Conroy v. 3M Corp.*, No. C-00-2810 CW (N.D. Cal.) (invisible tape).

*Copper Antitrust Litigation,* MDL 1303 (W.D. Wis.) (physical copper).

*Cox v. Microsoft Corp.,* No. 105193/00 (N.Y. Sup. Ct. N.Y. County) (software).

*D.C. 37 Health & Security Plan v. Medi-Span*, No. 07-cv-10988 (D.Mass.); *New England Carpenters Health Benefits Fund v. First DataBank, Inc.,* No. 1:05-CV-11148 (D. Mass.) (pharmaceutical).

*Giral v. Hoffman-LaRoche Ltd.*, C.A. No. 98 CA 7467 (W. Va. Cir. Ct., Kanawha County) (vitamins).

*In re Buspirone Antitrust Litigation*, MDL No. 1413 (S.D.N.Y.) (pharmaceutical).

*In re Cardizem Antitrust Litigation*, 200 F.R.D. 326 (E.D. Mich.) (pharmaceutical).

*In re Compact Disc Minimum Price Antitrust Litigation*, MDL No. 1361 (D. Me.) (compact discs).

*In re Insurance Brokerage Antitrust Litig.*, MDL No. 1663 Civil No. 04-5184 (FSH) (D.N.J.) (insurance).

*In re International Air Transportation Surcharge Antitrust Litigation*, No. M 06-1793, MDL No. 1793 (N.D. Cal.) (airline fuel surcharges).

*In re Monosodium Glutamate Antitrust Litig.,* D-0202-CV-0200306168, D-202-CV-200306168 (N.M. Dist. Ct., Bernalillo County) (MSG).

*In re Motorsports Merchandise Antitrust Litigation,* No. 1:97-CV-2314-TWT (N.D. Ga.) (merchandise).

*In re Nasdaq Market-Makers Antitrust Litigation*, MDL No. 1023 (S.D.N.Y.) (securities).

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, No. CA:01-CV-12257, MDL No. 1456 (D. Mass.) (pharmaceutical).

*In re Toys "R" Us Antitrust Litigation*, No. CV-97-5750, MDL No. 1211, (E.D.N.Y.) (toys and other products).

*In re Western States Wholesale Natural Gas Antitrust Litigation*, No. CV-03-1431, MDL No. 1566, (D. Nev) (natural gas).

*Kelley Supply, Inc. v. Eastman Chemical Co*., No. 99CV001528 (Wis. Cir. Ct., Dane County) (Sorbates).

*Ohio vs. Bristol-Myers Squibb, Co*., No. 1:02-cv-01080 (D.D.C.) (pharmaceutical).

*Raz v. Archer Daniels Midland Co.,* Inc., No. 96-CV-009729 (Wis. Cir. Ct. Milwaukee County) (citric acid).

## Consumer and Product Liability

*Azizian v. Federated Department Stores, Inc.,* No. 4:03 CV-03359 (N.D. Cal.) (cosmetics).

*Baird v. Thomson Consumer Elecs.,* No. 00-L-000761 (Ill. Cir. Ct., Madison County) (television).

*Bonilla v. Trebol Motors Corp.,* No. 92-1795 (D.P.R.) (automobiles).

*Burch v. American Home Products Corp.,* No. 97-C-204 (1-11) (W. Va. Cir. Ct., Brooke County) (Fen Phen).

*Cosby v. Masonite Corp., No.* CV-97-3408 (Ala. Cir. Ct. Mobile County) (siding product); *Quin v. Masonite Corp.,* No. CV-97-3313 (Ala. Cir. Ct. Mobile County) (roofing product).

*Cox v. Shell Oil Co.,* No. 18,844 (Tenn. Ch. Ct. Obion County) (polybutylene pipe).

*Daniel v. AON Corp.,* No. 99 CH 11893 (Ill. Cir. Ct. Cook County) (insurance).

*Fettke v. McDonald's Corp.,* No. 044109 (Cal. Super Ct. Marin County) (trans fatty acids).



*Florida v. Nine West Group, Inc.,* No. 00 CIV 1707 (S.D.N.Y.) (shoes).

*Foothill/De Anza Community College Dist. v. Northwest Pipe Co.,* No. 00-20749-JF(N.D. Cal.) (fire sprinklers).

*Galanti v. The Goodyear Tire & Rubber Company,* No. 03-209 (D.N.J.) (radiant heating) (2002).

*Garza v. Sporting Goods Properties, Inc.,* No. SA 93-CA-1082 (W.D. Tex.) (gun ammunition).

*Hoorman v. GlaxoSmithKline,* No. 04-L-715 (Ill. Cir. Ct., Madison Cty.) (Paxil pharmaceutical*).*

*In re Louisiana Pacific Corp. Inner Seal OSB Trade Practices Litigation,* MDL No. 1114 (N.D. Cal.) (oriented strand board).

*In re Tri-State Crematory Litig,* MDL 1467 (N.D. Ga.) (improper burial).

*Lebrilla v. Farmers Group Inc.,* No. 00-CC-07185 (Cal. Super. Ct., Orange County) (auto insurance).

*Lovelis v. Titflex,* No. 04-211 (Ak. Cir. Ct., Clark County) (gas transmission pipe).

*Naef v. Masonite Corp.,* No. CV-94-4033 (Ala. Cir. Ct. Mobile County) (hardboard siding product).

*Peterson v. BASF Corp.,* No. C2-97-295 (D. Minn.) (herbicide).

*Posey v. Dryvit Sys., Inc.* No. 17,715-IV (Tenn. Cir. Ct., Jefferson County) (EIFS stucco).

*Reiff v. Epson America, Inc. and Latham v. Epson Am., Inc.,* J.C.C.P. No. 4347 (Cal. Super. Ct., L.A. County) (ink jet printers).

*Richison v. Weyerhaeuser Company Limited,* No. 05532 (Cal. Super. Ct. San Joaquin County) (roofing product).

*Ruff v. Parex, Inc.,* No. 96-CvS 0059 (N.C. Super. Ct. Hanover County) (synthetic stucco product).

*Shah v. Re-Con Building Products, Inc.,* No. C99-02919 (Cal. Super. Ct. Contra Costa County) (roofing product).

*Shields vs. Bridgestone/Firestone, Inc., Bridgestone Corp.,* No. E-167.637 (D. Tex.) (tires).

*Smith v. Behr Process Corp.,* No. 98-2-00635 (Wash. Super. Ct., Gray Harbor County) (stain product).



*Weiner v. Cal-Shake, Inc., J.*C.C.P. No. 4208 (Cal. Super. Ct., Contra Costa County) (roofing product).

*Wholesale Elec. Antitrust Cases I & II,* J.C.C.P. Nos. 4204 & 4205 (Cal. Super. Ct., San Diego County) (energy).

*Woosley v. State of California,* No. CA 000499 (Cal. Super. Ct., Los Angeles County) (automobiles).

## Mass Tort

*Ahearn v. Fibreboard Corp.,* No. 6:93cv526 (E.D. Tex); *Continental Casualty Co. v. Rudd*, No. 6:94cv458 (E.D. Tex) (asbestos injury).

*Backstrom v. The Methodist Hospital,* No. H.-94-1877 (S.D. Tex.) (TMJ injury).

*Engle v. RJ Reynolds Tobacco Co.,* No. 94-08273 (Fla. Cir. Ct. Dade County) (tobacco injury).

*Georgine v. Amchem, Inc.,* No. 93-CV-0215 (E.D. Pa.) (asbestos injury).

## Bankruptcies

*In re Armstrong World Industries, Inc.,* No. 00-4471 (Bankr. D. Del.).

*In re Dow Corning,* No. 95-20512 (Bankr. E.D. Mich.) (breast implants).

*In re Johns-Manville Corp.,* 68 B.R. 618, 626 (Bankr. S.D.N.Y.) (asbestos).

*In re Kaiser Aluminum Corp.,* No. 02-10429 (JFK) (D. Del).

*In re Owens Corning,* No. 00-03837 (Bankr. D. Del.).

*In re Raytech Corp.,* No. 5-89-00293 (Bankr. D. Conn.) (asbestos).

*In re The Celotex Corp.,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (asbestos).

*In re U.S. Brass Corp.,* No.94-40823S (Bankr. E.D. Tex.) (polybutylene).

*In re USG Corp.,* Nos. 01-2094 - 01-2104 (Bankr. D. Del.).

*In re W.R. Grace & Co.,* No. 01-01139 (Bankr. D. Del.).



## Insurance

*McNeil v. American General Life and Accident Insurance Co.,* No. 8-99-1157 (M.D. Tenn.) (insurance).

*Nealy v. Woodmen of the World Life Insurance Co.,* No. 3:93 CV-536 (S.D. Miss.) (insurance).

## Holocaust Victims Reparations

*In re Holocaust Victim Assets Litigation,* Nos. CV 96-4849, CV-5161 and CV 97-461 (E.D.N.Y.) (Holocaust).

The International Commission on Holocaust Era Insurance Claims Outreach

## Pension Benefits

*Collins v. Pension Benefit Guarantee Corp.,* No. 88-3406 (D.D.C.); Page v. Pension Benefit Guarantee Corp., No. 89-2997 (D.D.C.).

*Forbush v. J. C. Penney Co., Inc.,* Nos. 3:90-2719 and 3:92-0109 (N.D. Tex.).

## International

*Ahearn v. Fiberboard Corporation,* No. 6:93cv526 (E.D. Tex) and *Continental Casualty Co. v. Rudd,* No. 6:94cv458 (E.D. Tex.) (asbestos injury) (1993).

*Galanti v. The Goodyear Tire & Rubber Company,* No. 03-209 (D.N.J.) (radiant heating) (2002).

*In re Holocaust Victims Assets Litigation,* No. CV 96-4849 (ERK) (MDG) (Consolidated with CV-5161 and CV 97461) (E.D.N.Y.) (2003).

*In re Owens Corning, Chapter 11,* No. 00-03837 (MFW) (Bankr. D. Del.) (2006).

*In re The Celotex Corporation, Chapter 11,* Nos. 90-10016-8B1 and 90-10017-8B1 (Bankr. M.D. Fla.) (1996).

*In re USG Corporation, Chapter 11,* Nos. 01-2094 (RJN) through 01-2104(RJN) (Bankr. D. Del.) (2006).

*In re Western Union Money Transfer Litigation,* No. 01 0335 (CPS) (VVP) (E.D.N.Y.) (wire transactions) (2004).

*In re W.R. Grace & Co., Chapter 11,* No. 01-01139 (Bankr. D. Del.) (bankruptcy) (2001).



International Committee on Holocaust Era Insurance Claims (1999).

## Product Recall

Central Sprinkler Voluntary Omega Sprinkler Replacement Program

*Hart v. Central Sprinkler Corp.,* No. BC17627 (Cal. Super. Ct. Los Angeles County) & *County of Santa Clara v. Central Sprinkler Corp., No.* CV 17710119 (Cal. Super. Ct. Santa Clara County)

## Telecom

*Bidner, et al. v. LCI International Telecom Corp d/b/a Qwest Communications.*

*Community Health Association v. Lucent Technologies, Inc.,* No. 99-C-237, (W.Va. Cir. Ct., Kanawha County).

*Cundiff et al. v. Verizon California, Inc.,* No. 237806 (Cal. Super Ct., Los Angeles County).

*Kushner v. AT&T Corporation,* No. GIC 795315 (Cal. Super. Ct., San Diego County).

*Rish Enterprise v. Verizon New Jersey,* No. MID-L-8946-02 (N.J. Super. Ct.).

*Sonnier, et. al. v. Radiofone, Inc.,* No. 44-844, (L.A. Jud. Dist. Ct., Plaquemines Parish County).

*State of Louisiana v. Sprint Communications Company L.P.,* No. 26,334 (Jud. Dis. Ct., Parish of West Baton Rouge) and *State of Louisiana v. WilTel, Inc.,* No. 26,304 (Jud. Dis. Ct., Parish of West Baton Rouge).



Case 1:12-cv-02684-CRB   Document 37-8   Filed 04/25/13   Page 55 of 303   PageID #: 1448

# EXHIBIT B

# Relish Carrier Newspaper List

| Publication | City | State | County | Circulation | DMA |
|---|---|---|---|---|---|
| The Sand Mountain Reporter | Albertville | AL | Marshall | 10,100 | HUNTSVILLE-DECATUR (FLOR) |
| The Outlook | Alexander City | AL | Tallapoosa | 3,900 | MONTGOMERY (SELMA) |
| The Andalusia Star-News | Andalusia | AL | Covington | 4,450 | MONTGOMERY (SELMA) |
| The Anniston Star | Anniston | AL | Calhoun | 22,000 | BIRMINGHAM (ANN AND TUSC) |
| Daily Home | Anniston | AL | Calhoun | 9,500 | BIRMINGHAM (ANN AND TUSC) |
| Coosa Valley Advantage | Anniston | AL | Calhoun | 17,500 | BIRMINGHAM (ANN AND TUSC) |
| The News Courier | Athens | AL | Limestone | 7,226 | HUNTSVILLE-DECATUR (FLOR) |
| The Atmore Advance | Atmore | AL | Escambia | 3,200 | MOBILE-PENSACOLA (FT WALT) |
| The Brewton Standard | Brewton | AL | Escambia | 3,000 | MOBILE-PENSACOLA (FT WALT) |
| The Cullman Times | Cullman | AL | Cullman | 12,125 | BIRMINGHAM (ANN AND TUSC) |
| The Demopolis Times | Demopolis | AL | Marengo | 3,000 | MONTGOMERY (SELMA) |
| The Dothan Eagle | Dothan | AL | Houston | 31,700 | DOTHAN |
| The Eufaula Tribune | Eufaula | AL | Barbour | 5,580 | COLUMBUS GA |
| The Times-Journal | Fort Payne | AL | DeKalb | 6,500 | HUNTSVILLE-DECATUR (FLOR) |
| North Jefferson News | Gardendale | AL | Jefferson | 4,454 | BIRMINGHAM (ANN AND TUSC) |
| Daily Mountain Eagle | Jasper | AL | Walker | 11,044 | BIRMINGHAM (ANN AND TUSC) |
| The Monroe Journal | Monroeville | AL | Monroe | 7,000 | MOBILE-PENSACOLA (FT WALT) |
| The Opelika-Auburn News | Opelika | AL | Lee | 14,800 | COLUMBUS GA |
| St. Clair News-Aegis | Pell City | AL | St. Clair | 3,200 | BIRMINGHAM (ANN AND TUSC) |
| The Randolph Leader | Roanoke | AL | Randolph | 7,200 | ATLANTA |
| The Daily Sentinel | Scottsboro | AL | Jackson | 5,100 | HUNTSVILLE-DECATUR (FLOR) |
| The Tallassee Tribune | Tallassee | AL | Elmore | 4,000 | MONTGOMERY (SELMA) |
| The Messenger | Troy | AL | Pike | 3,333 | MONTGOMERY (SELMA) |
| The Eclectic Observer | Wetumpka | AL | Elmore | 1,600 | MONTGOMERY (SELMA) |
| The Wetumpka Herald | Wetumpka | AL | Elmore | 4,000 | MONTGOMERY (SELMA) |
| Blytheville Courier News | Blytheville | AR | Mississippi | 4,949 | MEMPHIS |
| Camden News | Camden | AR | Ouachita | 3,959 | LITTLE ROCK-PINE BLUFF |
| The Villager Journal | Cherokee Village | AR | Sharp | 2,200 | JONESBORO |
| El Dorado News-Times | El Dorado | AR | Union | 9,382 | MONROE-EL DORADO |
| Northwest Arkansas Times | Fayetteville | AR | Washington | 64,000 | FT. SMITH-FAY-SPRNGDL-RGRS |
| Cleburne County Sun-Times | Heber Springs | AR | Cleburne | 5,025 | LITTLE ROCK-PINE BLUFF |
| Helena-West Helena Daily World | Helena | AR | Phillips | 4,090 | MEMPHIS |
| Hope Star | Hope | AR | Hempstead | 3,075 | SHREVEPORT |
| The Daily Siftings Herald | Hope | AR | Hempstead | 3,075 | SHREVEPORT |
| The Sentinel-Record | Hot Spring | AR | Garland | 22,370 | LITTLE ROCK-PINE BLUFF |
| The Jonesboro Sun | Jonesboro | AR | Craighead | 20,000 | JONESBORO |
| Arkansas Democrat Gazette Inc | Little Rock | AR | Pulaski | 120,000 | LITTLE ROCK-PINE BLUFF |
| Banner-News | Magnolia | AR | Columbia | 4,157 | SHREVEPORT |
| Northeast Arkansas Town Crier | Manila | AR | Mississippi | 2,000 | MEMPHIS |
| Newport Independent | Newport | AR | Jackson | 2,261 | LITTLE ROCK-PINE BLUFF |
| Paragould Daily Press | Paragould | AR | Greene | 4,800 | JONESBORO |
| Clay County Times Democrat | Rector | AR | Clay | 2,600 | JONESBORO |
| The Courier | Russellville | AR | Pope | 8,500 | LITTLE ROCK-PINE BLUFF |
| The News | Salem | AR | Fulton | 2,550 | SPRINGFIELD MO |
| The Daily Citizen | Searcy | AR | White | 5,208 | LITTLE ROCK-PINE BLUFF |
| Daily Leader | Stuttgart | AR | Arkansas | 3,015 | LITTLE ROCK-PINE BLUFF |
| Poinsett County Democrat Tribune | Trumann | AR | Poinsett | 1,500 | MEMPHIS |
| The White Hall Journal | White Hall | AR | Jefferson | 2,350 | LITTLE ROCK-PINE BLUFF |
| San Pedro Valley News - Sun | Benzon | AZ | Cochise | 3,030 | TUCSON (SIERRA VISTA) |
| The Bugle | Cottonwood | AZ | Yavapai | 2,450 | PHOENIX (PRESCOTT) |
| The Verde Independent | Cottonwood | AZ | Yavapai | 2,499 | PHOENIX (PRESCOTT) |
| The Daily Dispatch | Douglas | AZ | Cochise | 4,040 | TUCSON (SIERRA VISTA) |
| Arizona Daily Sun | Flagstaff | AZ | Coconino | 11,383 | PHOENIX (PRESCOTT) |
| The Kingman Daily Miner | Kingman | AZ | Mohave | 8,314 | PHOENIX (PRESCOTT) |
| Today's News Herald | Lake Havasu City | AZ | Mohave | 11,500 | PHOENIX (PRESCOTT) |
| Parker Pioneer | Parker | AZ | Mohave | 4,660 | PHOENIX (PRESCOTT) |
| Payson Roundup | Payson | AZ | Gila | 6,000 | PHOENIX (PRESCOTT) |
| Ahwatukee Foothills News | Phoenix | AZ | Maricopa | 28,280 | PHOENIX (PRESCOTT) |
| The Daily Courier | Prescott | AZ | Yavapai | 16,500 | PHOENIX (PRESCOTT) |
| Eastern Arizona Courier | Safford | AZ | Graham | 6,666 | PHOENIX (PRESCOTT) |
| Sedona Red Rock News | Sedona | AZ | Coconino | 5,500 | PHOENIX (PRESCOTT) |
| White Mountain Independent | Show Low | AZ | Navajo | 9,000 | PHOENIX (PRESCOTT) |
| Sierra Vista Herald | Sierra Vista | AZ | Cochise | 10,605 | TUCSON (SIERRA VISTA) |
| Glendale/Peoria Today | Sun City | AZ | Maricopa | 30,000 | PHOENIX (PRESCOTT) |

**Relish Carrier Newspaper List**

| Surprise Today | Sun City | AZ | Maricopa | 40,000 PHOENIX (PRESCOTT) |
|---|---|---|---|---|
| Chandler Tribune/East Valley Tribune | Tempe | AZ | Maricopa | 98,000 PHOENIX (PRESCOTT) |
| Arizona Range News | Willcox | AZ | Cochise | 3,131 PHOENIX (PRESCOTT) |
| Williams-Grand Canyon News | Williams | AZ | Coconion | 4,000 PHOENIX (PRESCOTT) |
| The Sun | Yuma | AZ | Yuma | 24,450 YUMA-EL CENTRO |
| Palo Verde Valley Times(/Quartzsite Times) | Blythe | CA | Riverside | 4,140 LOS ANGELES |
| Chester Progressive | Chester | CA | Lassen | 2,440 SACRAMNTO-STKTON-MODESTO |
| Chico-Orovlle Enterprise Record | Chico | CA | Butte | 28,000 CHICO-REDDING |
| The Davis Enterprise | Davis | CA | Yolo | 10,393 SACRAMNTO-STKTON-MODESTO |
| Imperial Valley Press | El Centro | CA | Imperial | 11,500 YUMA-EL CENTRO |
| Escalon Times | Escalon | CA | Stanislaus | 1,700 SACRAMNTO-STKTON-MODESTO |
| Escalon Times | Escalon | CA | Stanislaus | 1,800 SACRAMNTO-STKTON-MODESTO |
| Eureka Times Standard | Eureka | CA | Humboldt | 30,684 EUREKA |
| Daily Republic | Fairfield | CA | Solano | 19,301 SACRAMNTO-STKTON-MODESTO |
| Fort Bragg Advocate News | Fort Bragg | CA | Mendocino | 5,048 SAN FRANCISCO-OAK-SAN JOSE |
| Fremont Argus | Fremont | CA | Alameda | 22,068 SAN FRANCISCO-OAK-SAN JOSE |
| The Union | Grass Valley | CA | Nevada | 15,000 SACRAMNTO-STKTON-MODESTO |
| Indian Valley Record | Greenville | CA | Plumas | 1,498 SACRAMNTO-STKTON-MODESTO |
| The Gridley Herald | Gridley | CA | Butte | 2,500 CHICO-REDDING |
| The Hanford Sentinel | Hanford | CA | Kings | 15,913 FRESNO-VISALIA |
| Hayward Daily Review | Hayward | CA | Alameda | 24,275 SAN FRANCISCO-OAK-SAN JOSE |
| Lake County Record Bee | Lakeport | CA | Lake | 9,086 SAN FRANCISCO-OAK-SAN JOSE |
| Lompoc Record | Lompoc | CA | Santa Barbara | 6,900 SANTABARBRA-SANMAR-SANLUOB |
| Press Telegram | Long Beach | CA | Los Angeles | 60,773 LOS ANGELES |
| The Manteca Bulletin | Manteca | CA | San Joaquin | 5,800 SACRAMNTO-STKTON-MODESTO |
| Appeal-Democrat | Marysville | CA | Yuba | 27,000 SACRAMNTO-STKTON-MODESTO |
| Merced Sun-Star | Merced | CA | Merced | 18,500 FRESNO-VISALIA |
| The Modesto Bee | Modesto | CA | Stanislaus | 59,500 SACRAMNTO-STKTON-MODESTO |
| The Monterey County Herald | Monterey | CA | Monterey | 25,863 MONTEREY-SALINAS |
| Salinas Valley Weekly | Monterey | CA | Monterey | 35,000 MONTEREY-SALINAS |
| Mount Shasta Herald | Mount Shasta | CA | Siskiyou | 4,920 MEDFORD-KLAMATH FALLS |
| The Napa Valley Register | Napa | CA | Napa | 14,300 SAN FRANCISCO-OAK-SAN JOSE |
| The Napa Valley Register | Napa | CA | Napa | 14,300 SAN FRANCISCO-OAK-SAN JOSE |
| Marin Indpendent Journal | Novato | CA | Marin | 30,483 SAN FRANCISCO-OAK-SAN JOSE |
| Oakdale Leader | Oakdale | CA | Stanislaus | 3,600 SACRAMNTO-STKTON-MODESTO |
| Alameda Times Star | Oakland | CA | Alameda | 4,540 SAN FRANCISCO-OAK-SAN JOSE |
| The Oakland Tribune | Oakland | CA | San Mateo | 35,157 SAN FRANCISCO-OAK-SAN JOSE |
| Inland Valley Daily Bulletin | Ontario | CA | San Bernardino | 42,899 LOS ANGELES |
| Antelope Valley Press | Palmdale | CA | Los Angeles | 19,500 LOS ANGELES |
| Paradise Post | Paradise | CA | Butte | 8,084 CHICO-REDDING |
| Star News | Pasadena | CA | Los Angeles | 21,623 LOS ANGELES |
| Mountain Democrat | Placerville | CA | Placer | 14,783 SACRAMNTO-STKTON-MODESTO |
| Tri-Valley Herald | Pleasanton | CA | Alameda | 23,820 SAN FRANCISCO-OAK-SAN JOSE |
| The Porterville Recorder | Porterville | CA | Tulare | 8,791 FRESNO-VISALIA |
| Portola Reporter | Portola | CA | Plumas | 2,475 SACRAMNTO-STKTON-MODESTO |
| Feather River Bulletin | Quincy | CA | Plumas | 3,742 SACRAMNTO-STKTON-MODESTO |
| Red Bluff Daily News | Red Bluff | CA | Tehama | 7,918 CHICO-REDDING |
| Redlands Daily Fact | Redlands | CA | San Bernardino | 7,324 LOS ANGELES |
| The Daily Indpendent | Ridgecrest | CA | Kern | 8,200 LOS ANGELES |
| The Sacramento Bee | Sacramento | CA | Sacramento | 176,000 SACRAMNTO-STKTON-MODESTO |
| The Sun | San Bernardino | CA | San Bernardino | 43,019 LOS ANGELES |
| The San Diego Union-Tribune | San Diego | CA | San Diego | 257,000 SAN DIEGO |
| San Jose Mercury News | San Jose | CA | Santa Clara | 173,504 SAN FRANCISCO-OAK-SAN JOSE |
| San Mateo County Times | San Mateo | CA | Alameda | 20,486 SAN FRANCISCO-OAK-SAN JOSE |
| The Signal | Santa Clarita | CA | Los Angeles | 10,046 LOS ANGELES |
| Santa Cruz Sentinel | Santa Cruz | CA | Santa Cruz | 25,531 MONTEREY-SALINAS |
| The Santa Maria Times | Santa Maria | CA | Santa Barbara | 20,418 SANTABARBRA-SANMAR-SANLUOB |
| Tahoe Daily Tribune | South Lake Tahoe | CA | El Dorado | 7,600 RENO |
| The Record | Stockton | CA | San Joaquin | 30,700 SACRAMNTO-STKTON-MODESTO |
| Lassen County Times | Susanville | CA | Lassen | 8,600 RENO |
| Westwood Pinepress | Susanville | CA | Lassen | 1,245 RENO |
| Daily Midway Driller | Taft | CA | Kern | 3,075 LOS ANGELES |
| Daily Breeze | Torrance | CA | Los Angeles | 58,621 LOS ANGELES |
| Sierra Sun | Truckee | CA | Nevada | 5,700 SACRAMNTO-STKTON-MODESTO |
| Turlock Journal | Turlock | CA | Stanislaus | 3,600 SACRAMNTO-STKTON-MODESTO |

**Relish Carrier Newspaper List**

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| Ukiah Daily Journal | Ukiah | CA | Mendocino | 7,774 | SAN FRANCISCO-OAK-SAN JOSE |
| Vacaville Reporter | Vacaville | CA | Solano | 17,187 | SACRAMNTO-STKTON-MODESTO |
| Vallejo Times Herald | Vallejo | CA | Solano | 17,311 | SAN FRANCISCO-OAK-SAN JOSE |
| Press-Dispatch | Victorville | CA | San Bernardino | 39,972 | LOS ANGELES |
| Visalia Times Delta/Tulare Advance Register | Visalia | CA | Tulare | 20,500 | FRESNO-VISALIA |
| Contra Costa Times | Walnut Creek | CA | Contra Costa | 146,500 | SAN FRANCISCO-OAK-SAN JOSE |
| San Gabriel Valley Tribune | West Covina | CA | Los Angeles | 30,385 | LOS ANGELES |
| The Daily News | Whittier | CA | Los Angeles | 11,431 | LOS ANGELES |
| The Willits News | Willits | CA | Mendocino | 3,030 | SAN FRANCISCO-OAK-SAN JOSE |
| Woodland Daily Democrat | Woodland | CA | Yolo | 10,096 | SACRAMNTO-STKTON-MODESTO |
| Los Angeles Daily News | Woodland Hills | CA | Los Angeles | 78,208 | LOS ANGELES |
| Siskiyou Daily News | Yreka | CA | Siskiyou | 5,945 | MEDFORD-KLAMATH FALLS |
| Daily Camera | Boulder | CO | Boulder | 27,000 | DENVER |
| The Burlington Record | Burlington | CO | Kit Carson | 3,370 | DENVER |
| Daily Record | Canon City | CO | Fremont | 5,300 | COLORADO SPRINGS-PUEBLO |
| Craig Daily Press | Craig | CO | Moffat | 3,535 | DENVER |
| The Denver Post | Denver | CO | Denver | 215,452 | DENVER |
| Fort Morgan Times | Fort Morgan | CO | Morgan | 2,800 | DENVER |
| The Greeley Tribune | Greeley | CO | Weld | 21,000 | DENVER |
| Lafayette News | Lafayette | CO | Boulder | 2,020 | DENVER |
| Daily Times - Call | Longmont | CO | Boulder | 21,715 | DENVER |
| Louisville Times | Louisville | CO | Boulder | 2,020 | DENVER |
| (Loveland) Daily Reporter - Herald | Loveland | CO | Larimer | 18,685 | DENVER |
| Steamboat Pilot | Steamboat Springs | CO | Routt | 5,355 | DENVER |
| Steamboat Today | Steamboat Springs | CO | Routt | 5,250 | DENVER |
| Journal Advocate | Sterling | CO | Logan | 2,900 | DENVER |
| The Chronicle News | Trinidad | CO | Las Animas | 4,080 | COLORADO SPRINGS-PUEBLO |
| The News-Times | Danbury | CT | Fairfield | 30,500 | NEW YORK |
| Journal Inquirer | Manchester | CT | Hartford | 45,450 | HARTFORD & NEW HAVEN |
| The Hour | Norwalk | CT | Fairfield | 9,000 | NEW YORK |
| Norwich Bulletin | Norwich | CT | New London | 25,149 | HARTFORD & NEW HAVEN |
| The Chronicle | Willimantic | CT | Windham | 7,000 | HARTFORD & NEW HAVEN |
| The Washington Examiner | Washington | DC | DC | 200,000 | WASHINGTON DC (HAGRSTWN) |
| Desoto Sun | Arcadia | FL | Desoto | 5,000 | FT. MYERS-NAPLES |
| The Polk County Democrat | Bartow | FL | Polk | 4,500 | TAMPA-ST. PETE (SARASOTA) |
| Charlotte Sun Herald | Charlotte Harbor | FL | Charlotte | 2,500 | FT. MYERS-NAPLES |
| Chiefland Citizen | Chiefland | FL | Levy | 3,500 | GAINESVILLE |
| Holmes County Advertisers | Chipley | FL | Holmes | 3,131 | PANAMA CITY |
| Washington County News | Chipley | FL | Washington | 3,131 | PANAMA CITY |
| The South Lake Press | Clermont | FL | Lake | 15,000 | ORLANDO-DAYTONA BCH-MELBRN |
| The Destin Log/The Walton Log | Destin | FL | Okaloosa | 6,452 | MOBILE-PENSACOLA (FT WALT) |
| Englewood Sun | Englewood | FL | Sarasota | 6,000 | TAMPA-ST. PETE (SARASOTA) |
| The Fort Meade Leader | Fort Meade | FL | Polk | 6,250 | TAMPA-ST. PETE (SARASOTA) |
| Frostproof News | Frostproof | FL | Polk | 4,500 | TAMPA-ST. PETE (SARASOTA) |
| The Florida Times-Union | Jacksonville | FL | Duval | 160,743 | JACKSONVILLE |
| Osceola News-Gazette | Kissimmee | FL | Osceola | 40,400 | ORLANDO-DAYTONA BCH-MELBRN |
| Lake Placid Journal | Lake Placid | FL | Highlands | 7,000 | TAMPA-ST. PETE (SARASOTA) |
| Lake Wales News | Lake Wales | FL | Polk | 4,750 | TAMPA-ST. PETE (SARASOTA) |
| The Daily Commercial | Leesburg | FL | Lake | 22,000 | ORLANDO-DAYTONA BCH-MELBRN |
| Suwannee Democrat | Live Oak | FL | Suwannee | 6,350 | TALLAHASSEE-THOMASVILLE |
| Jackson County Floridan | Marianna | FL | Jackson | 7,272 | PANAMA CITY |
| Santa Rosa Press-Gazette | Milton | FL | Santa Rosa | 7,070 | MOBILE-PENSACOLA (FT WALT) |
| North Port Sun | North Port | FL | Sarasota | 5,000 | TAMPA-ST. PETE (SARASOTA) |
| Palatka Daily News | Palatka | FL | Putnam | 7,300 | JACKSONVILLE |
| Walton Sun | Santa Rosa Beach | FL | Walton | 12,240 | PANAMA CITY |
| The News-Sun | Sebring | FL | Highlands | 8,000 | TAMPA-ST. PETE (SARASOTA) |
| St. Augustine Record | St. Augustine | FL | St. Johns | 21,776 | JACKSONVILLE |
| Treasure Coast News | Stuart | FL | Martin | 79,000 | WEST PALM BEACH-FT. PIERCE |
| Hardee Sun | Venice | FL | Sarasota | 6,000 | TAMPA-ST. PETE (SARASOTA) |
| Venice Gondolier Sun | Venice | FL | Sarasota | 10,000 | TAMPA-ST. PETE (SARASOTA) |
| The Herald Advocate | Wauchula | FL | Hardee | 4,000 | TAMPA-ST. PETE (SARASOTA) |
| News Chief | Winter Haven | FL | Polk | 8,413 | TAMPA-ST. PETE (SARASOTA) |
| Americus Times-Recorder | Americus | GA | Sumter | 4,400 | COLUMBUS GA |
| Athens Banner Herald | Athens | GA | Clarke | 22,000 | ATLANTA |
| The Augusta Chronicle | Augusta | GA | Richmond | 45,000 | AUGUSTA |

**Relish Carrier Newspaper List**

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| The Post Searchlight | Bainbridge | GA | Decatur | 7,575 | ATLANTA |
| The Brunswick News | Brunswick | GA | Glynn | 16,200 | JACKSONVILLE |
| The Daily Tribune News | Cartersville | GA | Bartow | 6,600 | ATLANTA |
| Columbus Ledger-Enquirer | Columbus | GA | Muscogee | 43,430 | COLUMBUS GA |
| The Rockdale News | Conyers | GA | Rockdale | 7,500 | ATLANTA |
| The Cordele Dispatch | Cordele | GA | Crisp | 4,058 | ALBANY GA |
| The Covington News | Covington | GA | Newton | 6,000 | ATLANTA |
| The Daily Citizen | Dalton | GA | Whitfield | 13,956 | CHATTANOOGA |
| The Courier Herald | Dublin | GA | Laurens | 10,000 | MACON |
| The Times | Gainesville | GA | Hall | 22,000 | ATLANTA |
| Griffin Daily News | Griffin | GA | Spalding | 8,500 | ATLANTA |
| Jackson Progress Argus | Jackson | GA | Butts | 3,998 | ATLANTA |
| The Press-Sentinel | Jesup | GA | Wayne | 6,565 | SAVANNAH |
| Clayton News-Daily | Jonesboro | GA | Clayton | 2,800 | ATLANTA |
| The News & Farmer | Louisville | GA | Jefferson | 4,000 | AUGUSTA |
| The Macon Telegraph | Macon | GA | Bibb | 36,000 | MACON |
| Daily Herald | McDonough | GA | Henry | 3,100 | ATLANTA |
| The Metter Advertiser | Metter | GA | Candler | 2,700 | SAVANNAH |
| The Union Recorder | Milledgeville | GA | Baldwin | 8,413 | MACON |
| The Observer | Moultrie | GA | Colquitt | 6,929 | ALBANY GA |
| Rome News Tribune | Rome | GA | Floyd | 17,271 | ATLANTA |
| Savannah Morning News | Savannah | GA | Chatham | 50,000 | SAVANNAH |
| The Statesboro Herald | Statesboro | GA | Bulloch | 8,000 | SAVANNAH |
| The Sylvania Telephone | Sylvania | GA | Scravem | 4,375 | SAVANNAH |
| Thomasville Times Enterprise | Thomasville | GA | Thomas | 9,898 | TALLAHASSEE-THOMASVILLE |
| Valdosta Daily Times | Valdosta | GA | Lowndes | 19,796 | TALLAHASSEE-THOMASVILLE |
| Dallas County News | Adel | IA | Adel | 1,500 | DES MOINES-AMES |
| NE Dallas County Record | Adel | IA | Adel | 1,500 | DES MOINES-AMES |
| The Algona Upper Des Moines | Algona | IA | Kossuth | 3,250 | DES MOINES-AMES |
| Butler County Tribune Journal | Allison | IA | Butler | 1,300 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| The Tribune | Ames | IA | Story | 11,378 | DES MOINES-AMES |
| The Britt News Tribune | Britt | IA | Hancock | 1,100 | ROCHESTR-MASON CITY-AUSTIN |
| Buffalo Center Tribune | Buffalo Center | IA | Winebago | 1,200 | ROCHESTR-MASON CITY-AUSTIN |
| The Hawk Eye | Burlington | IA | Des Moines | 21,634 | DAVENPORT-R.ISLAND-MOLINE |
| Daily Times Herald | Carroll | IA | Carroll | 6,161 | DES MOINES-AMES |
| Daily Iowegian | Centerville | IA | Appanoose | 2,771 | DES MOINES-AMES |
| Chronicle Times | Cherokee | IA | Cherokee | 2,552 | SIOUX CITY |
| Clarinda Herald-Journal | Clarinda | IA | Page | 1,212 | OMAHA |
| Clarksville Star | Clarksville | IA | Butler | 1,100 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Clinton Herald | Clinton | IA | Clinton | 11,900 | DAVENPORT-R.ISLAND-MOLINE |
| CWL Times | Corwith | IA | Hancock | 320 | ROCHESTR-MASON CITY-AUSTIN |
| The Daily Nonpareil | Council Bluffs | IA | Pottawattamie | 17,170 | OMAHA |
| Creston News Advertiser | Creston | IA | Union | 4,949 | DES MOINES-AMES |
| Wright County Monitor | Dows | IA | Wright | 600 | DES MOINES-AMES |
| Eagle Grove Eagle | Eagle Grove | IA | Wright | 1,600 | DES MOINES-AMES |
| The Fairfield Daily Ledger | Fairfield | IA | Jefferson | 3,359 | OTTUMWA-KIRKSVILLE |
| Forest City Summit | Forest City | IA | Winnebago | 1,750 | ROCHESTR-MASON CITY-AUSTIN |
| Village Vine | Freemont | IA | Mahaska | 1,450 | DES MOINES-AMES |
| Garner Leader & Signal | Garner | IA | Mahaska | 1,400 | ROCHESTR-MASON CITY-AUSTIN |
| The Grundy Register | Grundy Grove | IA | Grundy | 2,200 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Hamburg Reporter | Hamburg | IA | Fremont | 1,256 | OMAHA |
| Calhoun County Advocate | Hampton | IA | Calhoun | 550 | DES MOINES-AMES |
| Hampton Chonicle | Hampton | IA | Franklin | 3,330 | DES MOINES-AMES |
| Pioneer Enterprise | Hampton | IA | Franklin | 450 | DES MOINES-AMES |
| Kanawha Reporter | Kanawha | IA | Hancock | 550 | ROCHESTR-MASON CITY-AUSTIN |
| Keota Eagle | Keota | IA | Keokuk | 700 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Journal Express | Knoxville | IA | Marion | 1,644 | DES MOINES-AMES |
| Lake City Graphic | Lake City | IA | Calhoun | 1,000 | DES MOINES-AMES |
| LeMars Daily Sentinel | LeMars | IA | Plymouth | 2,694 | SIOUX CITY |
| Globe Gazette | Mason City | IA | Cerro Cordo | 15,400 | ROCHESTR-MASON CITY-AUSTIN |
| Mt. Pleasant News | Mount Pleasant | IA | Henry | 3,054 | DAVENPORT-R.ISLAND-MOLINE |
| New Sharon Sun | New Sharon | IA | Mahaska | 650 | DES MOINES-AMES |
| Newton Daily News | Newton | IA | Jasper | 5,202 | DES MOINES-AMES |
| Mitchell County Press News | Osage | IA | Mitchell | 2,550 | ROCHESTR-MASON CITY-AUSTIN |
| Osceola Sentinel-Tribune | Osceola | IA | Clarke | 3,636 | DES MOINES-AMES |

**Relish Carrier Newspaper List**

| | | | | | |
|---|---|---|---|---|---|
| Oskaloosa Herald | Oskaloosa | IA | Marion | 3,200 | DES MOINES-AMES |
| The Ottumwa Courier | Ottumwa | IA | Wapello | 12,500 | OTTUMWA-KIRKSVILLE |
| The Chronicle | Pella | IA | Marion | 2,810 | DES MOINES-AMES |
| Sheffield Press | Sheffield | IA | Franklin | 800 | DES MOINES-AMES |
| Valley News Today | Shenandoah | IA | Page | 2,020 | OMAHA |
| Sigourney News Review | Sigourney | IA | Keokuk | 1,800 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Sioux City Journal | Sioux City | IA | Woodbury | 37,000 | SIOUX CITY |
| The Daily Reporter | Spencer | IA | Clay | 2,500 | SIOUX CITY |
| Pilot Tribune | Storm Lake | IA | Buena Vista | 2,000 | SIOUX CITY |
| The Washington Evening Journal | Washington | IA | Washington | 3,888 | CEDAR RAPIDS-WTRLO-IWC&DUB |
| Coeur d'Alene Press | Coeur d'Alene | ID | Kootenai | 21,423 | SPOKANE |
| Shoshone News-Press | Kellogg | ID | Shoshone | 4,200 | SPOKANE |
| Idaho Press Tribune | Nampa | ID | Canyon | 23,600 | BOISE |
| Idaho State Journal | Pacatello | ID | Bannock | 18,685 | IDAHO FALLS-POCATELLO |
| Priest River Times | Priest River | ID | Bonner | 2,800 | SPOKANE |
| Standard Journal | Rexburg | ID | Madison | 5,555 | IDAHO FALLS-POCATELLO |
| Bonner County Daily Bee | Sandpoint | ID | Bonner | 5,200 | SPOKANE |
| Bonners Ferry Herald | Sandpoint | ID | Boundary | 3,000 | SPOKANE |
| Times News | Twin Falls | ID | Twin Falls | 24,745 | TWIN FALLS |
| The Times Record | Aledo | IL | Mercer | 3,485 | DAVENPORT-R.ISLAND-MOLINE |
| The Telegraph | Alton | IL | Madison | 22,200 | ST. LOUIS |
| The Evening News | Benton | IL | Franklin | 2,500 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Daily Ledger | Canton | IL | Fulton | 5,641 | PEORIA-BLOOMINGTON |
| The Southern Illinoisan | Carbondale | IL | Jackson | 29,724 | PADUCAH-C.GIRD-HARBG-MT VN |
| Randolph County Herald-Tribune | Chester | IL | Randolph | 2,512 | ST. LOUIS |
| The Progress | Christopher | IL | Franklin | 1,000 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Northwest Herald | Crystal Lake | IL | McHenry | 28,200 | CHICAGO |
| Lake County Journals | Crystal Lake | IL | McHenry | 8,150 | CHICAGO |
| The Daily Chronicle | Dekalb | IL | DeKalb | 7,200 | CHICAGO |
| Suburban Life Publications | Downers Grove | IL | Cook | 101,000 | CHICAGO |
| Du Quoin Evening Call | Du Quoin | IL | Perry | 3,896 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Blade | Fairbury | IL | Livingston | 2,160 | PEORIA-BLOOMINGTON |
| The Clay County Advocate-Press | Flora | IL | Clay | 2,160 | TERRE HAUTE |
| The Journal-Standard | Freeport | IL | Stephenson | 9,500 | ROCKFORD |
| Register-Mail | Galesburg | IL | Knox | 12,000 | DAVENPORT-R.ISLAND-MOLINE |
| Geneseo Republic | Geneseo | IL | Henry | 5,979 | DAVENPORT-R.ISLAND-MOLINE |
| Kane County Chronicle | Geneva | IL | Kane | 7,100 | CHICAGO |
| The Daily Register | Harrisburg | IL | Saline | 6,253 | PADUCAH-C.GIRD-HARBG-MT VN |
| Jacksonville Journal Courier | Jacksonville | IL | Morgan | 14,836 | CHAMPAIGN&SPRNGFLD-DECATUR |
| The Daily Journal | Kankakee | IL | Kankakee | 23,300 | CHICAGO |
| Star-Courier | Kewanee | IL | Henry | 6,048 | DAVENPORT-R.ISLAND-MOLINE |
| The Courier | Lincoln | IL | Logan | 7,073 | CHAMPAIGN&SPRNGFLD-DECATUR |
| Rock Valley Publishing | Loves Park | IL | Boone | 1,600 | ROCKFORD |
| Elmhurst Independent | Machesney Park | IL | DuPage | 6,400 | ROCKFORD |
| Macomb Journal | Macomb | IL | McDonough | 4,220 | QUINCY-HANNIBAL-KEOKUK |
| Marion Daily Republican | Marion | IL | Williamson | 3,075 | PADUCAH-C.GIRD-HARBG-MT VN |
| Daily Review Atlas | Monmouth | IL | Warren | 1,537 | DAVENPORT-R.ISLAND-MOLINE |
| Morris Daily Herald | Morris | IL | Grundy | 7,720 | CHICAGO |
| Register-News | Mount Vernon | IL | Jefferson | 8,908 | PADUCAH-C.GIRD-HARBG-MT VN |
| Murphysboro American | Murphysboro | IL | Jackson | 1,859 | PADUCAH-C.GIRD-HARBG-MT VN |
| Newton Press-Mentor | Newton | IL | Jasper | 2,261 | TERRE HAUTE |
| Olney Daily Mail | Olney | IL | Richland | 3,675 | TERRE HAUTE |
| Oquawka Current | Oquawka | IL | Henderson | 1,025 | DAVENPORT-R.ISLAND-MOLINE |
| (Pekin) Daily Times | Pekin | IL | Tazwell | 7,500 | PEORIA-BLOOMINGTON |
| Chillicothe Times-Bulletin | Peoria | IL | Peoria | 3,215 | PEORIA-BLOOMINGTON |
| East Peoria Times-Courier | Peoria | IL | Tazewell | 5,000 | PEORIA-BLOOMINGTON |
| Morton Times-News | Peoria | IL | Tazewell | 5,000 | PEORIA-BLOOMINGTON |
| Washington Times-Reporter | Peoria | IL | Tazewell | 7,666 | PEORIA-BLOOMINGTON |
| Woodford Times | Peoria | IL | Woodford | 3,365 | PEORIA-BLOOMINGTON |
| Journal Star | Peoria | IL | Peoria | 55,000 | PEORIA-BLOOMINGTON |
| Daily Leader | Pontiac | IL | Livingston | 4,511 | PEORIA-BLOOMINGTON |
| Rockford Register Star | Rockford | IL | Winnegago | 39,500 | ROCKFORD |
| The Gallatin Democrat | Shawneetown | IL | Gallatin | 2,261 | PADUCAH-C.GIRD-HARBG-MT VN |
| Shelbyville Daily Union | Shelbyville | IL | Shelby | 2,300 | CHAMPAIGN&SPRNGFLD-DECATUR |
| State Journal Register | Springfield | IL | Sangamom | 39,490 | CHAMPAIGN&SPRNGFLD-DECATUR |

**Relish Carrier Newspaper List**

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| Sauk Valley Newspaper | Sterling | IL | Whiteside | 21,947 | DAVENPORT-R.ISLAND-MOLINE |
| The Daily American | West Frankfort | IL | Franklin | 3,075 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Herald Tribune | Batesville | IN | Ripley | 3,150 | CINCINNATI |
| The News-Banner | Bluffton | IN | Wells | 5,252 | FT. WAYNE |
| Brazil Times | Brazil | IN | Clay | 4,157 | TERRE HAUTE |
| Connersville News Examiner | Conenrsville | IN | Fayette | 5,600 | INDIANAPOLIS |
| Banner - Graphic | Greencastle | IN | Putnam | 5,543 | INDIANAPOLIS |
| Greensburg Daily News | Greensburg | IN | Decatur | 5,200 | INDIANAPOLIS |
| Kokomo Tribune | Kokomo | IN | Howard | 20,000 | INDIANAPOLIS |
| The Daily World | Linton | IN | Greene | 5,444 | TERRE HAUTE |
| Logansport Pharos-Tribune | Logansport | IN | Cass | 9,000 | INDIANAPOLIS |
| The Courier Times | New Castle | IN | Henry | 6,300 | INDIANAPOLIS |
| The Paoli News | Paoli | IN | Orange | 2,800 | LOUISVILLE |
| The Rochester Sentinel | Rochester | IN | Fulton | 3,900 | SOUTH BEND-ELKHART |
| The Rushville Republican | Rushville | IN | Rush | 3,050 | INDIANAPOLIS |
| The Tribune | Seymour | IN | Jackson | 8,448 | LOUISVILLE |
| The Shelbyville News | Shelbyville | IN | Shelby | 6,200 | INDIANAPOLIS |
| Vincennes Sun-Commercial | Vincennes | IN | Knox | 7,000 | TERRE HAUTE |
| Zionsville Times Sentinel | Zionsville | IN | Boone | 4,120 | INDIANAPOLIS |
| Atchison Daily Globe | Atchison | KS | Atchison | 3,800 | KANSAS CITY |
| Rawlins County Square Deal | Atwood | KS | Rawlins | 1,000 | WICHITA-HUTCHINSON PLUS |
| Augusta Daily Gazette | Augusta | KS | Butler | 2,525 | WICHITA-HUTCHINSON PLUS |
| Dodge City Daily Globe | Dodge City | KS | Ford | 6,929 | WICHITA-HUTCHINSON PLUS |
| The El Dorado Times | El Dorado | KS | Butler | 3,517 | WICHITA-HUTCHINSON PLUS |
| Anderson County Advocate | Garnett | KS | Anderson | 1,200 | KANSAS CITY |
| The Goodland Daily News | Goodland | KS | Sherman | 1,950 | WICHITA-HUTCHINSON PLUS |
| The Hays Daily News | Hays | KS | Ellis | 10,400 | WICHITA-HUTCHINSON PLUS |
| Hiawatha World | Hiawatha | KS | Brown | 2,500 | TOPEKA |
| The Daily Union | Junction City | KS | Geary | 4,400 | TOPEKA |
| The Kiowa County Signal | Kiowa | KS | Kiowa | 800 | WICHITA-HUTCHINSON PLUS |
| Journal-World | Lawrence | KS | Douglas | 21,210 | KANSAS CITY |
| Louisburg Herald | Louisburg | KS | Miami | 1,700 | KANSAS CITY |
| McPherson Sentinel | McPherson | KS | McPherson | 4,040 | WICHITA-HUTCHINSON PLUS |
| The Newton Kansan | Newton | KS | Harvey | 7,918 | WICHITA-HUTCHINSON PLUS |
| The Norton Telegram | Norton | KS | Norton | 1,900 | WICHITA-HUTCHINSON PLUS |
| Bird City Times | Oberlin | KS | Cheyenne | 551 | WICHITA-HUTCHINSON PLUS |
| Colby Free Press | Oberlin | KS | Thomas | 1,950 | WICHITA-HUTCHINSON PLUS |
| The Oberlin Herald | Oberlin | KS | Decatur | 1,850 | WICHITA-HUTCHINSON PLUS |
| The St. Francis Herald | Oberlin | KS | Cheyenne | 1,250 | WICHITA-HUTCHINSON PLUS |
| Osawatomie Graphic | Osawatomie | KS | Miami | 1,975 | KANSAS CITY |
| Johnson County Sun | Overland Park | KS | Johnson | 27,000 | KANSAS CITY |
| Wednesday Sun | Overland Park | KS | Johnson | 20,000 | KANSAS CITY |
| The Miami County Republic | Paola | KS | Miami | 3,550 | KANSAS CITY |
| Pittsburg Morning Sun | Pittsburgh | KS | Crawford | 8,512 | JOPLIN-PITTSBURG |
| Linn County News | Pleasanton | KS | Linn | 2,300 | KANSAS CITY |
| The Pratt Tribune | Pratt | KS | Pratt | 1,700 | WICHITA-HUTCHINSON PLUS |
| The St. John News | St. John | KS | Stafford | 800 | WICHITA-HUTCHINSON PLUS |
| Topeka Capital Journal | Topeka | KS | Shawnee | 37,000 | TOPEKA |
| Wellington Daily News | Wellington | KS | Sumner | 2,626 | WICHITA-HUTCHINSON PLUS |
| The Daily Independent | Ashland | KY | Boyd | 16,208 | CHARLESTON-HUNTINGTON |
| Kentucky Standard | Bardstown | KY | Nelson | 9,700 | LOUISVILLE |
| The Tribune Courier | Benton | KY | Marshall | 4,500 | PADUCAH-C.GIRD-HARBG-MT VN |
| Daily News | Bowling Green | KY | Warren | 30,000 | BOWLING GREEN |
| McLean County News | Calhoun | KY | McLean | 1,800 | EVANSVILLE |
| The Advocate Messenger | Danville | KY | Boyle | 9,000 | LEXINGTON |
| The News-Enterprise | Elizabethtown | KY | Hardin | 17,124 | LOUISVILLE |
| The State Journal | Frankfort | KY | Franklin | 10,000 | LEXINGTON |
| Franklin Favorite | Franklin | KY | Simpson | 2,000 | NASHVILLE |
| Glasgow Daily Times | Glasgow | KY | Barren | 8,198 | BOWLING GREEN |
| Greenup County News-Times | Greenup | KY | Greenup | 3,547 | CHARLESTON-HUNTINGTON |
| Kentucky New Era | Hopkinsville | KY | Christian | 9,000 | NASHVILLE |
| Fort Campbell Courier | Hopkinsville | KY | Christian | 18,000 | NASHVILLE |
| The Record | Leitchfield | KY | Grayson | 5,939 | LOUISVILLE |
| The Sentinel-Echo | London | KY | Laurel | 7,918 | LEXINGTON |
| The Messenger | Madisonville | KY | Hopkins | 7,000 | EVANSVILLE |

**Relish Carrier Newspaper List**

| Newspaper | City | State | County | Circ | Market |
|---|---|---|---|---|---|
| The Ledger Independent | Maysville | KY | Mason | 6,500 | CINCINNATI |
| The Jessamine Journal | Nicholasville | KY | Jessamine | 7,437 | LEXINGTON |
| The Eagle Post | Oak Grove | KY | Christian | 4,500 | NASHVILLE |
| Messenger - Inquirer | Owensboro | KY | McLean | 25,000 | EVANSVILLE |
| The Times - Leader | Princeton | KY | Caldwell | 4,500 | PADUCAH-C.GIRD-HARBG-MT VN |
| Sentinel-News | Shelbyville | KY | Shelby | 8,512 | LOUISVILLE |
| The Pioneer News | Shepherdsville | KY | Bullitt | 7,000 | LOUISVILLE |
| The Commonwealth-Journal | Somerset | KY | Pulaski | 9,403 | LEXINGTON |
| The McCreary County Record | Whitley City | KY | McCreary | 3,682 | KNOXVILLE |
| The Winchester Sun | Winchester | KY | Clark | 5,858 | LEXINGTON |
| Bastrop Daily Enterprise | Bastrop | LA | Morehouse | 4,613 | MONROE-EL DORADO |
| Denham Springs-Livingston Parish News | Denham Springs | LA | Livingston | 12,400 | BATON ROUGE |
| Beauregard Daily News | DeRidder | LA | Beauregard | 3,500 | LAKE CHARLES |
| Ascension Citizen | Gonzales | LA | Ascension | 7,236 | BATON ROUGE |
| The Daily Star | Hammond | LA | Tangipahoa | 10,059 | NEW ORLEANS |
| American Press | Lake Charles | LA | Calcasieu | 35,000 | LAKE CHARLES |
| Leesville News Leader | Leesville | LA | Vernon | 3,500 | ALEXANDRIA LA |
| Southwest Daily News | Sulphur | LA | Calcasieu | 4,000 | LAKE CHARLES |
| The Sun Chronicle | Attleboro | MA | Bristol | 20,290 | PROVIDENCE-NEW BEDFORD |
| The Salem News | Beverly | MA | Essex | 22,500 | BOSTON (MANCHESTER) |
| Patriot Ledger | Dorchester | MA | Norfolk | 45,000 | BOSTON (MANCHESTER) |
| The Enterpirse | Dorchester | MA | Plymouth | 28,000 | BOSTON (MANCHESTER) |
| Fall River Herald News | Fall River | MA | Bristol | 21,643 | PROVIDENCE-NEW BEDFORD |
| Sentinel & Enterprise | Fitchburg | MA | Worcester | 16,900 | BOSTON (MANCHESTER) |
| Milford Daily News | Framingham | MA | Worcester | 8,940 | BOSTON (MANCHESTER) |
| Metro West Daily News | Framingham | MA | Middlesex | 26,216 | BOSTON (MANCHESTER) |
| Gloucester Daily Times | Gloucester | MA | Essex | 8,200 | BOSTON (MANCHESTER) |
| The Recorder | Greenfield | MA | Franklin | 14,352 | SPRINGFIELD-HOLYOKE |
| The Sun | Lowell | MA | Middlesex | 40,569 | BOSTON (MANCHESTER) |
| Inquirer and Mirror | Nantucket | MA | Nantucket | 10,500 | BOSTON (MANCHESTER) |
| Daily News Tribune | Needham Heights | MA | Middlesex | 4,920 | BOSTON (MANCHESTER) |
| The Standard Times | New Bedford | MA | Bristol | 24,500 | PROVIDENCE-NEW BEDFORD |
| The Daily News of Newburyport | Newburyport | MA | Essex | 10,300 | BOSTON (MANCHESTER) |
| North Adams Transcript | North Adams | MA | Berkshire | 6,767 | ALBANY-SCHENECTADY-TROY |
| Eagle Tribune | North Andover | MA | Essex | 38,250 | BOSTON (MANCHESTER) |
| Berkshire Eagle | Pittsfield | MA | Bershire | 30,300 | ALBANY-SCHENECTADY-TROY |
| Taunton Daily Gazette | Taunton | MA | Bristol | 9,927 | PROVIDENCE-NEW BEDFORD |
| The Enfield Press | Westfield | MA | Hampden | 2,850 | SPRINGFIELD-HOLYOKE |
| The Longmeadow News | Westfield | MA | Hampden | 1,550 | SPRINGFIELD-HOLYOKE |
| The Westfield News | Westfield | MA | Hampden | 4,400 | SPRINGFIELD-HOLYOKE |
| Telegram & Gazette | Worcester | MA | Worcester | 70,000 | BOSTON (MANCHESTER) |
| The Capital | Annapolis | MD | Anne Arundel | 47,312 | BALTIMORE |
| Cumberland Times - News | Cumberland | MD | Cumberland | 27,775 | WASHINGTON DC (HAGRSTWN) |
| The Star Democrat | Easton | MD | Talbot | 19,301 | BALTIMORE |
| Cecil Whig | Elkton | MD | Cecil | 15,000 | BALTIMORE |
| The Frederick News-Post | Frederick | MD | Frederick | 37,000 | WASHINGTON DC (HAGRSTWN) |
| Carroll County Times | Westminster | MD | Carroll | 26,131 | BALTIMORE |
| Kennebec Journal & Morning Sentinel | Augusta | ME | Kennebec | 25,000 | PORTLAND-AUBURN |
| Bangor Daily News | Bangor | ME | Penobscot | 56,000 | BANGOR |
| Aaroostook Republican | Caribou | ME | Aaroostook | 4,200 | PRESQUE ISLE |
| Piscataquis Observer | Dover-Foxcroft | ME | Piscataquis | 3,500 | BANGOR |
| Houlton Pioneer Times | Houlton | ME | Aaroostook | 5,450 | PRESQUE ISLE |
| Sun Journal | Lewiston | ME | Androscoggin | 36,865 | PORTLAND-AUBURN |
| Portland Press Herald | Portland | ME | Cumberland | 54,000 | PORTLAND-AUBURN |
| The Star Herald | Presque Isle | ME | Aaroostook | 6,300 | PRESQUE ISLE |
| Cheboygan Daily Tribune | Cheboygan | MI | Cheboygan | 4,408 | TRAVERSE CITY-CADILLAC |
| The Daily Reporter | Coldwater | MI | Branch | 5,996 | GRAND RAPIDS-KALMZOO-B.CRK |
| Gaylord Herald Times | Gaylord | MI | Otsego | 5,700 | TRAVERSE CITY-CADILLAC |
| Grand Haven Tribune | Grand Haven | MI | Ottawa | 8,800 | GRAND RAPIDS-KALMZOO-B.CRK |
| Oceana's Herald Journal | Hart | MI | Oceana | 6,200 | GRAND RAPIDS-KALMZOO-B.CRK |
| The Hillsdale Daily News | Hillsdale | MI | Hillsdale | 6,500 | LANSING |
| The Holland Sentinel | Holland | MI | Ottawa | 14,500 | GRAND RAPIDS-KALMZOO-B.CRK |
| Sentinel-Standard | Ionia | MI | Ionia | 3,178 | GRAND RAPIDS-KALMZOO-B.CRK |
| (The Ironwood) Daily Globe | Ironwood | MI | Gogebic | 6,300 | DULUTH-SUPERIOR |
| Ludington Daily News | Ludington | MI | Mason | 8,500 | GRAND RAPIDS-KALMZOO-B.CRK |

## Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| Monroe Evening News | Monroe | MI | Monroe | 19,500 | DETROIT |
| Petoskey News-Review | Petoskey | MI | Emmet | 10,000 | TRAVERSE CITY-CADILLAC |
| The Evening News | Sault Ste. Marie | MI | Chippewa | 7,688 | TRAVERSE CITY-CADILLAC |
| Sturgis Journal | Sturgis | MI | Saint Joseph | 6,868 | GRAND RAPIDS-KALMZOO-B.CRK |
| Traverse City Record Eagle | Traverse City | MI | Grand Traverse | 28,704 | TRAVERSE CITY-CADILLAC |
| White Lake Beacon | Whitehall | MI | Muskegon | 4,000 | GRAND RAPIDS-KALMZOO-B.CRK |
| Austin Daily Herald | Austin | MN | Mower | 5,444 | ROCHESTR-MASON CITY-AUSTIN |
| The Bemidji Pioneer | Bemidji | MN | Beltrami | 7,300 | MINNEAPOLIS-ST. PAUL |
| Brainerd Daily Dispatch | Brainerd | MN | Crowwing | 13,000 | MINNEAPOLIS-ST. PAUL |
| Tri-County News | Cottonwood | MN | Lyon | 1,356 | MINNEAPOLIS-ST. PAUL |
| Crookston Daily Times | Crookston | MN | Polk | 2,060 | FARGO-VALLEY CITY |
| Duluth News Tribune | Duluth | MN | St. Louis | 30,000 | MINNEAPOLIS-ST. PAUL |
| Faribault Daily News | Faribault | MN | Rice | 5,259 | MINNEAPOLIS-ST. PAUL |
| The Daily Journal | Fergus Falls | MN | Otter Tail | 7,000 | FARGO-VALLEY CITY |
| Herald Review | Grand Rapids | MN | Itasca | 6,929 | DULUTH-SUPERIOR |
| Granite Falls Advocate-Tribune | Granite Falls | MN | Yellow Medicine | 2,716 | MINNEAPOLIS-ST. PAUL |
| The Daily Tribune | Hibbing | MN | St. Louis | 4,603 | DULUTH-SUPERIOR |
| Hutchinson Leader | Hutchinson | MN | McLeod | 16,766 | MINNEAPOLIS-ST. PAUL |
| The Daily Journal | International Falls | MN | Koochiching | 3,300 | DULUTH-SUPERIOR |
| The Le Center Leader | Le Center | MN | Le Sueur | 1,024 | MINNEAPOLIS-ST. PAUL |
| Le Sueur News Herald | Le Sueur | MN | Le Sueur | 1,336 | MINNEAPOLIS-ST. PAUL |
| Litchfield Independent Review | Litchfield | MN | Meeker | 11,009 | MINNEAPOLIS-ST. PAUL |
| The Free Press | Mankato | MN | Blue Earth | 22,220 | MANKATO |
| Montevideo American News | Montevideo | MN | Chippewa | 3,691 | MINNEAPOLIS-ST. PAUL |
| Northfield News | Northfield | MN | Rice | 4,300 | MINNEAPOLIS-ST. PAUL |
| Owatonna People's Press | Owatonna | MN | Steele | 6,102 | MINNEAPOLIS-ST. PAUL |
| The Redwood Falls Gazette | Redwood Falls | MN | Redwood | 3,998 | MINNEAPOLIS-ST. PAUL |
| Post-Bulletin | Rochester | MN | Olmsted | 41,645 | ROCHESTR-MASON CITY-AUSTIN |
| Sleepy Eye Herald - Dispatch | Sleepy Eye | MN | Brown | 2,000 | MANKATO |
| St. James Plaindealer | St. James | MN | Watonwan | 2,361 | MANKATO |
| St. Peter Herald | St. Peter | MN | Nicollet | 1,980 | MINNEAPOLIS-ST. PAUL |
| Thief River Falls Times | Thief River Falls | MN | Pennington | 4,545 | FARGO-VALLEY CITY |
| The Mesabi Daily News | Virginia | MN | St. Louis | 9,403 | DULUTH-SUPERIOR |
| Waseca County News | Waseca | MN | Waseca | 2,848 | MINNEAPOLIS-ST. PAUL |
| West Central Tribune | Willmar | MN | Kandiyohi | 15,000 | MINNEAPOLIS-ST. PAUL |
| Winona Daily News | Winona | MN | Winona | 9,000 | LA CROSSE-EAU CLAIRE |
| Daily Globe | Worthington | MN | Nobles | 9,700 | SIOUX FALLS(MITCHELL) |
| Aurora Advertiser | Aurora | MO | Lawrence | 3,075 | SPRINGFIELD MO |
| Bolivar Herald -Free Press | Bolivar | MO | Polk | 5,500 | SPRINGFIELD MO |
| Boonville Daily News | Boonville | MO | Cooper | 2,222 | COLUMBIA-JEFFERSON CITY |
| Buffalo Reflex | Buffalo | MO | Dallas | 5,950 | SPRINGFIELD MO |
| Lake Sun Leader | Camdenton | MO | Camden | 5,025 | SPRINGFIELD MO |
| Southeast Missourian | Cape Girardeau | MO | Cape Giranrdeau | 13,775 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Carthage Press | Carthage | MO | Jasper | 2,400 | JOPLIN-PITTSBURG |
| The Daily Statesman | Dexter | MO | Stoddard | 2,900 | PADUCAH-C.GIRD-HARBG-MT VN |
| Liberty Tribune | Gladstone | MO | Clay | 10,500 | KANSAS CITY |
| Hannibal Courier-Post | Hannibal | MO | Marion | 8,413 | QUINCY-HANNIBAL-KEOKUK |
| The Advertiser-Courier | Hermann | MO | Gasconade | 3,700 | ST. LOUIS |
| New Haven Leader | Hermann | MO | Franklin | 1,500 | ST. LOUIS |
| The Examiner | Independence | MO | Jackson | 9,200 | KANSAS CITY |
| Cash-Book Journal | Jackson | MO | Cape Giranrdeau | 4,405 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Kearney Courier | Kearney | MO | Clay | 3,000 | KANSAS CITY |
| The Daily Dunklin Democrat | Kennett | MO | Dunklin | 3,200 | PADUCAH-C.GIRD-HARBG-MT VN |
| Kirksville Daily Express | Kirksville | MO | Adair | 6,432 | OTTUMWA-KIRKSVILLE |
| The Lebanon Daily Record | Lebanon | MO | Laclede | 4,949 | SPRINGFIELD MO |
| The Louisiana Press Journal | Louisiana | MO | Pike | 3,131 | ST. LOUIS |
| The Banner Press | Marble Hill | MO | Bollinger | 3,200 | PADUCAH-C.GIRD-HARBG-MT VN |
| The Marshall Democrat News | Marshall | MO | Saline | 2,600 | KANSAS CITY |
| Maryville Daily Forum | Maryville | MO | Nodaway | 2,626 | ST. JOSEPH |
| Mexico Ledger | Mexico | MO | Audrain | 5,500 | COLUMBIA-JEFFERSON CITY |
| Evening Democrat | Moberly | MO | Randolph | 3,429 | COLUMBIA-JEFFERSON CITY |
| Moberly Monitor - Index | Moberly | MO | Randolph | 3,500 | COLUMBIA-JEFFERSON CITY |
| Neosho Daily News | Neosho | MO | Newton | 4,511 | JOPLIN-PITTSBURG |
| Sunday Herald-Tribune | Nevada | MO | Vernon | 4,000 | JOPLIN-PITTSBURG |
| Missourian-News | Portageville | MO | New Madrid | 1,200 | PADUCAH-C.GIRD-HARBG-MT VN |

**Relish Carrier Newspaper List**

| | | | | | |
|---|---|---|---|---|---|
| Rolla Daily News | Rolla | MO | Phelps | 7,045 | SPRINGFIELD MO |
| The Sedalia Democrat | Sedalia | MO | Pettis | 18,410 | KANSAS CITY |
| The Smithville Lake Herald | Smithville | MO | Clay | 2,350 | KANSAS CITY |
| St. Joseph News-Press | St. Joseph | MO | Buchanan | 30,000 | ST. JOSEPH |
| South Missourian-News | Thayer | MO | Oregon | 1,600 | SPRINGFIELD MO |
| The Daily Star-Journal | Warrensburg | MO | Johnson | 5,304 | KANSAS CITY |
| Warren County Record | Warrenton | MO | Warren | 3,775 | ST. LOUIS |
| Washington Missourian | Washington | MO | Franklin | 16,525 | ST. LOUIS |
| West Plains Daily Quill | West Plains | MO | Howell | 7,600 | SPRINGFIELD MO |
| The Monroe County Journal | Aberdeen | MS | Monroe | 6,000 | COLUMBUS-TUPELO-WEST POINT |
| The Daily Leader | Brookhaven | MS | Lincoln | 6,200 | JACKSON MS |
| Bolivar Commerical | Cleveland | MS | Boliver | 6,000 | GREENWOOD-GREENVILLE |
| The Daily Corinthian | Corinth | MS | Alcorn | 7,272 | MEMPHIS |
| The Itawamba County Times | Fulton | MS | Itawamba | 3,300 | COLUMBUS-TUPELO-WEST POINT |
| The Daily Star | Grenada | MS | Grenada | 5,670 | GREENWOOD-GREENVILLE |
| The Sun Herald | Gulfport | MS | Harrison | 41,500 | BILOXI-GULFPORT |
| The Lamar Times | Hattiesburg | MS | Lamar | 8,000 | HATTIESBURG-LAUREL |
| The South Reporter | Holly Springs | MS | Marshall | 5,200 | MEMPHIS |
| Chickasaw Journal/Times Post | Houston | MS | Chickasaw | 1,300 | COLUMBUS-TUPELO-WEST POINT |
| The Star-Herald | Kosciusko | MS | Attala | 4,949 | JACKSON MS |
| The Chronicle | Laurel | MS | Jones | 7,000 | HATTIESBURG-LAUREL |
| The Meridian Star | Meridan | MS | Lauderdale | 11,300 | MERIDIAN |
| New Albany Gazette | New Albany | MS | New Albany | 4,200 | COLUMBUS-TUPELO-WEST POINT |
| The Oxford Eagle | Oxford | MS | LaFayette | 6,060 | MEMPHIS |
| Picayune Item | Picayune | MS | Pearl River | 4,949 | NEW ORLEANS |
| The Pontotoc Progress | Pontotoc | MS | Pontotoc | 5,200 | COLUMBUS-TUPELO-WEST POINT |
| The Democrat | Senatobia | MS | Tate | 4,500 | MEMPHIS |
| Starkville Daily News | Starkville | MS | Oktibbeha | 6,060 | COLUMBUS-TUPELO-WEST POINT |
| Northeast Mississippi Daily Journal | Tupelo | MS | Lee | 39,000 | COLUMBUS-TUPELO-WEST POINT |
| The Tylertown Times | Tylertown | MS | Walthall | 2,250 | JACKSON MS |
| Vicksburg Post | Vicksburg | MS | Warren | 14,645 | JACKSON MS |
| Daily Times Leader | West Point | MS | Clay | 3,990 | COLUMBUS-TUPELO-WEST POINT |
| Belgrade News | Belgrade | MT | Gallatin | 4,500 | BUTTE-BOZEMAN |
| Lone Peak Lookout | Big Sky | MT | Gallatin | 3,000 | BUTTE-BOZEMAN |
| Billings Gazette | Billings | MT | Yellowstone | 39,000 | BILLINGS |
| Cut Bank Pioneer | Cut Bank | MT | Glacier | 1,500 | GREAT FALLS |
| Great Falls Tribune | Great Falls | MT | Cascade | 27,000 | GREAT FALLS |
| Ravalli Republic | Hamilton | MT | Ravalli | 5,858 | MISSOULA |
| The Indpendent Record Editorial | Helena | MT | Lewis & Clark | 13,500 | HELENA |
| The Western News | Libby | MT | Lincoln | 3,232 | SPOKANE |
| Shelby Promoter | Shelby | MT | Toole | 1,550 | GREAT FALLS |
| The Valierian | Valier | MT | Pondera | 250 | GREAT FALLS |
| West Yellowstone News | West Yellowstone | MT | Gallatin | 1,500 | BUTTE-BOZEMAN |
| Roanoke-Chowan News Herald | Ahoskie | NC | Hertford | 10,302 | NORFOLK-PORTSMTH-NEWPT NWS |
| The Stanly News & Press | Albemarle | NC | Stanly | 7,800 | CHARLOTTE |
| The Randolph Guide | Asheboro | NC | Randolph | 2,500 | GREENSBORO-H.POINT-W.SALEM |
| Watauga Democrat | Boone | NC | Watauga | 3,150 | CHARLOTTE |
| Avery Journal Times | Boone | NC | Avery | 4,020 | CHARLOTTE |
| Times-News | Burlington | NC | Alamance | 25,464 | GREENSBORO-H.POINT-W.SALEM |
| The Clayton News-Star | Clayton | NC | Johnston | 15,500 | RALEIGH-DURHAM (FAYETVLLE) |
| The Clemmons Courier | Clemmons | NC | Forsyth | 3,500 | GREENSBORO-H.POINT-W.SALEM |
| The Daily Record | Dunn | NC | Harnett | 9,000 | RALEIGH-DURHAM (FAYETVLLE) |
| The Herald Sun | Durham | NC | Durham | 30,000 | RALEIGH-DURHAM (FAYETVLLE) |
| The Daily Courier | Forest City | NC | Rutherford | 8,000 | GREENVLL-SPART-ASHEVLL-AND |
| The Gaston Gazette | Gastonia | NC | Gaston | 23,500 | CHARLOTTE |
| The Daily Dispatch | Henderson | NC | Vance | 8,000 | RALEIGH-DURHAM (FAYETVLLE) |
| Hickory Daily Record | Hickory | NC | Catawba | 20,400 | CHARLOTTE |
| The High Point Enterprise | High Point | NC | Guilford | 21,800 | GREENSBORO-H.POINT-W.SALEM |
| Denver Weekly | Huntersville | NC | Mecklenburg | 8,000 | CHARLOTTE |
| The Herald Weekly | Huntersville | NC | Mecklenburg | 25,000 | CHARLOTTE |
| Mountain Island Monitor | Huntersville | NC | Mecklenburg | 10,000 | CHARLOTTE |
| The Daily News | Jacksonville | NC | Onslow | 19,984 | GREENVILLE-N.BERN-WASHNGTN |
| Independent Tribune | Kannapolis | NC | Cabarrus | 12,000 | CHARLOTTE |
| Kinston Free Press | Kinston | NC | Lenior | 10,843 | GREENVILLE-N.BERN-WASHNGTN |
| News-Topic | Lenoir | NC | Caldwell | 8,800 | CHARLOTTE |

# Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| The McDowell New | Marion | NC | McDowell | 5,600 | GREENVLL-SPART-ASHEVLL-AND |
| Davie County Enterprise-Record | Mocksville | NC | Davie | 7,000 | GREENSBORO-H.POINT-W.SALEM |
| The Enquirer-Journal | Monroe | NC | Union | 6,300 | CHARLOTTE |
| The News Herald | Morganton | NC | Burke | 9,200 | CHARLOTTE |
| The Sun Journal | New Bern | NC | Craven | 14,613 | GREENVILLE-N.BERN-WASHNGTN |
| The News & Observer | Raleigh | NC | Wake | 130,500 | RALEIGH-DURHAM (FAYETVLLE) |
| The Salisbury Post | Salisbury | NC | Rowan | 18,500 | CHARLOTTE |
| The Sanford Herald | Sanford | NC | Lee | 9,000 | RALEIGH-DURHAM (FAYETVLLE) |
| Shelby Star | Shelby | NC | Cleveland | 10,800 | CHARLOTTE |
| The Pilot | Southern Pines | NC | Moore | 15,000 | RALEIGH-DURHAM (FAYETVLLE) |
| Statesville Record & Landmark | Statesville | NC | Iredell | 10,500 | CHARLOTTE |
| The Daily Southerner | Tarboro | NC | Edgecombe | 4,850 | RALEIGH-DURHAM (FAYETVLLE) |
| The Bismarck Tribune | Bismarck | ND | Burleigh | 29,290 | MINOT-BISMARCK-DICKINSON |
| Devils Lake Journal | Devils Lake | ND | Ramsey | 3,400 | FARGO-VALLEY CITY |
| The Dickinson Press | Dickinson | ND | Stark | 6,565 | MINOT-BISMARCK-DICKINSON |
| The Forum | Fargo | ND | Cass | 52,459 | FARGO-VALLEY CITY |
| Grand Forks Herald | Grand Forks | ND | Grand Forks | 32,663 | FARGO-VALLEY CITY |
| The Jamestown Sun | Jamestown | ND | Stutsman | 6,928 | FARGO-VALLEY CITY |
| BHG Inc. Newspapers | Minot | ND | Various | 5,555 | MINOT-BISMARCK-DICKINSON |
| Northern Sentry | Minot | ND | Mercer | 5,555 | MINOT-BISMARCK-DICKINSON |
| Ashland Gazette | Ashland | NE | Saunders | 2,000 | OMAHA |
| Beatrice Daily Sun | Breatrice | NE | Gage | 5,200 | LINCOLN & HASTINGS-KRNY |
| Columbus Telegram | Columbus | NE | Platte | 8,900 | OMAHA |
| Fremont Tribune | Fremont | NE | Dodge | 7,200 | OMAHA |
| Grand Island Independent | Grand Island | NE | Hall | 20,200 | LINCOLN & HASTINGS-KRNY |
| Journal - Register | Hebron | NE | Thayer | 1,700 | LINCOLN & HASTINGS-KRNY |
| Kearney Hub | Kearney | NE | Buffalo | 13,130 | LINCOLN & HASTINGS-KRNY |
| McCook Daily Gazette | McCook | NE | Red Willow | 5,050 | LINCOLN & HASTINGS-KRNY |
| The Minden Courier | Minden | NE | Kearny | 2,239 | LINCOLN & HASTINGS-KRNY |
| Nebraska City News-Press | Nebraska City | NE | Otoe | 2,208 | OMAHA |
| Norfolk Daily News | Norfolk | NE | Madison | 15,500 | SIOUX CITY |
| North Platte Telegraph | North Platte | NE | Lincoln | 12,867 | NORTH PLATTE |
| The Omaha World-Herald | Omaha | NE | Douglas | 166,260 | OMAHA |
| Star Herald | Scottsbluff | NE | Scotts Bluff | 15,150 | CHEYENNE-SCOTTSBLUF |
| Syracuse Journal-Democrat | Syracuse | NE | Otoe | 2,200 | OMAHA |
| Wahoo Newspaper | Wahoo | NE | Saunders | 2,000 | OMAHA |
| Waverly News | Waverly | NE | Saunders | 2,200 | LINCOLN & HASTINGS-KRNY |
| News-Time | York | NE | York | 4,545 | LINCOLN & HASTINGS-KRNY |
| Eagle Times | Claremont | NH | Sullivan | 7,900 | BURLINGTON-PLATTSBURGH |
| Concord Monitor | Concord | NH | Merrimack | 17,000 | BOSTON (MANCHESTER) |
| The Telegraph | Hudson | NH | Hillsborough | 20,000 | BOSTON (MANCHESTER) |
| Keene Sentinel | Keene | NH | Cheshire | 12,112 | BOSTON (MANCHESTER) |
| Laconia Citizen | Laconia | NH | Belknap | 7,500 | BOSTON (MANCHESTER) |
| New Jersey Herald | Newton | NJ | Sussex | 12,150 | NEW YORK |
| The Record | Woodland Park | NJ | Bergen | 166,040 | NEW YORK |
| Alamogordo Daily News | Alamogordo | NM | Otero | 6,500 | ALBUQUERQUE-SANTA FE |
| The Albuquerque Journal | Albuquerque | NM | Bernalillo | 104,000 | ALBUQUERQUE-SANTA FE |
| Carlsbad Current-Argus | Carlsbad | NM | Eddy | 6,600 | ALBUQUERQUE-SANTA FE |
| Deming Headlight | Deming | NM | Luna | 3,000 | ALBUQUERQUE-SANTA FE |
| The Daily Times | Farmington | NM | San Jaun | 19,000 | ALBUQUERQUE-SANTA FE |
| The Gallup Independent | Gallup | NM | McKinley | 22,000 | ALBUQUERQUE-SANTA FE |
| Hobbs News Sun | Hobbs | NM | Lea | 10,393 | ALBUQUERQUE-SANTA FE |
| Los Alamos Monitor | Las Alamos | NM | Los Alamos | 5,444 | ALBUQUERQUE-SANTA FE |
| Las Cruces Sun-News | Las Cruces | NM | Dona Ana | 21,500 | EL PASO |
| Las Vegas Optic | Las Vegas | NM | San Miguel | 4,949 | ALBUQUERQUE-SANTA FE |
| Roswell Daily Record | Roswell | NM | Chaves | 10,940 | ALBUQUERQUE-SANTA FE |
| The Ruidoso News | Ruidoso | NM | Lincoln | 6,300 | ALBUQUERQUE-SANTA FE |
| The Santa Fe New Mexican | Santa Fe | NM | Santa Fe | 21,250 | ALBUQUERQUE-SANTA FE |
| Nevada Appeal | Carson City | NV | Washoe | 10,050 | RENO |
| Lincoln County Record | Ely | NV | Lincoln | 2,000 | SALT LAKE CITY |
| Lahontan Valley News | Fallon | NV | Churchhill | 3,150 | RENO |
| The Record Courier | Gardnerville | NV | Douglas | 5,000 | RENO |
| Mineral County Independent News | Hawthorne | NV | Mineral | 1,500 | RENO |
| North Lake Tahoe Bonanza | Incline Village | NV | Washoe | 3,900 | RENO |
| The Humboldt Sun | Winnemucca | NV | Humboldt | 4,040 | RENO |

# Relish Carrier Newspaper List

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| The Daily News | Batavia | NY | Genesee | 13,000 | BUFFALO |
| Messenger Post Newspapers | Canandaigua | NY | Ontario | 11,000 | ROCHESTER NY |
| Catskill Daily Mail | Catskill | NY | Greene | 3,500 | ALBANY-SCHENECTADY-TROY |
| Chatham Courier | Chatham | NY | Columbia | 1,800 | ALBANY-SCHENECTADY-TROY |
| Genesee Country Express | Dansville | NY | Livingston | 2,562 | ROCHESTER NY |
| Finger Lakes Times | Geneva | NY | Ontario | 14,500 | ROCHESTER NY |
| The Post Star | Glens Falls | NY | Warren | 25,500 | ALBANY-SCHENECTADY-TROY |
| The Evening Telegram | Herkimer | NY | Herkimer | 3,300 | UTICA |
| Hudson Register-Star | Hudson | NY | Columbia | 5,000 | ALBANY-SCHENECTADY-TROY |
| The Evening Times | Little Falls | NY | Herkimer | 2,000 | UTICA |
| Times Herald-Record | Middletown | NY | Orange | 59,000 | NEW YORK |
| New York Daily News | New York | NY | New York | 800,000 | NEW YORK |
| The Daily Star | Oneonta | NY | Chenango | 13,500 | UTICA |
| Cooperstown Crier | Oneonta | NY | Otsego | 1,811 | UTICA |
| The Palladium Times | Oswego | NY | Oswego | 6,322 | SYRACUSE |
| The Chronicle-Express | Penn Yan | NY | Yates | 3,838 | ROCHESTER NY |
| Press-Republican | Plattsburgh | NY | Clinton | 20,000 | BURLINGTON-PLATTSBURGH |
| The Daily Gazette | Schenectady | NY | Albany | 50,500 | ALBANY-SCHENECTADY-TROY |
| Mountain Eagle | Stamford | NY | Greene | 2,200 | BINGHAMTON |
| Watertown Daily Times | Watertown | NY | Jefferson | 26,000 | WATERTOWN |
| Windham Journal | Windham | NY | Columbia | 1,520 | ALBANY-SCHENECTADY-TROY |
| Ulster Townsman | Woodstock | NY | Ulster | 2,500 | NEW YORK |
| The Subarbanite | Akron | OH | Stark | 34,138 | CLEVELAND-AKRON (CANTON) |
| The Akron Beacon Journal | Akron | OH | Summit | 112,000 | CLEVELAND-AKRON (CANTON) |
| Review | Alliance | OH | Stark | 12,000 | CLEVELAND-AKRON (CANTON) |
| Ashland Times-Gazette | Ashland | OH | Ashland | 14,000 | CLEVELAND-AKRON (CANTON) |
| Star Beacon | Ashtabula | OH | Ashtabula | 13,750 | CLEVELAND-AKRON (CANTON) |
| The Athens Messenger | Athens | OH | Athens | 8,275 | CHARLESTON-HUNTINGTON |
| Vinton County Courier | Athens | OH | Vinton | 2,200 | CHARLESTON-HUNTINGTON |
| Gazette Publishing Company | Bellevue | OH | Huron | 3,350 | CLEVELAND-AKRON (CANTON) |
| The Bryan Times | Bryan | OH | Williams | 10,313 | TOLEDO |
| The Repository | Canton | OH | Stark | 66,000 | CLEVELAND-AKRON (CANTON) |
| The Herald | Circleville | OH | Pickaway | 6,600 | COLUMBUS OH |
| Cresent-News | Defiance | OH | Defiance | 16,200 | TOLEDO |
| The Delaware Gazette | Delaware | OH | Delaware | 8,119 | COLUMBUS OH |
| The Chronicle Telegram | Elyria | OH | Lorain | 25,755 | CLEVELAND-AKRON (CANTON) |
| Georgetown News Democrat | Georgetown | OH | Brown | 3,460 | CINCINNATI |
| Hillsboro Times Gazette | Hillsboro | OH | Highland | 3,637 | CINCINNATI |
| The Jackson County Times-Journal | Jackson | OH | Jackson | 5,500 | CHARLESTON-HUNTINGTON |
| Record Courier | Kent | OH | Portage | 18,000 | CLEVELAND-AKRON (CANTON) |
| Sugarcreek-Bellbrook Times | Kettering | OH | Greene | 1,100 | DAYTON |
| Times Community Newspapers - North | Kettering | OH | Fulton | 14,677 | DAYTON |
| Times Community Newspapers - South | Kettering | OH | Fulton | 11,300 | DAYTON |
| Logan Daily News | Logan | OH | Hocking | 3,900 | COLUMBUS OH |
| Madison Press | London | OH | Madison | 4,545 | COLUMBUS OH |
| Marysville Journal -Tribune | Marysville | OH | Union | 6,000 | COLUMBUS OH |
| Richwood Gazette | Marysville | OH | Union | 2,000 | COLUMBUS OH |
| The Independent | Massillon | OH | Stark | 13,837 | CLEVELAND-AKRON (CANTON) |
| Northwest Signal | Napoleon | OH | Henry | 4,242 | TOLEDO |
| Perry County Tribune | New Lexington | OH | Perry | 4,000 | COLUMBUS OH |
| The Times Reporter | New Philadelphia | OH | Stark | 24,240 | CLEVELAND-AKRON (CANTON) |
| Norwalk Reflector | Norwalk | OH | Huron | 9,000 | CLEVELAND-AKRON (CANTON) |
| The Register-Herald | Piqua | OH | Preble | 13,681 | DAYTON |
| Sandusky Register | Sandusky | OH | Erie | 24,400 | CLEVELAND-AKRON (CANTON) |
| The Sidney Daily News | Sidney | OH | Shelby | 12,924 | DAYTON |
| Troy Daily News | Troy | OH | Miami | 10,710 | DAYTON |
| Putnam County Sentinel | Van Wert | OH | Van Wert | 5,500 | FT. WAYNE |
| Times-Bulletin | Van Wert | OH | Van Wert | 5,000 | FT. WAYNE |
| Record Herald | Washington Court House | OH | Fayette | 5,068 | COLUMBUS OH |
| Fulton County Expositor | Wauseon | OH | Fulton | 4,848 | TOLEDO |
| The News Watchman | Waverly | OH | Pike | 3,629 | COLUMBUS OH |
| People's Defender | West Union | OH | Adams | 6,800 | CINCINNATI |
| Wilmington News Journal | Wilmington | OH | Clinton | 6,400 | CINCINNATI |
| Daily Record | Wooster | OH | Wayne | 22,664 | CLEVELAND-AKRON (CANTON) |
| Beavercreek News Current | Xenia | OH | Greene | 2,785 | DAYTON |

# Relish Carrier Newspaper List

| | | | | | |
|---|---|---|---|---|---|
| Fairborn Daily Herald | Xenia | OH | Greene | 1,450 | DAYTON |
| The Xenia Daily Gazette | Xenia | OH | Greene | 4,150 | DAYTON |
| The Daily Ardmoreite | Ardmore | OK | Carter | 8,900 | SHERMAN-ADA |
| Express-Star | Chickasha | OK | Grady | 4,949 | OKLAHOMA CITY |
| Daily Progress | Claremore | OK | Rogers | 5,938 | TULSA |
| The Duncan Banner | Duncan | OK | Stephens | 6,500 | WICHITA FALLS & LAWTON |
| The Edmond Sun | Edmond | OK | Oklahoma | 4,200 | OKLAHOMA CITY |
| The American | Fairland | OK | Ottawa | 1,700 | JOPLIN-PITTSBURG |
| The Grove Sun | Grove | OK | Delaware | 2,800 | TULSA |
| McAlester News-Capital | McAlester | OK | Pittsburg | 9,403 | TULSA |
| Miami News-Record | Miami | OK | Ottawa | 3,500 | JOPLIN-PITTSBURG |
| Mustang Times | Mustang | OK | Canadian | 5,500 | OKLAHOMA CITY |
| The Nowata Star | Nowata | OK | Nowata | 2,500 | TULSA |
| The Daily Times | Pryor | OK | Mayes | 3,200 | TULSA |
| Sapulpa Daily Herald | Sapulpa | OK | Creek | 3,500 | TULSA |
| Shawnee News-Star | Shawnee | OK | Pottawatomie | 9,106 | OKLAHOMA CITY |
| News Press | Stillwater | OK | Adair | 7,800 | OKLAHOMA CITY |
| Tahlequah Daily Press | Tahlequah | OK | Cherokee | 3,959 | TULSA |
| Vinita Daily Journal | Vinita | OK | Craig | 3,000 | TULSA |
| Woodward News | Woodward | OK | Woodward | 4,751 | OKLAHOMA CITY |
| Albany-Democrat-Herald | Albany | OR | Linn | 16,100 | PORTLAND OR |
| The World | Coos Bay | OR | Coos | 9,000 | EUGENE |
| Corvallis Gazette Times | Corvallis | OR | Benton | 10,400 | EUGENE |
| Wallowa County Chieftain | Enterprise | OR | Wallowa | 3,030 | SPOKANE |
| The Register-Guard | Eugene | OR | Lane | 54,000 | EUGENE |
| The Hermiston Herald | Hermiston | OR | Umatilla | 3,838 | YAKIMA-PASCO-RCHLND-KNNWCK |
| Blue Mountain Eagle | John Day | OR | Grant | 3,030 | BOISE |
| Herald & News | Klamath Falls | OR | Klamath | 17,321 | MEDFORD-KLAMATH FALLS |
| Mail Tribune | Medford | OR | Jackson | 24,650 | MEDFORD-KLAMATH FALLS |
| East Oregonian | Pendleton | OR | Grant | 9,090 | YAKIMA-PASCO-RCHLND-KNNWCK |
| The News Review | Roseburg | OR | Douglas | 19,190 | EUGENE |
| East Penn Press | Allentown | PA | Lehigh | 8,000 | PHILADELPHIA |
| Northwestern Press | Allentown | PA | Lehigh | 3,000 | PHILADELPHIA |
| Parkland Press | Allentown | PA | Lehigh | 5,000 | PHILADELPHIA |
| Whitehall-Coplay Press | Allentown | PA | Lehigh | 7,000 | PHILADELPHIA |
| Bedford Gazette | Bedford | PA | Bedford | 9,421 | JOHNSTOWN-ALTOONA |
| Press Enterprise | Bloomsburg | PA | Columbia | 23,735 | WILKES BARRE-SCRANTON |
| The Sentinel | Carlisle | PA | Cumberland | 16,766 | HARRISBURG-LNCSTR-LEB-YORK |
| The Progress | Clearfield | PA | Clearfield | 11,200 | JOHNSTOWN-ALTOONA |
| The Express-Times | Easton | PA | Northampton | 51,439 | PHILADELPHIA |
| The Echo-Pilot | Greencastle | PA | Franklin | 2,562 | WASHINGTON DC (HAGRSTWN) |
| Hazleton Standard-Speaker | Hazleton | PA | Luzerne | 19,000 | WILKES BARRE-SCRANTON |
| The Wayne Independent | Honesdale | PA | Wayne | 4,100 | WILKES BARRE-SCRANTON |
| The Daily News | Huntingdon | PA | Huntingdon | 10,000 | JOHNSTOWN-ALTOONA |
| The Tribune-Democrat | Johnstown | PA | Cambria | 37,000 | JOHNSTOWN-ALTOONA |
| The Latrobe Bulletin | Latrobe | PA | West Moreland | 7,500 | PITTSBURGH |
| Salisbury Press | Lehighton | PA | Carbon | 3,000 | WILKES BARRE-SCRANTON |
| Times News | Lehighton | PA | Carbon | 16,420 | WILKES BARRE-SCRANTON |
| The Meadville Tribune | Meadville | PA | Crawford | 13,528 | ERIE |
| Lewisburg Daily Journal | Milton | PA | Northumberland | 1,020 | WILKES BARRE-SCRANTON |
| The Standard Journal | Milton | PA | Northumberland | 2,652 | WILKES BARRE-SCRANTON |
| New Castle News | New Castle | PA | Lawrence | 17,816 | PITTSBURGH |
| Trib Total Media | Pittsburgh | PA | Allegheny | 228,765 | PITTSBURGH |
| Republican-Herald/The News Item | Pottsville | PA | Schuylkill | 32,700 | WILKES BARRE-SCRANTON |
| Morning Times | Sayre | PA | Bradford | 6,222 | WILKES BARRE-SCRANTON |
| The Scranton Times | Scranton | PA | Lackawanna | 47,000 | WILKES BARRE-SCRANTON |
| The Pocono Record | Stroudsburg | PA | Monroe | 20,290 | WILKES BARRE-SCRANTON |
| The Daily Item | Sunbury | PA | Northumberland | 23,000 | WILKES BARRE-SCRANTON |
| The Daily Review | Towanda | PA | Bradford | 9,292 | WILKES BARRE-SCRANTON |
| The Daily Herald | Tyrone | PA | Huntingdon | 2,000 | JOHNSTOWN-ALTOONA |
| Observer-Reporter | Washington | PA | Washington | 36,000 | PITTSBURGH |
| The Record Herald | Waynesboro | PA | Franklin | 9,000 | WASHINGTON DC (HAGRSTWN) |
| The Citizens' Voice | Wilkes-Barre | PA | Luzerne | 29,000 | WILKES BARRE-SCRANTON |
| The Newport Daily News | Newport | RI | Newport | 11,000 | PROVIDENCE-NEW BEDFORD |
| The Westerly Sun | Westerly | RI | Washington | 10,670 | PROVIDENCE-NEW BEDFORD |

**Relish Carrier Newspaper List**

| | | | | | |
|---|---|---|---|---|---|
| The People-Sentinel | Barnwell | SC | Barnwell | 6,000 | AUGUSTA |
| Bluffton Today | Bluffton | SC | Beaufort | 12,500 | SAVANNAH |
| Morning News | Florence | SC | Florence | 24,200 | FLORENCE-MYRTLE BEACH |
| Hampton County Guardian | Hampton | SC | Hampton | 1,020 | SAVANNAH |
| The Messenger | Hartsville | SC | Darlington | 3,550 | FLORENCE-MYRTLE BEACH |
| The Weekly Observer | Henmingway | SC | Williamsburg | 2,040 | CHARLESTON SC |
| Lake City News & Post | Lake City | SC | Florence | 1,371 | FLORENCE-MYRTLE BEACH |
| Marion Star & Mullins Enterprise | Lake City | SC | Marion | 2,550 | FLORENCE-MYRTLE BEACH |
| The Sun News | Myrtle Beach | SC | Horry | 45,000 | FLORENCE-MYRTLE BEACH |
| Jasper County Sun Times | Ridgeland | SC | Jasper | 1,337 | SAVANNAH |
| The Daily Journal | Seneca | SC | Oconee | 8,000 | GREENVLL-SPART-ASHEVLL-AND |
| The Daily Messenger | Seneca | SC | Oconee | 1,000 | GREENVLL-SPART-ASHEVLL-AND |
| The Item | Sumter | SC | Sumter | 15,000 | COLUMBIA SC |
| The Daily Republic | Mitchell | SD | Davison | 12,327 | SIOUX FALLS(MITCHELL) |
| Capital Journal | Pierre | SD | Hughes | 4,400 | SIOUX FALLS(MITCHELL) |
| Rapid City Journal | Rapid City | SD | Pennington | 30,684 | RAPID CITY |
| Public Opinion | Watertown | SD | Codington | 12,726 | SIOUX FALLS(MITCHELL) |
| Daily Press and Dakotan | Yankton | SD | Yankton | 8,686 | SIOUX FALLS(MITCHELL) |
| The Daily Post-Athenian | Athens | TN | McMinn | 9,700 | CHATTANOOGA |
| Chattanooga Times Free Press | Chattanooga | TN | Hamilton | 78,788 | CHATTANOOGA |
| Cleveland Daily Banner | Cleveland | TN | Bradley | 16,000 | CHATTANOOGA |
| Herald -Citizen | Cookeville | TN | Putman | 11,878 | NASHVILLE |
| The Leader | Covington | TN | Tipton | 5,543 | MEMPHIS |
| Crossville Chronicle | Crossville | TN | Cumberland | 7,062 | KNOXVILLE |
| The State Gazette | Dyersburg | TN | Dyer | 5,939 | MEMPHIS |
| Elizabethton Star | Elizabethton | TN | Carter | 9,000 | TRI-CITIES TN-VA |
| The Greeneville Sun | Greeneville | TN | Greene | 14,000 | TRI-CITIES TN-VA |
| Johnson City Press | Johnson City | TN | Washington | 31,300 | TRI-CITIES TN-VA |
| Herald & Tribune | Jonesborough | TN | Washington | 4,400 | TRI-CITIES TN-VA |
| Kingsport Times-News | Kingsport | TN | Hawkins | 42,000 | TRI-CITIES TN-VA |
| The Mt. Juliet News | Lebanon | TN | Wilson | 2,500 | NASHVILLE |
| The Hartsville Vidette | Lebanon | TN | Trousdale | 2,500 | NASHVILLE |
| The Lebanon Democrat | Lebanon | TN | Wilson | 8,000 | NASHVILLE |
| The News-Herald | Lenoir City | TN | Loudon | 5,836 | KNOXVILLE |
| The Daily Times | Maryville | TN | Blount | 18,300 | KNOXVILLE |
| Southern Standard | McMinnville | TN | Warren | 8,908 | NASHVILLE |
| Citizen Tribune | Morristown | TN | Hamblen | 19,004 | KNOXVILLE |
| Murfreesboro Post | Murfreesboro | TN | Rutherford | 21,000 | NASHVILLE |
| The Oak Ridger | Oak Ridge | TN | Anderson | 7,622 | KNOXVILLE |
| The News Leader | Parsons | TN | Decatur | 3,535 | JACKSON TN |
| Portland Leader | Portland | TN | Sumner | 2,000 | NASHVILLE |
| The Mountain Press | Sevierville | TN | Sevier | 9,300 | KNOXVILLE |
| Shelbyville Times Gazette | Shelbyville | TN | Bedford | 10,888 | NASHVILLE |
| Smithville Review | Smithville | TN | DeKalb | 3,535 | NASHVILLE |
| Manchester Times | Tullahoma | TN | Coffee | 9,595 | NASHVILLE |
| Manchester Times | Tullahoma | TN | Coffee | 9,595 | NASHVILLE |
| Cannon Courier | Woodbury | TN | Cannon | 3,500 | NASHVILLE |
| Abilene Reporter News | Abilene | TX | Taylor | 29,000 | ABILENE-SWEETWATER |
| Alvin Sun | Alvin | TX | Brazoria | 1,000 | HOUSTON |
| Amarillo Globe-News | Amarillo | TX | Potter | 30,000 | AMARILLO |
| Athens Daily Review | Athens | TX | Henderson | 5,252 | DALLAS-FT. WORTH |
| Lake Travis View | Austin | TX | Travis | 5,050 | AUSTIN |
| Westlake Picayune | Austin | TX | Travis | 4,400 | AUSTIN |
| Bastrop Advertiser | Bastrop | TX | Bastrop | 6,700 | AUSTIN |
| Lewisville Leader | Bastrop | TX | Denton | 10,500 | AUSTIN |
| The Bay City Tribune | Bay City | TX | Matagorda | 4,000 | HOUSTON |
| Baytown Sun | Baytown | TX | Harris | 7,000 | HOUSTON |
| The Bowie News | Bowie | TX | Montaque | 3,500 | WICHITA FALLS & LAWTON |
| Breckenridge American | Breckenridge | TX | Stephens | 1,783 | ABILENE-SWEETWATER |
| The Banner - Press | Brenham | TX | Washington | 6,434 | WACO-TEMPLE-BRYAN |
| The Brownsville Herald | Brownsville | TX | Cameron | 25,061 | HARLINGEN-WSLCO-BRNSVL-MCA |
| Brownwood Bulletin | Brownwood | TX | Brown | 5,500 | ABILENE-SWEETWATER |
| Bryan-College Station Eagle | Bryan | TX | Brazos | 24,745 | WACO-TEMPLE-BRYAN |
| Alvarado Star | Burleson | TX | Johnson | 375 | DALLAS-FT. WORTH |
| Burleson Star | Burleson | TX | Johnson | 3,300 | DALLAS-FT. WORTH |

**Relish Carrier Newspaper List**

| | | | | | |
|---|---|---|---|---|---|
| Crowley Star | Burelson | TX | Tarrant | 745 | DALLAS-FT. WORTH |
| Everman Star | Burelson | TX | Tarrant | 289 | DALLAS-FT. WORTH |
| Joshua Star | Burelson | TX | Johnson | 687 | DALLAS-FT. WORTH |
| Kenne Star | Burelson | TX | Johnson | 554 | DALLAS-FT. WORTH |
| Canton Herald | Canton | TX | Van Zandt | 4,000 | DALLAS-FT. WORTH |
| Cleburne Times-Review | Cleburne | TX | Johnson | 3,000 | DALLAS-FT. WORTH |
| Corpus Christi Caller Times | Corpus Christi | TX | Nueces | 49,100 | CORPUS CHRISTI |
| Corsicana Daily Sun | Corsicana | TX | Navarro | 7,028 | DALLAS-FT. WORTH |
| El Paso Times | El Paso | TX | El Paso | 75,000 | EL PASO |
| Fort Worth Star-Telegram | Fort Worth | TX | Tarrant | 142,000 | DALLAS-FT. WORTH |
| Fredericksburg Standard-Radio Post | Fredericksburg | TX | Gillespie | 9,600 | AUSTIN |
| Gainesville Daily Register | Gainesville | TX | Cooke | 5,740 | DALLAS-FT. WORTH |
| Galveston County Daily News | Galveston | TX | Galveston | 24,500 | HOUSTON |
| The Gilmer Mirror | Gilmer | TX | Upshur | 4,545 | TYLER-LONGVIEW(LFKN&NCGD) |
| Glen Rose Reporter | Glen Rose | TX | Somervell | 2,000 | DALLAS-FT. WORTH |
| Lake County Sun | Graford | TX | Palo Pinto | 1,150 | DALLAS-FT. WORTH |
| The Graham Leader | Graham | TX | Young | 3,088 | WICHITA FALLS & LAWTON |
| Greenville Herald-Banner | Greenville | TX | Hunt | 8,000 | DALLAS-FT. WORTH |
| Henderson Daily News | Henderson | TX | Rusk | 6,060 | TYLER-LONGVIEW(LFKN&NCGD) |
| The Huntsville Item | Huntsville | TX | Walker | 5,939 | HOUSTON |
| West Kerr Current | Ingram | TX | Kerr | 1,500 | SAN ANTONIO |
| Jack County Herald | Jacksboro | TX | Jack | 1,266 | DALLAS-FT. WORTH |
| Cedar Park Citizen | Jonestown | TX | Williamson | 14,350 | AUSTIN |
| Leander Ledger | Jonestown | TX | Williamson | 9,700 | AUSTIN |
| Coppell Gazette | Jonestown | TX | Denton | 7,600 | AUSTIN |
| Flower Mound Leader | Jonestown | TX | Denton | 6,000 | AUSTIN |
| The Junction Eagle | Junction | TX | Kimble | 1,800 | SAN ANGELO |
| The Katy Times | Katy | TX | Harris | 6,000 | HOUSTON |
| Kaufman Herald | Kaufman | TX | Kaufman | 4,256 | DALLAS-FT. WORTH |
| Kerrville Daily Times | Kerrville | TX | Kerr | 9,000 | SAN ANTONIO |
| Longview News Journal | Longview | TX | Gregg | 29,795 | TYLER-LONGVIEW(LFKN&NCGD) |
| Lubbock Avalanche-Journal | Lubbock | TX | Lubbock | 30,850 | LUBBOCK |
| The Lufkin Daily News | Lufkin | TX | Angelina | 14,039 | TYLER-LONGVIEW(LFKN&NCGD) |
| The Monitor | Mabank | TX | Kaufman | 4,949 | DALLAS-FT. WORTH |
| Marshall News Messenger | Marshall | TX | Harrison | 7,575 | SHREVEPORT |
| The Mexia Daily News | Mexia | TX | Limestone | 2,771 | WACO-TEMPLE-BRYAN |
| Midland Reporter-Telegram | Midland | TX | Midland | 15,000 | ODESSA-MIDLAND |
| Mineral Wells Index | Mineral Wells | TX | Palo Pinto | 3,000 | DALLAS-FT. WORTH |
| The Daily Sentinel | Nochgodoches | TX | Nacogdoches | 8,989 | TYLER-LONGVIEW(LFKN&NCGD) |
| The Olney Enterprise | Olney | TX | Young | 1,000 | WICHITA FALLS & LAWTON |
| The Orange Leader | Orange | TX | Orange | 5,000 | BEAUMONT-PORT ARTHUR |
| Palestine Herald - Press | Palestine | TX | Anderson | 7,070 | DALLAS-FT. WORTH |
| Plainview Daily Herald | Plainview | TX | Hale | 6,632 | LUBBOCK |
| Port Arthur News | Port Arthur | TX | Jefferson | 13,500 | BEAUMONT-PORT ARTHUR |
| The Port Lavaca Wave | Port Lavaca | TX | Calhoun | 3,959 | HOUSTON |
| Rockport Pilot | Rockport | TX | Aransas | 4,949 | CORPUS CHRISTI |
| The Fort Bend Herald | Rosenburg | TX | Fort Bend | 8,413 | HOUSTON |
| Pflugerville Pflag | Round Rock | TX | Travis | 8,200 | AUSTIN |
| Round Rock Leader | Round Rock | TX | Williamson | 8,500 | AUSTIN |
| Carrollton Leader | Round Rock | TX | Denton | 3,100 | AUSTIN |
| Plano Star Courier | Round Rock | TX | Collin | 41,000 | AUSTIN |
| San Angelo Standard Times | San Angelo | TX | Tom Green | 18,300 | SAN ANGELO |
| San Marcos Daily Record | San Marcos | TX | Hays | 3,400 | AUSTIN |
| Seguin Gazette-Enterprise | Seguin | TX | Guadalupe | 6,060 | SAN ANTONIO |
| Herald Democrat | Sherman | TX | Grayson | 22,765 | SHERMAN-ADA |
| Smithville Times | Smithvilel | TX | Bastrop | 4,100 | AUSTIN |
| McKinney Courier Gazette | Smithvilel | TX | Collin | 4,000 | AUSTIN |
| Stephenville Empire-Tribune | Stephenville | TX | Erath | 4,800 | DALLAS-FT. WORTH |
| Temple Daily Telegram | Temple | TX | Bell | 18,500 | WACO-TEMPLE-BRYAN |
| Terrell Tribune | Terrell | TX | Kaufman | 2,969 | DALLAS-FT. WORTH |
| Texarkana Gazette | Texarkana | TX | Bowie | 34,000 | SHREVEPORT |
| Victoria Advocate | Victoria | TX | Victoria | 49,000 | VICTORIA |
| Waco Tribune - Herald | Waco | TX | McLennan | 37,370 | WACO-TEMPLE-BRYAN |
| Waxahachie Daily Light | Waxahachie | TX | Ellis | 5,000 | DALLAS-FT. WORTH |
| The Weatherford Democrat | Weatherford | TX | Parker | 6,000 | DALLAS-FT. WORTH |

**Relish Carrier Newspaper List**

| Mid Valley Town Crier | Weslaco | TX | Hidalgo | 23,230 | HARLINGEN-WSLCO-BRNSVL-MCA |
|---|---|---|---|---|---|
| Wichita Falls Times Records News | Wichita Falls | TX | Wichita | 25,000 | WICHITA FALLS & LAWTON |
| Van Banner | Wills Point | TX | Van Zandt | 1,000 | DALLAS-FT. WORTH |
| Davis County Clipper | Bountiful | UT | Davis | 10,000 | SALT LAKE CITY |
| The Herald Journal | Logan | UT | Cache | 17,170 | SALT LAKE CITY |
| Standard-Examiner | Ogden | UT | Weber | 60,000 | SALT LAKE CITY |
| The Daily Herald | Provo | UT | Utah | 27,000 | SALT LAKE CITY |
| The Salt Lake Tribune/Deseret News | Salt Lake City | UT | Salt Lake | 125,000 | SALT LAKE CITY |
| Tooele Transcript Bulletin | Tooele | UT | Tooele | 7,500 | SALT LAKE CITY |
| Bristol Herald Courier | Bristol | VA | Sullivan | 30,000 | TRI-CITIES TN-VA |
| The Floyd Press | Floyd | VA | Floyd | 5,000 | ROANOKE-LYNCHBURG |
| Smyth County News & Messenger | Marion | VA | Smyth | 4,632 | TRI-CITIES TN-VA |
| The Virginian-Pilot | Norfolk | VA | Norfolk | 164,000 | NORFOLK-PORTSMTH-NEWPT NWS |
| Hampton Roads Saving Weekly | Norfolk | VA | Norfolk | 34,000 | NORFOLK-PORTSMTH-NEWPT NWS |
| Progress-Index | Petersburg | VA | Prince George | 15,150 | RICHMOND-PETERSBURG |
| Clinch Valley News | Richlands | VA | Tazewell | 2,400 | BLUEFIELD-BECKLEY-OAK HILL |
| Richlands News-Press | Richlands | VA | Tazewell | 3,798 | BLUEFIELD-BECKLEY-OAK HILL |
| Richmond Times-Dispatch | Richmond | VA | Richmond City | 121,000 | RICHMOND-PETERSBURG |
| Northern Virginia Daily | Strasburg | VA | Shenandoah | 14,000 | WASHINGTON DC (HAGRSTWN) |
| The Bland Messenger | Wytheville | VA | Bland | 2,500 | ROANOKE-LYNCHBURG |
| Wytheville Enterprise | Wytheville | VA | Wythe | 5,415 | ROANOKE-LYNCHBURG |
| Bennington Banner | Bennington | VT | Bennington | 7,575 | ALBANY-SCHENECTADY-TROY |
| Brattleboro Reformer | Brattleboro | VT | Windham | 10,100 | BOSTON (MANCHESTER) |
| St. Albans Messenger | St. Albans | VT | Franklin | 6,060 | BURLINGTON-PLATTSBURGH |
| The Bellingham Herald | Bellingham | WA | Whatcom | 19,000 | SEATTLE-TACOMA |
| The Chronicle | Centralia | WA | Lewis | 12,800 | SEATTLE-TACOMA |
| Daily Record | Ellensburg | WA | Kittitas | 5,741 | YAKIMA-PASCO-RCHLND-KNNWCK |
| The Herald | Everett | WA | Snohomish | 54,439 | SEATTLE-TACOMA |
| Columbia Basin Herald | Moses Lake | WA | Grant | 9,090 | SPOKANE |
| Skagit Valley Herald | Mount Vernon | WA | Skagit | 15,000 | SEATTLE-TACOMA |
| Peninsula Daily News | Port Angeles | WA | Clallam | 18,000 | SEATTLE-TACOMA |
| Seattle Times | Seattle | WA | King | 218,000 | SEATTLE-TACOMA |
| The Columbian | Vancouver | WA | Clark | 32,000 | PORTLAND OR |
| Walla Walla Union Bulletin | Walla Walla | WA | Walla Walla | 12,500 | YAKIMA-PASCO-RCHLND-KNNWCK |
| The Wenatchee World | Wenatchee | WA | Chelan | 20,500 | SEATTLE-TACOMA |
| Yakima Herald-Republic | Yakima | WA | Yakima | 34,200 | YAKIMA-PASCO-RCHLND-KNNWCK |
| Waupaca Buyers Guide | Antigo | WI | Langlade | 11,276 | WAUSAU-RHINELANDER |
| The Daily Press | Ashland | WI | Ashland | 6,000 | DULUTH-SUPERIOR |
| Baraboo News Republic | Baraboo | WI | Sauk | 4,242 | MADISON |
| Daily Citizen | Beaver Dam | WI | Dodge | 10,492 | MILWAUKEE |
| Rural Post | Bowler | WI | Shawano | 9,000 | GREEN BAY-APPLETON |
| Burlington Standard Press | Burlington | WI | Racine | 3,000 | MILWAUKEE |
| Cambridge News | Cambridge | WI | Dane | 2,647 | MADISON |
| Ozaukee County News Graphic | Cedarburg | WI | Ozaukee | 8,080 | MILWAUKEE |
| Clintonville Tribune Gazette | Clintonville | WI | Waupaca | 2,500 | GREEN BAY-APPLETON |
| Clintonville Buyers Guide | Clintonville | WI | Waupaca | 14,000 | MISSOULA |
| Herald-Independent | Cottage Grove | WI | Dane | 1,981 | MADISON |
| DeForest Times | DeForest | WI | Dane | 2,550 | MADISON |
| The Delavan Enterprise | Delavan | WI | Walworth | 2,000 | MILWAUKEE |
| The East Troy News | East Troy | WI | Walworth | 500 | MILWAUKEE |
| The Leader-Telegram | Eau Claire | WI | Eau Claire | 24,707 | MADISON |
| The Elkhorn Independent | Elkhorn | WI | Walworth | 1,000 | MILWAUKEE |
| Mukwonago Chief | Hartland | WI | Waukesha | 5,126 | MILWAUKEE |
| Reporter Focus | Hartland | WI | Waukesha | 9,282 | MILWAUKEE |
| Sawyer County Record | Hayward | WI | Sawyer | 6,000 | DULUTH-SUPERIOR |
| Manawa Advocate | Iola | WI | Waupaca | 500 | GREEN BAY-APPLETON |
| The Iola Herald | Iola | WI | Waupaca | 1,000 | GREEN BAY-APPLETON |
| The Janesville Gazette | Janesville | WI | Rock | 22,220 | WAUSAU-RHINELANDER |
| Kenosha News | Kenosha | WI | Kenosha | 26,310 | MILWAUKEE |
| La Crosse Tribune | La Crosse | WI | La Crosse | 27,000 | MILWAUKEE |
| Lake Geneva Times | Lake Geneva | WI | Walworth | 2,000 | MILWAUKEE |
| Lake Mills Leader | Lake Mills | WI | Jefferson | 2,907 | MILWAUKEE |
| Lodi Enteprise | Lodi | WI | Columbia | 2,540 | MADISON |
| Eagle Herald | Marinette | WI | Marinette | 9,000 | GREEN BAY-APPLETON |
| Marshfield Buyers Guide | Marshfield | WI | Clark | 21,513 | WAUSAU-RHINELANDER |

**Relish Carrier Newspaper List**

| Newspaper | City | State | County | Circulation | Market |
|---|---|---|---|---|---|
| McFarland Thistle | McFarland | WI | Dane | 1,785 | MADISON |
| Foto News | Merrill | WI | Lincoln | 16,400 | WAUSAU-RHINELANDER |
| Milton Courier | Milton | WI | Rock | 3,519 | MADISON |
| The Monroe Times | Monroe | WI | Green | 5,050 | MADISON |
| New London Buyers Guide | New London | WI | Waupaca | 15,151 | GREEN BAY-APPLETON |
| Berlin/Ripon Ad Pack | Oshkosh | WI | Winneago | 12,700 | GREEN BAY-APPLETON |
| Oshkosh Buyers Guide | Oshkosh | WI | Winneago | 25,000 | GREEN BAY-APPLETON |
| The Park Falls Herald | Park Falls | WI | Price | 2,969 | MADISON |
| Daily Register | Portage | WI | Portage | 5,555 | MADISON |
| Poynette Press | Poynette | WI | Dane | 1,530 | MADISON |
| The Journal Times | Racine | WI | Racine | 26,000 | MILWAUKEE |
| Star Journal | Rhinelander | WI | Oneida | 16,000 | WAUSAU-RHINELANDER |
| Spooner Advocate | Spooner | WI | Washburn | 3,953 | MINNEAPOLIS-ST. PAUL |
| Stevens Point Buyers Guide | Stevens Point | WI | Portage | 21,097 | WAUSAU-RHINELANDER |
| The Star | Sun Prairie | WI | Dane | 5,396 | MADISON |
| The Daily Telegram | Superior | WI | Douglas | 5,000 | MILWAUKEE |
| Westosha Report | Twin Lakes | Wi | Walworth | 500 | MILWAUKEE |
| Westine Report | Union Grove | WI | Racine | 500 | MILWAUKEE |
| The Times Walworth | Walworth | WI | Walworth | 500 | MILWAUKEE |
| Waterford Post | Waterford | WI | Racine | 1,000 | MILWAUKEE |
| The Courier | Waterloo | WI | Jefferson | 2,309 | MILWAUKEE |
| Times Publishing Company | Watertown | WI | Jefferson | 8,050 | MILWAUKEE |
| Waukesha Freeman | Waukesha | WI | Waulkesha | 11,200 | MILWAUKEE |
| Waunakee Tribune | Waunakee | WI | Dane | 3,749 | MADISON |
| Waupaca County Post | Waupaca | WI | Waupaca | 7,300 | GREEN BAY-APPLETON |
| Marathon Buyers Guide | Wausau | WI | Marathon | 33,800 | WAUSAU-RHINELANDER |
| The Waushara Argus | Wautoma | WI | Waushara | 5,500 | GREEN BAY-APPLETON |
| West Bend Daily News | West Bend | WI | Washington | 9,343 | MILWAUKEE |
| The Chronicle | Weyauwega | WI | Waupaca | 2,500 | GREEN BAY-APPLETON |
| Whitewater Register | Whitewater | WI | Walworth | 1,000 | MILWAUKEE |
| Wisconsin Rapids Buyers Guide | Wisconsin Rapids | WI | Wood | 22,040 | GREEN BAY-APPLETON |
| The Register Herald | Beckley | WV | Raliegh | 22,904 | BLUEFIELD-BECKLEY-OAK HILL |
| Mineral Daily News Tribune | Keyser | WV | Mineral | 4,242 | WASHINGTON DC (HAGRSTWN) |
| Casper Star-Tribune | Casper | WY | Natrona | 24,500 | CASPER-RIVERTON |
| | | | | **15,061,439** | |

Case 1:11-cv-02664-CRB Document 31-7 Filed 05/04/13 Page 254 of 330 PageID #:

# EXHIBIT C

To:
From:     Barbara's Bakery Settlement Administrator
Subject:   Barbara's Bakery Settlement

### If You Bought a Barbara's Bakery Product
### You Could Get Up to $100 from a Settlement

***Includes: Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies***

Records show that you may have previously purchased a Barbara's Bakery product and that you may be eligible for a payment of up to $100 from a class action Settlement. The lawsuit claims that Barbara's Bakery violated state laws regarding the marketing and sale of certain products. Barbara's Bakery denies it did anything wrong. Please go to www.BarbarasBakerySettlement.com for a list of included products and / or to file a claim.

**What Does the Settlement Provide?**
A Settlement Fund of $4 million will pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) attorneys' fees and costs, and (4) a special service payment to the Class Representative. Barbara's Bakery has also agreed to change some of its business practices, including modifying its product labels and advertising. Any money remaining in the Settlement Fund after all claims are paid will be donated to charities and non-profit organizations. Additional details are in the Settlement Agreement available on the website.

**How Can I Get a Payment?** Submit a Claim Form online at www.BarbarasBakerySettlement.com or by mail by **Month 00, 2013**. The payment amount you receive will be based in part on the amount of products you purchased and the total number of claims made.

**What Are My Rights?** Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue Barbara's Bakery yourself, you must exclude yourself from the Settlement by **Month 00, 2013**. If you stay in the Settlement, you may object to it by **Month 00, 2013**.

The Court will hold a hearing on **Month 00, 2013** to consider whether to approve the Settlement and a request for attorneys' fees and costs up to $1 million and a special service payment of $2,500 from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

The detailed notice, available at www.BarbarasBakerySettlement.com or by calling 1-800-000-0000, further explains how to exclude yourself or object.

**For More Information: 1-800-000-0000     www.BarbarasBakerySettlement.com**

## If You Bought a Barbara's Bakery Product, You Could Get Up to $100 from a Settlement

*Includes: Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies*

Records show that you may have previously purchased a Barbara's Bakery product and that you may be eligible for a payment of up to $100 from a class action Settlement. The lawsuit claims that Barbara's Bakery violated state laws regarding the marketing and sale of certain products. Barbara's Bakery denies it did anything wrong. Please go to www.BarbarasBakerySettlement.com for a list of included products and / or to file a claim.

**What Does the Settlement Provide?** A Settlement Fund of $4 million will pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) attorneys' fees and costs, and (4) a special service payment to the Class Representative. Barbara's Bakery also has agreed to change some of its business practices, including modifying its product labels and advertising. Any money remaining in the Settlement Fund after all claims are paid will be donated to charities and non-profit organizations. Additional details are in the Settlement Agreement available on the website.

**How Can I Get a Payment?** Submit a Claim Form online at www.BarbarasBakerySettlement.com or by mail by **Month 00, 2013**. The payment amount you receive will be based in part on the amount of products you purchased and the total number of claims made.

**What Are My Rights?** Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue Barbara's Bakery yourself, you must exclude yourself from the Settlement by **Month 00, 2013**. If you stay in the Settlement, you may object to it by **Month 00, 2013**.

The Court will hold a hearing on **Month 00, 2013** to consider whether to approve the Settlement, a request for attorneys' fees and costs up to $1 million, and a special service payment of $2,500 from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

The detailed notice, available at www.BarbarasBakerySettlement.com or by calling 1-800-000-0000, further explains how to exclude yourself or object.

**For More Information: 1-800-000-0000     www.BarbarasBakerySettlement.com**

CLAIMS ADMINISTRATOR
PO BOX 0000
MINNEAPOLIS, MN 00000-0000

PRESOR ED
RS -CLASS MA L
U S POS AGE
PA D
Rust Consulting, nc

**Important Notice About Barbara's Bakery Product Settlement**

NAME
ADDRESS
CITY STATE ZIP CODE

# EXHIBIT D

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

# If You Bought a Barbara's Bakery Product Any Time From May 23, 2008 to Month 00, 0000

## *You Could Get Up to $100 From a Class Action Settlement*

---

**Included Products:** Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies

---

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

- There is a Settlement in a class action lawsuit that claims Barbara's Bakery violated state laws regarding the marketing and sale of its products (*see* Question 2). Barbara's Bakery denies it did anything wrong.

- Anyone who bought an eligible Barbara's Bakery product, referred to as the "Eligible Products" and listed below under Question 7, from May 23, 2008 to Month 00, 0000 is included in the Settlement. You may be entitled to a refund of up to $100.

- The Settlement will provide $4,000,000 to pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) a special service payment to the Class Representative, and (4) attorneys' fees and costs. Barbara's Bakery has also agreed to change some of its business practices.

- Your legal rights are affected whether you act or not.

- **Read this notice carefully because it explains decisions you must make and actions you must take now.**

| SUMMARY OF YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **DO NOTHING** | Get no payment. Give up your rights. |
| **SUBMIT A CLAIM FORM** | Submit a Claim Form by **Month 00, 0000** to get a payment (*see* Question 14). |
| **EXCLUDE YOURSELF** | Exclude yourself by **Month 00, 0000** and get no payment from the Settlement. This is the only choice that allows you to ever be part of any other lawsuit against Barbara's Bakery about the claims in this case (*see* Question 17). |
| **OBJECT** | Write to the Court by **Month 00, 0000** about why you don't like the Settlement (*see* Question 22). |
| **GO TO A HEARING** | Ask to speak in Court by **Month 00, 0000** about the fairness of the Settlement (*see* Question 26). |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the Settlement. If it does, and any appeals are resolved, payments will be distributed to those who qualify. Please be patient.

| WHAT THIS NOTICE CONTAINS |
|---|

**BASIC INFORMATION**................................................................................**3**
    1.    Why was this notice issued?
    2.    What is this lawsuit about?
    3.    Why is this a class action?
    4.    Why is there a Settlement?

**WHO IS PART OF THE SETTLEMENT?**....................................................**3**
    5.    Who is included in the Settlement?
    6.    Are there exceptions to being included?
    7.    Which products are included?
    8.    What if I'm still not sure if I'm included?

**THE SETTLEMENT BENEFITS – WHAT YOU CAN GET**...........................**6**
    9.    What does the Settlement provide?
    10.    What can I get from the Settlement?
    11.    What happens if there are any funds remaining?
    12.    What am I giving up if I stay in the Class?
    13.    When will I get my payment, if any?

**HOW TO RECEIVE A PAYMENT**..............................................................**7**
    14.    How can I get a payment?
    15.    What is the claim process?
    16.    What if I do nothing?

**EXCLUDING YOURSELF FROM THE SETTLEMENT**...................................**8**
    17.    How can I get out of the Settlement?
    18.    If I exclude myself, can I still get a payment?
    19.    If I don't exclude myself, can I sue Barbara's Bakery for the same thing later?

**THE LAWYERS REPRESENTING THE CLASS**...........................................**9**
    20.    Do I have a lawyer in this case?
    21.    How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT**.........................................................**9**
    22.    How can I tell the Court if I do not like the Settlement?
    23.    What is the difference between objecting and asking to be excluded?

**THE COURT'S FAIRNESS HEARING**.......................................................**10**
    24.    When and where will the Court decide whether to approve the Settlement?
    25.    Do I have to come to the hearing?
    26.    May I speak at the fairness hearing?

**GETTING MORE INFORMATION**..............................................................**11**
    27.    How can I get more information?

QUESTIONS? VISIT WWW.BARBARASBAKERYSETTLEMENT.COM OR CALL, TOLL-FREE, 1-000-000-0000

# BASIC INFORMATION

| **1. Why was this notice issued?** |
| --- |

The Court authorized this notice because you have a right to know about a proposed Settlement, and about your rights and options, before the Court decides whether to approve the Settlement. You will be informed of the progress of this Settlement and may receive a payment if you are a Class Member and submit a completed and timely Claim Form. This notice explains the lawsuit, the Settlement, and your legal rights. Judge Charles R. Breyer of the United States District Court for the Northern District of California is overseeing this case. The lawsuit is known as *Trammell v. Barbara's Bakery, Inc.,* Case Number 3:12-cv-02664-CRB. The person who sued is called the "Plaintiff." Barbara's Bakery is the "Defendant."

| **2. What is this lawsuit about?** |
| --- |

The lawsuit claims that Barbara's Bakery violated certain state laws and consumer protection statutes regarding the marketing and sale of certain products. For example, Plaintiff claims that Barbara's Bakery misrepresented the nature of certain products to consumers by labeling them as "All Natural." Plaintiff claims that these products contain ingredients that are not "All Natural." Barbara's Bakery denies any and all claims of wrongdoing and does not admit any fault, wrongdoing or liability.

Information about the Settlement is summarized in this notice. More detail is provided in the Settlement Agreement, available at www.BarbarasBakerySettlement.com.

| **3. Why is this a class action?** |
| --- |

In a class action, one or more people called "Class Representatives" (in this case, Plaintiff, Richard Trammell), sue on behalf of themselves and other people who have similar claims. Together, all of these people are "Class Members." One Court resolves the issues for all Class Members in a Class Action, except for those who exclude themselves from the Class (*see* Question 17).

| **4. Why is there a Settlement?** |
| --- |

The Court has not decided in favor of the Plaintiff or Barbara's Bakery. Instead, both sides have agreed to the Settlement. By agreeing to the Settlement, they avoid the costs and uncertainty of a trial, and Class Members receive the benefits described in this notice. The proposed Settlement does not mean that any law was broken or that Barbara's Bakery did anything wrong. The parties believe that the Settlement is fair, reasonable, and adequate and will provide substantial benefit to the Class.

# WHO IS PART OF THE SETTLEMENT?

| **5. Who is included in the Settlement?** |
| --- |

The Class includes all persons or entities that bought the Eligible Products (listed below under Question 7) from Barbara's Bakery U.S. Retailers, Barbara's Bakery, www.barbarasbakery.com, or other third-party retailers from May 23, 2008 through **Month 00, 0000**.

| 6. Are there exceptions to being included? |
|---|

The Settlement does not include:
- Barbara Bakery's board members or executive-level officers, including its attorneys;
- Persons or entities who purchased the Eligible Products primarily for purposes of resale;
- Any claims for personal injury relating to the use of the Eligible Products;
- Distributors or re-sellers of the Eligible Products;
- The judge and magistrate judge and their immediate families presiding over the class action and the Court staff;
- Governmental entities;
- Any person who excludes him or herself from the Class (*see* Question 17); and
- Anyone who purchased the Eligible Products via the Internet or other remote means while not residing in the United States.

| 7. Which products are included? |
|---|

The following Barbara's Bakery products are the Eligible Products:

---

**CEREALS:**
- **BROWN RICE CRISPS** (Fruit Juice Sweetened flavor);
- **CORN FLAKES** (Fruit Juice Sweetened flavor);
- **HIGH FIBER** (Cranberry, Flax & Granola, and Original flavors);
- **HOLE 'N OATS** (Fruit Juice Sweetened or Honey Nut flavors);
- **HONEST O'S** (Honey Nut, Multigrain, or Original flavors);
- **ORGANIC APPLE CINNAMON O'S**;
- **ORGANIC BREAKFAST O'S**;
- **ORGANIC BROWN RICE**;
- **ORGANIC BROWN RICE CRISPS**;
- **ORGANIC CORN FLAKES**;
- **ORGANIC CRISPY WHEATS**;
- **ORGANIC HONEY CRUNCH 'N OATS**;
- **ORGANIC HONEY NUT O'S**;
- **ORGANIC SNACKIMALS CEREAL** (Cinnamon Crunch or Vanilla Blast flavors);
- **ORGANIC WILD PUFFS** (Caramel, Cocoa, Cocoa Grahams, Fruity Punch, Honey Puffs, or Original flavors);
- **PUFFINS** (Cinnamon, Crunchy Cocoa, Fruit Medley, Honey Rice, Multigrain, Peanut Butter, Peanut Butter & Chocolate, or Original flavors);
- **PUFFIN PUFFS** (Crunchy Cocoa or Fruit Medley flavors);
- **SHREDDED OATS** (Cinnamon Crunch, Blueberry Burst, Multigrain, Original, Shredded Wheat, or Vanilla Almond flavors);
- **SHREDDED WHEAT**;
- **SHREDDED SPOONFULS** (Multigrain or Vanilla Blast flavors);
- **SHREDDED MINIS** (Blueberry Burst flavor);
- **TOASTED OATMEAL FLAKES** (Original flavor); and
- **ULTIMA ORGANIC** (Blue Corn, Blueberry, Flax & Granola, High Fiber, or Pomegranate flavors).

---

| **CEREAL BARS:** | **CHEESE PUFFS:** |
|---|---|
| • **MULTIGRAIN CEREAL BARS** (Apple Cinnamon, Blueberry, Cherry, Original, Raspberry, Strawberry, or Triple Berry flavors); <br> • **FRUIT & YOGURT BARS** (Apple Cinnamon, Blueberry Apple, Cherry Apple, Strawberry Apple, or Traditional flavors); and <br> • **PUFFINS CEREAL AND MILK BARS** (Blueberry Yogurt, French Toast, Peanut Butter Chocolate Chip, or Strawberry Yogurt flavors). | • **BAKED CHEESE PUFFS** (Original or White Cheddar flavors); and <br> • **CHEESE PUFFS** (Jalapeno or Original flavors). |
| **FIG BARS:** | **GRANOLA BARS:** |
| • **FIG BARS** (Apple Cinnamon, Blueberry, Multigrain, Raspberry, Traditional, Wheat Free or Whole Wheat flavors). | • **CRUNCHY ORGANIC GRANOLA BARS** (Cinnamon Crisp, Oat & Honey, Peanut Butter, or Toasted Almond flavors). |
| **SNACKIMALS ANIMAL COOKIES:** | **ORGANIC MINI COOKIES:** |
| • **SNACKIMALS ANIMAL COOKIES** (Chocolate Chip, Double Chocolate, Peanut Butter, Oatmeal, Vanilla, or Snickerdoodle flavors). | • **ORGANIC MINI COOKIES** (Chocolate, Ginger, or Oatmeal flavors). |
| **SNACK MIXES:** | **CRACKERS:** |
| • **BRUSCHETTA SNACK MIX**; <br> • **HONEY CINNAMON SNACK MIX**; <br> • **HONEY MUSTARD SNACK MIX**; and <br> • **SALSA SNACK MIX**. | • **CRISP COOKIES** (Chocolate Chip, Double Dutch Chocolate Chip, Old Fashioned Oatmeal, or Traditional Short Bread flavors); <br> • **GO GO GRAHAMS** (Chocolate, Cinnamon, Honey, or Lemon Ginger flavors); <br> • **PIZZA AND CHEESE BITES**; <br> • **RITE LITE ROUNDS** (Original, Poppy Seed, or Tamari Sesame flavors); and <br> • **WHEATINES** (Cracked Pepper, Original, or Sesame flavors). |

## 8. What if I'm still not sure if I'm included?

If you are not sure whether you are a Class Member, or have any other questions about the Settlement, visit the website, www.BarbarasBakerySettlement.com, or call the toll free number, 1-800-000-0000. You may also send questions to the Settlement Administrator at Barbara's Bakery Settlement, P.O. Box 0000, City, ST 00000.

## THE SETTLEMENT BENEFITS – WHAT YOU CAN GET

| 9. What does the Settlement provide? |
|---|

If the Settlement is approved and becomes final, it will provide benefits to Class Members. Barbara's Bakery will pay $4,000,000 to a Settlement Fund to make payments to Class Members who file valid claims (*see* Question 14), as well as to pay for costs associated with the notice and administration of the Settlement, attorneys' fees and costs (*see* Question 21), and a special service payment to the Class Representative (*see* Question 21). The costs of notice and administration are estimated to be $790,000.

In addition, Barbara's Bakery has agreed to change their labeling and advertising of the Eligible Products so as not to make certain claims. For example, Barbara's Bakery will not say that the Eligible Products are "All Natural," have "no artificial additives," have "no artificial flavors," and have "no artificial preservatives." The Settlement Agreement, available at www. BarbarasBakerySettlement.com, has more information.

| 10. What can I get from the Settlement? |
|---|

You can get up to $100 if you submit a valid Claim Form. The amount of your payment will depend on the total amount of money you spent on the Eligible Products at any time from May 23, 2008 until **Month 00, 0000** as follows:

| IF YOU SPENT: | YOU COULD RECEIVE A MAXIMUM OF: |
|---|---|
| More than $100.00 | $100.00 |
| $75.01 to $100.00 | $75.00 |
| $50.01 to $75.00 | $50.00 |
| $25.01 to $50.00 | $25.00 |
| $10.01 to $25.00 | $10.00 |
| $10.00 or less | $5.00 |

Payment amounts may be adjusted to ensure that all eligible Class Members receive a payment, as follows: If the total value of all approved claims is <u>greater</u> than the amount of money available to pay claims (after costs and fees have been deducted), eligible Class Members' payments will be reduced proportionally.

The actual amount available for each eligible Class Member will not be determined until after **Month 00, 0000** and all Claims Forms have been received, and may not be determined until after the Settlement is final.

**11. What happens if there are any funds remaining?**

If there are any funds remaining after all claims are processed, those funds will be distributed to the following non-profit organizations: Consumers Union (www.consumersunion.org) and Action for Healthy Kids (www.actionforhealthykids.org). No remaining funds will be returned to Barbara's Bakery.

**12. What am I giving up if I stay in the Class?**

Unless you exclude yourself from the Settlement, you can't sue Barbara's Bakery or be part of any other lawsuit against Barbara's Bakery about the issues in this case. Unless you exclude yourself, all of the decisions by the Court will bind you. The Settlement Agreement is available at www.BarbarasBakerySettlement.com and describes the claims that you give up if you remain in the Settlement.

**13. When will I get my payment, if any?**

Class Members who submit valid claims will receive their payments only after the Court grants final approval to the Settlement and after any appeals are resolved (*see* "The Court's Fairness Hearing" below). If there are appeals, resolving them can take time. Please be patient.

## HOW TO RECEIVE A PAYMENT

**14. How can I get a payment?**

To get a payment under the Settlement, you must send in a Claim Form. You may access a Claim Form and other relevant documents at www.BarbarasBakerySettlement.com. A Claim Form also is attached to this Notice. Please read the instructions carefully, and fill out the form completely and accurately. Claim Forms can be submitted two ways: electronically or by mail. Your Claim Form must be submitted electronically no later than **Month 00, 0000** or by mail postmarked no later than **Month 00, 0000** and addressed to:

Barbara's Bakery Settlement
P.O. Box 0000
City, ST 00000

**15. What is the claim process?**

The Settlement Administrator will review each Claim Form. Proofs of purchase are not initially required. However, in some cases you may be asked to verify your purchase(s) of any of the Eligible Products, by providing receipt(s) or other documentation. If you do not respond to these requests, it may result in the denial of your claim. You will have 35 days from the date of the Settlement Administrator's request to provide your documentation.

**16. What if I do nothing?**

If you are a Class Member and you do nothing, you will <u>not</u> get any payment from the Settlement and you will be bound by the Court's decisions, including the Settlement's release and waiver of claims you may have against Barbara's Bakery that related to the claims made in the lawsuit. To receive a payment, you must complete and submit a Claim Form (*see* Question 14).

# EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from this Settlement, but you want to keep the right to sue or continue to sue Barbara's Bakery on your own about the legal issues in this case, then you must take steps to get out of the Class. This is called excluding yourself – or it is sometimes referred to as "opting out" of the Class.

## 17. How can I get out of the Settlement?

To exclude yourself from the Class, you must mail a letter or written request to the Settlement Administrator. Your request must include:

1. Your name, address, and telephone number;
2. A statement that you wish to be excluded from the Class in *Trammell v. Barbara's Bakery, Inc.,* Case Number 3:12-cv-02664; and
3. Your signature (you must personally sign the letter).

Please write "exclusion request" on the lower left-hand corner of the front of the envelope.

Your exclusion request must be postmarked no later than **Month 00, 0000**. Send your request to:

Barbara's Bakery Settlement
P.O. Box 0000
City, ST 00000

## 18. If I exclude myself, can I still get a payment?

No. You will not get a payment if you exclude yourself from the Settlement. If you request exclusion from the Class, then for each of the excluded Eligible Products:

- You will not be eligible for payment under the proposed Settlement;
- You will not be allowed to object to the terms of the proposed Settlement, and
- You will not be bound by any subsequent rulings entered in this case if the proposed Settlement is finally approved.

## 19. If I don't exclude myself, can I sue Barbara's Bakery for the same thing later?

No. If the Court approves the proposed Settlement and you do not exclude yourself from the Class, you give up (or "release") all claims that have been or could have been made in this lawsuit relating to the Eligible Products.

As part of this Settlement, the Court has preliminary stopped all Class Members and/or their representatives (who do not timely exclude themselves from the Class) from filing, participating in, or continuing litigation against Barbara's Bakery (or against any of its related parties or affiliates), and/or from receiving any benefits from any other lawsuit relating to the claims being resolved in this case.

Upon final approval of the Settlement, Plaintiffs and Barbara's Bakery will ask the Court to enter a permanent ruling forbidding all Class Members and/or their representatives and/or personnel from engaging in the activities described above. All Class Members will be bound by this order.

## THE LAWYERS REPRESENTING THE CLASS

| 20. Do I have a lawyer in this case? |
| --- |

The Court has appointed attorneys at the law firm of Ahdoot & Wolfson, P.C. to represent you and the other Class Members in this lawsuit. The lawyers representing you and the Class Members are called "Class Counsel." You will not be charged for the services of these lawyers.

You may contact Class Counsel as follows:

Robert Ahdoot / Tina Wolfson
Ahdoot & Wolfson, PC
2355 Westwood Boulevard, #337
Los Angeles, CA 90064-2109
classactioncounsel@gmail.com
Telephone: 888-333-8996

You have the right to retain your own lawyer to represent you in this case, but you are not obligated to do so. If you do hire your own lawyer, you will have to pay his or her fees and expenses. You also have the right to represent yourself before the Court without a lawyer.

| 21. How will the lawyers be paid? |
| --- |

Class Counsel have not been paid anything to date for their work on this case. Class Counsel will request attorneys' fees and expenses of up to $1,000,000 to be paid out of the $4,000,000 Settlement Fund. The attorneys' motion(s) for fees, costs, and expenses and Class Representative payment will be filed on or before **Month 00, 0000**. The motion(s) will be posted on the website at www.BarbarasBakerySettlement.com.

Class Counsel will also ask the Court for a special service payment of up to $2,500 for the Class Representative, Richard W. Trammell, for his work on behalf of the Class. Any special service payment will also be paid out of the $4,000,000 Settlement Fund.

## OBJECTING TO THE SETTLEMENT

You have the right to tell the Court that you do not agree with the Settlement or any or all of its terms.

| 22. How can I tell the Court if I do not like the Settlement? |
| --- |

If you choose to remain a Class Member, you have a right to object to any part of the proposed Settlement. The Court will consider your views.

To object, you must send a letter stating that you object to *Richard W. Trammell v. Barbara's Bakery, Inc.,* Case Number 3:12-cv-02664. Your written objection must also include:

1. Your name, address, and telephone number;
2. A written statement of your objection(s), including any legal support and/or any supporting evidence you wish to introduce;
3. A statement of whether you intend to appear and speak at the Fairness Hearing; and
4. Your signature.

**QUESTIONS? VISIT WWW.BARBARASBAKERYSETTLEMENT.COM OR CALL, TOLL-FREE, 1-000-000-0000**

If you choose to object, in order to be considered by the Court, your written objections must be filed with the Court by **Month 00, 0000** and mailed to <u>each</u> of the following three addresses, postmarked by **Month 00, 0000**:

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of the Court<br>United States District Court<br>Northern District of California<br>Phillip Burton Federal Building<br>& United States Courthouse<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 | Robert Ahdoot<br>Tina Wolfson<br>Ahdoot & Wolfson, P.C.<br>2355 Westwood Boulevard, #337<br>Los Angeles, CA 90064-2109 | Clement L. Glynn<br>Glynn & Finley LLP<br>100 Pringle Avenue<br>Suite 500<br>Walnut Creek, CA 94596 |

**23. What is the difference between objecting and asking to be excluded?**

Objecting is simply a way of telling the Court that you don't like something about the Settlement. You can only object if you stay in the Class. You will also be bound by any subsequent rulings in this case and you will not be able to file or participate in any other lawsuit based upon or relating to the claims of this lawsuit. If you object to the Settlement, you still remain a Class Member and you will still be eligible to submit a Claim Form. Excluding yourself is telling the Court that you don't want to be a part of the Class. If you exclude yourself, you have no basis to object to the Settlement and appear at the Fairness Hearing because it no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a final hearing (called a Fairness Hearing) to decide whether to finally approve the Settlement. You may attend and ask to speak, but you don't have to.

**24. When and where will the Court decide whether to approve the Settlement?**

On **Month 00, 0000 at 00:00 x.m.** the Court will hold a Fairness Hearing at the United States District Court for the Northern District of California, before the Honorable Charles R. Breyer, Senior District Judge, in Courtroom 6, Phillip Burton Federal Building & United States Courthouse, 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102.

The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.BarbarasBakerySettlement.com for updates. At this hearing the Court will consider whether the Settlement is fair, reasonable, and adequate. The Court will also decide whether to award attorneys' fees and costs, as well as a special payment to the Class Representative. If there are objections, the Court will consider them at that time. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

**25. Do I have to come to the hearing?**

No. Class Counsel will answer questions the Court may have at the Fairness Hearing. But you are welcome to come at your own expense. Please note that the Court has the right to change the date and/or time of the Fairness Hearing without further notice. If you are planning to attend the hearing, you should confirm the date and time before going to the Court.

## 26.  May I speak at the fairness hearing?

Yes, you may ask the Court for permission to speak at the hearing.  To do so, you must file a document called a "Notice of Intention to Appear."  If you or your attorney wants to appear and speak at the Fairness Hearing, you (or your attorney) must mail a Notice of Intention to Appear at the Fairness Hearing to the addresses listed above in Question 22.  Your Notice of Intention to Appear at the Fairness Hearing must be filed and received by the Court, Barbara's Bakery's Counsel, and Class Counsel no later than **Month 00, 0000**.

# GETTING ADDITIONAL INFORMATION

## 27.  How can I get more information?

This notice summarizes the proposed Settlement.  More details are in the Settlement Agreement.  For a complete, definitive statement of the Settlement terms, refer to the Settlement Agreement at www.BarbarasBakerySettlement.com.   You also may write with questions to the Settlement Administrator at Barbara's Bakery Settlement, P.O. Box 0000, City, ST 00000 or call the toll-free number, 1-800-000-0000.

## PLEASE DO NOT CALL THE COURT

Dated:  **Month 00, 0000**                    Clerk of the Court for the United States
                                             District Court for the Northern District of California

# EXHIBIT E

# If You Bought a Barbara's Bakery Product

## *You Could Get Up to $100 From a Settlement*

---

### Includes: Barbara's Bakery Cereals, Cereal Bars, Cheese Puffs, Crackers, Fig Bars, Granola Bars, Organic Mini Cookies, Snack Mixes, and Snackimals Animal Cookies

---

There is a class action Settlement involving Barbara's Bakery Products. The lawsuit claims that Barbara's Bakery violated state laws regarding the marketing and sale of certain products. Barbara's Bakery denies it did anything wrong.

### Who is included in the Settlement?

Anyone who bought an eligible Barbara's Bakery product from May 23, 2008 to Month 00, 0000 is included in the Settlement. A full list of products is available at the website located at www.BarbarasBakerySettlement.com or by calling 1-800-000-0000.

### What does the Settlement provide?

A Settlement Fund of $4 million will pay (1) money to eligible Class Members, (2) the costs of notice and administration, (3) attorneys' fees and costs and (4) a special service payment to the Class Representative. Barbara's Bakery has also agreed to change some of its business practices including modifying its product lables and advertising. Any money remaining in the Settlement Fund afer all claims are paid will be donated to charities and non-profit organizations. Additional details are in the Settlement Agreement available on the website.

### How can I get a payment?

Submit a Claim Form online or by mail by **Month 00, 2013**. The payment amount you receive will be based in part on the amount of products you purchased and the total number of claims made.

### What are my rights?

Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue Barbara's Bakery yourself, you must exclude yourself from the Settlement by **Month 00, 2013**. If you stay in the Settlement, you may object to it by **Month 00, 2013**.

The Court will hold a hearing on **Month 00, 2013** to consider whether to approve the Settlement, a request for attorneys' fees up to $1 million, and a special service payment of $2,500 from the Settlement Fund. You or your own lawyer may appear and speak at the hearing at your own expense.

---

### For More Information: 1-800-000-0000
### www.BarbarasBakerySettlement.com

# EXHIBIT 2



# Shannon R. Wheatman, Ph.D.

Senior Vice President
Kinsella Media, LLC
2120 L Street NW, Suite 860
Washington, DC 20037
2010 – Present

Dr. Wheatman specializes in designing, developing, analyzing, and implementing large-scale legal notification plans. She is a court-recognized expert who provides testimony on the best notice practicable. Dr. Wheatman began her class action career in 2000 at the Federal Judicial Center where she was instrumental in the development of model notices to satisfy the plain language amendment to Rule 23. Her plain language expertise was advanced by her education, including her doctoral dissertation on plain language drafting of class action notice and her master's thesis on comprehension of jury instructions. Dr. Wheatman has been involved in over 200 class actions. Her selected case experience includes:

## *Antitrust*

*Blessing v. Sirius XM Radio Inc.*, No 09-CV-10035 HB (S.D.N.Y.).

*Brookshire Bros. v. Chiquita*, No. 05-CIV-21962 (S.D. Fla.).

*In re: Dynamic Random Memory (DRAM) Antitrust Litig.,* MDL No. 1486 (N.D. Cal.).

*In re Flonase Antitrust Litigation*, No. 08-CV-3301 (E.D. Pa.).

*In re: Metoprolol Succinate End-Payor Antitrust Litig.,* No. 06-cv-71 (D. De.).

*In re: Online DVD Rental Antitrust Litig.*, MDL No. 2029 (N.D. Cal.).

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827 (N.D. Cal.).

*Allen v. Dairy Farmers of America, Inc.*, No. 5:09-CV-00230-CR (D. Vt.).

*Sweetwater Valley Farm, Inc. v. Dean Foods*, No. 2:07-CV-208 (E.D. Tenn.).

## *Consumer and Product Liability*

*Beringer v. Certegy Check Servs., Inc.*, No. 8:07-cv-1434-T-23TGW (M.D. Fla.) (data breach).

*CSS Inc. v. FiberNet, L.L.C.*, No. 07-C-401 (Cir. Ct. W. Va.) (telecommunications).

*Donovan v. Philip Morris USA, Inc.*, No. 06-12234 NG (D. Mass.) (medical monitoring).

*FIA Card Services, N.A. v. Camastro*, No. 09-C-233 (Cir. Ct. W. Va.) (credit card arbitration).

*Glazer v. Whirlpool Corp.*, No. 1:08-WP-65001 (N.D. Ohio)(defective product).

*Grays Harbor v. Carrier Corp.*, No. 05-CIV-21962 (W.D. Wash.) (defective product).

*In Re: Checking Account Overdraft Litig.*, MDL No. 2036 (S.D. Fla.) (JP Morgan, U.S. Bank, BOA settlements; overdraft fees).

*In Re: Enfamil LIPIL Mktg. & Sales Practs. Litig.*, No. 11-MD-02222 (S.D. Fla.) (false advertising).

*In re: M3Power Razor System Marketing & Sales Practs. Litig.*, MDL 1704 (D. Mass.) (false advertising).

*In re Netflix Privacy Litig.*, No. 5:11-cv-00379 (N.D. Cal.) (privacy).

*In re: Pharmaceutical Industry Average Wholesale Price Litig.*, MDL No. 1456 (D. Mass.) (pharmaceutical).

*In re: SCBA Liquidation, Inc., f/k/a Second Chance Body Armor, Inc.,* No. 04-12515 (Bankr. W.D. Mich.) (defective product).

*In re: Toyota Motor Corp. Unintended Acceleration Mktg, Sales Practs, & Prods Litig.,* No. 8:10ML2151 (C.D. Cal.) (unintended acceleration).

*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Mktg & Sales Practs. Litig.*, No. M:09-CV-2015 (N.D. Cal.) (negative amortization).

*Keilholtz v. Lennox Hearth Prods.*, No. 08-CV-00836 (N.D. Cal.) (defective product).

*Kramer v. B2Mobile, LLC*, No. 10-cv-02722 (N.D. Cal.) (text messaging).

*Lee v. Carter Reed Co., L.L.C.*, No. UNN-L-39690-04 (N.J. Super. Ct.) (false advertising).

*Palace v. DaimlerChrysler*, No. 01-CH-13168 (Cir. Ct. Ill.) (defective product).

*Rowe v. UniCare Life & Health Ins. Co.*, No. 09-cv-02286 (N.D. Ill.) (data breach).

*Spillman v. Domino's Pizza*, No. 10-349 (M.D. La.) (robo-call).

*Wolph v. Acer*, No. 09-cv-01314 (N.D. Cal.) (false advertising).

## Environmental/Property

*Allen v. Monsanto Co.*, No. 041465 and *Carter v. Monsanto Co.*, No. 00-C-300 (Cir. Ct. W. Va.) (dioxin release).

*Angel v. U.S. Tire Recovery*, No. 06-C-855 (Cir. Ct. W.Va.) (tire fire).

*Ed Broome Inc. v. XTO Energy, Inc.,* No. 1:09-CV-147 (N.D. W. Va.) (oil & gas rights).

*Cather v. Seneca-Upshur Petroleum Inc.*, No. 1:09-cv-00139 (N.D. W. Va.) (oil & gas rights).



*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010,* MDL No. 2179 (E.D. La.) (BP oil spill).

*In Re Katrina Canal Breaches Litig.,* No. 05-4182 (E.D. La.) (Hurricanes Katrina and Rita).

*Jones v. Dominion Transmission Inc.,* No. 2.06-cv-00671 (S.D. W. Va.) (oil & gas rights).

*Thomas v. A. Wilbert Sons, LLC,* No. 55,127 (18th Jud. Dist. Ct., Iberville Parish) (vinyl chloride water contamination).

### Government

Countrywide Mortgage Settlement, Department of Justice.

Iovate Settlement, Federal Trade Commission.

*Cobell v. Salazar,* No. 1:96cv01285 (D. D.C.), Depts. of Interior and Treasury.

National Mortgage Settlement, Attorneys General.

Walgreens Settlement, Federal Trade Commission.

### Insurance

*Beasley v. Hartford Ins. Co. of the Midwest,* No. CV-2005-58-1 (Cir. Ct. Ark.) (homeowners insurance).

*Bond v. Am. Family Ins. Co.,* No. CV06-01249 (D. Ariz) (property insurance).

*Burgess v. Farmers Ins. Co.,* No. 2001-292 (Dist. Ct. Okla.) (homeowners insurance).

*Campbell v. First Am. Title Ins. Co.,* No. 2:08-cv-311-GZS (D. Me.) (title insurance).

*DesPortes v. ERJ Ins. Co.,* No. SU2004CV-3564 (Ga. Super. Ct.) (credit premium insurance).

*Fogel v. Farmers Group, Inc.,* No. BC300142 (Super. Ct. Cal.)(management exchange fees).

*Guidry v. Am. Public Life Ins. Co.,* No. 2008-3465 (14th Jud. Dist. Ct.) (cancer insurance).

*Gunderson v. F.A. Richard & Associates, Inc.,* No. 2004-2417-D. (14th Jud. D. Ct. La.) (PPO).

*Johnson v. Progressive Casualty Ins., Co.,* No. CV-2003-513 (Cir. Ct. Ark.) (automobile insurance).

*McFadden v. Progressive Preferred,* No. 09CV002886 (Ct. C.P. Ohio) (UM/UIM).

*Orrill v. Louisiana Citizens Fair Plan,* No. 05-11720 (Civ. Dist. Ct., Orleans Parish) (Hurricane Katrina property insurance).

*Purdy v. MGA Ins. Co.,* No. D412-CV-2012-298 (4th Jud. Ct. N. Mex.) (UM/UIM).

*Press v. Louisiana Citizens Fair Plan Prop. Ins. Co.,* No. 06-5530 (Civ. Dist. Ct., Orleans Parish) (Hurricane Katrina property insurance).

*Shaffer v. Continental Casualty Co.,* No. 06-2235 (C.D. Cal.) (long term care insurance).

*Sherrill v. Progressive Northwestern Ins. Co.,* No. DV-03-220 (18th D. Ct. Mont.) (automotive



premises).

*Soto v. Progressive Mountain Ins. Co.*, No. 2002CV47 (Dist. Ct. Mont.) (personal injury insurance).

*Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark) (bodily injury claims).

### Securities

*In re Municipal Derivatives Antitrust Litig.*, MDL No. 1950 (S.D.N.Y.).

*In re Mutual Funds Investment Litig.,* MDL No. 1586 (Allianz Sub-Track, D. Md.).

### Canada

*Donnelly v. United Technologies Corp.,* No. 06-CV-320045 CP (Ont. S.C.J.) (defective product).

*Wener v. United Technologies Corp.*, 2008 QCCS 6605 (Québec) (defective product).

*Dolmage v. Ontario*, No. CV-09-376927CP00 (Ont. S.C.J.) (personal injury).

*Hall v. Gillette Canada Co.*, No. 47521CP (Ont. S.C.J.) (false advertising).

## Articles and Presentations

Shannon R. Wheatman, Speaker, *Class Action Developments and Settlements*, 18th Annual Consumer Financial Services Institute, New York, New York (Apr. 2013).

Shannon R. Wheatman, *Ensuring Procedural Fairness Through Effective Notice, in* NATIONAL CONFERENCE ON CLASS ACTIONS: RECENT DEVELOPMENTS IN QUÉBEC, IN CANADA AND IN THE UNITED STATES 83-99 (Yvon Blais ed., 2013).

Shannon R. Wheatman, Speaker, *Recent Trends in Class Actions in the United States*, National Conference on Class Actions: Recent Developments in Québec, in Canada and in the United States, Montreal, Canada (Mar. 2013).

Joshua P. Davis & Shannon R. Wheatman, Speaker, *Report on Model Jury Instructions in Civil Antitrust Cases, Presentation*, American Antitrust Institute's 6th Annual Private Antitrust Enforcement Conference, Washington, DC (Dec. 2012).

Shannon R. Wheatman & Katherine M. Kinsella, *International Class Action Notice, in* WORLD CLASS ACTION: A GUIDE TO GROUP AND REPRESENTATIVE ACTIONS AROUND THE GLOBE 673-686 (Paul Karlsgodt ed., 2012).



Katherine Kinsella & Shannon Wheatman, *Class Notice and Claims Administration*, *in* Private Enforcement of Antitrust Law in the United States: A Handbook 338–348 (Albert A. Foer & Randy M. Stutz eds., 2012).

Shannon R. Wheatman, Webinar Speaker, *Class Action Notice Requirements: Challenges for Plaintiffs and Defendants*, Strafford Publications (July 2012).

Shannon R. Wheatman, Webinar Speaker, *How to Craft Plain Language Privacy Notices*, Int'l Assoc. of Privacy Professionals (Oct. 2011).

Shannon R. Wheatman, Speaker, *Improving Take-Up Rates in Class Actions*, The Canadian Institute's 12th Annual National Forum on Class Actions, Ontario, Canada (Sept. 2011).

Shannon R. Wheatman & Terri R. LeClercq, *Majority of Publication Class Action Notices Fail to Satisfy Rule 23 Requirements*, 30 Rev. Litig. 53 (2011).

Katherine Kinsella & Shannon Wheatman, *Class Notice and Claims Administration*, *in* The International Private Enforcement of Competition Law 264–274 (Albert A. Foer & Jonathan W. Cuneo eds., 2010).

Shannon R. Wheatman, Speaker, *Majority of Publication Class Action Notices Fail to Satisfy Plain Language Requirements*, Clarity International Conference, Lisbon, Portugal (Oct. 2010).

Shannon R. Wheatman, Webinar Speaker, *Class Action Notification With Electronic Media: Emerging Legal Issues*, Stratford Publications (Sept. 2010).

Shannon R. Wheatman & Thomas E. Willging, *Does Attorney Choice of Forum in Class Action Litigation Really Make a Difference?* 17 Class Actions & Derivatives Suits 1 (2007).

Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 Tulane Law Rev. 1771 (2006).

Thomas E. Willging & Shannon R. Wheatman, *Attorney Choice of Forum in Class Action Litigation: What Difference Does it Make?* Notre Dame L. Rev., 81 (2), 101, 161 (2006).

Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do you really want me to know my rights? The ethics behind due process in class action notice is more than just plain language: A desire to actually inform*. Geo. J. Legal Ethics, 18 (4), 1359-1382 (2005).



Thomas E. Willging & Shannon R. Wheatman, *An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation*. FEDERAL JUDICIAL CENTER (2005).

Elizabeth C. Wiggins & Shannon R. Wheatman, *So what's a concerned psychologist to do? Translating the research on interrogations, confessions, and entrapment into policy*, *in* INTERROGATIONS, CONFESSIONS AND ENTRAPMENT 265–280 (G. Daniel Lassiter ed., 2004).

Thomas E. Willging & Shannon R. Wheatman, *Attorneys' Experiences and Perceptions of Class Action Litigation in Federal and State Courts. A Report to the Advisory Committee on Civil Rules Regarding a Case Based Survey*. FEDERAL JUDICIAL CENTER (2003).

Shannon R. Wheatman, *Survey of Bankruptcy Judges on Effectiveness of Case-Weights*. FEDERAL JUDICIAL CENTER (2003).

Elizabeth C. Wiggins & Shannon R. Wheatman, *Judicial Evaluation of Bankruptcy Judges*. FEDERAL JUDICIAL CENTER (2003).

Robert Niemic, Thomas Willging, & Shannon Wheatman, *Effects of Amchem/Ortiz on Filing of Federal Class Actions: Report to the Advisory Committee on Civil Rules*. FEDERAL JUDICIAL CENTER (2002).

Shannon Wheatman, Robert Niemic & Thomas Willging, *Report to the Advisory Committee on Civil Rules: Class Action Notices*. FEDERAL JUDICIAL CENTER (2002).

Elizabeth C. Wiggins & Shannon R. Wheatman, *Implementation of Selected Amendments to Federal Rule of Civil Procedure 26 by United States Bankruptcy Courts*. FEDERAL JUDICIAL CENTER (2001).

Shannon R. Wheatman & David R. Shaffer, *On finding for defendants who plead insanity: The crucial impact of dispositional instructions and opportunity to deliberate*. LAW & HUM. BEH., 25(2), 165, 181(2001).

Shannon R. Wheatman, *Distance Learning in the Courts*. FEDERAL JUDICIAL CENTER (2000).

David R. Shaffer & Shannon R. Wheatman, *Does personality influence the effectiveness of judicial instructions?* PSYCHOL. PUB. POL'Y & L., 6, 655, 676 (2000).

**Court Testimony**

*Spillman v. Domino's Pizza*, No. 10-349 (M.D. La.)



*PRC Holdings LLC v. East Resources, Inc.*, No. 06-C-81 (Cir. Ct. W. Va.).

*Guidry v. American Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct., Calcasieu Parish).

*Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark).

*Beasley v. The Reliable Life Insurance Co.*, No. CV-2005-58-1 (Cir. Ct. Ark).

## Depositions

*Thomas v. A. Wilbert Sons, LLC*, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish).

## Judicial Comments

*PRC Holdings, LLC v. East Resources, Inc.*, No. 06-C-81(E) (W.Va. Cir. Ct., Roane County).

"Notice was uniquely effective in this action because East's records of their leases allowed the Claims Administrator to provide individual notice by mail to most Class Members." - Hon. Thomas C. Evans, III (2012).

*Kramer v. B2Mobile, LLC*, No. 10-cv-02722 (N.D. Cal.).
"The Court approved Notice Plan to the Settlement Classes . . . was the best notice practicable under the circumstances, including comprehensive nationwide newspaper and magazine publication, website publication, and extensive online advertising. The Notice Plan has been successfully implemented and satisfies the requirements of Federal Rule of Civil Procedure 23 and Due Process." - Hon. Claudia A. Wilken (2012).

*Cather v. Seneca-Upshur Petroleum, Inc.*, No. 1:09-CV-00139 (N.D. W. Va.).
 "The Court finds that Class Members have been accorded the best notice as is practical under the circumstances, and have had the opportunity to receive and/or access information relating to this Settlement by reading the comprehensive written notice mailed to them . . . or by reading the published Notice in the local newspapers . . . The Court further finds that the Notice provided to the members of the Settlement Class had been effective and has afforded such class members a reasonable opportunity to be heard at the Final Fairness Hearing and to opt-out of the subject settlement should anyone so desire." – Hon. Irene M. Keeley (2012).

*In re: Checking Account Overdraft Fee Litigation*, No. 1:09-md-2036-JLK (S.D. Fla.)  (JP Morgan Settlement)
"The Court finds that the Settlement Class Members were provided with the best practicable notice; the notice was "reasonably calculated, under [the] circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Shutts*, 472 U.S. at 812 (quoting *Mullane*, 339 U.S. at 314-15). This Settlement with Chase was widely publicized, and any



Settlement Class Member who wished to express comments or objections had ample opportunity and means to do so." - Hon. James Lawrence King (2012).

*In re Netflix Privacy Litigation*, No. 5:11-cv-00379 (N.D. Cal.)
"The Notice Plan and the intent of the forms of Notice to the Settlement Class as set forth in the Settlement Agreement and Exhibits B through E to the Wheatman Declaration are approved pursuant to subsections (c)(2)(B) and (ed) of Federal Rule of Civil Procedure 23. - Hon. Edward J. Davila (2012)

*Purdy v. MGA Ins. Co.,* No. D412-CV-2012-298 (N.M. 4th Jud. Dist. Ct.)
"Notice of the Settlement Class was constitutionally adequate, both in terms of it substance and the manner in which it was disseminated.  The Notice contained the essential elements necessary to satisfy due process . . . [T]he Notice also contained a clear and concise Claim Form, and a described a clear deadline and procedure for filing of Claims.  Notice was directly mailed to all Class Members whose current whereabouts could be identified by reasonable effort.  Notice reached a large majority of the Class Members.  The Court finds that such notice constitutes the best notice practicable." – Hon. Eugenio Mathis (2012).

*Blessing v. Sirius XM Radio Inc*., No 09-CV-10035 HB (S.D.N.Y.).
 "The Court finds that the distribution of the Notice and the publication of the Publication Notice . . . constituted the best notice reasonably practicable under the circumstances . . . was reasonably calculated . . . constituted due, adequate, and sufficient notice to all Class members who could be identified with reasonable efforts; and . . . satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, R 23.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, and all other applicable law and rules." - Honorable Harold Baer, Jr. (2011).

*Fogel v. Farmers Group, Inc.*, No. BC300142 (Super. Ct. Cal.).
"The Court further finds and confirms that the Individual Notice (including the Proof of Claim), the Summary Notice, the reminder postcard, and the notice methodology: (a) constituted the best practicable notice . . . ; (b) constituted noticed that was reasonably calculated under the circumstances to apprise potential Class Members . . .; (c) were reasonable and constituted due, adequate, and sufficient notice to all persons or entities entitled to receive notice, and (d) met all applicable requirements of California law . . . ." - Hon. Laura Evans (2011).

*In Re: Enfamil LIPIL Mktg. & Sales Practs. Litig.*, No. 11-MD-02222 (S.D. Fla.)
"The Court finds that the Class Notice provided to Class Members, in the form and manner of distribution described above, constitutes the best notice practicable under the circumstances, and fully



satisfies the requirements of Federal Rules of Civil Procedure, Rule 23, the requirements of due process, and any other applicable law. The declarations filed with the Court demonstrate that the Parties have fully complied with the Court's Preliminary Approval Order (as amended by Order dated April 1, 201 1) and that the best notice practicable under the circumstances was in fact given to Class Members." - Hon. James I. Cohn (2011).

*Keilholtz v. Lennox Hearth Prods.*, No. 08-CV-00836 (N.D. Cal.)
"Notice has been provided to the Settlement Class of the pendency of the Actions, the conditional certification of the Settlement Class for purposes of this Settlement, and the preliminary approval of the Settlement Agreement and the Settlement contemplated thereby. The Court finds that said notice and the related Notice Plan provided for the best notice practicable under the circumstances to all Persons entitled to such notice and fully satisfied the requirements of Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure and the requirements of due process." - Hon. Claudia Wilken (2011).

*Rowe v. UniCare Life and Health Insurance Company*, No. 09-CV-02286 (N.D.Ill.)
"The form, content, and method of dissemination of the notice given to the Settlement Class were adequate and reasonable, and constituted the best notice practicable under the circumstances. The notice, as given, provided valid, due, and sufficient notice of the proposed settlement, the terms and conditions set forth in the Settlement Agreement, and these proceedings to all Persons entitled such notice, and said notice fully satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process." – Hon. William J. Hibbler (2011).

*Thomas v. A. Wilbert & Sons, LLC*, 55,127 (La. 18th Jud. Dist. Ct., Iberville Parish).
"[N]otices complied with all requirements of the federal and state constitutions, including the due process clauses, and applicable articles of the Louisiana Code of Civil Procedure, and constituted the best notice practicable under the circumstances and constituted due and sufficient notice to all potential members of the Thomas Subclass." – Hon. Jerome M. Winsberg (2011).

*In re: M3Power Razor System Marketing & Sales Pract. Litig.*, MDL 1704 (D. Mass).
"The form, content, and method of dissemination of the notice given to the Settlement Class was adequate and reasonable, and constituted the best notice practicable under the circumstances. The notice, as given, provided valid, due, and sufficient notice of the proposed settlement, the terms and conditions set forth in the Amended Settlement Agreement, and these proceedings to all Persons entitled to such notice, and said notice fully satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process." - Hon. Douglas P. Woodlock (2011).

*Soto v. Progressive Mountain Ins. Co.*, No. 2002CV47 (Dist. Ct. Colo.).
"Notice of the Settlement Class was constitutionally adequate, both in terms of its substance and the manner in which it was disseminated. The Notice contained the essential elements necessary to satisfy



due process . . . Finally, the Notice also contained a clear and concise Claim Form, and described a clear deadline and procedure for filing of claims. . . . Notice reached a large majority of the Class Members. The Court finds that such notice constitutes the best notice practicable." - Hon. J. Steven Patrick (2010).

*Press v. Louisiana Citizens Fair Plan Prop. Ins. Co.*, No. 06-5530 (Civ. Dist. Ct., Orleans Parish).
"This notice methodology . . . constitutes reasonable and best practicable notice . . . constitutes due, adequate and sufficient notice to all persons entitled to receive notice; and . . . meets the requirements of the United States Constitution, Louisiana law, the Federal Rules of Civil Procedure and any other applicable rules of the Court . . ." - Hon. Sidney H. Cates, IV (2010).

*In Re Katrina Canal Breaches*, No. 05-4182 (E.D. La.).
"The notice here was crafted by Shannon Wheatman, Ph.D., whose affidavit was received as evidence . . . . The entire notice was drafted in plain, comprehensible language . . . The Court finds this notice adequately reached the potential class. "- Hon. Stanwood R. DuVal, Jr. (2009).

*Jones v. Dominion Transmission Inc.*, No. 2.06-cv-00671 (S.D. W. Va.)
"The Parties' notice expert Shannon R. Wheatman, Ph.D. . . testified that in this case . . . that the mailed notices reached approximately 95.4 percent of the potential class . . . I HOLD that personal jurisdiction exists over the Class Members because notice was reasonable and afforded the Settlement Class an opportunity to be heard and to opt out." - Hon. Joseph R. Goodwin (2009).

*Guidry v. American Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct.).
"The facts show that the notice plan . . . as adequate to design and implementation . . . Dr. Shannon R. Wheatman, a notice expert, also testified at the fairness hearing as to the sufficiency of the notice plan. Dr. Wheatman testified that the notice form, content, and dissemination was adequate and reasonable, and was the best notice practicable." - Hon. G. Michael Canaday (2008).

*Webb v. Liberty Mutual Ins. Co.*, (March 3, 2008) No. CV-2007-418-3 (Cir. Ct. Ark).
"Ms. Wheatman's presentation today was very concise and straight to the point . . . that's the way the notices were . . . So, I appreciate that . . . Having admitted and reviewed the Affidavit of Shannon Wheatman and her testimony concerning the success of the notice campaign, including the fact that written notice reached 92.5% of the potential Class members, the Court finds that it is unnecessary to afford a new opportunity to request exclusion to individual Class members who had an earlier opportunity to request exclusion but failed to do so . . . The Court finds that there was minimal opposition to the settlement. After undertaking an extensive notice campaign to Class members of approximately 10,707 persons, mailed notice reached 92.5% of potential Class members." - Hon. Kirk D. Johnson (2008).



*Sherrill v. Progressive Northwestern Ins. Co.*, No. DV-03-220 (18th D. Ct. Mont.).
"Dr. Wheatman's affidavit was very informative, and very educational, and very complete and thorough about the process that was undertaken here. . . So I have reviewed all of these documents and the affidavit of Dr. Wheatman and based upon the information that is provided . . . and the significant number of persons who are contacted here, 90 percent, the Court will issue the order." - Hon. Mike Salvagni (2008).

*Shaffer v. Continental Casualty Co.*, No. 06-2235 (C.D. Cal.).
"The Class Notice and the notice methodology implemented pursuant to the Settlement Agreement, as described in part in the Declarations of . . . Shannon Wheatman . . . constituted the best practicable notice. . . was reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and met all applicable requirements of the Federal Rules of Civil Procedure, the Class Action Fairness Act, the United States Constitution (including the Due Process Clauses), the Rules of the Court, and any other applicable law." - Hon. Philip S. Gutierrez (2008).

*Gray's Harbor v. Carrier Corp.*, No. 05-05437(W.D. Wash.).
"The Court finds that this notice was the best notice practicable under the circumstances, that it provided due and adequate notice of the proceedings and of the matters set forth therein, and that it fully satisfied all applicable requirements of law and due process." - Hon. Ronald B. Leighton (2008).

*Beringer v. Certegy Check Servs., Inc.*, No. 8.07-cv-1434-T-23TGW (M.D. Fla.).
"The proposed form of notice and plan for publishing are reasonable and designed to advise members of the Settlement class of their rights . . . A nationally recognized notice specialist, Hilsoft Notifications, has developed the comprehensive Notice Plan. Here, Notice is reasonably calculated to reach the maximum number of potential Settlement Class Members and, thus, qualifies as the best notice practicable. The Notice Plan here is designed to reach the maximum number of Class Members, and it is Plaintiffs' goal to reach at least 80% of the Class—an extraordinary result in consumer class action litigation." - Hon. Steven D. Merryday (2008).

*Palace v. DaimlerChrysler Corp.*, No. 01-CH-13168 (Cir. Ct. Ill.).
"The form, content, and method of dissemination of the notice given to the Illinois class and to the Illinois Settlement Class were adequate and reasonable, and constituted the best notice practicable under the circumstances. The notice, as given, provided valid, due, and sufficient notice of the proposed Settlement, the terms and conditions set forth in the Settlement Agreement, and these proceedings, to all Persons entitled to such notice, and said notice fully satisfied the requirements of due process . . ." – Hon. Mary Anne Mason (2008).

*Johnson v. Progressive Casualty Ins., Co.*, No. CV-2003-513 (Cir. Ct. Ark.).
"Notice of the Settlement Class was constitutionally adequate, both in terms of its substance and the



manner in which it was disseminated . . . Notice was direct mailed to all Class members whose current whereabouts could be identified by reasonable effort. Notice reached a large majority of the Class members. The Court finds that such notice constitutes the best notice practicable . . . The forms of Notice and Notice Plan satisfy all of the requirements of Arkansas law and due process." - Hon. Carol Crafton Anthony (2007).

*Beasley v. The Reliable Life Insurance Co.*, No. CV-2005-58-1 (Cir. Ct. Ark).
"[T]he Court has, pursuant to the testimony regarding the notification requirements, that were specified and adopted by this Court, has been satisfied and that they meet the requirements of due process. They are fair, reasonable, and adequate. I think the method of notification certainly meets the requirements of due process . . . So the Court finds that the notification that was used for making the potential class members aware of this litigation and the method of filing their claims, if they chose to do so, all those are clear and concise and meet the plain language requirements and those are completely satisfied as far as this Court is concerned in this matter." - Hon. Joe Griffin (2007).

## Education and Experience

### Education

Ph.D., Social Psychology, 2001; The University of Georgia, Athens, GA
Dissertation Title: *The effects of plain language drafting on layperson's comprehension of class action notices.*

M.S., Social Psychology, 1999; The University of Georgia, Athens, GA
Thesis Title: *Effects of verdict choice, dispositional instructions, opportunity to deliberate, and locus of control on juror decisions in an insanity case.*

M.L.S., Legal Studies, 1996; The University of Nebraska-Lincoln, Lincoln, NE

B.A., Psychology, 1993; Millersville University of Pennsylvania, Millersville, PA
Honor's Thesis Title: *The effects of inadmissible evidence and judicial admonishment in individual versus group decisions in a mock jury simulation.*

### Related Experience

Hilsoft Notifications
Souderton, PA
2004-2009



Dr. Wheatman was the Vice President (2006-2009) and Notice Director (2004-2009) at Hilsoft Notifications, a legal notification firm.

Federal Judicial Center
Washington, DC
2000-2004

Dr. Wheatman was a Research Associate at the Federal Judicial Center. The Federal Judicial Center is the education and research agency for the Federal Courts. The Research Division performs empirical and explanatory research on federal judicial processes and court management. Dr. Wheatman worked with the Civil Rules Advisory Committee on a number of class action studies and with the Bankruptcy Administration Committee on judicial evaluations.

## *Supplementary Background*

Dr. Wheatman has a strong statistical background, having completed nine graduate level courses as well as teaching undergraduate statistics at the University of Georgia. She is also a member of several plain language organizations, including the Center for Plain Language, Clarity, and Scribes.



Case 1:12-cv-02664-CRB Document 237-9 Filed 05/04/25 Page 286 of 330 PageID #: 1497

# EXHIBIT 9

3:12-cv-02664-CRB – EXHIBIT TO SETTLEMENT AGREEMENT

Case 1:12-cv-02164-CBA Document 37-9 Filed 05/04/13 Page 2 of 37 PageID #: 1498
Case 1:12-cv-02164-CBA Document 37-9 Filed 05/04/13 Page 2 of 37 PageID #: 1498

Non-GMO Project Standard

# Non-GMO Project Standard



October 2012

# Non-GMO Project Standard

This version of the Non-GMO Project Standard includes revisions based on the Fall 2011 and Summer 2012 Public Comment Periods.

The next round of public comment on the Working Standard in its entirety will be from March 10th through April 10th 2013. Comments may be submitted online at http://www.nongmoproject.org/non-gmo-project-standard/comment-on-the-standard/ or may be sent to standard@nongmoproject.org

**Non-GMO Project Standard**

TABLE OF CONTENTS

1. INTRODUCTION………………………………………………4
1.1. Purpose …………………………………………………4
1.2. Scope ……………………………………………………4
    1.2.1. Products ………………………………………4
    1.2.2.Activities ……………………………………… 5
    1.2.3. Program Elements ……………………………… 6

2. CORE REQUIREMENTS …………………………………9
2.1. Traceability …....................................................9
2.2. Cleanout and Segregation …………………………9
2.3. Specifications for Inputs and Products ……………………10
2.4. Input Categories ……………………………………11
2.5. Reclassification of Specific High-and Low-Risk
    Materials Based on Experience in the Field …………….....14
2.6. Action Thresholds …………………………………….15

3. QUALITY ASSURANCE AND QUALITY CONTROL …....21

4. TRANSITION PERIOD AND CONTINUOUS
    IMPROVEMENT ……………………………………….25

APPENDIX A: Current Variances to the Standard ……………...27

APPENDIX B: List of Crops, Processed/Processing Inputs,
Production Inputs and other Organisms with GMO Risk …........34

APPENDIX C: Monitored Crops ………………………………36

# Non-GMO Project Standard

| 1. INTRODUCTION |
| --- |

*Explanation of layout of this Standard:*
*This Standard is published in two columns.  The left-hand column contains clauses of the Standard itself.  The corresponding right-hand column contains Guidance notes that are included to help interpret and explain the intent of the given standard clause, offer additional relevant details, and/or place the clause into the context of current realities.  Guidance notes should be read along with the Standard's clauses and must be followed accordingly.  Where no Guidance is offered, the Standard alone suffices.*

| STANDARD | GUIDANCE |
| --- | --- |
|  |  |
| **1.1. Purpose:** The Non-GMO Project's Product Verification Program (the "Program" or "PVP") aims to verify: | See Section 1.3, "Additional Terms and Definitions," for meaning of "product" and definitions of other terms. |
| **1.1.1.** That the systems and procedures of the participant company or organization (the "Participant") are capable of delivering products that comply with the Non-GMO Project's Standard (the "Standard"). | Each Participant company or organization has the freedom to design its own systems to reflect its particular operational needs and practicalities, so long as the objectives of the Standard are met. |
| **1.1.2.** That the Participant consistently operates their systems according to those procedures. | Annual third-party verification of conformity to this Standard, via evaluation of Participant documentation and on-site inspection, is part of the Program. |
| **1.1.3.** That the resultant products are compliant with the Standard. | The Non-GMO Project's Product Verification Program ("PVP") is a practice/process-oriented standard that uses testing as a key strategic tool to confirm that practices/processes are meeting expectations. |
|  |  |
| **1.2. Scope:** The scope of the Program encompasses the following products, activities, and aspects: | Refer also to Section 4 and Appendix A regarding specific variances to this Standard and its scope. |
| **1.2.1. Products** |  |
| **1.2.1.1.** Agricultural inputs, such as seeds, fertilizers, pesticides, and herbicides.<br><br>The scope of this Standard includes an exclusion for composted materials and animal manures.  These may be used from any source, *except* manure from animals that have been genetically engineered to produce a novel material. | Examples of non-compliant fertilizers are oilcake/oilseed meal from genetically engineered soybeans, canola, or cotton, un-composted GMO cornstalks, etc.<br><br>An example of a non-compliant pesticide is genetically altered *Bacillus thuringiensis (Bt)*.<br><br>An example of a non-compliant herbicide is corn gluten from genetically engineered corn.<br><br>An example of an animal engineered to produce a novel material would be a goat that is genetically engineered to have antibiotics or |

# Non-GMO Project Standard

| | hormones secreted in its milk. |
|---|---|
| **1.2.1.2.** Unprocessed agricultural products, such as vegetables, grains, fruit, greens, herbs, and other fresh foods, fibers, etc. | |
| **1.2.1.3.** Livestock feed components, such as grains, vitamins, enzymes, minerals, etc. | |
| **1.2.1.4** Microbial starters, media, and products. | Includes those used for animal feed (e.g., silage or hay inoculants, fermentation solids or similar products) or human food. |
| **1.2.1.5.** Manufacturing and processing inputs ("inputs"), including ingredients, flavorings, seasonings, colorings, additives, and all other substances present in final, manufactured products.<br><br>Processing aids used by the Participant and present in the final product are also included in the scope of this Standard. | |
| **1.2.1.6.** Animal products, including dairy, meat, eggs, bee products, wool and hides. | |
| **1.2.1.7.** Veterinary inputs such as vaccines, hormones, semen and medicines. | For the purposes of the Standard, cloned animals and their progeny are not allowed. |
| **1.2.1.8.** Processed agricultural products or ingredients and manufactured food products. | |
| **1.2.1.9** Dietary supplements, vitamins and herbal preparations. | |
| **1.2.1.10.** Health-care products. | |
| **1.2.1.11.** Personal care products and cosmetics. | Includes lotions, soaps, balms, makeup, etc. |
| **1.2.1.12.** Cleaning products. | |
| **1.2.1.13.** Packaging, textiles and other agriculturally derived mercantile products. | |
| **1.2.2. Activities:** The scope of the Program encompasses the following types of activities and sectors of food and related production systems: | A core goal of the Project is to identify, create, and/or maintain sources and practices that effectively minimize GMO risk to the supply chain.  High-Risk Inputs (see below) will ultimately be able to be downgraded to low-risk status as a result of such efforts. |
| **1.2.2.1.** Agricultural production—seeds and crops | Includes farm production, harvest, and post-harvest handling and storage on farm or farm-related facilities. |

# Non-GMO Project Standard

| | |
|---|---|
| | Reduction of background contamination levels in seed supplies is of primary importance toward reduction of GMO content of consumer goods. |
| **1.2.2.2.** Handling | Includes any form of post-harvest movement, storage, transformation, or labeling of goods along the entire chain of custody from seed to consumer, except for products enclosed in final retail packaging. |
| **1.2.2.3.** Storage | Includes all links in the chain of custody from seed to finished product. |
| **1.2.2.4.** Distribution | This may or may not involve physical handling of goods. |
| **1.2.2.5.** Processing | Includes all movements, storage, transformations, combinations, or labeling of goods within any given production facility. |
| **1.2.2.6.** Manufacturing | Involves the combination of inputs to make the final product sold by the operation in question. |
| **1.2.2.7.** Packaging and labeling | Includes any and all events where the package or labeling of goods is altered. |
| **1.2.3. Program Elements:** The scope of the Program encompasses all aspects of the production process relevant to producing Non-GMO Project verified products, including the following: | |
| **1.2.3.1.**Traceability | Special attention needs to be paid to inputs and products that are verified as Non-GMO Project Standard compliant, versus like inputs or products that are not explicitly verified or included in the Program as such. This applies even if the presumed chance that non-verified goods have GMO content is low. |
| **1.2.3.2.** Segregation | Additional segregation measures for Non-GMO Project Standard compliant materials may be necessary, especially when any high-risk inputs are handled. Appendix B of this Standard lists high-risk crops and their derivatives. Segregation is also necessary between distinct lots of goods that are Non-GMO Project verified, versus inputs or products that are not explicitly verified or included in the program as such. |
| **1.2.3.3.** Specifications for Inputs and Products | Refers to GMO action thresholds, etc. This Standard specifies relevant quantitative limits. |
| **1.2.3.4.** Operating Procedures | |
| **1.2.3.5.** Quality System | |

# Non-GMO Project Standard

| | |
|---|---|
| **1.2.3.6.** Quality Assurance and Quality Control | Specific procedures and practices relevant to traceability, segregation, sampling and testing of lots for GMO content—with associated ingredient procurement SOPs and training of personnel—are a necessary inclusion in any operation's routine activities when assuring adherence to this Standard. Existing procedures and documents can be amended or new ones created, as deemed most appropriate by the operation in question. |
| **1.2.3.7.** Training | |
| **1.2.3.8.** Document Control | |
| **1.2.3.9.** Maintenance of Records and Data | |
| **1.3. Additional Terms and Definitions** | In addition to explanations of terms provided by other Guidance notes, the terms in this section are explicitly defined. |
| **1.3.1.** Compost | Decayed organic material used as a fertility amendment in agricultural production, produced by a combination of actions over time by microbes, invertebrates, temperature, and other elemental factors (e.g., moisture content, aeration). Composted material shows practically no macroscopic indication as to the original substrate(s) from which it was made. |
| **1.3.2.** Farming operation | Any operation involved with production, handling, storage, or management of crops until legal ownership or physical transformation of crops or livestock products occurs. |
| **1.3.3.** GM | Genetically Modified or Genetic Modification—A term referring to products or processes employing gene splicing, gene modification, recombinant DNA technology, or transgenic technology, and referring to products of the gene-splicing process, either as inputs or as process elements. |
| **1.3.4.** GMO or Genetically Modified Organism | A plant, animal, microorganism, or other organism whose genetic makeup has been modified using recombinant DNA methods, also called gene splicing, gene modification, or transgenic technology. Cloned animals and their progeny are also considered GMOs under this Standard. |
| **1.3.5.** Input | The term "input" includes any material or substance that becomes a part of the final product, or a component of which becomes a |

# Non-GMO Project Standard

| | |
|---|---|
| | part of the product, or is used otherwise in the production of a product. These include the following:<br>• Agricultural inputs, such as seeds, fertilizers, and pesticides.<br>• Unprocessed agricultural products, such as vegetables, grains, fruit, greens, herbs, and other fresh foods etc.<br>• Feed components, such as grains, forage plants, vitamins, enzymes and minerals.<br>• Livestock production inputs such as vaccines, hormones, and other veterinary materials.<br>• Manufacturing and processing inputs, including ingredients, flavorings, seasonings, colorings, additives, enzymes, cultures, and all other substances present in final manufactured products.<br><br>The PVP distinguishes between inputs as being "mono" (composed of only one component) or "compound" (composed of more than one component). |
| 1.3.6. Medicine (Veterinary) | (i) Any synthetic material other than vitamins, minerals, or amino acids given to livestock at any time; or (ii) Any non-synthetic material given to an animal on a non-routine basis for the purposes of maintaining or restoring health. |
| **1.3.7.** Non-GMO or Non-GM | A plant, animal, or other organism or derivative of such an organism whose genetic structure has not been altered by gene splicing. A process or product that does not employ GM processes or inputs. Cloned animals and their progeny are considered GM. |
| **1.3.8.** Participant | A company or other entity independent of the Non-GMO Project that enrolls in the Program. |
| **1.3.9.** Product | The term "product" refers to a distinct product name that the Participant offers to the marketplace, at whatever stage of the production chain (i.e., final consumer product, ingredient for further manufacturing, raw agricultural crop or commodity, etc., as applicable). "Product" refers to products that are involved in the Non-GMO Project Product Verification Program. |
| **1.3.10.** Shall or Must | A mandatory requirement under the Standard. |

# Non-GMO Project Standard

| | |
|---|---|
| **1.3.11.** Should or May | A non-mandatory recommendation or recommended practice. |
| **1.3.12.** Standard | The "Standard" herein refers to the Standard for The Non-GMO Project Product Verification Program, which is this document. |
| **1.3.13.** Supplier | Any party from whom an input is obtained. |
| **1.3.14.** Technical Administrator | The organization responsible for conducting the Program on behalf of the Non-GMO Project. |
| **1.3.15.** Unintentional Contamination | A contamination incident (event) will be deemed unintentional if available information confirms that:<br>i.   The operator did not knowingly use GMOs or GMO-derived inputs.<br>ii.   The operator used all due diligence to exclude GMO contamination. |
| | |
| **2. CORE REQUIREMENTS** | |
| **2.1. Traceability** | |
| **2.1.1.** Each lot of Non-GMO Project-verified product or input must be traceable back to specific lots of the inputs used in its production. | If the operation is dedicated strictly to Non-GMO Project Standard compliant production then it is sufficient to have a record-keeping system that records the lot numbers for all lots of inputs used to make a specific lot of product.<br><br>Systematic procedures shall be in place for tracking lot numbers and/or marking and labeling of packaging, containers, and storage facilities to assure traceability of inputs, work-in-progress, and final products at all points in the production process. |
| **2.1.2.** Traceability records shall explicitly trace and track the Non-GMO Project Standard compliant status of both inputs and the final product. | If lots of a given input are co-mingled in storage before use in production of a certain lot of product, the lot numbers related to all lots commingled shall be linked to that particular lot of product. |
| **2.1.3.** The producer/manufacturer must be prepared to provide the Technical Administrator of the Program with traceability information. | |
| **2.2. Cleanout and Segregation** | The aim of cleanout and segregation procedures is to prevent GMO contamination of inputs, work-in-progress, and final products. |
| **2.2.1.** Cleanout: | |
| **2.2.1.1.** Receiving, production, processing, | |

## Non-GMO Project Standard

| | |
|---|---|
| manufacturing, transfer, and storage facilities, as well as shipping and transportation conveyances, shall be inspected and cleaned/purged as needed to remove sources of GMO contamination, and all relevant cleaning, purging, and inspections shall be documented. | |
| **2.2.1.2.** Procedures shall be appropriate to the operation and may likely differ significantly between agricultural producer, manufacturer, etc. | |
| **2.2.2.** Segregation | If the operation is dedicated strictly to Non-GMO Project Standard compliant production, then segregation measures within the production operation are unnecessary, since only Non-GMO Project verified inputs will enter the operation.<br><br>Segregation measures are also required for instances where any required testing occurs after the input in question has entered the facility. For example, when a Participant, rather than an ingredient supplier, is taking responsibility for testing. |
| **2.2.2.1.** If the operation is not dedicated to Non-GMO Project verified production, systematic procedures shall be in place during production to keep Program verified inputs, work-in-progress, and finished products separate from all materials that are not compliant with the Non-GMO Project Standard. | |
| **2.2.2.2.** Tracking of lot numbers and labeling/marking on packaging and containers shall be used as necessary to identify and segregate Non-GMO Project Standard compliant materials from non-compliant materials. | |
| **2.3. Specifications for Inputs and Products** | The intent of the program is for the Participant to design production processes and input specifications that exclude GMOs from the Participant's products. This not only requires that one use inputs that are compliant with the Non-GMO Project Standard, but also that one employ practices that control unintentional contamination with GM material. |
| **2.3.1.** For products enrolled in the PVP, | |

**Non-GMO Project Standard**

| | |
|---|---|
| Participants shall not knowingly plant, purchase, or use inputs that are not compliant with the Non-GMO Project Standard. | |
| **2.3.2.** Preventive measures, as defined below, must be undertaken by Participants to prevent or reduce unintentional GMO contamination in excess of the action thresholds set by this Standard. | This requirement is necessitated because risk of unintentional contamination of inputs and products with GMOs is increasing due to the growing use of GMOs in non-organic agriculture. |
| **2.3.3.** The written specifications for all inputs and products shall include requirements regarding Non-GMO Project Standard compliance, and shall be updated when the Participant changes suppliers or inputs. | |
| **2.3.4.** Purchase and use of inputs shall be contingent on inputs being compliant with requirements of the Non-GMO Project Standard, including traceability, segregation and GMO content. | Methodology for determining this is given in sections 2.4., 2.5., and 2.6. of this Standard.<br><br>Spot purchasing from unverified suppliers should be avoided. Participants must seek out Non-GMO Project Verified inputs and if they are available, and a spot purchase is used instead, the Participant must justify to the Technical Administrator why the verified input was not used. Spot purchases are allowed on the following basis:<br>   (i) Any input that is spot purchased must be tested in accordance to the requirements of this Standard, and must be below the relevant Action Threshold.<br>   (ii) The Participant must provide the Technical Administrator with documentation of the purchase, including sampling information and test results on a periodic basis determined between the Technical Administrator and the Participant, with a minimum frequency of annual reporting.<br>   (iii) Constraints on spot purchasing may be enforced at the discretion of the Technical Administrator. For example, repeated spot purchases from the same supplier could be grounds for this allowance to be revoked or restricted. |
| **2.3.5.** Release of products to the marketplace | Participants shall have a written methodology |

# Non-GMO Project Standard

| | |
|---|---|
| shall be contingent on products meeting requirements regarding Non-GMO Project Standard compliance, including traceability, segregation and GMO content. | and rationale for determining this. Success must be documented, with adjustments made and documented as necessary to meet this Standard.<br><br>Methodology for determining this as described in sections 2.4., 2.5., and 2.6. of this Standard may be applied. |
| **2.4. Input Categories** | Appropriate preventive measures depend on the category of the input, and are elaborated below. |
| **2.4.1. Non-Risk Inputs**: Materials that are not derived from biological organisms and are not, therefore, susceptible to genetic modification. | Examples: lime, water and fossil-based products. |
| **2.4.1.1.** Preventive measures for Non-Risk Inputs consist of examining the specification sheet for compound ingredients to confirm the absence of components with GMO-risk. | Specification sheets must fully disclose all components of the input in question. |
| **2.4.2. Low-Risk Inputs**: Species for which genetically modified versions have not yet been commercialized. | Although biotechnologists are engaged in laboratory experimentation with most species, the crops, ingredients, and production inputs derived from such species (for example, cherries, wheat, and green peppers) have extremely low risk of being contaminated. |
| **2.4.2.1.** Preventive measures for Low-Risk Inputs consist of: | |
| **2.4.2.1.1.** Examining the specification sheet for compound ingredients to verify absence of high-risk ingredients. | Specification sheets must fully disclose all components of the input in question. |
| **2.4.2.1.2.** Verifying that the input was produced under conditions designed to avoid cross-contamination with GM materials. | a.  If the facility does not use any High-Risk Inputs, then demonstration of this fact is sufficient to fulfill this requirement.<br><br>b.  If the facility does use High-Risk Inputs, fulfillment of this requirement will involve demonstrating that procedures and systems are in place that effectively segregate the Low-Risk Input under consideration from potential sources of high-risk contamination within the facility. |
| **2.4.2.2.** Monitoring of Low-Risk Inputs with suspected contamination. Monitored crops are listed in Appendix C. | Certain crops for which genetically modified versions have not yet been commercialized may be subject to higher contamination risk. Such crops are subject to monitor testing by the technical administrator, and will be reclassified as High-Risk Inputs by the |

**Non-GMO Project Standard**

| | Standard Committee and Board of Directors if results indicate persistent contamination in accordance to section 2.5.1. Crops may be added to Appendix C for either of the following reasons:<br><br>• Suspected or known incident of contamination at any point in the production chain. Examples include flax, for which known contamination by an unapproved variety has occurred.<br>• Genetically modified relatives are in commercial production with which cross-pollination is possible. Examples include table beets, which have a risk of cross-pollination with genetically modified sugar beets. |
|---|---|
| **2.4.3. High-Risk Inputs:** Crops and their derivatives that carry high risk of being genetically modified are listed in Appendix B. | Genetically modified varieties of the crops listed in Appendix B include genetically modified crops that are grown on a large scale in North America and certain other parts of the world.<br><br>There is greater risk that any lot of these crops, whether conventional, natural or certified organic, could become contaminated, either via cross-pollination or admixture during storage, shipping, handling or processing.<br><br>Animal products are included in the list of High-Risk Inputs because animal feed commonly contains High-Risk Inputs. In addition, injections of recombinant bovine growth hormone are sometimes used to increase milk production, and other High-Risk Inputs may be used to treat problems encountered in livestock production.<br><br>There are other GM crops and biological materials, in addition to those in Appendix B, that have been commercialized (for example, tomatoes). However, because these are not in wide or common use in the food production system at this time, this Standard does not classify them as high-risk. |
| **2.4.4.** Participants shall undertake preventative | |

# Non-GMO Project Standard

| | |
|---|---|
| measures to assure the Non-GMO Project Standard compliance of High-Risk Inputs, and shall consist of at least the following: | |
| **2.4.4.1.** Examining the specification sheet of the input to identify all high-risk ingredients. | A specification sheet or similar description must be on file with Participants for each unique input received from each supplier, which discloses all components contained in that input. |
| **2.4.4.2.** Verifying that the input was produced under conditions designed to avoid cross-contamination with GM materials (traceability and segregation). | Participants must be able to show their methodology and due diligence in this. |
| **2.4.4.3.** Monitoring for GMO contamination against an Action Threshold, which, if exceeded, triggers the Participant to investigate the cause of the contamination and to correct that cause when identified. | Monitoring and associated testing regimens may be conducted by the supplier and/or the user of any given input. The validity of the testing regimen shall be evaluated. |
| **2.4.4.5.** Compliance of animal products with the Standard is not necessarily verified by testing of the animal product, but by showing that inputs (feed, supplements, etc.) are compliant with the Standard, and that adequate traceability, cleanout, and segregation measures have been used in handling the inputs and the resulting animal products. | A similar approach is applicable to other inputs where GMO content or origin is not readily determined by analysis, e.g. refined vegetable oil derived from GM canola. |
| **2.5. Reclassification of Specific High- and Low-Risk Materials Based on Experience in the Field** | |
| **2.5.1.** A Low-Risk Input that is found through verified, random testing to contain GM material at levels above the Action Threshold (defined below) at a frequency of greater than 1 sample per 50 samples tested, or that is projected to contain such GM material at a frequency greater than 1 in 50 samples based on existing test results, shall be classified as a High-Risk Input, the verification of which shall be carried out according to the requirements for High-Risk Inputs. | Such risks will be evaluated on a Project-wide basis, i.e., from compiled experience with Product Verification Program Participants using any given Low-Risk Input.<br><br>In addition to the examples given in the guidance to section 2.4.2.2., another example of a Low-Risk Input that might be classified as High-Risk according to this criterion would be wheat flour. GM wheat itself has not been commercialized. However, due to rotation with soy, cross-contamination frequently takes place in the fields, and, due to accidental admixture, cross-contamination of wheat flour with soy or corn often takes place in the flour mill or during other post-harvest activities. This also applies to most other flours, many of which |

**Non-GMO Project Standard**

| | may be made in the same mill. |
|---|---|
| **2.5.2.** On a case-by-case basis, certain High-Risk inputs may be downgraded to Low-Risk status based on source, documentation, protocols for contamination prevention/avoidance, and laboratory results (in accordance with this standard) demonstrating consistently low risk of GMO contamination. | An example would be cornstarch produced in a country where GMOs are prohibited, Non-GMO Project Standard compliant seed was verified as having been used, and documented IP procedures are in place for the manufacturing and transport of the product.<br><br>Another example would be honey produced by bees whose forage area is free of commercial agriculture involving GM risk crops within a 4 mile radius of hives, provided no other feed is used unless it is compliant with the Non-GMO Project Standard. |
| **2.6. Action Thresholds** for High-Risk Inputs: The Non-GMO Project has established the following long-term Action Thresholds for High-Risk Inputs and Products based on input from a broad range of stakeholders:<br><br>• Seed and Other Propagation Materials (see sections 2.7 and Appendix B): 0.1%.<br>• Human Food, Ingredients, Supplements, Personal Care Products, and other products that are either ingested or used directly on skin: 0.5%<br>• Animal Feed and Supplements: 0.9%<br>• Packaging, Cleaning Products, Textiles and other products that are not ingested or used directly on skin: 0.9%<br><br>For species not listed in Appendix B, there is no allowable presence. | Absence of all GMOs is the target for all Non-GMO Project Standard compliant products. Continuous improvement practices toward achieving this goal must be part of the Participant's quality management systems.<br><br>A key requirement of such quality management systems is to establish an Action Threshold, which, if exceeded, triggers the Participant to investigate the cause of the contamination, and to correct that cause when identified. Inputs contaminated above the action thresholds may not be intentionally used, except for livestock feed verified under section 2.7.2 of this standard.<br><br>When tested lots are mixed after testing has been conducted, the Participant must:<br><br>a. Demonstrate reasonable efforts to achieve homogeny prior to testing.<br>b. Investigate and document the cause of any individual lot's contamination over the relevant action threshold<br>c. Implement and document practical continuous improvement practices to reduce, and ultimately eliminate, the need for any future blending of lots. An example of one such practice would be to help growers secure Non-GMO Project Standard |

**Non-GMO Project Standard**

| | |
|---|---|
| | compliant planting seed.<br>d. In all cases, the finished lot must be below the relevant Action Threshold. |
| **2.6.1.** Compliance with Action Thresholds shall be verified on the basis of test results or affidavits from suppliers, as is consistent with the technical requirements applicable at each point in the production/storage/handling chain. The following methods shall be used where appropriate: | |
| **2.6.1.1.** Genetics-based testing using the Real-Time PCR method.<br><br>Where genetic testing is most appropriate, the following applies: | Genetics based testing is required before a finished product can be verified, except for livestock products verified under section 2.7 of this standard. The frequency and location of Real Time PCR testing can be tailored to accommodate an applicant's supply chain. |
| **2.6.1.1.1.** A statistically valid sampling and testing plan shall be designed on the basis of risk assessment of the production/handling system, and shall reflect the level of monitoring appropriate for the risks inherent in the production/handling system, as well as industry standards. | Risk assessment and monitoring must be done by the Participant, and the sampling and testing plan shall be approved as part of the Product Verification Program.<br><br>Compliant sampling and testing must occur at least once post harvest, depending on contamination risks, except for livestock products verified under section 2.7 of this standard. Sampling plans must be designed to achieve 90% confidence in quantification of GMO at the action threshold set by this Standard. When achieving this level of confidence through crop sampling is impractical (e.g. for large crops such as zucchini and papaya), the testing program may be shifted to the seed level. |
| **2.6.1.1.2.** Statistical calculations can also be used to design compositing strategies through which portions of multiple samples can be combined and tested together for the purpose of reducing the number of tests required and therefore the costs for testing. | Compositing must be done in a manner that assures that any single sample in excess of the relevant action threshold produces a positive result for the composite sample as a whole. If a positive result is obtained for the composite, it will be necessary to retest all samples individually. |
| **2.6.1.1.3.** Testing shall be carried out by a laboratory that is accredited to ISO17025 and uses methods that are included within the scope of their ISO17025 accreditation, for the | A list of approved labs that have provided this criteria, along with instructions to laboratories regarding being added to this list, is available on the Non-GMO Project website, |

## Non-GMO Project Standard

| crops/inputs in question. | www.nongmoproject.org. |
|---|---|
| **2.6.1.1.4.** Appropriate laboratory controls must indicate that the DNA of the input is sufficiently intact to allow valid quantitative analysis by PCR. | Inputs that do not meet this criterion and are, therefore not "testable" in this manner, must be verified by lot-specific traceability back to precursors for the input that are testable. |
| **2.6.1.1.5**. Laboratory testing must target all commercialized GM events relevant to the product and the production system. Where Quantitative results are required, the Real-Time PCR test must employ primers sufficient to accurately quantify the % GMO for that event. Qualitative analysis using Real-Time PCR is sufficient if 1) the PCR limit of detection is 0.01%; and 2) GMOs are not detected; and 3) appropriate laboratory controls indicate that the DNA of the input is sufficiently intact to allow for valid quantitative analysis by PCR. | See guidelines for recommended primers for each crop (see Non-GMO Project Real Time PCR Primer Table for GMO Detection). Examples of sample types for which the DNA is sufficiently intact to allow for valid quantitative analysis by Real-Time PCR: raw agricultural products such as seed, grain, legumes; raw milled products; flour. |
| **2.6.1.2.** Immunologically-based testing using strip tests. In cases where lateral flow strip tests are suitable, they must cover all commercialized GM events for the crop in question. | These methods shall be used when rapid, qualitative in-field testing is needed and when accuracy, sensitivity, and ramifications of false negative results are not large concerns. An example includes use of strip tests for the purpose of spot testing input samples. Compositing can be used for subsequent confirmatory Real-Time PCR testing. Frequency of Real-Time PCR testing and method of compositing to be determined such that there is 90% confidence in quantification of GMO at the action threshold set by the Standard. |

# Non-GMO Project Standard

| | |
|---|---|
| **2.6.1.2.1.** A statistically valid sampling and testing plan shall be designed on the basis of risk assessment of the production/handling system and shall reflect the level of monitoring appropriate for the risks inherent in the production/handling system, as well as industry standards. | See guidance to 2.6.1.1.1. |
| **2.6.1.2.2.** Analysts must be trained and their performance verified to assure they use the tests reliably. | Participants shall document the in-house evaluation of performance. |
| **2.6.1.3.** Supplier Affidavits. In cases where a non-GMO affidavit is appropriate, the following applies: | This option is available in cases where an input that is normally classified as High Risk is shown to be produced under conditions where the risk does not exist, for example, a crop grown in a country where no GMO production has been allowed, or a class of enzyme for which no GMO form has been developed. |
| **2.6.1.3.1.** The affidavit must attest that the origin of the input as well as its chain of custody merits the classification of the input as Low Risk as described in section 2.4.2 of this Standard. | |
| **2.6.1.3.2.** The affidavit must be signed by the manufacturer of the input. | |
| **2.7. Verification of livestock products** based on testing of seed and feed. | Livestock product inputs are qualitatively different from any other type of major input verified under this Standard in that there is no point in the production chain at which it is possible to identify GMO contamination using current testing methodologies. It is therefore necessary to control contamination based on testing of feed, and/or of the seed used to grow the feed. |
| **2.7.1. Seed** used to grow crops for livestock feed | From the point of enrollment, Participants have a five-year transition period to bring all seed into compliance with the requirements below. |
| **2.7.1.1. Commercially purchased seed** planted for on-farm feed production must be compliant with the requirements outlined in section 2.6 of this standard. | Commercially purchased seed must be tested using PCR and test below the action threshold outlined in section 2.6. |
| **2.7.1.2. Farmer-saved seed** and seed purchased from any neighboring farmer who does not have a retail seed operation must be | Frequency of testing should increase if there are any changes that would significantly increase the likelihood of contamination (e.g. |

# Non-GMO Project Standard

| | |
|---|---|
| strip tested annually. | new neighbor planting GMOs). If the strip test results are positive, samples must be submitted to a lab for quantitative PCR testing. If the seed is over the action threshold the seed may not be planted. |
| **2.7.2 Feed** | Must be monitored for compliance with Action Thresholds according to a sampling plan reviewed by the Technical Administrator. |
| **2.7.2.1. Feed for Certified Organic Operations in which products are pooled before final processing (e.g. dairy, ground meat, egg mixtures)** | The sampling plan for certified organic operations shall be based on testing of a composite sample of the high-risk feedstuffs from a representative selection of farms, with an intention of identifying and addressing any contamination occurring in the Participant's operation. The farms chosen for such testing shall be representative of the Participant's operations in a region (defined as a geographic area with relatively homogenous farm operations and sources of livestock feed, typically encompassing one or more states, in which farms ship unprocessed livestock products to one or a few processors).<br><br>Testing Methodology:<br>Testing method must yield valid quantitative results. When feedstuffs can be isolated into their raw material components, strip testing may be used. When feedstuffs are tested as a blend form, PCR testing must be used.<br><br>Quarterly Sampling Density<br>• Fewer than 10 farms per region: Minimum of 1 farm tested per region per quarter<br>• 10-20 farms per region: Minimum of 2 farms tested per region<br>• 21-50 farms per region: 10% of farms tested per region<br>• 51-100 farms per region: 5% of farms tested per region<br>• Over 100 farms per region: Minimum of 6 farms tested per region<br>The sampling plan within each region shall include a random selection of farms each quarter. Annual sampling plans shall be reviewed with the technical administrator and may be adjusted over time to provide the most |

# Non-GMO Project Standard

| | |
|---|---|
| | technically sound basis for continuous improvement. Adjustments shall be mutually agreed upon and might include increased/decreased sampling frequency or density in regions with unusually high/low percentages of samples over the action threshold. |
| | Composite samples shall be tested on a quarterly basis. When more than one test is needed, results shall be averaged. Quarterly results or averages in excess of the Action Threshold shall trigger an assessment of the cause of contamination and appropriate steps to eliminate identified sources of contamination. |
| | Participant shall provide a report upon renewal on any significant changes in the frequency of GMO presence in livestock feed, the percent of samples exceeding the action threshold, and steps taken to secure feed below the action threshold. |
| **2.7.2.2. Feed for Non-Organic Operations and all operations in which products are NOT pooled before final processing (e.g. shell eggs, cut meat)** | The sampling plan for non-organic operations must include quarterly composite testing of feed samples for each shipment of feed purchased by each farmer in the Participant's operations. If more than 20% of the Participant's farmers fail to supply samples, it will be considered a major nonconformity, subject to section 3.5.1 of this Standard. |
| | At time of annual evaluation, the average for all quarterly composite tests for the prior year must be below the Action Threshold. |
| **2.7.3. Onsite Inspections** | Inspections may be completed via a group certification model. In order to be considered compliant, the Participants' Internal Control System (ICS) must conduct a documented assessment visit to each farm at least once every year. |
| | In addition to the ICS, third party inspections must be conducted on 10% of all farms every year. Results of the third party audit will be compared with results of the ICS assessment of |

# Non-GMO Project Standard

|  | the farms to verify effectiveness of the ICS process.<br><br>For certified organic operations, additional inspections (beyond those required for organic certification) are not required. |
|---|---|
|  |  |
| **3. Quality Assurance and Quality Control** |  |
| **3.1.** The Participant's quality assurance and quality control program shall be revised as needed to assure compliance with the Non-GMO Project Standard. | These modifications will, in most cases, involve additions or revisions to existing procedures, but where necessary, may include new procedures specific to processes, procedures, and record keeping critical to compliance with the Non-GMO Project Standard. |
| **3.1.1.** Compliance with applicable requirements of the Non-GMO Project Standard shall be identified as a key quality indicator of the Participant's products, and standard operating procedures shall be revised, or added where necessary, to incorporate measures that assure such compliance of products with the Non-GMO Project Standard. |  |
| **3.1.1.1.** Where needed, additional training shall be provided to staff to assure that they are capable of fulfilling their duties in a manner that supports compliance of the operation, and the products produced, with the Non-GMO Project Standard. |  |
| **3.1.1.2.** Documents and forms shall be revised, as necessary, to include compliance with the requirements of the Non-GMO Project Standard as a key quality indicator, and to assure that the Participant organization operates in a manner that fulfils the requirements of the Non-GMO Project Standard. |  |
| **3.1.1.3.** All documents, forms, reference materials, and specifications needed by personnel to fulfill the requirements of the Non-GMO Project Standard shall be readily available to relevant personnel. |  |
| **3.1.1.4.** Records shall be retained for 3 years. |  |

# Non-GMO Project Standard

| | |
|---|---|
| **3.2.** Monitoring and control of key parameters relevant to compliance with the Non-GMO Project Standard shall be incorporated into the quality assurance and quality control program of the Participant organization. Key parameters are: | The Participant shall create or revise documentation accordingly to show compliance with each aspect identified below. |
| **3.2.1.** Traceability | |
| **3.2.2.** Segregation | |
| **3.2.3.** Compliance with Action Thresholds | Periodic monitoring of compliance with Action Thresholds is typically done via additional analytical testing at strategic times and points in the system to corroborate and support the regular sampling and testing program that the operation has implemented. |
| **3.2.4.** Labeling | Labeling claims must be accurate and truthful, and must not mislead the consumer about the GMO content of the product. Any reference to the Non-GMO Project or use of the seal must be approved by a written agreement with the Non-GMO Project.<br><br>Examples of claims that are not acceptable are "contains zero GMOs," "GMO-free" and GE-free.<br><br>The Technical Administrator will review labels to assess compliance with these claim guidelines. |
| **3.3.** The Participant organization shall monitor and verify the Non-GMO Project Standard compliance of inputs purchased, in line with section 2.3. of this Standard, and this shall be documented. | Record-keeping procedures shall be revised as necessary to assure that records include relevant information regarding the Non-GMO Project Standard compliance of each specific lot of input. |
| **3.4.** The Participant organization shall monitor and verify the Non-GMO Project Standard compliance of final products sold, in line with section 2.4. of this Standard, and this shall be documented. | Record-keeping procedures shall be revised as necessary to assure that records include relevant information regarding the Non-GMO Project Standard compliance of each specific lot of product. |
| **3.5.** Corrective actions. Non-conformities in processes, procedures, inputs, or products, which could impact compliance with the Non-GMO Project Standard, shall trigger corrective actions. | Nonconformities discovered during the program application or renewal process must be satisfied in order to achieve or maintain compliance with the Non-GMO Project Standard.<br><br>Mid-term nonconformities discovered through internal quality-assurance processes, |

# Non-GMO Project Standard

| | complaints from customers, or third party surveillance, require corrective action as described below. |
|---|---|
| **3.5.1.** Major nonconformities shall be reviewed at the time of occurrence, documented, and reported to the Product Verification Program's Technical Administrator. | A major nonconformity is a deviation that directly affects the compliance of the product with the Non-GMO Project Standard, such as accidental contamination of the product with GM material.<br><br>Any major non-conformities that go unreported and/or uncorrected according to the requirements below may be cause for product or the company to be removed from the Non-GMO Project Product Verification Program. Prior to removing company or product from the program, the Technical Administrator will notify company via email of this intended action. Company will have 5 days from date of said notice to provide all required documentary evidence in order to avoid withdrawal from the program.<br><br>The Technical Administrator will notify the Non-GMO Project of any withdrawal from the program. Additionally, if the company/products withdrawal impacts other Non-GMO Project Verified companies (such as the withdrawal of an ingredient supplier), the Technical Administrator will notify the other companies and require that a substitute supplier be found. Please see guidance in 3.6 for requirements for bringing in new suppliers. Any notice of product/company withdrawal from the program issued by the Technical Administrator will be devoid of any company confidential information. |
| **3.5.1.2.** Timely root-cause analysis. | Discovery of any major nonconformity must be immediately reported in writing to the Technical Administrator. "Timely" is considered to be typically within 7 days, and rarely longer than 30 days. Longer delays must be justified in writing. Accompanying the notice must be an explanation of the action steps being taken, and the expected completion date of the root-cause analysis. |

# Non-GMO Project Standard

| | Findings of the root-cause analysis must be reported in writing to the Technical Administrator, together with expected corrective actions to be undertaken. |
|---|---|
| **3.5.1.3.** Corrective actions designed to improve the system and products to achieve compliance with the Non-GMO Project Standard. | Corrective actions must be completed within 15 days of completing the root-cause analysis. The Technical Administer will review and approve the planned corrective actions.<br><br>Corrective action plans shall include identification of persons responsible for their execution, defined timelines for actions, and realization of the desired results of the corrective action plan. Documentary evidence must be submitted to the Technical Administrator within 5 days of completing corrective actions. Such evidence might include new/modified quality assurance SOPs such as updates to training and record keeping or changes to sampling and testing plans, and, where possible, evidence that these updated SOPs are achieving compliance with the Standard. The Technical Administer will review and approve all corrective evidence. Repeated non-conformance with the action threshold may require company mid-term re-evaluation of the facility and possibly including an onsite inspection and/or input supplier enrollment the Non-GMO Project's product verification program.<br><br>Any delays in the timeline from reporting to completion of corrective actions must be justified in writing and approved by the Technical Administrator. |
| **3.5.1.4.** Identification of nonconformities, corrective actions, root-cause analysis, and successful remediation of the non-compliance shall all be documented. | This documentation shall be available to the Technical Administrator and its inspectors. |
| **3.5.3.2.** Minor non-conformities shall be reviewed at the time of the annual inspection. | A minor non-conformity is a deviation in procedures, recordkeeping, documentation, or other part of the program that does not cause any of the relevant ingredients used throughout the operation to exceed action thresholds.<br><br>Renewal of verified status shall be contingent |

**Non-GMO Project Standard**

| | upon appropriate resolution of any such non-conformities. |
|---|---|
| **3.6.** In addition to Participants, suppliers and contractors shall also participate in the Non-GMO Project Product Verification Program to verify compliance with the Standard. | In some cases, inputs certified by other non-GMO certification programs may be approved as equivalent for use in Non-GMO Project compliant products. A program would be acceptable as long as that program is fully equivalent to or exceeds the requirements of the Non-GMO Project Product Verification Program. The decision on equivalency will be made by the Board of Directors based on evaluation of said program by the Technical Administrator via a procedure duly approved by the Board.  In such cases, certificates of compliance from such a program may be accepted as equivalent to verification by the Non-GMO Project.<br><br>Such suppliers and contractors must still, in all cases, input their product, ingredient and facilities data into the Non-GMO Project Product Verification Program database. |
| **3.6.1.** A Product Verification Program update shall be required at least annually. | The Technical Administrator may require a Participant to submit updates more frequently, if history shows cases of major non-conformities occurring as a result of unannounced changes to the operation.<br><br>Such changes could include the following: changes in product composition that involve High-Risk Inputs, changes in suppliers of High-Risk Inputs, changes in processes or procedures that alter segregation or traceability of products, or changes in specifications of a high-risk ingredient or of a final product that contains High-Risk Inputs. |
| | |
| **4. Transition Period and Continuous Improvement**<br>It is expected that with systematic efforts within each sector of the industry, it should eventually be possible for the industry to be successfully operating uniformly and consistently with all aspects of this Standard.  Until that time, compliance will be assessed according to program-wide variances set in Appendix A.  All variances are meant to be temporary, and will be reviewed on at least an annual basis by the Standard Revision Committee.  Each variance shall be removed from this Standard as quickly as is practically feasible on an industry-wide level. ||
| **4.1.** During this transition period Participants will develop systems, procedures, and source | |

# Non-GMO Project Standard

| | |
|---|---|
| materials required to enable their companies and the industry to operate effectively and sustainably to the Action Thresholds. | |
| **4.2.** During this transition period, while the industry is working cooperatively and dynamically to achieve the ability to consistently operate to these target Action Thresholds, temporary variances will be set on a sector-by-sector basis. Participants are required to operate to the most stringent conditions practical at this time, while also working with others in their sector to develop sources that are progressively closer to the Action Thresholds described above. | A primary goal of the Project is that sufficient experience (systems) and data will be generated to downgrade some sources of high-risk materials to low-risk status. |
| **4.3.** Variances can, in principle, be applied to any aspect of the Standard or the verification process, including the Action Thresholds, the risk classification of a given crop or input, or the criteria required to verify compliance with other aspects of the Non-GMO Project Standard. Variances are applied on an industry-wide basis, and apply uniformly to all companies. | Recommended changes to variances will be made by the Standard Revision Committee (which includes members of the Technical Advisory Board), and will be based on input received from stakeholders. These recommendations will be approved and finalized by the Board of Directors. |
| **4.4.** Individual Participants may choose to either operate to long-term action thresholds or avail themselves of current variances. Use of a variance is contingent upon participation in industry-wide continuous improvement efforts aimed at eliminating the need for that variance. | Variances have been set in acknowledgement of current industry-wide limitations, but the goal is to eventually overcome those limitations through collaborative efforts. |
| **4.5.** For manufactured food and feed products, distinct variances may be established for each of the following categories of High Risk Inputs (see Appendix A for currently applicable variances): | All percentages noted below are weight percentages of the product, not counting the weight of salt or added water in the finished product.<br><br>For livestock feed, the categories below are calculated based on the weight of the input as a percentage of the ration fed to the animal. |
| **4.5.1.** Major Ingredients, each of which represents 5% or more of the product or is a defining ingredient. | A defining ingredient is one whose name appears in the name of the product. |
| **4.5.2.** Minor Ingredients, each of which represents at least 0.5% but less than 5% of the product, and is not a defining ingredient. | |
| **4.5.3.** Micro Ingredients, each of which represents less than 0.5% of the product and is not a defining ingredient. | |

# Non-GMO Project Standard

| APPENDIX A: Current Variances to the Standard | |
|---|---|
| **Variance #1—Elevated Action Thresholds**<br><br>*Relates primarily to Section 2.6.* | Current variances for the Action Threshold are as follows:<br><br>• Planting Seed and Other Propagation Materials that are listed in Appendix B: 0.25%. For all other species, below the limit of detection.<br>• Human Food, Products, Ingredients, Supplements, and Personal Care Products and other products that are either ingested or used directly on skin: 0.9%<br>• Animal Feed and Supplements: 1.5%<br>• Packaging, Cleaning Products, Textiles and other products that are not ingested or used directly on skin: 1.5%<br><br>Absence of all GMOs is the target for all Non-GMO Project Standard compliant products. However, current risk of contamination makes it necessary to establish quality management systems to assure that GMO contamination stays within the applicable Standard.<br><br>A key requirement of such quality management systems is to establish an Action Threshold, which, if exceeded, triggers the Participant to investigate the cause of the contamination, and to correct that cause when identified. Participants must demonstrate compliance with the Action Threshold in one of two ways (please note that option 2 is NOT available for planting seed and other propagation material):<br><br>1. By ensuring that each batch of high-risk input used has tested below 0.9% prior to its use in verified product. In this case, test results are submitted to the technical administrator for review at the time of annual renewal.<br><br>OR |

# Non-GMO Project Standard

|  |  |
|---|---|
|  | 2. By ensuring that test results for all batches of high-risk input used during each 6 month period average at or below the relevant Action Threshold, with no single batch of input ever exceeding the relevant Action Threshold by more than a factor of 2. In this case, all test results are submitted to the technical administrator for review at least annually, and the Participant is responsible for ongoing monitoring of test results to ensure compliance for each period. A Participant may not use this option for a period in excess of three years from initial verification.<br><br>Allowed use of this variance is contingent upon the Participant demonstrating their role in sustained, active efforts to develop sources of the relevant input that are below the Action Thresholds specified in section 2.6. The focus of such efforts should be enrollment of the entire supply chain, with an ultimate goal of supporting farmers in planting seed that has tested below the relevant Action Threshold. |
| **Variance #2—Including on the list of crops with high risk of GMO contamination only those crops species for which genetic modification is widely and commonly used.**<br><br>*Relates primarily to Appendix B* | Appendix B is a list of the GMO crops and inputs considered "High-Risk" by the Non-GMO Project—this is the Project's Operational list of High-Risk Inputs. It does not include all GMO crops that have been commercialized. Some of GMO crops that were commercialized at one time are not in commercial use today. For instance, potatoes and tomatoes were once produced commercially but today are not in North America. Another example is rice, where accidental contamination occurred in both in the US and China before any varieties being commercialized. In all of these cases, the GM crop is present today in only low, residual amounts in the food system.<br><br>These and other low-incidence GMOs have been excluded from the Project's operational list of High-Risk Inputs (see Appendix B for list). This substantially reduces the number of |

**Non-GMO Project Standard**

| | products and ingredients that are classified as High-Risk and thereby reduces the number of inputs that require in-depth review.

Allowed use of this variance is contingent on the Participant demonstrating their role in sustained, active efforts to develop non-GMO sources of High-Risk Inputs. |
|---|---|
| **Variance #3—Exemptions from production facility review**

*Relates primarily to Section 2.4.2.1.2. and 2.5.* | Production facility reviews are not required for:
 a. Low-Risk inputs
 b. Products in which the only Low-Risk and/or High-Risk Inputs are approved under variances 4 or 5
 c. Products produced in a facility where the only high-risk ingredients are already Non-GMO Project Verified prior to entering the facility parallel processing of same ingredients.

Use of this variance is contingent on the Participant demonstrating sustained, active efforts to work with suppliers of the Low-Risk Input to enable them to comply with Section 2.4.2.1.2. of the Standard. |
| **Variance #4—Temporary exclusion of all Micro Ingredients**

*Relates primarily to Section 4.5.3.* | All Micro Ingredients used in livestock feed formulations or products manufactured for human consumption may be excluded from the Verification Process at this time, with the exception of:

 a. Viable microbes and their functional components, which replicate their action. Examples include yeasts and dairy cultures.
 b. Microbial products that have no viable microbes, or functional enzymes, but which are not isolates. Examples include cheese, bread, wine, beer and fruit puree.
 c. Enzymes. Examples include Chymosin.
 d. Recombinant bovine growth hormone (rBGH, rBST).

Any given product formulation included in the Program must not contain more than 10 unique non-verified High-Risk Micro Ingredients. |

**Non-GMO Project Standard**

| | |
|---|---|
| | Formulations exceeding 10 unique High-Risk Micro Ingredients must either be reformulated or enough of the micro inputs verified as Non-GMO Project Standard compliant in line with section 2.6. of this Standard, to reduce the amount of non-verified inputs to 10 or less.<br><br>Allowed use of this variance is contingent on the Participant demonstrating their role in sustained, active efforts to develop Non-GMO Project compliant sources of the exempted Micro Ingredients. |
| **Variance #5—Verification of Non-GMO Project compliance of Minor and Micro Ingredients using supplier affidavits**<br><br>*Relates primarily to Section 2.6.* | In cases where GMO analytical certificates or traceability linked to analytical certificates of precursors is not available, Non-GMO Project compliant status of Minor and Micro Ingredients may be verified based on affidavits from suppliers, as long as these ingredients are the product of a system that has been designed to avoid GMOs. Examples of such systems are organic certification and other identity preservation systems. Suitability of these other identity preservation systems are subject to review by the Technical Administrator. Suppliers shall agree to provide further information or demonstration in support of affidavit when requested by the Technical Administrator.<br><br>Allowed use of this variance is contingent on the Participant demonstrating their role in sustained, active efforts to develop Non-GMO Project compliant sources of that Ingredient. |
| **Variance #6—Eliminated Spring 2010** | This variance has been combined with Variance #5 |
| **Variance #7—Verification of inputs based on testing alone at any stage of the production chain.**<br><br>*Relates primarily to Section 1.2., 2.6.1.1.1. and 2.6.1.1.3.* | The intention of the Standard is that compliance be verified at all levels of the production chain regarding the use (intentional or accidental) of all production inputs.<br><br>A. This variance allows for high-risk inputs to be verified as compliant with the Non-GMO Project Standard if:<br>(i)    A copy of the original result for the PCR test shows that the GMO content of the input in question is |

**Non-GMO Project Standard**

|  | below the relevant action threshold; and |
|--|--|
|  | (ii)   The testing must have been conducted by a laboratory in compliance with sections 2.6.1.1.1 and 2.6.1.1.3 of this Standard and must reference by lot number the specific lot of product used by the Participant; and |
|  | (iii)   Appropriate laboratory controls indicate that the DNA of the input is sufficiently intact to allow valid quantitative analysis by PCR. (Inputs that do not meet this criterion and are, therefore not "testable" in this manner, must be verified by lot-specific traceability back to precursors for the input that are testable.) |
|  | B.   This variance also allows for high-risk inputs to be verified as compliant with the Non-GMO Project Standard if: |
|  | (i)   The precursor(s) to the input used by the Participant are tested by PCR; and |
|  | (ii)   For each precursor to an input used by the Participant, a copy of the original result for the PCR test of the specific lot of the precursor in question must show that the GMO content is below the relevant action threshold: and |
|  | (iii)   The testing must have been conducted by a laboratory in compliance with sections 2.6.1.1.1 and 2.6.1.1.3 of this Standard and must reference by lot number the specific lot(s) of the precursor used for lot of product used by the Participant; and |
|  | (iv)   Appropriate laboratory controls indicate that the DNA of the tested precursor is sufficiently intact to allow valid quantitative analysis by |

**Non-GMO Project Standard**

| | |
|---|---|
| | PCR; and |
| | (v)   From the point of the PCR testing forward, an identity preservation system is in place to ensure the given lot of the input in question has not been exposed to any other high-risk GMO material. All such systems are subject to review and must be approved by the Technical Administrator. |
| | Allowed use of this variance is contingent on the Participant demonstrating sustained, active efforts to obtain Non-GMO Project compliant sources of the ingredient in compliance with the fully applicable scope of this Standard as described in section 1.2. |
| **Variance #8 – Temporary Exclusion of vaccines and medicines used in livestock production as well as all fertilizers, pesticides, and herbicides.** | All vaccines and medicines used in livestock production, except for rBGH, as well as all fertilizers, pesticides, and herbicides may be excluded from the Verification Process at this time.<br><br>Allowed use of this variance is contingent on the Participant demonstrating their role in sustained, active efforts to develop Non-GMO Project compliant sources of these inputs. |
| **Variance #9 – Approval of a Participant's Co-Processed Products Based on a Process Certification Combined with Analytical Testing.** | The Non-GMO Project Standard's Product Verification Program follows a process-based approach that is supported by testing at strategic points in the supply chain, as applicable and taking into consideration the other variances of this Standard.  The Non-GMO Project acknowledges that pre-existing contractual agreements between certain Participants (e.g., brand owners) and their contracted processors, may pose barriers to enrollment in the early stages of the Program. This variance enables Participants who manufacture their products in contracted facilities (also known as co-packers or co-processors) to more quickly enter the Program while still adhering to the Program's process-based approach.<br><br>Under this variance, any manufactured product |

**Non-GMO Project Standard**

<table>
<tr>
<td></td>
<td>that is made by an operation contracted by the Participant may be evaluated and approved under the PVP as long as it is a product of a system that has been designed to avoid GMOs. Examples of such systems are organic certification and other identity preservation systems. All such systems are subject to review by the Technical Administrator, especially in cases where parallel processing occurs within the certified system. For example, processing certified organic soybeans in both Non-GMO Project verified and non-verified forms. In such cases lot by lot identity preservation will likely be necessary.<br><br>The Participant and/or the contracted operation provides evidence of testing as described in Variance #7 of the Non-GMO Project Standard.<br><br>Allowed use of this variance is contingent on the Participant having a defined plan for bringing contracted operations into full enrollment in the PVP within a defined time frame, not to exceed three years, to be reviewed and approved by the Technical Administrator with oversight by the Standards Committee.</td>
</tr>
<tr>
<td>**Variance #10—"Made with" claims for certain products containing livestock and bee product inputs**<br><br>*Relates primarily to Section 2.6. and section 4.5.1*</td>
<td>Under this variance, certain products made with livestock and bee product inputs may use a "Made with" claim in accordance with the following guidelines:<br><br>(i)    Livestock/bee product inputs may not collectively constitute more than 25% of the product, and may not be a defining ingredient (appearing in the product name).<br><br>(ii)    The product must contain approved major, high-risk inputs other than those from the livestock/bee products (e.g. corn meal, soy flour, etc. constituting more than 5% of the product).<br><br>(iii)    The "made with" claim may only be made in relation to approved</td>
</tr>
</table>

# Non-GMO Project Standard

<table>
<tr>
<td></td>
<td>major, high-risk inputs. For example, a corn chip with a seasoning blend containing more than 5% of an unverified dairy ingredient could claim "Made with Non-GMO Project Verified Corn."</td>
</tr>
<tr>
<td></td>
<td>(iv)   The "made with" claim is a text only claim. The Non-GMO Project Verification Mark may not be used on products approved under this variance. For more details, see the Non-GMO Project Licensing Agreement.</td>
</tr>
<tr>
<td></td>
<td>(v)   If the product contains dairy inputs, supplier affidavits must show that no recombinant bovine growth hormone (rBGH, rBST) was used.<br><br>Allowed use of this variance is contingent on the Participant demonstrating their role in sustained, active efforts to develop Non-GMO Project compliant sources of livestock and bee products.</td>
</tr>
</table>

<table>
<tr>
<td colspan="2" align="center"><strong>APPENDIX B</strong>: List of Crops, Processed/Processing Inputs, Production Inputs, and other Organisms with GMO Risk</td>
</tr>
<tr>
<td><strong>Crops -</strong> The following crops carry risk of being genetically engineered, because engineered varieties of these crops are grown large scale in North America and certain other parts of the world:</td>
<td>These crops may not be used in Non-GMO Project approved products unless verified as compliant with the Non-GMO Project Standard.</td>
</tr>
<tr>
<td>Alfalfa</td>
<td></td>
</tr>
<tr>
<td>Canola</td>
<td></td>
</tr>
<tr>
<td>Corn</td>
<td>Except popcorn</td>
</tr>
<tr>
<td>Cotton</td>
<td></td>
</tr>
<tr>
<td>Papaya</td>
<td></td>
</tr>
<tr>
<td>Soy</td>
<td></td>
</tr>
<tr>
<td>Sugar beets</td>
<td></td>
</tr>
<tr>
<td>Zucchini and yellow summer squash</td>
<td></td>
</tr>
<tr>
<td><strong>Animal Derivatives -</strong> These include products derived from cattle, sheep, pigs, chickens, and other common livestock, fowl, and fish, and include the following:</td>
<td>Most animal-derived products have GMO risk because soy, corn, cottonseed, and canola are commonly used in feed. Micro Inputs for feed such as vitamins may also carry risk of not being compliant with the Non-GMO Project Standard (see below).</td>
</tr>
</table>

# Non-GMO Project Standard

| | |
|---|---|
| | These animal derivatives may not be used in Non-GMO Project approved products unless verified as compliant with the Non-GMO Project Standard. |
| Milk | |
| Meat | Hides and skins are also included in this category. |
| Eggs | |
| Honey and other bee products | Due to potential for contamination with GMO crop pollen. |
| | |
| **Livestock Production Inputs** | The following inputs may not be used unless verified as compliant with the Non-GMO Project Standard. |
| rBGH, rBST (recombinant Bovine Growth Hormone or recombinant Bovine Somatotropin) | |
| Semen | See Guidance at 1.2.1.6. |
| Vaccines | |
| Veterinary Medicines | |
| | |
| **Microbes and microbial products** | |
| Enzymes, including chymosin | |
| Microbial cultures and starters | Including yeast. |
| | |
| **Processed/processing inputs and ingredients, and related derivatives, derived from crops, livestock, or microorganisms:** | The following is a non-exhaustive list of derivatives with high GMO risk that are commonly used in food production. It is meant to provide examples of materials that will be considered high-risk in the Non-GMO Project Product Verification Program. The following inputs may not be used unless verified as compliant with the Non-GMO Project Standard. |
| Amino Acids | |
| Aspartame | |
| Ascorbic Acid, Sodium Ascorbate, Vitamin C | |
| Citric Acid, Sodium Citrate | Derived from glucose syrup. |
| Ethanol | Derived from corn or GMO sugar beets. |
| Flavorings, "natural" and "artificial" | Also the carrier may have GMO risk. |
| High-Fructose Corn Syrup | |
| Hydrolyzed Vegetable Protein | |
| Lactic acid | |
| Maltodextrins | |

## Non-GMO Project Standard

| Microbial growth media | |
|---|---|
| Molasses | Derived from sugar beets, beginning 2008 crop. |
| Monosodium Glutamate | |
| Sucrose | Derived from sugar beets, beginning 2008 crop. |
| Textured vegetable protein | Including soy protein, |
| Xanthan Gum | |
| Vitamins | Vitamin A (various forms), Vitamin B6 (pyridoxine hydrochloride), Vitamin B12 (cyanocobalamin), Vitamin C (ascorbic acid), and Vitamin E (various forms) are known to have GMO risk.  Vitamins in general are often formulated with dispersants and related ingredients that also have GMO risk (e.g., corn oil). |
| Yeast products | |

| APPENDIX C: List of Monitored Crops | |
|---|---|
| **Crops -** The following crops carry potential risk of being contaminated with GMOs: | Monitored crops include those for which suspected or known incidents of contamination have occurred, and those crops which have genetically modified relatives in commercial production with which cross-pollination is possible. |
| *Beta vulgaris,*(e.g., chard, table beets) | Cross pollination risk from GM sugar beets |
| *Brassica napa* (e.g., rutabaga, Siberian kale) | Cross pollination risk from GM canola |
| *Brassica rapa* (e.g., bok choy, mizuna, Chinese cabbage, turnip, rapini, tatsoi) | Cross pollination risk from GM canola |
| *Curcubita* (acorn squash, delicata squash, patty pan squash, pumpkin, and spaghetti squash) | Cross-pollination risk from GM squash |
| Flax | |
| Rice | |

Case 1:12-cv-02664-CRB Document 237-10 Filed 04/25/13 Page 1 of 35 PageID #: 1534

# EXHIBIT 10

TINA WOLFSON, SBN 174806
twolfson@ahdootwolfson.com
ROBERT AHDOOT, SBN 172098
rahdoot@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10850 Wilshire Boulevard, Suite 370
Los Angeles, California 90024
Tel: 310-474-9111; Fax: 310-474-8585

*Counsel for Plaintiff, Richard W. Trammell*

Clement L. Glynn
cglynn@glynnfinley.com
GLYNN & FINLEY, LLP
100 Pringle Avenue, Suite 500
Walnut Creek, California 94596
Tel: 925-210-2801; Fax: 925-945-1975

*Counsel for Defendant, Barbara's Bakery, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD W. TRAMMELL,<br><br>     Plaintiff,<br><br>   v.<br><br>BARBARA'S BAKERY, INC., *et al.*,<br><br>     Defendants. | Case No. 3:12-cv-02664-CRB<br><br>**STIPULATED UNDERTAKING RE: ATTORNEYS' FEES AND EXPENSES IN CONNECTION WITH PROPOSED CLASS ACTION SETTLEMENT AND [PROPOSED] ORDER**<br><br>Honorable Charles R. Breyer, Presiding |

Plaintiff Richard Trammell ("Plaintiff") and Defendant Barbara's Bakery, Inc., ("Defendant" or "Barbara's Bakery") by and through their undersigned counsel, stipulate and agree as follows:

WHEREAS, Plaintiff and Defendant have entered into a Settlement Agreement ("Stipulation of Settlement") in the above captioned action to which this Stipulated Undertaking and Proposed Order is an exhibit;

WHEREAS, all capitalized terms used herein, without definition, shall have the same meaning, force and effect given to them Stipulation of Settlement;

WHEREAS, Class Counsel and their respective law firms desire to give an undertaking for the possible repayment of their award of the Attorneys' Fees and Expenses, as may be required by Section IX.D. of the Stipulation of Settlement.

NOW, THEREFORE, each of the undersigned Class Counsel, on behalf of themselves as individuals and as officers of their law firm, hereby submit themselves and their law firm to the jurisdiction of the Court for the purpose of enforcing the provisions of this Undertaking.

In the event that the Final Order in the Action is reversed or modified on appeal, in whole or in part, Class Counsel shall, within ten (10) business days after the order vacating or modifying the Final Order becomes final, repay to Defendant or any of its successors or assigns, a portion or all of the Attorneys' Fees and Expenses paid to Class Counsel in the amount vacated or modified.

In the event the Final Order is not reversed on appeal, in whole or in part, but the Attorneys' Fees and Expenses awarded by the Court are vacated or modified on appeal, Class Counsel shall, within ten (10) business days after the order vacating or modifying the award of Attorneys' Fees and Expenses becomes final, repay to the Fund, a portion or all of the Attorneys' Fees and Expenses paid from the Fund to Class Counsel in the amount vacated or modified.

Any action that may be required thereafter may be addressed to this Court on shortened notice, but not less than five (5) court days.

This Undertaking and all obligations set forth herein shall expire upon finality of all appeals of the Final Order, or upon the Final Settlement Date, whichever is earlier.

In the event Class Counsel fails to repay to the Fund, Defendant, or any of its successors or

assigns any of the Attorneys' Fees and Expenses that are owed pursuant to this Undertaking, the Court shall, upon application of such entity and notice to Class Counsel, summarily issue orders, including but not limited to judgments and attachment orders against Class Counsel, and each of them, and may make appropriate findings for sanctions for contempt of court.

The undersigned stipulate, warrant, and represent that they are equity partners in their law firm and have both actual and apparent authority to enter into this stipulation, agreement, and undertaking on behalf of their respective law firms.

This Undertaking may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Signatures by facsimile shall be as effective as original signatures.

The undersigned declare under penalty of perjury under the laws of the State of California and the United States that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED THROUGH COUNSEL OF RECORD:


AGREED TO BY CLASS COUNSEL


TINA WOLFSON
AHDOOT & WOLFSON, PC


By:_____          Date: _____
TINA WOLFSON
For herself and on behalf AHDOOT & WOLFON, PC


ROBERT AHDOOT
AHDOOT & WOLFSON, PC


By:_____          Date: _____
Robert Ahdoot
For himself and on behalf of AHDOOT & WOLFSON, PC.

ACKNOWLEDGED BY COUNSEL FOR DEFENDANT


By: _____          Date: _____
       Clement L. Glynn
       GLYNN & FINLEY, LLP


### [PROPOSED] ORDER

IT IS SO ORDERED this _____ day of _____, 20___.


                                        _____
                                        THE HONORABLE CHARLES R. BREYER
                                        SENIOR DISTRICT JUDGE
                                        UNITED STATES DISTRICT COURT

3:12-cv-02664-CRB: STIPULATED UNDERTAKING AND [PROPOSED] ORDER

**THE GOLAN FIRM**
Yvette Golan
1919 Decatur St.
Houston, Texas  77007
Telephone:     (866) 298-4150, ext. 101
Facsimile:     (928) 441-8250
Email:           ygolan@tgfirm.com

**REESE RICHMAN LLP**
Kim E. Richman
Michael R. Reese
875 Avenue of the Americas, 18th Floor
New York, New York  10001
Telephone:     (212) 643-0500
Facsimile:     (212) 253-4272
Email:           krichman@reeserichman.com
                    mreese@reeserichman.com

*Counsel for Plaintiff Erin Silber and the Proposed Classes*

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIN SILBER, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BARBARA'S BAKERY, INC.,<br><br>Defendant. | Case No. 1:12-cv-05511-WFK-RLM<br><br>**CERTIFICATE OF SERVICE** |
| OLYMPIA MORO, on behalf herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BARBARA'S BAKERY, INC.,<br><br>Defendant. | Case No. 1:12-cv-06087-WFK-RLM |

*DATE OF SERVICE*: May 1, 2013

## CERTIFICATE OF SERVICE

I, Kim E. Richman, hereby certify that on May 1, 2013, I filed the following documents electronically via the CM/ECF system:

- Preliminary Injunction bundle:
  - **PLAINTIFF'S NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**
  - **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
  - **DECLARATION OF YVETTE GOLAN IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** and Exhibits 1–23
  - **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**
  - **[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
  - **CERTIFICATE OF SERVICE**
  - Cover letter regarding Barbara's Bakery, Inc.'s Opposition to Motion for Preliminary Injunction
  - **OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**
  - **DECLARATION OF CLEMENT L. GLYNN IN SUPPORT OF BARBARA'S BAKERY INC.'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**
  - **CERTIFICATE OF SERVICE**
  - Cover letter regarding preliminary injunction bundle
  - **REPLY IN FURTHER SUPPORT OF PLAINTIFF ERIN SILBER'S MOTION FOR PRELIMINARY INJUNCTION**
  - **SUPPLEMENTAL DECLARATION OF YVETTE GOLAN IN SUPPORT OF PLAINTIFF ERIN SILBER'S MOTION FOR PRELIMINARY INJUNCTION** and Exhibits 1–4
  - **CERTIFICATE OF SERVICE**

which caused all CM/ECF participants to be served by electronic means.

Further, I, Kim E. Richman, hereby certify that I served the above-listed documents via electronic mail to the following addresses:

- Barbara A. Lukeman, BLUKEMAN@nixonpeabody.com
- James M. Hanlon, Jr., jhanlon@glynnfinley.com
- Clement Glynn, cglynn@glynnfinley.com

Further, I, Kim E. Richman, hereby certify that on May 2, 2013, I will serve hard copies of

1

the above-listed documents via United States Postal Service to the following addresses:

       NIXON PEABODY LLP
       Barbara A. Lukeman
       437 Madison Avenue
       New York, New York  10022

       GLYNN & FINLEY, LLP
       James M. Hanlon, Jr.
       Clement Glynn
       One Walnut Creek Center
       100 Pringle Avenue, Suite 500
       Walnut Creek, California  94596

       United States District Judge William F. Kuntz, II
       United States District Court
       225 Cadman Plaza East
       Brooklyn, New York  11201

Dated: May 1, 2013                              */s/ Kim E. Richman*
                                     Kim E. Richman